UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -x
                        :

UNITED STATES OF AMERICA      :
                        :        <u>SEALED INDICTMENT</u>
          - v. -          :
                        :        22 Cr. _____
SUNG KOOK (BILL) HWANG and  :
PATRICK HALLIGAN,          :
                        :
           Defendants.    :
                        :

- - - - - - - - - - - - - - - -x

22 CRIM 240

## <u>COUNT ONE</u>
### (Racketeering Conspiracy)

The Grand Jury charges:

### Overview

1.    From in or about 2020, up to and including in or about March 2021, SUNG KOOK (BILL) HWANG ("BILL HWANG"), PATRICK HALLIGAN, the defendants, and others known and unknown, corrupted the operations and activities of the family office known as Archegos Capital Management and its related corporate entities and employees (collectively, "Archegos" or the "Archegos Enterprise," as defined below). The defendants and their co-conspirators used Archegos, a family office that invested HWANG's personal fortune, as an instrument of market manipulation and fraud, with far-reaching consequences for other participants in the United States securities markets, companies whose stock prices they manipulated, innocent employees of Archegos whose savings they gambled, and the financial institutions left holding billions of dollars in losses.

2.   BILL HWANG, the founder and co-Chief Executive Officer of Archegos Capital Management ("ACM"), and PATRICK HALLIGAN, ACM's Chief Financial Officer, the defendants, along with William Tomita, ACM's Head Trader, and Scott Becker, ACM's Director of Risk Management, and others known and unknown (collectively, the "Archegos Conspirators"), used Archegos to perpetrate two interrelated criminal schemes. First, HWANG, with Tomita's assistance, schemed to defraud market participants by manipulating, controlling, and artificially affecting the market for certain securities in Archegos's portfolio. HWANG led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in truth, they were the artificial product of HWANG's manipulative trading and deceptive conduct that caused others to trade. Second, with HWANG's knowledge and approval, HALLIGAN, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to numerous leading global investment banks and brokerages (collectively, the "Counterparties"). These false and misleading statements were designed to fraudulently induce the Counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos.

3.     The criminal conduct of the defendants and others transformed BILL HWANG, the defendant, and Archegos into significant economic forces in the United States securities markets. Between in or about March 2020 and the week of March 22, 2021, Archegos's capital — essentially HWANG's personal fortune — increased from approximately $1.5 billion to more than $35 billion. Archegos's positions, including indirectly through derivative securities positions discussed below, were larger than any of the disclosed shareholders of multiple public companies. The total size of Archegos's market positions, including investments made with money borrowed from the Counterparties, grew from approximately $10 billion to more than $160 billion.

4.     At least in part to hide the extent of his market power from other investors, BILL HWANG, the defendant, conducted most of his trading through derivative securities that had no public disclosure requirement. As a result, despite the size of Archegos's positions, the investing public did not know that Archegos had come to dominate the trading and stock ownership of multiple companies.

5.     The Archegos Conspirators' manipulative and fraudulent schemes left Archegos's portfolio highly vulnerable to price fluctuations in a handful of stocks. In late March 2021, that risk materialized: a decline in the prices of certain stocks in Archegos's portfolio prompted margin calls; that is,

Counterparties required Archegos to provide more cash to support its trading. Because selling Archegos's positions to raise cash could further deflate the artificial prices of those securities, leading to a downward spiral, BILL HWANG, the defendant, instead directed Archegos's traders to engage in a desperate buying spree in an attempt to reverse the price declines of stocks underlying Archegos's core positions. Acting at HWANG's direction, the traders used Archegos's remaining cash and credit, including funds borrowed based on lies and misrepresentations to the Counterparties, to pay for billions of dollars in trades over just a few days.

6.      The buying spree failed, and Archegos was unable to pay the additional cash demanded by its Counterparties. As a result, the Counterparties sold Archegos's positions, and the prices that had been artificially supported by the trading directed by BILL HWANG, the defendant, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within days.

7.      Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized an array of market participants, including (a) banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit; (b) ordinary investors who purchased and sold the relevant securities at artificial prices;

and (c) securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

## The Creation of Archegos

8.    In or about 2001, BILL HWANG, the defendant, founded a hedge fund, Tiger Asia Management ("Tiger Asia"), that operated as an investment adviser. In 2013, Tiger Asia faced regulatory and criminal sanctions relating to Tiger Asia and HWANG's trading. Specifically, and among other things, the Securities and Exchange Commission ("SEC") alleged in a civil complaint that, at HWANG's direction, Tiger Asia engaged in open-market manipulation of the prices of certain stocks listed on the Hong Kong Stock Exchange. In response to this complaint, HWANG consented to an order enjoining him and his employees, among others, from violating Section 10(b) of the Securities Exchange Act of 1934, relating to securities fraud. HWANG also returned all outside investor capital and deregistered the fund as an investment adviser. HWANG then rebranded Tiger Asia as Archegos. Archegos subsequently managed HWANG's wealth and the compensation of certain employees.

9.    Because Archegos was owned and controlled by BILL HWANG, the defendant; because it only invested the personal wealth

of HWANG, his family, and the deferred compensation of employees; and because it did not hold itself out as an investment adviser, Archegos operated as a "family office" under the Family Office Rule of the SEC. The SEC's Family Office Rule effectively exempts "family office" investment funds from regulatory oversight pursuant to the Investment Advisers Act of 1940 on the theory that a "family office" manages its own wealth and thus the investor protections of the Investment Advisers Act are unnecessary. For Archegos, this exemption meant that, unlike typical hedge funds, it was not subject to examination or inspection by the SEC and was not required to report information regarding its holdings and borrowing to the SEC and the Financial Stability Oversight Council.

10.   Notwithstanding its technical classification as a "family office," Archegos operated as a sophisticated investment firm. By in or about 2021, Archegos employed more than fifty employees and paid consultants, engaged various outside vendors, and held numerous banking and brokerages accounts. Archegos employees received compliance trainings and Archegos maintained a compliance manual, that, among other things, warned that "[i]t is essential that no employee or principal of Archegos engages in any activity the purpose of which is to interfere with the integrity of the marketplace" and that "intentionally manipulating the market . . . is a violation of the securities laws and of Archegos' policies and standards of conduct."

11.   The Archegos Enterprise constituted an enterprise as defined in Title 18, United States Code, Section 1961(4); that is, a group of entities and individuals associated in fact, consisting of BILL HWANG and PATRICK HALLIGAN, the defendants; William Tomita; Scott Becker; Archegos Fund, LP; Archegos Capital Partners, LLC; Archegos Capital Management, LP, and its employees; and Archegos Capital, LLC; and others known and unknown. The Archegos Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise. The Archegos Enterprise operated in the Southern District of New York and elsewhere. The Archegos Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

## The Archegos Conspirators

12.   At all times relevant to this Indictment, BILL HWANG and PATRICK HALLIGAN, the defendants, William Tomita, and Scott Becker, collectively the Archegos Conspirators, were leaders of the Archegos Enterprise.

a.   HWANG owned, ran, and provided substantially all financial backing for Archegos. HWANG personally made all investment and trading decisions, and he directed the Archegos Enterprise research analysts as well as the Archegos Enterprise traders in carrying out his decisions. In practice, HWANG made

every significant trading and investment decision within the Archegos Enterprise.

b.    HALLIGAN was at all times relevant to this Indictment the Chief Financial Officer of ACM. In that role, HALLIGAN reported to HWANG and oversaw the accounting, cash management, and operations functions of the Archegos Enterprise.

c.    Tomita was at all times relevant to this Indictment the Head Trader of ACM. In that role, Tomita reported to HWANG, who directed Tomita's trading during the relevant time period. Tomita also supervised a trading team, which included one other senior trader and two junior traders, and he was a primary point of contact for certain Counterparty personnel, including regarding trading.

d.    Becker was at all times relevant to this Indictment the Director of Risk Management of ACM. Becker served as the primary point of contact within the Archegos Enterprise for the Counterparties' credit risk personnel, who would assess the risk associated with their business relationship with the Archegos Enterprise. In this role, Becker reported directly to HALLIGAN. Becker also oversaw an operations team that booked trades and interacted with the Archegos Enterprise's fund administrator and auditors.

### Archegos's Trading and Counterparties

13.   In or about 2020 and 2021, Archegos's largest trading positions related to common stocks and American Depositary Receipts, also known as "ADRs,"[1] traded on United States securities exchanges, including the New York Stock Exchange and NASDAQ. In order to engage in this trading, Archegos entered into various contractual agreements with its Counterparties. Although the terms of those agreements varied, in general, each Counterparty facilitated trading and provided Archegos with access to credit to enable Archegos to trade using leverage — that is, to invest not only its own cash, but also money functionally loaned to it by the Counterparty, as further described below.

14.   Typically, Archegos would initially establish its investments in cash equities, until it approached 5% ownership of all outstanding stock of the security. The Archegos Conspirators understood that ownership in excess of that amount could trigger certain public disclosure requirements. Accordingly, in order to avoid public disclosure of its positions, once Archegos neared 5% ownership of the outstanding shares of a stock, BILL HWANG, the defendant, required that any additional exposure be through a financial agreement known as a total return swap.

---

[1] ADR refers to a negotiable certificate issued by a U.S. bank representing a specified number of shares of a foreign company's stock. An ADR trades on U.S. securities exchanges as though it were stock.

15. A total return swap, or "swap," is a contract in which one party makes payments based on a set rate while the other party makes payments based on the return of an underlying asset, in this case, stocks. A party that purchases a total return swap is, in effect, making a bet on whether the underlying asset — again, here, a particular stock — will increase or decrease in value by the end of the term of the swap. Thus, if someone purchases a total return swap taking a long position on a particular stock, the counterparty to the swap will pay that person the amount of the increase in the price of the stock during the life of the swap contract if the price goes up, and the purchaser will pay the counterparty the amount of the decrease in the price of the stock during the life of the swap contract if the price goes down. Conversely, if someone purchases a total return swap taking a short position on a particular stock, the counterparty to the swap will pay that person the amount of the decrease in the price of the stock during the life of the swap contract if the price goes down, and the purchaser will pay the counterparty the amount of the increase in the price of the stock during the life of the swap contract if the price goes up.

16. Furthermore, as BILL HWANG, the defendant, and other Archegos Conspirators understood, the Counterparties generally did not enter into swap contracts with Archegos in order to bet on the increase or decrease of the stock price. Rather, the

Counterparties did so to profit from the financing fees charged on the transaction. Accordingly, in order to avoid market exposure on a swap contract, the Counterparties themselves purchased the stock underlying the swap. For example, if Archegos entered into a swap agreement to gain economic exposure to one share of ViacomCBS, the swap Counterparty typically would purchase one share of ViacomCBS stock. That way, if the price of the ViacomCBS share went up $1, the swap counterparty would have to pay Archegos $1 — but, its own share of ViacomCBS would have also increased by $1, so it would not have lost any money. Indeed, certain Counterparties would finalize and price swap contracts with Archegos only after first purchasing an equivalent number of shares or ADRs of the underlying securities.

17. For this reason, in practice, trading using swap contracts instead of purchasing actual shares meant that Archegos could bet on the price of a stock, and dictate trading in the stock, without owning the stock itself. Archegos therefore would not have to disclose its positions even if it effectively exceeded the 5% ownership threshold that ordinarily would require public disclosure. Instead, the swap Counterparty would appear as the owner of the shares, even though it only purchased the stock to offset its swap contract with Archegos. The Archegos Conspirators understood these swaps-trading mechanics and treated their swaps

as the functional equivalent of purchasing or selling the stock or ADR itself.

18.   Archegos's Counterparties also permitted trading "on margin," meaning, in substance, that the Counterparty let Archegos transact on credit. In practice, Archegos put up a certain amount of its capital ("margin") as collateral for a trade and then received loans from the Counterparty for the balance. At various times, Archegos's margining agreements required the deposit of additional cash collateral if the swap's underlying securities depreciated in value. That is, if a stock decreased in value during the day, and Archegos had a long swap position, Archegos might owe money to the swap Counterparty. Conversely, when its positions rose in price, certain of Archegos's margining agreements provided it the right to withdraw existing collateral, or "excess margin," or amounts based on the appreciation itself. For example, if the price of ViacomCBS stock rose during the day, and Archegos had a long swap position, a swap counterparty could owe Archegos money at the end of the day, reflecting a portion of the increase in the price. For this reason, under certain of Archegos's agreements, if the stock price of one of its long positions appreciated, Archegos could obtain as cash portions of the gain without needing to exit its position.

19.   Because the Counterparties were functionally lending money to Archegos, they were taking on risk in entering

into the swap contracts. If the stock prices associated with Archegos's long positions dropped, for example, a Counterparty would be faced with the risk that Archegos could not or would not make good on what it owed the Counterparty — and even if the Counterparty sold the shares it held as a hedge, it could face losses because the price had dropped.

### The Archegos Conspirators Corrupted the Archegos Enterprise

20.  By at least in or about 2020, BILL HWANG and PATRICK HALLIGAN, the defendants, and William Tomita and Scott Becker corrupted the Archegos Enterprise. At HWANG's implicit and at times explicit direction, and using Archegos Enterprise's infrastructure and reputation, the defendants and their co-conspirators engaged in numerous acts of securities fraud and wire fraud.

21.  The central aim of BILL HWANG, the defendant, who employed and directed the Archegos Conspirators, was to control the price and artificially increase the value of securities in Archegos's portfolio. To this end, HWANG employed various strategies to manipulate the markets for securities in Archegos's portfolio. These securities included the following stocks then trading on United States securities exchanges:

| Company | Ticker | Archegos Position |
|---|---|---|
| ViacomCBS | VIAC | Long |
| Discovery Communications, Inc. | DISCA | Long |
| Discovery Communications, Inc. | DISCK | Long |
| GSX Techedu Inc. | GSX | Long |
| iQIYI, Inc. | IQ | Long |
| Tencent Music Group | TME | Long |
| Vipshop Holdings Ltd | VIPS | Long |
| Baidu | BIDU | Long |
| Farfetch | FTCH | Long |
| Texas Capital Bancshares Inc. | TCBI | Long |
| Futu Holdings | FUTU | Short |
| Rocket Companies, Inc. | RKT | Short |

a.     The majority of Archegos's positions were "long," meaning the value of Archegos's portfolio would increase if the prices of the stock underlying its swaps increased. To drive up the prices, HWANG amassed extraordinary exposure to those stocks through billions of dollars in purchases made with money borrowed from Counterparties based on lies and misrepresentations. The increased demand for these stocks, and the dwindling supply of freely trading shares, led to significant artificial appreciation in the price of each stock. This manipulative strategy harnessed the margin frameworks of Archegos's Counterparties by recycling "excess" margin into further buying. In turn, the strategy

generated additional price inflation and, thus, still more "excess" margin.

b.    HWANG also used his market power to "support" or "defend" the prices of stocks underlying Archegos's positions through a variety of manipulative short-term trading techniques, as further described below, including by engaging in trades at certain times, or trading in certain dollar amounts or volumes of shares, in ways designed and intended to artificially affect stock prices.

c.    Finally, in order to obtain the near-limitless capacity for trading that his scheme required and that he demanded, HWANG, as well as PATRICK HALLIGAN, the defendant, and Tomita and Becker, engaged in schemes to defraud Archegos's Counterparties. Specifically, the conspirators repeatedly made materially false and misleading statements to Counterparties about Archegos's financial portfolio and positions in order for HWANG to obtain billions of dollars of credit, or "trading capacity." These lies and misrepresentations disguised the true — and grave — risks associated with Archegos's portfolio and were integral to the conspiracy's success.

## HWANG Established Significant Market Influence in Certain Securities

22.   Between founding Archegos in or about 2013 and early 2020, BILL HWANG, the defendant, took positions

predominantly in large companies with highly liquid stock, especially technology companies. HWANG also occasionally took a significant short position. During that period, HWANG generally did not engage heavily in day-trading strategies.

23. In or about spring 2020, COVID-related restrictions caused Archegos to move to a remote work environment. BILL HWANG, the defendant, began working from an apartment in Manhattan, New York. He communicated with Archegos employees both within and outside the Southern District of New York by phone, email, Bloomberg message, and video conferencing software. Around that time, COVID-related market losses also prompted HWANG to reduce or sell many of Archegos's previous investment positions.

24. Subsequently, in or about spring 2020, BILL HWANG, the defendant, began to build extraordinarily large positions in a handful of securities. By in or about mid-July 2020, HWANG amassed economic exposure in excess of $1 billion to BIDU, GSX, IQ, and VIAC; by the end of 2020, HWANG had more than $1 billion of exposure to each of those four stocks as well as DISCA, FTCH, TME, and VIPS. Between mid-November 2020 and late March 2021, HWANG established positions exceeding $5 billion in eight different stocks, including more than $10 billion in GSX, BIDU, and TME, respectively, and more than $20 billion in VIAC.

25. As BILL HWANG, the defendant, well knew, Archegos's positions became so large that they significantly altered the

shareholder composition of the companies in which it most heavily invested. As described above, Archegos's swaps trades typically caused its Counterparties to acquire a share of stock for each one swapped with Archegos, in order to hedge against market risk on the position. Thus, as Archegos's swap positions grew, so too did the Counterparties' purchases of the corresponding stock. For many positions, multiple Archegos Counterparties held, respectively, more than 5% of the publicly trading shares of the issuer's stock. Those Counterparties therefore were required to, and did, file corresponding public disclosures of such ownership.

26.  By in or about 2021, Archegos's total position in the securities of certain companies equated to more than approximately 30%, 40%, and 50% of the freely traded stock shares, or "float," of those companies. For example, by in or about February 2021, Archegos held a position equal to more than 50% of the float of GSX. Similarly, by on or about March 24, 2021, Archegos held a position equal to more than 50% of the float of VIAC, as reflected in the following chart depicting approximate float percentages of VIAC effectively controlled by Archegos:



VIAC % Float Held by Archegos from 3/2/20 - 3/24/21

Additionally, the size and significance to the market of Archegos's positions were magnified by the fact that for certain stocks, substantial portions of the float were held by index funds. By design, those funds would not sell holdings of stocks included in the relevant index, regardless of market performance. Accordingly, accounting for index fund holders, Archegos's positions affected even larger percentages of the freely trading shares.

27. Ordinary market participants had no way to know that Archegos had come to dominate the marketplace for these securities. As its positions grew increasingly large, Archegos did not report them publicly because it avoided crossing the 5%

ownership threshold for its stock purchases. Instead, Archegos established and maintained most of its positions on swap. And Archegos placed its orders through a growing number of counterparties and brokerages, making it appear that different parties were buying the companies' stock when, in fact, that buying was all dictated by Archegos. As described further below, the Archegos Conspirators engaged in an extensive pattern of fraud and deceit to prevent the Counterparties from knowing and understanding the extent of Archegos's positions.

### HWANG Utilized Trading Strategies to Affect Market Prices

28. BILL HWANG, the defendant, repeatedly traded in ways that were not motivated by any business interest other than the desire to manipulate the prices of certain securities in which Archegos held long positions. For example:

a. During the course of the scheme, HWANG traded in the same stocks in large quantities day after day, and he commonly directed traders consistently to raise limit prices, or the highest price they would pay for the stock, as the prices of the stocks rose. HWANG intended these transactions to drive up the price of the stocks.

b. Similarly, HWANG would buy heavily to "defend" the price of securities facing negative press or market movements. This happened frequently, but not exclusively, with respect to GSX, which was especially volatile due in part to active short

sellers, regulatory inquiries, and public accusations of fraud. As the portfolio became more concentrated, HWANG traded with the further purpose of propping up the stock price to avoid margin calls — which, due to the extraordinary concentration of Archegos's portfolio, might trigger the collapse of its positions.

c.   HWANG also traded the relevant securities in amounts far exceeding volumes known within the securities industry and to HWANG to affect market prices. Specifically, HWANG, Tomita, and others working at Archegos understood that buying or selling more than approximately 10-15% of a day's total trading volume of a given stock would likely affect the market price in the stock. HWANG routinely directed trading in excess of these volumes. For example:

i.   In DISCA, between November 2020 and March 2021, Archegos routinely accounted for more than 20% of the entire volume of the stock traded on the given day. In December 2020, Archegos averaged more than 20% of the trading volume on a daily basis. Between early November and early January 2021, Archegos exceeded 30% of daily volume on approximately nine days, and exceeded 35% on approximately four days.

ii.   In VIAC, between October 2020 and March 2021, Archegos routinely accounted for more than 10% of the entire daily traded volume of the stock. Indeed, in February and March 2021, Archegos averaged more than 10% of the trading volume on a

daily basis. In that period, Archegos exceeded 15% of daily volume on approximately 10 of 40 trading days, and exceeded 25% on approximately four days.

iii. In GSX, between December 2020 and March 2021, Archegos averaged more than 15% of the trading volume on a daily basis. During that period, Archegos exceeded 30% of daily volume on approximately 11 days, and exceeded 35% on approximately five days.

iv. In TME, Archegos averaged more than 10% of the trading volume on a daily basis between November 2020 and March 2021. Between on or about February 22 and March 26, 2021, Archegos exceeded 15% of daily trading volume on approximately 19 of 25 trading days, and exceeded 20% on approximately 14 days. Between October 2020 and March 2021, Archegos trading exceeded 35% of trading volume on approximately eight days.

29.   BILL HWANG, the defendant, understood and intended his trading to affect the prices of securities he traded. For example, on or about June 11, 2020, in an effort to "defend" VIAC against downward market pressure, HWANG serially raised his limit price between 11:00 a.m. and the close of the market at 4:00 p.m. During that time, HWANG went from a $25 million order for ViacomCBS with a "[$]22.40 limit without impacting," meaning without causing price disruption, to a limit of $22.60, to a limit of $22.70, to a limit of $23.00, to a limit of $23.50, to a final limit of $23.60

at 3:55 p.m., five minutes before the market close. By the end of the day, Archegos had purchased approximately 82.1 million shares of VIAC, which represented approximately more than 17% of the day's trading volume. Although VIAC still closed down on the day, it avoided the kind of major sell-off experienced by others in the market, including comparable peer companies.

30.   BILL   HWANG,   the   defendant,   acknowledged   his influence over the market prices expressly and contemporaneously. For example, on the day described immediately above, an analyst texted HWANG: "VIAC held up pretty well today relative to market [. . .] Would you say that is a sign of strength?" HWANG responded: "No. It is a sign of me buying," followed by an emoji.

31.   The trading by BILL HWANG, the defendant, had a stark impact upon market prices. For example, in just two of Archegos's positions, VIAC and DISCA, the stock prices rose more than 250%, respectively, between on or about October 1, 2020, and March 23, 2021 — as compared to the Nasdaq-100 index (represented in the below chart with the ticker name QQQ), which appreciated approximately 20% during the same period. Following the collapse of Archegos, and the sale of its positions, the stock prices fell precipitously:



% Change in Share Value from 10/1/20 Closing Price

32.   As it became increasingly important for BILL HWANG, the defendant, to continue to grow his largest positions, to prevent the artificial prices from collapsing, he pursued that goal at increasing economic cost. For example, many Counterparties increased margin requirements as Archegos's positions grew, including up to 100% collateral for certain swaps. That made it far more expensive for HWANG to add to those positions. Nevertheless, and notwithstanding his own prior focus on low-cost margining, HWANG continued to trade in the same securities.

33.   BILL   HWANG,   the   defendant,   also   increasingly
ignored   internal   Archegos   analyst   research   throughout   2020   and
2021.   Prior   to   2020,   HWANG   commonly   spent   significant   time   with
Archegos   analysts,   evaluating   potential   investments   and   holding
weekly   investment   strategy   meetings   where   analysts   presented   their
recommendations.   Beginning   in   or   about   March   2020   and   accelerating
in   or   about   fall   2020,   however,   HWANG   frequently   spent   almost   all
of   his   workday   with   the   traders,   primarily   via   all-day,   open-line
video-conferences,   or,   when   the   Archegos   offices   were   open,   with
them   in   a   trading   room.   HWANG   all   but   stopped   holding   investment
strategy   meetings   and   essentially   ignored   analyst   recommendations
about   purchasing   new,   different   stocks   in   any   significant   size.

### HWANG Employed Manipulative Strategies to Maximize Price Impact and Market Power

34.   As   Archegos's   positions   grew   exponentially,
Counterparties   began   to   impose   increasing   costs   and   restrictions
on   further   enlargement   of   Archegos's   concentrated   holdings.
Sporadically   throughout   2020,   and   increasing   in   late   2020   and   2021,
Counterparty   limitations   constrained   the   ability   of   BILL   HWANG,
the   defendant,   to   further   rapidly   grow   Archegos's   positions.   As
that   occurred,   HWANG   began   to   engage   in   various   types   of
manipulative   open-market   trading   to   further   influence   the   prices
of   the   top   stocks   in   his   portfolio   and   to   maximize   his   capacity   to
conduct   further   trading.

35. In particular, BILL HWANG, the defendant, influenced the prices of stocks by utilizing manipulative and deceptive trading techniques such as purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. For example:

<u>Setting the Tone</u>

a. Regular trading hours in the United States securities markets are 9:30 a.m. to 4:00 p.m. Eastern time, on weekdays. After-hours trading can occur after 4:00 p.m., and pre-market trading can occur before 9:30 a.m., separate from the use of a traditional stock exchange. The "closing price" of a stock is its price when formal trading hours end. That price is often used as an indicator of the market for a stock, and the closing price also is often used as a relevant factor in financial agreements and contracts. For example, a margin call might be made following a calculation based on a stock's closing price.

b. On numerous occasions during the course of the scheme, and with increasing frequency in February and March 2021, HWANG instructed his traders to trade in certain stocks before the market opened, when liquidity was low and, at times, when prices were comparatively poor, in an effort to have a greater impact on the price of the stock than at times of day when more of the stock