# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 21 MAG 9335

In the Matter of a Warrant for All
Content and Other Information
Associated with the Certain Email,
Cloud Storage, and Electronic
Communications Accounts Maintained
at Premises Controlled by Microsoft
Corporation, Google, LLC, Bloomberg
L.P., and Apple Inc., USAO Reference
No. 2021R00339

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK  )

THOMAS McDONALD, being duly sworn, deposes and states:

## I.  Introduction

### A.  Affiant

1.  I am and have been a Special Agent with the Federal Bureau of Investigation ("FBI")
for approximately 14 years. I am assigned to a squad that focuses on securities and investment
frauds in the FBI's New York Field Office. I have participated in numerous investigations
involving fraud, including those concerning hedge funds, insider trading, and market manipulation,
I am familiar with the use of computers, cellphones, email accounts, instant message services, and
cloud-based accounts in connection with criminal activity. I have participated in the execution of
numerous search warrants involving electronic evidence, including warrants involving email,
cloud storage, and other electronic communications accounts.

SDNY_001_00000139

**B. The Providers, Subject Accounts, and Subject Offenses**

2.  I make this affidavit in support of an application for search warrants pursuant to 18 U.S.C. § 2703 for all content and other information associated with certain email, cloud storage, and messaging accounts maintained by Microsoft Corporation (the "Microsoft Accounts"), Google, Inc. (the "Gmail Account"), Bloomberg L.P. (the "Bloomberg Accounts"), and Apple Inc. (the "iCloud Account") (collectively, the "Subject Accounts").

3.   The Microsoft Accounts consist of seven user accounts maintained and controlled by Microsoft Corporation ("Microsoft" or "Provider-1") headquartered at 1 Microsoft Way, Redmond, Washington 98052, specifically:

> a.  sbecker@archegoscapital.com ("Microsoft Account-1");
>
> b.  wtomita@archegoscapital.com ("Microsoft Account-2");
>
> c.  phalligan@archegoscapital.com ("Microsoft Account-3");
>
> d.  bhwang@archegoscapital.com ("Microsoft Account-4");
>
> e.  dtaniguchi@archegoscapital.com ("Microsoft Account-5");
>
> f.  ascholl@archegoscapital.com ("Microsoft Account-6"); and
>
> g.  pdesanto@archegoscapital.com ("Microsoft Account-7").

4.  The Gmail Account refers to the account associated with the email address bill.hwang.tigerasia@gmail.com, maintained and controlled by Google, LLC ("Google" or "Provider-2"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.

5.  The Bloomberg Accounts consist of seven Bloomberg user accounts maintained and controlled by Bloomberg L.P. ("Bloomberg" or "Provider-3") headquartered at 731 Lexington Avenue, New York, New York 10022, specifically:

> a.  SBECKER15 ("Bloomberg Account-1");
>
> b.  WTOMITA1 ("Bloomberg Account-2"),;

12.06.2018

SDNY_001_00000140

c.  PHALLIGAN7 ("Bloomberg Account-3");

d.  BHWANG ("Bloomberg Account-4");

e.  DTANIGUCHI2 ("Bloomberg Account-5");

f.  ASCHOLL7 ("Bloomberg Account-6"); and

g.  PDESANTO ("Bloomberg Account-7").

6.    The iCloud Account refers to the account assigned identification number 177189970, maintained and controlled by Apple Inc. ("Apple" or "Provider-4," and together with Providers-1, -2, and -3, the "Providers"), headquartered at 1 Infinite Loop, Cupertino, California 95014.

7.    The information to be searched is described in the following paragraphs and in the applicable Attachment A to each of the proposed warrants.

8.    As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) manipulation of security prices, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344;  (g) false statements to a lending institution, in violation of Title 18, United States Code, Section 1014; and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code, Sections 371 and 1349 (the "Subject Offenses").

12.06.2018

SDNY_001_00000141

9.   This affidavit is based upon my personal knowledge; my participation in interviews of witnesses; my review of documents and other evidence, including emails, spreadsheets, handwritten notes, and Bloomberg messages; materials obtained from the U.S. Securities and Exchange Commission and the Commodities Futures Trading Commission through file access requests; my review of audio recordings and draft transcriptions of audio recordings; my review of public news reports; my review of publicly available price and volume information about certain equity securities; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C.  Services and Records of the Providers

10. Based upon my training and experience and my participation in this investigation, including review of publicly available information, I have learned the following about the Providers-1 and -2:

a.   Providers-1 and -2 offer email services to the public. In particular, Provider-1 allows a subscriber to maintain email accounts under any domain name under the subscriber's control. Specifically, as is relevant here, if a subscriber controls, for example, the domain name archegoscapital.com, Provider-1 provides services that enable the subscriber to host any email address under such a domain name (*e.g.*, "bhwang@archegoscapital.com"), on servers operated by Provider-1. As is relevant here, Provider-2 allows subscribers to maintain email accounts under

4

SDNY_001_00000142

the domain name gmail.com. A subscriber using either Provider's services can access his or her email account from any computer or Internet-capable device connected to the Internet.

b.   Providers-1 and -2 each maintain the following records and information with respect to every subscriber account:

i.   *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii.   *Address book.* Providers-1 and -2 each also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii.   *Subscriber and billing information.* Providers-1 and -2 each collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Providers-1 and -2 each also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber.  Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv.   *Transactional information.* Providers-1 and -2 each also typically retain certain transactional information about the use of each account on its system. This information can

12.06.2018

SDNY_001_00000143

include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

    v. *Preserved and backup records*. Providers-1 and -2 each also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). Providers-1 and -2 may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

  11. Based upon my training and experience and my participation in this investigation, including review of publicly available information of notes of a conversation with a representative of Provider-1, I have learned that Provider-1, which is Microsoft, also provides subscribers, including the users of the Microsoft Accounts, with additional services, and maintains additional records, including, as relevant here, the following:

    a. *OneDrive*. Microsoft provides personal cloud storage, known as "OneDrive," the contents of which are stored and maintained on Microsoft's servers. Microsoft's OneDrive service provides a personal cloud storage account associated with each user's email account. Users can store and share files, including word documents, spreadsheets, and photographs, among other things, using OneDrive, and can access OneDrive storage from any computer or Internet-capable device connected to the Internet.

    b. *Sharepoint*. Microsoft provides an intranet and group file sharing service, known as "Sharepoint," the contents of which are stored and maintained on Microsoft's servers. Microsoft's Sharepoint service provides, among other things, a group cloud storage and file sharing platform, allowing users of a domain, such as archegoscapital.com to share and exchange

6

SDNY_001_00000144

information and electronic files. Users can access Sharepoint files and data from any computer or Internet-capable device connected to the Internet.

12. I have learned that Provider-2, which is Google, also provides subscribers with additional services, and maintains additional records, including the following:

a. *Chats and Instant Messages.* Google allows subscribers to engage in "chat" sessions in an instant messaging format with other users, the transcripts of which are generally stored in a user's email content. Similarly, Google also allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images. In general, Hangouts content is stored separately from a user's email and chat content.

b. *Search history.* Google also typically maintains records of any search history or web history associated with the subscriber's account.

c. *Google Payments.* Google allows for the storage of payment information associated with a Google account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

d. *Google Drive.* Google provides users with a certain amount of free "cloud" storage, currently 15 gigabytes, through a service called "Google Drive" (users can purchase a storage plan through Google to store additional content). Users can purchase enhanced storage capacity for an additional monthly fee. Users can use their Google Drive to store email, attachments, videos, photographs, documents, and other content "in the cloud" (that is, online). A user can access content stored on Google Drive by logging into his Google account through any computer or other electronic device connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

7

12.06.2018

SDNY_001_00000145

e.  *Google Docs.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs." Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

f.  *Google Calendar.* Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars.

g.  *Location History.* Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google. For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

h.  *Device Information.* Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

8

SDNY_001_00000146

i.   *Android Services.* Google also maintains information relating to Android, as it relates to an account. Android is a mobile operating system that is developed by Google, and is used on a variety of touchscreen mobile devices, such as smartphones and tablet computers. Google retains information related to the Android device associated with an account, including the IMEI (International Mobile Station Equipment Identifier), MEID (Mobile Equipment Identifier), device ID, and/or serial number of the device. Each of those identifiers uniquely identifies the device used.  One device may be associated with multiple different Google and Android accounts, and one Google or Android account may be associated with multiple devices.

j.   *Cookie Data and Linked Accounts.* Google uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

13. Based upon my training and experience and my participation in this investigation, including review of publicly available information, I have learned that Provider-3, which is Bloomberg, provides subscribers with services, and maintains records, including the following:

a.   *Bloomberg messaging and email contents.* Bloomberg offers email and instant messaging services to the public. In particular, Bloomberg allows subscribers to maintain email accounts under the domain name bloomberg.net. In general, emails (which can include attachments such as documents, images, and videos) sent to or from a user account hosted by Bloomberg, or stored in draft form in the account, are maintained on Bloomberg's servers unless and until the user deletes the email. If the user does not delete the email, it can remain on the provider's

12.06.2018

SDNY_001_00000147

computers indefinitely. Even if the user deletes the email, it may continue to be available on the provider's servers for a certain period of time. In addition to email services, Bloomberg allows users to engage in "chat" sessions in an instant messaging format with other Bloomberg users. The transcripts of such Bloomberg chat exchanges are generally stored on Bloomberg's servers.

b. *Bloomberg Execution Management Data.* Bloomberg offers trade execution and analysis tools that enable subscriber customers to evaluate, place, and analyze, among other things, stock, option, and swaps trades with broker-dealers participating in the Bloomberg network.

c. *Address book.* Bloomberg also allows subscribers to maintain the equivalent of an address book, which is known as "Bloomberg SPDL," comprising Bloomberg messaging and email addresses and other contact information of other Bloomberg account users.

d. *Subscriber information.* Bloomberg collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, telephone number, and alternate email addresses.

e. *Preserved and backup records.* Bloomberg also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).

14. Based upon my training and experience and my participation in this investigation, including review of publicly available information, I have learned the following about Provider-4, which is Apple:

a. Apple designs, manufactures, and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications. Apple's products and services include Macs (computers), iPhones (cell phones),

12.06.2018

SDNY_001_00000148

iPads (tablets), iPods (music players), Apple TVs (video streaming devices), a portfolio of consumer and professional software applications, the iOS and Mac OS operating systems, a variety of accessory, service and support offerings, and iCloud, a cross-device online data storage and syncing service described more fully below. Apple provides email services to its users through email addresses at the domain names mac.com, me.com, and icloud.com. Apple also sells and delivers digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store.

 b.  The iPhone is a line of smartphones designed and marketed by Apple. It runs Apple's iOS mobile operating system. The iPhone has wireless internet capabilities and can connect to many cellular networks around the world. The iPhone can shoot video, send and receive email, browse the Internet, send and receive text messages, provide navigation services via Global Positioning Satellite location technology, record notes, do mathematical calculations, and receive visual and audio voicemail. Apple's text and video messaging application programs are, respectively, iMessage, which enables users of Apple devices to exchange instant messages containing text, photos, videos, locations, and contacts, and FaceTime, which enables those users to conduct video calls. Other functions such as video games, reference works, social networking— including Facebook and Twitter—can be enabled by downloading application programs ("apps" or, singular, "app"). Apple operates an App Store, which offers numerous apps by Apple and third parties.

 c.  Apple's devices, including cellphones, tablets, and personal computers can be backed up to iCloud, a file hosting, storage, and sharing service provided by Apple. Apple provides users with gigabytes of free electronic storage space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may be used to store

11

SDNY_001_00000149

iOS device backups, which by default happen automatically for a user of an iCloud account. iCloud accounts may also be used to store or backup data associated with the use of iCloud-connected services including email (iCloud mail), images and video (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud accounts are accessed using an "Apple ID," which is typically created during the setup of an Apple device or through the registration of an iCloud account. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism. When an account is designated by Apple as a "full iCloud" account, it has been linked to one or more Apple devices. Because iCloud accounts are typically linked to at least one iPhone, iCloud accounts are generally registered with a telephone number belonging to an iPhone.

       d.  Apple maintains the following records and information with respect to iCloud accounts:

       i.  *Subscriber and billing information.* When a user registers an Apple device with an iCloud account, Apple collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and email addresses. Apple also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for some subscribers, Apple maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

12.06.2018

SDNY_001_00000150

ii.     *Device information and settings.* Apple maintains information about the devices associated with an Apple ID and the data underlying account activity. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers for the device, such as the Integrated Circuit Card ID ("ICCID") number, which is the serial number on the device's SIM card, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's device is captured when iTunes is used on that device to play content associated with an Apple ID. Information about a user's device settings may be captured and stored on iCloud. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

iii.    *IP records.* Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as the iTunes Store and the App Store, iCloud, the Game Center, and the My Apple ID and iForget pages on Apple's website.

iv.     *Purchase records.* Apple maintains records reflecting a user's purchases from the App Store and iTunes Store.

v.     *Address book.* Apple allows subscribers to maintain the equivalent of an address book on Apple devices, comprising telephone numbers, email addresses, and other contact information. That information may be backed up to a user's iCloud account.

vi.     *Call history and voicemails.* Apple maintains records reflecting telephone call history and connectivity logs for Apple's native video call application, FaceTime. That information may be backed up to a user's iCloud account. Apple also allows iCloud subscribers to automatically backup voicemails and transcripts of those voicemails, which Apple calls "visual voicemail," to a subscriber's iCloud account.

13

12.06.2018

SDNY_001_00000151

vii.    *Text message contents.* In general, text messages, Short Message Service ("SMS") messages, Multimedia Messaging Service ("MMS") messages, and iMessages sent to or from a subscriber's account are backed up to the iCloud unless and until the subscriber deletes the messages. If the subscriber does not delete messages, they can remain on the iCloud indefinitely. Even if the subscriber deletes messages off of an electronic device, they may continue to be available on the iCloud for a certain period of time.

viii.    *Email contents.* In general, an iCloud account subscriber may elect to store and maintain email content on an iCloud account by linking one or more email accounts to Apple devices. When a subscriber links an email account, any email (which can include attachments such as documents, images, and videos) sent to or from that email account, or stored in draft form in the account, is maintained on Apple's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on Apple's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Apple's servers for a certain period of time. Additionally, to the extent a subscriber maintains an iCloud Mail account, iCloud enables a user to access Apple-provided email accounts, and email stored in those accounts are maintained by Apple.

ix.    *Photos and videos.* In general, an iCloud account subscriber may elect to store and maintain photographs and videos on an iCloud account. Such photos may include pictures taken by devices linked to the iCloud account, pictures sent to those devices electronically, pictures downloaded onto those devices, and images created by device users who take a "screenshot" of whatever email, document, text message, or other record is displayed on the device screen. Any photograph or video stored in the account is maintained on Apple's servers unless and until the subscriber deletes the photograph or video. If the subscriber does not delete the

14

SDNY_001_00000152

photograph or video, it can remain on Apple's servers indefinitely. Even if the subscriber deletes a photograph or video, it may continue to be available on Apple's servers for a certain period of time. Additionally, to the extent a subscriber uses iCloud Photo Library and My Photo Stream, which can be used to store and manage images and videos, or iCloud Photo Sharing, which allows users to share images and videos with other Apple subscribers, photographs and videos stored in those platforms are also maintained in a subscriber's iCloud account Apple also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are stored on an iCloud account. This metadata includes what is known as exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

x.  *Documents.* An iCloud account subscriber may elect to store and maintain documents on an iCloud account by saving documents on an iPhone to the iCloud or by using the service iCloud Drive, which can be used to store documents to the iCloud. Additionally, iWork Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.

xi.  *Web history, search history, and bookmarks.* Apple maintains search and web browsing activity from Safari, Apple's proprietary web browser, as well as bookmarks used to save particular website addresses. iCloud account subscribers may also use iCloud Tabs, which enables iCloud to store and synchronize webpages opened in Safari web browsers on multiple devices, and iCloud Keychain, which enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

12.06.2018

SDNY_001_00000153

xii.   *Third-party application data.* Records and data associated with third-party apps may also be stored on iCloud. For example, the iOS app WhatsApp, an encrypted instant messaging and calling service, can be configured to regularly backup a user's instant messages on iCloud.

xiii.   *Location data.* Apple maintains recent location data, collected periodically, from mobile devices. For example, Apple collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location. The Apple application Find My iPhone, which enables owners of Apple devices to remotely identify and track the location of devices, allows for location reporting, which allows Apple to periodically store and use a device's most recent location data in connection with an iCloud account.

xiv.   *iOS Device Backups.* Apple allows iPhone users to back up the contents of their devices, including messages, web history, and preferences, to an iCloud account.

xv.   *Customer correspondence.* Apple also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's iCloud account.

xvi.   *Preserved and backup records.* Apple also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). Apple may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D.  Jurisdiction and Authority to Issue Warrant**

15. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining

16

SDNY_001_00000154

to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

16. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i), or "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored," 18 U.S.C. § 2711(3)(A)(ii).

17. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

18. The United States Attorney's Office for the Southern District of New York ("USAO") and the FBI are currently investigating a scheme by an investment firm known as "Archegos" or "Archegos Capital" and certain of its officers and employees (1) to defraud at least certain of its prime brokers in an effort to secure credit and capacity to trade securities and security-base swaps through false and misleading statements regarding, among other things, (a) the nature and concentration of its investments and (b) Archegos's liquidity and cash position; and (2) to artificially raise the share price of companies in which Archegos invested through trades executed with and through these prime brokers.

17

SDNY_001_00000155

19. On July 21, 2021, the Honorable Katharine H. Parker, United States Magistrate Judge for the Southern District of New York, issued a warrant authorizing the seizure and search of a cellphone belonging to Scott Becker, who at all times relevant to this affidavit served as Archegos's Chief Risk Officer. The affidavit supporting that warrant (the "Becker Affidavit") is attached hereto as Exhibit A and hereby incorporated by reference. As set forth in the Becker Affidavit, and as further detailed below, there is probable cause to believe that Archegos and certain of its officers and employees engaged in a scheme to defraud certain of its prime brokers, manipulate the price of certain securities, and caused at least hundreds of millions of dollars in losses.

20. Following the execution of the warrant issued by Judge Parker authorizing the search of Becker's cellphone, Becker began meeting with me and other members of the investigative team in the hopes of obtaining leniency relating to his role in the Subject Offenses. Becker has not at this time been charged with any crimes or entered into any formal cooperation agreement with the Government. Becker has confirmed that he, along with others, made false and misleading statements to prime brokers and swap counterparties regarding the nature and concentration of Archegos's investments and its liquidity and cash position. Furthermore, Becker's information has proven reliable and has been corroborated by independent evidence, some of which is described in this affidavit.

**Background**

21. As set forth in the Becker Affidavit (*see* Ex. A ¶ 14), and based on my involvement in this investigation, my participation in and review of notes from interviews of witnesses, and my review of know-your-customer information supplied by Archegos to various banks and broker-dealers, Archegos payroll records, Archegos trading records and spreadsheets reflecting

18

12.06.2018

SDNY_001_00000156

Archegos's investments, press accounts, and internal Archegos correspondence, I have learned, in part, the following:

a.  Archegos refers to a group of business entities that managed the personal wealth of Sung Kook Hwang, who went by the nickname "Bill."

b.  Archegos is principally composed of Archegos Capital, LLC, Archegos Capital Management, LP, and Archegos Fund LP. Archegos Capital, LLC acted as the general partner of Archegos Capital Management, LP, which, in turn, acted as the management company for Archegos Fund LP.

c.  Archegos is the successor entity to Hwang's prior investment firm, Tiger Asia Management, LLC. In or about February 2013, Hwang rebranded Tiger Asia Management to Archegos Capital Management following Tiger Asia Management's 2012 conviction for wire fraud in the District of New Jersey and related enforcement actions by the U.S. Securities and Exchange Commission ("SEC") and the Hong Kong Securities & Futures Commission. After Tiger Asia Management's conviction, it returned all outside investor capital and deregistered as an investment advisor with the S.E.C. Thereafter Archegos managed Hwang's personal wealth as a so-called "family office."

d.  Bill Hwang owned and managed Archegos and directed its trading strategy. Archegos also employed, among others, Andrew A. Mills as President, Patrick Halligan as Chief Financial Officer, Scott Becker as Chief Risk Officer, William Kenji Tomita as Head Trader, and Austin Scholl, Peter DeSanto, and Daiki Taniguchi as traders.

e.  As of early 2021, Archegos's investment portfolio made extensive use of an instrument known as a total return equity swap. Based on my experience, review of documents and publicly available information, and participation in interviews in this investigation, I know a

12.06.2018

total return equity swap is a two-sided financial contract in which one counterparty pays out the total return of the equity, including its dividends and capital appreciation or depreciation, and in return, receives a regular fixed or floating cash flow. For the party that agrees to receive the total return of the equity, a total return equity swap is, in effect, a bet that the equity will increase in value by the end of the term of the swap.

f.   Between 2013 and January 2020, Archegos established prime brokerage or swap-counterparty relationships with multiple financial institutions, including Credit Suisse, Goldman Sachs & Co., Jefferies Financial Group, Morgan Stanley, Nomura Global Financial Products, MUFG Americas, and UBS. Based on my training and experience, I have learned that "prime brokerage" is a bundled group of services that investment banks and other financial institutions offer to hedge funds and other large investment clients. These services typically include the ability to buy and sell equities and derivatives, such as total return equity swaps, including using funds borrowed from the prime brokerage.

g.   Using various of its prime brokerage relationships, Archegos engaged in both traditional securities trading and in swaps trading, often in the form of the total return equity swaps. Archegos's securities and total return equity swaps positions were weighted toward "long"— meaning that Archegos would make money if the security underlying the swap increased in value—and Archegos's prime brokerage partners acted as swap counterparties. Typically, to hedge their risk on the swap positions, Archegos's prime brokerage partners would acquire and hold the equities referenced by Archegos's swaps.

h.   Based on a table of Archegos position and trade information obtained from Archegos by the U.S. Securities and Exchange Commission, I know that as of March 1, 2021, Archegos managed approximately $23 billion in capital, held approximately $77.4 billion of long

12.06.2018

SDNY_001_00000158

equity exposure in the market, and held approximately $39.5 billion of short equity exposure in the market. Archegos's portfolio had been increasing in value for months at the start of 2021, but Archegos's portfolio turned sharply negative the week of March 22, 2021. At the close of business on March 22, 2021, Archegos's internal position and trade spreadsheet reflected more than $36 billion in capital, but by the close of business on March 26, 2021, Archegos's internal position and trade spreadsheet reflected that the firm held negative $5.7 billion in capital: Archegos had lost more than $40 billion in a matter of days. As a result of these losses, and the fact that much of Archegos's trading was highly leveraged—meaning that many of Archegos's prime brokers had functionally allowed Archegos to conduct much of its trading on credit—and as a result of the scheme described below, several of Archegos's prime brokers lost significant amounts of money, in some cases multiple billions of dollars.

### The Scheme to Defraud

22. Based on my involvement in this investigation, my participation in and review of notes from interviews of witnesses, and my review of documents, including internal Archegos financial documents and trading information obtained by the SEC, I have learned the following:

a.   Between in or around March 2020 and in or around March 2021, the size and value of Archegos's portfolio grew substantially. For example, as of on or about March 31, 2020, Archegos's net assets were less than approximately $1.5 billion. As of on or about February 28, 2021, Archegos's net assets were nearly approximately $23 billion. The growth in the value of Archegos's assets was attributable substantially if not entirely to the increase in value of Archegos's equity and swaps positions, which, as discussed in greater detail below, had become increasingly concentrated in a small number of companies, primarily in the media and Chinese media/technology sectors.

21

12.06.2018

b.   Because Archegos would have to pay the prime brokers if the equities underlying its swap positions decreased in value and because Archegos's positions were highly leveraged— that is, Archegos's prime brokers functionally loaned Archegos money by permitting Archegos to purchase its positions in substantial part on credit—Archegos's prime brokers faced a risk that they could lose money if, among other things, Archegos's positions declined substantially enough that Archegos could not pay what it owed. In order to manage the risk associated with Archegos's portfolio, prime brokers used a number of techniques, including (1) placing "capacity" limits on the total value of the positions that Archegos could trade with through the prime broker; (2) increasing the "margin," meaning the collateral that Archegos must place with the prime broker, either overall or with respect to particular trades, such as trades relating to specified companies; (3) requiring Archegos to hedge its positions by taking short positions in the same or related companies as it had long positions, or by investing in companies or indices that would be less risky or would be expected to increase in value if other positions of Archegos would decrease in value; and (4) asking Archegos to sell or move positions between or among prime brokers with the goal of diversifying the portfolio held by a particular prime broker. In making these decisions, the prime brokers relied on both the knowledge they had of Archegos's portfolio at the particular prime broker and information provided by Archegos regarding its overall portfolio and strategy.

23. As described more fully below and in the Becker Affidavit, I believe that there is probable cause to conclude that Archegos—through at least William Tomita, Patrick Halligan, and Scott Becker—deceived at least certain of its prime brokers regarding (a) the nature and concentration of its investments and (b) its liquidity and cash positions. I further believe that there is probable cause to conclude that this deception formed part of a scheme to defraud Archegos's prime brokers calculated to allow Archegos to obtain and preserve the ability to place large-value,

12.06.2018

SDNY_001_00000160

leveraged trades through its prime brokerage partners. As Becker has stated, in substance and in part, during interviews in which I took part, there were many instances in which Archegos—including through Becker, Tomita, and Halligan—misled banks regarding Archegos's portfolio risk. Indeed, it was, according to Becker, a common refrain of Halligan to remark, "if they only knew," referring to Archegos's prime brokers. Examples of the false and misleading statements made by Tomita, Halligan, and Becker are described below and in the Becker Affidavit.

*Archegos Misled Morgan Stanley*

24. As part of this investigation, I participated in an interview of a Morgan Stanley employee ("Morgan Stanley Employee-1") who was a member of the counterparty risk team and, in part, had responsibility for determining the margin requirements—that is, the amount of collateral required—for Archegos trading done through Morgan Stanley's prime brokerage unit. Based on my participation in and review of notes of the interview of Morgan Stanley Employee-1, as well as my review of documents obtained from Morgan Stanley, I have learned, in part, the following:

      a.  Morgan Stanley's prime brokerage risk team manages and monitors counterparty (e.g., Archegos) risk for the purpose of, among other things, determining margin requirements and capacity limits to manage the risk to Morgan Stanley associated with its prime brokerage clients. Typically, when a new client is onboarded, the risk team will seek information regarding a client's total assets under management, leverage, investment strategy, and other information to assess the risk profile of the client across the client's fund. The risk team thereafter focuses predominantly on the risk profile associated with the client's portfolio at Morgan Stanley, which, of course, is visible to Morgan Stanley, while the client's portfolio with other prime brokers is not.

12.06.2018

SDNY_001_00000161

b.   Morgan Stanley Employee-1 began working with Archegos in or around 2019, at which time Archegos was already a client of Morgan Stanley's prime brokerage. Morgan Stanley Employee-1's primary contact at Archegos was Tomita, who generally did the talking on calls, but Becker served a secondary point of contact.

c.   During 2020, the size and concentration of Archegos's portfolio at Morgan Stanley increased considerably, and at least by in or around November 2020, Morgan Stanley Employee-1 began to focus on the risks associated with those changes. For example, on or about November 9, 2020, Morgan Stanley Employee-1 wrote an internal email flagging that Archegos's "book ha[d] grown from $2.5bn gross in June to $9.35bn gross today," that Archegos's investments had become less liquid (i.e., would be more difficult to sell quickly), and that Archegos's portfolio had become highly concentrated in certain Chinese companies, including companies known as Baidu, Tencent, GSX Techedu (also known as GSX), and Vipshop.

d.   On or about November 11, 2020, Tomita, using Microsoft Account-2, emailed another Morgan Stanley employee ("Morgan Stanley Employee-2") in apparent reference to a conversation between Tomita and Morgan Stanley Employee-2 regarding Archegos's willingness to move certain positions to other prime brokerages to reduce the concentration of Archegos's positions at Morgan Stanley. Tomita offered to move $50 million of one position, but stated that "cash positions are very hard to move right now…a combo of a the [sic] 70/30 trades, increased swap trades and how we balanced everything out makes it more complex than you would think." Based on my involvement in this investigation, and the interviews I have conducted, I understand that "70/30 trades" refers to a type of equity swap referenced to a "basket" of multiple different equities and designed to confer favorable tax treatment on the trader's portfolio. Morgan Stanley Employee-2 forwarded Tomita's email to others at Morgan Stanley, including Morgan Stanley

12.06.2018

SDNY_001_00000162

Employee-1, who responded, in substance and in part, that moving the position that Tomita offered to move would not help reduce the risk associated with Archegos's portfolio at Morgan Stanley, but suggested moving positions in Vipshop or Tencent, which would help to alleviate concerns about both concentration and liquidity.

e.   The following day, on or about November 12, 2020, Morgan Stanley Employee-2, copying, among others, Morgan Stanley Employee-1, wrote to Tomita and Becker, who were using Microsoft Account-2 and Microsoft Account-1, respectively, "to set up a call next week to discuss aspects of the portfolio that we don't see." That call occurred on or about November 30, 2020, with an additional call with Morgan Stanley's credit team several days later. Morgan Stanley Employee-1 recalls, in substance an in part, the following from those calls:

i.   Tomita and possibly Becker participated. Although Becker may have provided some information, Tomita primarily spoke on behalf of Archegos.

ii.   During the calls, the parties discussed ways to reduce the risk profile of Archegos's account, including transferring out concentrated positions and replacing them with less concentrated positions to increase diversification.

iii.   Archegos (likely Tomita) stated, in substance, that Archegos would not move positions out of Morgan Stanley because it was Archegos's view that novating swaps—as would be required to move swap positions—would be a taxable event and Archegos did not want adverse tax consequences at year end. Furthermore, according to Archegos, it was a busy time at year end. However, Archegos would be willing to consider moving positions to other prime brokerages in the new year.

iv.   Based on this response, Morgan Stanley Employee-2 understood that Archegos would be willing and able to move portions of its concentrated positions at Morgan

12.06.2018

SDNY_001_00000163

Stanley to other prime brokerages, suggesting to Morgan Stanley Employee-2 that such moves would be possible and therefore Archegos must have a more diverse portfolio at other prime brokerages.

f.   Subsequently, in lieu of requiring concentrated positions to be moved, Morgan Stanley required Archegos to pay higher margin—in some instances as much as 100% margin—for further trades on concentrated positions.

25.   Based on my participation in and review of my notes of interviews with Becker, I have learned, in part, the following:

a.   Becker independently recalls a phone call with Tomita and Morgan Stanley Employees-1 and -2, and potentially others from Morgan Stanley, that occurred in or about November 2020.

b.   During that phone call, which appears to be the same call recalled by Morgan Stanley Employee-1, Archegos was asked to transfer out of Morgan Stanley its concentrated positions in Chinese companies. Tomita responded, in substance and in part, that, owing to so-called 70/30 baskets that Archegos held in these companies and to potential adverse tax consequences at year end, Archegos could not move out the positions requested by Morgan Stanley, but that Archegos could explore moving the positions in the new year.

c.   According to Becker, and corroborated by my review of documents reflecting Archegos positions and interviews with other individuals, these statements were false and misleading because, in fact, Archegos could not move these positions because Archegos held concentrated positions in precisely the same companies at its other prime brokers. Furthermore,

26

SDNY_001_00000164

although Archegos did have 70/30 baskets relating to some of its investments, it did not in fact have 70/30 baskets relating to particular companies discussed with Morgan Stanley.[1]

26. Based on my interview of Morgan Stanley Employee-1 and my review of documents, I know that that Morgan Stanley permitted Archegos to retain its concentrated positions and, although Morgan Stanley imposed certain additional margin requirements, allowed Archegos to continue to increase its positions in those companies.

*Archegos Misled Goldman Sachs*

27. As part of this investigation, I participated in an interview of a Goldman Sachs employee ("Goldman Sachs Employee-1") who, in or about 2020 and early 2021, was a synthetics specialist on Goldman Sachs's equities floor—meaning, in substance and as relevant here, that she worked with clients and sales teams to educate them regarding the use of swap product—and, as a practical matter, served a point of contact between Goldman Sachs and Archegos. Based on my participation in and review of notes of the interview of Goldman Sachs Employee-1, as well as my review of documents obtained from Goldman Sachs, I have learned, in part, the following:

a. Archegos became a client of Goldman Sachs's prime brokerage in or about the fall of the 2020. Tomita was Goldman Sachs Employee-1's main point of contact at Archegos, and Becker served as a secondary point of contact, primarily for operational and/or logistical issues.

---

[1]    Based on my participation in and review of notes of the interview with Morgan Stanley Employee-1, I know that Morgan Stanley Employee-1 does not recall Tomita referring on that call to 70/30 baskets (although Tomita did refer to them in his November 9, 2020 email to Morgan Stanley Employee-2, described above), but, as noted above, does recall Tomita focusing on potential adverse tax consequences. Further, as noted above, 70/30 baskets refer to a trading strategy designed to avoid adverse tax consequences or to receive more favorable tax treatment.

12.06.2018

SDNY_001_00000165

b.  During conversations as Archegos became a client of Goldman Sachs, Tomita told Goldman Sachs Employee-1 the following regarding Archegos's portfolio and strategy, in substance and in part:

i.  Archegos did not intend to move a slice of their existing portfolio to Goldman Sachs, but rather would add new investments through Goldman Sachs over time.

ii.  Archegos had a fairly concentrated overall portfolio, but, based on among other things sample portfolios provided by Archegos, Archegos's concentration was in approximately 50 to 100 different companies, as opposed to approximately 10.

c.  In or about November 2020, as Archegos prepared to begin trading through Goldman Sachs, Tomita began to provide names of companies Archegos was interested in to determine Goldman Sachs's willingness to allow Archegos to trade in those names. For example, on or about November 24, 2020, Tomita, using Bloomberg Account-2, sent a message to Goldman Sachs Employee-1 proposing swap positions in five companies, including GSX. Based on the conversations with Tomita described above, as well as additional conversations with Tomita where he made comments such as, "we want to try these names on with Goldman," Goldman Sachs Employee-1 understood that investments in these companies and others proposed by Archegos were new for Archegos, and that Archegos did not already have positions in these companies at other prime brokers. In fact, based on my review of documents including Archegos's trade blotter obtained by the SEC, and my participation in interviews, I know that Archegos had substantial investments in each of those companies. Furthermore, it would have been significant to Goldman Sachs Employee-1 if she had known that Archegos already had concentrated positions in those companies because significant holdings can create credit and concentration risks, and she would have considered elevating the issue to the sales team, legal team, or others.

12.06.2018

SDNY_001_00000166

d.   Furthermore, as Archegos sought increasingly large positions in GSX through Goldman Sachs, there were internal discussions at Goldman Sachs regarding the risk associated with Archegos's positions in GSX in particular, because GSX's stock was volatile due, at least in part, to reports of investigations into GSX's accounting practices. For example, on or about December 7, 2020, Tomita, using Bloomberg Account-2, messaged Goldman Sachs Employee-1, to ask about adding additional investment in GSX and referencing Goldman's internal conversations: "Do you have an idea of how that GSX convo is heading? If it pulls back we may want to add some." During the course of discussions with Tomita regarding GSX, Tomita told Goldman Sachs Employee-1, in substance and in part, that it was important to Archegos to remain anonymous with respect to its investment in GSX and for this reason Archegos invested in GSX through swaps and only with Goldman Sachs.

e.   In or about January 2021, traders at Goldman Sachs noticed that many other dealers were trading in GSX and, based on publicly available information, other prime brokers were the top holders of GSX. Based on my training and experience and involvement in this investigation, I know that (1) holders of more than 5% of the shares of a company must disclose their ownership, and (2) because swap trading often results in the prime broker owning the shares, when a counterparty like Archegos takes large positions in a company through swap trading, it is the prime broker who would have to disclose a greater than 5% ownership in the company. Individuals at Goldman Sachs found it unusual that so many dealers would be trading in GSX and that the top holders would be other banks with prime brokerages, and wished to ask Archegos about these circumstances.

f.   In or about January 2021, Goldman Sachs Employee-1, along with a second Goldman Sachs employee ("Goldman Sachs Employee-2") had a telephone conversation with

29

SDNY_001_00000167

Tomita regarding what the traders at Goldman Sachs had observed. Tomita stated, in substance and in part, that he could not talk about Archegos's positions at other prime brokers, but went on to say, in substance and in part, that it would not be unusual regarding GSX that other investors similarly situated to Archegos would not want their positions to be disclosed as well, and that it would not surprise Tomita if other funds were using banks to use swaps to enter into the same position as Archegos with respect to GSX. Although Tomita specified that he would not talk about Archegos's positions away from Goldman Sachs, Goldman Sachs Employee-1 understood Tomita to be suggesting, in substance, that the findings of Goldman Sachs's traders were not surprising because other funds would be taking the same position as Archegos. Following this conversation, Goldman Sachs Employee-1 told others to proceed with caution regarding GSX, but Goldman Sachs continued to allow Archegos to maintain and increase its position in GSX.

28. Based on my participation in and review of my notes of interviews with Becker, I have learned, in part, the following:

a.   Becker independently recalls being on a phone call with Tomita and Goldman Sachs Employee-1 and Goldman Sachs Employee-2 in or about early 2021.

b.   During that phone call, which appears to be the same call recalled by Goldman Sachs Employee-1, Goldman Sachs Employee-1 and -2 conveyed, in substance, that Goldman Sachs did have capacity for more trades in GSX, but that they had learned that the other top 10 holders in GSX were Archegos's other prime brokers. Tomita responded, in substance and in part, that Archegos had noticed the same thing too as it had added to its position. At the time, Becker understood that Tomita's response was misleading because, in fact, Archegos's investing in GSX at its other prime brokers was substantial and was the cause of the large holdings in GSX by those banks.

12.06.2018

SDNY_001_00000168

29. Based on my review of Bloomberg messages, Archegos positions records, and call logs, and my participation in and review of my notes of interviews with Becker, I have learned, in part, the following:

a.   On or about March 24, 2021, due to the decline in value of certain Archegos investments, Goldman Sachs and other prime brokers each issued substantial margin calls, meaning that Archegos would have to post additional collateral, in the form of cash, with Goldman Sachs or other prime brokers the following day. Also due to the decline in value of Archegos's investments, as well as the fact that Archegos had continued to invest heavily in concentrated positions requiring high amounts of margin with multiple prime brokers, Archegos would not be able to provide Goldman Sachs or others with the margin required. If Archegos did not meet its margin call the following day, Goldman Sachs and others would have the ability to liquidate Archegos's investments to satisfy Archegos's debt. Archegos scheduled calls with its prime brokers for the evening of March 24, 2021, to address Archegos's ability to meet its margin calls and provide assurance to its prime brokers.

b.   Prior to its calls with the prime brokers, Hwang, Tomita, Halligan, Becker, and others from Archegos convened via an internet-based video conferencing service to strategize regarding what to tell Archegos's brokers. Based on my interviews of Becker and review of contemporaneous notes taken by Becker, I know that Halligan instructed that they should tell prime brokers that Archegos was facing a liquidity issue, not a solvency one, notwithstanding that Archegos was indeed facing and did shortly thereafter enter into insolvency. I know from my interviews of witnesses and review of notes and other communications, that this representation was made during the calls with prime brokers that followed. Also on this strategy call, Hwang instructed that Archegos's representatives should tell prime brokers that Archegos had faced a

31

12.06.2018

SDNY_001_00000169

perfect storm, but that Archegos was comfortable with its stock and capital, that Archegos knew the companies it invested in well, and that those companies were household names.

    c.   On or about the evening of March 24, 2021, employees of Archegos, including Becker and Halligan, spoke to representatives of Goldman Sachs by telephone. On that call, Archegos's representatives stated, in substance and in part, that Archegos would not be able to meet the margin call the following day.

    d.   At the conclusion of that call, Halligan and Becker were asked to remain on the line to speak to Goldman Sachs employees responsible for, among other things, assessing the risk to Goldman Sachs associated with Archegos and its portfolio. During that call, Becker and Halligan simultaneously maintained a separate private Bloomberg chat, using Bloomberg Account-1 and Bloomberg Account-3, on which Halligan instructed Becker what to say in response to questions from Goldman Sachs. In particular, and for example, the following occurred:

       i.   A member of Goldman Sachs's team asked, in substance and in part, what Archegos's net asset value ("NAV") was at the time.

       ii.   After the question was asked, in their private Bloomberg chat occurring simultaneously, Becker asked Halligan, "Do I give htem [sic] current nav/performance or no? I usually give the most recent mont hend [sic]."

       iii.   Halligan responded "~$20b." Becker then responded to the Goldman Sachs's team's question with the figure $20 billion.

       iv.   Becker knew at the time that that number was false and misleading, as it overstated Archegos's NAV, and understood that the purpose of giving the false and inflated figure was to calm Goldman Sachs and to paint a better picture of Archegos's position than truly existed.

12.06.2018

SDNY_001_00000170

*Archegos Misled UBS*

30.  As set forth in greater detail in the Becker Affidavit (*see* Ex. A ¶ 19), and based on an interview of a UBS risk management official ("UBS Employee-1") who, in part, had responsibility for determining how much leverage to extend to Archegos for trading done through UBS's prime brokerage unit, and a review of prime brokerage and margin agreements between UBS and Archegos and emails and Bloomberg communications, I have learned, in part, the following

a.  At the beginning of March 2021, Archegos was a client of UBS and had been for approximately one year. Archegos's trading through UBS primarily took the form of total return equity swaps. As with other prime brokers and as noted above, UBS permitted Archegos to trade swaps "on margin," meaning Archegos did not have to supply UBS with cash equal to the full value of the swaps it traded in the marketplace. UBS did require, however, that Archegos deposit as collateral, generally referred to as "margin," a portion of the value of the swaps, which portion varied daily, in part, based on the value of the swaps as measured by then-prevailing market prices.

b.  UBS also limited the total size of the trades it was willing to engage in with Archegos, particularly with respect to any single equity or total return equity swap. In this way, UBS had "capacity" limits that defined the upper bound of the amount of market risk it was willing to accept in its dealings with Archegos.

c.  As of early March 2021, Archegos had fully utilized all of the credit capacity UBS had agreed to extend to Archegos, which, at the time, totaled approximately $10 billion in market value.

d.  On or about March 8, 2021, UBS Employee-1 became aware that Tomita had inquired about raising the capacity limit by approximately $2 billion to enable Archegos to place additional trades through UBS. Because additional trades would expose UBS to additional market

33

SDNY_001_00000171

risk, UBS Employee-1's approval was required before UBS would agree to increase the capacity limits.

    e.  UBS, as was typical of prime brokers and as is described above, did not have visibility into trading activity conducted by its clients at other prime brokers. UBS had similar limitations with respect to Archegos: although UBS was aware that Archegos had other prime brokerage relationships, it did not know what trades, if any, Archegos had placed through those institutions.

31. On or about March 8, 2021, three UBS risk management officials, including UBS Employee-1, spoke by phone with Becker to evaluate the request to expand Archegos's trading capacity at UBS. The March 8, 2021 call with Becker was recorded by UBS Employee-1 pursuant to UBS policy. Based on a review of the audio recording of that call, I have learned, in part, the following conversation occurred:

    a.  UBS Employee-1 began the call by explaining that the purpose of the call was to discuss Archegos's request for additional capacity: "Will is you know, again looking for some additional capacity." Based on context and my participation in the interview of UBS Employee-1, I understand "Will" refers to Will Tomita.

    b.  Becker, in part, informed the UBS team that Archegos had continued to have remarkable success since its last performance update to UBS, noting: the "February the streak continued, so in February we were up 38 percent, and that brought capital to 23 billion 46 million."[2]

---

[2] The quotations of certain recorded conversations set forth in this affidavit are based on draft transcriptions, and are in preliminary form only and subject to change upon further review.

12.06.2018

SDNY_001_00000172

c.   Later in the conversation, one of the UBS employees ("UBS Employee-2") inquired about the size of Archegos's positions relative to the portfolio:

> UBS EMPLOYEE-2: And Scott, can you just remind me in terms of, kind of how the- how the total portfolio, not just UBS portion looks, um, as a percent of um, of the 23 billion, where do you guys cap out your largest position? And if you could talk about kind of your top, the top um, sizes of your, of your largest positions, that'd be helpful.

> BECKER: Yeah sure, so the largest positions are around 35 percent of capital. Uh, the top 10 positions, they're all pretty close, largest being 35, the smallest being 25, so they kind of tail off gradually. Um, but the top 10 in aggregate being around 300 percent. And this is all on the long side. Like I said, on the short side, being that it's almost entirely index ETFs it's, you know, a little different to look at it from that perspective.

Based on my interview of UBS Employee-1, the context of this conversation, and my training and experience, I understand Becker to be explaining that the market exposure, measured in dollars, for Archegos's largest positions equaled approximately 35% of Archegos's capital ("the largest positions are 35 percent of capital") and that the aggregate market exposure from the top ten positions equaled approximately 300% of Archegos's capital ("the top 10 in aggregate being around 300 percent"). I further understand that the value of Archegos's market exposure exceeded the value of Archegos's capital because it made use of margin trading and other forms of leverage, so it could invest more capital than it owned.

d.   After discussing the relative size of Archegos's positions, Becker and UBS Employee-1 then discussed the size of Archegos's positions in dollar value:

> UBS EMPLOYEE-1: I think you're getting closer to that than you know, where you were 3 months ago, because I mean you know, you certainly had you

35

SDNY_001_00000173

|  | know, the AUM and the account has moved around a bit from what I recollect in terms of performance, but obviously nothing like this, uh, I've seen and I think in the past your peak was I don't know, eight, nine, ten if I remember from our original conversations a year ago, and now you're quite a bit higher than that. |
|---|---|
| BECKER: | Right, yes. |
| UBS EMPLOYEE-1: | And at 35 percent of AUM for your top position, I mean we're talking seven yards for a name. |
| BECKER: | Yep. |

Based on my interview with UBS Employee-1, I understand "AUM" to be an acronym that stands for "assets under management," "yard" to be a colloquialism for "billion," and "name" to be a colloquialism for a particular securities issuer. Accordingly, UBS Employee-1's statement— "we're talking seven yards for a name"—signifies that Archegos largest positions would each total $7 billion or more in market exposure.

e.   After discussing the relative and dollar-value size of Archegos's positions, Becker and UBS Employee-1 then discussed the nature of Archegos's positions at other prime brokerages:

| UBS EMPLOYEE-1: | And I mean, I'm hoping it's Amazon, a Google, a Microsoft, an Apple, like big, stupidly-liquid type name, whereby you know even at that size it doesn't really matter, you can dump that and not move the market. |
|---|---|
| BECKER: | Mhm. Right— |
| UBS EMPLOYEE-1: | And those are kind of the names that I recall from a year ago that were some of your bigger names, were those type names if I remember. |
| BECKER: | Yeah, and they still are. They still are. Those were going back to when we became the family office in uh, early 2013 or so, and I |

SDNY_001_00000174

would say then through maybe late 2019 or so, those were, I mean essentially those were our portfolio frankly.

UBS EMPLOYEE-1: Wow, okay.

BECKER:        Yeah, it's-

UBS EMPLOYEE-1: I didn't think my memory was that good, but I'll take it.

BECKER:        Yeah no, it's (laughter). Those have always been pretty big names for us, so we're taking advantage in the recent pullback in a few of those.

UBS EMPLOYEE-1: Yep. Yeah, because that's really where I get, if I'm honest, that's where I get concerned on the liquidity profile is. I mean you have a lot of big-conviction names but as long as the market is deep enough, it doesn't really matter almost how big you get, but when you're not playing in the 100-billion, 500-billion type market cap names, it then becomes, you know, the liquidity, you know, under the surface can be less than what you're seeing if the market churns.

BECKER:        Right, yeah that makes sense.

Based on my training, experience, and interview of UBS Employee-1, I understand this conversation to reflect UBS Employee-1's efforts to evaluate how risky Archegos's concentrated trading strategy would be to UBS, given that UBS did not have independent visibility into Archegos's trading elsewhere. Accordingly, UBS Employee-1's statement that he hoped certain of Archegos biggest positions were "stupidly liquid," like "Amazon or Google, Microsoft and Apple," was an effort to determine whether Archegos's overall portfolio was structured so that even though its biggest positions were large they could be sold if necessary and still "not move the market." UBS Employee-1 then recalled that Archegos had previously said it traded in those sorts of highly-liquid securities ("I recall from a year ago that were some of your bigger names"), and

12.06.2018

SDNY_001_00000175

Becker agreed ("Yeah, and they still are."). Becker then emphasized that those liquid stocks remained large positions and, indeed, had recently increased its position in them ("Those have always been pretty big names for us, so we're taking advantage in the recent pullback in a few of those."). Based on this conversation, UBS Employee-1 understood that some of Archegos's largest positions were in highly-liquid stocks like Amazon, Google, Microsoft, or Apple and that, therefore, Archegos could, if necessary, quickly and substantially sell out of its positions in those securities and generate cash to meet margin calls.

     f.   Later the conversation turned, in part, to how Archegos's investments conducted through other prime brokerages compared to those at UBS:

| | |
|---|---|
| UBS EMPLOYEE-2: | Bryan, just because I missed it and I'm sorry Scott, it sounds like our portfolio though is pretty, at least our top names are pretty fairly representative of, and excuse me if I'm wrong Scott, pretty representative of what you have across your brokers right? In the size? Is that fair to say? |
| BECKER: | Let me take a look here. Uh, hang on a second, I just want (U/I) |
| UBS EMPLOYEE-1: | I was just saying, I guess I would think we don't have a ton of your top 10s, because we don't have those names. |
| BECKER: | Yeah, it's- it's not fully representative, and I think part of that is as we, because we really got- When did we open our account with you guys, was it late 2019? |
| UBS EMPLOYEE-1: | June-ish, July last year. No, it's not even been a year I think. |
| BECKER: | 'Cause some of these names, yeah, looking at these names that we have with you guys, and just, if I look at the portfolio, uh, GSX, Viacom, Discovery. What else? I think some of the ADRs- Like we really started trading those more actively last year as- as things |

38

SDNY_001_00000176

turned a bit. Being that we were on-boarding with you guys and you guys had the capacity, that's- that's how we got to that place with you guys. So it's not a- Not to say that those names aren't big names but I wouldn't say if you took our top ten positions at UBS, that those are our top ten positions overall.

UBS EMPLOYEE-1: Yeah. Well I mean, other than Viacom I don't know that you could have five, seven yards of any of those names.

BECKER: (Laughter) Right.

UBS EMPLOYEE-1: Just to be honest, I know the market caps and DTV, so-

BECKER: Yeah, yeah, exactly.

UBS EMPLOYEE-1: Like my expectation is my book is different than your others.

BECKER: Yeah, it is.

Based on my training, experience, and an interview of UBS Employee-1, I understand that in this conversation UBS Employee-2 asked Becker whether the trades placed through UBS are similar to the trades at other prime brokers ("our top names are pretty fairly representative of, and excuse me if I'm wrong Scott, but pretty representative of what you have across your brokers right?"). UBS Employee-1, however, interjected to say that UBS could not have a similar book to other prime brokers because Archegos did not have the substantial trades in highly liquid equities like Amazon, Google, Apple, or Microsoft at UBS that Becker had just referenced ("I guess I would think we don't have a ton of your top 10s, because we don't have those names."). Becker then agreed with UBS Employee-1 that UBS's book did not fully reflect Archegos's trading strategy ("Yeah, it's- it's not fully representative"). UBS Employee-1 then further observed that it would be difficult to have billions of dollars in exposure to most of the equities Archegos was trading at UBS ("Well I mean, other than Viacom I don't know that you could have five, seven yards of any

12.06.2018

SDNY_001_00000177

of those names."), which prompted Becker to chuckle. UBS Employee-1 then confirmed one more time that the Archegos trades at UBS did not reflect Archegos positions at other prime brokers ("Like my expectation is my book is different than your others."), to which Becker agreed ("Yeah, it is.").

32. After the call, UBS decided to solicit additional information from Archegos about Archegos's risk profile before agreeing to increase the capacity limits. Based on a review of email correspondence between UBS employees and Becker, I have learned that later on or about March 8, 2021, UBS Employee-2 emailed Becker at Microsoft Account-1, and asked if Archegos could identify "which, if any" of the positions at UBS were "top 10 in your overall exposure (across counterparties)." Becker refused to provide the information: "unfortunately I cant [sic] comment about positions sizes away from UBS or individual names overall." UBS Employee-2 then inquired, "without naming the name of the common/stock security just Top 1, Top 2 by GMV (excluding ETFs) the % of ADV you are of that security?" (Based on context and my training and experience, I believe that "GMV" refers to gross market value; "ETFs" refer to exchange traded funds; and "ADV" refers to average daily trade volume.) Becker refused to provide that information, too, writing, "unfortunately I can't provide that color either, I spoke to Will Tomita on it and he said that if there are liquidity profile concerns that you could reflect that in the margin rates."

33. On or about March 10, 2021, Becker called UBS Employee-1 to discuss again whether UBS would increase its capacity limits. The call was audio recorded by UBS Employee-1 pursuant to UBS policy. Based on a review of the audio recording of that call, I have learned, in part, that the following conversation occurred:

    a.  UBS Employee-1 explained that he needed more information:

12.06.2018

SDNY_001_00000178

UBS EMPLOYEE-1: I appreciate your sensitivity towards your top names and stuff, but I just need a little more color on the overall liquidity because, just to be upfront and honest, like when you, when we first on-boarded the account you guys gave us great transparency, you know, but at four billion, levered call it five, it's twenty yards. Now at 100, 120 billion, the balance is, like, it's much more meaningful in the market.

BECKER: Right.

UBS EMPLOYEE-1: You know, and, and that's what I'm trying to you know, make sure that my boss and his boss, who I have to have a follow-up call with, you know, just have some level of comfort that, you know, because, portfolio liquidity at that size is probably the biggest item.

BECKER: Okay. Yeah, that makes sense.

Based on a review of the audio recording of the call, my training, experience, and an interview of UBS Employee-1, I believe that this conversation reflects UBS Employee-1 conveying to Becker that UBS needed more information about Archegos's trading ("I just need a little more color") because Archegos's positions had become so large that liquidity—that is, the ability to sell out of the position when desired—was a concern for UBS ("portfolio liquidity at that size is probably the biggest item"). Becker indicated that he understood liquidity information was important to UBS ("Yeah, that makes sense.").

    b.    As the March 10, 2021 call continued, Becker informed UBS Employee-1 that he had obtained additional information to share with UBS following a conversation with Tomita:

BECKER: So what he said right now overall, we could close out half the book in ten days, twenty-five percent of the book in twenty days-

UBS EMPLOYEE-1: You mean the next twenty-five percent?

12.06.2018

SDNY_001_00000179

BECKER:                     Right, exactly, but we do it all concurrently, so the whole process, in terms of that first seventy-five percent is twenty days-

UBS EMPLOYEE-1: Yeah yeah yeah.

BECKER:                     And then the rest of the book, to close everything out fully, about a month.

UBS EMPLOYEE-1: And what, what is this in terms of, you know, DTV use?

BECKER:                     Volume?

UBS EMPLOYEE-1: Yeah is this like, ten percent?

BECKER:                     Between ten to fifteen percent of volume, depending on the name.

UBS EMPLOYEE-1: Okay.

BECKER:                     He kind of did a deep dive into it.

UBS EMPLOYEE-1: Any chance you have the numbers in the first five days?

BECKER:                     Uh, no. I do not.

UBS EMPLOYEE-1: Okay. So, okay, if I do that, that implies like fifty percent of your book is roughly one DTV. Twenty percent of your book is two DTV, and the last twenty-five percent, if I can write, is about three DTV.

BECKER:                     Yeah, that makes sense.

UBS EMPLOYEE-1: Which would tell me your average book is about one and a half, call it one and three quarters DTV, for the whole book.

BECKER:                     Yeah. Yeah, that gets about there, right.

UBS EMPLOYEE-1: Okay. Okay, that is helpful, so thank you for that.

Based on a review of the audio recording of the call, my training, experience, and interview of

UBS Employee-1, I believe that this conversation reflects Becker providing information about the

12.06.2018

SDNY_001_00000180

concentration and liquidity of the Archegos portfolio to UBS Employee-1. In particular, Becker relayed information he said he obtained from Tomita about how quickly Archegos could unwind its positions ("we could close out half the book in ten days, twenty-five percent of the book in twenty days"). Becker also relayed that those numbers were based on closing its book at a rate equal to approximately ten to fifteen percent of the average daily traded volume of any particular equity ("Between 10 to 15 percent of volume, depending on the name."). UBS Employee-1 then performed some back-of-the-envelope calculations to conclude that, based on those numbers, Archegos's overall portfolio across all prime brokers had positions that averaged 1.75 times the daily traded volume of the stock, which Becker agreed was accurate ("Yeah, that gets about there, right.").

34. UBS Employee-1 has informed me that, based upon this back of the envelope calculation, he concluded that Archegos's largest positions were in highly liquid stocks, such as Amazon and Google, because only those stocks have a sufficiently large average daily traded volume for Becker's representations about the speed at which the portfolio could be liquidated to be true.

35. Following the March 10, 2021 call, UBS Employee-1 wrote other members of the risk team to convey the substance of the call. In that email, UBS Employee-1 further observed that "Overall this is better than you feared (assuming our book is the same away which Scott confirmed it isn't). Plus we know their largest positions are the like of Amazon, Google, Facebook, Alibaba type names which we have none."

36. Based on my interview of UBS Employee-1 and contemporaneous UBS correspondence, I have learned that UBS approved the capacity increase based on what UBS Employee-1 had learned from Becker, namely (a) Archegos's trades through UBS were different

12.06.2018

SDNY_001_00000181

than what Archegos was trading with other prime brokers; (b) Archegos's biggest positions across prime brokers were highly liquid stocks, like Amazon, Google, Apple, or Microsoft; and (c) Archegos could close out half of its risk within ten days and all of its risk in a matter of weeks. Within days, Archegos placed additional trades—adding an additional $2 billion in market risk to its portfolio.

37. Based on a review of position and trading records maintained by Archegos, my interview of UBS Employee-1, and my participation in and review of my notes of interviews with Becker, I have learned that Becker's statements to UBS on March 8 and March 10 contained numerous falsehoods and misleading omissions. For example:

a. Notwithstanding Becker's March 8 statement that Archegos's top long position was approximately 35% of capital, Archegos's top long position was, in fact, more than approximately 75% of capital as of the close of business on March 5 (the trading day ending most recently before March 8, 2021). Indeed, based on Archegos's own position and trading spreadsheet, at no time between March 1, 2021 and March 8, 2021 were either of Archegos's top two positions less than 50% of Archegos's capital.

b. Notwithstanding Becker's March 8 statements suggesting that highly liquid stocks such as Amazon, Google, Apple, and Microsoft ranked among the top ten of Archegos's positions in terms of size of position, they did not. Based on Archegos's own contemporaneous tabulation of its positions, none of Amazon, Google, Apple, Facebook, Microsoft, and Alibaba figured among the top ten largest positions held by Archegos as of the close of business on March 5th (the trading day ending most recently before March 8, 2021). (Microsoft came closest, coming in at number eleven, measured by value.)

12.06.2018

SDNY_001_00000182

c.   Notwithstanding Becker's March 8 statements that the trades through UBS were not representative of Archegos trades elsewhere, in fact, they were. Archegos's positions at UBS included swaps in the securities of Viacom, GSX, Baidu, Tencent Music Entertainment, iQYI, Discovery, Texas Capital Bancshares, and Farfetch—each of which ranked among Archegos's ten largest positions across all prime brokers as of March 8 and, in fact, collectively represented nine of Archegos's top ten positions.[3]

d.   Notwithstanding the fact that Becker chuckled and said "right" when UBS Employee-1 remarked that Archegos could not possibly have five- to seven billions of dollars of exposure to the equities it traded through UBS, other than Viacom, Archegos, in fact, did have more than five billion dollars of exposure to multiple of those equities. Indeed, as of the close of business on March 5, 2021, Archegos had more than $5 billion in market exposure to Discovery, Tencent Music, GSX, iQYI, and Bidu, in addition to Viacom.

e.   Notwithstanding the fact that Becker represented to UBS Employee-1 on or about March 10 that Archegos could close out its book in approximately one month using 10-15% of the daily traded volume of the equities associated with its positions, UBS Employee-1 estimates, based on public information about the sell-off of Archegos's positions, that, in truth, it would have taken as many as approximately 200 days to close out the risk in Archegos's book due to the extraordinary concentration of the investments.

38. During my interviews of Becker, he confirmed that the above representations were false, and, based on what I learned during those interviews as well as my review of contemporaneous Bloomberg messages, I know that Becker coordinated at least certain of these false statements with Halligan and Tomita. Specifically with respect to Becker's false

---

[3] Archegos held two positions in Discovery, corresponding to two classes of Discovery shares.

12.06.2018

SDNY_001_00000183

representations regarding the liquidity of Archegos's total portfolio—that it could close out half its book in ten days, the next 25% in twenty days, and the total book in one month selling at 10-15% of daily traded volume—I have learned the following:

a.   As noted above, on or about March 10, 2021, UBS Employee-1 asked Becker, in substance and in part, for additional detail regarding the liquidity of Archegos's overall portfolio. Becker responded that he needed to check with others at Archegos to provide that information.

b.   After his call with UBS Employee-1, Becker communicated with Halligan and Tomita using an internet-based video conferencing service and relayed the question that UBS Employee-1 had posed. Tomita appeared to be reviewing information on another screen before providing to Becker the figures that Becker subsequently gave to UBS Employee-1 and that were false. At the time Becker received the figures from Tomita, he recognized that they were false because, at a minimum, he knew the portfolio could not be fully closed in the time specified by Tomita.

c.   As noted above, by on or about March 24, 2021, certain of Archegos's investments had quickly experienced significant decline in value. As a result, similar to Goldman Sachs, UBS issued a substantial margin call, meaning that Archegos would have to post additional collateral, in the form of cash, with UBS as well the following day. Also, as noted above, due to the decline in value of Archegos's investments, as well as the fact that Archegos had continued to invest heavily in concentrated positions requiring high amounts of margin with multiple prime brokers, Archegos would not be able to provide UBS with the margin required, which would allow UBS to liquidate Archegos's investments to satisfy Archegos's debt.

d.   On or about the evening of March 24, 2021, following their call with Goldman Sachs, Tomita, Halligan and Becker had a call with UBS similarly to discuss Archegos's inability

12.06.2018

SDNY_001_00000184

to meet its obligations to UBS. In advance of that call, and in order to make sure that what they said on the call was consistent with prior misrepresentations made to UBS, Becker reminded Tomita and Halligan of the false representations regarding the liquidity of Archegos's overall portfolio that Becker had previously made, in consultation with Tomita and Halligan, to UBS. Specifically, Becker, using Bloomberg Account-1, wrote to Tomita, using Bloomberg Account-3, "It if [sic] comes up w ubs-remember we gave them the following liquidity recently:" "50% in 10 days, 25% in 20 days, entire book in 5-6 weeks." Approximately one minute later, Becker, using Bloomberg Account-1, wrote to Halligan, using Bloomberg Account-2, "I just gave will the heads up-- this is the liquidity profile we've given them recently: 50% in 10 days, 25% in 20 days, entire book in 5-6 weeks."

39. During the interview of UBS Employee-1, UBS Employee-1 informed me, in substance and in part, that, had he known that Archegos's positions at UBS were similar to its positions across all brokers or that Archegos did not have as significant relative exposure to highly liquid stocks, like Amazon, Google, and Facebook, as Becker represented, UBS Employee-1 would not have approved the capacity limit increase. Moreover, UBS Employee-1 informed me, in substance and in part, that had UBS Employee-1 known those details, UBS Employee-1 would have recommended that UBS terminate the client relationship entirely because of the extraordinary risk posed by its large, highly-concentrated, highly illiquid positions.

47

SDNY_001_00000185

*Archegos Misled Jefferies and UBS into Sending Excess Margin While Facing Shortfalls*

40. Based on my involvement in this investigation, participation in interviews, including with Becker and a Jefferies employee with risk management responsibilities for the Archegos account ("Jefferies Employee-1"), and review of documents, including notes taken by Jefferies Employee-1, and I have learned, among other things, the following:

a.   Like other prime brokerages, Jefferies permitted Archegos to place trades on margin and to maintain an account to which Archegos would post margin, when necessary.

b.   In or about March 2021, Archegos contacted Jefferies about increasing the amount of trades it placed through Jefferies. At the time, Archegos had exhausted available capacity with Jefferies, which totaled approximately $950 million in notional value.

c.   On or about March 19, 2021, Jefferies Employee-1 spoke by telephone with Becker to obtain an update on Archegos and, in particular, its liquidity and positions to evaluate the request for additional capacity. Becker, in substance and in part, informed Jefferies Employee-1 that Archegos had approximately $7 billion in available cash.

d.   On or about March 24, 2021, based on prices as of the close of business on March 23, 2021, Archegos had hundreds of millions of dollars in excess margin at Jefferies. Archegos requested that Jefferies return excess collateral in its margin account to Archegos.[4] Jefferies Employee-1, who heard about the request, spoke to Becker on or about March 24, 2021, to discuss the request for return of excess collateral. Jefferies Employee-1 found the request surprising because Becker had not asked for the excess on March 19, 2021, and because Archegos was

---

[4] I am aware that Archegos and Jefferies had one or more contracts that established the circumstances under which Archegos could demand and receive its excess collateral. Based on my experience and participation in witness interviews in this case, I know that, generally speaking, Archegos would be entitled by contract to its excess margin upon request absent an event of default.

48

SDNY_001_00000186

looking to increase its positions with Jefferies, which would require it to deposit more cash into the margin account.

     e.  During the March 24 call between Jefferies Employee-1 and Becker, Jefferies Employee-1 specifically inquired whether Archegos was distressed or confronting a liquidity problem. Becker told Jefferies Employee-1, in substance and in part, that Archegos was not in a distressed situation and did not have a liquidity issue. Becker explained that the reason for the request was that Archegos noticed that it had relatively more excess margin in its account at Jefferies than at its other prime brokerages and that Jefferies Employee-1 should approve whatever she was comfortable sending out. Becker also informed Jefferies Employee-1, in substance and in part, that Archegos had approximately $9 billion in excess cash divided between prime brokerage accounts and custodial accounts.

     f.  Based on Becker's explanation, and further based on Becker's specific denials regarding a liquidity or distress situation, Jefferies Employee-1 approved the return of a portion of the excess margin, which Jefferies then wired back to Archegos.

41. Jefferies Employee-1 informed me, in substance, that had she known that Archegos was in a distressed situation, she would never have approved the release of the excess collateral.

42. On March 24, 2021 at approximately 3:13 p.m., Becker spoke to UBS Employee-1. The call was audio recorded by UBS Employee-1 pursuant to UBS policy. Based on my review of that recording and my interview of UBS Employee-1, I have learned, in part, the following:

     a.  During the call (and as noted above), UBS Employee-1 informed Becker that UBS would be issuing a sizable margin call to Archegos, to be paid on March 25, 2021.

     b.  UBS Employee-1 also noted that he had seen that Archegos had asked UBS to return excess margin in its account, as calculated using March 23, 2021 trade prices. UBS

12.06.2018

SDNY_001_00000187

Employee-1 remarked, in part, "I was to be honest a little surprised you guys put in the wire today, uh, for the excess since you've been leaving with us for a while." UBS Employee-1 further noted that it was odd to request it back on the day before a known margin call, but that, as UBS Employee-1 understood the margining agreement, Archegos could have requested the money back the day before. Becker responded, in part, "I'm not sure why it wasn't yesterday or even last week. I think we were, yeah I don't know. I have to talk to the ops guys on it[.]"

      c.  Before the call ended, UBS Employee-1 also inquired more generally about Archegos's positions, in light of the upcoming margin call:

> UBS EMPLOYEE-1:  [S]ince I got you, just kinda knowing some of the other bigger names, that they're kinda flat-ish, um, so I'm guessing it's more impacted over here than elsewhere.
>
> BECKER:  Yeah.
>
> UBS EMPLOYEE-1:  Is that a fair statement?
>
> BECKER:  Yeah, it is.

Based on my training, experience, and interview of UBS Employee-1, I understand that UBS Employee-1 was attempting to confirm that Archegos's positions at other prime brokers had not been negatively affected by the downturn in the prices for the securities Archegos had with UBS ("I'm guessing it's more impacted over here than elsewhere") based on UBS Employee-1's understanding from his prior call with Becker that Archegos's largest positions included highly-liquid stocks, such as Amazon, Google, Facebook, and Apple ("just kinda knowing some of the other bigger names"). Becker confirmed that UBS Employee-1 was correct ("Yeah, it is.").

      43. As detailed below and as confirmed by Becker during interviews in which I participated, Becker's statements to Jefferies and UBS were false and misleading, and calculated to persuade Jefferies and UBS to release cash to Archegos by concealing the fact that Archegos

12.06.2018

SDNY_001_00000188

was facing an acute liquidity crisis and significant margin calls from other prime brokers. For example:

    a.  Becker has confirmed that it was untrue that Archegos did not have a liquidity problem and also untrue that Archegos had $9 billion in excess cash.

    b.  Indeed, during the trading day on March 23, 2021, Archegos positions lost considerable value. Based on Archegos's own position summary, its book lost approximately 9.7% in value between the close of business on March 22, 2021 and the close of business on March 23, 2021.

    c.  The downturn in performance created immediate liquidity constraints, in part, because Archegos would be required to post additional margin at various prime brokerages. Based on a review of Archegos emails, I know that by the afternoon of March 23, 2021, Becker was aware of the problem. At approximately 3:10 p.m. on March 23, 2021, for example, Becker wrote to Andy Mills, Archegos's president, observing, "[W]e are in a very tight margin/cash situation today that we are hunkered down on."

    d.  Based on Bloomberg messages exchanged between Becker and Will Tomita, beginning around 15:41 UTC, Becker acknowledged the market movements and the day's trading had depleted billions of Archegos's available cash:

| | |
|---|---|
| TOMITA: | How is our cash looking? |
| BECKER: | Let me check |
| TOMITA: | Not urgent |
| BECKER: | Not good. |
| BECKER: | Started $6B, less impact from P&L of 3B, less trade impact of $700mm, ending cash $2.3B. |
| TOMITA: | yowza |

12.06.2018

SDNY_001_00000189

And by approximately 19:14 UTC, after some intraday fluctuations, Becker reported to Tomita that cash stood between $500 million and $1 billion.

e.   Based on a review of Bloomberg messages exchanged between Scott Becker and Archegos employees Jesse Martz, Barima Osei, and David Holhman, I know that at approximately 22:52 UTC on March 23, 2021, Becker sent a message reading, "I don't think I'm going [to] h[a]ve an answer on this cash stuff. There is a zoom with me, pat, will, bill, and andy in a few minutes, but I'll keep you updated on cash here as soon as possible." Based on context, I understand this message to mean that Becker was going to discuss the liquidity crisis with the most senior members of the firm—Hwang, Mills, Halligan (the CFO), and Tomita.

f.   By the morning of March 24, 2021, Morgan Stanley and Nomura had each issued substantial margin calls to Archegos.

g.   As reflected in Bloomberg messages with one another, over the course of the day of March 24, 2021, Becker, Osei, and Hohlman tracked the escalating negative performance of Archegos's portfolio, noting as it passed negative 19% and later as it passed negative 41.5%.

h.   As representatives of Morgan Stanley and Nomura began inquiring about Archegos's ability to pay the issued margin calls, Becker, in a Bloomberg message sent at approximately 15:40 UTC, instructed his colleagues to ignore them: "We should not reply to any of those margin call follow up emails."

i.   By approximately 17:23 UTC, Becker wrote via Bloomberg, "OK—we are paying Nomura now actually" and "Will just said to pay." Osei responded, however, that "We don't have the money if JEFF doesn't hit though." To which Becker replied, "We have en[o]ugh for nom, just not MS" and "Will is on the phone w jeff." Based on the context and my training and experience, I understand that the back-and-forth messages between Becker and Osei reflect that Archegos had

SDNY_001_00000190

found enough cash to pay the Nomura margin call but that its ability to meet the Morgan Stanley

call as well depended on whether Jefferies ("JEFF") released the excess margin in Archegos's

account there ("en[o]ugh for nom, just not MS") and that Will Tomita was in touch with Jefferies

about the excess margin in the account there ("Will is on the phone w jeff").

      j.   Later, at approximately 17:31 UTC, Hohlman wrote Becker, "What's the latest with

MS" and Becker responded, "Waiting to see what Jeff will pay us back, most lik[el]y not the full

amount but enough."

      k.   At approximately 17:52 UTC, Tomita forwarded to Becker a Bloomberg exchange

Tomita had had with a representative of Jefferies, in which Tomita asked Jefferies to release excess

margin.[5] The Jefferies representative responded, in part, "Our Credit Officer is going to call Scott

to get a bit more colour[.]" Thereafter, Becker wrote Tomita, "Thanks, calling her now." Based on

the context, my training, experience, and my interviews of Jefferies Employee-1 and Becker, I

believe that after writing "calling her now," Becker spoke to Jefferies Employee-1.

      l.   At approximately 19:25 UTC, Becker wrote "Spoke to ubs too, they just released

the wire." Based on the context, my training, experience, and my interviews of UBS Employee-1

and Becker, I believe that Becker wrote this message after speaking to UBS Employee-1.

### The Scheme to Manipulate the Prices of Certain Securities

    44. Based on my involvement in this investigation, my participation in and review of notes

from interviews, including of Becker, and my review of documents, including internal Archegos

financial documents and trading information obtained by the SEC, I have learned the following:

---

[5] I am aware that Jefferies's counsel, in an attorney proffer, has said that on or about March 24, 2021, Tomita informed a trader at Jefferies that the money would be used for a collateral call but the trader did not supply that information to the Jefferies Employee.

12.06.2018

SDNY_001_00000191

a.   Archegos's trades and trading strategy was directed by Hwang. Beginning in or around March 2020, when the COVID-19 pandemic caused Archegos employees to work from home, Hwang maintained throughout each day an internet-based video conference with Archegos's traders—Tomita, Daiki Taniguchi, Austin Scholl, and Peter DeSanto—during which Hwang would discuss and dictate trades.

b.   Beginning in or about March 2020, Archegos's trading strategy—directed by Hwang—changed dramatically. Prior to that time, Archegos invested predominantly in large companies, especially technology companies, with highly liquid stock, such as Google, Facebook, Microsoft, and Alibaba, and had a short position in Tesla. Also prior to that time, Hwang was very margin-sensitive, meaning that he was extremely careful to invest in a way that minimized that amount of margin Archegos would have to post.

c.   In or about March 2020, however, Archegos began to heavily concentrate its portfolio by purchasing shares (or American depository receipts for China-based companies) or, even more so, by taking long swap positions in a small number of American and Chinese media companies. Those companies included Viacom, GSX, Baidu, Tencent Music, Vipshop, iQIYI, and Discovery. Moreover, as Archegos's portfolio became more concentrated, and contrary to his prior strategy, Hwang was willing to pay increasing amounts of margin in order to place further trades in the stock of the same companies. As noted above, many if not all of Archegos's prime brokers continued to raise margin requirements as Archegos's portfolio with the given prime broker became more concentrated (even though the prime brokers were not aware of, and in certain instances were misled regarding, the total concentration of Archegos's portfolio across all prime brokers), and by in or about March 2021, Archegos was posting 100% margin on many of its trades in order to keep placing trades in the stock of same companies.

12.06.2018

SDNY_001_00000192

45. As Archegos pursued its concentrated trading strategy, the prices of the stocks that formed the core of its portfolio (either through direct equity ownership or through swaps) began to increase substantially. For example:

a.   On or about March 2, 2020, Discovery Series A (Ticker: DISCA) closed at approximately $26.40 per share. On or about March 2, 2021, Discovery Series A closed at approximately $59.24 per share.

b.   On or about March 2, 2020, ViacomCBS Inc. (Ticker: VIAC) ("Viacom") closed at approximately $24.31 per share. On or about March 2, 2021, Viacom closed at approximately $68.72 per share.

c.   On or about March 2, 2020, Tencent Music Entertainment Group (Ticker: TME) ("Tencent") closed at approximately $12.13 per share. On or about March 2, 2021, Tencent closed at approximately $27.60 per share.

d.   On or about March 2, 2020, Vipshop Holdings Ltd. (Ticker: VIPS) ("Vipshop") closed at approximately $12.62 per share. On or about March 2, 2021, Vipshop closed at approximately $39.08 per share.

46. Based on my training and experience, involvement in this investigation, and my preliminary review of Archegos trade information obtained by the SEC, I believe that probable cause exists to conclude that Archegos's trading strategy was calculated to produce increases in the stock price of companies in whose stock Archegos traded.

47. Based on my training and experience and interview of various prime brokerage employees, I understand that prime brokers and swap counterparties typically offset most, if not all, of the risk generated from a total return equity swap by purchasing a share of the equity referenced by the swap. That occurred here: as Archegos increased the size of its swap positions

SDNY_001_00000193

its counterparties tended to correspondingly increase their holdings of the equities referenced by the swaps. By virtue of this dynamic—which prime broker employees describe, in substance, as a standard and well-known practice—Archegos's decision to undertake a long total return equity swap would therefore create demand for the purchase of the underlying equity. As a result, between in or about March 2020 and March 2021, Archegos's counterparties became substantial owners of equities referenced by Archegos's swaps and Archegos was responsible for many billions of dollars in stock purchases related to its portfolio.

48. I am also aware of evidence showing that employees of Archegos were aware that Archegos's prime brokers were hedging their positions by purchasing shares in the referenced equity including, for example, the January 2021 conversation between Tomita and employees of Goldman Sachs regarding GSX described in paragraphs 27 and 28, above.

49. In addition to the general price pressure created by Archegos's trading in the year leading up to March 2021, there is probable cause to believe that Archegos made daily trading decisions in a manner that further exacerbated the upward price pressure on certain stocks. For example, as noted above, when Archegos—through at least Becker, Tomita, and Halligan—misrepresented to UBS the liquidity of Archegos's portfolio, it did so by referencing the speed at which the portfolio could be liquidated if sold at a maximum of 10-15% of each stock's average daily trading volume. Based on my interview of UBS Employee-1, and my training and experience and involvement in this investigation, I understand that 10-15% of average daily trading volume is referenced in this context because it is commonly understood that purchasing or selling substantially more than this amount of a stock will move the stock's price—up when an investors seek to purchase this amount and down when an investor seeks to sell this amount.

12.06.2018

SDNY_001_00000194

50. Based on a conversation with representatives of the SEC's Division of Economic and Risk Analysis ("DERA"), I know that, based on a preliminary analysis of trading records obtained from Archegos, DERA has identified numerous days in which Archegos, by entering in swap transactions with its prime brokers, caused the purchase of more than 20% of a particular stock's daily trading volume and indeed regularly caused the purchases of as high as 40% to 50% of a stock's daily trading volume.[6] Furthermore, I have learned that, based on an analysis using a commercially available trade pricing model, DERA's preliminary analysis shows that, if one were to enter into the trades that Archegos did concerning the following companies in the approximately 7-month period between in or about September 2020 and on or about March 22, 2021, one could expect that those trades alone would increase the price of the underlying stocks as follows:[7]

      a.   Baidu's stock price would increase between approximately 24% and approximately 46.6%.

      b.   Discovery's Series A stock price would increase between approximately 14% and approximately 24.8%.

      c.   Discovery's Series C stock price would increase between approximately 4.3% and approximately 6.5%.

---

[6] As noted above, DERA's analysis was preliminary only, and relied on certain assumptions or approximations. For example, DERA assumed that prime brokers consistently hedged their swap transactions with Archegos by purchasing an equal number of shares to the number of shares that Archegos obtained exposure to through a swap contract. However, based on the interviews I have participated in, my review of documents, and my training and experience, I am aware that, although the prime brokers generally purchased shares to be fully hedged—that is on a one-to-one ratio with the number of shares Archegos had exposure to through a swap contract—prime brokers did not in every instance purchase shares equal to the number of shares referenced in a swap contract with Archegos.

[7] Many, although not all, of the stocks referenced above in fact increased far more than the amount predicted by DERA's model during that time period.

57

SDNY_001_00000195

d. Farfetch's stock price would increase between approximately 25% and approximately 37.1%.

e. GSX's stock price would increase between approximately 30.3% and approximately 61.4%.

f. iQIYI's stock price would increase between approximately 24.8% and approximately 36.4%.

g. Tencent's stock price would increase between approximately 17.7% and approximately 24.7%.

h. Viacom's stock price would increase between approximately 23.9% and approximately 42.1%.

i. Vipshop's stock price would increase between approximately 21.2% and approximately 34.1%.

51. As the stock price of the companies in which Archegos invested rose, and Archegos continued to purchase swaps referenced to the stock of the same company, the value of its portfolio rose dramatically. Based on internal Archegos documents, I know that on or about March 31, 2020, Archegos's assets were worth approximately $1.7 billion. At the end of the day on or about January 4, 2021, Archegos's capital was approximately $7.68 billion. At the beginning of the day on or about March 23, 2021, just before market forces destroyed the value of Archegos's portfolio in a matter of day, Archegos had more than $36 billion in capital.

52. Furthermore, based on my training and experience, involvement in this investigation, interviews, including of Becker, and review of documents, I know that the manner in which Archegos traded obscured the fact that it was one entity—Archegos—that was causing much of the trading of the companies in which Archegos had concentrated positions. Specifically, and for

58

SDNY_001_00000196

the following reasons, Archegos was able to avoid any public knowledge of the size and nature of its investments:

a.   Generally, investors who own 5% or more of a publicly traded company must, pursuant to SEC regulation, disclose their ownership interest. Archegos would invest in a company's shares until just shy of the 5% threshold.

b.   After reaching approximately 4.9% ownership interest through the purchase of shares, Archegos would begin investing in the given company through swap trading. As set forth above, by investing in this way, Archegos would cause its prime broker to purchase the shares, but Archegos would receive the benefit of any increase in stock price. Accordingly, even though Archegos caused its prime brokers to purchase in many cases far more than 5% of the outstanding shares of a company, it was the prime brokers and not Archegos that had to publicly disclose their ownership interest. Similarly, other investors would know that a broker was purchasing shares, but have no insight into the fact that the shares were being purchased as a result of swap trading with Archegos.

c.   Because Archegos was a so-called "family office" that managed the wealth of Hwang and his family, and not other investors, it did not have to file quarterly disclosures regarding its positions as it might otherwise have had to pursuant to SEC regulation for regular investment advisers.

d.   Finally, as noted above, Archegos took steps to mislead its prime brokers in a manner that disguised the fact that Archegos was trading in the same companies across its prime brokers. For example, as set forth above, Tomita made misleading statements to Goldman Sachs Employee-1 that appeared calculated to cause Goldman Sachs Employee-1 to believe that funds other than Archegos were causing prime brokers other than Goldman Sachs to make investments

12.06.2018

SDNY_001_00000197

in GSX. Indeed, many of these representations were occasioned by Tomita and/or Becker, at the direction of Hwang, seeking the permission of Archegos's prime brokers to enter into further transactions in the same concentrated positions, despite the concentration risks that the prime brokers had identified. In fact, and for example, DERA's preliminary analysis suggests that Archegos effectively controlled, either by purchasing the stock or causing prime brokers to purchase the stock as hedges on swap contracts, approximately 50% of the public float of Viacom, 70% of the public float of GSX, 50% of the public float of iQIYI, and 62% of the public float of Discovery's Series A stock, even though no prime broker was aware of these extreme concentrations.[8]

53. Based on my interviews of Becker and my review of contemporaneous notes taken by Becker, I have learned that, on or about March 24, 2021, during an internal Archegos conference in preparation for calls with various prime brokers regarding the sizable margin calls that Archegos would not be able to meet the following day, Hwang instructed others at Archegos to characterize its investments to the prime brokers as in "household names" and to state that "we know these companies well." I have therefore considered whether Archegos's trading strategy between in or about March 2020 and in or about March 2021 could be explained by an investment strategy in "household names" that Archegos knew well, other than as seeking to artificially inflate the price of the underlying stock. In particular, I have reviewed internal Archegos memoranda and related documentation obtained by the SEC created by Archegos analysts provided analysis and support for Archegos's investments, and have learned, among other things, the following:

---

[8] As noted above, DERA's preliminary analysis relied on certain assumptions and estimations, including regarding the prime brokers' hedging practices and regarding the total public float of each stock.

12.06.2018

SDNY_001_00000198

a.  Although it does appear, based on my preliminary review, that Archegos's employees compiled information and conducted analysis and modeling regarding the companies in which it took concentrated positions between in or about March 2020 and in or about March 2021, my review of certain modeling and analysis spreadsheets shows that Hwang frequently both dictated target stock prices far in excess of what his analysts proposed and revised those target prices upwards as the stock prices increased during the period in which Archegos was taking its concentrated positions.

b.  For example, an internal Archegos memorandum with the re: line "ViacomCBS (VIAC) 3Q20 Update Memo – Long," dated November 9, 2020, and addressed to Hwang from three individuals who I understand from context to be analysts recommends that Archegos take a long position in Viacom with a "team target price" of $35 (Viacom's price at the opening of the market on November 9, 2020 was $30.85).

c.  Notwithstanding the contents of the memorandum and its recommendation, an internal Archegos spreadsheet containing data regarding Viacom reflects that Hwang's own target price for Viacom stock increased from $50 to $55 on or about December 18, 2020 (Viacom's stock opened at $35.48 on December 18, 2020); from $55 to $75 on or about January 6, 2021 (Viacom's stock opened at $37.85 on January 6, 2021); and from $75 to $100 on or about January 13, 2021 (Viacom's stock opened at $41.58 on January 13, 2021). During the time period in which Hwang's target price for Viacom increased from $50 to $100, the target price of Viacom's stock proposed by the three analysts who drafted the November 9, 2020 memorandum remained at $35.

d.  Internal Archegos memorandum with the re: line "ViacomCBS (VIAC) 4Q20 Update Memo – Long" (i.e. the next quarter following the November 9, 2020 memorandum), dated February 26, 2021, and addressed to Hwang recommends that Archegos take a long position in

SDNY_001_00000199

Viacom with a "team target price" of $100 (Viacom's price at the opening of the market on February 26, 2021 was $62).

e.   For the foregoing reasons, as well the fact that Archegos's employed a consistent strategy across all of its concentrated positions of seeking as much long exposure as it could obtain, I think it is likely that the analyses described above were, at least in part, pretextual and do not fully explain Hwang's and Archegos's trading strategy.

54. Based on my participation in and review of my notes of interviews with Becker, I have learned, among other things, the following:

a.   Although Becker was not involved in trade decisions or strategy, it was obvious that the fund's performance in or about late 2020 and early 2021—which Becker described as "mind boggling"—was a result of rise in the stock prices of the companies in which Archegos had concentrated positions. Becker believed at the time that Tomita was conservative and consulted with Archegos's compliance personnel, who were able to see Archegos's trades.

b.   However, in or about March 2021, Becker approached Halligan to discuss whether employee trading in the same investments as Archegos and an investment strategy of matching long and short positions that Archegos was using known as "box trading"—which Becker believed might allow Archegos to execute even more trades in the companies in which it had concentrated positions—might be manipulative of market prices. Halligan "flipped out" and demanded to know why Becker was asking about it, asked why anyone would bring this up, and noted that Archegos's compliance personnel could see Archegos's trading. Soon thereafter Halligan approached Becker and, referring to their prior conversation, stated, in substance, that Tomita was conducting the trading and it was therefore Tomita's problem. In a subsequent videoconference that occurred several days before the events of March 23-26, 2021, Becker raised these topics with compliance

12.06.2018

SDNY_001_00000200

personal and Andy Mills. Mills stated, in substance and among other things, that he had known Hwang a long time, that Hwang would never do anything inappropriate (notwithstanding the guilty plea entered by Hwang on behalf of his prior fund for wire fraud) and that there was nothing wrong with Archegos supporting its stocks.

55. Based on the foregoing, I believe that there is probable cause to believe that Archegos, at the direction of Hwang, engaged in a manipulation trading strategy designed to cause others to trade in securities of companies in which Archegos had invested at prices artificially inflated by a pattern of undisclosed buying by Archegos that gave the false impression that numerous actors in the market were actively trading.

### B.  Probable Cause Regarding the Microsoft Accounts

56. There is probable cause to believe that the Microsoft Accounts contain evidence of the Subject Offenses.

57. Based on information supplied by Provider-1, I have learned that Microsoft Accounts-1 through -7 are all individual user accounts created within the overarching @archegoscapital.com account that Archegos established with Microsoft in or about December 2017. From a review of correspondence and witness interviews, I know the Microsoft Accounts are the Archegos work accounts used by Becker, Tomita, Halligan, Hwang, Taniguchi, Scholl, and Desanto and that the accounts enabled them and other Archegos employees to send and receive emails, create, save, and share records, make and manage calendar appointments, and exchange instant messages. Based on interviews with Becker, for example, I understand that Archegos employees used the Microsoft platform to discuss trades, to manage cash flow, to prepare cash and trade management records, and to conduct the day-to-day affairs of the business.

58. Based on my involvement in this investigation, training and experience, and participation in interviews of Becker, and as set forth further below, I know that the Microsoft

63

SDNY_001_00000201

Accounts were, in fact, used to share Archegos information, including information regarding Archegos's positions and financial condition, and to communicate with prime brokers and internally, including regarding the misrepresentations described above. Specifically:

a.  Based on my review of documents obtained in this investigation, including emails sent or received by Microsoft Account-1, I have learned that Microsoft Account-1 is associated with Becker. Becker used Microsoft Account-1 to exchange communications regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. For example, as set forth above, on or about November 12, 2020, Becker used Microsoft Account-1 to communicate with Morgan Stanley Employee-1 to arrange for calls to discuss Archegos's portfolio. Also as described above, Becker used Microsoft Account-1 to communicate with UBS Employee-2 regarding the liquidity of Archegos's portfolio.

b.  Based on my review of documents obtained in this investigation, including emails sent or received by Microsoft Account-2, I have learned that Microsoft Account-2 is associated with Tomita. Tomita used Microsoft Account-2 to exchange communications regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. For example, as set forth above, on or about November 12, 2020, Tomita used Microsoft Account-2 to tell Morgan Stanley Employee-2 that Archegos could not move certain concentrated positions away from Morgan Stanley and to provide a purported justification, and to arrange for further communications with Morgan Stanley Employee-1. Tomita also used Microsoft Account-2 to discuss trades, trading strategy, available cash, and margin calls with others at Archegos. For example, on or about March 23, 2021, Tomita used Microsoft Account-1 to email, among others, Becker (using Microsoft Account-1), Halligan (using Microsoft Account-3), Hwang (using

12.06.2018

SDNY_001_00000202

Microsoft Account-4), and Scholl (using Microsoft Account-6), regarding the margin calls anticipated the following day, margin rates for trades in Baidu, and how to address cash shortfalls.

c.   Based on my review of documents obtained in this investigation, including emails sent or received by Microsoft Account-3, I have learned that Microsoft Account-3 is associated with Halligan. Halligan used Microsoft Account-3 to communicate both externally and internally regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. For example, on or about March 20, 2021, Halligan used Microsoft Account-3 to email with Tomita (using Microsoft Account-2) regarding Archegos's prime brokers' margin rates and capacity for Archegos to invest further in the companies in which it had concentrated positions. And, as noted above, on or about March 23, 2021, Tomita emailed Halligan at Microsoft Account-3 regarding margin calls anticipated the following day, margin rates for trades in Baidu, and how to address cash shortfalls. I also know, based on my review of communications obtained from Archegos's prime brokers, Halligan used Microsoft Account-3 to communicate with Archgos's prime brokers. For example, on or about January 8, 2021, Becker, Tomita, and Halligan (using Microsoft Accounts-1, -2, and -3, respectively) exchanged emails with a Morgan Stanley employee regarding how a box trade of Baidu would affect Morgan Stanley's view of the concentration of Archegos's portfolio.

d.   Based on my review of documents obtained in this investigation, including emails sent or received by Microsoft Account-4, I have learned that Microsoft Account-4 is associated with Hwang. As set forth in the proceeding paragraphs, Hwang used Microsoft Account-4 to communicate both externally and internally regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. I also know that Hwang received frequent reports updating him on Archegos trade and investment information and cash

65

SDNY_001_00000203

positions, and Microsoft Account-4 therefore contains information regarding Archegos's available cash and its trading strategy, and Hwang's knowledge of the same.

e.   Based on my review of documents obtained in this investigation, including emails sent or received by Microsoft Accounts-5, -6, and -7, I have learned that Microsoft Accounts-5, -6, -7 are subscribed to by Taniguchi, Scholl, and DeSanto, respectively, who were traders with Archegos, and these accounts are therefore likely to contain, among other things, communications and records reflecting trading and trading strategy. For example, on or about October 13, 2020, representatives of Morgan Stanley and Taniguchi, Scholl, and DeSanto, using Microsoft Accounts-5, -6, and -7, as well as Tomita, using Microsoft Accounts-2, exchanged emails regarding whether Morgan Stanley would provide additional capacity for trading in GSX or iQIYI. Similarly, on or about November 30, 2020, Goldman Sachs Employee-1 and other Goldman Sachs representatives emailed Taniguchi, Scholl, and DeSanto, using Microsoft Accounts-5, -6, and -7, as well as Becker and Tomita, using Microsoft Accounts-1 and -2, regarding, among other things, the parameters that Goldman Sachs would impose on Archegos's trading once Archegos began trading through Goldman Sachs's prime brokerage.

59. Based on the above, and for the reasons set forth below, I submit that there is probable cause to believe that the following information for the Microsoft Accounts that is stored by Microsoft contains evidence and instrumentalities of the Subject Offenses:

a.   *Email contents*. From my training and experience, and based on the above, I believe the email contents of the Microsoft Accounts will content evidence and instrumentalities of the Subject Offenses, including communications between and among Archegos officers and employees relating to representations to make and made to Archegos's prime brokers, Archegos's trading strategy and decisions, Archegos's cash positions margin calls, and events of default, as

12.06.2018

SDNY_001_00000204

well as communications between representatives of Archegos and representatives of Archegos's prime brokers reflecting representations made by Archegos representatives regarding Archegos's portfolio, risk profile, and strategy, trade orders, limits placed on Archegos by its prime brokers, margin calls, and events of default.

b. *Address book.* From my training and experience, I know that an email user's address book can be used to identify contact information for co-conspirators and victims.

c. *Subscriber and billing information.* From my training and experience, I know that subscriber and billing information will confirm the identity of the users of the Microsoft Accounts.

d. *Transactional information.* As noted above, Microsoft retains transactional information about the use of each account on its system, including login information. Such information can aid in establishing the identity and location of users of the Microsoft Accounts and their locations at particular times.

e. *OneDrive.* From my training and experience, and based on the above, I believe that the personal cloud storage drives of the users of the Microsoft Accounts are likely to contain records relevant to Archegos's trading, portfolio, and cash positions, such as position and investment research reports. These cloud storage drives are also likely to contain evidence of association with co-conspirators.

f. *Sharepoint.* From my training and experience, and based on the above, I believe that Archegos's Sharepoint file sharing service is likely to contain records relevant to Archegos's trading, portfolio, and cash positions, such as position and investment research reports. This file sharing system is also likely to contain evidence of association of co-conspirators

g. *Preserved and backup records.* On or about June 30, 2021, the Government sent a preservation request to Microsoft pursuant to 18 U.S.C. § 2703(f) for all accounts associated with

12.06.2018

SDNY_001_00000205

archegoscapital.com, including the Microsoft Accounts, and later received confirmation from Microsoft that reasonable steps had been taken preserve the available requested records. Because a preservation functions as a snapshot of the account as it existed at the time of the preservation, any preserved records of the Microsoft Accounts are expected to include content and other data that were extant on the account immediately before the preservation notice, but deleted after that preservation's submission to and processing by Microsoft.

60. <u>Temporal Limitation.</u> As set forth above, Archegos changed its trading strategy to engage in market manipulation in or around March 2020. Accordingly, content for the Microsoft Accounts is requested from shortly before that change, January 1, 2020, to the present.

**C. Probable Cause Regarding the Gmail Account**

61. There is probable cause to believe that the Gmail Account, which appears to be Hwang's personal Gmail account, contains evidence of the Subject Offenses.

62. Based on subscriber records obtained from Google, I have learned that the Gmail Account is subscribed to by "bill-SungKook Hwang," and the recovery email address is Microsoft Account-4.

63. Based on records obtained from Archegos's prime broker and by the SEC from Archegos, I know that Hwang used the Gmail Account to communicate both externally and internally regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. For example, I know that on or about March 23 and 24, 2021, Hwang used the Gmail Account to send text messages to Tomita and Scholl with instructions for trades and to discuss potential trades. On March 24, 2021, Hwang used the Gmail Account to exchange a text message with Mills regarding how calls with prime brokers regarding their margin calls went. Furthermore, I know, based on my participation in an interview of Becker, that shortly after Archegos suffered the losses that caused its insolvency, Hwang reached out to Becker using

68

12.06.2018

SDNY_001_00000206

the Gmail Account and asked Becker to correspond with him using Becker's personal gmail account, which Becker declined.

64. Based on the above, and for the reasons set forth below, I submit that there is probable cause to believe that the following information for the Gmail Account that is stored by Google contains evidence and instrumentalities of the Subject Offenses:

a. *Email contents*. From my training and experience, and based on the above, I believe the email contents of the Gmail Account will content evidence and instrumentalities of the Subject Offenses, including communications between and among Archegos officers and employees relating to representations to make and made to Archegos's prime brokers, Archegos's trading strategy and decisions, Archegos's cash positions margin calls, and events of default, as well as communications between representatives of Archegos and representatives of Archegos's prime brokers reflecting representations made by Archegos representatives regarding Archegos's portfolio, risk profile, and strategy, trade orders, limits placed on Archegos by its prime brokers, margin calls, and events of default.

b. *Address book.* From my training and experience, I know that an email user's address book can be used to identify contact information for co-conspirators and victims.

c. *Subscriber and billing information.* From my training and experience, I know that subscriber and billing information will confirm the identity of the user of the Gmail Account.

d. *Transactional information.* As noted above, Google retains transactional information about the use of each account on its system, including login information. Such information can aid in establishing the identity and location of user of the Gmail Account and his location at particular times.

12.06.2018

SDNY_001_00000207

e.  *Chats and Instant Messages.* From my training and experience, and based on the above, I believe chat and instant message contents of the Gmail Account will content evidence and instrumentalities of the Subject Offenses, including communications between and among Archegos officers and employees relating to representations to make and made to Archegos's prime brokers, Archegos's trading strategy and decisions, Archegos's cash positions margin calls, and events of default, as well as communications between representatives of Archegos reflecting representations made by Archegos representatives regarding Archegos's portfolio, risk profile, and strategy, trade orders, limits placed on Archegos by its prime brokers, margin calls, and events of default.

f.  *Search history.* From my training and experience, and the above, I believe that Hwang's web history, browser history, and web activity are likely to contain evidence of the Subject Offenses, including evidence relating to research conducted by Hwang on companies and use of criminal proceeds by Hwang.

g.  *Google Payments.* From my training and experience, and the above, I believe that records of Hwang's use of Google payment are likely to contact evidence of the Subject Offenses, including evidence that can establish Hwang's location at particular times and his use of criminal proceeds.

h.  *Google Drive Content and Google Docs.* From my training and experience, and based on the above, I believe that Hwang's personal cloud storage drives is likely to contain evidence of the Subject Offenses, including documents records relevant Archegos's trading, portfolio, and cash positions, such as position and investment research reports, as well as evidence of association with co-conspirators.

70

SDNY_001_00000208

i. *Google Calendar and Location History.* From my training and experience, and based on the above, I know that business and finance executives keep records of meetings with other executives and employees, all of which is likely to contain evidence of the Subject Offenses and of the identity of additional co-conspirators.

j. *Device Information.* Based on my training and experience, I know that Google can provide information regarding linked devices, which can help identify the location of additional evidence.

k. *Cookie Data, Linked Accounts, and Android Services.* From my training and experience, and my involvement in this case, I know that individuals engaged in fraud frequently use multiple email accounts and communication applications to communicate with co-conspirators, and linked account, device information, cookie data, and Android services information is likely to help identify additional accounts.

l. *Preserved and backup records.* On or about July 21, 2021, the Government sent a preservation request to Google pursuant to 18 U.S.C. § 2703(f) for all accounts associated with archegoscapital.com, including the Gmail Account, and later received confirmation from Google that reasonable steps had been taken preserve the available requested records. Because a preservation functions as a snapshot of the account as it existed at the time of the preservation, any preserved records of the Gmail Account are expected to include content and other data that were extant on the account immediately before the preservation notice, but deleted after that preservation's submission to and processing by Google.

65. <u>Temporal Limitation.</u> As set forth above, Archegos changed its trading strategy to engage in market manipulation in or around March 2020. Accordingly, content for the Gmail Account is requested from shortly before that change, January 1, 2020, to the present.

12.06.2018

SDNY_001_00000209

### D. Probable Cause Regarding the Bloomberg Accounts

66. There is probable cause to believe that Bloomberg Accounts-1 through -7, which are Bloomberg accounts used by Becker, Tomita, Halligan, Hwang, Taniguchi, Scholl, and Desanto, contain evidence of the Subject Offenses. Based on my involvement in this investigation, training and experience, and participation in interviews of Becker, and as set forth further below, I know that these accounts were used to share Archegos information, including information regarding Archegos's positions and financial condition, and to communicate with prime brokers and internally, including regarding the misrepresentations described above. Specifically:

a.   Based on my review of documents obtained in this investigation, including messages sent or received by Bloomberg Accounts-1, -2, and -3, I have learned that Bloomberg Account-1 is associated with Becker, Bloomberg Account-2 is associated with Tomita, and Bloomberg Account-3 is associated with Halligan. Becker, Tomita, and Halligan used these Bloomberg accounts to exchange communications regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. For example, as set forth above, on or about March 30, 2021, Becker used Bloomberg Account-1 to communicate with Halligan, who was using Bloomberg Account-3, during which chat Halligan dictated false and misleading statements for Becker to relay to Goldman Sachs. Also as set forth above, on or about March 24, 2021, Becker used Bloomberg Account-1 to coordinate with Tomita, who was using Bloomberg Account-2, and Halligan, who was using Bloomberg Account-3, in advance of a call with UBS so that Tomita and Halligan would remember the prior false and misleading statement that had been provided to UBS Employee-1 regarding the liquidity of Archegos's portfolio. As described above, Tomita also Bloomberg Account-2 to communicate with prime brokers, such as Goldman Sachs, regarding trades that Archegos wished to place.

12.06.2018

b.  Based on my review of documents obtained in this investigation, including messages sent or received by Bloomberg Accounts-4, -5, -6, and -7, I have learned that Bloomberg Account-4 is associated with Hwang, Bloomberg Account-5 is associated with Taniguchi, Bloomberg Account-6 is associated with Scholl, and Bloomberg Account-7 is associated with DeSanto. Hwang, Taniguchi, Scholl, and DeSanto used these Bloomberg accounts to exchange communications regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. Specifically, I know based on my review of records obtained by the SEC that, at least on certain days, Hwang, Taniguchi, Scholl, DeSantos, and Tomita (using Bloomberg Account-2) would engage in a permanent chat during which the four of them would discuss trades, prices, and prime brokers, and during which Hwang would direct trades. These accounts therefore contain evidence of trades and trading strategy as well as evidence regarding the need for capacity at and margin requirement imposed by prime brokers.

67.  Based on the above, and for the reasons set forth below, I submit that there is probable cause to believe that the following information for the Bloomberg Accounts that is stored by Bloomberg contains evidence and instrumentalities of the Subject Offenses:

a.  *Bloomberg messaging and email contents*. From my training and experience, and based on the above, I believe the email contents of the Bloomberg Accounts will contain evidence and instrumentalities of the Subject Offenses, including communications between and among Archegos officers and employees relating to representations to make and made to Archegos's prime brokers, Archegos's trading strategy and decisions, Archegos's cash positions margin calls, and events of default, as well as communications between representatives of Archegos and representatives of Archegos's prime brokers reflecting representations made by Archegos

12.06.2018

SDNY_001_00000211

representatives regarding Archegos's portfolio, risk profile, and strategy, trade orders, limits placed on Archegos by its prime brokers, margin calls, and events of default.

b. *Bloomberg Execution Management Data.* From my training and experience, my participation in interviews with Becker, and based on the above, I know that Bloomberg offers trade execution and analysis tools that enable subscriber customers to evaluate, place, and analyze, among other things, stock, option, and swaps trades with broker-dealers participating in the Bloomberg network and that Archegos's traders made use of some of those features to place trades.

c. *Address book.* From my training and experience, I know that an email or chat user's address book can be used to identify contact information for co-conspirators and victims.

d. *Subscriber information.* From my training and experience, I know that subscriber and billing information will confirm the identity of the users of the Bloomberg Accounts.

e. *Preserved and backup records*. On or about August 6, 2021, the Government sent a preservation request to Bloomberg pursuant to 18 U.S.C. § 2703(f) for all accounts associated with archegoscapital.com, including the Bloomberg Accounts, and later received confirmation from Bloomberg that reasonable steps had been taken preserve the available requested records. Because a preservation functions as a snapshot of the account as it existed at the time of the preservation, any preserved records of the Bloomberg Accounts are expected to include content and other data that were extant on the account immediately before the preservation notice, but deleted after that preservation's submission to and processing by Bloomberg.

68. <u>Temporal Limitation.</u> As set forth above, Archegos changed its trading strategy to engage in market manipulation in or around March 2020. Accordingly, content for the Bloomberg Accounts is requested from shortly before that change, January 1, 2020, to the present.

SDNY_001_00000212

### E.  Probable Cause Regarding the iCloud Account

69. There is probable cause to believe that the iCloud, which appears to be Hwang's personal iCloud account, contains evidence of the Subject Offenses.

70. Based on subscriber records obtained from Apple, I have learned that the iCloud Account is subscribed to by "Sungkook Hwang," and the subscriber email address is the Gmail Account. I have further learned that the user of the iCloud Account—which appears to be Hwang—has associated a number of devices with the iCloud account, including iPads and iPhones, meaning that it is likely that text messages and other contents from those devices have been backed up to the iCloud Account.

71. Based on my training and experience, I know that individuals engaged in fraud and other crimes similar to the Subject Offenses frequently use personal electronic devices, communication applications, and email accounts to communicate with co-conspirators and victims regarding their criminal activity.

72. Furthermore, as set forth above, *see supra* ¶ 63, I have learned, based on records obtained from Archegos's prime broker and by the SEC from Archegos, that Hwang used the Gmail Account to send text message communications both externally and internally regarding the events and conduct at issue in this investigation and it therefore contains evidence of the Subject Offenses. Because it appears that Hwang has associated his electronic devices with the iCloud Account, there is probable cause to believe that the iCloud Account contains evidence of the Subject Offenses, including the text messages referenced above.

73. Based on the above, and for the reasons set forth below, I submit that there is probable cause to believe that the following information for the iCloud Account that is stored by Apple contains evidence and instrumentalities of the Subject Offenses:

12.06.2018

SDNY_001_00000213

a. *Subscriber, billing, and device information and settings.* From my training and experience, I know that subscriber, billing, and device information and settings will confirm the identity of the user of the iCloud Account, and provide information regarding the identity of devices used in connect with the iCloud Account and the manner in which they were used and additional information provided by the user since records were previously obtained from Apple related to iCloud Account.

b. *IP records and location data.* From my training and experience, I know that IP and location data can assist in confirming the location in which devices were used and in identifying co-conspirators and victims.

c. *Text message contents, email contents, photos and videos, documents, purchase records.* Based on my training and experience, and the information provided above, I believe that text messages, emails, photos and videos, documents, and purchase records are likely to contain evidence of the Subject Offenses, including documents, photographs, and communications between and among Archegos officers and employees relating to representations to make and made to Archegos's prime brokers, Archegos's trading strategy and decisions, Archegos's cash positions margin calls, and events of default, as well as communications between representatives of Archegos and representatives of Archegos's prime brokers reflecting representations made by Archegos representatives regarding Archegos's portfolio, risk profile, and strategy, trade orders, limits placed on Archegos by its prime brokers, margin calls, and events of default.

d. *Address book, call history and voicemails.* Based on my training and experience, I know that an iCloud address book, call history, and voicemail records can assist in identifying and can provide information about communications with co-conspirators or victims.

12.06.2018

SDNY_001_00000214

e. *Web history, search history, and bookmarks.* From my training and experience, and the information provided above, I believe that Hwang's web history, search history, and bookmarks are likely to contain evidence of the Subject Offenses, including evidence relating to research conducted by Hwang on companies and use of criminal proceeds by Hwang.

f. *Third-party application data.* From my training and experience, and my involvement in this case, I know that individuals engaged in fraud frequently use multiple email accounts and communication applications to communicate with co-conspirators and victims, and third-party application data is likely to include such communications as well as help identify additional accounts.

g. *iOS backups.* Based on my training and experience, I know that a full iPhone, iMac, or iPad backup to an iCloud account can contain each of the types of data set forth above, including emails, text messages, documents, and third party application data. Accordingly, there is reason to believe that any device backup will contain evidence of the Subject Offenses.

h. *Preserved and backup records.* On or about August 25, 2021, the Government sent a preservation request to Apple pursuant to 18 U.S.C. § 2703(f) for the iCloud Account, and received confirmation from Apple that reasonable steps had been taken preserve the available requested records. Because a preservation functions as a snapshot of the account as it existed at the time of the preservation, any preserved records of the iCloud Account are expected to include content and other data that were extant on the account immediately before the preservation notice, but deleted by Hwang after that preservation's submission to and processing by Apple.

74. <u>Temporal Limitation.</u> As set forth above, Archegos changed its trading strategy to engage in market manipulation in or around March 2020. Accordingly, content for the iCloud Account is requested from shortly before that change, January 1, 2020, to the present.

12.06.2018

SDNY_001_00000215

### F. Evidence, Fruits and Instrumentalities

75. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to each proposed warrant.

76. In particular, I believe the Subject Accounts are likely to contain the following information:

a. Evidence of Archegos's cash position, including account balances, company ledgers, margin call reports and notices, Treasury orders, transfer requests, and account statements.

b. Evidence of trading conducted by, or at the request of Archegos, such as trade confirmations, position reports, portfolio summaries, and discussions of trading strategy.

c. Evidence reflecting representations made to prime brokers or others regarding Archegos's trading strategy, portfolio concentration and liquidity, investment decisions, risk profile, solvency, or need for or basis for withdrawing cash from margin or other accounts.

d. Evidence reflecting Archegos's overall portfolio and portfolio at individual counter-parties, including account statements, portfolio breakdowns, or position statements.

e. Evidence of access to, or control over, brokerage accounts, trading accounts, margin accounts, prime brokerage accounts, or custodial accounts at financial institutions.

f. Evidence of the state of mind of participants in the Subject Offenses, including communications among co-conspirators and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

g. Evidence of the identities of, and communications among, co-conspirators in the Subject Offenses.

h. Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Archegos meetings and conversations or (b) meetings and conversations with representatives of financial institutions.

78

SDNY_001_00000216

i.   Evidence of the receipt, transfer, disposition or location of funds or securities constituting proceeds of the Subject Offenses.

j.   Evidence relating to efforts to evade law enforcement and/or regulatory agencies.

k.   Information that would assist in identifying and locating investors, prospective investors, victims or witnesses.

l.   Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

m.  Evidence of motive to commit the Subject Offenses.

n.   Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

o.   Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of crimes, and proceeds of those crimes.

p.   Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

## III. Review of the Information Obtained Pursuant to the Warrant

77. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and

12.06.2018

SDNY_001_00000217

instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

78. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

79. The scope of this ongoing criminal investigation is not publicly known.  As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Based on available information, it appears that multiple subjects of this investigation, as reflected above, have used various email, messaging, and telephone services to communicate with each other and with potential victims in this case. Digital data, including emails, electronic messages, and call data, can easily be deleted or modified, and

80

SDNY_001_00000218

that the subjects of this investigation are capable of destroying that evidence if they become aware of the focus and scope of the Government's investigation. This concern is heightened here, where the subjects of the investigation worked for and through a business entity that the Government understands to be facing potential restructuring or liquidation, and thus business document retention practices may not be observed or enforced. Additionally, the subjects of the investigation appear to have access to substantial wealth and have the means to flee.

80. These risks extend to notification to representatives of the enterprise account holder for the Microsoft Accounts. Although there has been some public reporting regarding this investigation, its existence has not been confirmed to Archegos or publicly, Archegos's representatives are not aware of its scope, and numerous representatives of Archegos have longstanding relationships with Hwang, Tomita, Halligan, Becker, Taniguchi, Scholl, and DeSantos. Moreover, Archegos is or was a "family office," and is effectively a corporate shell for Hwang himself. Were the specifics of this request disclosed, including the types of data sought, it could alert Hwang, Tomita, Halligan, Becker, Taniguchi, Scholl, and DeSantos or other individuals that the Government is in fact conducting this investigation, leading to destruction of evidence and flight from justice, and could also reveal that the Government is seeking particular types of records which would reveal the direction of the Government's investigation. Disclosure to Archegos's outside counsel does not appear to be a viable option because, based on my understanding of professional responsibility rules, such counsel will be required to report such a disclosure to the client, Archegos, which is also effectively Hwang.

81. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers

81

SDNY_001_00000219

not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

82. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

83. Finally, based on my training and experience, I know that Microsoft will request that the Government seek data related to an enterprise such as Archegos, which would include data relating to the Microsoft Accounts, directly from the enterprise, pursuant to the U.S. Department of Justice Policy titled Seeking Enterprise Customer Data Held by Cloud Service Providers, December 2017, available at https://www.justice.gov/criminal-ccips/file/1017511/download. However, pursuant to that policy, because Archegos appears to be solely controlled by or at least closely associated with the Target Subjects of this investigation as set forth above who would be in a position to delete, encrypt, or otherwise conceal the requested data if alerted to the Government's investigation, I respectfully request that the proposed order specifically require Microsoft to produce enterprise data.

82

SDNY_001_00000220

## V. Conclusion

84. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

/s/ sworn telephonically
_____
Special Agent Thomas McDonald
Federal Bureau of Investigation

Sworn to before me this 27th day
of September, 2021

_____
HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

83

12.06.2018

SDNY_001_00000221

# EXHIBIT A

SDNY_001_00000222

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

See Both Attachments A

)
)
)
)
)
)

# 21 MAG   7286

Case No. 21 Mag.

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attached Affidavit and Both Attachments A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| 15 U.S.C. 78j(b) & 78ff; 17 C.F.R. 240.10b-5; 18 U.S.C. 371, 1014, 1343, 1344, 1348, 1349 | Fraud in connection with the purchase and sale of securities; fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934; wire fraud; bank fraud; false statements to a lending institution; conspiracy and attempts to do the same. |

The application is based on these facts:

See Attached Affidavit and Both Attachments A

☑ Continued on the attached sheet.

☐ Delayed notice of ___30___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Thomas McDonald, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **7·21·21**

City and state:  New York, NY

_____
*Judge's signature*

Hon. Katharine H. Parker, U.S.M.J.
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for a Search and Seizure Warrant for:<br><br>(1)   an iPhone X Space Gray 256GB bearing Serial Number DNPVMVVQJCL6, in the Possession, Custody, or Control of Scott Becker, and<br><br>(2)   the Premises Known and Described as 23 Danielle Drive, Goshen, New York 10924, and Any Closed Containers / Items Contained Therein,<br><br>USAO Ref. No. 2021R00339. | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

        THOMAS McDONALD, being duly sworn, deposes and says:

## I.   Introduction

### A.   Affiant

        1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 14 years. I am assigned to a squad that focuses on securities and investment frauds in the FBI's New York Field Office. I have participated in numerous investigations involving fraud, including those concerning hedge funds, insider trading, and market manipulation. I am familiar with the use of computers, cellphones, instant message services, and cloud-based accounts in connection with criminal activity. I have participated in the execution of numerous search warrants involving electronic evidence, including cellphones.

        2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person and premises specified below and in Attachment A to each of the proposed warrants, respectively, for, and to seize, the items and

2017.08.02

information described in Attachment A to each of the proposed warrants. This affidavit is based upon my personal knowledge; my review of documents and other evidence, including emails, spreadsheets, handwritten notes, Bloomberg messages; materials obtained from the U.S. Securities and Exchange Commission through a file access request; my review of audio recordings and draft transcriptions of audio recordings; my review of public news reports; my review of publicly available price and volume information about certain equity securities; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.   The Subject Person**

3.      The Subject Person to be searched is Scott Becker, who was born on August 16, 1983, and who resides at 23 Danielle Drive, Goshen, NY 10924, and any and all clothing and personal belongings, backpacks, briefcases, purses, and bags that are within Becker's immediate vicinity and control at the location where the search warrant is executed. Becker is depicted in the following photograph, which was obtained from Department of Motor Vehicle records:

2

2017.08.02

SDNY_001_00000225



4.     As further described below, this application seeks authorization to search the Subject Person only for a cellphone described below as Subject Device-1.

## C. The Subject Devices

5.     The Subject Devices are Subject Device-1 and Subjective Device-2.

6.     Subject Device-1 is particularly described as an iPhone X space gray 256GB, model MQCN2LL/A, bearing serial number DNPVMVVQJCL6.

7.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online,[1] I know that Subject Device-1 has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal digital assistant.

8.     Subject Device-2 is particularly described as an iMac 27" bearing serial number D25M10MQF8JC.

---

[1] https://support.apple.com/kb/sp770?locale=en_US

2017.08.02

3

SDNY_001_00000226

9.      Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online,[2] I know that Subject Device-2 is a personal computer with data storage, internet, and videoconferencing capabilities.

10.     The Subject Devices are presently located in the Southern District of New York.

**D.  The Subject Premises**

11.     The Subject Premises are particularly described as the residence located at the address 23 Danielle Drive, Goshen, NY 10924, consisting of a free-standing, two-story house, with an attached garage and a partial wrap-around porch. The following is a photo of the Subject Premises obtained from an online repository of Orange County property records:



12.     The Subject Premises are located within the Southern District of New York.

_____

[2] https://support.apple.com/kb/sp688?locale=en_US

4

SDNY_001_00000227

### E. The Subject Offenses

13.     For the reasons detailed below, I believe that there is probable cause to believe that Subject Device-1, Subject Device-2, and the Subject Premises contain evidence, fruits, and instrumentalities of (a) fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) wire fraud, in violation of Title 18, United States Code, Section 1343; (d) bank fraud, in violation of Title 18, United States Code, Section 1344 and false statements to a lending institution, in violation of Title 18, United States Code, Section 1014; and (e) conspiracies and attempts to commit the same, in violation of Title 18, United States Code, Sections 371 and 1349 (the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding Becker's Commission of the Subject Offenses

#### *Archegos Causes Billions in Losses*

14.     As used in this affidavit, "Archegos" and "Archegos Capital" refer to a related group of business entities that managed the personal wealth of Sung Kook Hwang, who went by the nickname "Bill." Based on know-your-customer information supplied by Archegos to various banks and broker-dealers, Archegos payroll records, press accounts, and internal Archegos correspondence, I have learned, in part, the following:

a.  Archegos is principally composed of Archegos Capital, LLC, Archegos Capital Management, LP, and Archegos Fund LP. Archegos Capital, LLC acted as the general partner of Archegos Capital Management, LP, which, in turn, acted as the management company for Archegos Fund LP.

2017.08.02

5

SDNY_001_00000228

b.   Archegos is the successor entity to Hwang's prior investment firm, Tiger Asia Management, LLC. In or about February 2013, Hwang rebranded Tiger Asia Management to Archegos Capital Management following Tiger Asia Management's 2012 conviction for wire fraud in the District of New Jersey and related enforcement actions by the U.S. Securities and Exchange Commission and the Hong Kong Securities & Futures Commission. After Tiger Asia Management's conviction, it returned all outside investor capital and deregistered as an investment advisor with the S.E.C. Thereafter Archegos managed Hwang's personal wealth as a so-called "family office."

c.   Bill Hwang owned and managed Archegos. Archegos also employed, among others, Andrew A. Mills as President, Patrick Halligan as Chief Financial Officer, Scott Becker as Chief Risk Officer, William Kenji Tomita as Head Trader, and Austin Scholl, Peter DeSanto, and Daiki Taniguchi as traders.

d.   As of early 2021, Archegos's investment portfolio made extensive use of an instrument known as a total return equity swap. Based on my experience, review of documents and publicly available information, and participation in interviews in this investigation, I know a total return equity swap is a two-sided financial contract in which one counterparty pays out the total return of the equity, including its dividends and capital appreciation or depreciation, and in return, receives a regular fixed or floating cash flow. For the party that agrees to receive the total return of the equity, a total return equity swap is, in effect, a bet that the equity will increase in value by the end of the term of the swap.

e.   Between 2013 and January 2020, Archegos established prime brokerage relationships with multiple financial institutions, including Credit Suisse, Goldman Sachs & Co., Jefferies Financial Group, Morgan Stanley, Nomura Global Financial Products, MUFG Americas,

6

SDNY_001_00000229

and UBS. Based on my training and experience, I have learned that "prime brokerage" is a bundled group of services that investment banks and other financial institutions offer to hedge funds and other large investment clients. These services typically include the ability to buy and sell equities and derivatives, such as total return equity swaps, including using funds borrowed from the prime brokerage.

f.  Using various of its prime brokerage relationships, Archegos engaged in swaps trading, often in the form of the total return equity swaps. Archegos's total return equity swaps positions were usually "long"—meaning that it would make money if the security underlying the swap increased in value—and Archegos's prime brokerage partners acted as swap counterparties. Typically, to hedge their risk, Archegos's prime brokerage partners would acquire and hold the equities referenced by Archegos's swaps.

15.  Based on a table of Archegos position and trade information obtained from Archegos by the U.S. Securities and Exchange Commission, I know that as of March 1, 2021, Archegos managed approximately $23 billion in capital, held approximately $77.4 billion of long equity exposure in the market, and held approximately $39.5 billion of short equity exposure in the market. Archegos's portfolio had been increasing in value for months at the start of 2021, but Archegos's portfolio turned sharply negative the week of March 22, 2021. By the close of business on March 26, 2021, Archegos's internal position and trade spreadsheet reflected that the firm held negative $5.7 billion: Archegos had lost more than $40 billion in a matter of days.

16.  By April 2021, numerous news outlets were reporting that, not only had Archegos collapsed into insolvency, but it had caused billions of dollars in losses to the banks providing it with prime brokerage services. For example:

2017.08.02

SDNY_001_00000230

      a.      In an April 22, 2021 investor update, Credit Suisse reported at least an estimated $4.7 billion in losses due to its business with Archegos.

      b.      In an April 27, 2021 press release, Nomura estimated that its US subsidiary lost at least $2.3 billion due to its business with Archegos, with hundreds of millions in additional losses still to be realized.

      c.      In an April 16, 2021 call with analysts, Morgan Stanley's CEO reported that the bank had lost approximately $911 million due to its business with Archegos.

      d.      In an April 27, 2021 investor update, UBS estimated that it had lost at least $774 million due to its business with Archegos, with additional losses still to be realized.

      e.      Based on a March 29, 2021 "Early Termination Calculation Statement," I have learned that, at that time, Jefferies estimated that Archegos owed Jefferies approximately $43.4 million.

17.     In total, by late April 2021, the *Wall Street Journal* and other news outlets were reporting that Archegos's prime brokerage counterparties had lost more than $10 billion. *See, e.g.*, Margot Patrik and Quentin Webb, "Archegos Hit Tops $10 Billion After UBS, Nomura Losses," https://www.wsj.com/articles/ubs-takes-surprise-774-million-archegos-hit-11619501547 (last accessed: July 19, 2021).

### *Archegos Personnel Misled at Least Certain of Its Prime Brokers Causing Loss*

18.     As described more fully below, I believe that there is probable cause to conclude that Archegos—through at least Scott Becker, its Chief Risk Officer—deceived at least certain of its prime brokers regarding (a) the nature and concentration of its investments and (b) its liquidity and cash position. I further believe that there is probable cause to conclude that this deception formed part of a scheme to defraud Archegos's prime brokers calculated to allow Archegos to

8

2017.08.02

SDNY_001_00000231

obtain and preserve the ability to place large-value, leveraged trades through its prime brokerage partners. As set forth below, Archegos's misrepresentations caused at least hundreds of millions of dollars in losses.

*Archegos Obtains $2 Billion in Additional Trading Capacity from UBS*

19.     I participated in an interview of a UBS risk management official ("UBS Employee-1") who, in part, had responsibility for determining how much leverage to extend to Archegos for trading done through UBS's prime brokerage unit. Based on an interview of UBS Employee-1 and a review of prime brokerage and margin agreements between UBS and Archegos, I have learned, in part, the following:

   a.     At the beginning of March 2021, Archegos was a client of UBS and had been for approximately one year. Archegos's trading through UBS primarily took the form of total return equity swaps. These swaps were typically structured such that Archegos's positions would increase in value if the underlying equity security increased in value and, conversely, Archegos's positions would decrease in value if the underlying equity security declined in value.

   b.     UBS permitted Archegos to trade swaps "on margin," meaning Archegos did not have to supply UBS with cash equal to the full value of the swaps it traded in the marketplace. UBS did require, however, that Archegos deposit as collateral, generally referred to as "margin," a portion of the value of the swaps, which portion varied daily, in part, based on the value of the swaps as measured by then-prevailing market prices. For example, if the value of the swaps to Archegos increased from Monday to Tuesday, the contract between UBS and Archegos permitted Archegos to draw down cash in its UBS accounts on Wednesday; conversely, if the value of the swaps to Archegos decreased from Monday to Tuesday, UBS would require Archegos to add cash in its UBS account. If the amount of cash in the margin account was not sufficient to

2017.08.02

SDNY_001_00000232

the amount required by UBS, UBS would issue a "margin call," which meant that Archegos had until the close of business the following day to post sufficient additional cash.

      c.    UBS also limited the total size of the trades it was willing to engage in with Archegos, particularly with respect to any single equity or total return equity swap. In this way, UBS had "capacity" limits that defined the upper bound of the amount of market risk it was willing to accept in its dealings with Archegos.

      d.    As of early March 2021, Archegos had fully utilized all of the credit capacity UBS had agreed to extend to Archegos, which, at the time, totaled approximately $10 billion in market value.

      e.    On or about March 8, 2021, UBS Employee-1 became aware that Archegos's head trader, Will Tomita, had inquired about raising the capacity limit by approximately $2 billion to enable Archegos to place additional trades through UBS. Because additional trades would expose UBS to additional market risk, UBS Employee-1's approval was required before UBS would agree to increase the capacity limits.

      f.    UBS, as was typical of prime brokers, did not have visibility into trading activity conducted by its clients at other prime brokers. UBS had similar limitations with respect to Archegos: although UBS was aware that Archegos had other prime brokerage relationships, it did not know what trades, if any, Archegos had placed through those institutions.

    20.    On or about March 8, 2021, three UBS risk management officials, including UBS Employee-1, spoke by phone with Scott Becker, Archegos's Chief Risk Officer, to evaluate the request to expand Archegos's trading capacity at UBS The March 8, 2021 call with Scott Becker

10

SDNY_001_00000233

was recorded by UBS Employee-1 pursuant to UBS policy. Based on a review of the audio recording of that call, I have learned, in part, the following conversation occurred:

      a.      UBS Employee-1 began the call by explaining that the purpose of the call was to discuss Archegos's request for additional capacity: "Will is you know, again looking for some additional capacity." Based on context and my participation in the interview of UBS Employee-1, I understand "Will" refers to Will Tomita.

      b.      Becker, in part, informed the UBS team that Archegos had continued to have remarkable success since its last performance update to UBS, noting: the "February the streak continued, so in February we were up 38 percent, and that brought capital to 23 billion 46 million."[3]

      c.      Later in the conversation, one of the UBS employees ("UBS Employee-2") inquired about the size of Archegos's positions relative to the portfolio:

> UBS EMPLOYEE-2:    And Scott, can you just remind me in terms of, kind of how the- how the total portfolio, not just UBS portion looks, um, as a percent of um, of the 23 billion, where do you guys cap out your largest position? And if you could talk about kind of your top, the top um, sizes of your, of your largest positions, that'd be helpful.

> BECKER:    Yeah sure, so the largest positions are around 35 percent of capital. Uh, the top 10 positions, they're all pretty close, largest being 35, the smallest being 25, so they kind of tail off gradually. Um, but the top 10 in aggregate being around 300 percent. And this is all on the long side. Like I said, on the short side, being that it's almost entirely index

---

[3] The quotations of certain recorded conversations set forth in this affidavit are based on draft transcriptions, and are in preliminary form only and subject to change upon further review.

2017.08.02

SDNY_001_00000234

> ETFs it's, you know, a little different to look
> at it from that perspective.

Based on my interview of UBS Employee-1, the context of this conversation, and my training and experience, I understand Becker to be explaining that the market exposure, measured in dollars, for Archegos's largest positions equaled approximately 35% of Archegos's capital ("the largest positions are 35 percent of capital") and that the aggregate market exposure from the top ten positions equaled approximately 300% of Archegos's capital ("the top 10 in aggregate being around 300 percent"). I further understand that the value of Archegos's market exposure exceeded the value of Archegos's capital because it made use of margin trading and other forms of leverage, so it could invest more capital than it owned.

     d.  After discussing the relative size of Archegos's positions, Becker and UBS Employee-1 then discussed the size of Archegos's positions in dollar value:

> UBS EMPLOYEE-1: I think you're getting closer to that than you know, where you were 3 months ago, because I mean you know, you certainly had you know, the AUM and the account has moved around a bit from what I recollect in terms of performance, but obviously nothing like this, uh, I've seen and I think in the past your peak was I don't know, eight, nine, ten if I remember from our original conversations a year ago, and now you're quite a bit higher than that.
>
> BECKER: Right, yes.
>
> UBS EMPLOYEE-1: And at 35 percent of AUM for your top position, I mean we're talking seven yards for a name.
>
> BECKER: Yep.

Based on my interview with UBS Employee-1, I understand "AUM" to be an acronym that stands for "assets under management," "yard" to be a colloquialism for "billion," and "name" to be a

12

SDNY_001_00000235

colloquialism for a particular securities issuer. Accordingly, UBS Employee-1's statement—"we're talking seven yards for a name"—signifies that Archegos largest positions would each total $7 billion or more in market exposure.

    e.  After discussing the relative and dollar-value size of Archegos's positions, Becker and UBS Employee-1 then discussed the nature of Archegos's positions at other prime brokerages:

| | |
|---|---|
| UBS EMPLOYEE-1: | And I mean, I'm hoping it's Amazon, a Google, a Microsoft, an Apple, like big, stupidly-liquid type name, whereby you know even at that size it doesn't really matter, you can dump that and not move the market. |
| BECKER: | Mhm. Right— |
| UBS EMPLOYEE-1: | And those are kind of the names that I recall from a year ago that were some of your bigger names, were those type names if I remember. |
| BECKER: | Yeah, and they still are. They still are. Those were going back to when we became the family office in uh, early 2013 or so, and I would say then through maybe late 2019 or so, those were, I mean essentially those were our portfolio frankly. |
| UBS EMPLOYEE-1: | Wow, okay. |
| BECKER: | Yeah, it's- |
| UBS EMPLOYEE-1: | I didn't think my memory was that good, but I'll take it. |
| BECKER: | Yeah no, it's (laughter). Those have always been pretty big names for us, so we're taking advantage in the recent pullback in a few of those. |
| UBS EMPLOYEE-1: | Yep. Yeah, because that's really where I get, if I'm honest, that's where I get concerned on the liquidity profile is. I mean you have a lot of big-conviction names but as long as the market is deep enough, it doesn't really matter almost how big you get, but when |

13

2017.08.02

SDNY_001_00000236

you're not playing in the 100-billion, 500-billion type market cap names, it then becomes, you know, the liquidity, you know, under the surface can be less than what you're seeing if the market churns.

BECKER:   Right, yeah that makes sense.

Based on my training, experience, and interview of UBS Employee-1, I understand this conversation to reflect UBS Employee-1's efforts to evaluate how risky Archegos's concentrated trading strategy would be to UBS, given that UBS did not have independent visibility into Archegos's trading elsewhere. Accordingly, UBS Employee-1's statement that he hoped certain of Archegos biggest positions were "stupidly liquid," like "Amazon or Google, Microsoft and Apple," was an effort to determine whether Archegos's overall portfolio was structured so that even though its biggest positions were large they could be sold if necessary and still "not move the market." UBS Employee-1 then recalled that Archegos had previously said it traded in those sorts of highly-liquid securities ("I recall from a year ago that were some of your bigger names"), and Becker agreed ("Yeah, and they still are."). Becker then emphasized that those liquid stocks remained large positions and, indeed, had recently increased its position in them ("Those have always been pretty big names for us, so we're taking advantage in the recent pullback in a few of those."). Based on this conversation, UBS Employee-1 understood that some of Archegos's largest positions were in highly-liquid stocks like Amazon, Google, Microsoft, or Apple and that, therefore, Archegos could, if necessary, quickly and substantially sell out of its positions in those securities and generate cash to meet margin calls.

f. Later the conversation turned, in part, to how Archegos's investments conducted through other prime brokerages compared to those at UBS:

UBS EMPLOYEE-2:   Bryan, just because I missed it and I'm sorry Scott, it sounds like our portfolio though is pretty, at least our top names are pretty fairly

14

2017.08.02

SDNY_001_00000237

representative of, and excuse me if I'm wrong Scott, pretty representative of what you have across your brokers right? In the size? Is that fair to say?

BECKER: Let me take a look here. Uh, hang on a second, I just want (U/I)

UBS EMPLOYEE-1: I was just saying, I guess I would think we don't have a ton of your top 10s, because we don't have those names.

BECKER: Yeah, it's- it's not fully representative, and I think part of that is as we, because we really got- When did we open our account with you guys, was it late 2019?

UBS EMPLOYEE-1: June-ish, July last year. No, it's not even been a year I think.

BECKER: 'Cause some of these names, yeah, looking at these names that we have with you guys, and just, if I look at the portfolio, uh, GSX, Viacom, Discovery. What else? I think some of the ADRs- Like we really started trading those more actively last year as- as things turned a bit. Being that we were on-boarding with you guys and you guys had the capacity, that's- that's how we got to that place with you guys. So it's not a- Not to say that those names aren't big names but I wouldn't say if you took our top ten positions at UBS, that those are our top ten positions overall.

UBS EMPLOYEE-1: Yeah. Well I mean, other than Viacom I don't know that you could have five, seven yards of any of those names.

BECKER: (Laughter) Right.

UBS EMPLOYEE-1: Just to be honest, I know the market caps and DTV, so-

BECKER: Yeah, yeah, exactly.

UBS EMPLOYEE-1: Like my expectation is my book is different than your others.

15

SDNY_001_00000238

BECKER:            Yeah, it is.

Based on my training, experience, and an interview of UBS Employee-1, I understand that in this conversation UBS Employee-2 asked Becker whether the trades placed through UBS are similar to the trades at other prime brokers ("our top names are pretty fairly representative of, and excuse me if I'm wrong Scott, but pretty representative of what you have across your brokers right?"). UBS Employee-1, however, interjected to say that UBS could not have a similar book to other prime brokers because Archegos did not have the substantial trades in highly liquid equities like Amazon, Google, Apple, or Microsoft at UBS that Becker had just referenced ("I guess I would think we don't have a ton of your top 10s, because we don't have those names."). Becker then agreed with UBS Employee-1 that UBS's book did not fully reflect Archegos's trading strategy ("Yeah, it's- it's not fully representative"). UBS Employee-1 then further observed that it would be difficult to have billions of dollars in exposure to most of the equities Archegos was trading at UBS ("Well I mean, other than Viacom I don't know that you could have five, seven yards of any of those names."), which prompted Becker to chuckle. UBS Employee-1 then confirmed one more time that the Archegos trades at UBS did not reflect Archegos positions at other prime brokers ("Like my expectation is my book is different than your others."), to which Becker agreed ("Yeah, it is.").

21.    After the call, UBS decided to solicit additional information from Archegos about Archegos's risk profile before agreeing to increase the capacity limits. Based on a review of email correspondence between UBS employees and Becker, I have learned that later on or about March 8, 2021, UBS Employee-2 asked if Archegos could identify "which, if any" of the positions at UBS were "top 10 in your overall exposure (across counterparties)." Becker refused to provide the information: "unfortunately I cant [sic] comment about positions sizes away from UBS or individual names overall." UBS Employee-2 then inquired, "without naming the name of the

16

SDNY_001_00000239

common/stock security just Top 1, Top 2 by GMV (excluding ETFs) the % of ADV you are of that security?" (Based on context and my training and experience, I believe that "GMV" refers to gross market value; "ETFs" refer to exchange traded funds; and "ADV" refers to average daily trade volume.) Becker refused to provide that information, too, writing, "unfortunately I can't provide that color either, I spoke to Will Tomita on it and he said that if there are liquidity profile concerns that you could reflect that in the margin rates."

22.      On or about March 10, 2021, Becker, using the Subject Device-1, called UBS Employee-1 to discuss again whether UBS would increase its capacity limits. The call was audio recorded by UBS Employee-1 pursuant to UBS policy.

     a.      During that call, UBS Employee-1 explained that he needed more information:

| | |
|---|---|
| UBS EMPLOYEE-1: | I appreciate your sensitivity towards your top names and stuff, but I just need a little more color on the overall liquidity because, just to be upfront and honest, like when you, when we first on-boarded the account you guys gave us great transparency, you know, but at four billion, levered call it five, it's twenty yards. Now at 100, 120 billion, the balance is, like, it's much more meaningful in the market. |
| BECKER: | Right. |
| UBS EMPLOYEE-1: | You know, and, and that's what I'm trying to you know, make sure that my boss and his boss, who I have to have a follow-up call with, you know, just have some level of comfort that, you know, because, portfolio liquidity at that size is probably the biggest item. |
| BECKER: | Okay. Yeah, that makes sense. |

17

SDNY_001_00000240

Based on a review of the audio recording of the call, my training, experience, and an interview of UBS Employee-1, I believe that this conversation reflects UBS Employee-1 conveying to Becker that UBS needed more information about Archegos's trading ("I just need a little more color") because Archegos's positions had become so large that liquidity—that is, the ability to sell out of the position when desired—was a concern for UBS ("portfolio liquidity at that size is probably the biggest item"). Becker indicated that he understood liquidity information was important to UBS ("Yeah, that makes sense.").

　　　　　b.　　　　As the March 10, 2021 call continued, Becker informed UBS Employee-1 that he had obtained additional information to share with UBS following a conversation with Will Tomita, Archegos's head trader:

| | |
|---|---|
| BECKER: | So what he said right now overall, we could close out half the book in ten days, twenty-five percent of the book in twenty days- |
| UBS EMPLOYEE-1: | You mean the next twenty-five percent? |
| BECKER: | Right, exactly, but we do it all concurrently, so the whole process, in terms of that first seventy-five percent is twenty days- |
| UBS EMPLOYEE-1: | Yeah yeah yeah. |
| BECKER: | And then the rest of the book, to close everything out fully, about a month. |
| UBS EMPLOYEE-1: | And what, what is this in terms of, you know, DTV use? |
| BECKER: | Volume? |
| UBS EMPLOYEE-1: | Yeah is this like, ten percent? |
| BECKER: | Between ten to fifteen percent of volume, depending on the name. |
| UBS EMPLOYEE-1: | Okay. |
| BECKER: | He kind of did a deep dive into it. |

18

SDNY_001_00000241

| | |
|---|---|
| UBS EMPLOYEE-1: | Any chance you have the numbers in the first five days? |
| BECKER: | Uh, no. I do not. |
| UBS EMPLOYEE-1: | Okay. So, okay, if I do that, that implies like fifty percent of your book is roughly one DTV. Twenty percent of your book is two DTV, and the last twenty-five percent, if I can write, is about three DTV. |
| BECKER: | Yeah, that makes sense. |
| UBS EMPLOYEE-1: | Which would tell me your average book is about one and a half, call it one and three quarters DTV, for the whole book. |
| BECKER: | Yeah. Yeah, that gets about there, right. |
| UBS EMPLOYEE-1: | Okay. Okay, that is helpful, so thank you for that. |

Based on a review of the audio recording of the call, my training, experience, and interview of UBS Employee-1, I believe that this conversation reflects Becker providing information about the concentration and liquidity of the Archegos portfolio to UBS Employee-1. In particular, Becker relayed information he said he obtained from Will Tomita about how quickly Archegos could unwind its positions ("we could close out half the book in ten days, twenty-five percent of the book in twenty days"). Becker also relayed that those numbers were based on closing its book at a rate equal to approximately ten to fifteen percent of the average daily traded volume of any particular equity ("Between 10 to 15 percent of volume, depending on the name."). UBS Employee-1 then performed some back-of-the-envelope calculations to conclude that, based on those numbers, Archegos's overall portfolio across all prime brokers had positions that averaged 1.75 times the daily traded volume of the stock, which Becker agreed was accurate ("Yeah, that gets about there, right.").

19

2017.08.02

SDNY_001_00000242

23.     UBS Employee-1 has informed me that, based upon this back of the envelope calculation, he concluded that Archegos's largest positions were in highly liquid stocks, such as Amazon and Google, because only those stocks have a sufficiently large average daily traded volume for Becker's representations about the speed at which the portfolio could be liquidated to be true.

24.     Following the March 10th call, UBS Employee-1 wrote other members of the risk team to convey the substance of the call. In that email, UBS Employee-1 further observed that "Overall this is better than you feared (assuming our book is the same away which Scott confirmed it isn't). Plus we know their largest positions are the like of Amazon, Google, Facebook, Alibaba type names which we have none."

25.     Based on my interview of UBS Employee-1 and contemporaneous UBS correspondence, I have learned that UBS approved the capacity increase based on what UBS Employee-1 had learned from Becker, namely (a) Archegos's trades through UBS were different than what Archegos was trading with other prime brokers; (b) Archegos's biggest positions across prime brokers were highly liquid stocks, like Amazon, Google, Apple, or Microsoft; and (c) Archegos could close out half of its risk within ten days and all of its risk in a matter of weeks. Within days, Archegos placed additional trades—adding an additional $2 billion in market risk to its portfolio.

*Becker's Statements to UBS Contained False and Misleading Information*

26.     Based on a review of position and trading records maintained by Archegos, and my interview of UBS Employee-1, I have learned that Becker's statements to UBS on March 8 and March 10 contained numerous falsehoods and misleading omissions. For example:

2017.08.02

SDNY_001_00000243

a.    Notwithstanding Becker's March 8th statement that Archegos's top long position was approximately 35% of capital, Archegos's top long position was, in fact, more than approximately 75% of capital as of the close of business on March 5th (the trading day ending most recently before March 8, 2021). Indeed, based on Archegos's own position and trading spreadsheet, at no time between March 1, 2021 and March 8, 2021 were either of Archegos's top two positions less than 50% of Archegos's capital.

b.    Notwithstanding Becker's March 8th statements suggesting that highly liquid stocks such as Amazon, Google, Apple, and Microsoft ranked among the top ten of Archegos's positions in terms of size of position, they did not. Based on Archegos's own contemporaneous tabulation of its positions, none of Amazon, Google, Apple, Facebook, Microsoft, and Alibaba figured among the top ten largest positions held by Archegos as of the close of business on March 5th (the trading day ending most recently before March 8, 2021). (Microsoft came closest, coming in at number eleven, measured by value.)

c.    Notwithstanding Becker's March 8th statements that the trades through UBS were not representative of Archegos trades elsewhere, in fact, they were. Archegos's positions at UBS included swaps in the securities of Viacom, GSX Techedu, Bidu, Tencent Music Entertainment, iQYI, Discovery, Texas Capital Bancshares, and Farfetch—each of which ranked among Archegos's ten largest positions across all prime brokers as of March 8th and, in fact, collectively represented nine of Archegos's top ten positions.[4]

d.    Notwithstanding the fact that Becker chuckled and said "right" when UBS Employee-1 remarked that Archegos could not possibly have five- to seven billions of dollars of exposure to the equities it traded through UBS, other than Viacom, Archegos, in fact, did have

---

[4] Archegos held two positions in Discovery, corresponding to two classes of Discovery shares.

2017.08.02

SDNY_001_00000244

more than five billion dollars of exposure to multiple of those equities. Indeed, as of the close of business on March 5, 2021, Archegos had more than $5 billion in market exposure to Discovery, Tencent Music, GSX Techedu, iQYI, and Bidu, in addition to Viacom.

        e.       Notwithstanding the fact that Becker represented to UBS Employee-1 on or about March 10 that Archegos could close out its book in approximately one month using 10-15% of the daily traded volume of the equities associated with its positions, UBS Employee-1 estimates, based on public information about the sell-off of Archegos's positions, that, in truth, it would have taken as many as approximately 200 days to close out the risk in Archegos's book due to the extraordinary concentration of the investments.

      27.     During the interview of UBS Employee-1, UBS Employee-1 informed me, in substance and in part, that, had he known that Archegos's positions at UBS were similar to its positions across all brokers or that Archegos did not have as significant relative exposure to highly liquid stocks, like Amazon, Google, and Facebook, as Becker represented, UBS Employee-1 would not have approved the capacity limit increase. Moreover, UBS Employee-1 informed me, in substance and in part, that had UBS Employee-1 known those details, UBS Employee-1 would have recommended that UBS terminate the client relationship entirely because of the extraordinary risk posed by its large, highly-concentrated, highly illiquid positions.

*Archegos Misleads Jefferies and UBS into Sending Excess Margin While Facing Shortfalls*

      28.     Like other prime brokerages, Jefferies permitted Archegos to place trades on margin and to maintain an account to which Archegos would post margin, when necessary.

      29.     Based on my participation in an interview of a Jefferies employee with risk management responsibilities for the Archegos account ("Jefferies Employee") and my review of notes taken by Jefferies Employee, I have learned, in part, the following:

2017.08.02

SDNY_001_00000245

a.   In or about March 2021, Archegos contacted Jefferies about increasing the amount of trades it placed through Jefferies. At the time, Archegos had exhausted available capacity with Jefferies, which totaled approximately $950 million in notional value.

b.   On or about March 19, 2021, Jefferies Employee spoke by telephone with Scott Becker to obtain an update on Archegos and, in particular, its liquidity and positions to evaluate the request for additional capacity. Becker, in substance and in part, informed Jefferies Employee that Archegos had approximately $7 billion in available cash.

c.   On or about March 24, 2021, based on prices as of the close of business on March 23, 2021, Archegos had hundreds of millions of dollars in excess margin at Jefferies. Archegos requested that Jefferies return excess collateral in its margin account to Archegos.[5] Jefferies Employee, who heard about the request, spoke to Becker on or about March 24, 2021, to discuss the request for return of excess collateral. Based on call detail records that show Becker placed an approximately 11-minute phone call to Jefferies on March 24, 2021, I believe that Becker used the Subject Device-1 for this call. Jefferies Employee found the request surprising because Becker had not asked for the excess on March 19, 2021, and because Archegos was looking to increase its positions with Jefferies, which would require it to deposit more cash into the margin account.

d.   During the March 24 call between Jefferies Employee and Becker, Jefferies Employee specifically inquired whether Archegos was distressed or confronting a liquidity problem. Becker told Jefferies Employee, in substance and in part, that Archegos was not in a distressed situation and did not have a liquidity issue. Becker explained that the reason for the

---

[5] I am aware that Archegos and Jefferies had one or more contracts that established the circumstances under which Archegos could demand and receive its excess collateral. Based on my experience and participation in witness interviews in this case, I know that, generally speaking, Archegos would be entitled by contract to its excess margin upon request absent an event of default.

2017.08.02

SDNY_001_00000246

request was that Archegos noticed that it had relatively more excess margin in its account at Jefferies than at its other prime brokerages and that Jefferies Employee should approve whatever she was comfortable sending out. Becker also informed Jefferies Employee, in substance and in part, that Archegos had approximately $9 billion in excess cash divided between prime brokerage accounts and custodial accounts.

e.   Based on Becker's explanation, and further based on Becker's specific denials regarding a liquidity or distress situation, Jefferies Employee approved the return of a portion of the excess margin, which Jefferies then wired back to Archegos.

30.     On March 24, 2021 at approximately 3:13 p.m., Becker spoke to UBS Employee-1 using the Subject Device-1. The call was audio recorded by UBS Employee-1 pursuant to UBS policy. Based on my review of that recording and my interview of UBS Employee-1, I have learned, in part, the following:

a.   During the call, UBS Employee-1 informed Becker that UBS would be issuing a sizable margin call to Archegos, to be paid on March 25, 2021.

b.   UBS Employee-1 also noted that he had seen that Archegos had asked UBS to return excess margin in its account, as calculated using March 23, 2021 trade prices. UBS Employee-1 remarked, in part, "I was to be honest a little surprised you guys put in the wire today, uh, for the excess since you've been leaving with us for a while." UBS Employee-1 further noted that it was odd to request it back on the day before a known margin call, but that, as UBS Employee-1 understood the margining agreement, Archegos could have requested the money back the day before. Becker responded, in part, "I'm not sure why it wasn't yesterday or even last week. I think we were, yeah I don't know. I have to talk to the ops guys on it[.]"

2017.08.02

SDNY_001_00000247

c.  Before the call ended, UBS Employee-1 also inquired more generally about Archegos's positions, in light of the upcoming margin call:

> UBS EMPLOYEE-1:  [S]ince I got you, just kinda knowing some of the other bigger names, that they're kinda flat-ish, um, so I'm guessing it's more impacted over here than elsewhere.
>
> BECKER:  Yeah.
>
> UBS EMPLOYEE-1:  Is that a fair statement?
>
> BECKER:  Yeah, it is.

Based on my training, experience, and interview of UBS Employee-1, I understand that UBS Employee-1 was attempting to confirm that Archegos's positions at other prime brokers had not been negatively affected by the downturn in the prices for the securities Archegos had with UBS ("I'm guessing it's more impacted over here than elsewhere") based on UBS Employee-1's understanding from his prior call with Becker that Archegos's largest positions included highly-liquid stocks, such as Amazon, Google, Facebook, and Apple ("just kinda knowing some of the other bigger names"). Becker confirmed that UBS Employee-1 was correct ("Yeah, it is.").

31.    As detailed below, Becker's statements to Jefferies and UBS were false and misleading, and appear calculated to persuade Jefferies and UBS to release cash to Archegos by concealing the fact that Archegos was facing an acute liquidity crisis and significant margin calls from other prime brokers. For example:

a.     During the trading day on March 23, 2021, Archegos positions lost considerable value. Based on Archegos's own position summary, its book lost approximately 9.7% in value between the close of business on March 22, 2021 and the close of business on March 23, 2021.

SDNY_001_00000248

    b.      The downturn in performance created immediate liquidity constraints, in part, because Archegos would be required to post additional margin at various prime brokerages. Based on a review of Archegos emails, I know that by the afternoon of March 23, 2021, Becker was aware of the problem. At approximately 3:10 p.m. on March 23, 2021, for example, Becker wrote to Andy Mills, Archegos's president, observing, "[W]e are in a very tight margin/cash situation today that we are hunkered down on."

    c.      Based on Bloomberg messages exchanged between Becker and Will Tomita, beginning around 15:41 UTC, Becker acknowledged the market movements and the day's trading had depleted billions of Archegos's available cash:

| TOMITA: | How is our cash looking? |
| --- | --- |
| BECKER: | Let me check |
| TOMITA: | Not urgent |
| BECKER: | Not good. |
| BECKER: | Started $6B, less impact from P&L of 3B, less trade impact of $700mm, ending cash $2.3B. |
| TOMITA: | yowza |

And by approximately 19:14 UTC, after some intraday fluctuations, Becker reported to Tomita that cash stood between $500 million and $1 billion.

    d.      Based on a review of Bloomberg messages exchanged between Scott Becker and Archegos employees Jesse Martz, Barima Osei, and David Holhman, I know that at approximately 22:52 UTC on March 23, 2021, Becker sent a message reading, "I don't think I'm going [to] h[a]ve an answer on this cash stuff. There is a zoom with me, pat, will, bill, and andy in a few minutes, but I'll keep you updated on cash here as soon as possible." Based on context, I

2017.08.02

SDNY_001_00000249

understand this message to mean that Becker was going to discuss the liquidity crisis with the most senior members of the firm—Hwang, Mills, Halligan (the CFO), and Tomita.

e.      By the morning of March 24, 2021, Morgan Stanley and Nomura had each issued substantial margin calls to Archegos.

f.      As reflected in Bloomberg messages with one another, over the course of the day of March 24, 2021, Becker, Osei, and Hohlman tracked the escalating negative performance of Archegos's portfolio, noting as it passed negative 19% and later as it passed negative 41.5%.

g.      As representatives of Morgan Stanley and Nomura began inquiring about Archegos's ability to pay the issued margin calls, Becker, in a Bloomberg message sent at approximately 15:40 UTC, instructed his colleagues to ignore them: "We should not reply to any of those margin call follow up emails."

h.      By approximately 17:23 UTC, Becker wrote via Bloomberg, "OK—we are paying Nomura now actually" and "Will just said to pay." Osei responded, however, that "We don't have the money if JEFF doesn't hit though." To which Becker replied, "We have en[o]ugh for nom, just not MS" and "Will is on the phone w jeff." Based on the context and my training and experience, I understand that the back-and-forth messages between Becker and Osei reflect that Archegos had found enough cash to pay the Nomura margin call but that its ability to meet the Morgan Stanley call as well depended on whether Jefferies ("JEFF") released the excess margin in Archegos's account there ("en[o]ugh for nom, just not MS") and that Will Tomita was in touch with Jefferies about the excess margin in the account there ("Will is on the phone w jeff").

2017.08.02

SDNY_001_00000250

i.   Later, at approximately 17:31 UTC, Hohlman wrote Becker, "What's the latest with MS" and Becker responded, "Waiting to see what Jeff will pay us back, most lik[el]y not the full amount but enough."

j.   At approximately 17:52 UTC, Tomita forwarded to Becker a Bloomberg exchange Tomita had had with a representative of Jefferies, in which Tomita asked Jefferies to release excess margin. The Jefferies representative responded, in part, "Our Credit Officer is going to call Scott to get a bit more colour[.]" Thereafter, Becker wrote Tomita, "Thanks, calling her now." Based on the context, my training, experience, and my interview of Jefferies Employee, I believe that after writing "calling her now," Becker spoke to Jefferies Employee.

k.   At approximately 19:25 UTC, Becker wrote "Spoke to ubs too, they just released the wire." Based on the context, my training, experience, and my interview of UBS Employee-1, I believe that Becker wrote this message after speaking to UBS Employee-1.

32.    Jefferies Employee informed me, in substance, that had she known that Archegos was in a distressed situation, she would never have approved the release of the excess collateral.

33.    In light of the foregoing, there is probable cause to believe that Becker's statements to Jefferies Employee were false and misleading: Contrary to what Becker told Jefferies Employee, Archegos did not have access to $9 billion in cash on March 24, 2021; contrary to what Becker told Jefferies Employee, Archegos was not calling in its excess margin from Jefferies because it was comparatively higher, but because it needed the cash to pay margin calls; and contrary to Becker's statements that Archegos was not in a distressed situation, Archegos was in fact facing an existential liquidity crisis.

34.    There is also probable cause to believe that Becker's statements to UBS Employee-1 were false and misleading. Becker agreed with UBS Employee-1 that Archegos's portfolio was

28

SDNY_001_00000251

"more impacted [at UBS] than elsewhere," but that statement was not accurate; in fact, Archegos's positions at numerous prime brokerages had been deeply strained by the market movements, its overall performance had deteriorated, and it was already struggling to meet margin calls—including a margin call from Morgan Stanley in an amount of approximately $950 million.

*Losses*

35.     Based on public reports, notices of default, and my participation in interviews during this investigation, I know that Archegos subsequently defaulted in its margin obligations to UBS and Jefferies, and that UBS's losses exceed $774 million and Jefferies losses were perhaps as high as approximately $43 million.

**B. Probable Cause Justifying Search of Subject Device-1, Subject Device-2, and the Subject Premises**

36.     Based on subscriber records maintained by Verizon Wireless, I know that the Subject Device-1 is associated with a call number ending in 7921 (the "7921 Number") and subscribed to in the name of Scott Becker, with a payment address at 23 Danielle Drive, Goshen, NY, the address of the Subject Premises.

37.     Based on customer records maintained by Apple, Inc., I have learned, in part, the following: Subject Device-1 and Subject Device-2 have been registered with Apple in the name of "Scott Becker" at the address of the Subject Premises. I have further learned that Becker as at least two Apple iCloud accounts, one of which is associated with the Apple ID "scott.v.becker@gmail.com" and linked to the 7921 Number for iMessages and FaceTime. Based on Apple's records, I know that this iCloud Account has calendar, iCloud photos, contacts, iCloud Drive, Mail, and Photo Stream services enabled. According to Apple's records, Becker also has a second iCloud account, associated with Apple ID "sbecker@archegoscapital.com" and a phone number ending in 8448, for which the 7921 Number is listed as a two-factor authentication phone.

2017.08.02

SDNY_001_00000252

38.     Based on information provided by an information technology firm that assisted Archegos is setting up its cloud computing capabilities, I have learned, in part, that Archegos's emails and documents were hosted by Microsoft and Archegos used Microsoft Office 365 applications and software called Intune MDM. Based on my training and experience, and an internet query of Intune MDM's capabilities, I understand this software configuration is capable of allowing users to remotely access email and data, including on personal computing devices.

39.     Based on statements made by Becker during a recorded call on or about March 24, 2021, I know that as of March 2021 Becker had been performing his work for Archegos from his home in Goshen, New York due to COVID and that Archegos had no planned date on which it would expect employees to return to the office. Accordingly, it is likely that much of Becker's work for Archegos occurred through electronic devices available to him at his home—such as Subject Device-1 and Subject Device-2 or another desktop or laptop computer—rather than through devices at Archegos's Manhattan office.

40.     Further, in my experience, individuals who work from home often take notes, print copies of documents, and have on-hand certain physical work materials to assist them in performing their work as they might at their business office.

41.     From a review of correspondence and messages in this case, I know that (a) Becker and Archegos conducted at least some business by Zoom, including by holding various Zoom meetings in March 2021; (b) Becker sent and received Bloomberg messages and numerous emails; and (c) Becker created and shared a number of reports, which he saved to an Archegos file system. Based on my experience with Zoom, Bloomberg, and cloud-based email systems, I know that Zoom meetings can be convened and joined by electronic devices such as Subject Device-1 and Subject Device-2; that Bloomberg messages can be sent and received through an app on Subject

30

SDNY_001_00000253

Device-1 and through a browser portal on Subject Device-2, among other ways; and that the Subject Devices have the capability to send and receive emails and to create documents and spreadsheets.

42.     Based on preliminary analysis of call detail records for 7921 Number, I have learned the following:

a.     Between January 1 and April 30, 2021, all 5 of the top 5, and 8 of the top 10, most called/received numbers are associated with other Archegos employees or Archegos's transactional counsel, Ropes & Gray. The top 5 called/received numbers during that time-period include Patrick Halligan's cell, Will Tomita's office line, and Barima Osei.

b.     Between in or about September 1, 2020 and Jun 17, 2021, Becker's most frequent contact by telephone was Halligan, with more than 500 calls placed or received in that period.

43.     As noted above, on multiple occasions in March 2021, Becker spoke to UBS Employee-1 using the Subject Device-1. Those calls included the March 10, 2021 call during which Becker misrepresented information about the concentration of Archegos's portfolio. Based on a review of call detail records for the 7921 Number, I also know that Becker called both Tomita and Halligan between the time Becker spoke to UBS Employee-1 on March 8, 2021 and the time Becker spoke to UBS Employee-1 on March 10, 2021.

44.     As noted above, it appears Becker used the Subject Device-1 to contact Jefferies Employee on March 24, 2021. Based on call detail records, using the Subject Device-1, spoke to Halligan immediately before and after the call with Jefferies.

45.     Further, based on communications maintained by Archegos, I have learned that Becker used the Subject Device-1 for other internal and external business matters. For example:

31

SDNY_001_00000254

c.      On or about March 20, 2021, in an email chain with Will Tomita and Patrick Halligan, Becker informed Tomita and Halligan that he had created a margin report and further that "[w]e can jump on the phone and walk through any of this, you can call me at [the 7921 Number]."

d.      On or about March 24, 2021, at approximately 10:05 a.m., Becker wrote an employee of Wells Fargo, at which Archegos had a prime brokerage account, to ask, in part, "Are we able to withdraw some of our excess today cash since the debit is lower?" In a subsequent message, Becker noted "I can be reached at [the 7921 Number]."

e.      At approximately 6:01 a.m. on March 26, 2021, Patrick Halligan, Archegos's CFO, sent an electronic message to Becker at the 7921 Number, reading "When you can, please see about pulling margin call reports together so we can get a picture of the smaller guys[.]"

f.      At approximately 5:42 p.m. on April 1, 2021, Becker, using the 7921 Number, sent an instant message to Halligan reading, "Wire confirmed."

g.      At approximately 5:56 p.m. on April 1, 2021, Halligan sent an instant message to Becker at the 7921 Number, reading "Ok. Guess we will just be on the lookout in case of any more requests[.]"

h.      Based on call detail reports for the week of March 22, 2021, I have learned that Becker used the Subject Device-1 to contact, among others, representatives at UBS, Jefferies, Morgan Stanley, Credit Suisse, Goldman Sachs, and Nomura.

Based on these messages and toll records, I know that Becker, in fact, used Subject Device-1 to communicate with coworkers and prime brokerages, including about cash and liquidity issues, such as excess margin, margin calls, and margin payment wire transfers.

2017.08.02

SDNY_001_00000255

46.     Additionally, like individuals engaged in any other kind of activity, individuals who engage in fraud store records relating to their illegal activity and to persons involved with them in that activity on electronic devices such as Subject Device-1 and Subject Device-2. Such records can include, for example, logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators and victims, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; and bank account and trading information. Individuals engaged in criminal activity often store such records in order to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of transactions for future reference; and (3) keep an accounting of what was said to various victims.

47.     Computer files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the Subject Devices or other laptop and desktop computers and smartphones. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve from information from the Subject Device-1 and Subject Device-2 and other computing devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

48.     In addition to probable cause to believe that the Subject Premises contain desktop and laptop computers, smartphones, or tablets containing evidence of the Subject Offenses, including the Subject Devices, there is also probable cause to believe that the Subject Devices constitute instrumentalities of the Subject Offenses, in that Subject Device-1 was used to convey material false statements to UBS Employee-1, for example.

33

SDNY_001_00000256

49.     Based on the foregoing, I respectfully submit there is probable cause to believe that Scott Becker and other members of Archegos deceived at least certain of Archegos's prime brokers regarding the nature and concentration of its investments and its liquidity and cash position, as part of a scheme to obtain and keep the ability to place leveraged trades through its prime brokerage partners, and that evidence of this criminal activity is likely to be found within computing devices, including the Subject Devices, and among paper records within the Subject Premises.

## III.  Biometric Unlock

50.     Based on publicly available feature specifications advertised on Apple's website, I know that the Subject Device-1 has biometric security features, namely a facial recognition unlock capability known as "Face ID."

51.     The warrant I am applying for would permit law enforcement to compel Becker to unlock the Subject Device-1 using each device's biometric features. I seek this authority based on the following:

i.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize. The Subject Device-1 has facial recognition unlock capabilities.

j.     If a device is equipped with a facial recognition feature, as these are, a user may enable the ability to unlock the device through his or her face. In order to activate this unlocking mechanism, the user holds the device in front of his or her face. The device's front-

SDNY_001_00000257

facing camera apparatus analyzes data based on the user's facial characteristics and compares it to data stored on the device. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

      k.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

      l.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

      m.    The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the search authorized by the requested warrant, it will likely be necessary to unlock the Subject Device-1 using facial

2017.08.02

SDNY_001_00000258

recognition by holding the device in front of Becker. The government may not otherwise be able to access the data contained on the Subject Device-1 for the purpose of executing the search authorized by this warrant.

          n.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

    52.    Due to the foregoing, if the Subject Device-1 may be unlocked using biometric features, the warrant I am applying for would permit law enforcement personnel to hold Becker in place while holding the device in front of his face to activate the facial recognition feature.

    53.    It is anticipated that law enforcement will ask Becker to provide passwords or passcodes for the Subject Device-1 prior to attempting to unlock it using facial recognition features. This application does not, however, seek authority to compel that Becker state or otherwise provide the password or any other means that may be used to unlock or access the Subject Device-1. Nor does this application seek authority to compel Becker to identify the specific biometric characteristics that may be used to unlock or access the Subject Device-1.[6]

---

[6] In the course of my training and experience, I have become familiar with federal court decisions standing for the proposition that government agents may compel individuals to provide biometric data in order to effectuate a search of devices lawfully seized pursuant to a warrant. For example, in *In re Search Warrant Application*, 279 F. Supp. 3d 800, 801 (N.D. Ill. 2017), a district court in the Northern District of Illinois reversed a magistrate judge's decision that the Fifth Amendment's privilege against self-incrimination barred a portion of a search warrant that would have required "residents of a home to apply their fingers and thumbs (as chosen by government agents) to the fingerprint sensor on any Apple-made devices found at the home during the search." The district court noted that the Fifth Amendment "only prevents the government from compelling a person from being a 'witness' against himself" and that, since "[w]itnesses provide *testimony*, [ ] that is the forbidden compulsion; the government cannot force someone to provide a communication that is 'testimonial' in character." *Id.* at 803 (emphasis in original). On the other hand, "the Supreme Court has distinguished between compelling a communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." *Id.* (citing

2017.08.02

SDNY_001_00000259

## IV. Procedures for Searching ESI

### A. Review of ESI

54.     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Devices and any other seized computing device for information responsive to each warrant.

55.     In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data,

---

*United States v. Hubbell*, 530 U.S. 27, 34 (2000), and collecting cases). Applied in the context of biometric data, the court held that, especially where government agents select the fingers to be pressed on the Touch ID sensor, thereby eliminating the "need to engage the thought process of any of the residents at all in effectuating the seizure," "[t]he application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by *itself* does not communicate anything." *Id.* at 803-04 (emphasis in original). Recently, similar reasoning supported a search warrant that would compel biometric data not only from an individual's fingerprints but from his face and irises as well. *See In re Search of [Redacted Text]*, Case No. 18-SW-0122 (GMH), 2018 U.S. Dist. LEXIS 109572 (D.D.C. June 26, 2018).

SDNY_001_00000260

yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the seized computing devices to locate all data responsive to the warrant.

## V.   Conclusion and Ancillary Provisions

56.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

2017.08.02

SDNY_001_00000261

57.     In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Special Agent Thomas McDonald
Federal Bureau of Investigation

Sworn to before me on
July 21, 2021

HON. KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE

39

2017.08.02

SDNY_001_00000262

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

In the Matter of a Warrant for All
Content and Other Information
Associated with the Certain Email,
Cloud Storage, and Electronic
Communications Accounts Maintained
at Premises Controlled by Microsoft
Corporation, Google, LLC, Bloomberg
L.P., and Apple Inc., USAO Reference
No. 2021R00339

----------------------------------------

# 21 MAG 9335

## Search Warrant and Non-Disclosure Order

TO:   Microsoft Corporation ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent Thomas McDonald of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the following email accounts, maintained at premises controlled by Microsoft Corporation, contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto:

      a.   sbecker@archegoscapital.com;

      b.   wtomita@archegoscapital.com;

      c.   phalligan@archegoscapital.com;

      d.   bhwang@archegoscapital.com;

      e.   dtaniguchi@archegoscapital.com;

      f.   ascholl@archegoscapital.com; and

      g.   pdesanto@archegoscapital.com.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A.  The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

    **2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber,  to any representative of the enterprise account holder (including an attorney for the enterprise), or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

12.06.2018

2

SDNY_001_00000264

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

September 27, 2021
_____
Date Issued

6:52 p.m.
_____
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

3

SDNY_001_00000265

## Search Warrant Attachment A

### I.  Subject Account and Execution of Warrant

This warrant is directed to Microsoft Corporation (the "Provider"), headquartered at 1 Microsoft Way, Redmond, Washington 98052, and applies to all content and other information within the Provider's possession, custody, or control associated with the following email accounts (the "Subject Accounts"):

     a.  sbecker@archegoscapital.com;

     b.  wtomita@archegoscapital.com;

     c.  phalligan@archegoscapital.com;

     d.  bhwang@archegoscapital.com;

     e.  dtaniguchi@archegoscapital.com;

     f.  ascholl@archegoscapital.com; and

     g.  pdesanto@archegoscapital.com.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II.  Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is directed to produce

SDNY_001_00000266

the following information associated with the Subject Accounts from January 1, 2020, to the present:

      a.  *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

      b.  *Address book information.* All address book, contact list, or similar information associated with the Subject Accounts.

      c.  *Subscriber and payment information*. All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

      d.  *Transactional records*. All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

      e.  *OneDrive*. All OneDrive files account associated with the Subject Accounts, including all documents and other records stored on the OneDrive accounts.

      f.  *Sharepoint*. All Sharepoint files account associated with the Subject Accounts or their domain name (archegoscapital.com), including all documents and other records stored on the Sharepoint account.

      g.  *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

12.06.2018

SDNY_001_00000267

### III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) manipulation of security prices, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344, (g) false statements to a lending institution, in violation of Title 18, United States Code, Section 1014; and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code, Sections 371 and 1349, including the following:

    a.  Evidence of Archegos's cash position, including account balances, company ledgers, margin call reports and notices, transfer requests, and account statements.

    b.  Evidence of trading conducted by, or at the request of Archegos, such as trade confirmations, position reports, portfolio summaries, and discussions of trading strategy.

    c.  Evidence reflecting representations made to prime brokers or others regarding Archegos's trading strategy, portfolio concentration and liquidity, investment decisions, risk profile, solvency, or need for or basis for withdrawing cash from margin or other accounts.

12.06.2018

SDNY_001_00000268

d.  Evidence reflecting Archegos's overall and prime broker-specific portfolios.

e.  Evidence of access to, or control over, brokerage accounts, trading accounts, margin accounts, prime brokerage accounts, or custodial accounts at financial institutions.

f.  Evidence of the state of mind of participants in the Subject Offenses, including communications among co-conspirators and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

g.  Evidence of the identities of, and communications among, co-conspirators in the Subject Offenses.

h.  Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Archegos meetings and conversations or (b) meetings and conversations with representatives of financial institutions.

i.  Evidence of the receipt, transfer, disposition or location of funds or securities constituting proceeds of the Subject Offenses.

j.  Evidence relating to efforts to evade law enforcement and/or regulatory agencies.

k.  Information that would assist in identifying and locating investors, prospective investors, victims or witnesses.

l.  Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

m.  Evidence of motive to commit the Subject Offenses.

n.  Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

o.  Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of crimes, and proceeds of those crimes.

p.  Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing

4

12.06.2018

SDNY_001_00000269

categories could be stored, including any passwords or encryption keys needed to access such evidence.

12.06.2018

SDNY_001_00000270

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of a Warrant for All Content and Other Information Associated with the Certain Email, Cloud Storage, and Electronic Communications Accounts Maintained at Premises Controlled by Microsoft Corporation, Google, LLC, Bloomberg L.P., and Apple Inc., USAO Reference No. 2021R00339

# 21 MAG 9335

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:     Google, LLC ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent Thomas McDonald of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the email account bill.hwang.tigerasia@gmail.com, maintained at premises controlled by Google, LLC, contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A. The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

SDNY_001_00000271

2. **Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

3. **Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

September 27, 2021
_____
Date Issued

6:52 p.m.
_____
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

2

12.06.2018

SDNY_001_00000272

**Search Warrant Attachment A**

## I.   Subject Account and Execution of Warrant

This warrant is directed to Google, LLC (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 9404, and applies to all content and other information within the Provider's possession, custody, or control associated with the email account bill.hwang.tigerasia@gmail.com (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

## II.   Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account from January 1, 2020, to the present:

a. *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

b. *Address book information.* All address book, contact list, or similar information associated with the Subject Account.

c. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone

number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d.   *Transactional records*. All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations.

e.   *Chats and Instant Messages.* All chats, messages, and shared content in Google Chats, Google Talk, or Google Hangout associated with the Subject Account.

f.   *Search history.* All search history, web browser history, Chrome history, and/or Web & App Activity associated with the Subject Account.

g.   *Google Payments*. All records of payments and payment information associated with the Subject Account.

h.   *Google Drive Content*. All Google Drive records associated with the Subject Account, including all documents and other records stored on the Google Drive accounts.

i.   *Google Docs.* All Google Docs, Google Sheets, and Google Slides records associated with the Subject Account, including all documents created or stored in Google Docs, Google Sheets, and Google Slides.

j.   *Google Calendar.* All calendar entries and records associated with the Subject Account.

k.   *Location History*. All location records associated with the Subject Account.

l.   *Device Information.* Any information identifying the device or devices used to access the Subject Account, including a device serial number, a GUID or Global Unique Identifier, a phone number, serial numbers, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber

2

SDNY_001_00000274

Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access the Subject Account.

m. *Cookie Data and Linked Accounts*. Any information identifying accounts that are associated or connected to the Subject Account, including specifically by Cookie, email account, phone number, Google Account ID, Android ID, or other account or device identifier.

n. *Android Services*. All records relating to Android services associated with the Subject Account.

o. *Preserved or backup records*. Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

## III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) manipulation of security prices, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344, (g)

12.06.2018

SDNY_001_00000275

false statements to a lending institution, in violation of Title 18, United States Code, Section 1014;

and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code,

Sections 371 and 1349, including the following:

a. Evidence of Archegos's cash position, including account balances, company ledgers, margin call reports and notices, transfer requests, and account statements.

b. Evidence of trading conducted by, or at the request of Archegos, such as trade confirmations, position reports, portfolio summaries, and discussions of trading strategy.

c. Evidence reflecting representations made to prime brokers or others regarding Archegos's trading strategy, portfolio concentration and liquidity, investment decisions, risk profile, solvency, or need for or basis for withdrawing cash from margin or other accounts.

d. Evidence reflecting Archegos's overall and prime broker-specific portfolios.

e. Evidence of access to, or control over, brokerage accounts, trading accounts, margin accounts, prime brokerage accounts, or custodial accounts at financial institutions.

f. Evidence of the state of mind of participants in the Subject Offenses, including communications among co-conspirators and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

g. Evidence of the identities of, and communications among, co-conspirators in the Subject Offenses.

h. Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Archegos meetings and conversations or (b) meetings and conversations with representatives of financial institutions.

i. Evidence of the receipt, transfer, disposition or location of funds or securities constituting proceeds of the Subject Offenses.

j. Evidence relating to efforts to evade law enforcement and/or regulatory agencies.

k. Information that would assist in identifying and locating investors, prospective investors, victims or witnesses.

12.06.2018

SDNY_001_00000276

l.  Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

m.  Evidence of motive to commit the Subject Offenses.

n.  Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

o.  Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of crimes, and proceeds of those crimes.

p.  Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

5

12.06.2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

In the Matter of a Warrant for All
Content and Other Information
Associated with the Certain Email,
Cloud Storage, and Electronic
Communications Accounts Maintained
at Premises Controlled by Microsoft
Corporation, Google, LLC, Bloomberg
L.P., and Apple Inc., USAO Reference
No. 2021R00339

-----------------------------------------------------------

# 21 MAG 9335

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:   Bloomberg L.P. ("Provider")

      Federal Bureau of Investigation ("Investigative Agency")

    **1. Warrant.** Upon an affidavit of Special Agent Thomas McDonald of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the following email accounts, maintained at premises controlled by Bloomberg L.P., contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto:

      a.   SBECKER15

      b.   WTOMITA1;

      c.   PHALLIGAN7;

      d.   BHWANG;

      e.   DTANIGUCHI2;

      f.   ASCHOLL7; and

      g.   PDESANTO.

SDNY_001_00000278

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A. The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

    **2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber,  to any representative of the enterprise account holder (including an attorney for the enterprise), or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

12.06.2018

SDNY_001_00000279

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_September 27, 2021_
Date Issued

_6:52 p.m._
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

3

12.06.2018

**Search Warrant Attachment A**

## I.  Subject Account and Execution of Warrant

This warrant is directed to Bloomberg L.P. (the "Provider"), headquartered 731 Lexington Avenue, New York, New York 10022, and applies to all content and other information within the Provider's possession, custody, or control associated with the following accounts (the "Subject Accounts"):

      a.  SBECKER15

      b.  WTOMITA1;

      c.  PHALLIGAN7;

      d.  BHWANG;

      e.  DTANIGUCHI2;

      f.  ASCHOLL7; and

      g.  PDESANTO.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

## II.  Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts from January 1, 2020, to the present:

      a.  *Bloomberg messaging and email contents.* All messages and/or emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message

content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

b. *Bloomberg Execution Management Data.* All Bloomberg Execution Management Data associated with the Subject Accounts or any archegoscapital.com account, including but not limited to records of stock, option, and swaps trades with broker-dealers.

c. *Address book information.* All address book, contact list, or similar information associated with the Subject Accounts.

d. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

e. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

## III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports

12.06.2018

2

under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) manipulation of security prices, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344, (g) false statements to a lending institution, in violation of Title 18, United States Code, Section 1014; and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code, Sections 371 and 1349, including the following:

    a.  Evidence of Archegos's cash position, including account balances, company ledgers, margin call reports and notices, transfer requests, and account statements.

    b.  Evidence of trading conducted by, or at the request of Archegos, such as trade confirmations, position reports, portfolio summaries, and discussions of trading strategy.

    c.  Evidence reflecting representations made to prime brokers or others regarding Archegos's trading strategy, portfolio concentration and liquidity, investment decisions, risk profile, solvency, or need for or basis for withdrawing cash from margin or other accounts.

    d.  Evidence reflecting Archegos's overall and prime broker-specific portfolios.

    e.  Evidence of access to, or control over, brokerage accounts, trading accounts, margin accounts, prime brokerage accounts, or custodial accounts at financial institutions.

    f.  Evidence of the state of mind of participants in the Subject Offenses, including communications among co-conspirators and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

    g.  Evidence of the identities of, and communications among, co-conspirators in the Subject Offenses.

    h.  Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Archegos meetings and conversations or

3

12.06.2018

SDNY_001_00000283

(b) meetings and conversations with representatives of financial institutions.

i.   Evidence of the receipt, transfer, disposition or location of funds or securities constituting proceeds of the Subject Offenses.

j.   Evidence relating to efforts to evade law enforcement and/or regulatory agencies.

k.   Information that would assist in identifying and locating investors, prospective investors, victims or witnesses.

l.   Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

m.  Evidence of motive to commit the Subject Offenses.

n.   Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

o.   Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of crimes, and proceeds of those crimes.

p.   Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

4

SDNY_001_00000284

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------

In the Matter of a Warrant for All
Content and Other Information
Associated with the Certain Email,
Cloud Storage, and Electronic
Communications Accounts Maintained
at Premises Controlled by Microsoft
Corporation, Google, LLC, Bloomberg
L.P., and Apple Inc., USAO Reference
No. 2021R00339

-------------------------------------------

# 21 MAG 9335

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Apple Inc. ("Provider")

       Federal Bureau of Investigation ("Investigative Agency")

     **1. Warrant.** Upon an affidavit of Special Agent Thomas McDonald of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the iCloud account assigned identification number 177189970, maintained at premises controlled by Apple Inc., contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto. Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A. The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance. The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

SDNY_001_00000285

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

September 27, 2021
_____
Date Issued

6:52 p.m.
_____
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

12.06.2018

2

SDNY_001_00000286

**Search Warrant Attachment A**

## I. Subject Account and Execution of Warrant

This warrant is directed to Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014, and applies to all content and other information within the Provider's possession, custody, or control associated with the email account the iCloud account assigned identification number **177189970** (the "Subject Account"). The records to be produced cover the period from account creation to the date of this warrant.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

## II. Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account from January 1, 2020, to the present:

a.   *Subscriber and billing.* All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

b.   *Device information and settings*. All information about the devices associated with the Subject Account, including but not limited to the Integrated Circuit Card ID ("ICCID") number, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), the serial number, customer device settings, and repair history.

c. *IP records.* All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations.

d. *Address book.* All address book, contact list, or similar information associated with the Subject Account.

e. *Call history and voicemails.* All call histories, logs for FaceTime calls, audio voicemails, and visual voicemails associated with the Subject Account.

f. *Email.* All emails sent to or from, or stored in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

g. *Messages.* All text messages, short message service ("SMS") messages, multimedia messaging service ("MMS") messages, and iMessages sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each text message, and the date and time at which each text message was sent).

h. *Photos and videos.* All photographs or videos associated with the Subject Account, including any photographs or videos found on any iCloud Photo Library, My Photo Stream, or iCloud Photo Sharing service linked to the Subject Account. All associated metadata with any photograph or video including the time and date of creation, the author or creator, the means of its creation, and the GPS location information for where a photo or video was taken.

i. *Documents.* All documents stored in or otherwise associated with the Subject Account, including all documents in iCloud Drive, and iWork Apps.

2

SDNY_001_00000288

j. *Web history, search history, and bookmarks.* All search history, web history, bookmarks, and iCloud Tabs.

k. *Third-party application data.* All records, messages, and data relating to third-party applications, including WhatsApp and other third-party messaging applications, stored in or otherwise associated with the Subject Account.

l. *Location data*. All location data associated with the Subject Account.

m. *iOS Device Backups.* All device backups, and the contents of those backups, including but not limited to messages, web history, and preferences.

n. *Preserved backup copies.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

## III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, 17 C.F.R. 240.10b-5; (b) fraud in connection with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) manipulation of security prices, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States

12.06.2018

SDNY_001_00000289

Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344, (g)

false statements to a lending institution, in violation of Title 18, United States Code, Section 1014;

and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code,

Sections 371 and 1349, including the following:

    a.  Evidence of Archegos's cash position, including account balances, company ledgers, margin call reports and notices, transfer requests, and account statements.

    b.  Evidence of trading conducted by, or at the request of Archegos, such as trade confirmations, position reports, portfolio summaries, and discussions of trading strategy.

    c.  Evidence reflecting representations made to prime brokers or others regarding Archegos's trading strategy, portfolio concentration and liquidity, investment decisions, risk profile, solvency, or need for or basis for withdrawing cash from margin or other accounts.

    d.  Evidence reflecting Archegos's overall and prime broker-specific portfolios.

    e.  Evidence of access to, or control over, brokerage accounts, trading accounts, margin accounts, prime brokerage accounts, or custodial accounts at financial institutions.

    f.  Evidence of the state of mind of participants in the Subject Offenses, including communications among co-conspirators and any communications reflecting false (purportedly exculpatory) explanations of any participant's involvement in the Subject Offenses.

    g.  Evidence of the identities of, and communications among, co-conspirators in the Subject Offenses.

    h.  Meeting invitations, calendar appointments, and video-conferencing invitations reflecting (a) internal Archegos meetings and conversations or (b) meetings and conversations with representatives of financial institutions.

    i.  Evidence of the receipt, transfer, disposition or location of funds or securities constituting proceeds of the Subject Offenses.

    j.  Evidence relating to efforts to evade law enforcement and/or regulatory agencies.

12.06.2018

SDNY_001_00000290

k.  Information that would assist in identifying and locating investors, prospective investors, victims or witnesses.

l.  Evidence concerning any proceeds or benefits received as a result of the commission of the Subject Offenses.

m.  Evidence of motive to commit the Subject Offenses.

n.  Location data, including but not limited to geolocation reporting and location history data and metadata associated with other files that would place co-conspirators and aiders and abettors, as well as the devices they used, in specific places at specific times, and would indicate the use of their devices during those times.

o.  Information regarding the registration of other email accounts, computer servers, or other computer network infrastructure, including servers and Internet domains, or online communications facilities, payment for such online facilities or services, transfers of funds in furtherance of crimes, and proceeds of those crimes.

p.  Evidence concerning any other online accounts, any computer devices or servers, or any other location where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.

12.06.2018

SDNY_001_00000291