EXHIBIT Q

GIBBONS

# Sung Kook "Bill" Hwang

Presentation to
U.S. Attorney's Office, S.D.N.Y.
April 25, 2022

Subject to FRE 408 and 410

# Recapping the Legal Standard: The Government's Heavy Burden

- To recap, in order to convict Mr. Hwang of alleged open-market manipulation:

  – The Government would be required to show beyond a reasonable doubt, that "the **purpose** of [the] transaction [was] **solely to affect the price** of [the] security." *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991).

  – The Government also would have to show beyond a reasonable doubt that Mr. Hwang's actions involved **deceptive conduct**, and that his conduct was **willful** – *i.e.*, that he acted with bad purpose to violate the law.

  – Moreover, where Mr. Hwang's trading activity is "**at least as consistent with innocence as with guilt**," there can be no conviction. *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (citing *Mulheren*, 938 F.2d at 372)).

- The facts here do not approach proof beyond a reasonable doubt that Mr. Hwang's intention when trading was solely to affect price, or that he engaged in deceptive conduct or acted wilfully, as that term is defined in the law.

- To the contrary, the evidence is of legitimate, *bona fide* reasons for Mr. Hwang's trading; certainly, at the very worst, the evidence of such trading activity is as consistent with innocence as with guilt, within the meaning of *Mulheren*.

- But really, it would be a terrible injustice to prosecute Mr. Hwang because he did not commit a crime and could never have conceived that what he was doing could somehow be viewed as criminal.  Let us be clear: our view is that he is not just "not guilty"; he is truly innocent.

2

GIBBONS

# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

3

GIBBONS

# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

4

GIBBONS

# Archegos's Investment Strategy and Operations

- Mr. Hwang began Archegos Capital Management (ACM) in 2013 with about $500M. ACM was a **family office**.  All funds invested were Mr. Hwang's and his wife's, so he was free to take risks and invest as he saw fit.

- Archegos employed a **private equity approach to public markets**: large positions concentrated in 20-30 thoroughly-researched companies that were publicly traded and highly liquid and thus afforded Mr. Hwang, as the sole portfolio manager, the ability to adjust positions as conditions changed and they became good candidates for a strategic exit.

- The portfolio was **long-term focused** but was **managed on a daily basis.** Mr. Hwang – a particularly gifted and extremely experienced portfolio manager – constantly strove to improve his positions by taking advantage of his fund's capacity, daily market movements, new company disclosures, market trends, market research, and his overall knowledge about, and **conviction** in, the companies in which he invested.

5

GIBBONS

# Archegos's Investment Strategy and Operations

- Research was a critical component of Mr. Hwang's **conviction-based** investment strategy.

  - In 2020, for example, Archegos paid more than $20 million to the employees in its Research Department, which included 25 analysts and research professionals.

  - Analysts synthesized for Mr. Hwang's benefit the extensive quantitative and qualitative research they performed on the companies Archegos covered in numerous documents, including cap sheets, investment memos, and "Fisher 15" memos.

  - Mr. Hwang used this mosaic of information to formulate his target price, or **fair price**, for a stock, which was his belief as to the stock's intrinsic value that guided his investment decisions.

6

GIBBONS

# Archegos's Investment Strategy and Operations

- Archegos invested primarily through **total return swaps**.  There are several important features about such swaps:

  - Swaps allowed Archegos to stay below the 5% reporting threshold applicable to direct holdings and thus keep its positions confidential which was, based upon experience, very important to Mr. Hwang.

  - Over the life of the Fund, Archegos had swap contracts with 11 sophisticated Wall Street banks.  Mr. Hwang had no control over: (1) **whether** the swap counterparty would buy the underlying securities as a hedge (indeed, several contracts stated that the counterparty was **not** obligated to do so); (2) **how much** of the underlying security, if any, would be bought on the **open market**; and (3) **how long** a counterparty would hold any of the underlying securities.

Goldman Sachs:   "***Neither party intends*** that any Transaction will be settled by taking delivery of any shares or other securities, or ***that a Transaction will … entitle or oblige either party to acquire … any particular shares*** or other securities."  (Archegos-SDNY-02383873)

Deutsche Bank:  "Each of Deutsche and Counterparty represents and warrants to and agrees with the other party … that … ***neither party is obliged to*** sell, ***purchase***, hold, deliver or receive ***any Share*** …."  (Archegos 002869)

7

GIBBONS

# Archegos's Investment Strategy and Operations

– In addition, rather than buying the underlying securities for any particular TRS, counterparties could choose to hedge on a portfolio-wide basis and/or by using offsetting derivative positions.

  • As Credit Suisse acknowledged in connection with this matter, rather than purchasing the underlying shares to hedge a total return swap, its traders "might seek to (*i.e.*, with a client who wants exposure to any decrease in the value of the stock) . . . enter a TRS in the opposite direction more efficient from a balance sheet and/or funding perspective" than buying the underlying shares.  (PW Report at 38-39.)

– Regardless, as former Chief Judge Winter observed in *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 299 (2d Cir. 2011) (Winter, J., concurring),  even when a counterparty bought the underlying shares as a hedge, "**[t]he long counterparties' act of entering into a swap … falls well short of 'directing' the short counterparties to purchase the stock.**" Indeed, "[a]bsent an agreement or informal understanding committing the banks to buy shares to hedge their CSX-referenced swaps or to sell those shares to the long party when the swaps terminated, **the Funds possessed only the power to predict with some confidence the purchase of those shares as a hedge, not the power to direct such a purchase, much less to direct those shares' disposition**."  *Id.*

– **In sum, while Mr. Hwang may have assumed that sometimes counterparties would purchase the underlying security, he did not and could not know what each counterparty did or would do, if anything, to manage its portfolio risk in response to any particular TRS.  This fact added a level of attenuation between Mr. Hwang's trading activity and any movement of a stock's price and increases the difficulty of obtaining a conviction of Mr. Hwang based upon his having caused these transactions.**

8

GIBBONS

# Archegos's Investment Strategy and Operations

- Mr. Hwang considered two primary ways to **exit a position**:   (1) sales in the market (including possible block trades); and (2) an M&A takeout where the transaction price represented a substantial premium to the stock's market price and thus a realization approximating his target, or fair value, price for the stock.

    - The M&A strategy, which Research analysts addressed in their investment memos and in other analyses, had paid off for Mr. Hwang in the past with respect to, for example, FirstData and LinkedIn, each of which each yielded a return of more than half a billion dollars.

    - Because Mr. Hwang envisioned the Fund as a going concern for years to come, there was no "end date" or "set amount" for a position, and he could wait for strategic acquisitions to materialize.  That is not to say, however, that Mr. Hwang held an initial investment static until disposition.  He continued to add to his positions, even as they increased in price, on the thesis that when the stock hit his fair price, or an M&A event occurred that would yield a premium, he would profit in an order of magnitude above what a traditional buy-and-hold strategy might yield.

- Changed circumstances wrought by the onset of the pandemic – both due to lockdowns and the increased volatility and deeply discounted prices in the market – led to changes in Mr. Hwang's day-to-day focus, but did not alter his overall investment strategy, one that had produced a multi-year track record of extraordinarily successful returns.

9



# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

10

GIBBONS

# Increased Trading During The Pandemic

- A confluence of factors contributed to Archegos's heightened trading activity during the once-in-a-lifetime circumstances of the pandemic:

    – The pandemic, which Mr. Hwang analogized to "a war that we know we are going to WIN," created market opportunities that were consistent with his philosophy of taking large concentrated positions in public companies. (Archegos-SDNY-00071705.)

    – The market volatility during this unprecedented period enabled Archegos to buy stock cheaply and in sectors that were positioned to capitalize on Covid conditions (*e.g.*, online education), but also required particular attention to managing the Fund's investments; its short positions in particular required intense attention, given the potential for unlimited exposure if the stock price increased (as happened on at least one occasion with Futu).

    – Due to the COVID restrictions, Mr. Hwang had fewer outside distractions and meetings, and thus more time to focus on trading.

    – His traders were a captive audience on Zoom, which facilitated daily and more frequent interactions between them and Mr. Hwang.

    – The overall Archegos portfolio grew exponentially in a short time, making daily attention to and management of the Fund's positions, margin requirements, and overall capacity an even more demanding undertaking.

11


GIBBONS

# Evolution Of Largest Positions

- The positions Archegos took in key names – such as Viacom, GSX, and Discovery – were built by accumulating shares over time.

- Although Archegos certainly took very large positions in these stocks, the total concentration was not so different from levels the Fund had reached on previous occasions: for example, Amazon was 62% of NAV in December 2018; Tesla (a short) was 58% of NAV in May 2017; Apple was 57% of NAV in October 2018; and LinkedIn was 44% of NAV in July 2016.

- Nor was the strategy unlike some other well known portfolio managers (like Cathie Wood and Bill Ackman) who, since the pandemic began, have also been investing (albeit, unlike Mr. Hwang, with other people's money) more deeply in fewer names.

- The massive and rapid run-up in Fund exposure in late 2020 and early 2021 was attributable largely to price appreciation ($17B of the Fund's $28B exposure to VIAC as of March 22, 2021, was organic) and the V-shaped recovery in the broader market (the S&P increased 75% between March 2020 and March 2021). Mr. Hwang had not planned for such explosive growth, but it obviously provided him with more capital to invest, and while he started buying other stocks, he did not pivot away from his long-held strategy of placing big bets on the names in which he had the highest conviction.

12

GIBBONS

# Attractive Companies
# At Attractive Prices

- While we will discuss specific trades and Mr. Hwang's intentions for making them, it is important to remember that the evidence establishes some guiding principles about all of Mr. Hwang's trading activity:

    – When Mr. Hwang decided to build a large position, it was because he had a very strong, often intuitive, conviction in the company and a belief that its stock was mispriced, as well as a willingness to accept risk.

    – Mr. Hwang's convictions were based on many factors, including the Fund's extensive research that, for a Fund of this size, concentrated on a relatively small number of stocks that were analyzed in great depth, with investments ultimately made in an even smaller number of names.

    – Mr. Hwang had in-depth knowledge of the companies in which he invested.  Indeed, he and his analysts had followed many of them for years before making any large investments.

    – Every company that Mr. Hwang invested in was one he honestly believed represented a long-term strategic opportunity and was undervalued by the market.

13

GIBBONS

# USAO Question:
# Can Intent Alone Create An "Artificial Price"
# For Purposes Of Market Manipulation?

- As discussed during our meeting on April 19, proof of criminal market "manipulation" requires **deceitful conduct and willful wrongdoing**.  Open-market trading, without more, does not involve deceitful and wrongful conduct and does not create any "artificial" market price.

- We do not believe a trader's "intent" alone – even if that intent is to affect price – turns an **actual market trade** into a "deceptive" one or creates an "artificial" price.  That is why traditional manipulation cases involve deceptive conduct like spoofing or wash trades, where there is no substantive economic transaction taking place, resulting in an "artificial" stock price – *i.e.,* a price that does not comport with the natural forces of supply and demand.  *See Sullivan & Long Inc. v. Scattered Corp.*, 47 F.3d 857, 859, 864 (7th Cir. 1995) (Posner, J.) (upholding dismissal of §§ 9(a)(2) and 10(b) claims where there was no "false impression of supply or demand. … On the other side of all of the [defendant's short sale] transactions were real buyers, betting … however foolishly that the price of LTV stock would rise."); *United States v. Hall*, 48 F. Supp. 2d 386, 387 (S.D.N.Y. 1999) (Chin, J.) (explaining that conduct intended to increase a stock price cannot lead to an artificial price if the conduct is not deceptive).

- The decision in *SEC v. Masri*, 523 F. Supp. 2d 361, 373 (S.D.N.Y. 2007), to which you have pointed, is also instructive:  A transaction "conducted for investment purposes or other economic reasons, **and regardless of the manipulative purpose**" does not "artificially [affect] the price of the security or [inject] inaccurate information into the market."

- Mr. Hwang's intent was not to affect price, but in any event, the evidence establishes that he **always** had an "investment purpose or other economic reason" for conducting trades including increasing overall buying power, avoiding capacity limitations, or for tax purposes.  And there is no documentary evidence to the contrary.

14



# USAO Question:
# Are There Material Differences Between The Elements Of § 9(a)(2) vs. § 10(b)?

Section 9(a)(2) and 10(b) both proscribe manipulation of securities markets. 15 U.S.C. §§ 78i(a)(2), 78j(b).   Although the elements differ in some respects, they are essentially the same regarding the elements that are material here.

- Both provisions, as well as 18 U.S.C. § 1348 and the Commodity Exchange Act, 7 U.S.C. §§ 9, 13(a)(2), require proof of some **deceptive conduct.**

- Both provisions also require **scienter**.  In the criminal context, the Government must adduce proof beyond a reasonable doubt that the defendant **willfully** violated a securities law.

- Section 9(a)(2) is **more limited** in scope than Section 10(b) and also requires proof that the alleged manipulator had "the purpose of inducing the purchase or sale of [the] security by others."  15 U.S.C. § 78i(a)(2).  But the evidence, as discussed below, shows no such purpose.

15


GIBBONS

# SDNY Trades of Interest

At Mr. Hwang's second interview, you asked him about the following trades.  Those in boxes are a representative sample that we will address in more detail when discussing Mr. Hwang's trading purpose and intentions.

**BAIDU**
- BIDU  3.16.21
- BIDU  3.24.21

**DISCOVERY**
- DISCK  3.23.21
- DISCK  3.24.21

**GSX**
- GSX  3.16.21
- GSX  3.23.21

**FUTU**
- FUTU  3.16.21

**FARFETCH**
- FTCH  3.15.21
- FTCH  3.24.21

**IQIYI**
- IQ  3.15.21
- IQ  3.16.21

**TENCENT MUSIC**
- TME  3.16.21
- TME  3.18.21
- TME  3.23.21
- TME  3.24.21

**VIACOM**
- VIAC  6.11.20
- VIAC  3.16.21
- VIAC  3.23.21
- VIAC  3.24.21

**VIPSHOP**
- VIPS  3.15.21

16



# Intraday Buying And Selling

- We understand you have questions about Mr. Hwang's decision to place trades at various times when stock prices were fluctuating.  But there was nothing even remotely unlawful about those decisions.

- Mr. Hwang traded based on the current stock price relative to where he thought, at that moment, the price was going to go in the future.  Viewing those trading decisions in hindsight, divorced from the information available to Mr. Hwang at the time, is unfair and overlooks the fact that Mr. Hwang was assessing risk and reward as he saw it, always taking risks **with his own money**.

- In many cases, Mr. Hwang placed buy orders when the price was below the prior day's price or below earlier intra-day prices.  Those orders bear out Mr. Hwang's strategy of buying stocks at a discount and are at least as, if not more, consistent with a legitimate investment purpose as with any purported illicit motive to prop up the price.

    <u>**Archegos-SDNY-03928804**</u>:
    01/06/2021 16:53:37 UTC WILLIAM TOMITA posted: Bill, we can do ~$200mm VIAC at MS with the current portfolio
    01/06/2021 16:54:56 UTC BILL HWANG posted: Got you. **The stock is so cheap** even here at 7 time PE next year! using GS numbers!

    <u>**Archegos-SDNY-03929443**</u>:
    02/05/2021 18:25:13 UTC BILL HWANG posted: DAIKI LET'S STEP UP ON DK. LIMIT TO 36.2 PLEASE. DA TARGET TO $40 MIL. AND LIMIT TO 42.45.
    02/05/2021 18:25:28 UTC DAIKI TANIGUCHI posted: Got it thanks
     […]
    02/05/2021 18:33:36 UTC DAIKI TANIGUCHI posted: There could be some seller holding it down at 36.00 for DISCK.
    02/05/2021 18:33:53 UTC BILL HWANG posted: DAIKI GOOD. **WE WILL BUY THEM CHEAP**!

    - There are many more examples like this.  *See, e.g.*, Archegos-SDNY-00309778 (1/26 at 15:56); Archegos-SDNY-03929443 (2/4 at 16:23); Archegos-SDNY-03929613 (2/12 at 18:21); Archegos-SDNY-00321320 (3/16 at 14:59).

17



# Intraday Buying And Selling

ACM not only bought stocks when their price was falling, it bought as they were going up and when they were flat, too, so long as they were below his target price, as depicted below for VIAC over the period March 15-24, 2021.  This is true for all of ACM's trades, including on the days that you have highlighted, *e.g.*, TME on March 18, 2021, and DISCK on March 23, 2021.



18

# Intraday Buying And Selling

- You asked Mr. Hwang, in connection with his buying of VIAC on June 11, 2020, about his text, in reply to a Su-Kyung Lee text, that the strength of VIAC that day "is a sign of me buying [laughing emojis]."

  – Archegos did place large buy orders in VIAC on that date.  But it followed up those purchases with **many more months of buying** – to the tune of billions of dollars more – of long positions in VIAC.  Mr. Hwang's trading in VIAC stock on this date was not done with the intention of affecting the price, it was done with the intention of accumulating a large long position in a stock he believed was significantly undervalued.

  – It defies logic that the June 11 buys were intended to manipulate the price of VIAC in any way.  Any attempt to artificially inflate the price upward at that time clearly would have been to Archegos's detriment, as it continued over the following months to accumulate its large position.

  – Moreover, inferences drawn from cherry-picked snippets are not the kind of direct evidence required to convict a person of market manipulation, as *Mulheren* makes clear.  And the fact that a trade may have affected the stock's price is not proof that it was made with the purpose of doing so.

19

GIBBONS

# Intraday Buying And Selling

- Every single trade of interest was executed at prices well below Mr. Hwang's target prices. For example, for the trades you identified during the two critical weeks in March 2021:

| Date | Security | Trade Avg PX (Range) | Target Price |
|------|----------|----------------------|--------------|
| 3/15/21 | FTCH | $57.95 - $58.25 | $140 |
| 3/15/21 | VIPS | $41.38 - $41.69 | $70 |
| 3/15/21 | IQ | $25.11 | $40 |
| 3/16/21 | VIAC | $95.73 - $97.83 | $100 |
| 3/16/21 | BIDU | $264.36 - $271.22 | $500 |
| 3/16/21 | GSX | $89.53 - $93.03 | $250 |
| 3/16/21 | FUTU (short) | $139.29 - $161.20 | $30 |
| 3/16/21 | TME | $26.09 - $26.57 | $35 |
| 3/18/21 | TME | $27.41 - $28.75 | $35 |
| 3/23/21 | TME | $29.84 - $31.86 | $35 |
| 3/23/21 | VIAC | $91.11 - $95.92 | $100 |
| 3/23/21 | TME | $29.84 - $31.86 | $35 |
| 3/23/21 | DISCK | $60.24 - $62.999 | $90 (DISCA) |
| 3/24/21 | TME | $23.21 - $31.05 | $35 |
| 3/24/21 | DISCK | $54.76 - $63.12 | $90 (DISCA) |
| 3/24/21 | FTCH | $55.23 - $55.89 | $140 |
| 3/24/21 | BIDU | $239.01 - $252.64 | $500 |
| 3/24/21 | VIAC | $70.51 - $81.99 | $100 |

20

GIBBONS

# Trading "Without Impact"

- You asked Mr. Hwang about certain instructions he would give to trade "without impact" and, relatedly, showed him a chat from March 15, 2021, with Peter DeSanto, in which he directed Mr. DeSanto to "just work in the lit market on VIPS," meaning that, unlike in the dark pools, the trades would be visible to the market.

  - "Without impact" and similar instructions mean, as Mr. Hwang explained, doing what could be done to not alert the market to the trade, so as to avoid revealing the interest and minimize any risk of affecting the price.  This contrasts with instructions to, for example, "be aggressive," which tells traders that acquiring the stock is more important than not alerting the market.

  - As discussed, this shows that Mr. Hwang understood, based on basic laws of supply and demand, that trading on the open market could potentially impact price. But he in fact had no way to know whether or how any specific trade would affect a stock's price because, as he explained, that depended on a host of market variables outside of Mr. Hwang's control, including how the short position in a stock reacted, the volume of the trade compared to the number of outstanding shares, the liquidity of the stock at the time of the trade, and in the case of swaps whether and how a counterparty hedged a position.

  - More importantly, whether you believe Mr. Hwang ever thought about price impact or not when making a trade – and he says he did not – what is clear is that he bought stock because he believed it was underpriced and genuinely wanted to own it and profit in the long term when a company's fair value was realized.  And again, there is nothing even remotely illegal about that.

21

GIBBONS

# Pre-market Trading

- While markets operate during traditional trading hours, it is widely acknowledged and perfectly acceptable to place trade orders at any time of the day, including before markets open, as institutional and high-net-worth investors commonly do.

- You asked Mr. Hwang about an instruction given to Peter DeSanto to buy $30 million of IQ with a 1/3 of volume limit at $25.25 the morning of March 16, 2021.  (Archegos-SDNY-00013244.)

  – Twenty minutes earlier Mr. DeSanto informed Mr. Hwang that the stock was trading at $25.26 in the pre-market:

    > 9:20 AM (13:20:18 UTC) PETER DESANTO: IQ: on 12/17 there was the follow on offering of 40mm shares that priced at 17.50. The lock-up expiry for these shares is tomorrow. Stock is +48bps (last 25.26) in the premkt

  – Mr. Hwang's order – one basis point **below** the pre-market price – is clearly at odds with any intent to artificially drive up the price of IQ stock.  We do not understand why the Government may view this trade with any suspicion.

22

GIBBONS

# USAO Question:
# Can "Marking The Close" Constitute Criminal Market Manipulation?

- "Marking the close" is "the practice of **repeatedly executing the last transaction** of the day in a security in order to affect its closing price."  *Masri*, 523 F. Supp. 2d at 369.  Of course, "stock transactions made at the close of the day are not prohibited" and studies have shown increased trading "just before the market closes, as traders monitor activity and their positions throughout the day before conducting their trades."  *Id.* at 370.
    - *Wall Street Journal* reporting on March 11, 2020, confirmed that there is **increased liquidity at the end of the day**:  "From the start of [2020] through [March 6, 2020], about 23% of trading volume in the 3,000 largest stocks by market value has taken place after 3:30 p.m., according to data from Pragma LLC.   That's compared with about 4% from 12:30 p.m. to 1p.m."

- When "marking the close" has been alleged as "market manipulation" the conduct has involved some purposeful wrongdoing – *i.e.*, trying to (deceptively) make a fund portfolio look more attractive to investors, or trying to (artificially) affect an options contract tied to the stock price. These types of scenarios do not apply to any of Mr. Hwang's trading – remember that he was trading his own money.

- Moreover, we are aware of **no criminal "marking the close" case in the S.D.N.Y.**; and only two reported federal criminal cases, neither of which is analogous:
    - *United States v. Markusen*, 2018 WL 4191399 (D. Minn. July 18, 2018) (defendants marked the close to inflate their funds' performance and enhance management fees).
    - *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) (conspirators engaged in a host of deceptive and manipulative conduct, including matched trades, wash sales, and marking the close).

- **As we will discuss, Mr. Hwang's trading activity was not consistent with "marking the close" or was ever intended to do so.**

23



# Trading Near The Close

We analyzed trading in the Fund's top 14 names[1] from March 2020 through March 2021 to determine how many trades were made within the **last 30 minutes and last 5 minutes** of the trading day.  Based on our analysis we do not believe the Fund's trading activity supports the view that Mr. Hwang was purposefully trading to "mark the close."

- In only about 15% of the time, on average, did Archegos place a trade after 3:30 P.M.  **And that percentage falls to 3% for trades after 3:55 P.M.**

- Three names with the most trades – VIAC, GSX, and DISC (DISCA + DISCK) – are not traded near the close more frequently than the median, and the fourth most traded (FUTU) was traded near the close only slightly more frequently.

- In none of the trades you have highlighted was trading done *only* during the last 5 minutes of the day.

[1] BIDU, DISCA, DISCK, FTCH, FUBO, FUTU, GOTU (GSX), IQ, PARA (VIAC), RKT, SHOP, TCBI, TME, VIPS

24

GIBBONS

# Trading Near The Close

- To take a more specific example, you asked Mr. Hwang about instructing his traders to place buy orders in BIDU on March 16, 2021, including to "buy some at the end of the session."

  – A review of the Fund's blotter activity that day shows 11 buy orders in BIDU throughout that day, at points when the stock's price was rising, falling, and relatively flat, undermining any reason to believe there was any intention to manipulate the price.

  – One of those 11 trades was placed near the end of market trading, at 3:56 P.M. A review of Bloomberg market data indicates that BIDU activity was disproportionately larger near the close that day (and this involved a majority of market volume unrelated to Archegos), as is the case for stocks like BIDU that hold end-of-day auctions.

  – Finally, these buy orders were in keeping with Mr. Hwang's strategy of buying stocks he believed were mispriced, and he expressed this to his traders on that day: "BIDU IS SO CHEAP AND IN ALL THE RIGHT SECTORS AS YOU ALL KNOW!!" (Archegos-SDNY-03930095.)

25

GIBBONS

# Trading Near The Close

- Trading through swap counterparties also undermines the idea that Archegos executed any of its trades with the intent to "mark the close."

- To "mark the close" on a swap transaction, the trader must not only execute a trade at or very near the close intending that trade to affect the stock's price, but must also know that the swap counterparty will **virtually simultaneously purchase all the underlying securities on the open market in a very short window of time.**

- Mr. Hwang had no such knowledge and no agreement with any counterparty that it would do so – indeed, as we showed earlier, the contractual relationships between Archegos and the swap counterparty required no such thing.

- Thus, as a practical matter, a "marking the close" scheme makes little sense here, as there is no guarantee the counterparty would execute a hedging trade before the market closed.  This attenuation significantly undermines any likely success of an Archegos scheme to "mark the close."  Nor was there any reason for such a scheme, unlike cases in which fund managers mark the close to improve reported month-end performance data, for example.  **In fact, there is no evidence whatsoever that Mr. Hwang intended to mark the close for any security in Archegos's portfolio.**

26

GIBBONS

# Trading Near The Close

- Archegos derived little or no benefit from having a stock close at any specific price.

  - As a family office, Archegos was not trying to convince any outside investor that it had a certain value.

  - Nor did any public disclosure requirements obligate Archegos to report its NAV.

  - The impact, if any, of the closing price on margin terms was a matter of extreme complexity. For some counterparties, an increase in stock price even required the posting of additional collateral.

27

GIBBONS

# Same Day Buy/Sells and Box Trading

- You have also asked Mr. Hwang about reasons why Archegos may have sold or shorted a stock in which it had high conviction on the same day it bought that name.  Based on our analysis, it was usually done to enhance Mr. Hwang's buying power – by obtaining a lower margin rate or avoiding capacity limitations – thereby enabling his investment strategy.  And, again, nothing about this was improper.

- Because its counterparties all charged different margin rates, Archegos would, on occasion, move positions from one to another to **obtain a lower margin rate**.

  – For example, on December 8, 2020, Archegos closed out 2,725,000 shares of VIAC at Nomura (at 23% margin) and opened the same position at Goldman Sachs (at 15% margin).  (Archegos-SDNY-00195554.)

- Archegos also did so-called "box" trades to **free up capacity** so that Mr. Hwang could opportunistically take advantage of favorable price movements.

  – As an example, you asked Mr. Hwang about same day buying and selling in GSX on March 16, 2021.  As reflected on that day's Capacity and Borrow Memo, execution of this box trade freed up capacity, which was then used to execute more trades in GSX.  (Archegos-SDNY-00011620.)

28



# Same Day Buy/Sells and Box Trading

- On rarer occasions, Archegos executed a box trade to **realize a gain** – sometimes at a counterparty's suggestion:

  – On March 15, 2021, a Goldman Sachs employee asked Will Tomita via Bloomberg chat if Archegos was "looking at boxing viac at these levels?"  (Archegos-SDNY-00055693.)

- Finally, other same day buy/sell trades were done for **tax-planning purposes**.

  – For example, on December 31, 2020, Archegos reset several recent lots of swaps in BIDU in order to bring Mr. Hwang's capital losses down to zero for New Jersey tax planning purposes.  (Archegos-SDNY-00277573.)

- And again, none of this was in any way unlawful, let alone criminal.

29



# Trading – No Meaningful Price Impact

- On the days Archegos traded in its top names between March 2020 and March 2021, it never, on average, accounted for more than 22% of the daily volume in any of these names. If the days Archegos did *not* trade are included and counterparties did *not* actually buy 100% of the underlying shares, the percentages in the table would be even lower.

- In any event, this lack of market dominance, as case law has recognized, undercuts any theory that Archegos could have meaningfully impacted the price of these stocks.  *See, e.g.*, *Mulheren*, 938 F.2d at 371.

| NAME | AVG ACM VOL (%) ON DAYS TRADED Mar '20 - Mar '21 | AVG ACM VOL (%) ON DAYS TRADED Jan '21 – Mar '21 |
|------|---------------------------------------------------|--------------------------------------------------|
| VIAC | 11.4 | 10.8 |
| GSX | 13.8 | 14.7 |
| BIDU | 7.0 | 6.0 |
| DISCA | 15.2 | 10.3 |
| DISCK | 21.9 | 23.9 |
| TME | 17.7 | 16.1 |
| IQ | 14.9 | 17.2 |
| VIPS | 16.3 | 19.3 |
| FTCH | 16.3 | 19.4 |

30

GIBBONS

# Trading – Summary

- We have reviewed each of the specific trades that you have identified.  To us – and we think to a jury – the evidence is clear: these, and every other trade, were **not** done to affect price, let alone for the sole purpose of affecting price, and in fact that was not Mr. Hwang's intent.

- Indeed, we have carefully analyzed Mr. Hwang's trading in the Fund's key holdings over a long period of time, and while that analysis is ongoing – and will, if our discussions continue, also be shared with you in the spirit of openness that has pervaded our interactions – we are confident that there has been no deception and thus no manipulative conduct.  Mr. Hwang traded in the pre-market, throughout the day, and near the close, taking on both long and short positions for a variety of reasons, all of which were legitimate and lawful:
    - **To accumulate a position in a stock**
    - **To increase the Fund's capacity to trade**
    - **To manage the Fund's margin requirements**
    - **To hedge long positions**
    - **To manage or reduce tax liabilities**
    - **To take gains (or reduce losses)**
    - **To manage risk exposure**
    - **To balance the overall fund portfolio**

31



# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

32

GIBBONS

# Communications With Tao Li

- Mr. Hwang spoke regularly with Mr. Li, who worked for Mr. Hwang at Tiger Asia and now runs his own hedge fund focused on Chinese stocks in which Mr. Hwang is an investor.

- Although they discussed GSX, and Mr. Li shared some of his research on GSX with Mr. Hwang, they did not coordinate their trading on this or any other name, and we are aware of no evidence even suggesting that they did.

- There was nothing unlawful about Mr. Hwang's request of Mr. Li to move a position Mr. Li had in GSX from one counterparty to another in order to free up capacity for Archegos.

- There was nothing unlawful about any inquiry by Mr. Hwang concerning whether Mr. Li had an interest in doing a block trade with Archegos.

- **We are unaware of any evidence whatsoever of any unlawful trading activity between Mr. Hwang and Mr. Li.**

33



# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

34

GIBBONS

# USAO Question:
# What Was Bill's Understanding Of What Counterparties Asked For And Were Told?

- Mr. Hwang trusted Will Tomita, Scott Becker and others, supervised by Andy Mills, to deal with the specifics of communicating with the counterparties.

- Mr. Hwang's policy dating to Tiger Asia was to disclose to counterparties whatever was legally required.  He did not want to disclose more than necessary, so as to prevent front-running and avoid copycat trading or other conduct that could unfairly and negatively impact the Fund's returns.

  - Archegos received advice from outside counsel on what did and did not have to be disclosed.

- Mr. Hwang was not aware of any misrepresentation made to a bank representative and would not have condoned that.

35



# Sample Portfolios

- Archegos provided sample portfolios to potential counterparties for the purpose of discussing margin pricing, as is **typical industry practice**.

    – Archegos had no obligation to disclose specific positions beforehand.

    – Any reliance by counterparties on a "sample" portfolio would be misplaced because after onboarding, a counterparty could refuse to execute a trade in any name.

    – Counterparties always had the ability (and obligation) to monitor their clients' trading activity and investigate any trades for any concerns.

- As an example, on March 5, 2021, Will Tomita sent BAML an email explaining that he was providing "a sample portfolio of what we think we could work towards over the long term of building out with BAML. This isn't a real one, but something similar to this is something we could envision, and would be entire synthetic on swap." (Archegos-SDNY-04502770.)

- Thus, there was nothing misleading or unlawful about the October 15, 2020 email thread you showed to Mr. Hwang regarding portfolios that Archegos sent to Goldman Sachs (Archegos-SDNY-02847158).

    – **On November 4, 2020 – weeks before the new GS Master Confirmation Agreement was signed – Archegos sent Goldman Sachs a list of Chinese ADRs, including GSX, in which it intended to invest.** (Archegos-SDNY-00398308.)

- Moreover, the October 15 email thread makes clear that Mr. Hwang was not directing Mr. Tomita to do anything, but was following his guidance.

36


GIBBONS

# Credit Suisse Agreement

- Mr. Hwang had no knowledge of the representation in the December 15, 2020 Portfolio Swaps Annex with Credit Suisse (CS PSA) that the sum of equity and swap positions in a given stock would not exceed a certain threshold:

  – He left negotiations of the CS PSA to Scott Becker and Will Tomita, who were advised by experienced counsel;

  – Neither Mr. Becker nor Mr. Tomita brought this provision to Mr. Hwang's attention; and

  – When the CS PSA was ready for Mr. Hwang's execution on behalf of Archegos, **Mr. Becker only emailed Will Tomita and Daiki Taniguchi the signature page for Mr. Hwang's execution** and wrote, "These are for the Credit Suisse ISDA migration that we are working on—moving from facing one CS entity in the UK to another. **No impact on us** …." (Archegos-SDNY-00060173-77.)

- For context, we note that similar boilerplate representations were rejected by Archegos in four other agreements (with CS, GS, DB, and BMO), suggesting that: (1) it was simply overlooked in the CS PSA; and (2) counterparties clearly did not consider it a necessary part of doing business with Archegos.

- According to the PW Report (at 99-100), "CS was in such a rush to complete the migration before the end of the year, that the Head of PSR [Prime Services Risk] agreed to give up multiple then-standard contractual terms, including one that would require Archegos to represent, in connection with any trade, that it did not hold beneficial ownership (whether in stock or through swaps) amounting to 10% of the outstanding shares of an issuer. Instead, the CSi agreement carried over the term from the CSSEL agreement where the beneficial ownership representation was capped at 20%."

37



# Topics To Address

- Archegos's Investment Strategy and Operations

- Trading / Intent

- Communications with Tao Li

- Counterparties

- Week of March 22, 2021

GIBBONS

# Not The "End Of Days"

- The $2B Viacom secondary offering announced on Monday, March 22 was disappointing to Mr. Hwang but **did not create a solvency issue** for the Fund.

- In fact, the Fund's ending capital on March 22 was $36.3 billion – up $1 billion from Friday's close – and it remained positive through the start of the day on Friday, March 26:

| Date | Ending Capital ($B) |
|---|---|
| Mon Mar 22 | 36.3 |
| Tues Mar 23 | 32.7 |
| Wed Mar 24 | 16.9 |
| Thurs Mar 25 | 9.2 |
| Fri Mar 26 | est. -5.8 |

- Even on March 25, when Archegos received $10.7 billion in margin calls, it began the day with $16.9 billion in capital – twice what it had only three months earlier in December 2020.

- Mr. Hwang believed his existing Bank partners, many of whom he had a decades-long relationship with, would work to manage what was a liquidity problem.  And BAML was only 1-2 days from onboarding, which would have unlocked additional capacity.

39

GIBBONS

# Trading During March 22-24 Was Done To Take Advantage Of Price Declines

- Investigation is ongoing into what triggered the decline in the Fund's top names, including whether any counterparties' trading caused or exacerbated the problem and whether, as Patrick Halligan and Will Tomita speculated, "[s]omeone [wa]s purposely doing this" (Archegos-SDNY 31226 at 4).

- Regardless of the reason, Mr. Hwang firmly believed that he would weather the storm.  Consistent with his investment approach over many years, he continued trading on March 23 and 24 because the stocks in which he had the highest conviction were available at very attractive prices.  Moreover, the extent of the liquidity problem and impending margin calls the Fund was facing did not become evident to him until the portfolio was closed on March 24.

- Mr. Hwang's trading was inconsistent with someone desperate to support a stock's price.  For example, if his goal had been solely to support a stock's price, Mr. Hwang could have bought stocks directly, not on swap, both to have more direct price impact and to save on transaction costs, which could have enabled even more buying.

40

GIBBONS

# Mr. Hwang's Conduct Was Not Driven By Personal Profit Or Greed

- Had Mr. Hwang's trading activity been solely intended to affect stock prices – or to engage in any type of market manipulation – Mr. Hwang presumably would have sought to profit by taking substantial amounts of money out of the Fund before it collapsed.  He did not.  To the contrary:

  – He took no money from the Fund in 2021 and only $500,000 in 2020. Ultimately Mr. Hwang lost more than any Bank counterparty. That is hardly the conduct of a "manipulator" with **billions of dollars** available to be withdrawn.

  – Over the life of Archegos, the Fund gave more than $500 million to charity.

  – Pursuant to Mr. Hwang's estate plan, upon the death of him and his wife, more than 99% of the value of the Fund (as measured in March 2021 just prior to the collapse) would have passed to charity. His family will inherit only approximately 10% of how much he *started* Archegos with in 2013.

  – The bottom line is that what happened to the Archegos Fund certainly was a catastrophe, but it was not a crime by Mr. Hwang.

41



# Conclusion

- And not every catastrophe is a crime even if, with 20-20 hindsight, it could have been avoided. An investigation, of course, is worthwhile, and we have welcomed and participated in it, and continue to do so. That investigation should be completed, including every aspect of it. It should be, as we were told, expedited but should also be robust and careful.

- But no crime can be charged unless there is a criminal violation and, for the reasons we discussed last time, there is no crime as a matter of law, and the theory of open market manipulation that has been advanced is both unprecedented and destructive of the markets that are here to be protected.

- Today, we have shown you the facts do not support such a theory either, that any prosecution would be of an innocent man, one who lost money – all his own – and whose actions bespoke charity not greed.

42

GIBBONS