# EXHIBIT CC

Sanjay Wadhwa
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center, Suite 400**
**New York, NY 10281-1022**
**(212) 336-0181**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| -against- | : | **COMPLAINT** |
| | : | |
| **TIGER ASIA MANAGEMENT, LLC,** | : | **ECF CASE** |
| **TIGER ASIA PARTNERS, LLC,** | : | |
| **SUNG KOOK (a/k/a BILL) HWANG,** | : | |
| **and** | : | |
| **RAYMOND Y.H. PARK** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against defendants Tiger Asia Management, LLC ("Tiger Management"), Tiger Asia

Partners, LLC ("Tiger Partners"), Sung Kook (a/k/a Bill) Hwang ("Hwang"), and

Raymond Y.H. Park ("Park") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.      This case involves insider trading and attempted manipulative trading by

Hwang, the sole principal and portfolio manager of two unregistered funds advised by

Tiger Management and Tiger Partners, and Hwang's head trader, Park. In December

2008 and January 2009, the Defendants entered into "wall-crossing" agreements for three

private placements of Chinese bank stocks, subsequently violated the wall-crossing

agreements by short selling the Chinese bank stocks, and then covered these short

positions with private placement shares purchased at a discount. This illegal trading

resulted in profits to the funds advised by Tiger Management and Tiger Partners of

approximately $16.2 million.

2.      Also, starting in November 2008 and continuing through February 2009,

Hwang, Tiger Management, and Tiger Partners, aided and abetted by Park,

misappropriated fund assets by placing losing trades in Chinese bank stocks in which the

funds had substantial short positions, in an attempt to manipulate the price of these stocks

at month's end to inflate the calculation of management fees. The attempted

manipulative trading scheme earned Tiger Management approximately $496,000 in

fraudulent management fees.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

3.      The Commission brings this action pursuant to the authority conferred

upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §

77t(b)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78u(d)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers

Act") [15 U.S.C. § 80b-9(d)]. The Commission seeks permanent injunctions against each

of the Defendants, enjoining them from engaging in the transactions, acts, practices, and

courses of business alleged in this Complaint, and disgorgement of ill-gotten gains,

including profits realized and losses avoided, from the unlawful activity set forth in this

Complaint, together with prejudgment interest. The Commission also seeks civil

penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] and Section

209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. Finally, the Commission seeks any

other relief that the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78(u)(d)(5)].

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

5.      Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)]; Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]; and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of New Jersey, and were effected, directly or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails.  During the time of the conduct at issue, Hwang resided in New Jersey and placed and received telephone calls from his residence relating to certain of the acts, practices, transactions, and courses of business alleged in this Complaint.

## DEFENDANTS

6.      **Hwang**, age 48, resides in Tenafly, New Jersey.  During the relevant period, he was the sole principal and portfolio manager of Tiger Asia Fund, L.P. and Tiger Asia Overseas Fund, Ltd. (collectively, the "Funds").  Hwang made all investment and disclosure decisions for the Funds, and was compensated for acting as the Funds' portfolio manager.  Hwang has held Series 7, 24 and 63 licenses.

7.      **Tiger Management** is a Delaware limited liability company with its principal place of business in New York, New York.  During the relevant period, Tiger Management served as the unregistered investment adviser and investment manager to Tiger Asia Overseas Fund, Ltd., and was responsible for administrative matters relating to the Tiger Asia Fund, L.P.  Hwang owns and controls Tiger Management.

8.      **Tiger Partners** is a Delaware limited liability company with its principal place of business in New York, New York.  During the relevant period, Tiger Partners served as the unregistered investment adviser and general partner of Tiger Asia Fund L.P.  Hwang owns and controls Tiger Partners.[1]

9.      **Park**, age 40, resides in Riverdale, New York.  During the relevant period, Park was an employee of Tiger Management and was the head trader for the Funds.  During the relevant period, Park served as the point of contact for investment banks soliciting the Funds to participate in private placements.  Park reported to Hwang and executed Hwang's trading instructions; Park had no trading authority himself.  Park has held Series 7, 55 and 63 licenses.

## FACTS

### Chinese Bank Private Placements

10.     Between December 2008 and January 2009, Tiger Asia participated in three private placements for the securities of two Chinese banks: two for Bank of China ("BOC") and one for China Construction Bank ("CCB") (collectively "the Chinese Bank Placements").

---

[1] Tiger Management, Tiger Partners, and the Funds will collectively be referred to as "Tiger Asia."

11.     In each instance, an investment banking placement agent ("IBPA") approached Park and inquired about Tiger Asia's interest in participating in the private placement. Prior to providing Park with the details of the transaction, the IBPA required that Park, on behalf of Tiger Asia, be "wall-crossed" – meaning that Tiger Asia agreed to keep the disclosed information confidential and to refrain from trading in the relevant securities until the transaction took place or was canceled.

12.     In each instance Park, from his office in New York, New York, agreed on behalf of Tiger Asia to be wall-crossed in telephone conversations with the IBPA. It is well understood in the investment industry – an industry in which Hwang and Park have obtained licenses and have spent their careers – that the information provided about the Chinese Bank Placements was material nonpublic information that Tiger Asia would receive only upon agreeing to not share or trade while in possession of the information.

13.     Following the wall-crossing conversations with the IBPAs, Park told Hwang about each of the Chinese Bank Placement offers while Hwang was in his office in New York, New York or in his home in Tenafly, New Jersey.

14.     After receiving this information from Park, Hwang ordered Park to short sell the relevant stock on the Hong Kong Stock Exchange ("HKSE") in the days prior to each Chinese Bank Placement. During the relevant period, Hong Kong was thirteen hours ahead of Eastern Time ("ET"), and the HKSE had a morning session from 9:00 pm to 11:30 pm ET, an afternoon session from 1:30 am to 3:00 am ET, and a ten minute auction period after the close of the afternoon session. During the auction session, short sales could only be ordered at the afternoon session closing price.

5

15.     Hwang also ordered Park to purchase a large amount of stock in each Chinese Bank Placement at the discounted placement price, some of which was used to cover the Funds' newly-acquired short positions.

16.     Park did not disclose to any of the IBPAs that Tiger Asia had breached its agreement to keep the information confidential and to refrain from trading in the relevant stock. In each Chinese Bank Placement, Tiger Asia was allocated all or most of the stock that it had agreed to purchase. Through this conduct, Tiger Asia made total illegal profits of approximately $16.2 million for the Funds.

**Insider Trading Concerning the December 2008 Private Placement of BOC Stock**

17.     On December 18, 2008, the IBPA for a large investment bank called Park to determine Tiger Asia's interest in participating in a private placement of that investment bank's shares of BOC. The IBPA told Park that he had confidential information that could only be shared with Park if Park agreed to be "wall-crossed." Park, speaking from Tiger Asia's New York offices, agreed to be wall-crossed on behalf of Tiger Asia, after which the IBPA told him that the investment bank intended to sell its entire stake in BOC, the transaction date would be December 31, 2008, and the price would be set at an 8-10% discount from the stock's closing price on December 31, 2008.

18.     The IBPA then asked for an indication of how much stock Tiger Asia was interested in purchasing, which Park declined to answer until after he had spoken with Hwang. Later on December 18, 2008, the IBPA memorialized his wall-crossing of Tiger Asia in an internal email.

19.     On December 21, 2008, Hwang directed Park and Tiger Asia's assistant trader to short sell $5 million of BOC stock, which they did. On December 22, 2008, the

IBPA sent an email to Park with the subject "[o]ver the wall notice," stating in part: "My compliance department has asked me to [sic] send the email below to everyone i [sic] have taken over the wall .... you have agreed on behalf of Tiger Asia to ... not engage in any trading activities regarding any security of Bank of China ...." Park responded: "Got it. Thx." Four hours later, Hwang directed Park and the assistant trader to short sell an additional $5 million of BOC stock, which they did.

20.     On that same day, Hwang also told Park to communicate to the IBPA that Tiger Asia would "likely [buy] around $50 mil between 10-15 percent discount." On December 24, 2008, Hwang confirmed his intention to purchase the BOC stock in an email to Park and another Tiger Asia employee: "We plan to buy around $50mil. to cover our short if discount is good enough." At Hwang's direction, Park and the assistant trader continued to short $5 million of BOC stock daily on December 23, 28, and 29, 2008.

21.     On December 28, 2008, Park confirmed to the IBPA, on the same email chain as the "over the wall notice," that Tiger Asia was "still good for $50mm between the 10-15% discount."

22.     On December 30, 2008, Park emailed Hwang: "The deal will come at a 12% discount. We are assured $50mm allocation if we choose to take it." Hwang responded "Pls take $50 mil." Park relayed this order to the IBPA by email from the United States. On December 31, 2008, Tiger Asia was allocated 199 million shares of BOC in the private placement, which it used to fully cover the short position it had established over the prior ten days.

23.     Based on the private placement price and the sale prices of BOC shares

Tiger Asia shorted after being brought over the wall, Tiger Asia reaped illicit profits of

approximately $3.2 million.

**Insider Trading Concerning the January 2009 Private Placement of CCB Stock**

24.     On January 5, 2009 around 7:45 pm ET, another IBPA at the same

investment bank as that involved in the December 2008 private placement of BOC

shares, called Park to inquire about Tiger Asia's interest in participating in a private

placement of shares of CCB owned by a large domestic financial institution.

25.     The IBPA told Park that he had confidential information that could only

be shared with Park if he agreed to be wall-crossed.  Park, speaking from Tiger Asia's

New York offices, agreed to be wall-crossed on behalf of Tiger Asia, after which the

IBPA told him that the financial institution intended to sell a large amount of its CCB

stock through a private placement and that the price would be set at a discount of

approximately 15% from the closing price the day before the transaction closed.  The

IBPA then asked for an indication of how much stock Tiger Asia was interested in

purchasing, to which Park replied that he would need to follow up with colleagues at

Tiger Asia.  In a call later that day, the IBPA informed Park that the transaction would

take place within the next forty-eight hours.  Park then told Hwang about the planned

private placement of CCB stock.

26.     On January 5, 2009 between 8:45 p.m. ET and 11:46 ET, Hwang sent

several emails to Park instructing him to short sell millions of shares of CCB stock.  At

the end of the Hong Kong trading day on January 5, 2009, Tiger Asia had executed short

sales of 93 million CCB shares.  On the same day, Tiger Asia also purchased during the trading day and sold during the closing auction 17 million CCB shares for a profit.

27.     Tiger Asia accounted for 35.86% of the auction volume in CCB on January 5, 2009.  On January 5, CCB closed down 3% from the morning session's close, and down 4.3% from the previous day's close.

28.     On January 6, 2009 Hwang emailed Park, the assistant trader and another colleague cautioning: "Pls do NOT discuss about the potential deal with ANYBODY including our analysts without getting my consent."  (emphasis in original.)

29.     On January 6, 2009 around 10:40 am ET, the IBPA informed Park that the private placement would take place before the HKSE's open that day, the pricing would be at a 12% discount to the previous close, and Tiger Asia would be allocated $1 billion of CCB stock if they wanted it.

30.     Hwang told Park by email to accept the $1 billion allocation, which Park, on behalf of Tiger Asia, and from New York, relayed to the IBPA by telephone.  On January 6, 2009, Tiger Asia was allocated 1.977 billion shares of CCB stock in the private placement, which it used to cover its entire short position in the stock.

31.     Based on the private placement price and the sale prices of CCB shares Tiger Asia shorted after being brought over the wall, Tiger Asia reaped illicit profits of approximately $7.3 million.

**Insider Trading Concerning the January 2009 Private Placement of BOC Stock**

32.     On January 11, 2009 around 10:58 pm ET, two IBPAs at a large investment bank called Park to determine Tiger Asia's interest in participating in a private placement of shares of BOC owned by an international financial institution.

33.     During this conversation, which was recorded by the investment bank, the IBPAs wall-crossed Park on behalf of Tiger Asia.  After Park agreed to be wall-crossed, the IBPAs stated that the financial institution intended to sell its BOC stock through a private placement in the next twenty-four to forty-eight hours, and that the price would be set at a 7-11% discount to that day's closing price.  The IBPAs made it clear that this was a private placement being offered to a small number of sophisticated investors and asked for an indication of how much stock Tiger Asia was interested in purchasing.  Park, speaking from Tiger Asia's New York offices, replied that Tiger Asia was interested in purchasing between $100 million and $150 million of BOC stock depending on the price but that he would have to discuss it with the "fund manager" and would get back to them.

34.     A few minutes later, at 11:19 pm ET, Park emailed Hwang the confidential information about the private placement that the IBPAs had provided.  A little over an hour later, at 12:27 am ET on January 12, 2009, Hwang instructed Park to communicate to the IBPAs that Tiger Asia would purchase $150 million of BOC stock if the price was HKD1.60, and $100 million of BOC stock if the price was HKD1.70. (HKD denotes Hong Kong dollar.)  Approximately a half hour later, Park called the IBPAs and communicated Hwang's commitments.

35.     On January 11, 2009, prior to Park being wall-crossed on behalf of Tiger Asia, Hwang directed Park and the assistant trader to short sell $30 million of BOC stock. After Park was wall-crossed, Hwang increased his sell order to $50 million of BOC stock.  Tiger Asia ultimately short sold approximately $42 million of BOC stock on January 11, 2009.

36.     On January 12, 2009, around 1:00 pm ET, Park had a call with the IBPA, in which he learned that the transaction would most likely take place at the HKSE close that night and that the discount would be 9-10% from the closing price on the HKSE. Park repeated this information to Hwang and noted that the "stock [would] trade one more day" on the HKSE.

37.     After Park reported this information to him, Hwang directed Park and the assistant trader to short sell up to $50 million of BOC stock. However, because they were not able to locate sufficient shares of BOC stock, Tiger Asia only short sold $42 million of BOC stock on January 12, 2009.

38.     On January 12, 2009, at 9:18 pm ET, Hwang instructed Park to order $125 million of BOC stock in the private placement regardless of how many shares Tiger Asia could short sell that night. After further discussions between Park and the IBPA, Tiger Asia's allocation was increased to $373 million of BOC shares in the private placement, at a 7.6% discount from the HKSE closing price, which it used to cover a large portion of its short position.

39.     Based on the private placement price and the sale prices of BOC shares Tiger Asia shorted on and after January 11, 2009, the day Tiger Asia was brought over the wall, Tiger Asia reaped illicit profits of approximately $5.7 million.

### Attempted Manipulative Trading

40.     Pursuant to the Funds' offering documents, Tiger Management was entitled to receive a fixed annual management fee equal to 1.5% of the value of the net assets of the Funds calculated as of the end of each month. On at least four occasions, Tiger Asia attempted to manipulate the month-end closing prices of stocks listed on the

11

HKSE. The stocks that Tiger Asia attempted to manipulate were among the largest short position holdings in the Funds' portfolios. Tiger Asia placed trades designed to depress the price of the stocks in which it held large short positions, which would increase the value of the short positions, in an attempt to inflate the Funds' assets under management. The more assets Tiger Asia had under management, the greater the management fee Tiger Management was entitled to collect.

41.    On November 28, 2008, at Hwang's direction, Tiger Asia short sold shares of Industrial and Commercial Bank of China ("ICBC"), CCB, and China Life Insurance Company Limited ("China Life") during the last hour of the afternoon trading session and sold the same stocks during the auction session. In order to conceal Tiger Asia's trading, Park directed Tiger Asia's assistant trader to not use the same brokers for the sales during the auction session as he had for the short sales during the regular session. ICBC, CCB and China Life were among Tiger Asia's largest short positions. The auction session sales were intended to depress the closing prices of ICBC, CCB, and China Life stock.

42.    On December 31, 2008, at Hwang's direction, Park and the assistant trader sold large quantities of ICBC, CCB and China Life stock during the auction session in an attempt to depress the stocks' closing prices.

43.    On January 29, 2009, Hwang instructed Park and the assistant trader in an email to "[l]ong [b]uy $7 mill ICBC during first 3 hours of trading today and sell what we bought ($7 mil) at the auction. This is to prevent any pushing up at the end." Park and the assistant trader executed the trades as directed by Hwang.

44.     On February 27, 2009, Tiger Asia did not own any long shares of its largest short positions. So, Park and the assistant trader purchased large quantities of CCB, ICBC, Bank of Communications, China Mobile and China Life stock during the morning and afternoon regular trading sessions, and then sold those newly purchased shares during the auction session. Park and the assistant trader also short sold these stocks throughout the trading day. This trading was intended to depress the closing prices of CCB, ICBC, Bank of Communications, China Mobile and China Life stock.

45.     Tiger Management earned over $496,000 in management fees attributable to the change in value of Tiger Asia's short positions described in Paragraphs 41 through 44 during the months in which the attempted manipulative trading occurred.

### FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Against all Defendants)

46.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 45 of this Complaint.

47.     The information provided by the IBPAs to Park who communicated it to Hwang was, in each case, material and nonpublic. Before providing this material nonpublic information to Park, in each case, the IBPA required that Park, on behalf of Tiger Asia, agree to be brought over the wall, and to refrain from trading the relevant securities. In each case, Park agreed, on behalf of Tiger Asia, to be brought over the wall.

48.     In each case, after receiving the material nonpublic information from the IBPA, Hwang directed Park to short sell the relevant securities in Tiger Asia's accounts in advance of the private placement.

49.     Defendants Hwang, Tiger Management, Tiger Partners and Park knowingly or recklessly breached a duty of trust and confidence owed to the IBPAs by short selling the relevant securities while in possession of material nonpublic information about the forthcoming private placements provided by the IBPAs.

50.     By engaging in the conduct described above, defendants Hwang, Tiger Management, Tiger Partners and Park, and each of them, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

51.     By virtue of the foregoing, defendants Hwang, Tiger Management, Tiger Partners and Park, and each of them, directly or indirectly, violated, and, unless enjoined, will again violate, Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Against all Defendants)

52.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 51 of this Complaint.

53.     By virtue of the foregoing, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or

by use of the mails, directly or indirectly, defendants Hwang, Tiger Management, Tiger Partners and Park, and each of them: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

54.     By reason of the conduct described above, defendants Hwang, Tiger Management, Tiger Partners and Park, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 206(1) and 206(2) of the Advisers Act**
**(Against Defendants Hwang, Tiger Management and Tiger Partners)**

55.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54 of this Complaint.

56.     At all relevant times, Hwang, Tiger Management and Tiger Partners were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

57.     Despite owing a duty to the Funds to act in the best interests of the Funds, Hwang, Tiger Management and Tiger Partners knowingly or recklessly attempted to manipulate the month-end closing prices of stocks in which the Funds had large short positions.  Tiger Asia placed these trades in an attempt to inflate the Funds' assets under

management. The more assets Tiger Asia had under management, the greater the management fee Tiger Management was entitled to collect.

58.     By engaging in the conduct described above, defendants Hwang, Tiger Management and Tiger Partners, and each of them, directly or indirectly, knowingly or recklessly, by use of the mails or any means or instrumentalities of interstate commerce: (a) employed devices, schemes or artifices to defraud clients or prospective clients, or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon clients or prospective clients.

59.     By reason of the foregoing, defendants Hwang, Tiger Management and Tiger Partners, and each of them, directly or indirectly, violated, and unless enjoined, will again violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
### (Against Defendants Hwang, Tiger Management and Tiger Partners)

60.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 59 of this Complaint.

61.     The Funds were pooled investment vehicles, as defined in Rule 206(4)-8 under the Advisers Act, and engaged primarily in the business of investing, directly or indirectly, in securities.

62.     By engaging in the conduct alleged above, defendants Hwang, Tiger Management and Tiger Partners, and each of them, directly or indirectly, knowingly or recklessly, by use of the mails or any means or instrumentalities of interstate commerce: (a) made untrue statements of material fact or omitted to state material facts necessary to

make the statements made, in light of the circumstances under which they were made, not

misleading, to an investor or prospective investor in the Funds; or (b) otherwise engaged

in acts, practices, or courses of business that were fraudulent, deceptive or manipulative

with respect to investors or prospective investor in the Funds.

63.     By reason of the foregoing, Defendants Hwang, Tiger Management and

Tiger Partners, and each of them, directly or indirectly, violated, and unless enjoined, will

again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule

206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### FIFTH CLAIM FOR RELIEF

#### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act
#### (Against Defendant Park)

64.     The Commission realleges and incorporates by reference herein each and

every allegation contained in paragraphs 1 through 63 of this Complaint.

65.     At all relevant times, Park was an associated person of Tiger Management,

an investment adviser.

66.     Park provided substantial assistance to Hwang, Tiger Management and

Tiger Partners in their attempts to manipulate the month-end closing prices of stocks in

which the Funds had large short positions.  At Hwang's direction, Park and Tiger Asia's

assistant trader knowingly sold large quantities of stocks in which the Funds had large

short positions on the last trading day of the months of November 2008, December 2008,

January 2009, and February 2009, in an attempt to depress the stocks' closing prices.

67.     By engaging in the conduct described above, Park knowingly provided

substantial assistance to Hwang, Tiger Management and Tiger Partners, and thus aided

17

and abetted Hwang's, Tiger Management's and Tiger Partners' violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder
### (Against Defendant Park)

68.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 67 of this Complaint.

69.     At all relevant times, Park was an associated person of Tiger Management, an investment adviser.

70.     By engaging in the conduct described above, Park knowingly provided substantial assistance to Hwang, Tiger Management and Tiger Partners, and thus aided and abetted Hwang's, Tiger Management's and Tiger Partners' violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently restraining and enjoining defendants Hwang, Tiger Management, Tiger Partners and Park, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4)

18

of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## II.

Ordering defendants Hwang, Tiger Management, Tiger Partners and Park to disgorge, with prejudgment interest, all ill-gotten gains received as a result of the conduct alleged in this Complaint.

## III.

Ordering defendants Hwang, Tiger Management, Tiger Partners and Park to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] or Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## IV.

Granting such other and further relief as this Court may deem just and proper.

Dated:  December 12, 2012
        New York, New York

_Sanjay Wadhwa_
Sanjay Wadhwa*
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281-1022
(212) 336-0181
WadhwaS@sec.gov

Of Counsel:
Amelia A. Cottrell (CottrellA@sec.gov)*
Thomas P. Smith, Jr. (SmithTh@sec.gov)*
Sandeep Satwalekar (SatwalekarS@sec.gov)*

*not admitted in New Jersey