UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA         :

                         :

       - v. -              :           22 Cr. 240 (AKH)

                         :

SUNG KOOK (BILL) HWANG and   :
PATRICK HALLIGAN,          :

                         :

        Defendants.      :

                         :

------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' OMNIBUS PRETRIAL MOTIONS

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Matthew Podolsky
Alex Rossmiller
Danielle Sassoon
Andrew Thomas
Assistant United States Attorneys

- Of Counsel -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 1

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 3

    A.   Factual Overview ................................................................................................ 3

    B.   Investigation Overview and Warrants ................................................................ 7

    C.   The Informations, Guilty Pleas, and Indictment ............................................... 8

    D.   Agency Enforcement Actions ............................................................................ 9

    E.   The Motions ....................................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.  The Counts in the Indictment Properly Allege the Offenses Charged.................... 10

    A.   Applicable Law ................................................................................................ 10

    B.   Discussion ........................................................................................................ 11

        1.   The Indictment Properly Alleges a Racketeering Conspiracy ................ 11

        2.   The Indictment Alleges Market Manipulation ........................................ 23

        3.   Count Ten of the Indictment Alleges Security Fraud.............................. 35

        4.   Count Eleven Properly Pleads Wire Fraud ............................................. 43

        5.   The Indictment Properly Provides Notice of the Possibility of Forfeiture.............47

II.  The Warrant Affidavit Established Probable Cause, as Magistrate Judge Gabriel Gorenstein Found..................................................................................................... 50

    A.   Applicable Law ................................................................................................ 50

    B.   Discussion ........................................................................................................ 52

III. The Defendants' Demand for a Bill of Particulars Should Be Denied ................... 56

    A.   Applicable Law ................................................................................................ 57

    B.   Discussion ........................................................................................................ 58

        1.   The Government Need Not Supply Any Further Information About Misrepresentations Made During and in Furtherance of the Schemes.................. 60

        2.   The Government Need Not Disclose Further Details About the Alleged Conspiracy.......................................................................................... 63

3.    The Defendants Are Not Entitled to Itemized Proof of the Market Manipulation Schemes ........................................................................................................ 64

4.    The Defendants Are Entitled to No More Particulars for the Section 10(b) Counts ........................................................................................................ 67

IV. The Defendants' Motion to Strike Language from the Indictment Should Be Denied .......... 68

A.    Applicable Law ..................................................................................... 68

B.    Discussion ............................................................................................ 69

V.  The Defendants' *Brady* Motion Should Be Denied .............................................. 72

CONCLUSION ..................................................................................... 79

# TABLE OF AUTHORITIES

## CASES

*A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967)................................................. 39

*Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610 (AGS) (S.D.N.Y. Mar. 27, 2001) ............... 21

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ............................... passim

*Berger v. New York*, 388 U.S. 41 (1967) ....................................................................... 51

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ........................................... 47

*Calderon Serra v. Banco Santander Puerto Rico*, 747 F.3d 1 (1st Cir. 2014) ........................... 38

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .... 41

*CFTC v. Archegos Capital Management*, et al., No. 22 Civ. 3401 (JPO) ..................................... 9

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 932 (2d Cir. 1984)............................... 38, 39

*Ciminelli v. United States*, 142 S. Ct. 2901 (2022).......................................................... 44

*Ciminelli v. United States*, No. 21-1170 ......................................................................... 43

*Connolly v. Havens,* 763 F. Supp. 6 (S.D.N.Y. 1991) ...................................................... 21

*Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126 (E.D.N.Y. 2010) ....................................... 14

*Costello v. United States*, 350 U.S. 359 (1956) ............................................................. 37

*Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969)............................... 27, 29

*Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297 (S.D.N.Y. 2010) ............................... 21

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).......................................................... 24, 25

*First Pacific Bancorp, Inc. v. Bro,* 847 F.2d 542 (9th Cir. 1988)....................................... 20

*Flexborrow LLC v. TD Auto Finance LLC*, 255 F. Supp. 3d 406 (E.D.N.Y. 2017).................... 16

*Goldfine v. Sichenzia*, 118 F Supp. 2d 392 (S.D.N.Y. 2000) ........................................... 14

*Grace International Assembly of God v. Festa*, 797 F. App'x 603 (2d Cir. 2019) .................... 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ......................................................... 34

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ......................................................... 24, 25

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)..................................... 16

*Herring v. United States*, 555 U.S. 135 (2009).............................................................. 56

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)..................................... 19

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................................................ 50, 51, 55

*In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation*, 583 F. Supp. 1388 (E.D. Pa. 1984) ......................................................................................................................... 20

*In re Colonial Ltd. Partnership Litigation*, 854 F. Supp. 64 (D. Conn. 1994) ........................... 20

*In re Crazy Eddie Securities Litigation*, 812 F. Supp. 338 (E.D.N.Y. 1993) ........................ 20, 21

*In re Par Pharmaceutical, Inc. Securities Litigation,* 733 F. Supp. 668 (S.D.N.Y. 1990)........... 19

*International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149 (4th Cir. 1987) ....................................... 20

*Janus Capital Group, Inc. v. First Derivates Traders*, 564 U.S. 135 (2011) .............................. 41

*Lorenzo v. S.E.C.*, 139 S. Ct. 1094 (2019) ................................................................................. 43

*Lou v. Belzberg*, 728 F. Supp. 1010 (S.D.N.Y. 1990) ................................................................. 20

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ............................................................................ 34

*Merrill Lynch, Pierce, Fenner, & Smith v. Dabit*, 547 U.S. 71 (2006) ...................................... 37

*Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514 (S.D.N.Y. 2001). 21

*Parker v. Levy*, 417 U.S. 733 (1974) .......................................................................................... 34

*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999)................................................... 38

*Production Resource Group, L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236 (S.D.N.Y. 1998)................................................................................................... 38

*Prousalis v. Moore*, 751 F.3d 272 (4th Cir. 2014)...................................................................... 41

*Prousalis v. United States*, 692 F. App'x 675 (2d Cir. 2017)...................................................... 41

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010)...................................................................... 38

*S.E.C. v. Drysdale*, 785 F.2d 38 (2d Cir. 1986)................................................................... 39, 40

*S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017) ............................................ 26, 27

*S.E.C. v. Malenfant,* 784 F. Supp. 141 (S.D.N.Y. 1992) ................................................ 26, 27, 35

*S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007) .................................................. 24, 26, 35

*S.E.C. v. Vali Mgmt. Partners*, No. 21-453 (2d Cir. June 15, 2022) ........................ 26, 28, 31, 35

*Salinas v. United States*, 522 U.S. 52 (1997)........................................................................ 13, 17

*Santa Fe Industries v. Green*, 430 U.S. 462 (1977)................................................................... 25

*SEC v. Hwang*, et al., No. 22 Civ. 3402 (JPO) ........................................................................... 9

*SEC v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022) ..................................................................... 42

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL) (S.D.N.Y. June 26, 2007) ........................................... 75

*SEC v. Zandford*, 535 U.S. 813 (2002) ...................................................................... 37, 40

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) ...................................................... 21

*Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021) ........................... passim

*United States v. Agrawal*, 726 F.3d 235 (2d Cir. 2013) ......................................................... 44

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022) ............................................................... 19

*United States v. Almaleh*, No. 17 Cr. 025 (ER) (S.D.N.Y. Feb. 28, 2022) ................................. 45

*United States v. Amendolara*, No. 01 Cr. 694 (S.D.N.Y. Oct. 21, 2002) ................................... 63

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ................................................. 13, 14, 17, 18

*United States v. Arrington*, 941 F.3d 24 (2d Cir. 2019) ......................................................... 14

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ......................................................... 74

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ....................................... 57, 59

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ................................. 58, 68, 71

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................... 58

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015) ........................................................... 44

*United States v. Birrell,* 242 F. Supp. 191 (S.D.N.Y. 1965) ................................................... 53

*United States v. Blaszczak*, 308 F.Supp.3d 736 (S.D.N.Y. 2018) ................................... 74, 75, 78

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016) ................................................... 50

*United States v. Bortnick* No. 03 Cr. 414 (E.D. Pa. Nov. 29, 2004) ......................................... 46

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ............................................... 57, 58

*United States v. Boyle*, No. 08 Cr. 534 (CM), (S.D.N.Y. July 9, 2009) ..................................... 13

*United States v. Brooks*, 966 F. 2d 1500 (D.C. Cir. 1992) ..................................................... 76

*United States v. Brouillette,* 478 F.2d 1171 (5th Cir. 1973) ................................................... 53

*United States v. Brown*, 828 F.3d 375 (6th Cir. 2016) ........................................................... 54

*United States v. Butler*, 351 F. Supp. 121 (S.D.N.Y. 2004) ............................................... 69, 70

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012) ............................................................... 14

*United States v. Capers*, 20 F.4th 105 (2d Cir. 2021) ........................................................... 14

*United States v. Carroll*, 510 F.2d 507 (2d Cir. 1975) ........................................................... 63

*United States v. Carroll*, No. 19 Cr. 545 (CM) (S.D.N.Y. Apr. 14, 2020)...................................78

*United States v. Chalmers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006)..............................................57

*United States v. Chan,* No. 96 Cr. 350 (E.D. Cal. Jan. 27, 2006)................................................49

*United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69 (S.D.N.Y. Feb. 9, 2018) ..............74

*United States v. Coffey*, 361 F. Supp. 2d 102 (E.D.N.Y. 2005)...................................................68

*United States v. Collins*, 409 F. Supp. 3d 228 (S.D.N.Y. 2019)............................................74, 75

*United States v. Connolly,* No. 16 Cr. 370 (CM) (S.D.N.Y. May 24, 2017)...............................66

*United States v. Contorinis,* 692 F.3d 136 (2d Cir. 2012) ...........................................................48

*United States v. Cordones*, No. 11 Cr. 205 (AKH) (S.D.N.Y. Mar. 17, 2022) ..........................57

*United States v. Coriaty*, No. 99 Cr. 1251 (S.D.N.Y. July 16, 2001) ..........................................39

*United States v. Cornelson*, No. 15 Cr. 516 (JGK) (S.D.N.Y. June 27, 2022)............................43

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016)...........................................................11

*United States v. Daugerdas*, No. 09 Cr. 581 (WHP) (S.D.N.Y. Nov. 22, 2010)........................71

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ...................................................11, 24, 43

*United States v. Deeb*, 175 F.3d 1163 (9th Cir. 1999)..................................................................19

*United States v. Eisenberg*, 773 F. Supp. 662 (D.N.J. 1991).......................................................20

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017)..................................................................44

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006)...............................................73

*United States v. Gambino*, 809 F. Supp. 1061 (S.D.N.Y. 1992) .................................................68

*United States v. Georgiou*, 742 F. Supp. 2d 613 (E.D. Pa. 2010)...............................................32

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001)..................................................58

*United States v. Gilbert*, 668 F.2d 94 (2d Cir. 1981)...................................................................35

*United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010)......................................75

*United States v. Grass*, 274 F. Supp. 2d 648 (M.D. Pa. 2003) ...................................................49

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) ..................................................76

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016)..............................................................33

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .................................................57, 59

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992)...........................................................18

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) .......................................... 16

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ...................................................... 11

*United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014)................................. 46

*United States v. Lahey,* 967 F. Supp. 2d 698 (S.D.N.Y. 2013)...................................... 54

*United States v. Leon*, 468 U.S. 897 (1984)................................................................... 55

*United States v. Leonard*, 350 F. App'x 480 (2d Cir. 2009)........................................... 79

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) .................................................... 79

*United States v. Levy,* No. S5 11 Cr. 62 (PAC) (S.D.N.Y. Feb. 25, 2013)................... 66

*United States v. Lino*, No. 00 Cr. 632 (S.D.N.Y. Jan. 2, 2001) ..................................... 58

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) .............................. 57, 58, 61, 62

*United States v. Marchese*, No. 89 CR. 229 (PKL) (S.D.N.Y. Apr. 11, 1991) ............ 22

*United States v. Martin*, 411 F. Supp. 2d 370 (S.D.N.Y. 2006) .................................... 45

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ................................ 77

*United States v. Maxwell*, 534 F. Supp. 3d 299 (S.D.N.Y. 2021)................................. 69

*United States v. McLaughlin*, 565 F. App'x 470 (6th Cir. 2014) ................................... 48

*United States v. Middendorf*, No. 18 Cr. 36 (JPO) (S.D.N.Y. Aug. 17, 2018)........... 74, 75, 76, 79

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990).......................................... 34

*United States v. Miller*, 471 U.S. 130 (1985)................................................................. 44

*United States v. Minaya*, 395 F. Supp. 2d 28 (S.D.N.Y. 2005) ................................ 45, 63

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001)...................................... 57

*United States v. Moore*, 968 F.2d 216 (2d Cir. 1992)..................................................... 55

*United States v. Mora*, No. 19 Cr. 514 (JPO) (S.D.N.Y. Dec. 21, 2020) ..................... 67

*United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) ........................ 69, 70, 72

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)................................................ 68, 69

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991).......................................... 27, 28

*United States v. Murphy*, No. 21 Cr. 280 (AKH) (S.D.N.Y. Apr. 28, 2022)............. 57, 59

*United States v.* Nadi, 996 F.2d 548 (2d Cir. 1993)........................................................ 34

*United States v. Naftalin*, 441 U.S. 768 (1979) ............................................................. 39

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) ................................................... 37

*United States v. Ostrander*, 999 F.2d 27 (2d Cir. 1993) .............................................. 38

*United States v. Panza*, 750 F.2d 1141 (2d Cir. 1984) ............................................... 58

*United States v. Percoco*, 13 F.4th 158 (2d Cir. 2021) .............................................. 44

United States v. Perez, 575 F.3d 164 (2d Cir. 2009) ............................................. 11, 24

*United States v. Persico*, 621 F. Supp. 842 (S.D.N.Y. 1985) ...................................... 64

*United States v. Pizzonia*, 577 F.3d 455 (2d Cir. 2009).............................................. 17

*United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH) (S.D.N.Y. Jul. 13, 2010) ......................... 58

*United States v. Raniere*, 384 F. Supp. 3d 282 (E.D.N.Y. 2019) ........................... 15, 22

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) ............................................ 25, 28

United States v. Resendiz-Ponce, 549 U.S. 102 (2007)........................................... 23, 36

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) ..................................... 58

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ............................................ 73, 75

*United States v. Rigas*, No. 02 Cr. 1236 (LBS) (S.D.N.Y. Jan. 15, 2008) ................................ 73

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003)................................ 57, 59, 63

*United States v. Rodriguez*, No. 99 Cr. 367 (DLC) (S.D.N.Y. Oct. 13, 1999) ........................... 64

*United States v. Ross*, 456 U.S. 798 (1982) ............................................................ 55

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008)........................................... passim

*United States v. Russo*, 483 F. Supp. 2d 301 (S.D.N.Y. 2007)..................................... 62

*United States v. Rutherford* 71 F. Supp. 3d 386 (S.D.N.Y. 2014)................................. 54

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) .......................................... 15, 34

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998)........................................... 50, 51

*United States v. Scarpa*, 913 F.3d 993 (2d Cir. 1990) .......................................... 68, 71

United States v. Schneiderman, 968 F.2d 1564 (2d Cir. 1992) ...................................... 34

*United States v. Shkreli*, 779 F. App'x 38 (2d Cir. 2019)........................................ 50

*United States v. Simon*, 425 F.2d 796 (2d Cir. 1969) ............................................ 31

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................................... 69

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ..................................... 46

*United States v. Stein*, 456 F.2d 844 (2d Cir. 1972) ........................................................ 26, 27, 35

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ........................................................ 75

*United States v. Stewart*, 513 F.2d 957 (2d Cir. 1975) ........................................................ 79

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ........................................................ 45

*United States v. Torres*, 191 F.3d 799 (7th Cir. 1999) ........................................................ 15

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ........................................................ 59

*United States v. Torres*, No. 20 Cr. 608 (DLC), (S.D.N.Y. May 13, 2021) ................................ 10

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ........................................................ 64

*United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444 (D. Conn. 2002) ............... 15

*United States v. Tuzman,* 301 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................................................ 65

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) ........................................................ 11

*United States v. Ventresca*, 380 U.S. 102 (1965) ........................................................ 51

*United States v. Verra*, 203 F. Supp. 87 (S.D.N.Y. 1962) ........................................................ 71

*United States v. Vought*, No. 05 Cr. 268 (JBA) (D. Conn. June 15, 2006) ................................. 67

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ........................................................ 11

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ........................................................ 10, 22

*United States v. Wey*, No. 15 Cr. 611 (AJN) (S.D.N.Y. Jan. 18, 2017) ........................................ 65

*United States v. White*, 7 F.4th 90 (2d Cir. 2021) ........................................................ 17

*United States v. White*, No. 17 Cr. 611 (RWS) (S.D.N.Y. Aug. 28, 2018) ................................ 13

*United States v. Wilson*, 493 F. Supp. 2d 364 (E.D.N.Y. 2006) ........................................................ 63

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ........................................................ 14, 43

*United States v. Zichettello*, 208 F.3d 72 (2d Cir. 2000) ........................................................ 14, 22

*Uni-World Capital LP v. Preferred Fragrance Inc.*, No. 13 Civ. 7204 (PAE) (S.D.N.Y. Aug. 8, 2014) ........................................................ 40

Village of Hoffman Estates v. Flipside, 455 U.S. 489 (1982) ........................................................ 34

*Weaver v. Marine Bank*, 637 F.2d 157 (3d Cir. 1980) ........................................................ 39

## OTHER AUTHORITIES

*Modern Federal Jury Instructions*, Instruction 57-21 ........................................................ 38

**RULES**

Fed. R. Crim. P. 32(b)(1)(B)..................................................................................... 47

Fed. R. Crim. P. 32.2(a)............................................................................................. 47

Fed. R. Crim. P. 32.2(b)(1)........................................................................................ 47

Fed. R. Crim. P. 32.2(b)(1)(a).................................................................................... 47

Fed. R. Crim. P. 7(c).................................................................................................. 13

Fed. R. Crim. P. 7(c)(1).............................................................................................. 10

Fed. R. Crim. P. 7(c)(2).............................................................................................. 47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
                                           :
UNITED STATES OF AMERICA                   :
                                           :
              - v. -                       :            22 Cr. 240 (AKH)
                                           :
SUNG KOOK (BILL) HWANG and                 :
PATRICK HALLIGAN,                          :
                                           :
                   Defendants.             :
----------------------------------------------------x

### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' OMNIBUS PRETRIAL MOTIONS

The Government respectfully submits this memorandum of law in opposition to the omnibus pretrial motions of Sung Kook (Bill) Hwang and Patrick Halligan, the defendants, seeking to dismiss all charges and various other relief. *See* ECF Doc. Nos. 47 (notice of motion) and 48 (memorandum of law).[1]

### PRELIMINARY STATEMENT

On April 25, 2022, a grand jury returned Indictment 22 Cr. 240 (AKH), ECF Doc. 1,. charging Hwang and Halligan with racketeering and fraud offenses they committed as executives of Archegos Capital Management—offenses that led to the firm's collapse and to billions of dollars in losses. The defendants now ask the Court to spare them from a trial on the merits of any of the Indictment's eleven counts, arguing the allegations are wrong and do not amount to crimes. In the alternative, the defendants ask the Court to tailor a future trial to their liking by striking the reference to Hwang's prior failed fund from the Indictment, by supplying the defendants with an itemized list of the Government's trial proof, by suppressing evidence obtained from a search warrant issued by a United States magistrate judge, and by predetermining forfeiture in their favor.

---

[1] "Defense Brief" or "Def. Br." refers to the defendants' memorandum in support of their omnibus motions. "ECF Doc." refers to an entry on the docket of this case, 22 Cr. 240 (AKH).

The law does not advantage the defendants with the extraordinary pre-trial relief they seek. A recurring theme in the defendants' motions is that the defendants, so they say, have not committed any crimes, and therefore all eleven counts in the Indictment must be infirm. But that is an argument for a jury, not a basis for dismissal. When a charge contains the essential elements of the offense and gives notice of the core criminality at issue, as those in the Indictment do, nothing more is required to justify a trial on the merits. The defendants make a similar error when seeking to suppress evidence obtained from certain search warrants by concluding that because no crime was committed, there could not have been probable cause for the issuance of the warrants in the first place. The defendants encourage the Court to substitute their assessment of the evidence for that of Magistrate Judge Gabriel W. Gorenstein, who found probable cause, based on the warrant affidavit to believe a crime had been committed. But this Court must read the warrants as a whole and accord considerable deference to the issuing magistrate, so the defendants' arguments fail from the start. The defendants may not obtain dismissal of the charges and suppression of the evidence merely because they assert their innocence.

As an alternative strategy, the defendants seek to predetermine evidentiary and punishment issues that should not, and cannot, be decided until or after trial. To this end, the defendants request that the Court dismiss the Indictment's forfeiture allegations on the theory that there is nothing to forfeit, which has yet to be determined. Similarly, the defendants' move to strike references to Hwang's prior civil and criminal violations in the Indictment and assume that evidence of those things will be precluded at trial, an issue that should properly be decided *in limine* on a full record. The defendants also hope to get a preview of the government's trial evidence, demanding now—roughly ten months before trial—a comprehensive catalog of any trading or misrepresentation evidence the Government may seek to present to the jury. That is not an acceptable basis to obtain a Bill of Particulars, nor could they identify any other. The Government has gone well above and beyond its obligations to provide notice to the defendants of the essential facts establishing the charged offenses through the filing of a 59-page speaking Indictment, *see* ECF Doc. No. 1, and by the submission of a supplemental 12-page letter, *see* ECF Doc. No. 38, that described in great

detail the numerous relevant false and misleading representations, including more than 50 citations to particular pages produced in discovery.

Last, the defendants seek to compel the Government to search materials in the exclusive possession of the Securities and Exchange Commission and the Commodity Futures Trading Commission, styling the request as one for *Brady*, but they do so in disregard of settled law.

The defendants' motions should be denied in their entirety.

## BACKGROUND

### A. Factual Overview

From early 2020 through March 2021, Sung Kook "Bill" Hwang operated his investment company, Archegos Capital Management, L.P., and its affiliated funds and entities ("Archegos," "ACM," or the "fund") through systematic fraud.[2] Indictment ¶¶ 1, 21, 41, 47, 68-74. Hwang did not act alone to do so: Halligan, ACM's Chief Financial Officer, along with William Tomita, ACM's Head Trader, and Scott Becker, ACM's Director of Risk Management, among others, joined Hwang to defraud Archegos's trading counterparties and to manipulate the securities markets using Archegos's resources and relationships. Indictment ¶¶ 1-2, 68-74. During that time, Archegos's capital—essentially Hwang's personal fortune—increased from approximately $1.5 billion to more than $35 billion. The total size of Archegos's market positions, including investments made with money borrowed from the counterparties, grew from approximately $10 billion to more than $160 billion. Indictment ¶ 3. And its positions were almost entirely concealed from the market, through trading in derivative securities that had no public disclosure requirement, in part to hide the extent of Hwang's market power from financial counterparties and from other investors. Indictment ¶¶ 4, 73.

The defendants' frauds rested on two interrelated criminal schemes, involving manipulative trading in the marketplace and false and misleading statements to Archegos's trading

---

[2] The offense conduct set forth herein is principally a summary of the facts alleged in the Indictment.

counterparties, including numerous leading global investment banks and brokerages (collectively, the "Counterparties"). The trading scheme aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio. Indictment ¶ 2. For securities in which Archegos had a long position, the conspirators aimed to inflate the price of the stock; for securities in which Archegos had a short position, Archegos aimed to depress the price of the stock. To achieve his plans, Hwang developed and deployed a variety of techniques to affect the price of stocks, such as purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. Indictment ¶ 35. Moreover, and in addition to specific days of price manipulation, Hwang caused Archegos to dominate the securities of multiple stock issuers, causing significant artificial increases in the prices of the securities underlying Archegos's long swaps, as Hwang had intended. Indictment ¶ 40.

To accomplish their schemes, Hwang and his conspirators made use of both ordinary equity securities and derivatives known as total return swaps. A total return swap is a contract in which one party makes payments based on a set rate while the other party makes payments based on the return of an underlying asset, in this case, stocks. A party that purchases a total return swap is, in effect, making a bet on whether the underlying asset will increase or decrease in value by the end of the term of the swap. The Archegos Conspirators treated their swaps as the functional equivalent of purchasing or selling the equity itself. Indictment ¶¶ 14-17. Transacting in swaps conferred the added advantage of concealing the size and extent of Archegos's positions from the Counterparties and from the market as whole because, unlike its equity holdings, Archegos did not have to report its swap positions publicly. At the same time, transacting on swaps allowed the Archegos Conspirators to manipulate the equities markets, however, because, as Hwang knew, the Counterparties themselves purchased the stock underlying the swap as a hedge.

Over time, the defendants' manipulative and fraudulent schemes artificially altered the prices of certain Archegos-held stocks vastly above (or, for short positions, below) what otherwise

would have been their market prices. This included the following equities:

| Company | Ticker | Archegos Position |
|---------|--------|-------------------|
| ViacomCBS | VIAC | Long |
| Discovery Communications, Inc. | DISCA | Long |
| Discovery Communications, Inc. | DISCK | Long |
| GSX Techedu Inc. | GSX | Long |
| iQIYI, Inc. | IQ | Long |
| Tencent Music Group | TME | Long |
| Vipshop Holdings Ltd | VIPS | Long |
| Baidu | BIDU | Long |
| Farfetch | FTCH | Long |
| Texas Capital Bancshares Inc. | TCBI | Long |
| Futu Holdings | FUTU | Short |
| Rocket Companies, Inc. | RKT | Short |

Indictment ¶ 21.

By March 2021, Hwang's trading strategies and use of multiple counterparties led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in fact, they were the artificial product of Hwang's manipulative trading and deceptive conduct that caused trading by others. Indictment ¶¶ 2, 21, 39.

Hwang's trading schemes were enabled and furthered by lies and misrepresentations made to Archegos's counterparties. With Hwang's knowledge, approval, and participation, Halligan, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to the Counterparties. Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions;

(ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. Indictment ¶ 48. These false and misleading statements were designed to fraudulently induce the Counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos. Indictment ¶¶ 47, 49. That risk was massive, dire, and ultimately catastrophic, resulting in losses to the Counterparties totaling billions upon billions of dollars.

Because Archegos devoted so much of its available funds to propping up those prices (or for short positions, depressing them), Archegos's portfolio became highly vulnerable to external events that might deflate or derail the artificial prices Hwang had created. In late March 2021, that vulnerability materialized: a decline in the prices of just a handful of stocks in Archegos's portfolio prompted significant margin calls; that is, Counterparties required Archegos to provide more cash to support its trading and to do so urgently. Indictment ¶¶ 5-6, 60.

In March 2021, these circumstances posed an existential threat to Hwang's schemes and to Archegos as a whole. Hwang knew that closing Archegos's positions to raise cash to meet the margin calls would worsen the price pressure that caused the margin calls in the first place. Accordingly, and instead of ending the scheme and acknowledging the failure of his manipulative trading strategies, Hwang directed Archegos's traders to engage in a desperate buying spree in an attempt to reverse the price declines of stocks constituting Archegos's core long positions. Indictment ¶ 60. Acting at Hwang's direction, the traders used Archegos's remaining cash and credit. To support them, Halligan, Becker, and Tomita attempted to, and at times succeeded in, misleading the Counterparties about Archegos's financial condition and portfolio in order to fund the last-ditch trading effort. But Hwang's buying spree—which rapidly ballooned to billions of dollars—was not enough to overcome the correction of the inflated prices of Archegos's long holdings; Archegos defaulted on its agreements with the Counterparties, unable to pay them what they were owed due to the stock price reductions. As a result, the Counterparties sold the stocks they held in connection with their agreements with Archegos, and the prices that had been

artificially supported by the trading directed by Hwang, and funded by lies told to the Counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days. Indictment ¶¶ 61-67.

Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized a wide swath of market participants, including banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit, ordinary investors who purchased and sold the relevant securities at artificial prices, and securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

## B.  Investigation Overview and Warrants

Within days of the collapse of Archegos in March 2021, the U.S. Attorney's Office for the Southern District of New York, in conjunction with the Federal Bureau of Investigation, opened an investigation of Archegos and its employees for possible criminal wrongdoing. As part of that investigation, and over the course of a year of fact gathering, law enforcement officers interviewed dozens of individuals, including numerous former employees of Archegos; reviewed thousands of pages of email and chat communications among Archegos employees and between Archegos personnel and Counterparties; reviewed tens of thousands of pages of bank and trading records and spreadsheets reflecting Archegos investments; and obtained search warrants for, among other things, electronic devices belonging to Becker.

Based on those investigative steps and others, a Special Agent with the FBI submitted an agent affidavit to support of an application for search warrants for certain email and electronic storage accounts (the "Affidavit"), including for the Archegos email accounts of several employees, including but not limited to Hwang, Halligan, Tomita, and Becker; Bloomberg user accounts of several Archegos employees, among them Hwang, Halligan, Tomita, Becker, and others; and personal email and Apple iCloud accounts of Hwang. On September 27, 2021, Magistrate Judge Gabriel W. Gorenstein issued the search warrant orders (collectively, the

"Warrants"), finding that the affidavit set forth probable cause to believe the relevant electronic accounts contained evidence, fruits, and instrumentalities of (a) market manipulation and fraud in connection with the purchase and sale of securities and securities-based swap agreements, in violation of Title 15, United States Code, Section 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) fraud in connection with the securities of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Section 1348; (c) fraud in connection with securities-based swaps, in violation of Title 15, United States Code, Section 78i(j) & 78ff; (d) market manipulation, in violation of Title 15, United States Code, Section 78i(a) & 78ff; (e) wire fraud, in violation of Title 18, United States Code, Section 1343; (f) bank fraud, in violation of Title 18, United States Code, Section 1344; (g) false statements to a lending institution, in violation of Title 18, United States Code, Section 1014; and (h) conspiracies and attempts to commit the same, in violation of Title 18, United States Code, Sections 371 and 1349.

### C.  The Informations, Guilty Pleas, and Indictment

On April 21, 2022, an Information was filed charging Scott Becker in three counts with violations of Title 18, United States Code, Sections 1962(d) (Racketeering Conspiracy) and 1343 (Wire Fraud); and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud). On April 26, 2022, Becker pled guilty to all three counts of that Information, pursuant to a cooperation agreement with the Government.

On April 22, 2022, an Information was filed charging William Tomita in five counts with violations of Title 18, United States Code, Sections 1962(d) (Racketeering Conspiracy) and 1343 (Wire Fraud); Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud); and Title 15, United States Code, Sections 78i(a)(2) and 78ff (Market Manipulation). On April 26, 2022, Tomita pled guilty to all five counts of that Information, pursuant to a cooperation agreement with the Government.

On April 25, 2022, a grand jury sitting in this District returned an eleven-count indictment charging Hwang and Halligan with violations of Title 18, United State Code, Section 1962(d) (Racketeering Conspiracy) (Count One); Title 18, United State Code, Section 1343 (Wire Fraud); and Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Ten); and charging Hwang with violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Two); and Title 15, United States Code, Sections 78i(a)(2) and 78ff (Market Manipulation) (Counts Three through Nine).

### D.  Agency Enforcement Actions

On April 27, 2022, the U.S. Securities and Exchange Commission ("SEC") filed a civil enforcement action against Archegos Capital Management, Hwang, Halligan, Tomita, and Becker. The same day, the Commodity Futures Trading Commission filed a civil enforcement action against Archegos Capital Management and Halligan. Both cases are currently pending before the Hon. J. Paul Oetken, District Judge. *See SEC v. Hwang*, et al., No. 22 Civ. 3402 (JPO); *CFTC v. Archegos Capital Management*, et al., No. 22 Civ. 3401 (JPO).

### E.  The Motions

The defendants filed the instant motions on December 2, 2022. The defendants' motions argue, principally, that Counts One through Eleven of the Indictment should be dismissed for failure to allege a criminal offense; that the Court could also delay ruling on the dismissal of Count Eleven, which alleges wire fraud, until the Supreme Court decides a pending case; that the Court should strike certain references to prior civil and criminal proceedings against Hwang and his prior business from paragraph eight of the Indictment; that certain evidence seized from the Warrants should be suppressed because the Warrants were not supported by probable cause; that the Court should order the Government, to produce a bill of additional particulars; and that the Court should order the Government, under *Brady*, to obtain and produce materials from separate entities with which the defendants are engaged in civil litigation.

**ARGUMENT**

**I.    The Counts in the Indictment Properly Allege the Offenses Charged**

**A.  Applicable Law**

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (citation omitted).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Id*. (citation omitted). Accordingly, an indictment must only describe the "core of criminality to be proven at trial," or the "essence of a crime, in general terms." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016) (citation omitted). It need not describe "the particulars of how a defendant effected the crime." *Id*.

Under this standard, dismissal of an indictment is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (citation omitted).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009) (citation omitted). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the

specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (citation omitted). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). Rather, "[t]hat is something [courts] do after trial." *Id.* This principle is consistent with the well-established principle that summary judgment proceedings "do[] not exist in federal criminal procedure." *Id.*

### B. Discussion

The Indictment tracks the relevant statutory language and provides the approximate times and places of the alleged offenses. The Indictment also contains more than fifty pages of detailed factual and statutory allegations about the defendants' agreement to conduct the affairs of Archegos through a pattern of securities fraud and wire fraud. Those allegations encompass the essential elements of every offense and describe the time period, means, and purposes of the alleged conspiracy and related schemes. The Indictment also includes numerous examples of the defendants' criminal affairs in action, with reference at times to particular dates, stocks, conversations, and correspondence. In doing so, the Indictment provides the defendants with a "plain, concise, and definite written statement of the essential facts constituting the offense charged," as required by Rule 7, and much more beside.

#### 1. The Indictment Properly Alleges a Racketeering Conspiracy

The defendants challenge the validity of the racketeering conspiracy count, Count One, on the basis that the Indictment fails to allege a pattern of racketeering activity and further fails to allege Halligan's agreement to participate in the conspiracy. Def. Br. 23. The defendants advance both arguments by discounting the Indictment's actual allegations and by invoking inapplicable civil pleadings standards that, unlike Rule 7 and the Fifth Amendment, demand particularity in pleadings.

*a.   The Indictment Alleges a Pattern of Racketeering*

The defendants' argument that the Indictment fails to allege a "pattern of racketeering activity" is refuted by the text: The Indictment alleges that the defendants "willfully and knowingly combined, conspired, confederated and agreed together and with each other to violate the racketeering laws of the United States," namely by agreeing "to conduct and participate, directly and indirectly in the conduct of the affairs of the Archegos Enterprise *through a pattern of racketeering activity*[.]" Indictment ¶ 68 (emphasis added). The Indictment further alleges that the contemplated pattern of racketeering activity consisted of, among other things, (a) "Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Section 78j(b) and 78ff"; (b) "Offenses involving fraud in the sale of securities, in violation of Title 18, United States Code, Section 1348"; and (c) "Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud)." Indictment ¶¶ 68(a)-(c). "Fraud in the sale of securities" and wire fraud fall within the statutory definition of racketeering activity contained in 18 U.S.C. § 1961(1), a statute the Indictment expressly invokes. And the Indictment alleges that "each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise." Indictment ¶ 69. Taken together, these allegations plainly and succinctly describe a "pattern of racketeering activity" and the defendants' conspiratorial objective, and they are therefore legally adequate. *See* Fed. R. Crim. P. 7(c). Indeed, Courts in this District have held that substantially identical allegations and charging format suffice to state a racketeering conspiracy claim. *See, e.g.*, *United States v. White*, No. 17 Cr. 611 (RWS), 2018 WL 4103490, at *2-5 (S.D.N.Y. Aug. 28, 2018); *United States v. Boyle*, No. 08 Cr. 534 (CM), 2009 WL 2032105, at *3-4 (S.D.N.Y. July 9, 2009) .

The defendants argue otherwise based on the supposed principle that "[w]here allegations are insufficient to make out the elements of a substantive RICO offense, a RICO conspiracy charge must necessarily fail as well." Def. Br. 23-24. The defendants are wrong about this legal principle, and their entire argument proceeds from this error.

Racketeering conspiracy is its own crime, separate from a substantive racketeering offense. *See* 18 U.S.C. § 1963(d). The defendant cites no authority, and the Government is aware of none, that would require an Indictment to allege a substantive racketeering count, or the facts to support one, to allege a separate racketeering conspiracy count. After all: "It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas v. United States*, 522 U.S. 52, 65 (1997) (rejecting argument that racketeering conspiracy required proof of an overt act or proof that a conspirator personally committed two racketeering predicates). Not surprisingly, then, the Supreme Court has affirmed the conviction of a racketeering conspiracy charge even though the defendant had been acquitted of the substantive offense. *See id.* And the Second Circuit has recognized that the Supreme Court "rejected the proposition that a conviction for RICO conspiracy requires proof that a substantive offense was committed . . . ." *United States v. Applins*, 637 F.3d 59, 74 (2d Cir. 2011).

Additionally, the Supreme Court and the Second Circuit have noted significant differences between the elements required to prove a substantive RICO count and the elements required to prove a RICO conspiracy. *See, e.g.*, *Salinas*, 522 U.S. at 65-66. "The conspiracy provision of [RICO] proscribes an agreement to conduct or to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity." *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019) (quotation marks, statutory reference, and alterations omitted). The objective of the conspiracy is to commit a substantive RICO violation, so a conspirator "must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive RICO offense," *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012). But to demonstrate this, the government does not need to prove a substantive violation; the government need only prove "that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *Arrington*, 941 F.3d at 36-37. Specifically, unlike a substantive RICO offense, a RICO conspiracy charge does not require proof of the existence of an enterprise, *Applins*, 637 F.3d at 75; does not require proof of the defendant's commission of a predicate act, *United States v. Yannotti*, 541 F.3d 112,

129 (2d Cir. 2008); and does not require proof that the defendant took part in directing the enterprise's affairs, *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000). As the Second Circuit has observed, "RICO conspiracy is thus a crime that can be committed simply by sitting around a table and agreeing with other individuals to create an organization . . . that would engage in criminal acts . . . , whether or not the organization ever gets off the ground and whether or not the defendant, or any of his co-conspirators, ever commits any of the anticipated crimes." *United States v. Capers*, 20 F.4th 105, 118 (2d Cir. 2021).

These basic precepts categorically foreclose the defendants' arguments that, to properly allege a racketeering conspiracy, the Indictment must contain allegations sufficient to establish a substantive racketeering offense. The defendants appear to fashion their mistaken principle from civil cases where the plaintiffs alleged a racketeering conspiracy claim that depended upon a separately alleged substantive racketeering claim that had been dismissed. *See* Def. Br. 24 (citing *Conte v. Newsday, Inc.*, 703 F. Supp. 2d 126, 139 (E.D.N.Y. 2010) ("Because plaintiff's substantive RICO claims cannot survive defendants' motions to dismiss, plaintiffs' conspiracy claim must also be dismissed.") and *Goldfine v. Sichenzia*, 118 F Supp. 2d 392, 406 (S.D.N.Y. 2000) ("Plaintiffs' substantive claims under 18 U.S.C. § 1962(a) and (c) fail to state a cause of action, and have been dismissed. As a result, Plaintiffs' claim under section 1962(d) sounding in conspiracy to violate sections 1962(a) and (c) must also be dismissed.")). Whether or not such a pleading rule exists in civil law, the Indictment does not contain any allegations of substantive civil RICO nor, indeed, any substantive RICO count at all, so these civil decisions have no bearing whatsoever on the validity of the Indictment's criminal conspiracy charge.

### b.   The Indictment's Racketeering Pattern Allegations Are Proper

The defendants' legal errors also lead them to demand of the Indictment factual specificity not required by law. The defendants, for example, argue that the Government failed to allege "the continuity required" to constitute a pattern of racketeering activity and that the Government "failed to plead the occurrence of at least two predicate acts." Def. Br. 24, 25. Neither point has merit.

14

As to the assertion that the Government has failed to allege "continuity," the defendants confuse a characteristic of the "pattern" element with a requirement to plead specific facts regarding continuity. As the Seventh Circuit has observed, however, "an indictment does not have to allege continuity, which is not an element of the offense, with particularity." *United States v. Torres*, 191 F.3d 799, 806-07 (7th Cir. 1999); *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444, 452-53 (D. Conn. 2002), abrogated on other grounds by *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003). Tellingly, the defendants cite no authority that holds an Indictment must specifically allege relatedness and continuity to state a racketeering conspiracy charge. *See* Def. Br. 28-29 (citing civil decisions, predominantly in which the courts analyze substantive RICO allegations). Nor would such an effort be fruitful; the Hon. Nicholas G. Garaufis, U.S. District Judge, noted in response to a similar argument that: "While there is no Second Circuit ruling directly on point, other case law indicates overwhelmingly that the Government does *not* have to plead either subpart of the 'pattern' element—relatedness or continuity—with the particularity that [the defendants] suggest, and that, at most, an indictment need only specify predicate acts that evidence continuity and relatedness." *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) (emphasis original) (quotation marks omitted) (collecting cases). "An interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989). Here, of course, the Indictment goes even further than alleging a pattern of racketeering activity and specifically alleges that the pattern consisted of multiple acts of wire fraud and securities fraud, *e.g.*, Indictment ¶ 68, and details, over more than 45 pages, how the conspirators, including Halligan, "with HWANG's implicit and, at times, explicit approval . . . systematically misled" Archegos's counterparties, *e.g.*, Indictment ¶¶ 47-48, engaged in manipulative trading schemes, *e.g.*, Indictment ¶¶ 28, 35, 63, and undertook their criminal activity for a set of common purposes, *e.g.*, Indictment ¶¶ 70-73.

The related argument that no racketeering charges could be proper here because the enterprise has now ended its operations is both illogical and wrong. *See* Def. Br. 30. As the Supreme Court has made clear, to establish a "pattern of racketeering activity" what a "plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter*." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 241 (1989) (emphasis original). Here, the Indictment alleges that the defendants struck a criminal agreement when the Enterprise existed and at a time when the conspiracy's schemes threatened to continue indefinitely. The fact that the defendants' conduct ultimately led to the collapse of the Enterprise does not excuse that they formed the criminal agreement in the first place. Were the defendants correct that any racketeering scheme that could be terminated could therefore not be prosecuted, virtually no racketeering charges could ever be brought because the arrest and prosecution of the defendants would, in most circumstances, end the operations of the associated enterprise. Defendants cite no case in which a district court dismissed an Indictment on such a theory. Rather, and once again, the defendants cite a number of civil decisions that have nothing to do with the sufficiency of indictments or the elements of racketeering conspiracy. *See* Def. Br. 29-30; *see also Grace Int'l Assembly of God v. Festa*, 797 F. App'x 603, 604-05 (2d Cir. 2019) (affirming dismissal of substantive RICO claim, under *Iqbal* and *Twombly*, where the alleged pattern of racketeering activity concerned a single, finite construction project); *Flexborrow LLC v. TD Auto Finance LLC*, 255 F. Supp. 3d 406, 415 (E.D.N.Y. 2017) (dismissing complaint's substantive RICO claim because, among other things, plaintiffs did not allege defendant conducted or participated in enterprise's affairs and did not allege mail or wire fraud with particularity).

As to the assertion that the Government needs to "plead the occurrence of at least two predicate acts," Def. Br. 24, the defendants are wrong: the occurrence of two predicate acts is not an element of a racketeering conspiracy charge. *See, e.g.*, *Salinas*, 522 U.S. at 65*; United States v. White*, 7 F.4th 90, 98-100 (2d Cir. 2021). Nor is it necessary to prove, let alone allege, an agreement to commit two specific predicates, as "the agreement proscribed by section 1962(d) is . . . not a conspiracy to commit predicate acts." *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009)

16

(quotation marks and alterations omitted). Here, the Indictment alleges three categories of criminal activity that comprise the intended racketeering activity. *See* Indictment ¶¶ 68(a)-(c). This approach conforms to Second Circuit practice: "Because a RICO conspiracy charge need not specify the predicate or racketeering acts that the defendants agreed would be committed, it is sufficient to allege and prove that the defendants agreed to the commission of multiple violations of a specific statutory provision that qualifies as RICO racketeering activity." *Applins*, 637 F.3d at 81 (citations omitted).

The defendants next resort to fanciful interpretations of the alleged facts and crimes. For example, the defendants attempt—in a single sentence—to invalidate wire fraud as one of the categories of racketeering activity alleged by the Indictment on the theory that the Government advances a right-to-control theory of wire fraud that, in a future decision, the Supreme Court may unsettle. *See* Def. Br. 28. But the racketeering conspiracy allegations do not specify a right-to-control theory and, indeed, neither the phrase "right to control" nor anything similar appears at all in the allegations related to Count One; that is language exclusively found in Count Eleven. In Count One, the allegation is simply that the pattern of racketeering activity consisted of, among other things, multiple "[a]cts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud)." *See* Indictment ¶ 68(c). And given that the defendants concede that an act of wire fraud "could definitionally constitute a predicate act," *see* Br. 28 *and* 18 U.S.C. § 1961(1), even just the Indictment's allegations that the defendants conspired to commit multiple acts of wire fraud suffice to allege a pattern of racketeering activity. *See Applins*, 637 F.3d at 81.

The defendants' efforts to disregard the additional two categories of racketeering activity, which relate to securities fraud, are similarly unavailing. As to those, the defendants argue that only fraud in the sale of securities qualifies as a racketeering predicate and that "the focus of the Indictment is the *purchase*—not the sale—of stocks" so "neither Archegos's purchases of securities, nor the allegedly false and misleading statements to banks and brokerages related to them, constitute RICO predicate acts." Def. Br. 27-28 (quotation marks and citation omitted).

This argument suffers many flaws. First and most simply, the Indictment does allege a contemplated pattern of racketeering activity that consisted of, among other things, "Offenses involving fraud in the sale of securities, in violation of Title 18, United States Code, Section 1348" and "Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Section 78j(b) and 78ff." Indictment ¶ 68 (a)-(b). Even the defendants acknowledge that phrasing "tracks [the] statutory language." Def. Br. 26. Moreover, in addition to those allegations, the Indictment describes how Archegos's own sales activity figured into the schemes, noting, for example, that Hwang at times would direct traders to sell and short sell stock. Indictment ¶ 35 ("HWANG . . . influenced the prices of stocks by utilizing manipulative and deceptive trading techniques such as purchasing or selling securities at particular, strategic times of day"); *see also* Indictment ¶¶ 36(a) & (b). And the Indictment alleges that members of the conspiracy told lies about Archegos's ability and willingness to sell securities. *E.g.,* Indictment ¶ 45. Because these allegations exceed what is required by Rule 7 of the Federal Rules of Criminal Procedure, Count One adequately alleges "fraud in the sale of securities" as part of the contemplated racketeering pattern and the defendants' arguments premised on ignoring these allegations must be rejected. *See United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992) (instructing that indictments must be read in their entirety).

Second, to suggest the Indictment does not sufficiently allege a fraud in the "sale" of securities, the defendants resort to improper efforts to weigh and characterize the facts. For example, the defendants offer their subjective belief that, notwithstanding the Indictment's allegations, "this case is not about the sale of securities but rather their purchase" and that the Indictment's "focus" is on "purchases," and therefore not sales. But this gloss on the facts has no legal significance in a motion to dismiss and ought to be saved for the jury. *See United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) ("[A]lthough a judge may dismiss a civil complaint pretrial for insufficient evidence on a motion for summary judgment, a judge generally cannot do the same for a federal criminal indictment." (alterations omitted)). The Indictment alleges that there was a "fraud, sufficiently willful to constitute a criminal violation, and that there [was] a sale of

securities," which is all that is required to demonstrate a securities RICO predicate. *Holmes v. Securities Investor Protection Corp*., 503 U.S. 258, 282-83 (1992) (O'Connor, J., concurring).

Third, the defendants' cited authorities—not one of which dismissed an indictment based on the argument advanced here—do not support dismissal. The district court in *In re Par Pharmaceutical, Inc. Securities Litigation*, analyzing the plaintiffs' standing to sue, interpreted the phrase "fraud in the sale of securities" to apply to "fraud that occurs as part of the actual securities transaction" and not, as was alleged there, fraudulent statements that caused the plaintiff to purchase securities from others on the open market. 733 F. Supp. 668, 684, 686 (S.D.N.Y. 1990). Here, of course, the Government's standing to prosecute is undeniable and the fraud described in the Indictment involved repeated instances in which Archegos personnel defrauded the counterparties to its securities transactions, so there are numerous examples of "fraud that occurs as part of the actual securities transaction." Similarly, in *United States v. Deeb*, 175 F.3d 1163 (9th Cir. 1999), the Ninth Circuit affirmed a money laundering conviction based on a trial record that showed the victims were enticed to send money for stock certificates they never received. *Id.* at 1169. If the Government proves the Indictment's allegations here, the Government will have similarly demonstrated the occurrence of sales in furtherance of a fraud scheme. The same factual allegations distinguish the other Ninth Circuit case cited by the defendants, *First Pacific Bancorp, Inc. v. Bro*, which affirmed a grant of summary judgment and observed that "18 U.S.C. 1961(1)(D) requires evidence of a sale" and that "[n]either proxy solicitation nor appellees' shareholder derivate suit constitutes a 'sale' of securities." 847 F.2d 542, 546-47 (9th Cir. 1988). And, lastly, *International Data Bank, Ltd. v. Zepkin*, addressed the issue of whether a civil plaintiff had standing to sue when it was neither a purchaser nor a seller, an issue irrelevant to this action. *See* 812 F.2d 149 (4th Cir. 1987).

The defendants' efforts to assemble inapposite cases about the meaning of the phrase "fraud in the sale of securities" telegraph their plan to argue that a criminal violation of Rule 10b-5 or 18 U.S.C. § 1348 would not necessarily establish "fraud in the sale of securities." Def. Br. 26. But the defendants' self-serving interpretation runs counter to longstanding persuasive authority

in this Circuit. For example, the Hon. Eugene H. Nickerson, U.S. District Judge, flatly rejected the interpretation advanced by the defendants, holding that "any violation of 10(b) sufficiently willful to trigger the criminal penalties of section 32(a) constitutes 'fraud in the sale of securities.'" *In re Crazy Eddie Securities Litigation*, 812 F. Supp. 338, 351 (E.D.N.Y. 1993). Similarly, the Hon. José A. Cabranes, then Chief Judge of the District of Connecticut, "reject[ed] defendants' contention that 'fraud in the sale of securities' extends only to actual sellers, and conclude[d] that nonsellers who 'willfully' violate section 10(b) may be liable under RICO." *In re Colonial Ltd. Partnership Litig.*, 854 F. Supp. 64, 105-06 (D. Conn. 1994); *see also United States v. Eisenberg*, 773 F. Supp. 662, 725 (D.N.J. 1991) (refusing to dismiss indictment and rejecting the argument that "the language "offense . . . involving fraud in the sale of securities" contained in section 1961(1)" did not encompass "the full breadth of conduct made illegal by the securities laws"); *Lou v. Belzberg*, 728 F. Supp. 1010, 1026 (S.D.N.Y. 1990) (holding that "Section 13(d) violations may constitute a RICO predicate act" in certain circumstances, such as where the defendant's deliberate violation of the Section 13(d) rule enabled it "to purchase shares of . . . stock at an artificially low price"); *In re Catanella and E.F. Hutton and Co., Inc. Securities Litigation*, 583 F. Supp. 1388, Fed. Sec. L. Rep. (CCH) ¶ 91497 (E.D. Pa. 1984) (finding that violations of section 10(b) formed valid RICO predicate where complaint alleged various instances of fraud in connection with the purchase or sale of securities). Further still, the defendants urging of a restrictive interpretation of RICO runs counter to the Supreme Court's command that "RICO is to be read broadly," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985).[3]

---

[3] The defendants also fail to acknowledge that the civil racketeering decisions they cite largely predate the PSLRA's so-called "RICO Amendment," Section 107 of the Private Securities Litigation Reform Act, 109 Stat 737, 758 (1995), codified at 18 U.S.C. § 1964(c). That amendment, in pertinent part, commands that, in a private civil action, "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 1964(c). As described in the contemporaneous report of the Senate's Committee on Banking, Housing, and Urban Affairs, Congress intended this amendment "to eliminate securities fraud as a predicate act of racketeering in a civil action." S. Rep. 104-98 at

*c.   The Indictment Alleges that Halligan Agreed to the Conspiracy*

The defendants' final challenge to Count One is that the Indictment fails to allege Halligan's agreement to the charged conspiracy. Specifically, they argue that "the Indictment recites boilerplate and conclusory allegations that are insufficient as a matter of law." Def. Br. 33. The supposed authority for this proposition is a string of civil decisions that have nothing to do with the sufficiency of criminal indictments. *See* Def. Br. 32-33 (citing *Connolly v. Havens,* 763 F. Supp. 6, 14 (S.D.N.Y. 1991) (applying Federal Rules of Civil Procedure and interpreting decisional law); *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001) (civil decision requiring "specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy"); *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 313 (S.D.N.Y. 2010) (civil decision discussing *Twombly* and asserting that "a RICO civil conspiracy claim must specifically allege" an agreement to commit predicate acts); *Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610 (AGS), 2001 WL 293683, at *9 (S.D.N.Y. Mar. 27, 2001) (requiring "specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy")). It is well-settled that an indictment need not do more than track the statutory language, *Wedd*, 993 F.3d at 121, so Halligan's argument that RICO conspiracies require more particular pleading is wrong. Indeed, courts have rejected that argument as applied to racketeering conspiracy counts specifically. *See Raniere*, 384 F. Supp. 3d at 302 (rejecting effort to dismiss indictment by reference to civil RICO case and observing that the defendant "fails to acknowledge that criminal and civil pleading standards are different, even in RICO cases"); *United States v. Marchese*, No. 89 Cr.229 (PKL), 1991 WL 60338, at *2 (S.D.N.Y. Apr. 11, 1991) (rejecting effort to dismiss indictment, in part, based on civil RICO cases, as

*19, 1994 U.S.C.C.A.N. 679, 698 (104th Cong. 1995). In addition to unsettling the decisional law analyzing standing or causation in a civil RICO pleading premised on securities fraud, such as many of the authorities that the defendants cite, the very fact that Congress eliminated "fraud in the purchase or sale of securities" as a basis for civil racketeering claims demonstrates that such claims had been a basis for a civil suit before the amendment. This, too, supports the decisions *In re Crazy Eddie Securities Litigation*, *In re Colonial Ltd. Partnership Litig.*, and the like and refutes the defendants' cramped reading.

"inapposite, involving as they do motions to dismiss civil RICO complaints, and not criminal indictments"). Here, the Indictment's allegations that Halligan and Hwang and others "willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws," Indictment ¶ 68, and "agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise," Indictment ¶ 69, provide all the factual assertions necessary to allege adequately Halligan's "agreement" to the conspiracy.

Halligan's further arguments that the Indictment does not allege his involvement in the market manipulation conduct is irrelevant.[4] Even at trial "there is no rule requiring the government to prove that a conspirator knew of all criminal acts by insiders in furtherance of the conspiracy." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000). Rather, "[a]ssuming that a RICO enterprise exists, the government must prove only that the defendants know the general nature of the conspiracy and the conspiracy extends beyond their individual roles." *Id.* (quotation marks and alterations omitted). The Indictment goes well beyond making such allegations and describes, among other things, that Halligan and his conspirators (a) used Archegos "as an instrument of market manipulation and fraud," Indictment ¶ 1; (b) "used Archegos to perpetrate two interrelated criminal schemes," Indictment ¶ 2; (c) "engaged in numerous acts of securities fraud and wire fraud," Indictment ¶ 20; (d) "knowingly and willfully" agreed to join a racketeering conspiracy where the contemplated pattern of racketing activity consisted of multiple acts of wire fraud and securities fraud, Indictment ¶¶ 68; and (e) and agreed to join a conspiracy that had, among its purposes, the aims "to manipulate the prevailing prices of certain securities" and to "obtain trading

---

[4] Halligan asserts that the pattern of racketeering activity described in the Indictment "hinges on supposed market manipulation." Def. Br. 31. It appears he makes this assertion in an effort to distance his conduct from the criminal conduct of other members of the conspiracy. But the Indictment alleges that the racketeering activity contemplated by the conspirators included numerous acts of wire fraud, Title 15 securities fraud, and Title 18 securities fraud, and none of those categories of activity is restricted to market manipulation (though they certainly would include it).

capacity, brokerage relationship, and specific margin rates through false and misleading statements to banks and brokerages," Indictment ¶¶ 68, 70, 71. Nothing more is required.

### 2.   The Indictment Alleges Market Manipulation

Hwang contends that Count Two—which charges him with securities fraud, principally in violation of Section 10(b) of the Securities Exchange Act of 1934, based on his manipulation of the prices of certain securities—and Counts Three through Nine—which charge him with market manipulation, principally in violation of Section 9(a)(2) of the Securities Exchange Act of 1934— should be dismissed. Def. Br. 33. Hwang does not, however, contend that the Indictment fails to include the elements of the offense charged, fairly inform him of the charges against him, or enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense. For this reason alone, the motion to dismiss must be denied. *See, e.g.*, *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (noting that the two constitutional requirements for an indictment are that it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" (citation omitted)).

Hwang nonetheless argues that Counts Two through Nine of the Indictment should be dismissed because, in his view, (1) market manipulation claims under both Section 10(b) and Section 9(a)(2) require "deception"; (2) the Indictment fails to allege such deceptive conduct; (3) with respect to the Section 9(a)(2) counts (Counts Three through Nine), the Indictment "fails to allege facts demonstrating that Mr. Hwang traded for the purpose of *inducing others* to buy or sell an underlying security"; and (4) "market manipulation claims are unconstitutionally vague as applied to the allegations in the Indictment." Def. Br. 34.

Of course, these claims amount to nothing more than a request for summary judgment upon the Indictment, a form of relief not available to Hwang. *See Dawkins*, 999 F.3d at 780. Because the Government has not made "a full proffer of the evidence it intends to present at trial," the Government is entitled to a trial on the merits and the motion to dismiss must be denied. *Perez*, 575

F.3d at 166. Even if Hwang's claims were cognizable at this stage, however, they would still readily be rejected, as each of them is wrong.

### a. Neither Section 10(b) Nor Section 9(a)(2) Require "Deceptive Conduct or False Market Information"

Hwang contends that "some deceptive conduct or false market information is required to prove market manipulation." Def. Br. 35-36. This claim misconstrues the meaning of "deception" in the context of market manipulation and the Second Circuit has squarely rejected the argument that some form of deceit or misrepresentation beyond the intent to create an artificial price is required.

Market manipulation is a form of securities fraud that involves "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 198 (1976)). "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

Such manipulation is unlawful under both Section 10(b) and Section 9(a)(2). "Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance' . . . prohibits not only material misstatements but also manipulative acts." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78j(b)). Thus, a defendant may be convicted under Section 10(b) and Rule 10b-5 for manipulating the market for a security. *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (affirming market manipulation conviction under Section 10(b), and noting that "[i]n enacting section 10(b), 'Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities price'" (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 477 (1977))).

In this context, market manipulation "'refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting

market activity,' and 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2021) (quoting *Santa Fe Indus.*, 430 U.S. at 476, and *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)); *see also United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (explaining that the Court of Appeals sustains convictions under Rule 10b-5 where defendants seek to artificially affect the prices of securities).

In order to sustain a charge of market manipulation under Section 10(b), "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security," *ATSI Commc'ns*, 493 F.3d at 100. "The deception arises from the fact that investors are misled to believe "that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* (quoting *Gurary*, 190 F.3d at 45); *see also Set Capital*, 996 F.3d at 76 ("For market activity to artificially affect a security's price, we generally ask whether the transaction or series of transactions sends a false pricing signal to the market." (quotation marks and citations omitted)); *Royer*, 549 F.3d at 899 (approving jury instruction that "[t]he essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand"); *Regan*, 937 F.2d at 829 ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." (quotation marks and citation omitted)).

Thus, the "deception" required for market manipulation convictions under Section 10(b) is not, as Hwang would have it, some additional act of deception or false information, *see Def. Br.* 36-39, but rather the deception inherent in engaging in market transactions with the intent to deceive investors into believing that the price is set by natural market forces, *ATSI Commc'ns*, 493 F.3d at 100. Accordingly, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital*, 996 F.3d at 77; *see also S.E.C. v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 64 (S.D.N.Y. 2017) (rejecting

argument that purely open market transactions cannot constitute market manipulation); *Masri*, 523 F. Supp. 2d at 372 (open market transactions may constitute market manipulation if the defendant intended to control or artificially affect the price). In fact, the Second Circuit only recently affirmed a jury instruction explaining that "'[i]n some cases, a defendant's 'scienter,' that is, a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading.'" *S.E.C. v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022). That court went on to reject the very argument advanced by Hwang here— that to commit market manipulation, a defendant must have injected false information into the market—observing that "[w]e have found certain open-market transactions 'may constitute manipulative activity when accompanied by manipulative intent,' but have not required a showing of artificial market impact resulting from the injection of false information before concluding certain acts are manipulative under federal securities laws." *Id.* at *2 (quoting *Set Capital*, 996 F.3d at 77).

Similarly, "[t]he central purpose of [S]ection 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *S.E.C. v. Malenfant,* 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (citations omitted); *see also, e.g.*, *United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972) ("The purpose of the statute is to prevent rigging of the market and to permit operation of the natural law of supply and demand."). "Section 9(a)(2) was considered to be 'the very heart of the act' and its purpose was to outlaw every device 'used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage.'" *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969) (quoting 3 Loss, Securities Regulation 1549-55 (2d ed. 1961)).

Accordingly, to establish a violation of Section 9(a)(2),[5] first, the Government must prove that the defendant, through a series of transactions, either created actual or apparent active trading in a stock or raised or depressed the price of a stock. *See Stein*, 456 F.2d at 850; *Malenfant*, 784 F. Supp. at 144. Second, the Government must prove that the defendant acted for the purpose of inducing the purchase or sale of the security by others. *See United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991); *Malenfant*, 784 F. Supp. at 144. Third, the Government must prove second that the defendant acted willfully and with a manipulative purpose. *See Crane Co.*, 419 F.2d at 794; *Lek Sec. Corp.*, 376 F. Supp. 3d at 62. There is therefore no additional element of deceptive conduct beyond the scheme to create apparent or active trading with a manipulative purpose.

Hwang suggests that *Mulheren* stands for the proposition that so-called open-market manipulation is not sustainable without additional deception or misrepresentations. Def. Br. 38. Not so. In *Mulheren*, the Second Circuit simply found, on appeal after trial, that the evidence of the defendant's intent to manipulate price was insufficient. 938 F.2d at 372. Hwang nonetheless seeks to make use of dictum in which that court expressed some "misgivings" about the government's view, in that case, that "when an investor, who is neither a fiduciary nor an insider, engages in securities transactions in the open market with the sole intent to affect the price of the

---

[5] In relevant part, Section 9 of the Securities Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange . . . [t]o effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2).

security, the transaction is manipulative and violates Rule 10b–5." *Id.* at 368. These generalized "misgivings" are of no help to Hwang, and in fact undercut his arguments.

As an initial matter, it is not clear exactly what caused the *Mulheren* court to have "misgivings," and the view of the law questioned in that case does not capture the requirement, described above, that, to commit market a manipulation, a defendant must engage in transactions with the intent to deceive investors into believing that the price is set by natural market forces. Further, the court "expressed no view" on the theory that a manipulator deceives the market by failing to disclose his or her manipulative intent. *See id.* at 368 n.2; *see also Regan*, 937 F.2d at 829 ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." (quotation marks and citation omitted)). Of course, any focus on the Second Circuit's commentary in its 1991 decision in *Mulheren* ignores the past thirty years of development in the law, including the Second Circuit's decisions, discussed above, making clear that open-market transaction executed with manipulative intent suffices to prove market manipulation. *See Vali Mgmt. Partners*, 2022 WL 2155094, at *1-2; *Set Capital*, 996 F.3d at 77; *ATSI Commc'ns*, 493 F.3d at 100. And, finally, any skepticism observed in *Mulheren* was pointed directly at market manipulation under Section 10(b); that court made clear that— contrary to Hwang's claims now—open-market transactions undertaken to affect the price of security for "the "purpose of inducing the purchase or sale of such security by others'" are unlawful under Section 9(a)(2). *Mulheren*, 938 F.2d at 368 (quoting 15 U.S.C. § 78i(a)(2)).

Finally, Hwang argues that because the trades themselves that he undertook as part of his scheme were "actual trades" or "real trades," they cannot be part of unlawful market manipulation. Def. Br. 40, 42. This principle finds no support in the law and indeed is foreclosed by binding authority. For example, in *Royer*, the Second Circuit affirmed convictions for market manipulation under Section 10(b), observing that "the defendants sought to artificially affect the prices of various securities by directing the AP site subscribers to trade and to disclose the negative information at times and in manners orchestrated by the defendants that were dictated not by market forces, but by defendants' desire to manipulate the market for their own benefit." 549 F.3d

at 900. The trades directed by the defendants were "actual," "real trades" (and the disclosure of negative information was not itself deceptive), but because they were executed "at times and in manners" set to accomplish a manipulative purpose, the Second Circuit found it "hard to imagine conduct that more squarely meets the ordinary meaning of 'manipulation.'" *Id.*[6] And it is enough to observe that Section 9(a)(2) explicitly prohibits engaging in "a series of transactions . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." That is, Section 9(a)(2) explicitly and unmistakably criminalizes engaging in "actual," "real trades," Def. Br. 40, 42, when done for the purpose of inducing others to buy or sell.

> ### b.   *The Indictment Alleges Deceptive Conduct*

Even if it were proper to evaluate the factual allegations contained in the Indictment, and even if Hwang were correct that, to prevail in a market manipulation, the Government must prove that the defendant engaged in falsehoods or deception beyond transactions intended to create artificial prices—neither of which is the case—Hwang's arguments would still fail because the Indictment is replete with allegations regarding deceptive practices and acts by Hwang and his co-conspirators.

Indeed, the second paragraph of the Indictment alleges: "HWANG led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in truth, they were the artificial product of HWANG's manipulative trading and deceptive conduct that caused others to trade." Indictment ¶ 2. This allegation alone is far more than

---

[6] The Second Circuit also noted that, in *Crane*, 419 F.2d at 792-98, "we held that Rule 10b–5 was violated when the defendant sought to thwart a tender offer by purchasing the target company's stock on the open market at increasingly higher prices while simultaneously secretly selling the stock in off-market sales." *Royer*, 549 F.3d at 900. Certainly, Hwang would not dispute—since he makes the point repeatedly in his brief—that purchases of a company's stock on the open market at increasingly higher prices are "actual," "real trades" (not to mention, in isolation, perfectly lawful trades), as are off-market sales, and yet, the Second Circuit has had no problem concluding that those transactions amounted to unlawful market manipulation. *Id.*

sufficient, but the Indictment supplies further details regarding Hwang's deceptive conduct. Among other things, the Indictment alleges that Hwang used swap transactions with multiple counterparties to amass enormous, price-altering market power and to cause trading in price-altering volumes, while hiding those positions from the market so that the market would not know that the price was being driven by a single actor. Indictment ¶¶ 15-17, 24-26, 27, 28(a), 28(c), 29, 60-63. Indeed, the Indictment alleges that Hwang caused others involved in his criminal activities to make false and fraudulent representations to counterparties to suggest a more diverse market and thereby to maintain and promote false price signals. *See* Indictment ¶¶ 55-59.

The Indictment also alleges that Hwang engaged in numerous, specific deceptive techniques to deceive market participants. Indictment ¶ 21. For example, Hwang timed trades in order to march prices of stocks up (or down if he was seeking to depress a price in furtherance of a short position) or to defend a stock's price against news that, in a natural and un-manipulated market, would affect the value of the stock. Indictment ¶ 28(a)-(b). Hwang timed trades for times of low liquidity to increase price impact, and to give the false impression of multiple traders seeking to buy at his inflated prices. Indictment ¶ 35(a)-(b). Hwang also timed trades to artificially alter the closing price of stocks, which would allow him to obtain excess margin from counterparties. Indictment ¶ 35(c)-(d). Hwang further engaged in coordinated trading with a former colleague to increase price impact. Indictment ¶ 37.

Hwang's attempts now—before trial—to argue away these facts are both premature and unpersuasive, and in many cases are flatly contradicted by the Indictment.[7] Hwang broadly argues that trades that would be, in isolation, lawful cannot serve as the basis for a market manipulation.

---

[7] To choose but one example, Hwang asserts that "the Government does not allege that Mr. Hwang's high-volume buying sent any false signal to the market." Def. Br. 46. In fact, the Indictment alleges clearly that Hwang's scheme was designed to and did create artificial prices and deceived market participants into believing "that the prices of those stocks were the product of natural forces of supply and demand when, in truth, they were the artificial product of HWANG's manipulative trading and deceptive conduct that caused others to trade." Indictment ¶ 2.

*See, e.g.*, Def. Br. 46 ("each of the trading practices alleged in the Indictment is perfectly lawful, and indeed routine"); *id.* at 48 ("the end-of-day trading alleged is not unlawful"); *id.* at 49 ("lawfully transacting business in a way that generates capacity is perfect appropriate, and short selling, in particular, is neither illegal nor inherently manipulative"); *id.* at 50 ("contracting with multiple counterparties to engage in swap transactions is, of course, perfectly legal"). This claim is utterly meaningless. All crimes have elements, and conduct undertaken without the presence of the remaining elements is definitionally lawful. It is therefore of no moment whether a particular trade, or for that matter statement or wire or any other act that might be taken in furtherance of a scheme to defraud, is itself lawful or unlawful, routine or rare. As noted above, trades that might be lawful if not accompanied by manipulative intent can nonetheless form an unlawful market manipulation scheme when that intent is present. *Vali Mgmt. Partners*, 2022 WL 2155094, at *1-2; *Set Capital*, 996 F.3d at 77; *Royer*, 549 F.3d at 900; *ATSI Commc'ns*, 493 F.3d at 100; *see also United States v. Simon*, 425 F.2d 796, 805-08 (2d Cir. 1969) (Friendly, J.) (accounting procedures that might otherwise be acceptable constitute fraud when undertaken with deceptive intent).

Hwang's attempts to minimize specific deceptive conduct alleged in the Indictment are no more persuasive. For example, Hwang contends that concentrated buying intended to create artificial prices cannot support a market manipulation charge. But the cases he relies on do not support that proposition—particularly where, as here, Hwang paired that buying with conduct intended to hide from the market that the buying volume was driven by a single individual and other techniques to enhance price impact. *See* Def. Br. 43-46.

Hwang's claims that timing trades to impact the market cannot, when the other elements are present, establish market manipulation is foreclosed by Second Circuit law. *Royer*, 549 F.3d at 900. Hwang's attempt to add a requirement to the technique of "marking the close" whereby the strategy is not manipulative unless the point is to achieve an increase in portfolio value around "a reporting event," Def. Br. 48, is similarly not supported by the law, *see, e.g.*, *United States v. Georgiou*, 742 F. Supp. 2d 613, 624 (E.D. Pa. 2010) (affirming a guilty verdict of securities fraud based in part on jury instructions that defined marking the close as "a form of market manipulation

that involve[s] attempting to influence the closing price of a publicly trade[d] share by executing purchase or sale orders at or near the close of normal trading hours"). In any event, and despite the assertions contained in Hwang's brief, the Indictment does, in fact, allege that Hwang traded to impact prices at the close of the market to influence an "external event," Def. Br. 48-49—the daily calculation of excess margin, Indictment ¶ 35(d). Hwang's argument therefore fails even on its own terms.

Finally, Hwang's various arguments regarding the allegations concerning his use of multiple counterparties are belied by the Indictment. For example, Hwang asserts that "Archegos's use of multiple counterparties did not impermissibly conceal any information that would otherwise have been known to the market if there were fewer, or even just one, counterparty; nor does, or can, the Government allege that it sent false information to market participants." Def. Br. 50. Again, this contention does not find support in the Indictment, which actually does allege that Hwang deceived market participants, including by sending signals to the market that the purchasing for which Hwang was responsible was being undertaken by multiple actors. *See, e.g.*, Indictment ¶¶ 2, 27. And Hwang does not address the fact that he caused others to make misrepresentations to counterparties to advance this scheme. *See* Indictment ¶¶ 55-59. In short, even if there were a requirement, which there is not, that the Indictment contain factual allegations demonstrating that Hwang employed deceptive conduct beyond trading with an intent to manipulate prices, that obligation would be far more than satisfied by the extensive allegations contained in the Indictment.

### c. The Indictment Alleges that Hwang Acted for the "Purpose of Inducing the Purchase or Sale" of Securities by Others

Hwang next argues that Counts Three through Nine (the Section 9(a)(2) counts) must be dismissed because they failed to allege that the defendant acted "with the purpose of inducing others to buy or sell" the securities. Def. Br. 52. To the contrary, the Indictment alleges precisely that in the charging language and "to wit" clauses of Counts Three through Nine, Indictment ¶ 78, as well as in the speaking portion of the Indictment, Indictment ¶¶ 2, 35(b).

Hwang specifically claims that the Indictment does not allege that he manipulated the market with "any intent to influence market participants to buy or sell anything." Def. Br. 53. It is not at all clear why Hwang believes there is a requirement to allege that "general market investors" or "third parties" were influenced to buy or sell, Def. Br. 52-54, but that question is of no moment, given that the Indictment makes exactly those allegations, Indictment ¶¶ 2, 35(b), 78. In short, the Indictment contains precisely the allegations that Hwang claims it lacks with respect to Counts Three through Nine.

### d.   Counts Two Through Nine Are Not Vague

Hwang next seeks to dismiss the market manipulation counts on the theory that they are unconstitutionally vague. This vagueness challenge is premature and should be denied.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quotation marks omitted). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* (quotation marks omitted). Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* (quotation marks omitted).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for

33

vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (quotation marks and citation omitted)).

The law is clear: Hwang's challenge to Counts Two through Nine is premature and must await trial. But even if this claim were addressed now, it would fail.

A two-part test is used to evaluate claims of vagueness "as-applied": "[A] court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited'; and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) (*citing United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992)); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Because the statute is judged on an as-applied basis, a defendant whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness. *See Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 495 n.7 (1982); *Parker v. Levy,* 417 U.S. 733, 756 (1974). Put differently, the as-applied analysis examines the defendant's conduct and does not look to any hypothetical array of potential conduct upon which a statute may touch. *See United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir. 1991) ("In the absence of first amendment considerations, vagueness challenges must be evaluated based on the particular application of the statute and not on the ground that the statute may conceivably be applied unconstitutionally to others in situations not before the Court." (citation, brackets, quotation marks omitted)).

Hwang argues that Count Two should be dismissed because he lacked fair notice that Section 10(b) prohibits open-market manipulation. Def. Br. 58-62. This claim is wholly unconvincing. The very title of Section 10(b) is "Manipulative and Deceptive Devices," and the statute explicitly prohibits "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device." 15 U.S.C. § 78j(b). And a person of reasonable intelligence was certainly on notice that stock manipulation carried out over the open market is prohibited, given that, as discussed above, the Second Circuit and courts in this district have repeatedly, consistently, and over decades made clear that such conduct is unlawful under Section

10(b). *See, e.g.*, *Vali Mgmt. Partners*, 2022 WL 2155094, at \*1-2; *Set Capital*, 996 F.3d at 77; *Royer*, 549 F.3d at 900; *ATSI Commc'ns*, 493 F.3d at 100; *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981); *Stein*, 456 F.2d at 846; *Masri*, 523 F. Supp. 2d at 372.

Hwang also contends that Section 9(a)(2) is unconstitutionally vague when applied to a scheme that involves increasing a stock's share price. This argument is incoherent. Section 9(a)(2) proscribes engaging in a series of transactions "creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." That is, engaging in transactions "raising or depressing the price" of the security is included in the language of the statute itself. In fact, creating actual or apparent active trading or raising or depressing the price of a security is an element of the offense. *Stein*, 456 F.2d at 850; *Malenfant*, 784 F. Supp. at 144. A scheme wherein the defendant manipulates the price of a stock with the purpose of causing others to purchase or sell, as alleged in the Indictment, is the very heartland of Section 9(a)(2).

Moreover, Hwang certainly cannot express surprise that his conduct was prohibited. As alleged in the Indictment, the compliance manual at Archegos "warned that '[i]t is essential that no employee or principal of Archegos engages in any activity the purpose of which is to interfere with the integrity of the marketplace' and that 'intentionally manipulating the market . . . is a violation of the securities laws and of Archegos' policies and standards of conduct.'" Indictment ¶ 10. And Hwang himself was directly put on notice of the unlawfulness of open-market manipulation by the Securities and Exchange Commission in 2013, years before he undertook the scheme alleged here. Indictment ¶ 8.

In short, the conduct charged here falls squarely within the ambit of Section 10(b) and Section 9(a)(2), as courts in this Circuit have made clear.

### 3. Count Ten of the Indictment Alleges Security Fraud

The defendants next seek dismissal of Count Ten, again attempting to argue and contest issues of fact without a trial record. The defendants do not, however, argue that the Indictment fails to allege the elements of the securities fraud offense charged in Count Ten, fairly inform them

of the charge, or enable them to plead an acquittal or conviction in bar of future prosecutions for the same offense. Accordingly, the motion to dismiss Count Ten must be rejected as well. *See, e.g.*, *Resendiz-Ponce*, 549 U.S. at 108.

Instead, the defendants argue, prematurely, that (1) the alleged misrepresentations were not in fact made "in connection" with the purchase or sale of any securities; (2) neither Hwang nor Halligan were the "maker" of the misrepresentations alleged in the Indictment; and (3) there is an insufficient basis for "scheme liability" under Section 10(b). Even if they were properly raised at this stage, these claims would be without merit.

### a. Count Ten Alleges a Scheme to Defraud "in Connection with" the Purchase and Sale of Securities

Count Ten charges Hwang and Halligan with engaging "in a scheme to defraud Archegos's counterparties through false and misleading statements regarding Archegos's business, portfolio, and assets," in violation of Section 10(b) and Rule 10b-5, and with aiding and abetting and willfully causing the same, in violation of 18 U.S.C. § 2. Indictment ¶ 80. Hwang, Halligan, and their co-conspirators undertook this scheme to fraudulently induce the Counterparties to enter into with Archegos security-based swaps—themselves constituting the purchase and sale of securities under the securities laws—and extend credit to Archegos for these transactions. Indictment ¶¶ 2, 15-16, 18-19, 21(c), 41-59, 64-66.

The defendants contend that the Indictment insufficiently alleges that they engaged in the scheme charged in Count Ten "'in connection with the purchase or sale of any security.'" Def. Br. 66 (quoting 15 U.S.C. § 78j(b)). The defendants are wrong. The Indictment charges explicitly that the defendants "willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, *in connection with the purchase and sale of securities*, manipulative and deceptive devices and contrivances . . . ." Indictment ¶ 80 (emphasis added). This allegation is sufficient "to call for trial of the charges on the merits." *Costello*, 350 U.S. at 365.

The defendants argue nonetheless that the allegations in the Indictment are insufficient because "not one of the alleged misrepresentations concerns the nature or value of the securities underlying the swap transactions in issue, or the terms of the securities purchase or sale transactions." Def. Br. 65. This claim is wrong on the law and the facts. There is no requirement, despite the defendants' assertions, that there be misrepresentations directed toward the nature or value of the securities where the defendants fraudulently induce the victim to engage in a securities transaction. And even if there were, the Indictment does in fact allege that the defendants made misrepresentations of this sort.

The Supreme Court has long made clear that the language "in connection with" should be construed broadly and encompasses circumstances in which a victim is defrauded into purchasing a security. *See Merrill Lynch, Pierce, Fenner, & Smith v. Dabit*, 547 U.S. 71, 85 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (explaining that the statute should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes" (internal quotation marks omitted)). Indeed, the Second Circuit has observed that "[t]he Supreme Court has repeatedly held that Rule 10b-5's requirement that a fraud be 'in connection with' the purchase or sale of a security is easily satisfied." *United States v. Nouri*, 711 F.3d 129, 143-44 (2d Cir. 2013) (collecting cases, including where the requirement is satisfied "where the alleged fraud 'coincided' with the purchase or sale of securities and where "deceptive devices 'touch[]' a sale or purchase of a security"); *see also* Sand, *Modern Federal Jury Instructions*, Instr. 57-21 (stating that "in connection with" is satisfied "if you find that there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities").

 Not surprisingly, "[t]he Second Circuit has broadly construed the phrase 'in connection with,' interpreting the Congressional intent underlying the phrase to mandate only that the act complained of somehow induced the purchaser to purchase the security at issue." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999); *see also Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (same); *cf. United States v. Ostrander*, 999 F.2d 27, 32-33 (2d Cir. 1993) (payments to a portfolio manager intended to induce purchase of securities "easily qualifies as a

'fraudulent, deceptive or manipulative' act 'in connection with' the investment company's acquisition of securities"). Similarly, fraud relating to margin lending also satisfies the "in connection with" requirement, inasmuch as margin lending is directly connected to the purchase and sale of securities. *See Calderon Serra v. Banco Santander Puerto Rico*, 747 F.3d 1, 6-7 (1st Cir. 2014).

Despite the broad ambit of the "in connection with" requirement, and notwithstanding case law to the contrary, the defendants claim that misrepresentations cannot satisfy the "in connection with" requirement unless they "concern the value, nature, or investment characteristics of the particular securities in issue." Def. Br. 66-67. For this proposition, the defendants rely on the Second Circuit's opinion in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 932, 943 (2d Cir. 1984).[8] Def. Br. 66.

But just two years after *Chemical Bank* was decided—more than thirty-five years ago—the Second Circuit clarified that *Chemical Bank* does not have the reach now claimed by the defendants. In *S.E.C. v. Drysdale*, the Second Circuit explained that the failure to meet the "in connection with" requirement in *Chemical Bank* was not a result of the fact that the

---

[8] The defendants also cite numerous cases that employ language from *Chemical Bank*, which, for the reasons explained above, does not lead to the conclusion advanced by the defendants. *See* Def. Br. 66-68. These cases also do not address the circumstances here. For example, it is true that in *Production Resource Group, L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 239-40 (S.D.N.Y. 1998), the court referred at length to the opinion in *Chemical Bank*. But that court also acknowledged that the plaintiff there failed to allege—as it might have in order to satisfy the "in connection with" requirement—that the defendant's misrepresentations "regarding plaintiff's inducement to enter into an agreement or the consideration offered by plaintiff." *Prod. Res. Grp.*, 6 F. Supp. 2d at 241.

Similarly, the criminal case discussed by the defendants—*United States v. Coriaty*, No. 99 Cr. 1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001)—does not support their argument. Def. Br. 67-68. It is true, once again, that the court in that case deferred to language contained in *Chemical Bank*. *Coriaty*, 2001 WL 1910843, at *7. But it appears that in that case the nature of the misrepresentation and fraudulent inducement had nothing to do with the securities transaction at all—rather, the defendant lied regarding his intended use of proceeds from a stock sale. *Id.* Thus, the scheme was not about the purchase and sale of securities, but instead about the theft of money.

misrepresentations did not concern the value, nature, or investment characteristics of the securities at issue, but rather because the securities at issue in *Chemical Bank*—which were merely collateral for a transaction that the victim was fraudulently induced to enter—were too remotely connected to the conduct. 785 F.2d 38, 41-42 (2d Cir. 1986). In *Drysdale* (as in the Indictment in this case), by contrast, "securities were transferred as a direct result of a misrepresentation," and therefore the misrepresentations were in connection with the purchase or sale of securities, even though the misrepresentations went to the financial health of a party to the transaction, not the characteristics of the securities themselves. *Id.* at 42-43. Indeed, as the court observed in *Drysdale*, the conclusion that misrepresentations need not go to the value of the securities themselves to be "in connection with the securities" was not only consistent with Supreme Court and Second Circuit precedent, *id.* at 42 (citing *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967), and *United States v. Naftalin*, 441 U.S. 768 (1979)), but indeed with the reasoning in *Chemical Bank* itself, which distinguished its own reasoning from a case in which misrepresentations induced a pledge of stock, *Drysdale*, 785 F.2d at 43 (discussing *Chemical Bank*, 726 F.2d at 944, and *Weaver v. Marine Bank*, 637 F.2d 157, 159-60 (3d Cir. 1980)). Consistent with this law, "judges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold," *Uni-World Capital LP v. Preferred Fragrance Inc.*, No. 13 Civ. 7204 (PAE), 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014), and the Supreme Court itself has made clear that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of" Section 10(b), *Zandford*, 535 U.S. at 820.

In short, the Indictment includes extensive factual allegations making clear that there was a nexus between the misrepresentations to Counterparties and the purchase a sale of securities—including both the transactions in swaps, which are themselves securities, and the underlying securities, which the defendants' misrepresentations caused Counterparties to purchase. Indictment ¶¶ 2, 16, 41. The Indictment also alleges that the defendants made the

misrepresentations to obtain margin lending, which was in connection with the purchase or sale of securities. Indictment ¶¶ 2, 18-19, 21(c), 41.

At any rate, even if it were necessary to allege misrepresentations that "concern the nature, value, or investment characteristics," Def. Br. 68, of the relevant securities, the defendants' claim would still fail, because the Indictment does make such allegations. Indeed, the defendants seem to ignore altogether that the swap transactions in which Archegos engaged with its Counterparties are themselves securities transactions. The applicable statutes define a security to include security-based swaps, like the ones Archegos bought and sold. 15 U.S.C. §§ 77b(a)(1), 77b(a)(17), 78c(a)(10), 78c(a)(68). As the Indictment alleges, the misrepresentations made by the defendants to the Counterparties bore directly on the risk associated with the swaps and therefore the swaps' expected return, as well as the margin lending requirements for execution of those swaps. *See* Indictment ¶¶ 15, 41-59. These allegations are therefore consistent even with the broad and erroneous reading of *Chemical Bank* advanced by the defendants, because the misrepresentations went directly to the expected return and value to the Counterparties of the swaps. And these allegations are certainly consistent with *Drysdale*, which makes plain that misrepresentations about a party's financial health that bear on its ultimate ability to make good on its contractual obligations, where the transaction involves securities, satisfy the "in connection with" requirement. 785 F.2d at 42.

### b.  There Is No Failure to Allege "Maker Liability"

In reliance on the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivates Traders*, 564 U.S. 135 (2011), the defendants argue that Count Ten should also be dismissed as to any misrepresentation (as opposed to scheme) liability "because neither Mr. Hwang nor Mr. Halligan is the 'maker' of any misrepresentations alleged in the Indictment," Def. Br. 72. The

defendants point to nothing that would suggest that such allegations are required in a criminal indictment, and they are not.[9]

As the Fourth Circuit has explained, *Janus* concerns private rights of action and does not apply in criminal cases. *Prousalis v. Moore*, 751 F.3d 272, 275-79 (4th Cir. 2014). Moreover, as the Second Circuit has recognized, the limitations on "maker" liability articulated in *Janus* and its progeny are inapplicable in criminal cases such as this one, where the Government has pled aiding-and-abetting and willfully causing liability under 18 U.S.C. § 2. *See Prousalis v. United States*, 692 F. App'x 675, 676 (2d Cir. 2017) (summary order) (declining to address whether *Janus* applied to criminal cases because the petitioner had allocuted in his plea to conduct that constituted aiding and abetting securities fraud). Those decisions accord with *Janus* itself, which explained that its rule "follows from" the Supreme Court's opinion in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994), *Janus*, 564 U.S. at 143, where, in turn, the Supreme Court concluded that Rule 10b-5's implied private right of action did not include a right to sue under 18 U.S.C. § 2, *see Central Bank of Denver*, 511 U.S. at 190-91.

Even if *Janus* did apply, the motion to dismiss would still be quickly dispensed with. First, the Indictment does include factual allegations making clear that both Hwang and Halligan were "makers" of misrepresentations. For example, the Indictment alleges that "HALLIGAN, William Tomita, and Scott Becker, with the implicit and at times explicit permission and direction of HWANG, provided false and misleading information to Counterparties in an effort to conduct swap transactions and obtain margin lending, all to facilitate the manipulative trading scheme."

---

[9] The defendants also claim that Count Ten is deficient against Halligan because he is not alleged to have participated in the market manipulation scheme that the misrepresentations to Counterparties supported. Def. Br. 75. This observation has no significance whatsoever. It is hardly a defense to securities fraud—and certainly not a basis for dismissal of a properly returned indictment—that the perpetrator did not *also* engage in market manipulation.

Indictment ¶ 41. The Indictment also alleges that both Hwang and Halligan themselves made false certifications in furtherance of the scheme.[10] Indictment ¶ 59.

Second, the Indictment alleges that the defendants aided and abetted and willfully caused the misrepresentations made by others. Indictment ¶ 80; *see also, e.g.*, Indictment ¶¶ 44-47, 52, 54, 56, 66 (describing Hwang's and Halligan's participation in the scheme to defraud, including assistance and direction in making misrepresentations). Liability for Hwang and Halligan is therefore not limited to misrepresentations they made themselves, but extends to misrepresentations that they aided and abetted or willfully caused, for which they may be punished as principals. *Prousalis*, 692 F. App'x at 676.

### c.   There Is No Failure to Allege "Scheme Liability"

Finally, the defendants argue that Count Ten should be dismissed as to any theory of scheme liability. The defendants point to *SEC v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022), for the proposition "that 'an actionable scheme liability claim also requires something *beyond* misstatements and omission.'" Def. Br. 77 (quoting *Rio Tinto*, 41 F.4th at 49). Like *Janus*, it is far from clear that *Rio Tinto* has any applicability in the criminal context. *Rio Tinto*'s reasoning is derived from *Janus*'s holding regarding the distinction between "maker" liability and "scheme" liability under Rule 10b-5, and the opinion in *Rio Tinto* itself explains its basis as considerations under the PSLRA and application to private civil actions. *Rio Tinto*, 41 F.4th at 52, 54-55. Accordingly, it does not appear that *Rio Tinto* provides any useful guidance for evaluating the sufficiency of a criminal indictment under the Rules of Criminal Procedure.

Even assuming that *Rio Tinto* does apply here, however, the Indictment sufficiently alleges scheme liability to meet the standard articulated by the court in that case. This is so, first, for the

---

[10] The defendants bizarrely claim that the Indictment fails to allege that they were "aware of the existence of" these misrepresentations. Def. Br. 74. Certainly there is no requirement that the Indictment contain those particular words, and the Indictment does allege that "BILL HWANG and PATRICK HALLIGAN, the defendants, each falsely signed these certifications knowing that, in fact, Archegos's positions exceeded the warranted thresholds." Indictment ¶ 59.

basic reason that the Indictment tracks the language of the statute and is therefore sufficient to call for a trial on the facts. *Dawkins*, 999 F.3d at 780; *Yannotti*, 541 F.3d at 127. And, second, even if one were to consider the factual allegations contained in the Indictment, they are far more than sufficient to allege scheme liability under *Rio Tinto*.

The Indictment describes at length and in detail a sustained and multifaceted scheme to deceive Archegos's Counterparties, that included actions beyond misrepresentations and omissions. Among other things, the defendants divided Archegos's positions among multiple counterparties and held those positions in swaps to prevent Counterparties from gaining an understanding as to the liquidity, concentration, and profile of Archegos's portfolio. Indictment ¶¶ 4, 14, 17, 44. The defendants also created lists of "dummy" or "decoy" names to provide to Counterparties. Indictment ¶ 56. And the defendants worked together to create false numerical profiles and descriptions of Archegos's portfolio for dissemination to Counterparties during credit checks, as well as false certifications. *See* iIndictment ¶¶ 43-45, 52, 59. These actions "easily" constitute "'artful stratagem' or a 'plan'" or "'device,'" and the defendants' arguments regarding scheme liability should be rejected. *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101 (2019).

### 4.  Count Eleven Properly Pleads Wire Fraud

The Indictment includes as Count Eleven a substantive count of wire fraud. That count incorporates by reference the preceding factual allegations, specifies a location and time frame, and further alleges the essential elements of the offense by tracking the statutory language. Indictment ¶ 82. Accordingly, Count Eleven is facially valid. *See, e.g.*, *United States v. Cornelson*, No. 15 Cr. 516 (JGK), 2022 WL 2334054, at *5 (S.D.N.Y. June 27, 2022) ("Courts generally find that indictments sufficiently allege wire fraud where they track the language of the wire fraud statute, and where they set forth approximate details about the alleged scheme to defraud.").

In their effort to dismiss Count Eleven, the defendants invite the court to move beyond the text. First, the defendants forecast that the Supreme Court will limit "right to control" wire fraud theories when it decides *Ciminelli v. United States*, No. 21-1170, a pending case, and thus undermine Count Eleven; and, second, the defendants contend generally that the Indictment is

deficient because it does not particularize allegations about the defendants' intent or participation in the fraud. Neither point supports dismissal.

As to the "right to control" argument, the reason the defendants ask for permission to raise their motion after the outcome of *Ciminelli* is that their motion is meritless under existing law. The Second Circuit has repeatedly upheld convictions for wire fraud where the proven injury was a harm to the victim's ability to allocate its property as it saw fit. *See, e.g.*, *United States v. Percoco*, 13 F.4th 158, 175 (2d Cir. 2021), *certiorari granted by Ciminelli v. United States*, 142 S. Ct. 2901 (2022); *United States v. Finazzo*, 850 F.3d 94, 110-111 (2d Cir. 2017); *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). So, although the defendants characterize the "right to control" aspect of property as "controversial," Def. Br. 80, a scheme to deprive a victim of his or her right to control his or property is now, and has been for years, a proper basis for a wire fraud conviction in the Second Circuit. If and when the Supreme Court changes the law, the Government will be prepared to respond to any motion the defendants may make based on the change.[11]

As to the argument that Count Eleven is improperly pled as alleged, the defendants once again rely on civil litigation rhetoric, arguing "the wire fraud count is also subject to dismissal because the facts set forth in the Indictment do not support the conclusory allegation in Count Eleven[.]" Def. Br. 82. An Indictment need not allege particularized facts to support allegations

---

[11] It is far from certain that the outcome in *Ciminelli* will help the defendants avoid trial on Count Eleven, even if the Supreme Court disapproves of the wire fraud formulation used to charge the jury in that case. The defendants assert that Count Eleven is "expressly and solely" premised on a right-to-control theory. Def. Br. 80. But the "to wit" clause of Count Eleven, Indictment ¶ 82, which describes how the defendants deprived "Archegos's trading counterparties of their rights to control their assets," is illustrative and not restrictive. *See, e.g.*, *United States v. Agrawal*, 726 F.3d 235, 261 (2d Cir. 2013). Indeed, the factual allegations incorporated into Count Eleven make clear that the defendants also deprived the counterparties of money in the form of margin loans, and indeed caused billions in losses, so the Indictment contains plentiful references to a scheme to obtain indisputable "money or property" within the meaning of the wire fraud statute. *See* 18 U.S.C. § 1343. Accordingly, whether or not the right to control one's assets remains "property" within the meaning of the wire fraud statute, Count Eleven is viable on the basis of the other allegations. *See United States v. Miller*, 471 U.S. 130, 136 (1985) (noting that proof of any alleged means of committing a crime will support conviction even if other means are invalid or unproven).

that track the statutory language, however; the fact that Count Eleven tracks the statutory language makes it legally sufficient. *See Stringer*, 730 F.3d at 124 (noting that the Second Circuit has held that "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime" (quotation marks omitted)).

The defendants repeatedly commit the same error in demanding particularized pleading of various aspects of the alleged wire fraud scheme. For example, the defendants insist that, to be proper, the Indictment must allege specific misstatements made by Hwang or Halligan is incorrect, and not even something the Government will be required to prove at trial. *See*, e.g., Sand, *Modern Federal Jury Instructions*, Instr. § 44-3 (describing second element as "defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud"); *see also United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (rejecting that defendant's scheme was not a "scheme to defraud" because it did not involve misrepresentations or omissions). Similarly, the assertion that the Indictment must describe how the defendants specifically participated in the scheme or aided and abetted its work, *see* Def. Br. 83, is also wrong as a matter of law. *See United States v. Minaya*, 395 F. Supp. 2d 28, 46 (denying Bill of Particulars request for information about whether defendant was charged as aider or principal as "not necessary to the adequate preparation of a defense"); *United States v. Almaleh*, No. 17 Cr. 025 (ER), 2022 WL 602069, at *7 (S.D.N.Y. Feb. 28, 2022) (observing that even a Bill of Particulars may not be used to "compel disclosure about the precise manner in which the charged crimes were allegedly committed or the particular acts in which a defendant alleged participated"). And the assertion that the there is "no allegation of fraudulent intent" in the Indictment, Def. Br. 82, ignores that Count Eleven describes that the defendants acted "willfully and knowingly," and that the defendants, "having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses," then transmitted "writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice," and further that the defendants "engaged in a scheme to

defraud." Indictment ¶ 82. Finally, the argument that the Indictment had to allege that each defendant specifically contemplated a harm to property is mistaken; "harm" is an aspect of the intent to defraud—an intent the Indictment squarely alleges—and, in any event, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

Perhaps finding no cases in this district or circuit where a court dismissed an indictment that alleged wire fraud and tracked the statutory language, as Count Eleven does, the defendants urge the court to follow *United States v. Keuylian*, 23 F. Supp. 3d 1126 (C.D. Cal. 2014). But that decision offers them no help. In *Keuylian*, the district court dismissed the indictment because it did not give "any fair indication of the scheme to defraud, or the false pretenses, misrepresentations, or promises forming a part of it." *Id.* at 1129. Here, by contrast, the Indictment describes a scheme to defraud counterparties, many of which are explicitly named, *see, e.g.*, Indictment ¶¶ 52, 54, 59 (naming certain banks and brokerages that Archegos personnel misled); identifies the general categories of misrepresented information, Indictment ¶ 48; identifies numerous examples of false and misleading statements, *e.g.*, Indictment ¶¶ 52(a), 52(b), 52(c); explains the purpose of the false statements and omission, *e.g.*, Indictment ¶¶ 21(c), 47, 65, 70-73; and alleges the defendants' knowing participation in the fraud, *e.g.*, Indictment ¶¶ 28(c), 29, 47, 68, 80, 82. The only other case cited by the defendants to support their position is *United States v. Bortnick*, but that case is entirely inapposite. No. 03 Cr. 414, 2004 WL 2752471 (E.D. Pa. Nov. 29, 2004). There, an indictment alleged bank fraud but the identified victim of the alleged fraud was not a federally-insured financial institution, a fact the government conceded in connection with the motion, and so the indictment did not allege that the fraud affected a "financial institution" as that term was defined by statute. *Id*. at *1-2. *Bortnick* offers no insights into what must be alleged to make out a wire fraud claim, and does not suggest in any way a failing of Count Eleven to do so.

### 5. The Indictment Properly Provides Notice of the Possibility of Forfeiture

The defendants' motion to dismiss the forfeiture allegations in the Indictment has no legal basis. A forfeiture allegation—like any other allegation in an indictment—"must be taken as true." *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952). Just because the defendants claim, at this early stage, that they have no criminal proceeds does not make it so. A defendant is no more permitted to have a forfeiture allegation dismissed on the ground that, in his view of the facts, "there are no 'proceeds,'" Def. Br. 84, than a defendant is entitled to dismissal of a substantive allegation on the ground that, in his view of the facts, he is not guilty.

The purpose of a forfeiture allegation is to advise a defendant that, in the event that (1) he is convicted, and (2) there are proceeds subject to forfeiture, the Government will seek forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1). A forfeiture allegation merely provides "notice to the defendant" of this possibility. *Id*. 32.2(b)(1)(a). Indeed, Rules 7(c)(2) and 32.2(a) of the Federal Rules of Criminal Procedure require the Government to provide notice to a defendant in an indictment of the Government's intention to seek the forfeiture of the defendant's property as part of any criminal sentence, in accordance with the applicable forfeiture statute. *See* Fed. R. Crim. P. 7(c)(2) and 32.2(a). If such notice is not provided to the defendant, the Court cannot order forfeiture. *See id*. The forfeiture allegations in the Indictment comply with these rules.

The defendants here do not assert that the Government is precluded from providing such notice in this case. Nor do they assert that the provision of notice prevents them from disputing that they obtained proceeds subject to forfeiture, an issue the Court will not reach unless and until the defendants are convicted. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.").

As stated in the forfeiture allegations, if convicted of the crimes charged in the Indictment, the defendants must forfeit to the United States all property, real and personal, constituting, or derived from, proceeds that they obtained directly or indirectly as a result of their offenses. The term "proceeds" means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not

limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2) (emphasis added). The term does not mean, as the defendants suggest, whatever profits remain after a defendant has obtained proceeds from a crime and then reallocated them to ultimately-losing bets.

The cases cited by the defendants do not counsel otherwise. In *United States v. Contorinis*, the issue was what the defendant gained, not what "actual gain" amounted to; in that case, the defendant "made investment decisions [for a fund] but did not control disbursements of profits" or himself receive the profits from the insider trading for which he was convicted. 692 F.3d 136, 139, 146 (2d Cir. 2012) ("Because the 'proceeds' sought by the government here were 'acquired' by the Fund over which appellant lacks control, it is difficult to square the [forfeiture] statute with the forfeiture order [against appellant]."). And, notably, *Contorinis* did not involve a motion to dismiss; rather, the Second Circuit reviewed the factual findings of the trial court following a jury trial. *See id*. at 145-47. The Sixth Circuit decision in *United States v. McLaughlin* is similarly inapposite, and is based on a detailed evaluation of facts not applicable here. *See* 565 F. App'x 470, 475 (6th Cir. 2014) (noting that the defendant—unlike in this case—did not "exert the type of control necessary to subject him to personal liability for the company's losses," and distinguishing from its reasoning cases where "the court found that the defendant had complete domination of the corporation because he and his close family members owned all but 1% of the corporate stock and the defendant controlled the day-to-day business of the corporation" and where a court found that "the entire operation was permeated with fraud, and that income generated from fraud cycled through [the company's] operations during the entire period of the Indictment" (alteration in original) (citations omitted)).[12]

---

[12] The defendants consign to a footnote their argument that only 18 U.S.C. § 981(a)(2)(B)—and not 18 U.S.C. § 981(a)(2)(A)—could apply "here," by which they apparently mean "to every count in the Indictment." *See* Def. Br. 85 n.55. But the question of whether the defendants' conduct here as to each of the eleven counts involved "unlawful activities" or "lawful goods or lawful services" sold in an illegal manner is an issue of fact, is not susceptible to determination on a motion to dismiss, and can be determined by the Court—or, as appropriate, by a jury—after the defendants are convicted at trial.

The defendants also cite *United States v. Chan* for the proposition that a count of criminal forfeiture may be dismissed for being legally insufficient, but that opinion established no standard for such a dismissal and in fact *denied* the entirety of the defendant's motions to dismiss forfeiture counts in that case, noting the fact-intensive nature of forfeiture determinations. *See* No. 96 Cr. 350, 2006 WL 224389, at *1-3 (E.D. Cal. Jan. 27, 2006). In a footnote, *Chan* observed that legal insufficiency in a count permits dismissal, *id.*, at *3 n.3, citing *United States v. Grass*, 274 F. Supp. 2d 648, 652-53 (M.D. Pa. 2003). And, indeed, *Grass* is the only other case identified by the defendants here for the claim that "multiple courts" have held that legally insufficient forfeiture allegations may be dismissed. But in *Grass* itself, a forfeiture count was dismissed due to a failure to allege an essential element of the statute, where the facts alleged (that the relevant fraud did not affect financial institutions) were specifically contrary to the requirements of the relevant statute. This idiosyncratic, fact-intensive, nearly-20-year-old case from the Middle District of Pennsylvania is neither applicable nor controlling here.

Finally, the defendants cite not a single case to support their argument that the offenses specified in Counts Two through Ten of the Indictment do not permit forfeiture. That argument is both premature and incorrect. The language of the Indictment states that the defendants, respectively, shall be subject to forfeiture "[a]s a result of committing *one or more of the offenses* alleged in Counts Two through Eleven." Indictment ¶¶ 84, 85. By the defendants' own admission, at least Count Eleven is plainly enumerated in the relevant statute. *See* Def. Br. 87 ("none of the offenses charged in Counts Two through Eleven are included in [the relevant] list *except for wire fraud*, charged in Count Eleven" (emphasis added)). Whether, and to what extent, forfeiture is warranted as to any of Counts Two through Eleven can and will be determined after Hwang and Halligan are convicted. In any event, the claim that Counts Two through Ten—which charge securities fraud offenses under Title 15—do not authorize forfeiture at all is specious. The Second Circuit has repeatedly upheld the validity of forfeiture orders based on 18 U.S.C. § 981, where the offense of conviction is a Title 15 securities fraud offense. *See, e.g.*, *United States v. Shkreli*, 779 F. App'x 38, 41 (2d Cir. 2019); *United States v. Jiau*, 624 F. App'x 771, 773 (2d Cir. 2015) ("A

court may order a defendant convicted of securities fraud to forfeit any property, real or personal, which constitutes or is derived from proceeds traceable to the violation." (alterations and quotations omitted)); *United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016) (holding that "district court correctly ordered forfeiture based on the gross proceeds" generated by defendants' securities fraud and accounting fraud scheme).

Accordingly, the forfeiture allegations are not "legally defective." Def. Br. 84. Following conviction of the defendants, the Government will be required to establish by a preponderance of the evidence that the defendants obtained proceeds from their crimes, the amount of the proceeds the defendants obtained, and the amount of proceeds foreseeable to each defendant. The Court cannot resolve these issues on a motion to strike the forfeiture allegations.

***

The defendants cannot seriously contend, as they must, that the Indictment does not contain the essential elements of each offense or that it has failed to inform them of the charges against which they must defend. Accordingly, the defendants' motions to dismiss should be denied.

## II.  The Warrant Affidavit Established Probable Cause, as Magistrate Judge Gabriel Gorenstein Found

### A.  Applicable Law

In deciding whether a search warrant is supported by probable cause, a court must determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). A judge's determination of probable cause should be given great deference by a reviewing court. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation omitted). An affidavit in support of an application for a search warrant demonstrates a proper showing of probable cause when it sets forth facts which are sufficient to induce a reasonably prudent person to believe that a search of the areas described within the warrant will uncover evidence of a crime. *Berger v. New York*, 388 U.S. 41, 55 (1967). "In assessing the proof of probable cause, the government's affidavit in support of the search

50

warrant must be read as a whole, and construed realistically." *Salameh*, 152 F.3d at 113 (citing *Gates*, 462 U.S. at 230-31). A court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," *id*., and must accord "considerable deference to the probable cause determination of the issuing magistrate," *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (citing *Gates*, 462 U.S. at 238-39). So long as there is a substantial basis for concluding that probable cause existed, even in "doubtful or marginal cases" the resolution "should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

A search conducted pursuant to a warrant is "presumed valid," *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003), and "will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer acted in good faith in conducting the search," *United States v. Leon*, 468 U.S. 897, 922 (1984). Even when a search is found to be illegal, suppressing evidence is a court's "last resort," not its "first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009).

Under the "good faith" exception, the exclusionary rule does not apply "to evidence seized in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008). Accordingly, evidence collected pursuant to a warrant later found defective will be suppressed only if (1) the issuing judge was knowingly misled; (2) the issuing judge wholly abandoned his judicial role; (3) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable. *Id.* The central question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.

## B. Discussion

In asking this Court to suppress evidence seized pursuant to the judicially-authorized Warrants, Hwang[13] again premises his argument on the unfounded and incorrect argument that he did not commit—and that, based on the conduct alleged, could not have committed—any of the charged offenses. Even leaving aside that a grand jury returned the Indictment against the defendants, and that two former Archegos employees have already pleaded guilty to, among other things, conspiring with the defendants here to commit certain of the crimes with which they are charged, the defendant's arguments are meritless.

The affidavit in support of the application for the Warrants devotes more than 40 pages to setting forth the probable cause regarding subject offenses including market manipulation, securities fraud, wire fraud, bank fraud, false statements to a lending institution, and conspiracies and attempts to commit the same. *See* Ex. B to Lustberg Decl. (Agent Affidavit in Support of Application for Search Warrants for Stored Electronic Devices, hereinafter cited as the "Affidavit") at 3, 17-63. The Affidavit then addresses the probable cause regarding, among other accounts, Hwang's Microsoft, Archegos, Apple, and Google accounts, in approximately 15 additional pages of analysis. *Id*. at 63-77.

As a threshold matter, Hwang does not argue that a single statement in the Affidavit is inaccurate or misleading, or that any material fact is omitted. Rather, Hwang's argument reduces the lengthy, detailed, and undisputedly factually accurate Affidavit to accusations of "completely legal trading activity." *See* Def. Br. 100. Hwang further argues that the Affidavit relied on "an unprecedented open-market manipulation theory" and that the "overriding theory of the case, is one of purely open-market manipulation." *Id*. These arguments are plainly incorrect, on two fronts—first, as described above, the market manipulation is not unprecedented and is against the

---

[13] Although defendant Halligan's electronic accounts at Archegos and Bloomberg were also subject to search pursuant to the relevant warrant, Halligan does not join the argument set forth in Section III of the Defense Brief. *See* Def. Br. 98 (arguing that the court should suppress evidence seized pursuant to searches of "Mr. Hwang's electronic accounts"), 106 (claiming that "probable cause was not shown for the search warrants issued on all four of Mr. Hwang's accounts").

law, and, second, it is also one of several charged crimes—and Hwang's request for suppression accordingly fails.

In reality, the Affidavit sets forth extensive evidence of numerous offenses, including, but certainly not limited to, the market manipulation scheme. Among other things, the Affidavit includes the fact that at the time, Becker had already confirmed that he and others had made false and misleading statements to prime brokers and swap counterparties regarding the nature and concentration of Archegos's investments and its liquidity and cash position. Affidavit at 18. It sets forth in detail false and misleading statements made to Morgan Stanley in order to affect its decision-making with respect to extending credit, and continuing to extend credit, to Archegos for its investments. *Id*. at 23-27. It sets forth in detail false and misleading statements made to Goldman Sachs, including with respect to the net asset value of the entire fund, in order to retain access to loans and margin extended to Archegos for its investments. *Id*. at 27-32. It sets forth in detail false and misleading statements made to UBS in order to cause UBS to increase the amount of margin and loans extended to Archegos for investments. *Id*. at 33-47. It sets forth in detail false and misleading statements made to Jefferies and UBS in order to cause them to provide cash to Archegos when Archegos was facing a liquidity or distress situation. *Id*. at 48-53. It also sets forth in detail evidence that Archegos was intentionally concealing the nature and extent of its trading from the Counterparties and from the public, that its trades were intended to—and in fact did— have the effect of artificially inflating the prices of its principal investments, and that Hwang personally directed all of the Archegos trading. *Id.* at 53-63. These are obviously not, as Hwang asserts, "attenuated, speculative and conclusory allegations," Def. Br. 98, and his claim that the Affidavit fails to allege sufficient facts to establish probable cause that any federal crime had been committed, *id*. at 100, is wrong.

The cases cited by Hwang offer no support for his argument. Hwang cites just three supposedly analogous cases where warrants were invalidated. Not only are these cases inapplicable, but also none was decided by the Second Circuit, and only was decided in the last 45 years. In *United States v. Brouillette*, a Fifth Circuit case from 1973, a warrant in connection with

an investigation of use of interstate facilities in furtherance of criminal activities "fail[ed] in any respect to show underlying facts which tend to establish a connection with the use of interstate facilities." 478 F.2d 1171, 1176 (5th Cir. 1973). That case involved a concern, wholly irrelevant here, that without establishing that a federal law violation was being investigated, federal agents otherwise "would be able, by merely mentioning a statute involving interstate commerce, to search what would otherwise be establishments violating only local state law . . . ." *Id*.

Similarly, in *United States v. Birrell*, the affidavit was "plainly insufficient on its face," without "a single fact stated which even tends to show that [the defendant] used the mails . . . let along as the means for committing [mail fraud]." 242 F. Supp. 191, 201 (S.D.N.Y. 1965). The court went on to admonish that a warrant affidavit must recite "some of the underlying circumstances . . . if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." *Id*. In this case, unlike in *Birrell*, the Affidavit did not recite merely "some of the underlying circumstances" of the fraudulent schemes, but instead contained dozens of pages of description and analysis. Finally, in *United States v. Rutherford*, a state warrant affidavit to search a residence for firearms failed to describe how or why firearms were "unlawfully" possessed and failed to even identify the crime of which the weapons would serve as evidence. 71 F. Supp. 3d 386, 389-90 (S.D.N.Y. 2014). Here, by contrast, the Affidavit contained extensive factual support for the application for the Warrants. Hwang's isolated and cherry-picked complaints about aspects of the Affidavit, such as its description of Hwang's deviation from target prices, Def. Br. 102, or the concealment of the size of Archegos's positions, *id*., do not vitiate the thorough, comprehensive, accurate, and damning delineation of probable cause methodically set forth in the Affidavit.

Hwang's arguments that the facts set forth in the Affidavit do not establish probable cause as to his accounts specifically are also unavailing. Hwang claims that the assertion that he "directed" others (in their illegal activities) does not make him "legally responsible for their conduct." *See* Def. Br. 104. But a suppression motion is not a forum for the Court to adjudicate Hwang's guilt or innocence of the charged offenses, and in any case, the question is whether the

facts in the affidavit demonstrate probable cause that evidence of a crime will be found. Hwang cites *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016) for the proposition that a suspect's "status as a drug dealer, standing alone" does not give rise to a fair probability that drugs will be found in his home. Indeed. But evidence that someone is directing others to sell drugs, including through means of electronic communications, certainly would give rise to a fair probability that evidence of drug dealing could be found in his emails and iCloud account.[14] As set forth in the Affidavit, Hwang owned and managed Archegos and directed its illicit trading strategy, and he approved and directed false statements in connection with the scheme to defraud Counterparties. The Affidavit includes well more than probable cause to search the relevant accounts for evidence of this conduct.

Finally, Hwang inexplicably fails to even address, much less overcome, the good faith exception. Even were the Warrants here invalid—which they are not—any such invalidity would not necessarily require the exclusion of the evidence obtained as a result of the search, as the deterrent purpose of the exclusionary rule is not served "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920. Indeed, it is the responsibility of the magistrate to determine whether an affiant's allegations establish probable cause, and "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921. The question is "whether a reasonably well

---

[14] Hwang's citation of *United States v. Lahey* is also misguided. The Defense Brief misleadingly suggests that the warrant in that case was suppressed where it was "premised on very thin evidence"—which, even if that were true, is not the case here—and neglects to include the remainder of the relevant sentence, which reads, more fully: "In short, the five factors that the Government emphasizes do not allay the Court's concern that the search of [the defendant's] home was premised on very thin evidence . . . and the Court accordingly holds *that the specific sequencing misrepresentation and the totality of the related omissions are material*." 967 F. Supp. 2d 698, 727 (S.D.N.Y. 2013) (emphasis added). That is, *Lahey* involved material misrepresentations and omissions, which are neither alleged nor present here.

trained officer would have known that the search was illegal despite the magistrate's authorization." *Id*. at 922 n.23. The answer here is no.

"[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id*. at 922 (citing *Gates*, 462 U.S. at 267, and *United States v. Ross*, 456 U.S. 798, 823 (1982)) (quotations omitted). Against this presumption of reasonableness, there are four circumstances where an exception to the exclusionary rule would not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citing *Leon*, 468 U.S. at 923). None of these factors are even alleged here, and none applies. There is no allegation or suggestion that the magistrate was misled at all, much less knowingly, or that there are any material falsehoods or omissions in the Affidavit. There is also no suggestion or indication that Magistrate Judge Gorenstein abandoned his judicial role in reviewing the dozens of pages of probable cause set forth in the Affidavit, or that the same detailed, thorough, and accurate application is so lacking in indicia of probable cause as to render reliance upon it unreasonable or to make it facially deficient. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Nothing of the sort occurred here.

## III.    The Defendants' Demand for a Bill of Particulars Should Be Denied

The 58-page Indictment supplies the defendants with information sufficient to understand the charges against them, to prepare a defense, and to protect against double jeopardy. The Indictment, therefore, discharges its constitutional obligations without need for further particularization. Even so, the Government has provided further insights—including, at times,

precise evidentiary detail—through extensive text-searchable discovery organized with detailed cover letters and indices, and a lengthy recitation by letter of categories and examples of specific false and misleading statements. The defendant also will also receive trial exhibits, a witness list, and 3500 material reasonably in advance of trial. Accordingly, the defendants have already obtained far more information about the nature of the allegations and, indeed, the Government's anticipated trial proof, than the law requires.

The defendants' Brief makes clear that what the defendants now request is a full accounting of the Government's trial evidence. The defendants demand to know every false utterance, every conspirator, every act that furthered the scheme, each trade in service of the fraud, and more. The defendants multi-page laundry list of demands is nothing short of a demand for the Government's trial proof masquerading as a request for a bill of particulars, and it should be rejected.

### A.  Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022) (citation and quotation marks omitted).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and the acquisition of evidentiary detail is not its function. "It is not enough that the information would be useful to the defendant." *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022) (citation and quotation marks omitted). The question is whether it is "necessary for the preparation of the defense," *United States v. Chalmers*, 410 F. Supp. 2d 278, 286-87 (S.D.N.Y. 2006) (emphasis added) (citation omitted). "The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed

the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) (citing *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases)). "Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citations omitted); *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."). As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574.

Nor does the law "allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). In short, courts "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *Bin Laden*, 92 F. Supp. 2d at 233).

### B. Discussion

The defendants' request for a bill of particulars should be denied because the Indictment, discovery produced to date, and additional information provided by the Government, including a

lengthy delineation of the false and misleading statements made in connection with the charged schemes (ECF Doc. No. 38, hereinafter the "Misrepresentations Letter"), are far more than sufficient to put the defendants on notice of the nature and specifics of the crimes of which they are accused and to permit them to adequately prepare their defense. Courts "routinely" deny motions for bills of particular—even in racketeering conspiracy cases—where, as in this case, the charging document is sufficiently detailed and further notice has been supplied through discovery. *See Murphy*, 2022 WL 1270958, at *3.

Both the detailed speaking Indictment, which contains more than 45 pages of particularized allegations, and the Misrepresentations Letter, which comprises approximately nine pages of itemized false and misleading statements including more than 50 citations of particular pages produced in discovery, contain specific factual support for the charges, including numerous references to and quotes from specific documents produced in discovery, as well as references to statements made by witnesses to the Government.[15] The defendants make no serious argument that they have not been apprised of the charges against them. Indeed, they labor elsewhere in their motions to argue that the factual pleadings of the Indictment enable the Court to discern the very specific theories at the heart of the Government's charges and to dismiss them as a matter of law. The defendants cannot then credibly change tack and profess ignorance of the essence of the charges against them. Indeed, the Indictment explains in depth the nature of the interrelated schemes to defraud the Counterparties in order to obtain money to fuel market manipulation in the primary Archegos investments. This alone requires the defendants' motion to be denied. *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (overruled on other grounds).

_____

[15] Additionally, despite the defendants' repeated references to the initial conference, they fail to note that the Court instructed counsel: "Don't ask me for particulars that I am not going to give you.  And I am not sure there will be anything else that I will be giving you on this."  Jun. 1, 2022, Tr. at 20.  The Government has supplied extensive information regarding the misrepresentations, and, as further described below, the Court should deny the defendants' extraordinary and unfounded additional requests.

The defendants nonetheless seek additional details regarding seventeen categories of evidence. The nature and volume of the requests reveal that the defendants' twin aims are to obtain minute evidentiary detail about the Government's trial proof and, where possible, constrain the Government's ability to present its case to the jury. Neither objective is permissible. *See, e.g.*, *Rittweger*, 259 F. Supp. 2d at 291; *Henry*, 861 F. Supp. at 1197; *Bellomo*, 263 F. Supp. 2d at 580.

Though each and every request should be denied, the Government addresses the four groups of requests presented by the defendants.

### 1. The Government Need Not Supply Any Further Information About Misrepresentations Made During and in Furtherance of the Schemes

The racketeering, securities fraud, and wire fraud schemes involved, among other things, sustained and repeated efforts to mislead Archegos's counterparties. The Indictment specifically alleges that, with Hwang's knowledge and approval, Halligan, William Tomita, and Scott Becker repeatedly made materially false and misleading statements about Archegos's portfolio of securities to numerous leading global investment banks and brokerages. The Indictment describes the purpose of the false statements: to advance and conceal the conspirators' schemes by fraudulently inducing the Counterparties into trading with and extending credit to Archegos, enabling and facilitating Hwang's market manipulation scheme, and hiding the true risk of doing business with Archegos. *See* Indictment ¶ 2. The Indictment groups the Conspirators' misrepresentations into three general categories: "(i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio." Indictment ¶ 48. The Indictment also supplies numerous examples, including by reference to approximate date and Counterparty, of occasions on which a conspirator misrepresentations of each type. *E.g.*, Indictment ¶ 52(d) ("The Archegos Conspirators made similar deceptive, false, and misleading statements regarding the size of Archegos's largest position on additional occasions and to additional Counterparties, including in or about October 2020 and January 2021 to representatives of Mitsubishi UFJ Financial Group; in or about

December 2020, January 2021, and February 2021 to representatives of Goldman Sachs; in or about December 2020 and March 2021 to representatives of Credit Suisse; in or about January 2021 and March 2021 to representatives of Nomura; . . . ."). And the Indictment further alleges that the Conspirators conveyed a variety of lies, deceptive omissions, and intentional misstatements on other topics, such as Archegos's reasons for seeking new counterparty arrangements and its handling of excess cash. *See* Indictment ¶¶ 43-49, 64.

The defendants now demand "[e]ach and every alleged misrepresentation, by the person(s) who made it, by its nature, the person(s) who received it, and the date, time, and place." Def. Br. 107. The defendants make no attempt to explain why those details are "necessary" to provide the defendants with fair notice, nor could they. Courts routinely deny this kind of demand for comprehensive detailing of the government's proof. As the court found in *Mandell*, where the defendant in a securities fraud and market manipulation case "[sought] to compel the Government to particularize the allegations in the Indictment regarding misrepresentations allegedly made to investors and to identify the allegedly defrauded investors," that "level of detail sought demonstrate[d] that the request [was] nothing more than an 'ill-disguised attempt at general pretrial discovery." 710 F. Supp. 2d at 372. That is equally true here.

Indeed, the defendants' requests—which are infirm based on the Indictment alone—are all the more extraordinary in light of the Government's Misrepresentations Letter, which supplied substantial additional information about the Government's proof, including approximately nine pages identifying particular misrepresentations with cross-references to specific pages of the discovery. Defendants go to great pains to describe the Court's colloquy with counsel at the initial pretrial conference as an "order" to the Government to identify "each and every" misrepresentation its trial proof may include. The defendants hope the Court pre-determined this issue because their demand for further particulars has no support in the law. But the Court did not do so; rather, the Court told the defendants that if the Government did not sufficiently supply additional information, the defendants could move for a bill of particulars. The Government supplied the Misrepresentations Letter in light of the Court's direction during the conference on June 1, 2022,

to provide additional identification of alleged misrepresentations (*see* Jun. 1, 2022, Tr. at 15-17). The defendants also raised no objections regarding the Misrepresentations Letter in a subsequent conference—rather, defense counsel described it, accurately, as a "lengthy filing." Sept. 8, 2022, Tr. at 6.[16] Accordingly, although the defendants attempt to rely on a colloquy from the initial appearance before the Court in this case, before any briefing or arguments were submitted and prior to the completion of discovery production and the voluntary provision of additional information, the question now is whether, at this stage and based on the current record, a bill of particulars is warranted. The answer is no. Because the Indictment supplies more than sufficient information alone, and because the Misrepresentations Letter provides an additional veritable roadmap of information—including, as described above, voluminous cites to specific documents and pages produced in discovery—the defendants' arguments fail.

The *Mandell* decision is also instructive more generally—there, as here, despite a detailed Indictment, the defendant made broad demands; there, arguing that the court should order the Government to provide "detailed particulars with respect to thirteen categories of information. Generally, [the defendant sought] the names of defrauded investors and the specific content of the alleged misrepresentations made to investors," arguing that "given the scope of the alleged conspiracy, the number of investors allegedly involved and the scope of discovery in [the] case, the defendant cannot navigate the discovery and prepare a defense without the requested particulars." 710 F. Supp. 2d at 384. The court found that the defendant's "request for information regarding material misstatements [was] completely unfounded," because the Indictment catalogued a number of falsehoods with great specificity and the "detailed information provided in the thirty-four page Indictment [was] more than sufficient." *Id.* at 385. Similarly, the court found that the defendant's request for a list of the defrauded victims was "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars"

---

[16] Additionally, and notably, in contrast to the defendants' current portrayal of the Court's guidance in their Motion, counsel described it then more equivocally as a "request or demand or order." Sept. 8, 2022, Tr. at 6.

and noted that the court had previously denied requests for bills of particular specifying the names of defrauded investors. *Id.* at 384 (quoting *United States v. Russo*, 483 F. Supp. 2d 301, 311 (S.D.N.Y. 2007)) (quotations omitted). Moreover, as here, the defendant in *Mandell* "complain[ed] of the massive amount of discovery," but the court noted that the mere existence of "mountains of documents" did not entitle the defendant to a bill of particulars, and that the defendant fell far short of showing that a bill of particular was necessary to enable him to prepare a defense and avoid unfair surprise at trial—and that, rather, and as here, the motion was "an ill-disguised attempt at discovering information to which he [was] not entitled." *Id.* at 385.

### 2. The Government Need Not Disclose Further Details About the Alleged Conspiracy

The defendants' next set of requests demand evidentiary detail about the racketeering conspiracy count. "As a general rule," however, "a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars." *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006). Each of the demands should be rejected.

Among other things, the defendants seek disclosure of "[a]ny over acts not listed in the Indictment" and "[t]he means and methods by which the alleged conspiracy was carried out." Def. Br. 108. These are improper requests. As the Second Circuit has observed, "[t]here is no general requirement that the government disclose in a bill of particulars all the overt acts it will prove in establishing a conspiracy charge." *United States v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975). This is true in a RICO conspiracy in particular, where, as here, the Indictment contains detailed allegations about the alleged schemes. *Minaya*, 395 F. Supp. 2d at 37 (rejecting request for "information regarding any overt acts not enumerated in the indictment").

The defendants also demand to know "[a]ll unindicted coconspirators." But courts routinely deny blanket requests for the identities of all co-conspirators. *See, e.g.*, *United States v. Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) (concluding, in thirteen-count, multi-defendant securities fraud case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Amendolara*, No. 01 Cr.

694 (DAB), 2002 WL 31368279, at *5-6 (S.D.N.Y. Oct. 21, 2002) (denying a request for the identities of all unindicted co-conspirators because "the Indictment and discovery material already provided to Defendant Anello by the Government sufficiently facilitate his ability to avoid surprise and prepare for trial"); *Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the Indictment and through discovery) (collecting cases); *United States v. Rodriguez*, No. 99 Cr. 367 (DLC), 1999 WL 820558, at *2 (S.D.N.Y. Oct. 13, 1999) (denying motion for a bill of particulars identifying known co-conspirators where the Indictment coupled with discovery allowed a defendant "both to prepare his defense and to avoid prejudicial surprise at trial").

As is routine, the Government here will disclose a witness list and 3500 material sufficiently in advance of trial for the defense to adequately prepare. Accordingly, consistent with precedent in this Circuit and District, the defendants' request for names of unindicted co-conspirators should be denied.

The defendants also demand further information about "[w]hat or who is meant by the Archegos Enterprise," and the date when it was allegedly formed. Def. Br. 108, 115. Neither request is necessary to assist the defendant. The Indictment defines the Enterprise. Indictment ¶ 11. And the Indictment gives an approximate period for the conspiracy. Those are all the allegations that are needed. *See United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985) ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial").

### 3. The Defendants Are Not Entitled to Itemized Proof of the Market Manipulation Schemes

The defendants' third tranche of requests relate to Counts Three through Nine, each of which charges securities fraud in the form of market manipulation. As to these, the defendants essentially ask the Court to require the Government to provide exhaustive information on every single one of the trades made by Archegos based on strategies directed by Hwang. *See, e.g.*, Def.

Br. 108 ("Every trade alleged to be manipulative or otherwise unlawful," "Every trade alleged to have created an artificial price," "Every person or entity induced to sell (or buy) a security bought (or sold) by Archegos based on an alleged artificial price, including the name of the security and the date/time of the trade").

Courts in this district have rejected requests for particularized trade information as "nothing more than ill-disguised attempts at general pretrial discovery." *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (alterations and quotation marks omitted). In *United States v. Tuzman*, for example, the court refused an attempt to obtain "particularized trade information" because the indictment alleged "the types of trades the government considers improper" and because the defendant cited "no market manipulation case in which a court has required that particularized trade information be disclosed." 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017) (alterations and quotation marks omitted). Similarly, in *Wey*, the district court rejected requests for "disclosures detailing on an individualized basis those trades and other acts that the Government claims manipulated the price of the Issuers' stock." 2017 WL 237651, at *19. The court saw in those requests an "aim to compel the production of the very type of evidentiary minutiae that is not appropriate for a bill of particulars" and found the Indictment's allegation and search warrant affidavit sufficiently "spelled out the types of actions" alleged to have been manipulative. *Id.*

The same circumstances that weighed against detailed trade information in *Tuzman* and *Wey* also do so here. Counts Three through Nine correspond to alleged manipulation in one particular security each, and those counts identify the relevant security and the time period of the manipulation. *See* Indictment ¶¶ 77-78. The Indictment also describes the manipulative strategies deployed by the defendants generally, *e.g.*, Indictment ¶ 21, and furnishes specific examples of manipulative techniques, such as trading in large volumes, consistently raising limit prices, buying stocks to "defend" against adverse price movements, many of which are detailed over numerous pages. Indictment ¶¶ 28, 34, 35, 36. The Indictment even describes trading in specific stocks, during specific time periods, with references to descriptive information about the trades and their

significance, and occasionally graphs. *E.g.* Indictment ¶ 28 ("Between early November and early January 2021, Archegos exceeded 30% of daily volume on approximately nine days, and exceeded 35% on approximately four days.") These allegations plainly advise the defendants of the conduct alleged to be unlawful and enable them to prepare a defense. *See United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) ("The Indictment's identification of two companies as the subject of the manipulation for hire scheme and the otherwise detailed allegations concerning this scheme preclude a finding that the charges of the Indictment are so general that they do not advise Mrs. Levy of the specific acts of which she is accused.").

The defendants also ignore that the allegations in the Indictment relate to Archegos's own trades and over a finite period. The Government has produced in discovery every trade Archegos made of which it has a record, including all the trades Archegos made in each of the securities identified by Counts Three through Nine during the manipulative schemes. While Archegos traded extensively, the approximate one-year period of the alleged schemes, the Indictment's specific identification of the stocks at issue, and the fact that the Indictment describes the type of manipulative conduct the defendants undertook through their trading distinguishes the case from *United States v. Connolly*, which the defendants cite for support. No. 16 Cr. 370 (CM), 2017 WL 2537808, at *6-7 (S.D.N.Y. May 24, 2017). In *Connolly*, the court confronted a scheme alleged to have occurred over seven years, spanned multiple continents, and involved "literally millions of transactions." No. 16 Cr. 370 (CM), 2017 WL 2537808, at *6-7 (S.D.N.Y. May 24, 2017). Nothing like that is presented here.  The Government has described a scheme lasting less than a year, across a limited, identified set of several stocks, involving a systematic and essentially continuous pattern of trading abuse.  If the materials produced in this case are a haystack, the Government has identified the names of the embedded needles, described their size and shape and how they were manufactured, and given the defendants a metal detector.

### 4. The Defendants Are Entitled to No More Particulars for the Section 10(b) Counts

The defendants' final group of requests aims to require specific delineation of how the Government intends to prove Counts Two and Ten, which each relate to willful violations of Section 10(b) of the Exchange Act. For example, the defendants ask the Court to require the Government to provide a listing of "[a]ll instances in which Mr. Halligan and/or Mr. Hwang are alleged to have aided and abetted supposed misrepresentations to counterparties." Def. Br. 108. But "[t]he Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed," which is what the defendants seek. *United States v. Mora*, No. 19 Cr. 514 (JPO), 2020 WL 7496281, at *1 (S.D.N.Y. Dec. 21, 2020). The same principle undermines the defendants' effort to require the Government to identify every victim "of the alleged misconduct." Def. Br. 108. That request cannot be granted, as "a bill of particulars is not properly directed to disclosure of the prosecution's legal theory such as, in this case, the Government's fraud theory, including the claimed victims of the alleged fraud." *See United States v. Vought*, No. 05 Cr. 268 (JBA), 2006 WL 1662882, at *13 (D. Conn. June 15, 2006). Moreover, the Indictment provides ample information about the categories of persons and business who have been victimized by the defendants' conduct, including the names of specific financial institutions, express references to a particular public company, and discussion of Archegos employees whose deferred compensation had been lost. Whatever remaining detail the defendants wish to obtain they can easily find in the discovery, which is both text searchable and sorted by producing party.

Finally, under the guise of obtaining information about Counts Two and Ten, the defendants appear to pose questions of personal interest that have no legal significance to the allegations or the defendants' ability to prepare for trial. For example, the defendants seek to learn "[a]ny and all trades or transaction that Mr. Halligan allegedly made or directed to be made between Archegos and its counterparties from 2020 to March 31, 2021" and "[a]ny and all trades or transactions over which Mr. Halligan allegedly had ultimate authority during the relevant time period." Def. Br. 108. The Indictment alleges that Bill Hwang "personally made all investment

and trading decisions," Indictment 12(a), and never alleges that Halligan had ultimate authority over any trade, so his request appears calculated to discover what witnesses may say about Halligan and do appear to relate to any issue alleged in the case. For similar reasons, the request for "[t]he date on which the alleged 'scheme to defraud Archegos's Counterparties' began" is improper both because the Indictment provides an approximate date, *see, e.g.*, Indictment ¶¶ 1, 39-41, 68, 76, 78, 80, 82, and because the request seeks a detail court routinely deny as unnecessary to the preparation of a defense. *United States v. Gambino*, 809 F. Supp. 1061, 1071 (S.D.N.Y. 1992) ("[C]ourts have repeatedly denied requests for the "whens" and "wheres" and "with whoms" concerning the formation of schemes and conspiracies.").

## IV.    The Defendants' Motion to Strike Language from the Indictment Should Be Denied

The defendants ask the Court to strike from the Indictment references to the prior civil and criminal actions undertaken against Hwang and his prior corporate entity, Tiger Asia Management ("Tiger Asia"). Def. Br. 88-89. The defendants' motion is premature and meritless, and should be denied.

### A.  Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quotation marks, alterations, and citations omitted). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (quotation marks omitted); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *Scarpa*, 913 F.3d at 1013). "Given this exacting standard, such motions [to strike] are rarely granted." *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).

In setting forth allegations in a charging instrument, the Government is not limited to an enumeration of the bare elements of a crime; instead, a charging instrument may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods, of an offense, and to describe evidence that is otherwise admissible at trial. *See United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 99). Where there is any doubt about the connection between the allegations and the evidence that will be admitted at trial, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467; *see also United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021). As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'" *United States v. Smith*, 985 F. Supp. 2d 547, 612 (S.D.N.Y. 2014) (brackets in original) (quoting *United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

### B. Discussion

The defendants move to strike paragraph eight of the Indictment, which describes the factual background that led to the creation of Archegos. Paragraph eight specifies that in or about 2001, Hwang founded a hedge fund, Tiger Asia, which operated as an investment advisor. Then, "[i]n 2013, Tiger Asia faced regulatory and criminal sanctions relating to Tiger Asia and Hwang's trading." Indictment ¶ 8. Among other things, the SEC alleged in a civil complaint that "at HWANG's direction, Tiger Asia engaged in open-market manipulation of the prices of certain stocks listed on the Hong Kong Stock Exchange." Indictment ¶ 8. After the filing of the SEC complaint, "HWANG consented to an order enjoining him and his employees, among others, from violating Section 10(b) of the Securities Exchange Act of 1934, relating to securities fraud." Indictment ¶ 8. In addition, "HWANG also returned all outside investor capital and deregistered the fund as an investment adviser." Indictment ¶ 8. Afterward, "HWANG rebranded Tiger Asia as Archegos," which "subsequently managed HWANG's wealth and the compensation of certain employees." Indictment ¶ 8.

As a threshold matter, the defendants' motion to strike is premature and may be rendered moot. Any surplusage issues "need not be fully addressed" at the motion to dismiss stage because "[c]ourts in this district routinely await presentation of the Government' evidence at trial before ruling on a motion to strike." *Mostafa*, 965 F. Supp. 2d at 467 (citing cases); *see also Butler*, 351 F. Supp. 2d at 124 ("if it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial"). In this District, it is often the practice of the courts not to give "speaking" indictments to the jury, so this issue may be entirely moot; in the event this Court decides to provide the jury with the Indictment following the conclusion of the trial and in connection with deliberations, the defendants will have an opportunity to make a motion then with the benefit of the trial evidence, the Court's expected jury instructions, and information about what materials would otherwise be provided to the jury.

Substantively, the limited, factual references to the SEC complaint and its aftermath, within one paragraph of a 58-page and 86-paragraph indictment, should not be stricken from the Indictment because the information is relevant and not inflammatory or improperly prejudicial. The information in paragraph eight provides context for the creation of Archegos, is necessary to understand why Hwang no longer invested outside funds, and is evidence of Hwang's knowledge, intent, and state of mind with respect to the charged crimes.

Indeed, if and when it becomes ripe to consider the defendants' motion, the trial will likely have established that the information in paragraph eight is both relevant and admissible evidence. Specifically, this evidence may be admissible as direct evidence of the offenses committed here, or, alternatively, under Rule 404(b). Evidence about Tiger Asia is direct evidence that explains the creation of Archegos and why it did not accept outside investor capital. The fact that Hwang was previously charged with manipulative trading, and entered a consent order enjoining him and his employees from committing securities fraud, is also evidence under Rule 404(b) of his knowledge, intent, and state of mind because it shows that Hwang was on notice of the prohibitions against manipulative trading (regardless of when the SEC complaint was filed, or how many paragraphs

of that complaint concerned manipulative trading). And the Government expects its trial proof to demonstrate that Patrick Halligan knew of those allegations against Hwang, and that he and Becker had to assure Counterparties that Archegos and Hwang had taken meaningful steps to avoid a recurrence of improper behavior.

The defendants make a variety of arguments about the supposed prejudice of this evidence, but "[i]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa*, 913 F.2d at 1013. As noted above, it is rare for courts in this District to "tamper[] with indictments,'" *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2010 WL 4967878, at *1 (S.D.N.Y. Nov. 22, 2010) (quoting *United States v. Bin Laden,* 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000)), and the only cases the defendants rely on in support of their motion concern allegations of prior convictions that were stricken from indictments. Def. Br. 94. But those cases are plainly distinguishable because the mention of prior criminal convictions was otherwise inadmissible at trial. *See, e.g.*, *United States v. Verra*, 203 F. Supp. 87, 80-90 (S.D.N.Y. 1962) (the defendant's "conviction, if permitted to remain in the indictment, could not properly be brought to the jury's attention at the start of the trial, and if the prosecutor . . . . were to . . . refer to this allegation, a mistrial would result").

The Indictment's allegations do not reference a prior criminal conviction, let alone one the Court has already determined to be inadmissible. The Government will provide notice before trial, pursuant to Rule 404(b), of any evidence related to the civil suit against Tiger Asia, or Tiger Asia's criminal conviction for wire fraud, that should be admitted. And although Hwang emphasizes that the civil allegations against him "were never admitted or proven," Def. Br. 91, that assertion highlights that these facts carry far less potential prejudice than the fact of a prior criminal conviction, while nonetheless remaining relevant. Hwang entered a consent order enjoining him and his employees from committing securities fraud, which is itself probative of Hwang's knowledge, intent, and state of mind with respect to the charged scheme. Moreover, any putative prejudice to Hwang could be addressed with an appropriate limiting instruction. The same is true for Halligan, whose claims of spillover prejudice could readily be addressed by limiting

instructions. The Court need not, however, resolve this evidentiary dispute now; the evidence related to this allegation will very likely be the subject of a motion *in limine* prior to trial and even if not, the Court should "await presentation of the Government's evidence at trial before" granting a motion to strike. *Mostafa*, 965 F. Supp. 2d at 467.

## V.     The Defendants' *Brady* Motion Should Be Denied

The defendants move to compel the Government to obtain and produce "all discoverable records that were created by the SEC and CFTC in the course of their joint investigations of Defendants, including all exculpatory evidence." Def. Br. 120; *see also* Def. Br. 116-120. The defendants style this motion as a motion to compel the production of *Brady* material. Because the SEC and CFTC conducted separate, parallel investigations of the defendants, however, they are not part of the prosecution team for *Brady* purposes and their records are not in the Government's custody and control or otherwise discoverable, and the defendant's motion should therefore be denied.

The Government does not have a duty to request, obtain, and review materials that are solely in the possession of the SEC or CFTC. A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency only where the Government conducts a "joint investigation" with that agency. *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the New York Stock Exchange, even if it were a state actor, did not conduct a joint investigation related to the policies of the New York Stock Exchange).

The defendants claim that the Government conducted a "joint investigation" with the SEC and CFTC principally because the agencies participated in "many of the proffers provided by Mr. Hwang and his counsel . . . and the Government, the SEC, and the CFTC have all publicly" thanked

one another for their assistance in the investigation. Def. Br. 119. These circumstances fall far short of establishing a joint investigation and courts in this District have routinely rejected such arguments.

Although the Second Circuit has not spoken directly to the question, the majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to trigger an extension of the Government's *Brady* obligations. Instead, "[a] number of factors are relevant in determining whether the prosecution conducted a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018)); *Rigas*, 2008 WL 144824, at *2 (finding that parallel civil and criminal investigations were not "joint"). Asking the Government to review the entire investigative file of a parallel investigating agency merely because the agencies sought to maximize the efficiencies of their respective investigation's would "inappropriately require [the Court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

Here, the Government did not conduct its investigation jointly with the SEC and CFTC and therefore it is not in "possession" of the SEC's and CFTC's files. Many aspects of the Government's investigation were conducted without any involvement of the SEC and CFTC whatsoever. The SEC and CFTC played no role in the development of the Government's prosecutorial strategy or charging decisions; they were not involved in presenting the case to the grand jury; they did not receive productions in response to grand jury subpoenas; they did not participate in the execution of search warrants; and they have not accompanied the Government to court. *See United States v. Collins*, 409 F. Supp. 3d 228, 242 (S.D.N.Y. 2019) (citing such factors in support of a finding that the SEC and the USAO did not conduct a joint investigation); *United*

*States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness).

The fact that the SEC and CFTC participated in proffers with the Government reflects only a typical and unsurprising degree of coordination and does not amount to a joint investigation. Avoiding this type of overlap would require witnesses to sit for multiple interviews and subpoena recipients to produce documents to multiple agencies. Combining interviews thus promotes efficiency for all parties involved in an investigation. In part for this reason, several judges in this District have held that such practices are indicative of parallel as opposed to joint investigations. *See United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Collins*, 409 F. Supp. 3d at 241 (finding no joint investigation where SEC and Government participated in some joint interviews); *accord SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3.

The balance of the *Blaszczak* and *Middendorf* factors weigh against the defendants' argument. As Judge Kaplan explained in *Blaszczak*:

> Although [the SEC] interviewed witnesses and gathered facts alongside the USAO, it was not present at some prosecution contacts and interviews, did not review documents gathered only by the prosecution, and did not 'develop[] prosecutorial strategy.' Representatives of the SEC have not accompanied the USAO to court proceedings in this case. Neither the Commission nor the USAO recommended action to the other or had any role in the other's decision making process. The USAO has not even seen the SEC's action memorandum.

308 F. Supp. 3d at 742 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)); *see Middendorf*, 2018 WL 3956494, at *5 (relying on the *Blaszczak* factors and finding no joint investigation where "the SEC was not involved in [the Government's] grand jury presentation, has

not reviewed documents gathered by the Government or shared the fruits of its investigation with the Government, and did not participate in the overall development of prosecutorial strategy. And beyond conducting joint interviews, the Government and SEC have not coordinated their separate fact-finding efforts"). The facts here compel a similar outcome. The Government did not involve the SEC or CFTC attorneys in the issuance of grand jury subpoenas; did not produce documents obtained from grand jury subpoenas to the SEC or CFTC; and did not include SEC or CFTC personnel in the Government's grand jury presentation. The USAO, the SEC, and the CFTC made independent decisions about what charges or claims they intended to bring. (Notably, of course, the composition of each agency's action differs: the Indictment charges Hwang and Halligan; the SEC has sued Archegos Capital Management, Hwang, Halligan, Tomita, and Becker; and the CFTC has sued Archegos Capital Management and Halligan. *See SEC v. Hwang*, et al., No. 22 Civ. 3402 (JPO); *CFTC v. Archegos Capital Management*, et al., No. 22 Civ. 3401 (JPO).) Nor did the USAO, the SEC, or the CFTC direct one another to take any particular investigative actions. Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary.

The cases upon which the defendants rely do not support imposing the broad discovery obligations the defendants request here. In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff instructed the Government to review for *Brady* only SEC memoranda from witness interviews conducted with the Government. *Gupta*, unlike more recent cases to consider the issue, focused almost exclusively on the fact that interviews were conducted together, and not on the other factors considered by courts. *Compare Gupta*, 848 F. Supp. 2d at 494 ("when it comes to Brady disclosures, the relevant contest is one of fact-gathering, not charging determinations or otherwise"), *with Middendorf*, 2018 WL 3956494, at *4 (considering, among other things, charging determinations). In reaching its limited decision, *Gupta* explicitly relied on the fact that the Government could easily access the requested materials. *See Gupta*, 848 F. Supp. 2d at 495 (citing *United States v. Brooks*, 966 F. 2d 1500, 1503 (D.C. Cir. 1992) (holding that prosecutor must search files "particularly when files can be searched 'without any difficulty'")). That is

obviously not true with respect to the defendants' request that the Government review "all discoverable records that were created by the SEC and CFTC" during their investigations. Def. Br. 120. Moreover, *Gupta* makes clear that not "all of the documents the SEC prepared and accumulated in its investigation of Gupta are part of the joint investigation." *Id.* Rather, Gupta held that the Government's obligation to review for Brady extends only to "documents arising from those joint efforts" to "investigate the facts of a case together." *Id.* Accordingly, the defendants overbroad request runs afoul of even *Gupta*.

In *United States v. Martoma*, 990 F. Supp. 2d 458, 460-62 (S.D.N.Y. 2014), the defendant requested that the Government review even less material than in *Gupta*. *See Martoma*, 990 F. Supp. 2d at 459 (defendant requested that the Government review notes of communications between the SEC and attorneys for two cooperating witnesses in the sole possession of the SEC). With this narrow request in mind, Judge Gardephe conducted an analysis of the Government's and the SEC's investigations, ultimately finding that there was a "joint investigation" because (1) the two agencies conferred about their investigations and (2) jointly conducted interviews; (3) the SEC provided the Government with documents it obtained as part of its investigation; and (4) the two agencies "coordinated their efforts in conducting depositions of SAC Capital and its employees." *Id.* at 461. As a result, Judge Gardephe held that the Government was obligated to "produce to Defendant communications from the SEC to the doctors' counsel, or to [the cooperating witnesses] directly, that (1) threaten criminal prosecution of either [witness] if he does not implicate Martoma; or (2) promise a non-prosecution agreement to either doctor if he implicates Martoma." *Id.* at 462. The Government respectfully submits that *Martoma* was not intended to extend *Gupta* to all materials in the SEC's custody or control, or to contradict *Goffer*, *Rigas*, or *Stanard*, and must be limited to its unusual facts.

If *Martoma* were extended to support the defendants' request here, the exception would swallow the rule, and any jointly-conducted interviews or document-sharing between the SEC, CFTC, and the Government would require the Government to search the entire SEC and CFTC investigative file, including emails, chat messages, draft memoranda, and draft charging

76

instruments. No court has ever so held. That result would diverge wildly from the rationale of *Gupta*, and cannot be what *Martoma* intended. In fact, *Martoma*'s narrow request related to communications between the SEC—a civil regulator—and Government witnesses in connection with the possibility of criminal prosecution, which was an outcome that was exclusively in the control of the Government, not the SEC. *Martoma* is therefore properly read to simply provide a safeguard in an unusual situation to ensure that no promises or representations about a putative criminal prosecution are relayed to witnesses by the SEC, a civil regulator. Thus, to the extent that the defendants rely on *Martoma* to support their request for the Government to search the entire investigative files of the SEC and CFTC, such reliance is misplaced. Indeed, cases since *Gupta* and *Martoma* have rejected requests for internal SEC work product. *See Blaszczak*, 308 F. Supp. 3d at 742 (denying the defendant's motion to require the Government to review the SEC's "action memorandum and any similar work product"); *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *10 (S.D.N.Y. Apr. 14, 2020) (rejecting a motion for the "SEC's internal deliberative documents," citing among other things that the Government had already committed to collecting testimony, witness statements, and transcripts from the SEC).

Moreover, because the Government took the notes of witness interviews the Government has already disclosed the necessary essential facts to enable the defendants to call witnesses and take advantage of exculpatory information. The Government also has requested the production of certain materials from both the SEC and CFTC, understands that it has received all records produced by third parties to the SEC and most if not all records produced by third parties to the CFTC, and the Government has produced to the defense all such records it has obtained from both the SEC and the CFTC. It is not necessary to delve into the SEC's and CFTC's internal work product, which would be an enormous undertaking, would take significant resources of the USAO, SEC, and CFTC, and would invade the CFTC's and SEC's work product privilege. The Government is not required to disclose materials "to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Leonard*, 350 F. App'x 480, 482 (2d Cir. 2009)

(quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)) (government did not wrongfully withhold *Brady* material when it failed to turn over an SEC memorandum that concluded the defendant's misstatement was not material because the defendant was already aware of the essential facts).

Thus even if the SEC's or CFTC's internal work product contains references to statements of witnesses made during interviews conducted by the USAO—for instance, a summary of a witness's expected testimony in a memorandum or a discussion of a witness statement in an instant message or email—the Government has already satisfied its *Brady* obligation regarding the witnesses' statements because "[k]nowledge of the identity of a potential witness, and 'the essential facts which would enable' a defendant 'to call the witness and thus take advantage of any exculpatory testimony that he might furnish,' is sufficient to discharge the Government's Brady obligation." *Middendorf*, 2018 WL 3956494, at *4 (quoting *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975)). To the extent interviewed witnesses made statements that are potentially exculpatory, the Government has informed the defendants of the witnesses' identities and the essential facts about which they could testify when it produced excerpts of notes from interviews containing potentially exculpatory information. Indeed, the Government has supplied the defendants with a forty-page letter summarizing certain favorable statements of more than 25 witnesses and further provided approximately one dozen 302s or notes (with certain redactions). *Brady* requires nothing more from the Government. *Id.*

Therefore, for the reasons explained above, the *Brady* motion should therefore be denied.

**CONCLUSION**

For the foregoing reasons, the defendants' motions should be denied.

Dated:  New York, New York
        January 12, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

        By:   _____
                              Matthew Podolsky
                              Alex Rossmiller
                              Danielle Sassoon
                              Andrew Thomas
                              Assistant United States Attorneys
                              (212) 637-1947/1115/2415/2106