**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

      v.

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,

         Defendants.

Criminal Action No. 22-240 (AKH)

*Document Electronically Filed*

---

**REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF HWANG'S MOTION TO DISMISS FOR**
**PROSECUTORIAL MISCONDUCT**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

    I.    The Court's Supervisory Authority Provides a Basis for Relief............................................ 2

    II.   The Government's Misrepresentation of Mr. Hwang's Status is Subject to the Court's Supervisory Authority. ....................................................................................................... 4

    III.   The Government's Misrepresentation of its Open-Mindedness Is Subject to the Court's Supervisory Authority. ..................................................................................................... 10

    IV.   The Court Should Conduct a Hearing to Determine the Appropriate Relief. ................. 15

CONCLUSION ......................................................................................................................... 18

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                       **Page(s)**

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................... 14

*Connick v. Thompson*, 563 U.S. 51 (2011) .................................................................. 14

*DaCosta v. City of New York*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) ............................ 2

*In re Int'l Business Machines Corp. Securities Litig.*, 163 F.3d 102 (2d Cir. 1998) .................... 7

*McAuley v. Int'l Business Machines Corp., Inc.*, 165 F.3d 1038 (6th Cir. 1999) .......................... 7

*Pasquantino v. United States*, 544 U.S. 349 (2005) ...................................................... 7

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) .................................................. 7

*United States v. Babb*, 807 F.2d 272 (1st Cir. 1986) .................................................... 5

*United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) ............................................. 17

*United States v. Ciambrone*, 601 F.2d 616 (2d Cir. 1979) ............................................ 2

*United States v. Dolaway*, No. 12-CR-6097-FPG,
    2014 WL 2040041 (W.D.N.Y. May 15, 2014) ........................................................ 3

*United States v. Drake*, 310 F. Supp. 3d 607 (M.D.N.C. 2018) ........................................... *passim*

*United States v. Gillespie*, 974 F.2d 796 (7th Cir. 1992) ............................................... 6

*United States v. HSBC Bank USA, N.A.*, 863 F.3d 125 (2d Cir. 2017) ................................ 3

*United States v. Kastigar*, 406 U.S. 441 (1972) .......................................................... 16

*United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) ................................................... 3

*United States v. Myers*, 123 F.3d 350 (6th Cir. 1997) ................................................... 5

*United States v. Naegele*, 474 F. Supp. 2d 9 (S.D.N.Y. 2007) ...................................... 12

*United States v. Nejad*, 521 F. Supp. 3d 438 (S.D.N.Y. 2021) ...................................... 3

*United States v. Omni Int'l Corp.*, 634 F. Supp. 1414 (D. Md. 1986) ............................... 2

*United States v. Percoco*, 16-CR-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ....... 6

*United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958) ...................................................... 12

*United States v. Sabri*, 973 F. Supp. 134 (W.D.N.Y. 1996) ........................................................... 3

*United States v. Sinclair*, No. 10-CR-6211L, 2013 WL 6148078 (W.D.N.Y. May 10, 2013)..... 17

*United States v. Williams*, 504 U.S. 36 (1992) ......................................................................... 3, 4

## INTRODUCTION

Mr. Hwang's Motion to Dismiss the Indictment for Prosecutorial Misconduct argued that the Government induced pre-charge advocacy from Mr. Hwang—including two proffer sessions and several presentations by the defense team—through two related misrepresentations:  that Mr. Hwang was merely a subject, and not a target, of the Government's investigation, and that the Government was open-minded about whether or not to charge Mr. Hwang.  Mr. Hwang's Moving Brief (ECF 50, "Mov. Br.") demonstrated that he was not a subject, but was in fact a target, either at the time the Government made its representation or at some point thereafter.  And it pointed to significant evidence that the Government, far from being open-minded, had for all intents and purposes made up its mind to indict Mr. Hwang well before his legal team made at least its final presentation on his behalf—a presentation that addressed topics specifically requested by the Government and one that included some of the bases for Mr. Hwang's likely defense at trial.  The Moving Brief showed that both misrepresentations are remediable by this Court's inherent supervisory authority.  And it requested a hearing to further flesh out gaps in the factual record before settling on the appropriate remedy.

The Government's Opposition Brief (ECF 55, "Opp.") attempts to show that Mr. Hwang's claims are not cognizable and that there are no disputed facts.  It fails on both counts.  By misreading the Moving Brief at every turn, the Government attributes arguments to Mr. Hwang that he never made, while ignoring the ones he did make.  In an attempt to show that there are no further facts for the Court to discover, the Government introduces four brief, conclusory Declarations that shed no light on the Government's investigative process and raise more questions than they answer.  The Opposition Brief says next to nothing about various crucial steps leading up to the Indictment, leaving important questions that cannot be answered without a hearing.

## ARGUMENT

**I.   The Court's Supervisory Authority Provides a Basis for Relief.**

The Opposition Brief consistently mischaracterizes the defense's arguments, setting up strawmen only to knock them down.  Mr. Hwang is *not* arguing (and argued nowhere in his Moving Brief) that grand jury irregularities (Opp. 10-11, 15-16, 18-19), the right against self-incrimination (Opp. 12-13, 24-26), the Sixth Amendment (Opp. 22-24), or substantive due process (Opp. 13-14, 21-22) provide a basis for relief.  His citations to the Constitution in his Moving Brief instead provided context for a proper understanding of prosecutors' "heightened ethical obligation[s]," *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017), demonstrating that our entire system of justice—from pre-indictment investigation to post-indictment trial practice— turns on prosecutors' core obligation to be candid and fair, and to refrain from engaging in "fundamentally unfair tactics," *United States v. Ciambrone*, 601 F.2d 616, 623 (2d Cir. 1979). Each of these doctrinal points supports that understanding:  prosecutors must be honest before the grand jury, may not mislead a defendant into waiving *Miranda* rights, may not use false statements in search warrant affidavits, and may not use misrepresentations to intrude on a defendant's relationship with counsel.  *See* Mov. Br. at 17-18.  But to be clear, none of these specific violations are what Mr. Hwang alleges in this case.  What he does allege is that prosecutors deceived him through their actions and especially their inactions—that is, their failures to correct what they knew to be Mr. Hwang's and his counsel's misunderstanding of Mr. Hwang's status in the investigation.

And this kind of violation is precisely the kind of conduct that, because it is not addressed by existing doctrine, falls within the Court's supervisory authority.  *See, e.g.*, *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438 (D. Md. 1986) ("Exercising the inherent authority is most appropriate in particular fact situations that do not lend themselves to rules of general application."); *United States v. Dolaway*, No. 12-cr-6097 (FPG), 2014 WL 2040041, at *3

(W.D.N.Y. May 15, 2014) ("While this Court does indeed possess supervisory powers, they are generally used in situations where other remedies do not adequately address the alleged improper conduct.").  As we have argued, the Court can "exercise its supervisory powers to formulate procedural rules not mandated by the Constitution" to "supervise the administration of justice in the federal courts."  *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996).  Crucially, this supervisory authority is not, as the Government seems to contend, limited to remedying misconduct before the grand jury; it is instead a "general supervisory authority over members of the bar of this Court," the regulation of which is "within the traditional role of the Court."  *Id.* at 792-93; *see also United States v. Sabri*, 973 F. Supp. 134, 148 (W.D.N.Y. 1996) (noting that while supervisory authority is "more commonly raised in connection with irregularities in the grand jury proceedings," the court would use its supervisory authority to dismiss indictment where the government used undisclosed informants to intrude on the attorney-client relationship); *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 137 (2d Cir. 2017) (noting that if misconduct in the implementation of a deferred prosecution agreement came to a district court's attention, "the district court might very well be justified in invoking its supervisory power *sua sponte* to monitor the implementation of the DPA or to take other appropriate action"); *United States v. Nejad*, 521 F. Supp. 3d 438, 452 (S.D.N.Y. 2021) (Nathan, J.) (noting that district courts have "inherent supervisory power to investigate misrepresentations to the Court and sanction attorney misconduct").

The case law cited in the Moving Brief for the proposition that the Court's supervisory authority extends beyond review of grand jury misconduct goes unmentioned in the Opposition Brief.  The Government's repeated emphasis on the limitations on a court's review of grand jury misconduct, including by citation to, for example, *United States v. Williams*, 504 U.S. 36 (1992),

and its statement that "[e]verything Hwang complains about occurred outside of the grand jury process and during voluntary interactions with the U.S. Attorney's Office," therefore miss the point.  Opp. 10-11, 15-16.   As the Government itself points out, Mr. Hwang seeks to invoke the Court's supervisory authority *outside* the grand jury context, so his arguments are not subject to the strictures of cases like *Williams*.  Likewise, Mr. Hwang does not argue that the Government violated his substantive due process rights; indeed, the Moving Brief specifically demonstrated that misconduct justifying an invocation of supervisory authority can be based on conduct that does not rise to the level of a due process violation—case law the Government does not attempt to rebut.  *See* Mov. Br. at 27 (citing cases).  Nor does Mr. Hwang argue that the Government violated his Sixth Amendment right to counsel, which he concedes did not attach until the Indictment was issued; rather, he argues that by inducing a presentation by Mr. Hwang's counsel, the Government engaged in conduct functionally similar to an intrusion into the defense camp—again a matter that should be subject to the Court's supervisory power.  *See* Mov. Br. at 36-38.

In sum, the Government's argument that the Court lacks supervisory authority to redress the prosecutors' fundamentally dishonest conduct because that conduct does not violate any of Mr. Hwang's constitutional rights rebuts arguments that Mr. Hwang has not made and ignores the one that he has.  The Court's supervisory authority should be invoked so as not to leave this conduct un-redressed, though no specific doctrinal strand provides for a remedy.  That is what supervisory power is for.  It should be exercised here to allow the Court to address the Government's deceit.

## II.     The Government's Misrepresentation of Mr. Hwang's Status is Subject to the Court's Supervisory Authority.

The Government concedes that in late 2021, it represented to Mr. Hwang's counsel that he was a subject of its investigation.  Opp. at 5.  That statement was either false when it was made, or it became false at some later point before Mr. Hwang was indicted.  When that occurred is not

a fact that the Government provides to the Court in its certifications or its brief; this should be one subject of the evidentiary hearing that Mr. Hwang has requested.  There are, however, at least two essential facts that are undisputed:  first, that the Government never advised Mr. Hwang of the change in his status, Opp. at 33-34; and second, that Mr. Hwang's counsel, not having been so advised, continued to share their perspective on the case, including their factual contentions and legal theories, with the Government.  Opp. at 6-10.

The question of whether this conduct can and should be addressed by the Court and a remedy provided is strictly one of law:  did the Government have a duty to correct the statement it had made to defense counsel once it knew that it was no longer true?  Mr. Hwang has shown that the law supports that it did.  *See* Mov. Br. at 19-23, 28.  The Government's response is that no remedy has been forthcoming in other cases, *see* Opp. at 18-19, but this position does not account for what the case law says (as opposed to its ultimate determinations, reached on different, often less egregious, facts).  Thus, the cases cited in the Moving Brief established at least the possibility that, upon the necessary showing—not made in those cases—prosecutorial misrepresentations as to investigatory status could merit invoking the Court's supervisory authority.  *See, e.g.*, *United States v. Myers*, 123 F.3d 350, 358 (6th Cir. 1997) (declining to invoke its supervisory powers, but only because there was no evidence of governmental bad faith); *United States v. Babb*, 807 F.2d 272, 279 & n.6 (1st Cir. 1986) (if government falsehoods as to status had materially induced perjury, "then [the] conviction would have been a product of the prosecutor's improper conduct, and we would have been willing to exercise our supervisory powers")[1]; *United States v. Gillespie*,

---

[1] The Government is particularly critical of the First Circuit's decision in *Babb*, which it describes as "neither persuasive authority nor relevant" because there is no current factual basis to conclude that any conviction of Mr. Hwang would be the product of its improper conduct.  Opp. at 21.  Of course, that is true, at this point, but this argument demonstrates the importance of holding a *Kastigar*-type hearing to determine the extent to which the Government's conduct has affected the

974 F.2d 796, 802 (7th Cir. 1992) (limiting itself to "verbal admonitions" because there was no indication that the government had, in that case, misrepresented the defendant's status); *United States v. Drake*, 310 F. Supp. 3d 607, 629, 635-36 (M.D.N.C. 2018) (declining to invoke supervisory authority because government misrepresentations led to no prejudice, but noting that status misrepresentations have "a significant capacity to mislead as to the Government's knowledge and possible future consequences").

In fact, the law is fairly clear.  While the Government is right that, as Mr. Hwang has always conceded, prosecutors were under no obligation to inform Mr. Hwang or his lawyers about his investigatory status, once the Government did make such a representation, it owed it to Mr. Hwang to be truthful.  *See, e.g.*, *Drake*, 310 F. Supp. 3d at 632 (distinguishing cases where the Government refrains from giving a target warning from cases where the Government gives "inaccurate and misleading information" with respect to a person's status); *United States v. Percoco*, 16-cr-776 (VEC), 2017 WL 6314146, at *25 (S.D.N.Y. Dec. 11, 2017) ("It would be of grave concern if a representative of the prosecution intentionally misled targets of an investigation into believing that they were mere subjects in order to lure them into making proffers.").  The Government ignores this body of law, taking the extreme position that because it "has no legal obligation at all to inform a person of his status with respect to a criminal investigation . . . there can be no duty to continually update a person of changes with respect to his status."  Opp. at 33.  But if one cannot misrepresent a fact, it necessarily follows that one should not allow a statement that may have been true when made but has since become false to stand uncorrected.  This is the law applicable to criminal defendants accused of false statements, as well as to civil litigants accused of actionable fraud or

_____

conduct of this case.  Mov. Br. at 37-38.  Indeed, this hearing is required to address the Government's repeated, but premature, contention that Mr. Hwang has not shown that he was prejudiced by its misrepresentations.  *See* Opp. Br. at 14, 26-28.

deceit.  *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 357 (2005) (misleading omissions qualify as false representations); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (mail fraud, wire fraud, and bank fraud statutes prohibit omissions of material information, and "it is just as unlawful to speak half truths or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading"); *McAuley v. Int'l Business Machines Corp., Inc.*, 165 F.3d 1038, 1046 (6th Cir. 1999) ("[A] representation can become misleading through future changes in events."); *In re Int'l Business Machines Corp. Securities Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event.").

The Government attorneys apparently do not believe that this law should apply to them. Indeed, they go so far as to argue that "[t]he SDNY prosecution team did nothing to merit sanction . . . even if the Government had viewed Hwang as 'target' instead of 'subject' at the time of the Fall 2021 call [when it advised Mr. Hwang he was a subject]."  Opp. Br. at 15.  But, as shown, this is not the law; indeed, the Government's argument openly, and alarmingly, seeks a free pass for misstatements, one that the law does not provide.

In any event, even assuming that the prosecutors were telling the truth when they advised Mr. Hwang that he was only a subject of the investigation—a fact which could be subject to question, but which Mr. Hwang accepts for purposes of this argument[2]—he certainly became one

---

[2] The language used in the search warrants and affidavits provided in discovery certainly suggests that, per the Department of Justice's definition of "target," Mr. Hwang was a "putative defendant" even before the Government told counsel he was only a subject in November 2021.  DOJ Manual § 9-11.151.  For example, SDNY's July 21, 2021 pen-trap and search warrant applications reference the investigation of "Bill Hwang, Andrew Mills, William Tomita, Patrick Halligan, and Scott Becker," Mov. Br. at 3 (citing Ex. A at ¶ 2), four of whom were ultimately indicted. Likewise—and left unaddressed by the Government—the September 27, 2021 affidavit in support of its request for a Stored Communications Act court order states that misrepresentations "were occasioned by Tomita and/or Becker, at the direction of Hwang"; that "there is probable cause to

by the time he was indicted, something the Government cannot and does not dispute.  Instead, the Government appears to contend that, by its conduct, it did inform Mr. Hwang's counsel that he was a target.  In particular, the Government emphasizes that the prosecutors told Mr. Hwang's counsel on April 1, 2022 that they had "serious concerns about the lawfulness of Hwang's conduct and the credibility of his responses" at his second in-person proffer.  Opp. at 8; Mov. Br. at 9; Lustberg Decl. ¶ 21.  But "serious concern" is very different from a target designation, which requires that the prosecutors have "substantial evidence linking [a person] to the commission of a crime" and that the prosecutors judge the person "a putative defendant."  DOJ Manual § 9-11.151.  That, of course, is not what the Government indicated to defense counsel; indeed, the Government's express "concern" was as much about the Government's belief in Mr. Hwang's answers as it was about the lawfulness of his actions.  Moreover, this conversation occurred long after several of Mr. Hwang's counsel's presentations, including at least one that was directed to particular questions that the Government posed (*see* Mov. Br. at 5-6 ("At the conclusion of the proffer, the AUSAs posed specific follow-up questions to which Mr. Hwang's counsel agreed to respond as quickly as possible."); Lustberg Decl. ¶¶ 12-13), and more importantly, after Mr. Hwang's two in-person proffer sessions, meaning that those sessions indisputably occurred without Mr. Hwang having been told that he was a target.

---

believe that Archegos, at the direction of Hwang, engaged in a manipulation trading strategy designed to cause others to trade in securities of companies in which Archegos had invested at prices artificially inflated by a pattern of undisclosed buying by Archegos that gave the false impression that numerous actors in the market were actively trading"; that Hwang's search history and Google payments history likely contained evidence of his "use of criminal proceeds"; and that Hwang's Google drive content, Google docs, and Google Calendar and location history likely contained evidence of Hwang's "association with co-conspirators."  These statements are, at the very least, strong evidence of "the Government's firm opinion as to wrongdoing by [Hwang] and its consideration of [him] as a putative defendant."  *Drake*, 310 F. Supp. 3d at 624.

The same is true of the other facts that the Government claims render irrelevant its acknowledged failure to correct its prior statement that Mr. Hwang was a subject and not a target, including that when Mr. Hwang's counsel requested additional time to prepare its presentation to the Government, the prosecutors asked to take possession of Mr. Hwang's passport,[3] as well as their statement that senior leadership intended to make a charging decision by the end of April 2022.  Opp. at 33-34.  These statements too occurred long after two of Mr. Hwang's counsel's presentations, though immediately after both of Mr. Hwang's interviews, leading to at least the reasonable inference that the Government held off on making these remarks until it got Mr. Hwang to talk.  And both failed to correct the prior description of Mr. Hwang as a subject, in the language used not only by the Department of Justice, but by all who practice federal criminal law, to formally convey the idea that a client may well be charged.  Indeed, allowing the Government to use such surrogate target warnings to update its prior subject warnings would undermine the purpose of these warnings and thereby introduce significant uncertainty into pre-charge advocacy.

Finally, the Government seeks to shift the burden of clarifying Mr. Hwang's status to the defense, arguing that "if the issue of Hwang being a 'target' as opposed to a 'subject' were of such importance to Hwang, one wonders why counsel did not address the issue immediately before either or both interviews."  Opp. at 29.  This question answers itself: the Government had already said that Mr. Hwang was a subject, and counsel—obviously unwisely—believed that the Government would be candid about any changes in that status.  This was wrong, but blaming Mr.

---

[3] The Government did not, in fact, take possession of Mr. Hwang's passport, when it was told that Mr. Hwang had misplaced it.  Nor did the Government take any other measures in response to this information.

Hwang's attorneys for that seems perverse indeed.  It was the Government that misrepresented Mr. Hwang's status.[4]

Ultimately, Mr. Hwang is not requesting that the Court demand anything very burdensome from federal prosecutors.  They are not, for example, required to inform people of their target or subject status, either affirmatively or even when asked.  But when those warnings are given, they must be truthful, so long as they last—that is, if the status changes, those statements should, in the tradition of prosecutorial candor, and consistent with legal doctrine, be updated.  Anything less permits agents of the United States Government to use misrepresentations to obtain statements from potential defendants, a practice that should not be countenanced by this or any other Court.

### III.    The Government's Misrepresentation of its Open-Mindedness Is Subject to the Court's Supervisory Authority.

Mr. Hwang also seeks relief on a second and independent basis, which is that the Government continually—and affirmatively—sought additional information from Mr. Hwang on the pretense that it was open-minded, when in fact, it had already decided to indict him.  The Government's response on each of the elements of this claim is unsatisfying and insufficient, and demonstrates the need for a hearing.

As to the first aspect of this claim, that the Government sought information from Mr. Hwang—often very specific information—the record is clear.  From early on in Mr. Hwang's involvement in the investigation (although many months into the Government's work on the

---

[4] The Government also repeatedly emphasizes that the proffers and sessions between Mr. Hwang, his counsel, and the Government were "voluntary."  But that does not help the Government.  Mr. Hwang's point is not that the meetings were somehow coerced—it is that they were induced by misrepresentations, and that Mr. Hwang's decision to "volunteer" was of course based, in part, upon what the Government had told his counsel about his status and the Government having an open mind, discussed below.  As courts have noted, when prosecutors make misleading target/subject warnings "defense counsel is prevented from intelligently rendering . . . advice." *Drake*, 310 F. Supp. 3d at 625.

matter), the Government asked Mr. Hwang's counsel to address specific inquiries that it had.  *See* Mov. Br. at 5 & n.5.  Thus, at the conclusion of an attorney proffer given by Mr. Hwang's attorneys on January 7, 2022, the Government posed a series of follow-up questions, Lustberg Decl. ¶ 12; Ex. F; Ex. G, which Mr. Hwang, through counsel, answered in detail at a second attorney proffer session, Mov. Br. at 5; Lustberg Decl. ¶¶ 12-13; Ex. H.

Following that proffer, the Government set forth specific topics it wished Mr. Hwang to discuss in two in-person proffers.  Lustberg Decl. ¶ 14; Ex. I.  And following those two in-person proffers, the Government requested further presentations—including one as to which, in its own words, "the Government would benefit from Hwang's counsel's thoughts on certain topics, including Hwang's state of mind during his trading, as it considered potential charges."  Opp. at 8.  This is true, if a bit understated:  initially, the prosecutors, during their April 9 call with Mr. Hwang's counsel, requested a "focused discussion . . . about Mr. Hwang's intentions," Mov. Br. at 11; Lustberg Decl. ¶ 25, one that would include specific information as to "what Bill [Hwang] meant by" his trading activity, which the Government described as a "key consideration," Thomas Decl. Ex. D.  Indeed, the prosecutors informed Mr. Hwang's counsel that an "effective" presentation would address Mr. Hwang's "state of mind" and "intent" (Mov. Br. at 9; Lustberg Decl. ¶ 21) and would include specific topics that it would be "productive to focus on," including Mr. Hwang's intent when trading, his understanding and delegation of communications with counterparties, and further information on Archegos's agreement with Credit Suisse.  Podolsky Decl. Ex. B.  In sum, the Government effectively concedes that it made particularized requests for information from Mr. Hwang—requests going to the kind of evidence that is otherwise difficult to obtain, *i.e.*, proof of Mr. Hwang's state of mind and intent.

Nor, regarding the second aspect of the claim, does the Government deny that it gave Mr. Hwang's counsel the impression that, in asking these questions, it was conducting a truly open-minded inquiry, and was considering taking action other than charging Mr. Hwang. Indeed, the very act of requesting specified factual and legal information at least implied that the requested facts and analysis could have a material effect on the Government's decision whether to indict Mr. Hwang. Meanwhile, the Government does not provide the facts that would allow the Court and the defense to fully assess the honesty of the Government's conclusory contention as to when it actually decided to indict Mr. Hwang. To the contrary, the Government perfunctorily contends that "[f]ollowing Hwang's fourth and final presentation, and further internal consideration, the Deputy United States Attorney authorized the SDNY prosecution team to seek an indictment against Hwang. The grand jury returned the Indictment later that day and a magistrate judge issued a warrant for Hwang's and Halligan's arrests." Opp. at 9-10 (citing Garnett Decl. ¶¶ 3-4 ("After Hwang's April 25, 2022 presentation, and following internal deliberations, I decided that the filings of certain charges against Hwang was appropriate and directed the case team to seek the return of an indictment.")). But it conspicuously fails to adduce the facts that would actually allow the Court to fully consider this issue, facts like the following:

- When the 59-page Indictment was first drafted;
- Whether and when a pre-Indictment charging memo justifying every Count in the Indictment was drafted;
- When the Indictment was first presented to the grand jury;
- How long the grand jury process took, and how many witnesses were presented[5];

---

[5] This motion shows Mr. Hwang's particularized need for review of grand jury minutes, which would provide valuable information that would allow the Court and counsel to fully assess at what point the Government actually began to seek Mr. Hwang's indictment, and thus the extent to which that had occurred even as it made inquiries of Mr. Hwang. *See United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958) (movants must show a "particularized need" to review grand jury minutes); *United States v. Naegele*, 474 F. Supp. 2d 9, 10-12 (S.D.N.Y. 2007) (granting motion to inspect grand jury minutes and an evidentiary hearing).

- When approval was sought from, and granted by, the Department of Justice for the inclusion of RICO charges;
- When the grand jury session for the afternoon of April 25 was scheduled, and at what time that day it took place;
- When the press conference held two days after the April 25 presentation and attended by the Deputy Attorney General of the United States was scheduled and arrangements for it were made, including when the demonstratives displayed for the press were developed and prepared; and
- When the SEC and CFTC, with whom the prosecution carefully coordinated its efforts, as demonstrated by the fact that both filed complaints against Archegos and its personnel within hours of the Indictment's unsealing, were advised that Mr. Hwang would be indicted.

All of these considerations, as well as others flowing from earlier statements made in search warrant affidavits,[6] and in pleadings in the case of purported co-conspirators Becker and Tomita which pre-dated counsel's April 25 presentation,[7] bear on determining whether the Government was genuinely undecided as to whether it would charge Mr. Hwang, yet continued to elicit information after that time, even as it pretended to be seriously considering the issue.

There is one final, undisputed fact: the Government certainly did not advise Mr. Hwang's counsel that their client was about to be indicted. The prosecutors offer no argument, as they do with regard to the issue of Mr. Hwang's status, that counsel should have known that. And to be sure, Mr. Hwang's counsel clearly did not know it, as evidenced by the fact that they were still preparing submissions to the Government and communicating with the prosecutors—who

---

[6] For example, FBI Agent Thomas McDonald's affidavit in support of a request for a court order under the Stored Communications Act, dated September 27, 2021, provides significant evidence that the Government intended to indict Mr. Hwang as of that date. Mov. Br. at 3-4; Lustberg Decl. ¶ 6; Ex. B; *supra* n.3 ("I believe that there is probable cause to believe that Archegos, at the direction of Hwang, engaged in a manipulation trading strategy designed to cause others to trade in securities of companies in which Archegos had invested at prices artificially inflated by a pattern of undisclosed buying by Archegos that gave the false impression that numerous actors in the market were actively trading.").

[7] For example, the Government's sealed informations against Becker and Tomita each state that Mr. Hwang was a member of their racketeering conspiracy. *See* Case No. 22-cr-231 (LTS) ECF 1 at ¶ 2; ECF 2 at ¶ 2.

welcomed the communications—after the indictment had been returned (but before it was unsealed). Mov. Br. at 13-14 & n.9; Lustberg Cert. ¶ 30; Ex. R. To be sure, prosecutors need not have advised counsel that their client would be, or had already been, indicted, and Mr. Hwang does not claim that they were required to. But nor should they have continued to elicit information on the false pretense that the issue was undecided. Their obligation of candor required either that they honestly advise Mr. Hwang that he would be indicted, or, if they did not, that they cease information-gathering from his counsel after that decision had been made.[8]

As set forth in Mr. Hwang's moving papers, SDNY's actions are deeply disturbing and inconsistent with the kind of forthright and honorable behavior that is demanded of federal prosecutors. *See* Mov. Br. at 16-17; *Berger v. United States*, 295 U.S. 78, 88 (1935) ("[A United States Attorney is] the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *Connick v. Thompson*, 563 U.S. 51, 65-66 (2011) ("Prosecutors have a special duty to seek justice, not merely to convict."). Under these circumstances, and particularly in light of other evidence of this Office's record of acting in a way that is less than honorable,[9] the Court can and should exercise its supervisory power to enforce the most basic norms of prosecutorial conduct.[10] At the very least, it should hold a hearing to develop the facts necessary to this determination.

---

[8] Mr. Hwang acknowledges that, as the prosecutors argue, Opp. at 33, if the Government was set on indicting him, it could continue to employ its normal investigatory tools, just as it could before that time. It just could not request specific information from him or his counsel under false pretenses.

[9] *See, e.g.,* Mov. Br. at 22-23 (citing cases); *United States v. Ahuja et al.*, 18-cr-328 (KPF), ECF 456 & 457 at 10-18.

[10] The Government's contention that enforcing those norms will lead it to "cease to entertain pre-charge advocacy on behalf of potential defendants" is a petty and disturbing response. It is the Government's conduct here that will discourage defense counsel from providing information to

**IV.     The Court Should Conduct a Hearing to Determine the Appropriate Relief.**

The Government contends that this motion is an attempt "to spare the defendant from meeting the accusations of the Indictment," Opp. at 2—that is, "spare him a criminal trial," Opp. at 36.  This is false.  Mr. Hwang is, as the Government knows, litigating this matter in the way that the Rules allow, and will try this case, if necessary, in the same way.  But beyond falsely implying that Mr. Hwang's action amount to an effort to get off on a technicality, the Government's statements distort the Moving Brief by focusing only on dismissal, ignoring the full range of relief Mr. Hwang seeks.  In fact, at this point, the principal relief Mr. Hwang seeks is a hearing to further flesh out the facts, including both the facts as to what happened and the effect of the prosecution's action on the case, and then to determine an appropriate remedy, whether a hearing, suppression, dismissal, or any other alternative the Court concludes is appropriate.

Certainly, a hearing is warranted given the substantial gaps in the record—described above—that continue to exist, notwithstanding the Government's attempts to argue that there are no disputed or missing facts.  Most basically, a hearing would establish when, in fact, Mr. Hwang became a target of the investigation.  While the Government's submissions conclusorily state that as late as the Fall of 2021, prosecutors considered Mr. Hwang a subject, Mr. Hwang, just as in *Drake*, is entitled to test those statements to ascertain the point at which the prosecutors' prior statements ripened into a misrepresentation.  *See* 310 F. Supp. 3d at 621-22 (reviewing prosecutors' emails to determine whether a subject warning to a defendant was accurate).  As well,

---

the Government, while encouraging prosecutorial candor will likely increase the extent and value of pre-charge advocacy, to the benefit of both the defense, which will thus be afforded real, as opposed to illusory, opportunities to avoid unjust prosecutions, and the Government, which will gain the benefit of such presentations to the end of not wasting time on cases that ought not be brought while gaining insight into the defense position, but in an honest way.  The Government's threat that if it fails in this motion, it will "take its ball and go home" is, like its conduct here, unseemly and unfortunate.

and as is discussed above, there are serious gaps in the record as to when the Government in fact decided to prosecute Mr. Hwang. Filling those gaps would provide Mr. Hwang with the opportunity to test the Government's cursory denials of any misconduct.

Finally, at a hearing, the Court could assess what information the Government acquired from Mr. Hwang and defense counsel under false pretenses and how it has used and intends to use that information, as described above and in Mr. Hwang's prior submissions. The result, as discussed in Mr. Hwang's Moving Brief, would be familiar to the Court: a *Kastigar*-type hearing to determine whether and to what extent the Government obtained the defense's potential trial strategy, and the extent of the resulting prejudice to Mr. Hwang. *See* Mov. Br. at 37-38 (citing *United States v. Kastigar*, 406 U.S. 441 (1972)). Such a hearing would create a record that would allow the Court to determine whether the Government's current trial strategy is derived from information acquired during the proffer sessions and April 25 presentation; if the Government cannot show that its proposed evidence and trial strategy derive from other sources, then the proper remedy would be dismissal. *See Kastigar*, 406 U.S. at 461-62; *United States v. Danielson*, 325 F.3d 1054, 1071-72 (9th Cir. 2003) (applying a modified *Kastigar* hearing to determine whether governmental intrusion into the defense camp tainted the prosecution).[11] Alternatively, the Court could order the suppression of statements Mr. Hwang made to the Government.[12] This is

---

[11] It may also be appropriate for the Court to review limited discovery from the Government on this subject *in camera*. *See, e.g.*, *Drake*, 310 F. Supp. 3d at 626 n.17.

[12] The Government argues that Mr. Hwang waived his right to move to suppress statements made under the Proffer Agreement. Opp. Br. at 28 (citing ECF 54-3 at ¶ 5). But that refers only narrowly to the fact that the proffer agreement addressed any Fifth Amendment concerns; the Agreement is properly read to preclude a *Miranda*-type suppression motion, not one based upon the Court's supervisory authority. Moreover, the pertinent paragraph (¶ 5) of the Proffer Agreement only applies to the Government's "offering in evidence" Mr. Hwang's statements. It does not apply to the broader "use" of those statements discussed in Paragraph 3(c), which, to be clear, Mr. Hwang does not concede is permitted by the Proffer Agreement.

particularly important given the Government's position that under the proffer agreements upon which the Opposition heavily relies, "the Government may . . . use statements made by [Mr. Hwang] (including arguments made or issues raised *sua sponte* by the District Court) at any stage of the criminal prosecution (including bail, all phases of trial, and sentencing) in any prosecution brought against [Mr. Hwang]," Thomas Decl. Ex. C at ¶ 3(c), as the Government is already seeking to do.[13]

In any event, given the flexibility granted to courts to determine the appropriate remedy to be imposed in the exercise of their supervisory power, that issue should await the conclusion of a hearing at which these issues—both the facts as to what happened and their effect on the case—will be fully aired.  *See, e.g.*, *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (noting that courts have flexibility in determining the proper remedy for prosecutorial misconduct and must consider the government's willfulness in committing the misconduct and its willingness to own up to it); *United States v. Sinclair*, No. 10-cr-6211 (FPG) (MWP), 2013 WL 6148078, at *7 (W.D.N.Y. May 10, 2013) ("Courts have the inherent supervisory authority to fashion appropriate remedies to redress governmental misconduct.").  But first, a hearing should be held.

---

[13] Notwithstanding the Government's reference to the Proffer Agreement limiting its use of Mr. Hwang's statements to impeachment (Opp. Br. at 28), the Government is already using those statements more broadly here.  Thus, for example, in its brief, the Government seeks to use against Mr. Hwang his statement at his second proffer that he "was not aware that his trading could be moving the market because the market 'is a complicated thing.'"  Opp. Br. at 7.  Leaving aside that the Government omits that immediately after that statement, the Government's own notes show that Mr. Hwang explained that there are many market participants, and one cannot predict with confidence how they will react to events (for example, he explained that if Archegos's counterparties were purchasing stocks as hedges and lending them out to short sellers, there was effectively unlimited volume in the market, and the result of buying a long-side swap could actually be to facilitate short-selling in the referenced security and depress its market price), the Government's reference to this statement shows that it in fact intends to use what Mr. Hwang said at his proffer against him, and how it is already doing just that.

## **CONCLUSION**

For these reasons and those set forth in the Moving Brief, Defendant Hwang respectfully requests that the Court dismiss the Indictment, or, in the alternative, set a hearing to determine the disputed facts discussed above and determine the appropriate remedy for the Government's misconduct.

Dated: January 27, 2023

Respectfully Submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Thomas R. Valen
Jeffrey L. Nagel
GIBBONS P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com