UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                           :

UNITED STATES OF AMERICA        :

                           :     No. 22-CR-240 (AKH)

      - v. -               :

                           :

SUNG KOOK (BILL) HWANG and    :
PATRICK HALLIGAN,           :

                           :

               Defendants.   :

                           :

-------------------------------------------------------------- x

## DEFENDANT PATRICK HALLIGAN'S REPLY MEMORANDUM IN SUPPORT OF OMNIBUS PRETRIAL MOTIONS

FRIEDMAN KAPLAN SEILER &
 ADELMAN LLP

7 Times Square
New York, NY  10036-6516
(212) 833-1100

January 27, 2023           *Attorneys for Patrick Halligan*

3707749.1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ......................................................................................................4

I.     THE GOVERNMENT HAS FAILED TO STATE OFFENSES WITHIN THE
MEANING OF THE CHARGED STATUTES ...............................................4

    A.    Count One (Racketeering Conspiracy) Should Be Dismissed As Against
Halligan Because It Fails to Allege Essential Elements of the Charged
Offense ................................................................................................6

        1.    The Indictment Fails Sufficiently to Allege an Agreement to
Engage in "Racketeering Activity" ..............................................7

        2.    The Indictment Fails Sufficiently to Allege A *Pattern* of
Racketeering Activity Because It Fails to Allege Continuity ...................10

            a.    The Government Must Allege an Agreement to Engage in a
Pattern of Racketeering, Including Acts that Meet the
Requirement of Continuity ............................................10

            b.    The Indictment Fails Sufficiently to Allege Closed-Ended
Continuity ...................................................................13

            c.    The Indictment Fails Sufficiently to Allege Open-Ended
Continuity ...................................................................14

        3.    The Indictment Fails Sufficiently to Allege Halligan's Agreement ..........20

    B.    Count Ten Fails to Charge a Violation of Section 10(b) or Rule 10b-5 ...............21

    C.    The Court Should Hold in Abeyance Any Ruling on Wire Fraud (Count
Eleven) or Alternatively Dismiss Count Eleven for Failure to Allege
Essential Elements .............................................................................23

II.    THE ALLEGATIONS IN PARAGRAPH 8 OF THE INDICTMENT ARE
IRRELEVANT AND PREJUDICIAL TO HALLIGAN AND THEY SHOULD
BE STRUCK .................................................................................................24

III.   THE GOVERNMENT SHOULD BE DIRECTED TO FILE A BILL OF
PARTICULARS ............................................................................................26

**Page**

    A.    The Government Should Comply with the Court's Previous Directive to Identify *All* Alleged Misrepresentations (Indictment ¶¶ 41-59) ...........................27

        1.    The Court Previously Ordered the Government to Identify *All* Alleged Misrepresentations, and the Government Has Not Complied................................................................................................27

        2.    Identification of *All* Misrepresentations Is Appropriate Under Existing Law, and the Government's Failure to Provide this Information Prejudices Defendants.............................................29

    B.    The Government Should Identify Unindicted Co-Conspirators and Other Details Regarding the Alleged RICO Enterprise (Count One).............................32

    C.    The Government Should Provide Particulars Related to the Alleged Securities Fraud Against Archegos's Counterparties (Count Ten)......................35

    D.    The Government Should Provide Particulars Related to Alleged Manipulative Trading.............................................................................37

IV.    THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH *BRADY*..........38

CONCLUSION..............................................................................................40

3707749.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. New World Coffee, Inc.,*
   No. 00-cv-2610, 2001 WL 293683 (S.D.N.Y. Mar. 27, 2001)................................19

*Brady v. Maryland,*
   373 U.S. 83 (1963).....................................................................3, 38, 39, 40

*Breslin Realty Dev. Corp. v. Schackner,*
   397 F. Supp. 2d 390 (E.D.N.Y. 2005) ...............................................19

*In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.,*
   583 F. Supp. 1388 (E.D. Pa. 1984) ...................................................9

*CFTC v. Archegos Cap. Mgmt., LP et al.,*
   No. 1:22-cv-3401, ECF 52 (S.D.N.Y. Nov. 8, 2022) ......................19

*Ciminelli v. U.S.,*
   142 S. Ct. 2901 (2022), *cert. granted* (Jun. 30, 2022) .........................23

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
   187 F.3d 229 (2d Cir. 1999)..........................................................15, 16

*In re Colonial Ltd. P'ship Litig.,*
   854 F. Supp. 64 (D. Conn. 1994).....................................................9

*CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP,*
   No. 20-cv-4877, 2022 WL 562934 (S.D.N.Y. Feb. 23, 2022) ...................16, 19

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185 (1976)...................................................................5

*First Pac. Bancorp, Inc. v. Bro.,*
   847 F.2d 542 (9th Cir. 1988) ..........................................................8

*Frey v. Maloney,*
   476 F. Supp. 2d 141 (D. Conn. 2007).................................................17, 18

*H.J., Inc. v. Northwestern Bell Tel. Co.,*
   492 U.S. 229 (1989)..................................................................12

*Holmes v. Sec. Inv. Prot. Corp.,*
   503 U.S. 258 (1992)....................................................................8

iii

**Page(s)**

*Int'l Bhd. Of Teamsters v. Carey*,
    297 F. Supp. 2d 706 (S.D.N.Y. 2004)...................................................................16

*Janus Cap. Grp. Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)...................................................................................................22

*Li Jun An v. Hui Zhang*,
    No. 13-cv-5064, 2013 WL 6503513 (S.D.N.Y. Dec. 6, 2013) ...............................18

*Lou v. Belzberg*,
    722 F. Supp. 1010 (S.D.N.Y. 1990).........................................................................9

*In re MDC Holdings Sec. Litig.*,
    No. 89-cv-0090, 1991 WL 537515 (S.D. Cal. July 2, 1991) ................................8, 9

*Medinol Ltd. v. Bos. Sci. Corp.*,
    346 F. Supp. 2d 575 (S.D.N.Y. 2004).................................................13, 14, 18, 20

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ...........................................................................8

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*,
    879 F.2d 10 (2d Cir. 1989).......................................................................................12

*Reich v. Lopez*,
    858 F.3d 55 (2d Cir. 2017).................................................................................12, 13

*Russell v. U.S.*,
    369 U.S. 749 (1962)...................................................................................................5

*Schnell v. Conseco, Inc.*,
    43 F. Supp. 2d 438 (S.D.N.Y. 1999)..................................................................15, 19

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) .......................................................................................22

*SEC v. Sung Kook (Bill) Hwang et al.*,
    No. 1:22-cv-3402 (S.D.N.Y. Nov. 4, 2022)............................................................19

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008).........................................................................14, 15, 17

*U.S. v. Aleynikov*,
    737 F. Supp. 2d 173 (S.D.N.Y. 2010).......................................................................4

*U.S. v. Altman*,
    820 F. Supp. 794 (S.D.N.Y. 1993) .........................................................................12

iv

**Page(s)**

*U.S. v. Applins,*
   637 F.3d 59 (2d Cir. 2011)............................................................................................11

*U.S. v. Arrington,*
   941 F.3d 24 (2d Cir. 2019)............................................................................................11

*U.S. v. Aulicino,*
   44 F.3d 1102 (2d Cir. 1995)..........................................................................................15

*U.S. v. Basciano,*
   599 F.3d 184 (2d Cir. 2010)..........................................................................................11

*U.S. v. Benjamin,*
   No. 21-cr-706, 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022)........................................6

*U.S. v. Berlin,*
   472 F.2d 1002 (2d Cir. 1973).........................................................................................4

*U.S. v. Berlin,*
   707 F. Supp. 832 (E.D. Va. 1989) ................................................................................12

*U.S. v. Bin Laden,*
   92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings*
   *of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) ......................................30, 31, 35, 36

*U.S. v. Bongiorno,*
   No. 05-cr-390, 2006 WL 1140864 (S.D.N.Y. May 1, 2006)..............................11, 12

*U.S. v. Bortnovsky,*
   820 F.2d 572 (2d Cir. 1987).........................................................................30, 35, 37, 38

*U.S. v. Cain,*
   671 F.3d 271 (2d Cir. 2012).....................................................................................10, 11

*U.S. v. Carroll,*
   510 F.2d 507 (2d Cir. 1975)..........................................................................................34

*U.S. v. Coiro,*
   922 F.2d 1008 (2d Cir. 1991)........................................................................................15

*U.S. v. Connolly,*
   No. 16-cr-00370, 2017 WL 2537808 (S.D.N.Y. May 24, 2017).............................38

*U.S. v. Crysopt Corp.,*
   781 F. Supp. 375 (D. Md. 1991) ...................................................................................12

*U.S. v. Curtis,*
   506 F.2d 985 (10th Cir. 1974) ........................................................................................5

v

**Page(s)**

*U.S. v. Davidoff*,
  845 F.2d 1151 (2d Cir. 1988) ..................................................................................5, 38

*U.S. v. Deeb*,
  175 F.3d 1163 (9th Cir. 1999) .......................................................................................10

*U.S. v. Eisenberg*,
  773 F. Supp. 662 (D.N.J. 1991) ......................................................................................9

*U.S. v. Fruchter*,
  104 F. Supp. 2d 289 (S.D.N.Y. 2000) ...........................................................................12

*U.S. v. Gabriel*,
  920 F. Supp. 498 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ..................28

*U.S. v. Giovannelli*,
  No. 01-cr-749, 2004 WL 48869 (S.D.N.Y. Jan. 9, 2004) ........................................13

*U.S. v. Gonzalez*,
  686 F.3d 122 (2d Cir. 2012) ...........................................................................................4

*U.S. v. Hawit*,
  No. 15-cr-252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ..................................35

*U.S. v. Heicklen*,
  858 F. Supp. 2d 256 (S.D.N.Y. 2012) .............................................................................6

*U.S. v. Indelicato*,
  865 F.2d 1370 (2d Cir. 1989) .........................................................................................15

*U.S. v. Lieberman*,
  15 F.R.D. 278 (S.D.N.Y. 1953) ......................................................................................36

*U.S. v. Mandell*,
  710 F. Supp. 2d 368 (S.D.N.Y. 2010) ...........................................................................30

*U.S. v. Mandell*,
  No. 09-cr-00662 (S.D.N.Y. Dec. 14, 2010) .................................................................30

*U.S. v. Minaya*,
  395 F. Supp. 2d 28 (S.D.N.Y. 2005) .............................................................................34

*U.S. v. Minicone*,
  960 F.2d 1099 (2d Cir. 1992), *as amended on reh'g in part* (Apr. 13, 1992) ......................15

*U.S. v. Mulder*,
  273 F.3d 91 (2d Cir. 2001) .............................................................................................24

vi

**Page(s)**

*U.S. v. Murgio,*
 209 F. Supp. 3d 698 (S.D.N.Y. 2016)...................................................36

*U.S. v. Murphy,*
 No. 21-cr-280, 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022).................32

*U.S. v. Nachamie,*
 91 F. Supp. 2d 565 (S.D.N.Y. 2000)........................................29, 34, 38

*U.S. v. Pinto-Thomaz,*
 352 F. Supp. 3d 287 (S.D.N.Y. 2018)....................................................34

*U.S. v. Rajaratnam,*
 No. 09-cr-1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ..............34

*U.S. v. Raniere,*
 384 F. Supp. 3d 282 (E.D.N.Y. 2019) ...................................................13

*U.S. v. Rosenblatt,*
 554 F.2d 36 (2d Cir. 1977)....................................................................20

*U.S. v. Sainato,*
 33 F. Supp. 2d 155 (E.D.N.Y. 1998) .......................................................4

*U.S. v. Savin,*
 No. 00-cr-45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ...............35, 38

*U.S. v. Sessa,*
 125 F.3d 68 (2d Cir. 1997)....................................................................10

*U.S. v. Stavroulakis,*
 952 F.2d 686 (2d Cir. 1992).................................................................4, 5

*U.S. v. Strawberry,*
 892 F. Supp. 519 (S.D.N.Y. 1995) ............................................30, 33, 34

*U.S. v. Thompson,*
 141 F. Supp. 3d 188 (E.D.N.Y. 2015) ...................................................12

*U.S. v. Trie,*
 21 F. Supp. 2d 7 (D.D.C. 1998).................................................3, 30, 33

*U.S. v. Vernace,*
 811 F.3d 609 (2d Cir. 2016)..................................................................13

*U.S. v. Walters,*
 No. 16 Cr. 338 (S.D.N.Y. Dec. 13, 2016)..............................................38

3707749.1

**Page(s)**

*U.S. v. Webb,*
    24 F. Supp. 3d 432 (M.D. Pa. 2014) .................................................................6

*U.S. v. Young & Rubicam, Inc.,*
    741 F. Supp. 334 (D. Conn. 1990) ................................................................12

*U.S. v. Zichettello,*
    208 F.3d 72 (2d Cir. 2000) ............................................................................21

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.,*
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ..........................................................16

**Statutes**

15 U.S.C. §§ 78ff .....................................................................................................7

15 U.S.C. §§ 78j(b) .......................................................................................... *passim*

18 U.S.C. § 2 ..........................................................................................................35

18 U.S.C. § 1343 .......................................................................................................7

18 U.S.C. § 1348 .......................................................................................................7

18 U.S.C. § 1961 ...........................................................................................7, 8, 9, 10

18 U.S.C. § 1962(c) ................................................................................................10

18 U.S.C. § 1962(d) ...................................................................................11, 18, 20

18 U.S.C. § 3500 ....................................................................................................33

**Rules & Regulations**

17 C.F.R § 240.10b-5 ....................................................................................... *passim*

17 C.F.R. § 240.10b-5(a) .......................................................................................35

17 C.F.R. §240.10b-5(b) .......................................................................................35

17 C.F.R. § 240.10b-5(c) .......................................................................................35

FED. R. CRIM. P. 7 ...............................................................................................4, 24

FED. R. CIV. P. 9 .........................................................................................27, 28, 31

FED. R. CRIM. P. 12(b) ...........................................................................................12

FED. R. EVID. 404(b) .............................................................................................25

Patrick Halligan respectfully submits this memorandum of law in further support of Defendants' omnibus motion (the "**Motion**").[1] Halligan expressly incorporates by reference, as if fully set forth herein, the arguments made in Sung Kook (Bill) Hwang's reply brief in further support of the Motion ("**Hwang Reply Br.**").

## PRELIMINARY STATEMENT

The Government initiated this prosecution with a 58-page speaking Indictment asserting legally flawed claims, and then immediately trumpeted its untested allegations on Twitter and during a press conference livestreamed on Facebook. But now that Defendants' omnibus motion has exposed the Indictment's numerous intractable legal deficiencies, the Government seeks to shield its allegations from close scrutiny.

The Government is wrong in its defense of its charges. Defendants' Motion properly asks the Court to evaluate whether the Indictment adequately alleges criminal violations within the meaning of the charged statutes, and to conclude that it does not. The Government insists repeatedly that it need do nothing more to survive the Motion than track the language of the statutes, and that any further analysis must await a trial. Where, as here, however, the Indictment goes further, including factual allegations and revealing legal theories that simply cannot be reconciled with the meaning of the statutory language, the Court is by no means powerless to intervene at this juncture. To the contrary, the whole purpose of a motion to dismiss is to prevent the need for a trial where the facts, taken as true, do not make out the charged offenses.

---

[1] Capitalized terms are used as defined in Defendants' opening brief ("**Defs.' Br.**"). The Government's opposition brief is referred to as the "**Opposition**" or "**Opp.**" Unless otherwise indicated, citations and quotations are omitted in case quotations throughout.

Halligan is charged in three counts of the eleven-count Indictment (Count One, charging a racketeering conspiracy; Count Ten, charging securities fraud; and Count Eleven, charging wire fraud). The Court need not, and should not, ignore the legal deficiencies that plague those counts. For example:

- On both the securities fraud charge (Count Ten) and the RICO conspiracy charge that relies heavily on the same facts (Count One), the Court is not required to ignore the Indictment's allegations that the misstatements occurred during discussions regarding capacity and margin rates (which are not securities), and did not concern the value of securities or the consideration received in any securities transaction. Those allegations fall short of satisfying the narrow and exacting requirement, applicable in criminal as well as civil cases, that the charged fraudulent conduct occur "in connection with" a securities transaction. *See* Pt I.B below and Hwang Reply Br. at Pt. I.D.1.

- On the wire fraud charge (Count Eleven), which also constitutes an object of the RICO conspiracy charge (Count One), the Court is not required to ignore that the allegation expressly rests on a controversial legal theory – referred to as the "right to control" theory – that the U.S. Supreme Court is currently reviewing and is widely predicted to reject. The Government argues that Count Eleven might survive under an alternative "money or property" theory of wire fraud, but the Indictment does not charge that theory. *See* Pt I.C below and Hwang Reply Br. at Pt. I.E.

The Government's responses to the remaining aspects of the Motion reflect a degree of gamesmanship that, if accepted, would withhold vital information from Halligan, prevent him from preparing his own defense, and prejudice him at trial.

The Government continues to refuse to provide basic, essential information regarding the charges against Halligan. This includes, most significantly, the Government's continuing refusal to comply with the Court's clear directive – entered nearly eight months ago – that the Government identify *all* the misrepresentations that it will seek to prove at trial. The Government now contends that the Court's order was not an order at all, and that mere "examples" of misstatements suffice. They do not, and the Government's recalcitrance defies not only the Court's prior order, but also the case law explaining that complete identification of the

2

misstatements is required so that Halligan is not forced to "waste precious pre-trial preparation time guessing which statements he has to defend against." *See U.S. v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998). *See* Pt. III below.

      The Government also continues to refuse to comply with its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to review and produce exculpatory materials possessed by the SEC and CFTC. Having investigated these matters together with the SEC and CFTC, interviewed witnesses together with the SEC and CFTC, stood together with the SEC and CFTC at the press conference announcing their simultaneously filed civil and criminal actions, and thanked those agencies for their valuable assistance, the Government cannot credibly claim that they did not conduct a "joint investigation." *See* Pt IV below and Hwang Reply Br. at Pt. IV.

      Finally, the Government seeks to salvage its irrelevant and prejudicial allegations about the criminal and regulatory proceedings at Hwang's prior hedge fund, Tiger Asia, by arguing that Defendants' motion to strike should await the Government's presentation of proof. This contention utterly fails to recognize the unfair and incurable prejudice that these irrelevant allegations would cause to Halligan, as well as Halligan's need for a prompt resolution of this issue so that he can evaluate whether a severance motion is necessary. *See* Pt. II below.

      The Government has made serious and damaging allegations against Halligan. For the reasons discussed below, it cannot now avoid confronting the legal insufficiency of those allegations. Nor, if any aspect of the Indictment survives this Motion, should the Government be allowed to conduct a trial by ambush. The Motion seeks appropriate and timely relief, and it should be granted.

## ARGUMENT

### I.

### THE GOVERNMENT HAS FAILED TO STATE OFFENSES WITHIN THE MEANING OF THE CHARGED STATUTES

The Government's brief repeatedly returns to the refrain that the Motion asks the Court to weigh facts rather than accept them as true, and seeks "premature" relief because the Indictment need only "track[] the relevant statutory language and provide[] the approximate times and places of the alleged offenses." Opp. at 10, 11, 18, 21, 43, 45. The Government's characterization of Halligan's arguments is wrong and its recitation of the standards applicable to this Motion is incomplete. These threshold errors infect the Government's defense of each charge against Halligan.

First, the Government is wrong that mere recitation of the statutory language is dispositive of the Indictment's sufficiency. Rule 7 of the Federal Rules of Criminal Procedure "imposes two requirements: the statement of the essential facts *and* the citation of the statute. *They are separate requirements and not a restatement of one another*." *U.S. v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (emphases in original). Accordingly, even if the Indictment cites or tracks the language of the charged statutes, the Court still must scrutinize the Government's factual allegations to determine if they "are sufficient in law to support a conviction." *U.S. v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010); *see also U.S. v. Berlin*, 472 F.2d 1002, 1006 (2d Cir. 1973) (trial court should have dismissed certain counts in the indictment for failure to sufficiently allege knowledge of falsity, an essential element of the charged statute); *U.S. v. Stavroulakis*, 952 F.2d 686, 694-95 (2d Cir. 1992) (looking beyond the fact that the indictment "track[s] the language" of the statute to determine if the indictment adequately alleges "any fraudulent conduct directed at a bank"); *U.S. v. Sainato*, 33 F. Supp. 2d 155, 159 (E.D.N.Y. 1998)

(finding that the indictment tracked the language of the statute but then analyzing the meaning of "dishonesty and deceit" with respect to the facts alleged in the indictment).

The Government also ignores that merely tracking the language of a charged statute is inadequate when the statutory definition of an offense includes generic terms. *See Stavroulakis*, 952 F.2d at 693 (noting "the Supreme Court's caveat that when the definition of an offense includes 'generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.'") (quoting *Russell v. U.S.*, 369 U.S. 749, 765 (1962)). This principle applies with particular force in this case, as all the statutes under which Halligan has been charged – the RICO conspiracy, wire fraud, and securities fraud statutes – include the type of generic language that triggers a heightened need for particularity. *See U.S. v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) ("With the wide latitude accorded the prosecution [under the RICO statute] to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."); *U.S. v. Curtis*, 506 F.2d 985, 992 (10th Cir. 1974) (mail fraud indictment defective based on lack of particularity regarding the "scheme and artifice to defraud" and "false and fraudulent pretenses, representations and promises").[2]

The Government seeks to avoid this scrutiny by claiming that the Motion disputes the facts, but this too is wrong. Opp. at 1-8. For purposes of this Motion, Halligan accepts as true

---

[2] Section 10(b) is often described as a "catchall" provision of the securities laws, *see, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 203 (1976), and it is therefore exactly the type of generic statute that demands heightened particularity. *Cf. Russell*, 369 U.S. at 765 (where statute "includes generic terms," indictment "must descend to particulars").

the facts alleged by the Government, and demonstrates that those factual allegations are irreconcilable with the definitions applied to the terms of the charged offenses. In this procedural posture, it is appropriate for the Court to determine whether the Government's own allegations foreclose Halligan's prosecution as a matter of law. *See, e.g.*, *U.S. v. Benjamin*, No. 21-cr-706, 2022 WL 17417038, at *16 (S.D.N.Y. Dec. 5, 2022) ("While the government is certainly correct that an indictment need not divulge the bulk of its evidence, the Court is permitted to consider whether the facts, as alleged on the face of the indictment, satisfy the statutory definition of a crime."); *U.S. v. Heicklen*, 858 F. Supp. 2d 256, 263, 275 (S.D.N.Y. 2012) (indictment was stated with sufficient specificity, but failed to charge an offense within the terms of the applicable statute); *see also U.S. v. Webb*, 24 F. Supp. 3d 432, 440 (M.D. Pa. 2014) (dismissing indictment in prosecution arising from racehorse doping, explaining that "we need not blindly accept a recitation in general terms of the elements of the offense. . . . We must also look at the specific facts alleged in the indictment to see if an offense has been alleged. [W]e cannot ignore the factual allegations . . .").

The Government cannot have it both ways; having chosen to obtain a 58-page, 86-paragraph, 11-count speaking Indictment, it cannot now demand that the Court ignore the allegations that doom every count. Those allegations and the legal principles and definitions they offend are addressed below and in Hwang's reply brief.

### A.    Count One (Racketeering Conspiracy) Should Be Dismissed As Against Halligan Because It Fails to Allege Essential Elements of the Charged Offense

The Government in its opposition brief does not rehabilitate the numerous flaws in the Indictment's RICO conspiracy charge: the Indictment fails sufficiently to allege RICO predicate acts; it fails to allege a pattern of racketeering activity because it lacks even remote indicia of open-ended or closed-ended continuity; and it fails sufficiently to allege Halligan's

3707749.1

agreement to join that conspiracy, the bedrock element of a conspiracy charge. Accordingly, the Court should dismiss Count One.

1.  **The Indictment Fails Sufficiently to Allege
    an Agreement to Engage in "Racketeering Activity"**

The Government acknowledges that the Indictment must allege an agreement by the Defendants to engage in "racketeering activity" consisting of violations of statutory provisions that qualify as RICO predicate acts. Opp. at 16-17; *see also* 18 U.S.C. § 1961(1) (defining "racketeering activity"). It argues that it has satisfied that requirement by alleging "three categories" of racketeering activity: wire fraud in violation of 18 U.S.C. § 1343; securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff; and securities fraud in violation of 18 U.S.C. § 1348. Opp. at 17-18 (citing Ind. ¶¶ 68(a)-(c)). A careful reading of the relevant case law reveals, however, that these violations, as alleged by the facts set forth in the Indictment, do not and cannot supply the requisite racketeering predicates.[3]

As set forth more fully in Defendants' opening brief, only fraud in the *sale* of securities qualifies as a predicate act for a RICO conspiracy charge. Defs.' Br. at 25-28 (explaining that 18 U.S.C. § 1961(1)(D) defines "fraud in the sale of securities" as a predicate offense, with no corresponding inclusion for "fraud in the purchase of securities"). Therefore, the Indictment must allege that Defendants agreed to commit fraud in the sale of securities. However, the factual allegations contained in the Indictment relates almost exclusively to misconduct concerning securities *purchases*. *E.g.,* Ind. ¶¶ 21(a), 24, 39, 74(a); Defs.' Br. at 27-28. In service of its strained argument, the Government also attempts to transmogrify allegations about alleged

---

[3]  This discussion focuses only on the alleged securities fraud predicates. The wire fraud allegation is addressed in Hwang's reply brief at Pt. I.E.

misstatements regarding the characteristics of Archegos's portfolio into fraud in *actual* sales transactions. Opp. at 18.

Specifically, the Government points to allegations that members of the conspiracy (other than Halligan) misinformed counterparties about "the number of days it would take Archegos to sell its positions in normal market conditions," (Ind. ¶ 45), and misrepresented "how quickly the positions in Archegos's portfolio could be sold in the market." *Id.* ¶ 53. But these alleged misrepresentations are speculation about hypothetical future sales in assumed market conditions, not actual securities sales in the actual securities market. Thus, these allegations lack the elements of an actual sale of securities, as required by § 1961(1)(D). *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 283 (1992) (O'Connor, J., concurring) (explaining that at a minimum, § 1961(1) "unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, *and that there be a sale of securities*") (emphasis added).

The Government also fails meaningfully to distinguish Judge Patterson's unequivocal holding in *In re Par Pharm., Inc. Sec. Litig.*, that "giving Section 1961(1)(D) its plain meaning, RICO does not incorporate all violations of Section 10(b) and Rule 10b-5, but rather is limited to those fraudulent acts that occur in an actual sale transaction." 733 F. Supp. 668, 683 (S.D.N.Y. 1990). The court's determination that plaintiffs had failed to allege a RICO predicate act was based entirely on basic principles of statutory interpretation, and the Government's argument that it has standing here to prosecute RICO violations, Opp. at 19, is completely beside the point. Likewise, in *First Pac. Bancorp, Inc. v. Bro.*, which the Government attempts to distinguish merely by noting that it was a civil summary judgment decision, Opp. at 19, the court examined the same statutory language at issue here, "fraud in the sale of securities," 18 U.S.C. § 1961(1)(D), and held that the failure to file certain reports with the SEC did not constitute a "sale" of securities. 847 F.2d 542, 546 (9th Cir. 1988). The court in *In re MDC*

*Holdings Sec. Litig.* reached the same decision, holding that allegations that defendants' alleged misrepresentations caused them to purchase company stock on the open market at inflated prices failed to state a claim for "fraud in the sale of securities" under RICO *because there was no sale* as § 1961(1)(D) requires. No. 89-cv-0090, 1991 WL 537515, at *2 (S.D. Cal. July 2, 1991).

The Government contends that the statute does not mean what it says when it refers only to "sales" of securities, but the cases it cites to support that proposition are simply inapposite, as actual fraudulent sales were integral to all of them. *See* Opp. at 20, citing *Lou v. Belzberg*, 722 F. Supp. 1010, 1026 (S.D.N.Y. 1990) (deliberate violations of Section 13(d) that enabled defendants to purchase shares of stock at an artificially low price "center[ed] around the sale of securities"); *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 105 (D. Conn. 1994) (defendants sold, through fraudulent securities transactions, limited partnership interests in real estate; the issue was whether the accounting firm, which was neither purchaser nor seller, could be liable under RICO for misstatements in private placement memoranda); *U.S. v. Eisenberg*, 773 F. Supp. 662, 676, 725 (D.N.J. 1991) (relying on "ample authority holding that failure to report ownership of stock pursuant to various reporting provisions of the securities laws" can satisfy §1961(1) where defendants were alleged to have sold securities and fraudulently obtained profits); *In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1409-10 (E.D. Pa. 1984) (broker who opened discretionary accounts on behalf of unsophisticated investors had *de facto* control over the securities purchased and sold for plaintiffs' portfolios, which allowed him to engage in fraudulent transactions).

The Government also seeks support in the Indictment's allegations that at Hwang's direction, Archegos would sometimes sell stock to generate capacity and thereby "make room" to purchase that same stock later in the day. Ind. ¶¶ 36(a)-(b) (cited in Opp. at 18). But this argument fails because the Indictment alleges that the *purchases – not the sales –* allegedly inflated the

9

market by creating "the desired impact on the securities price." *Id.* ¶ 36 (a).[4] The Ninth Circuit

rejected an analogous argument in *U.S. v. Deeb*, 175 F.3d 1163 (9th Cir. 1999). As the court there

explained, "the Government does not contend that any of the sales of stock were illegal, only that

the proceeds from the sales enabled the fraudulent scheme to continue." *Id.* at 1168.  So, too,

here: sales that made room for allegedly fraudulent purchases do not amount to "fraud in the sale

of securities" as required by 18 U.S.C. § 1961(1)(D).

2.      **The Indictment Fails Sufficiently to Allege A *Pattern*
of Racketeering Activity Because It Fails to Allege Continuity**

a.      **The Government Must Allege an Agreement to
Engage in a Pattern of Racketeering, Including
Acts that Meet the Requirement of Continuity**

The Government agrees that a valid prosecution under the RICO conspiracy statute

requires that the defendant "agree[] with others" to "further an endeavor which, if completed,

would satisfy all the elements of a substantive RICO offense." *U.S. v. Cain*, 671 F.3d 271, 291

(2d Cir. 2012) (cleaned up) (cited in Opp. at 13); *see also U.S. v. Sessa*, 125 F.3d 68, 71 (2d Cir.

1997) (government must prove "an agreement to violate RICO's substantive provisions"). In

seeking to meet these requirements, the Government alleges a conspiracy to violate substantive

RICO provision 18 U.S.C. § 1962(c), which in turn contains the required element of a "pattern"

of racketeering activity. Ind. ¶ 68. Count One fails as a matter of law, however, because it does

not sufficiently allege this pattern element.

The Government expends great effort to establish that it need not prove a

substantive RICO violation, Opp. at 13-14, an issue that is not presented on this motion.

---

[4]  The Government fails to address the argument in Defendants' opening brief that the total return swaps at the heart of the schemes alleged in the Indictment, Ind. ¶¶ 14-17, do not constitute "securities" for purposes of RICO. *See* Defs.' Br. at 27 n.22.

3707749.1

Similarly, the Government makes the unjustified leap that because a RICO conspiracy charge does not require proof of certain elements required by a substantive RICO charge – e.g., the existence of an enterprise or of the defendant's commission of a predicate act – the Indictment therefore need not allege facts supporting an agreement to engage in a pattern of racketeering activity. Opp. at 13-14. This is plainly wrong. An indictment must allege that the defendants "reached a meeting of the minds as to the operation of the affairs of the enterprise *through a pattern of racketeering conduct*." *Cain*, 671 F.3d at 285 (quoting *U.S. v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010) (emphasis in original).

The Government begins by asking the Court simply to ignore the essential "pattern of racketeering activity" element when it analyzes the sufficiency of the Indictment's allegations. Opp. at 13-14. But even its own authorities do not support this entreaty. *See U.S. v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019) (explaining that § 1962(d) "proscribes an agreement to conduct or to participate in the conduct of an enterprise's affairs *through a pattern of racketeering activity*") (emphasis added) (cited in Opp. at 13; *see also Basciano*, 599 F.3d. at 199 (to prove a RICO conspiracy, the government must prove "that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering"). These cases confirm that a charge of racketeering conspiracy requires an allegation sufficient to meet the pattern element. *See U.S. v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (to sufficiently allege a violation of § 1962(d) – as charged in Count One here – the indictment *must* allege "that the defendant knowingly joined in a conspiracy the objective of which was to operate that enterprise through an identified *pattern of racketeering activity*") (emphasis added) (cited in Opp. at 13).[5]

---

[5]  The Government's effort to short-circuit consideration of the pattern element runs afoul of other basic principles as well. As the court recognized in *U.S. v. Bongiorno*, "it would be improper and a waste of resources for everyone involved to conduct a lengthy trial … and submit the case to a jury only to rule on a post-trial motion that the Government's theory of criminal liability fails no

To adequately allege the pattern element, the Indictment must allege both the relatedness and the continuity of predicate acts. As the Second Circuit has unequivocally stated, "when facing a RICO count *in an indictment or complaint*, a district court must determine whether it independently alleges … a pattern of racketeering activity," in which "the alleged criminal acts [are] characterized by their relatedness and continuity." *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 15 (2d Cir. 1989) (emphasis added). "[I]f a pleading does not indicate the existence of both components of the pattern of racketeering activity, a RICO claim should be dismissed." *Id.* Although *Procter & Gamble* was a civil case, the Second Circuit expressly referred to indictments, and courts have subsequently quoted this language in the criminal context. *U.S. v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 341 (D. Conn. 1990); *see also U.S. v. Fruchter*, 104 F. Supp. 2d 289, 296-97 (S.D.N.Y. 2000) (analyzing sufficiency of racketeering conspiracy count for allegations establishing continuity); *see also Reich v. Lopez*, 858 F.3d 55, 62 (2d Cir. 2017) (affirming dismissal of RICO conspiracy claim on a motion to dismiss because alleged acts lacked either relatedness or continuity).[6] A court is therefore

---

matter what facts it was able to adduce at trial." No. 05-cr-390, 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006); *see also U.S. v. Thompson*, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015) (defendant who objects to the indictment before trial is "entitled to a more exacting review of the indictment than one who waits until after trial to object").

[6] Courts in this Circuit and elsewhere have routinely relied on civil RICO decisions to dismiss RICO charges under FED. R. CRIM. P. 12(b) where, as a matter of law, the alleged facts would be insufficient to support a conviction were the case permitted to proceed to trial. *E.g., U.S. v. Altman,* 820 F. Supp. 794, 795-796 (S.D.N.Y. 1993) (relying on civil case of *Reves v. Ernst & Young*, 507 U.S. 170 (1993), to dismiss criminal RICO count after careful scrutiny of indictment and bill of particulars, on ground that government had failed sufficiently to allege defendant's participation in the operation or management of the enterprise); *U.S. v. Crysopt Corp.*, 781 F. Supp. 375, 384-385 (D. Md. 1991) (adhering to principles set forth in the civil case of *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989), court dismissed RICO counts in indictment on a number of bases, including that "[e]ven if proven by the government at trial, these [alleged predicate] acts, which number six at most and extend only over a nine month period, simply fail to satisfy the continuity element of the racketeering pattern test"); *U.S. v. Berlin*, 707 F. Supp. 832, 837-838 (E.D. Va. 1989) (following a number of civil analogs, court dismissed RICO counts

required to determine whether the indictment specifies predicate acts that evidence *both* continuity and relatedness. The Government's authorities concede as much. Opp. at 15 (*quoting U.S. v. Raniere,* 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019)); *see also U.S. v. Giovannelli*, No. 01-cr-749, 2004 WL 48869, at *3 (S.D.N.Y. Jan. 9, 2004) (to sufficiently allege a pattern of racketeering activity, the indictment must specify at least two racketeering acts within a 10-year period that evidence continuity).

Continuity is at the heart of a RICO charge. Consistent with the animating purpose of the RICO statute – to "seek the eradication of organized crime" – RICO does not apply to "the perpetrators of 'isolated' or 'sporadic' criminal acts," but rather requires a showing that the racketeering acts are related and that there is continuity or a threat of continuity. *U.S. v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016). The Indictment utterly fails to allege acts that evidence continuity, and nothing in the Opposition remedies this defect.

**b.      The Indictment Fails Sufficiently to Allege Closed-Ended Continuity**

As set forth in Defendants' opening brief, the Second Circuit has never found predicate acts spanning less than two years to be sufficient to constitute closed-ended continuity. Defs.' Br. at 29 (citing cases). And despite the Government's argument that substantive RICO elements are irrelevant here, courts have applied this very continuity rule to claims brought under the racketeering conspiracy statute. *E.g., Reich*, 858 F.3d at 60; *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 615 (S.D.N.Y. 2004) (Hellerstein, J.) (noting that Second Circuit has applied "two-year minimum" to find closed-ended continuity).

---

in indictment due to government's failure to sufficiently allege continuity/pattern element); *see also* Defs.' Br. at 25, n.21 and cases cited therein.

The Indictment does not contain any allegation that at the time the Defendants allegedly made their criminal agreement in 2020, Ind. ¶ 68, they intended to pursue their criminal objectives for a period greater than two years. And the Indictment fails to allege any facts that would support such a claim. Indeed, in its opposition brief, the Government appears to ignore Defendants' arguments as to closed-ended continuity altogether.

> **c.      The Indictment Fails Sufficiently to Allege Open-Ended Continuity**

The Government mischaracterizes Defendants' argument, Defs.' Br. at 30, as to the Indictment's failure to allege open-ended continuity. *See* Opp. at 16. The Government argues that if the Court finds that continuity is absent here, then "virtually no racketeering charges could ever be brought because the arrest and prosecution of the defendants would, in most circumstances, end the operations of the associated enterprise." *Id.* But that is a red herring because it is not this case, it is not this Indictment, and it is not Defendants' argument. Halligan and Hwang do not contend that in a hypothetical and imaginary situation where ongoing schemes had been terminated by the intervention of law enforcement, there would be an absence of open-ended continuity. Defs.' Br. at 30. That argument is irrelevant to the legal issues actually presented in this case, because it is undisputed that the alleged schemes here terminated on their own when, as the Indictment describes, Archegos collapsed in March 2021 and ceased trading. Ind. ¶¶ 7, 31, 48, 67.

The appropriate analysis of open-ended continuity, ignored in the Opposition, requires a finding that predicate acts "are likely to continue into the future, or that they represent the primary way that defendants do business." *Medinol*, 346 F. Supp. 2d at 616. Such a threat may be presumed when an enterprise's business is primarily or inherently unlawful, like the sorts of organized crime rackets that the RICO statute was intended to combat. *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). Thus, where an enterprise's essential

14

"business" is murder, obstruction of justice, narcotics trafficking, or embezzlement, courts find the element of open-ended continuity. *U.S. v. Aulicino*, 44 F.3d 1102, 1113 (2d Cir. 1995) (sustaining jury verdict in prosecution of members of a kidnapping ring that targeted and extorted drug dealers); *U.S. v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("numerous activities involving bribery and money laundering on behalf of organized crime" sufficient to establish open-ended continuity); *U.S. v. Indelicato,* 865 F.2d 1370, 1383-84 (2d Cir. 1989) (three murders constitute a "pattern" in prosecution of member of Bonanno organized crime family).

      However, where an alleged enterprise, like Archegos, "primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999); *U.S. v. Minicone*, 960 F.2d 1099, 1108 (2d Cir. 1992), *as amended on reh'g in part* (Apr. 13, 1992) ("The question of whether acts form a pattern rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts.").

      For example, in *Schnell v. Conseco, Inc.*, the court found that open-ended continuity was absent where the allegations arose from an allegedly deceptive and fraudulent corporate acquisition, in which the acquiror was alleged to have advanced the corporate transaction through acts of wire and mail fraud and securities fraud (essentially, a "pump and dump"). 43 F. Supp. 2d 438, 445 (S.D.N.Y. 1999). The court explained that corporate acquisitions are not inherently unlawful and that there was no evidence that "illegal" corporate acquisitions were the defendant's regular business. It therefore found that the element of open-ended continuity was absent. *Id.*; *see also Spool*, 520 F.3d at 185-86 (open-ended continuity not sufficiently pled where defendants are adoption agencies and their principals, who had "managed

15

over one thousand successful adoptions during the ten-year period" before the alleged

racketeering conduct began); *Cofacredit*, 187 F.3d at 244 (reversing district court's finding of

open-ended continuity where the defendants were a plumbing supply company and retailers who

allegedly submitted fraudulent invoices to obtain credit; holding that there was insufficient

evidence that the alleged crimes against the plaintiff bank "were a regular means by which

[defendants] conducted their plumbing supply business").

      The Indictment itself demonstrates that Archegos was primarily engaged in

legitimate business, thus foreclosing the inference that racketeering activity was the regular way

of conducting that business or the inference of a threat of continuing criminal activity. As

described in the Indictment, Archegos was *not* an inherently unlawful business, like a murder or

kidnapping ring, and it engaged in lawful and legitimate business both before and during the

alleged "racketeering period." *See* Ind. ¶ 10 (noting that Archegos "operated as a sophisticated

investment firm"). Nor can the Government bootstrap an inference of open-ended continuity from

its allegations that Hwang and Halligan committed alleged acts of wire fraud and securities fraud

during the alleged racketeering period: "[i]t is well established law that fraud does not fall within

the 'inherently unlawful' category of predicate acts." *CrossBorder Sols., Inc. v. Macias, Gini, &*

*O'Connell, LLP*, No. 20-cv-4877, 2022 WL 562934, at *9 (S.D.N.Y. Feb. 23, 2022).[7] There is no

---

[7] *See also Int'l Bhd. Of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) ("fraud
(the object of which is by definition to obtain money or property from others) has been held not to
be 'inherently unlawful' in the RICO continuity context"); *World Wrestling Entm't, Inc. v. Jakks
Pac., Inc.*, 530 F. Supp. 2d 486, 516 (S.D.N.Y. 2007) ("While embezzlement, extortion, bribery,
and money laundering are in pursuit of inherently unlawful goals, *fraud is not*.") (emphasis
added). If merely alleging the existence of an enterprise that engaged in acts of fraud was
sufficient to establish continuity, then the pattern element would cease to have an independent
meaning, which is not the law. *See World Wrestling Ent.*, 530 F. Supp. 2d at 515 (rejecting
"circular" argument that "once a RICO plaintiff has adequately pled a RICO enterprise, it has
automatically pled open-ended continuity").

allegation that Archegos engaged in *any* unlawful conduct between its founding in 2013 and the alleged racketeering period beginning in 2020. *Cf. Spool*, 520 F.3d at 185-86. And even during the supposed racketeering period, the Government acknowledges that Archegos employed more than fifty individuals, retained consultants (including law firms), and maintained a robust compliance program. Ind. ¶ 10.

Nowhere does the Indictment allege that the supposed misrepresentations to Archegos's Counterparties were the primary means by which Archegos communicated with the banks. To the contrary, the Indictment challenges only a few dozen alleged conversations over less than a year. This further forecloses any inference that racketeering activity was Archegos's primary way of conducting business.

Nor has the Government made any attempt to sustain the RICO conspiracy charge by showing a threat that racketeering conduct may continue in the future (or could have posed such a threat at the time the Indictment was returned). There is a simple reason: Archegos no longer exists as an ongoing participant in the trading markets. The Government concedes that the schemes alleged in the Indictment terminated with Archegos's collapse in March 2021. Ind. ¶ 48 (alleging that late March 2021 was "the final week of Archegos's trading, as its positions collapsed"); Ind. ¶ 31 (stock prices declined precipitously "[f]ollowing the *collapse of Archegos*") (emphasis added); *id.* ¶ 67 (beginning on March 26, 2021, "in a matter of days . . . Archegos owed billions of dollars more than it had on hand, and *Archegos collapsed*"). Thus, Archegos has long been functionally defunct and necessarily presents no threat of continued criminal activity. And Halligan, who is no longer employed by Archegos in any event, *cf. Frey*, 476 F. Supp. 2d at 161, likewise presents no threat of continued criminal activity. The Government does not allege otherwise (nor could it) – the Indictment does not point to a single alleged act of racketeering that occurred after March 2021. In other words, any conceivable "threat" of continuing criminal

17

conduct had terminated over a year before the Indictment was returned. Where, as here, circumstances have caused an alleged scheme to terminate and made its continuation impossible, courts routinely find open-ended continuity absent.

       This Court's decision in *Medinol* is especially instructive. There, a stent manufacturer (Medinol) brought a RICO conspiracy claim against a distributor (BSC) and certain individuals with whom Medinol had a long-term contractual agreement, alleging that the defendants had engaged in a "sinister plan" to circumvent the contract, steal the manufacturer's technology, and appropriate the manufacturer's profits (this alleged plot was known as "Project Independence"). *Medinol,* 346 F. Supp. 2d at 591-92. This Court dismissed the RICO conspiracy claim based on the plaintiff's failure sufficiently to allege open-ended continuity, including because there was no threat of predicate acts continuing into the future:

> Project Independence was disclosed to Medinol in April 2000, has not been revived in more than four years since then, and indeed could not be revived in the future because the relationship between the parties has been terminated. *It thus cannot continue into the future*. And there are no facts on the record—even if Project Independence was as heinous as Medinol alleges—which would suggest that BSC's regular way of doing business is through fraudulent acts that constitute racketeering activity, or that criminal behavior similar to that alleged with regard to Project Independence will soon recur.

*Id.* at 615-16 (emphasis added).

       As in *Medinol*, where no threat of continued misconduct exists because the alleged scheme has terminated, courts regularly find that claims under § 1962(d) and § 1962(c) are legally insufficient. *E.g., Li Jun An v. Hui Zhang,* No. 13-cv-5064, 2013 WL 6503513, *9 (S.D.N.Y. Dec. 6, 2013) (dismissing RICO conspiracy and substantive RICO claims where open-ended continuity is absent because the "the alleged scheme to remove plaintiff from his position [as CEO] has been completed."); *Frey v. Maloney*, 476 F. Supp. 2d 141, 161 (D. Conn. 2007) (open-ended continuity

is absent where defendant police officer had retired from police force and there was therefore no threat that he would continue to violate others' constitutional rights); *Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 404 (E.D.N.Y. 2005) (open-ended continuity absent where scheme came to an "abrupt halt" with the firing of two individuals); *Schnell*, 43 F. Supp. 2d at 445 (open-ended continuity absent where defendant was alleged to be engaged in racketeering conduct in connection with acquisition of bankrupt entity; reasoning that "once [target company's] bankruptcy petition is confirmed, [defendant's] alleged scheme to gain control of [target company] at the expense of its public shareholders will end. As such, the allegations in the complaint carry with them no threat of continued or future criminal activity."); *see also Allen v. New World Coffee, Inc.*, No. 00-cv-2610, 2001 WL 293683, at *6 (S.D.N.Y. Mar. 27, 2001) (dismissing RICO conspiracy claim where allegations that "the very nature of [defendant's alleged fraud] impl[ied] a threat of continued criminal activity, at present and in the future," were "merely conclusory" and insufficient to show open-ended continuity); *CrossBorder Sols.*, 2022 WL 562934, at *9 (finding no open-ended continuity where, *inter alia,* no circumstances suggested that defendants "are or were likely to engage in future racketeering acts").[8]

Moreover, while the Government criticizes Defendants' reliance on civil RICO conspiracy cases, Opp. at 21, the Government cites no case for the proposition that the continuity requirement should be construed differently in criminal cases. Accordingly, Count One of the

---

[8] In its applications to stay discovery in the parallel civil actions brought by the SEC and CFTC, the Government argued that a stay would not impair Archegos's business operations based on its understanding that "Archegos has no ongoing business operations and that it is engaged in winding down its affairs." *CFTC v. Archegos Capital Management, LP et al.*, No. 1:22-cv-3401, ECF 52 at 12 (S.D.N.Y. Nov. 8, 2022); *SEC v. Sung Kook (Bill) Hwang et al.*, No. 1:22-cv-3402, ECF 71 at 11 (S.D.N.Y. Nov. 4, 2022). Having relied on Archegos's inactive status and wind-down to advance another application to the District Court, the Government cannot argue here that there is a risk of continuing criminal activity.

19

Indictment is doomed by the same principles that this court applied in *Medinol* and that other courts have applied in the cases cited above, and it should accordingly be dismissed.

      **3.**      **<u>The Indictment Fails Sufficiently to Allege Halligan's Agreement</u>**

      The Government argues that the Indictment's conclusory assertion that Halligan agreed with Hwang and others to violate the RICO statute is sufficient to sustain the Indictment. Opp. at 21-22. However, in doing so, it elides the fact that in this case, the "agreement" element of § 1962(d) hinges on the purported market manipulation scheme, in which Halligan is not alleged to have participated, nor alleged to have been aware. *See* Defs.' Br. at 31-33.

      The Indictment alleges that Hwang and Halligan "used Archegos to perpetrate two interrelated criminal schemes," Ind. ¶ 2, and that Halligan agreed to join a conspiracy that aimed "to manipulate the prevailing prices of certain securities" and to "obtain trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages," Ind. ¶¶ 68, 70, 71; Opp. at 22-23. The alleged pattern of racketeering conduct described in the Indictment *depends* on supposed market manipulation that Archegos effected through its trading with the counterparties. *See, e.g.,* Ind. ¶¶ 34, 41, 46.

      The agreement element that is essential to a racketeering conspiracy prosecution is absent here because there is no allegation in the Indictment that Halligan was aware of – much less acquiesced to – illegal, manipulative trading activity, and there are no facts from which to infer the alleged conspiracy's requisite "meeting of the minds." *U.S. v. Rosenblatt,* 554 F.2d 36, 38 (2d Cir. 1977). Among the Indictment's 86 paragraphs, there is not a single allegation that Halligan knowingly had any role in the existence of manipulative trading, the strategy associated with the supposedly manipulative trading or in the execution of that strategy. To the contrary, the Indictment alleges that Hwang masterminded and implemented the manipulative trading conduct, and executed it with the involvement of William Tomita, Archegos's Head Trader. Ind. ¶ 2

("Hwang, with Tomita's assistance, schemed to defraud market participants by manipulating, controlling, and artificially affecting the market for certain securities in Archegos's portfolio.").

The Government falls back on the principle that it need not prove a conspirator knew of *all* the coconspirators' criminal acts, Opp. at 22, but this does not salvage Count One because the Indictment fails to allege that Halligan knew *anything* about the market manipulation activity that allegedly animated the conspiracy – i.e., the "general nature of the conspiracy," as required by *U.S. v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) – or that the alleged conspiracy encompassed any criminal activity beyond his own alleged involvement. Simply put, the Indictment alleges no facts from which the Court could infer that Halligan agreed with Hwang, or anyone else, to violate RICO's substantive provisions, or that Halligan knew "what the other conspirators 'were up to'" or that he "embraced the objective of the alleged conspiracy[.]" *Id.* at 99.

## B.    Count Ten Fails to Charge a Violation of Section 10(b) or Rule 10b-5

Defendants showed in their opening brief that the conduct alleged against Halligan in Count Ten – even if stated with sufficient specificity – cannot be charged as a violation of § 10(b) as a matter of law. Defs.' Br. at Pt. I.D. Once the Government moves beyond its familiar and incorrect complaint that the Motion is "premature[]," Opp. at 35-36, its arguments largely follow from the equally false premise that § 10(b) should have a different and more expansive meaning in criminal cases than it has in civil cases. The Court should reject the Government's effort to create dueling civil and criminal interpretations of this single statute, and should enforce the Supreme Court and Second Circuit decisions that foreclose prosecution of Count Ten as against Halligan. The legal deficiencies in Count Ten that apply equally to both Defendants are addressed in Hwang's reply brief at Pt. I.D, which Halligan incorporates here.

The Government's "maker" liability and "scheme liability" claims against Halligan fail for additional reasons.

First, as to any "maker" liability claim under Rule 10b-5(b), the Government has failed sufficiently to allege that Halligan "made" a misrepresentation within the meaning of *Janus Capital Group Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The two "examples" cited in the Government's opposition brief reveal why:

- The Government's allegation that "HALLIGAN, William Tomita, and Scott Becker, with the implicit and at times explicit permission and direction of HWANG, provided false and misleading information to Counterparties," Ind. ¶ 41, falls woefully short of alleging that Halligan "made" any statement within the meaning of Janus because, as Janus makes clear, the "maker" of a statement is the person with ultimate control over the statement. 564 U.S. at 142-43. If Hwang was providing ultimate direction as the Government alleges, then as a matter of law, Halligan was not the "maker" of the statements at issue.

- The Government's allegation that Halligan signed a certification containing an allegedly false representation, Ind. ¶ 59, is defective under even more basic legal principles, because the Indictment does not allege the necessary element of Halligan's knowledge that he was signing a false statement. *See U.S. v. Stewart*, 305 F. Supp. 2d 368, 378 (S.D.N.Y. 2004) (granting judgment of acquittal on securities fraud charge for insufficient evidence of intent, holding that falsity of defendant's statements failed to lend weight to inference of intent to deceive); *cf. Berlin*, 472 F.2d at 1006 (trial court should have dismissed certain counts in the indictment for failure to sufficiently allege knowledge of falsity, an essential element of the charged statute). The Government glibly describes this argument as "bizarre[]," but points to no allegation in the Indictment that Halligan was aware that the allegedly false statement was contained in the certification. Opp. at 42 n.10. The allegation that Halligan "falsely signed" the certification addresses the truth or falsity of the statement, but not Halligan's knowledge that the certification included a false statement.

Second, as to any "scheme liability" claim under Rule 10b-5(a) and (c), the Indictment does not comply with *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022), because it does not allege manipulative or deceptive conduct *by Halligan* that is separate and distinct from his role in the preparation of alleged misrepresentations. The Government summarily asserts that the

22

Indictment "include[s] actions beyond misrepresentations and omissions," Opp. at 43, but then cites only to conduct allegedly engaged in by others or involving the preparation of misstatements. Specifically, each example the Government points to falls into one of the following categories: (a) it relates to Hwang only, and therefore cannot provide the necessary allegation of manipulative or deceptive conduct by Halligan (Ind. ¶¶ 4, 56, cited in Opp. at 43); (b) it does not assert manipulative or deceptive conduct at all, but simply recites applicable rules regarding swap ownership and disclosure without any allegation that any defendant violated those rules (Ind. ¶¶ 14, 17, cited in Opp. at 43); and/or (c) it relates exclusively to conduct in connection with the preparation of misstatements (Ind. ¶¶ 43-45, 52, 59, all cited in Opp. at 43), which under *Rio Tinto plc* cannot form the basis for Rule 10b-5(a) or (c) scheme liability. Accordingly, the Indictment's allegations as against Halligan do not satisfy the statutory definition of a criminal violation of Rule 10b-5(a) or (c).

## C.     The Court Should Hold in Abeyance Any Ruling on Wire Fraud (Count Eleven) or Alternatively Dismiss Count Eleven for Failure to Allege Essential Elements

The Government does not offer any compelling response to Defendants' suggestion that a ruling on Count Eleven should be held in abeyance pending the Supreme Court's review of the right to control theory in *Ciminelli v. U.S.*, 142 S. Ct. 2901 (2022), *cert. granted*, (Jun. 30, 2022). As explained in Hwang's reply brief at Pt. I.E, which Halligan incorporates here, the future viability of the right to control theory is in serious doubt. The Government's suggestion – made in a footnote, Opp. at 44 n.11 – that Count Eleven might survive under an alternative "money or property" theory fails not only because the Government has not actually pled such a theory in the Indictment, but also because the Indictment does not allege a scheme to deprive ACM's counterparties of "money or property" as those terms have been defined by the Supreme Court. *See Kelly v. U.S.*, 140 S. Ct. 1565, 1571 (2020) (explaining

that the wire fraud statute is "limited in scope to the protection of property rights" and "prohibits only deceptive "schemes to deprive [the victim of] money or property"); *Cleveland v. U.S.*, 531 U.S. 12, 15 (2000) (a "thing" obtained by a defendant is property for purposes of the mail and wire fraud statutes only if it is property while still "in the hands of the victim").

## II.
## THE ALLEGATIONS IN PARAGRAPH 8 OF THE INDICTMENT ARE IRRELEVANT AND PREJUDICIAL TO HALLIGAN AND THEY SHOULD BE STRUCK

The allegations in Paragraph 8 regarding the 2013 criminal and civil proceedings involving Tiger Asia, Hwang's long-closed hedge fund, should be struck now, pursuant to FED. R. CRIM. P. 7(d), because they constitute irrelevant and highly prejudicial surplusage. The Government invites the Court to defer judgment on this issue, and to address it via motions *in limine*, evidentiary rulings during trial, and limiting instructions. Opp. at 70-72. The Government's premise that these issues are premature is wrong – the motion to strike is ripe for adjudication now. The Government's further suggestion that the issues can fairly be adjudicated on the eve of, or even during trial, is unworkable, problematic, and ultimately prejudicial – particularly to Halligan.

Allegations that are not relevant to the charges in the Indictment and are inflammatory or prejudicial may be struck from the Indictment upon a defendant's motion. *See U.S. v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). That result is warranted here because the allegations about Tiger Asia's nearly decade-old criminal and regulatory proceedings are neither relevant to, nor admissible against, Halligan. *See* Defs.' Br. at 88-98. In its opposition brief, the Government proffers a series of theories under which it might seek to admit these facts at trial. Opp. at 70-71. Each theory fails as to Halligan.

24

First, the Government argues that facts about these prior proceedings are "direct evidence that explains the creation of Archegos and why it did not accept outside investor capital." Opp. at 70. The Government does not explain why or how the creation of Archegos and any limitations on outside investor capital are relevant to any charge against Halligan. The alleged racketeering conduct did not begin until 2020, Ind. ¶ 1, years after Archegos's creation. Moreover, restrictions on outside investments do not bear on any issue related to the charges against Halligan. For example, there is no allegation that Archegos circumvented restrictions regarding its ability to accept outside investor capital, nor is there any allegation of any misrepresentation regarding its status as a family office.

Second, the Government argues that the prior regulatory and criminal proceedings may be admissible under Rule 404(b) as to Hwang's "knowledge, intent, and state of mind." Opp. at 70. These are issues that pertain solely to Hwang and do not support the relevance or admissibility of these facts as to Halligan.

Third, the Government argues that "it expects its trial proof to demonstrate that Patrick Halligan knew of those [2013] allegations against Hwang, and that he and Becker had to assure Counterparties that Archegos and Hwang had taken meaningful step to avoid a recurrence of improper behavior." Opp. at 70-71. But these are not relevant issues, because the Government has alleged that the charged misrepresentations related to Archegos's portfolio, and specifically "the concentration of Archegos's positions," "the composition of Archegos's positions," and the "liquidity of Archegos's positions." Ind. ¶ 48. None of those categories in any way implicates any so-called risk of "a recurrence of improper behavior."

In addition to being irrelevant as to Halligan, the admission of facts related to the Tiger Asia proceedings would be extremely prejudicial to him. Halligan worked at Tiger Asia, but was not implicated in the criminal or regulatory resolutions. The risk of "guilt by association"

25

based on his employment by Tiger Asia is profound. Indeed, the Government's proffer that it may

seek to prove that Halligan "knew of [the earlier] allegations against Hwang," Opp. at 70-71,

portends a troubling effort to bolster the instant case against Halligan through his prior association

with Hwang.

Finally, even if, *arguendo*, facts about Hwang's prior regulatory and criminal

matters were somehow proper as related to Hwang for the reasons cited by the Government – and

Halligan in no way concedes that point – they would still expose Halligan to extreme prejudicial

spillover. The Government's suggestion that a limiting instruction might suffice to address that

concern, *see* Opp. at 71-72, is flat wrong. The charges against Halligan form a small subset of the

charges in the Indictment and the conduct at issue, and the proof against Halligan at trial will

consist of a tiny subset of the proof as a whole. Under these circumstances, the risk of substantial

unfair prejudice is particularly great. In order for Halligan to assess whether he has a meritorious

severance motion, it is essential that the Court consider and resolve well before the trial not only

this prejudicial surplusage motion, but also the admissibility at trial of the Tiger Asia matters.

### III.
### THE GOVERNMENT SHOULD BE DIRECTED
### TO FILE A BILL OF PARTICULARS

The Government refuses to provide Defendants with the information they need to

prepare their defenses. The Government's brief ignores many of Defendants' specific arguments

while repeatedly asserting that they seek information that, while perhaps helpful, is not necessary.

The Government is wrong on that point, as well as its constant refrain that Defendants seek "the

Government's trial proof." Opp. at 1, 57, 60. Without the materials they seek, Defendants may

well face a "trial by ambush."

**A.      The Government Should Comply with the Court's Previous
Directive to Identify _All_ Alleged Misrepresentations (Indictment ¶¶ 41-59)**

Litigation over Defendants' request for particulars regarding the alleged misstatements should not be necessary because the Court already resolved this issue. During the June 1, 2022 conference, the Court directed the Government to identify *all* alleged misrepresentations, including "their nature," "persons who made [them]," "persons who received [them], and the "date, time, and place" they were made. June 1 Tr. at 16:24-17:1. The Government's refusal to identify *all* of the misstatements at issue significantly impairs Defendants' ability to prepare their defense, and is premised on a mischaracterization of the law as well as the June 1 Order.

**1.      The Court Previously Ordered the Government to Identify
_All_ Alleged Misrepresentations, and the Government Has Not Complied**

The Government argues that the Court did not "order" the identification of all alleged misrepresentations but instead provided "direction" that the Government provide "additional information" and permitted Defendants to move for a bill of particulars if that information was not sufficient. Opp. at 61. This characterization of the June 1 conference is inaccurate, incomplete, and misleading.

During that conference, the Court *sua sponte* raised identification of the alleged misrepresentations. June 1 Tr. at 15:21-23 (THE COURT: "One thing that comes to mind is whether or not we need a definition of the alleged misrepresentations. Not a definition, identification."). The Court went on to order a "complete" enumeration of the misrepresentations – pointedly asking whether the Government would seek to try misrepresentations not alleged in the Indictment, *id.* at 16:10-11 – and offered the Rule 9 civil standard as a guiding principle for the Government's particularization, to be set forth in a publicly docketed letter. *Id.* at 17:3-4

(THE COURT: "Like a Rule 9 allegation in a civil action"); *id.* at 17:10-11: THE COURT: "And once you have it, put it on ECF and serve it on the defendants.").[9]

The Government has not complied with the June 1 Order. The Indictment, the August 18 Letter, and the Government's opposition brief all refer to "examples" and "categories,"[10] but the June 1 Order did not merely require "examples" and "categories" – it required the disclosure of *all* misrepresentations. Jun. 1 Tr. at 16:24-17:1. Moreover, even if examples and categories were sufficient for the purposes of drafting an indictment, those examples and categories must be supplemented with a bill of particulars upon a defendant's motion. *See, e.g.*, *U.S. v. Gabriel*, 920 F. Supp. 498, 508 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) (in prosecution for mail fraud, wire fraud, and false statements, explaining that "greater particularization of such specifications [i.e., the alleged false statements], mandated in a civil proceeding by Rule 9(b) of the Rules of Civil Procedure, is provided in a criminal case, not by particularity in the indictment, but by the requisite responses to a bill of particulars"). Thus, Defendants would have been entitled to these particulars even in the absence of the June 1 Order.

Equally fundamentally, and as detailed at length in Defendants' moving brief, the August 18 Letter does not remedy the Indictment's failure to include rudimentary details regarding many of the alleged misrepresentations, such as their speaker(s), the time and place at

---

[9]  The Government quarrels with Defendants' characterization of the Court's June 1 Order as an order. The Government chooses words like "colloquy" and "guidance," Opp. at 61, 62 n.16, but these semantics cannot change a Court-imposed obligation. The Court issued a crystal clear directive that all alleged misrepresentations must be enumerated. Presumably, if the Government had any question as to what the terms "all" and "complete" meant, it would have sought clarification from the Court.

[10]  *See* Ind. ¶¶ 52, 54, 56, 57; Aug. 18 Letter at 4, 7, 9 (listing "examples" of misrepresentations) and at 12 (reserving rights regarding additional misrepresentations); Opp. at 57 (referring to "*categories and examples* of specific false and misleading statements") (emphasis added).

which they were made, and the recipients of the alleged misrepresentations at specific

Counterparties. Defs.' Br. at 110-111. The lack of key details, in addition to the Government's

reservation of its supposed right to add *more* alleged misrepresentations to an already

unparticularized Indictment would permit the Government to try Defendants for alleged

misrepresentations about which they received no notice and against which they therefore cannot

possibly prepare a defense.

### 2. Identification of *All* Misrepresentations Is Appropriate Under Existing Law, and the Government's Failure to Provide this Information Prejudices Defendants

There is a reason for the requirement that the Government identify *all* of the

misrepresentations that it alleges: a defendant cannot meaningful prepare his trial defense on the

basis of "examples" and "categories" as opposed to the actual statements that the Government

will seek to prove. Indeed, it is elementary that in order for Defendants to respond to the

Government's allegations that they or others made false statements, Defendants must know

exactly which statements are at issue. Without this information, Defendants cannot even begin to

assess the threshold question of whether the particular statement is actually false. To undertake

that analysis, Defendants need to know the words that were used (which the Indictment and the

August 18 Letter do not fully recite), as well as review the context in which the statement was

allegedly made, to determine whether there are surrounding circumstances that bear on its truth or

falsity. The Government utterly fails to appreciate that this type of analysis is detailed and labor-

intensive, and simply *cannot* be completed if the actual statements are disclosed only at or

near trial.

This is why other courts, like this Court through the June 1 Order, have directed

the Government to provide particulars in cases involving alleged false statements. *See U.S. v.*

*Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (defendants entitled to know, regarding

3707749.1

Medicare claims government intended to prove were fraudulent, who allegedly prepared each form, who submitted each form, when and where each form was prepared and submitted, each item or entry on each form alleged to be false, the manner of the falsity, the corresponding statement that would have been accurate, and the manner in which each amount was calculated); *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (reversing the denial of bill of particulars in an insurance fraud case where the Government failed to identify which insurance claims were falsified); *U.S. v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998) ("A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information. . . . The government must provide information as to exactly what the false statements are, what about them is false, who made them, and how [defendant] caused them to be made."); *cf. U.S. v. Strawberry*, 892 F. Supp. 519, 527 (S.D.N.Y. 1995) (partial grant of bill of particulars, including as to identification of co-conspirators, where defendant argued that he was not alleged to have participated in most incriminating conversations).[11]

---

[11] The Government relies on *U.S. v. Mandell* for the generic proposition that defendants' broad demands for detailed particulars are unfounded where the Indictment "catalogs a number of falsehoods and omissions with great specificity." 710 F. Supp. 368, 385 (S.D.N.Y. 2010) (cited in Opp. at 62). But *Mandell* obviously provides no explanation for the Government's non-compliance with the Court's June 1 Order, and in any event, as many courts have observed, the analysis of whether a bill of particulars is required in a particular case is so fact specific that "the precedents furnish little help in disposing of requests for bills of particulars in criminal cases." *Bin Laden*, 92 F. Supp. 2d at 234. The Government's resort to *Mandell* is unavailing here. Unlike Halligan, Mandell was alleged to be an "in-the-room" maker of misrepresentations and the alleged architect of the alleged scheme(s). *See* Superseding Indictment at ¶¶ 28-30, *U.S. v. Mandell*, No. 09-cr-00662, ECF 96 (S.D.N.Y. Dec. 14, 2010). As Halligan's alleged role and thus his alleged visibility into the purported scheme is significantly more minimal, his need for particulars is correspondingly greater.

Under these general principles, the Government's refusal to identify all of the misstatements at issue significantly impairs Defendants' ability to prepare their defenses. *See U.S. v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) (function of a bill of particulars is to "provide a defendant with information about the details of the charge against him"). Further, as Defendants' opening brief argued – and to which the Opposition tellingly does not respond – Halligan's need for a comprehensive list of alleged misrepresentations is particularly compelling because only one of the Indictment's alleged misrepresentations is attributed to him, he is not alleged to have been present when most were made, and it is otherwise impossible for him to discern his alleged role in their making. Defs.' Br. at 110. Rather, the Indictment relies on vague and convoluted language to impute others' misrepresentations to Halligan, alleging variously that he "directed" Becker to make misrepresentations (without specifying when such direction was given), *see, e.g.*, Ind. ¶ 51(a); that he acted with Hwang's "implicit and at times explicit permission" (without alleging that he was aware of the falsity of the underlying information or defining what constitutes "implicit permission"), *see, e.g.*, Ind. ¶ 41; and describing meetings at which it was allegedly "agreed" to provide false information to counterparties, without describing Halligan's alleged role in such meetings, *see, e.g.*, Ind. ¶ 54(b)(ii).

Ultimately, the allegations enumerated in the Indictment, as amplified in the August 18 Letter, are helpful but not sufficient. They would not survive under the Rule 9 civil standard that the Court referenced in its June 1 Order, let alone pass muster in a federal criminal prosecution where Defendants' liberty is at stake.

31

**B.**     **The Government Should Identify Unindicted Co-Conspirators**
**and Other Details Regarding the Alleged RICO Enterprise (Count One)**

The Indictment lacks the most basic and necessary details regarding the alleged
"Archegos Enterprise" (or the "Enterprise"), Defs.' Br. at 111, and the Government fails to
address this deficiency in any meaningful fashion. To prepare their defenses, Defendants need the
following three main categories of particulars concerning the alleged RICO conspiracy: (1)
formation date of the conspiracy; (2) unindicted members of the conspiracy; and (3) acts in
furtherance of the conspiracy. Opp. at 63-64.

*As to the formation date of the Enterprise:* The Government argues that the
Indictment provides an approximate time period for the conspiracy and defines the "Archegos
Enterprise," Opp. at 64, but even a cursory reading reveals that these disclosures  create confusion
rather than clarity concerning the formation date.  Paragraph 1 of the Indictment describes the
Archegos Enterprise as being active "from in or about 2020" – without specifying a month or
even season of 2020 – "up to and including in or about March 2021," while the Indictment
elsewhere narrates the "creation of Archegos" as occurring at some point during a twelve-year
span, between 2001 and 2013. *Id.* ¶¶ 8, 10. According to the Indictment, therefore, the Enterprise
could have been formed at any time in a nineteen-year range, between 2001 and 2020. The
Government's claim that the particularization of when the Enterprise formed – basic information
that would not burden the Government to provide – is not "necessary to assist the defendant" is
simply wrong. *See* Opp. at 64.  Nor, tellingly, has the Government articulated any risk to
prospective witnesses or to its investigation that such disclosure could cause, unlike cases cited in
the Opposition arising in the narcotics trafficking context, including *U.S. v. Murphy*, No. 21-cr-
280 (AKH), 2022 WL 1270958, at *5 (S.D.N.Y. Apr. 28, 2022), Opp. at 57, 59, where such a risk
was prevalent and thus a basis for denying the disclosure that defendants sought.

*As to the undicted members of the Enterprise* – The Government responds only generically to Defendants' request for disclosure of unindicted co-conspirators, and cites only fact-intensive decisions issued by other courts reflecting very different circumstances. Notably, the Government does not respond to Defendants' argument that the particular circumstances of *this* case warrant provision of the particulars that Defendants now seek. *See* Opp. at 64.

The identification of unindicted co-conspirators is vital to Halligan's trial preparation, particularly because, as the Government acknowledges, he is not a trader and had no role in trading, Opp. at 67-68, is not alleged to have any role in the alleged "market manipulation" conduct charged in the Indictment, and is not alleged to have been present when most of the alleged misrepresentations were made. Absent the identification of known unindicted co-conspirators, therefore, Halligan is unable to identify even the universe of *potential* individuals that the Government might be referring to as "others known and unknown" (which is at least Archegos's fifty employees, Ind. ¶ 10[12] and could be very much higher). He is thereby hindered in his ability to prepare a defense by, for example, developing impeachment evidence.[13] *Trie*, 21 F. Supp. 2d at 22 (ordering immediate disclosure of unindicted co-conspirators where "some of the alleged co-conspirators may have dealt only with the [co-defendant]" and "[defendant] had no way of identifying those persons"); *Strawberry*, 892 F. Supp. at 527 (granting bill of particulars

---

[12] The Government notes that Archegos grew to fifty employees in 2021, supposedly as emblematic of its sophistication, Ind. ¶ 10.

[13] The Government's promise to disclose a witness list and § 3500 material "sufficiently" in advance of trial to avoid delay, Opp. at 64, is no substitute for providing Defendants a meaningful opportunity to prepare their defenses, given the sizeable universe from which potential unindicted co-conspirators might be drawn. The Government typically produces its witness list and § 3500 material as close as it possibly can to the actual trial date, when, as a practical matter, in-depth investigation into any new factual issue by defense counsel is impossible. The Government's refusal to identify known co-conspirators now will thus significantly burden Defendants' efforts to prepare their defenses.

33

for co-conspirators who participated in alleged scheme where defendant argued in part that he was not present at most incriminating events); *Nachamie*, 91 F. Supp. 2d at 572 (citing *Strawberry* and noting that where there are an "unknown number of unindicted co-conspirators," provision of their names will "prevent unfair surprise"); *U.S. v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y. 2018) ("Here, while there is no allegation of a long-running conspiracy and [Defendant 1] is only alleged to have conspired with [Defendant 2], it would meaningfully alter the nature of the charges, and accordingly, [Defendant 1]'s preparation for trial if it were revealed that the Government considered him to be conspiring with other individuals.").

*As to acts in furtherance of the alleged conspiracy* – The Government relies on *U.S. v. Carroll*, 510 F.2d 507, 509 (2d Cir. 1975) and *U.S. v. Minaya*, 395 F. Supp. 2d 28 (S.D.N.Y. 2005), for the proposition that there is no Second Circuit requirement to disclose all overt acts underpinning a conspiracy charge. Opp. at 63. But this general principle has been notably constrained, and where "overt acts are alleged in terms too general to enable the defendant to defend against them," more particulars are required. *U.S. v. Rajaratnam*, No. 09-cr-1184, 2010 WL 2788168, at *2-3 (S.D.N.Y. July 13, 2010) (acknowledging *Minaya*'s holding but ordering particulars where insider trading conspiracy allegations are "complex[]," "fact-intensive," and the "potential for unfair surprise and the difficulty of preparing a defense are amplified").

The overt acts alleged against Halligan in this case are not merely general, they are indiscernible. As described above, the Indictment implicates Halligan in the misrepresentation allegations in only vague and conclusory fashion. Tellingly, the "means and methods" section of Count One constitutes just three short paragraphs, amounts to less than a page, and implicates Halligan only via a sweeping, vague, conclusory sentence accusing him of "obtaining trading capacity . . . through false statements." Ind. ¶ 74(b). In other words, absent particulars, the

34

Indictment does not inform Halligan of the conduct of which he is accused. *U.S. v. Savin*, No. 00-cr-45, 2001 WL 243533, at *4 (S.D.N.Y. Mar. 7, 2001) (bill of particulars granted in mail and wire fraud case where the "indictment does not provide detailed notice of the conspiracy allegations and the means and methods of the conspiracy"); *U.S. v. Hawit*, No. 15-cr-252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (ordering particulars "specifying the transactions . . . that the Government will seek to prove were tainted by an unlawful conspiracy" because otherwise the defendant will not have "notice of which specific transactions . . . are alleged to have been tainted by unlawful conduct.") (citing *Bortnovsky*, 820 F.2d at 574-575); *see also Bin Laden*, 92 F. Supp. 2d at 236 (granting bill of particulars where allegations of overt acts "refer to such broad categories of conduct" that defendants cannot reasonably focus their trial preparations).

## C.    The Government Should Provide Particulars Related to the Alleged Securities Fraud Against Archegos's Counterparties (Count Ten)

The Government glosses over Defendants' obvious concern that Count Ten is a veritable hodgepodge of potential charging theories – e.g., "maker" liability under Rule 10b-5(b), "scheme liability" under Rule 10b-5(a) and (c), aiding and abetting a violation of Rule 10b-5(a), (b), or (c) – with no differentiation among charging theories, Defendants, alleged primary violators, or alleged secondary violators. The Government argues that Defendants' request for particularization as to the aiding and abetting allegation improperly seeks disclosure of "the manner in which it will attempt to prove charges," Opp. at 67, but this is not so. In this sprawling and complex case, where the vast majority of the misrepresentations alleged in the Indictment were apparently made by individuals who are cooperating with the Government and whose versions of events will therefore not be revealed to Defendants until the virtual eve of trial, the Indictment's bald citation to the statutes (both § 10(b) and 18 U.S.C. § 2) without further

3707749.1

particularization falls short of the Government's requirement to provide Defendants fair notice of the nature of the crimes that they are alleged to have committed as necessary to prepare their defenses, avoid unfair surprise, and avoid double jeopardy. *See U.S. v. Murgio*, 209 F. Supp. 3d 698, 723 (S.D.N.Y. 2016) (defendant is entitled to know whether the Government is pursuing an aiding and abetting theory because the preparation necessary to defend against aiding and abetting a bribe "looks very different from the preparation necessary to defend against a charge that [the defendant] personally paid one"); *U.S. v. Lieberman,* 15 F.R.D. 278, 280-81 (S.D.N.Y. 1953) ("[T]he question here is whether Lieberman has been given sufficient information when told, in substance, that he is charged with aiding, abetting, counseling, commanding, inducing, procuring or causing the smuggling.  I do not think that that is enough in this case.").

The Government also argues that it need not provide particulars regarding the victims of the offenses alleged in the Indictment because such information exists somewhere in the mountains of the text-searchable discovery the Government has produced. Opp. at 67. But it is well established that "it is no solution to rely solely on the quantity of information disclosed by the government" because "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *Bin Laden*, 92 F. Supp. 2d at 234. Just so here, where the Government has produced over 3 million documents, totaling almost 10 million pages. Moreover, where particulars about putative victims are known to the Government, they should be provided. *See Davidoff*, 845 F.2d at 1154 (holding that "the trial judge exceeded his discretion in this RICO prosecution by denying a bill of particulars identifying at least the victims of discrete extortionate schemes that the prosecution intended to prove").

Finally, the Government makes the strange and erroneous argument that Halligan is using the Motion to seek information of "personal interest." Opp. at 67. Halligan seeks nothing more than the specific trades or transactions, if any, that the Government alleges *he* made or

36

directed, or over which he had ultimate control, Defs.' Br. at 108 – an appropriate request in a case given that Halligan was not a trader and that the overwhelming bulk of the trading allegations are asserted only against his co-defendant. The Government now seems to represent in its Opposition that there were no such trades. Opp. at 68. If that is indeed the Government's position, the Government should have no hesitation to say exactly that in a Bill of Particulars; then and only then will Halligan be protected against the possibility of a last-minute change of mind.

**D.    The Government Should Provide Particulars
Related to Alleged Manipulative Trading**

The Indictment lacks the most basic and necessary details regarding the trading that underpins the alleged market manipulation charged in the Indictment.[14] The requested information is set forth in Category 3(a) through 3(e) of Defendants' opening brief at 108. The Government's refusal to provide these particulars ignores the mandate of *Bortnovsky*, 820 F.2d at 574, that particulars be disclosed "in order to identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [the] defendant to prepare for trial[ and] to prevent surprise." Indeed, as explained in Defendants' opening brief, the concerns described in *Bortnovsky* are amplified here, given the myriad (still unparticularized) transactions -- over hundreds of days in multiple names -- at issue; Archegos's sometimes daily communications and interactions with its many counterparties; and, above all, the millions of documents that the Government has produced in discovery (an exponentially larger number than the 4,000 documents that the Second Circuit in *Bortnovsky* referred to as a "mountain"). *See* Defs.' Br. at 112-114.

---

[14]  As discussed above and in Defendants' opening brief, Halligan is not charged with market manipulation. The particulars addressed here are relevant to both Counts Two through Nine (which do not name Halligan) and Count One (which does).

37

As the court recognized in *U.S. v. Connolly*, No. 16-cr-00370, 2017 WL 2537808, at *5 (S.D.N.Y. May 24, 2017), when it ordered the Government to identify the trading data on which it intended to rely at trial, "Defendants have a perfect right to analyze, prior to trial, trade data with which the jury will be presented, in order to verify its accuracy and explore other issues, including issues that would relate, not to the Government's case, but to the defense." *See also* Transcript of Proceedings at 27:1-28:4, *U.S. v. Walters,* No. 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 13, 2016), ECF No. 51 (granting bill of particulars seeking identification of all allegedly unlawful trades). Moreover, the volume of documents that the Government has produced in this case – over 3 million documents and almost 10 million pages – far exceeds the volume in many other cases where particulars were granted. *See, e.g.*, *Davidoff*, 845 F.2d at 1154-55 (6,000 pages of wiretap applications and transcripts of wiretap intercepts); *Bortnovsky*, 820 F.2d at 574 (4,000 documents); *Savin*, 2001 WL 243533, at *3 (100,000 pages); *Nachamie*, 91 F. Supp. 2d at 571-72 (200,000 documents).

Accordingly, for the foregoing reasons, the Court should order a bill of particulars identifying details regarding the issues enumerated in Defendants' opening brief at pages 108-09.

## IV.
## THE GOVERNMENT SHOULD BE ORDERED TO COMPLY WITH *BRADY*

The Government conducted a joint investigation with the SEC and CFTC, it coordinated with the SEC and CFTC to commence simultaneous parallel proceedings, and it stood together with the SEC and CFTC at a joint press conference describing the three offices' coordinated efforts and common allegations. *See* Defs.' Br. at Pt. V. Now, when the consequence of that coordination is a discovery obligation under *Brady v. Maryland*, the Government runs away from its investigative partners. *See* Opp. at Pt. V.

38

But it can re-write neither history nor relevant law. Most critically, Judge Rakoff's decision in *U.S. v. Gupta*, 848 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2012), rejects many arguments the Government advances in its opposition brief. The court ordered the Government to review and produce exculpatory information in the SEC's memoranda of interviews it conducted jointly with the Government, explaining that "to hold that these memoranda were not created as part of a joint factual investigation would make a mockery of the joint investigation standard as applied to the defendant's constitutional right to receive all information the Government has available to it that tends to show his innocence." So too here, and the Government and should be required to comply with *Brady* by gathering and producing exculpatory documents from the SEC and CFTC.

Halligan incorporates by reference the arguments set forth in Hwang's reply brief at Pt. IV seeking an order compelling the Government to comply with its *Brady* obligations.

[CONCLUSION ON FOLLOWING PAGE]

## CONCLUSION

For the reasons set forth above, as well as in Defendants' opening brief and in Hwang's reply brief, the Court should dismiss the Indictment as against Halligan. If the Court declines to dismiss the Indictment, it should enter an Order striking prejudicial allegations from the Indictment referencing Tiger Asia, compelling the Government to provide a bill of particulars, and directing the Government to comply fully with its *Brady* obligations, specifically including production of materials in the hands of the SEC and CFTC.

Dated:   New York, New York
         January 27, 2023

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER &
 ADELMAN LLP



s/ Mary E. Mulligan
Mary E. Mulligan (mmulligan@fklaw.com)
Timothy M. Haggerty (thaggerty@fklaw.com)
Bonnie M. Baker (bbaker@fklaw.com)
Anil Vassanji (avassanji@fklaw.com)
Rupita Chakraborty (rchakraborty@fklaw.com)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Patrick Halligan*