UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                               :

UNITED STATES OF AMERICA               :

                                               :

   - v. -                              :                22 Cr. 240 (AKH)

                                             :

SUNG KOOK (BILL) HWANG and     :
PATRICK HALLIGAN,              :

                                             :

       Defendants.                :

                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<br/>

## MOTION TO EXCLUDE CERTAIN PROPOSED TESTIMONY OF MICHAEL JOHANNES AND FABIO SAVOLDELLI

<br/>

                                          DAMIAN WILLIAMS
                                          United States Attorney
                                          Southern District of New York
                                          One St. Andrews Plaza
                                          New York, New York 10007

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

LEGAL STANDARD........................................................................................................ 2

ARGUMENT ................................................................................................................... 4

   I.    The Court Should Order Hwang to Comply with Rule 16 ..................................... 4

      A.    Professor Johannes's Notice Omits Necessary Information......................... 4

      B.    Mr. Savoldelli's Notice Omits Necessary Information ................................ 6

   II.    The Court Should Preclude Certain Parts of Professor Johannes's Proposed Testimony 9

      A.    The Court Should Preclude Professor Johannes from Opining about Hwang's "Strategies" and "Target Prices" ............................................................. 9

      B.    The Court Should Preclude Professor Johannes from Arguing the Defense's View of the Evidence ............................................................................. 11

      C.    Professor Johannes's "What if" Testimony Should Be Precluded as Unreliable and Unhelpful ................................................................................... 13

      D.    The Court Should Preclude Professor Johannes's Opinion that "Archegos's trades involved real economic exposure" ........................................... 17

   III.    The Court Should Exclude Portions of Mr. Savoldelli's Proposed Testimony ............. 18

      A.    The Court Should Exclude Mr. Savoldelli's Proposed Testimony About Motives, Intents, and States of Mind ................................................................ 18

      B.    The Court Should Exclude Mr. Savoldelli's Proposed Testimony Offering Legal Opinions................................................................................. 20

CONCLUSION................................................................................................................ 22

# INTRODUCTION

The defense expert notices reflect a plan to use expert testimony for an array of impermissible purposes: to opine on Bill Hwang's motives, intentions, and state of mind, and to usurp the role of the Court and miseducate the jury on the legal framework by which it should decide the case. The Federal Rules of Evidence forbid expert witnesses from acting as a conduit for a defendant's (or any other person's) state of mind, however, and from intruding on the Court's role to instruct the jury on the law. The Court should exercise its gatekeeping authority and preclude this inadmissible testimony. Beyond those problems, the defense's proposed expert testimony presents an array of other deficiencies, including a recurring failure to identify the documents and evidence that purportedly undergird the work of the experts. As to these improperly noticed opinions, the Court should require the defense to correct its notices or, in the alternative, preclude the opinions.

# BACKGROUND

On April 25, 2022, a grand jury sitting in this District returned an eleven-count indictment charging Hwang and Patrick Halligan with violations of Title 18, United State Code, Section 1962(d) (Racketeering Conspiracy) (Count One), Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Ten), and Title 18, United State Code, Section 1343 (Wire Fraud) (Count Eleven); and charging Hwang with violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Two), and Title 15, United States Code, Sections 78i(a)(2) and 78ff (Market Manipulation) (Counts Three through Nine).

On December 8, 2023, consistent with this Court's scheduling order, Hwang provided his initial expert notice, which identified two experts he may call during his case in chief: Michael

Johannes and Fabio Savoldelli.[1] According to Hwang's notice related to Michael Johannes (the "Johannes Notice," attached hereto as Exhibit A), if permitted by the Court, Professor Johannes would testify to a range of macroeconomic and trading topics, ranging from a description of the financial markets in 2020 and 2021 to Archegos's investment strategy to explanations for why prices of certain securities increased during the period of the charged scheme. According to Hwang's notice related to Fabio Savoldelli (the "Savoldelli Notice," attached hereto as Exhibit B), if permitted by the Court, Mr. Savoldelli would testify to various "background topics related to family offices, common trading practices, and financial markets."

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has reliably applied to the case. Fed. R. Evid. 702. District courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose. First, it "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Interpretations of certain actions and inferences about "the intent and motive" of an individual "lie outside the bounds of

---

[1]    Halligan has provided no expert notice.

expert testimony." *Id.* at 547; *see, e.g.*, *Kewazinga Corp. v. Microsoft Corp.*, No. 18 Civ. 4500 (GHW), 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021) ("Expert opinions about beliefs, intents, or motives are inadmissible."); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank*, No. 09 Civ. 686 (SAS), 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("[O]pinions concerning state of mind are an inappropriate topic for expert opinion.").

Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This condition requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *accord Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a

district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

## ARGUMENT

### I.     The Court Should Order Hwang to Comply with Rule 16

Hwang's notices fail to identify the bases for multiple opinions or use generalities that obscure the actual data, analyses, documents, and witness statements that undergird the defense's anticipated expert testimony. The Court should order Hwang to supplement his notice to conform with Rule 16. In the absence of a corrective disclosure, the Court should preclude the defense experts from testifying on insufficiently noticed matters. *See United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (affirming preclusion of late-noticed defense expert and observing that, "[i]f a party fails to comply with Rule 16, the district court has broad discretion in fashioning a remedy, which may include granting a continuance or ordering the exclusion of the evidence" (quotation marks omitted)).

### A.     Professor Johannes's Notice Omits Necessary Information

The Johannes Notice obscures the precise contours of the professor's work behind expansive assertions that his opinions rest on, among other things, "documents produced in discovery" and "publicly available information." (Johannes Notice at 3). These categories are so broad as to be meaningless and provide no notice as to the factual material, if any, that underpins many of Johannes's various opinions and analyses.

Although the defense does cite certain data sets relied upon for some opinions, many others lack informative descriptions. For example:

- Professor Johannes plans to testify about the "comparative market capitalization of the at-issue firms relative to peers identified by Archegos." Johannes Notice ¶ 3. The Johannes Notice does not explain the meaning of the phrase "peers identified by Archegos" or identify the data that corresponds to or underlies the expected testimony.

4

- Professor Johannes plans to testify that "Archegos's investment strategy in the indictment period is consistent with Archegos's portfolio and historic approach," but does not identify the "trading and portfolio records" that correspond to or underly this expected testimony. *See* Johannes Notice ¶ 4. The Johannes Notice also states that Professor Johannes's testimony will be based on "public filings by other investors," but it does not identify either the investors or the filings that form the basis of this opinion. *Id.* Finally, the Johannes Notice states that Professor Johannes's testimony on this point will be based, in part, on "academic, industry, and government research." *Id.* The Johannes Notice does not, however, identify what that research is, nor is it obvious that any academic, industry, or government research bears on the point, given that the opinion relates to "Archegos's portfolio and historic approach," *id*.

- Professor Johannes plans to testify that "Mr. Hwang's target prices were consistent with certain external research conducted by independent analysts . . . ." Johannes Notice ¶ 5. Though the defense identifies and supplies third-party data constituting the research of independent analysts, it does not identify the dataset that constitutes "Mr. Hwang's target prices."

- Professor Johannes plans to testify that the "economic evidence is inconsistent with the government's theory that Archegos dominated/controlled the market for the at-issue securities" but does not identify much of the data that purportedly underlies this conclusion. For example:

  o Professor Johannes relies, in part, on "the counterparties' documents" but does not describe which ones or even which counterparties. Johannes Notice ¶ 6(b).

  o Professor Johannes relies on "public market data" including "data on daily share price and trading volume" and "short interest and lending fees" but does not provide it. Johannes Notice ¶ 6.

- Professor Johannes plans to testify that "[c]ontemporaneous valuations of market participants" serve to "contradict the notion that prices were artificially inflated," purportedly on the basis of "public market data; company earnings announcements, third-party analyst reports, and news related to the at-issue securities; and academic literature." *See* Johannes Notice ¶¶ 8 & 8(a). The Johannes Notice does not identify what data this actually may be or for what companies or at what times.

- Professor Johannes plans to testify to various aspects of Archegos's trading in reliance on, among other things, "records of Archegos's communications"; "Archegos's trading records and other Archegos documents"; "Archegos's counterparties' trading records and other documents"; and "public market data." *See, e.g.*, Johannes Notice ¶¶ 7, 9-10. But the Johannes Notice does not identify the actual data, records, or documents that form the bases for these opinions.

Without further description of the bases for Professor Johannes's opinions, the Government will be forced to discover them during cross-examination, spending the Court's and the jury's time to learn what Rule 16 requires the defense to share now.

### B.    Mr. Savoldelli's Notice Omits Necessary Information

The Savoldelli Notice also deals in vague generalities that render it deficient under Rule 16. For example, the Savoldelli Notice asserts:

> Unless otherwise noted, the basis for Mr. Savoldelli's testimony will be research, academic literature, publicly available information including industry news, his 40 years of professional experience and training in finance, trading, and investment and asset management, which, as explained above, includes overseeing investment strategies on behalf of banks, institutional asset managers, and hedge funds; his 15 years of teaching a graduate-level course on hedge funds at Columbia University's Graduate School of Business; and his decade of consulting on investment strategies for a family office.

Savoldelli Notice at 2.

The Savoldelli Notice goes on to enumerate 18 topics about which Mr. Savoldelli will testify. Savoldelli Notice ¶¶ 1-18. But for only one of those topics (addressed below) does the Savoldelli Notice specify the basis of the testimony. That means that the vast majority of Mr. Savoldelli's proposed testimony is based primarily on intangible items—"research," "experience," "training," "teaching," and "consulting"—and on only two tangible items: "academic literature" and "publicly available information including industry news." The defense has not specified what "academic literature" or "publicly available information" forms the bases of those 17 topics of proposed topics; in fact, it is not clear whether the defense has even produced such "literature" and "information."

That defect afflicts 17 of Mr. Savoldelli's 18 proposed topics, but it is particularly egregious that the defense failed to specify the "academic literature" and "publicly available

information" that support the following topics, whose specificity suggests that Mr. Savoldelli's proposed testimony is based on particular, identifiable materials:

- "Mr. Savoldelli will testify about industry standards and practices in connection with the United States Securities and Exchange Commission's Family Office Rule (Advisers Act Rule 202(a)(11)(G)-1), commonly referred to as the 'Family Office Rule,' which exempts family offices from a variety of regulations that apply to other asset management firms like hedge funds, which manage capital or assets from outside investors." Savoldelli Notice ¶ 3.

- "Mr. Savoldelli will testify that a concentrated investment strategy is a strategy used by investors who focus their investments in a small number of companies they see as offering opportunities for profit, and that this strategy can yield much higher returns than diversified investments." Savoldelli Notice ¶ 5.

- "Mr. Savoldelli will testify that a private equity approach to public equity investment may involve taking a long-term view of a security with deep knowledge of the company." Savoldelli Notice ¶ 6.

- "Mr. Savoldelli will testify that transacting with multiple counterparties is commonplace for, and may be advantageous to, institutional asset managers and funds. He will testify that transacting with multiple counterparties may allow investors to negotiate better terms (including margin rates) and pricing from each of them. He will also testify that the use of multiple counterparties is a form of risk mitigation, minimizing the risk of frontrunning and minimizing the fund's losses in the event that any single counterparty fails or experiences financial difficulties." Savoldelli Notice ¶ 8.

- "Mr. Savoldelli will testify that it is standard industry practice for investors to use indicative portfolios and/or decoy or sample names when negotiating with counterparties, including for the purpose of avoiding frontrunning. Mr. Savoldelli will testify about block trading, and that it is standard industry practice for investors seeking to execute block trades to choose to disclose a list of stocks to potential counterparties—containing both the stock they want to purchase and potentially decoy stocks—rather than disclose the target stock alone, to avoid potential frontrunning by the counterparties, their employees, or their clients." Savoldelli Notice ¶ 12.

- "Mr. Savoldelli will testify about trading at the close and the concepts of liquidity and slippage. He will testify that, generally speaking, markets are most liquid at or near closing, and that greater liquidity minimizes slippage because it allows traders to buy or sell assets quickly and at a price closer to the pre-execution market price." Savoldelli Notice ¶ 13.

- "Mr. Savoldelli will testify that 'dark pools' are used by institutional asset managers and funds and provide additional avenues for funds to seek liquidity." Savoldelli

Notice ¶ 16.

- "Mr. Savoldelli will testify about the concepts of liquidity and solvency and how institutional asset managers and funds apply those concepts, including that funds are considered solvent if they have assets greater than their liabilities." Savoldelli Notice ¶ 18.

The defense should be directed to specify, and to disclose, if it has not already done so, the "academic literature" and "publicly available information" that form the bases of the vast majority of Mr. Savoldelli's proposed testimony, including those categories listed above.

Further, the Savoldelli Notice is inadequate even as to the sole category of proposed testimony for which it specifies additional bases. The Savoldelli Notice states:

> Mr. Savoldelli will testify about the potential advantages of trading in total return swaps, including that they (1) allow investors to gain exposure to certain assets that are difficult to access directly, (2) may be cheaper and easier to leverage than stock purchased on margin, and (3) may not require disclosure. Mr. Savoldelli will also testify about the size of the market for these instruments.
>
> In addition to his professional and teaching experience, the basis for Mr. Savoldelli's testimony on total return swaps will be his review of public reports issued by regulators and other publicly available information. . . . This material is contained in today's defense production of Rule 16 material.

Savoldelli Notice ¶ 7.

The defense has failed to specify which "public reports issued by regulators and other publicly available information"—contained within the defense's 30,356-page production made in connection with the defense's two expert notices—support Mr. Savoldelli's proposed testimony about total return swaps. The defense should be directed to specify which "public reports" and "publicly available information" form the bases of that proposed testimony.

## II.     The Court Should Preclude Certain Parts of Professor Johannes's Proposed Testimony

The defense apparently seeks to use Professor Johannes to address a broad range of economic topics, ranging from the presentation of event studies to commentary on Hwang's trading strategies to opinions of market analysts with no involvement in this case. The Court should exercise its gatekeeping authority to preclude the defense from offering impermissible testimony regarding Hwang's state of mind, legal terms, or defense characterizations of the charges in the case.

### A.     The Court Should Preclude Professor Johannes from Opining about Hwang's "Strategies" and "Target Prices"

The Court should preclude Professor Johannes from offering impermissible state of mind and ultimate issue testimony cloaked as commentary on "Archegos's strategies" or Hwang's "target prices."

Experts are not permitted to testify "concerning the motive, intent, and state of mind" of people or entities. *Rezulin Prods.*, 309 F. Supp. 2d at 545. Such testimony is inadmissible for two reasons. First, "[b]ecause science has not yet invented a way to read minds, 'inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019) (quoting *Rezulin Prods.*, 309 F. Supp. 2d at 547); *accord In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (opinions about "intent, motives, or state of mind . . . have no basis in any relevant body of knowledge or expertise"); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 442-43 (E.D.N.Y. 2011) (same). "Instead, juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility." *AU New Haven*, 2019 WL 1254763, at *14. Second, and relatedly, expert testimony about a defendant's motive, intent, or state of mind is prohibited

9

under Rules 702 and 704 because it "does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Rezulin Prods.*, 309 F. Supp. 2d at 541 n.23; *see* Fed. R. Evid. 702 (requiring that the testimony "will help the trier of fact to understand evidence or determine a fact in issue); Fed. R. Evid. 704(b) (prohibiting an expert in a criminal case from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense"). "Expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). Accordingly, a defendant may not make an "effort to tell the jury the defendant's intentions through the mouth[] of" an expert witness. *United States v. Rahman*, 189 F.3d 88, 138 (2d Cir. 1999); *see also GST Telecom. Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000).

The defense has signaled a plan to use Professor Johannes to offer improper opinion about Hwang's state of mind. For example, Professor Johannes plans to testify that "Archegos's investment strategy in the indictment period is consistent with Archegos's portfolio and historic approach," Johannes Notice ¶ 4, and that Hwang's target prices are "consistent with certain external research," Johannes Notice ¶ 5. But the nature of Hwang's "strategy" in 2020 and 2021 is the central jury question in the case: If Hwang's strategy was to manipulate the prices of multiple stocks, then the Government will have established an essential element of market manipulation; if Hwang's strategy was to innocently invest, then the Government will not have met its burden. Inviting Professor Johannes to opine on Hwang's actual strategy—as opposed to opining from trading orders that those orders were consistent with a particular approach—runs afoul of the rule that experts cannot testify about a person's intent or motives, including the "intent or motives underlying . . . certain business transactions." *Rezulin Prods.*, 309 F. Supp. 2d at 546. Professor

Johannes would essentially be opining that Hwang lacked the criminal intent necessary to commit the charged offenses, which Professor Johannes may not do. The defense repeats the same mistake by planning for Professor Johannes to opine about Hwang's target prices, *see* Johannes Notice ¶ 4, which presupposes that Hwang, in fact, believed that certain securities had a particular value and that he reflected that value honestly in a target price.

Professor Johannes's opinion about Hwang's strategies and target prices also rests on an improper and unreliable basis. Professor Johannes has no special expertise in Hwang's or Archegos's approach to investing and no basis to report Hwang's intentions or target prices at any time. Professor Johannes did not work at Archegos—or, for that matter, Tiger Asia—and has no firsthand knowledge of the firms Hwang has run. Rather, he is simply reviewing selected discovery material, then "propound[ing] a particular interpretation" of that evidence. *LinkCo, Inc. v. Fujisu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). But an expert may not provide his own narrative gloss on the facts of a case. *See In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at *29 (S.D.N.Y. Feb. 11, 2022) (collecting cases). That rule applies with particular force here, where Professor Johannes's gloss would take the form of expert opinion about the thought processes of one of the defendants.

**B.     The Court Should Preclude Professor Johannes from Arguing the Defense's View of the Evidence**

The Johannes Notice demonstrates that the defense plans to use Professor Johannes, in part, to argue its view of the evidence through expert testimony. Professor Johannes plans to testify, for example, that "the economic evidence is inconsistent with the government's theory that Archegos dominated/controlled the market for the at-issue securities," Johannes Notice ¶ 6, and that "economic evidence contradicts the government's theory that the prices of the at-issue securities were artificially inflated over the indictment period," Johannes Notice ¶ 8. Neither opinion is

proper, and both should be precluded.

First, Professor Johannes is in no position to opine on the Indictment's allegations or the government's trial theory and thus cannot say the evidence disproves them. The Johannes Notice does not indicate that the professor is relying on the Indictment itself as the basis for an opinion, which significantly limits his ability to understand the Government's case, but more importantly Professor Johannes has no legal training, let alone experience in interpreting indictments or discerning prosecutorial strategy. And what Professor Johannes thinks of the Indictment or the Government's theories of the case is utterly irrelevant. It is the Court's role to instruct the jury on the law, and the jury's role to determine if the Government has proven the charges in the Indictment beyond a reasonable doubt. Accordingly, Professor Johannes should not be permitted to express any opinions in the form of commentary on the Indictment or the Government's theory of the case.

Second, Professor Johannes should not be permitted to testify that "economic evidence contradicts the government theory that the prices of the at-issue securities were artificially inflated over the indictment period" because doing so would involve both legal opinion and state of mind testimony. In the context of market manipulation, trading "'artificially' affect[s] a security's price" when it "'sends a false price signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded," *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2021) (footnotes omitted), though the "false" signal may arise solely from the trader's intent to rig the prices, *ATSI Commc'ns*, 493 F.3d at 102; *see also, e.g.*, *United States v. Eisenberg*, No. 21 Cr. 10 (AS), 2023 WL 8720295, at *5 (S.D.N.Y. Dec. 18, 2023) (discussing what it means to "artificially affect" prices in the context of a commodities fraud case). To the extent Professor Johannes understands "artificial" to have the same meaning as it has in common law, any opinion that Professor Johannes may offer about "artificially inflated" prices would

therefore require an assessment of Hwang's intentions. That would be improper. *Rezulin Prods.*, 309 F. Supp. 2d at 546. To the extent that Professor Johannes has a different understanding of the meaning of "artificial," any testimony he may give on this subject risks confusing the jury into applying Professor Johannes's understanding of the term in its deliberations rather than the legal instructions supplied by the Court.

Third, Professor Johannes should be precluded from characterizing a defense-selected set of days as "days that the government has alleged involved manipulation." Johannes Notice ¶ 7(b). Given that the Indictment charges schemes occurring from "in or about 2020 up to and including in or about March 2021," *e.g.*, Indictment ¶ 7, and given that the Court previously rejected the defendants' improper demand for a bill of particulars identifying each and every manipulative trade within that period, the defense appears to have misinformed Professor Johannes about the Government's allegations. Professor Johannes should not be permitted to repeat that misimpression to the jury.

## C.    Professor Johannes's "What if" Testimony Should Be Precluded as Unreliable and Unhelpful

The Court should preclude Professor Johannes from testifying about what "could have" happened if market events the week of March 22, 2021, had unfolded differently than they did. *See* Johannes Notice ¶ 12.

As set forth in the Johannes Notice, the defense aims to have Professor Johannes engage in counterfactual "what if" guesswork: "Professor Johannes will further testify that if only the Viacom and Discovery declines had happened that week, Archegos could have had billions of dollars of additional capital on March 25, 2021, all else equal. Similarly, he will testify, if only the at-issue Chinese ADR declines had happened that week, Archegos could have had billions of dollars of additional capital on March 25, 2021, all else equal." Johannes Notice ¶ 12. These

opinions lack any reliable methodology, however, and would be entirely unhelpful to the jury.

The "what if" testimony envisioned by the Johannes Notice appears to be rank speculation. The Johannes Notice does not describe any analysis Professor Johannes undertook to identify the counterfactual scenarios he posits, to assess which, if any of those scenarios would be plausible, or that might enable him to opine in any rigorous way that the Archegos portfolio—that is to say, Hwang—would have responded to these imaginary scenarios in the manner Professor Johannes assumes. Indeed, it is not clear that Professor Johannes's opinions derive from any analysis that could be replicated or tested, is of a sort used by economists, or has been applied in accordance with any particular professional standards. *Cf. United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (describing indicia of reliability). Instead, Professor Johannes's "what if" musings rest on a review of "Archegos's historical trading and portfolio records, public market data . . . , market news, and academic literature." Johannes Notice ¶ 12. Although the defense has not specified which data or news actually underpins the professor's work, it is not obvious that any "market data" or "news" reflects counterfactual events that did not occur. Accordingly, the connection between the facts as they existed and Professor Johanne's "what If" forecasts appears to simply be the professor's own *ipse dixit* assertions, which renders his opinions inadmissible.

In addition to being unreliable, the "what if" testimony envisioned by the Johannes Notice will also be unhelpful to the jury. A trial court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (*quoting United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Atlantic Specialty Ins. v. AE Outfitters Retail Co*., 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially

that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert"). As the crux of Professor Johannes's "what if" testimony appears to be that Archegos's portfolio "could have" survived the week of March 22, 2021, if its largest positions had not declined in value, then the jury will not need expert assistance to understand it: if stock prices had not gone down, a portfolio tied to stock prices would not have gone down.

Moreover, speculation about what "could have" happened the week of March 22, 2021, is not relevant to the jury's task of assessing whether the charged schemes existed and if so whether Hwang and Halligan joined them. No element of the charged offenses relates to proving or disproving the counterfactuals posited by Professor Johannes and, of course, there will be no evidence that Hwang or Halligan acted in reliance on some similar type of counterfactual analysis. The helpfulness standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. No such connection exists here.

Johannes's testimony on this subject would also be unhelpful to the jury, and indeed would suggest to the jury that it may reach a verdict on an impermissible basis, because a belief, even if truly held, that victims would not ultimately be harmed by a defendant's crime is not a defense to any charge. *See United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *see also, e.g.*, *United States v. Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008) (defendants' suggested "good faith belief" that "there would be no ultimate harm to investors because [their planned] movie would be produced as promised, and that investors would be no worse off" warranted a "no ultimate harm" instruction); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("the fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victim suffers no loss is no excuse"); *United States v. Berger*, 188 F. Supp. 2d 307, 329

(S.D.N.Y. 2002) ("Were a jury to find that [the defendant] intentionally caused others to issue materially false or misleading statements of the [company's] value to its investors . . . he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out.'"). Thus, evidence, like the proposed testimony of Johannes, tending to demonstrate that, regardless of whether the defendants committed a crime, no harm would have occurred if certain events had transpired should be precluded as irrelevant under Rules 401 and 402 and more unfairly prejudicial than probative under Rule 403. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid).

Finally, it is telling that the defense has pre-emptively signaled their intention to seek to preclude evidence of what actually did happen the week of March 22, 2021—that is, to prevent the jury from learning that without the defendants' manipulative conduct the prices of the stocks in Archegos's portfolio collapsed and never recovered[2]—while simultaneously seeking to present the jury with an imagined view of what could have happened that week if the markets had acted differently. The Court should constrain the evidence in this case to what the defendants thought, did, and caused, and should preclude the defendants from suggesting that there might have been a world where their schemes worked out okay for everyone.

---

[2]     The defense notes that they "expect there will be no evidence or argument suggesting that the stock decline after the Archegos collapse is indicative of manipulation." Johannes Notice ¶ 3 n.1. The defense's assumption is purportedly based on the Government's litigation position in *United States v. Phillips*, No. 22 Cr. 138 (LJL), a commodities fraud prosecution concerning the unlawful manipulation of the dollar-rand exchange rate. As it happens, even if the Government's litigation position in that case were analogous, the district court in *Phillips* rejected the Government's position and admitted evidence of post-manipulation movements in the dollar-rand exchange rate. *See United States v. Phillips*, No. 22 Cr. 138 (LJL), Dkt. 55 at 6-9 (S.D.N.Y. Oct. 10, 2023).

### D.   The Court Should Preclude Professor Johannes's Opinion that "Archegos's trades involved real economic exposure"

To the Government's knowledge, there is no factual dispute in this case that Hwang's trading involved economic risk for both Archegos and for its counterparties. The Government has not alleged that Hwang faked trade orders; rather, it has alleged that Hwang placed real orders with an intent to manipulate the prices of certain securities. *See, e.g.*, Indictment ¶¶ 2, 27, 35, 63. Thus, Professor Johannes's testimony on this subject is untethered to any disputed issue. Moreover, by the time that Professor Johannes takes the stand, the Government expects that more than a dozen witnesses will have testified that Hwang's trading involved real risk—not least because it led to billions in losses—and that, because of the possibility of losses, Archegos's counterparties considered whether to trade with Archegos at all. Professor Johannes's abstract testimony will therefore be, at best, cumulative and, at worst, unhelpful to a jury that will have already taken the point.

Finally, and most troublingly, it appears that the defense may be trying to invite Professor Johannes to suggest that the securities laws do not forbid open market manipulation, *see, e.g.*, Johannes Notice ¶ 8(b) (claiming that "[t]he at-issue securities traded in an efficient market, and therefore, any purportedly artificial prices would tend to revert"). "As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Professor Johannes has no legal expertise, however, and the view that open market activity cannot be the basis for a manipulation claim has been repeatedly rejected by the Circuit and has been rejected by this Court in this case. *See, e.g.*, Dkt. 66 at 3; *Set Capital*, 996 F.3d at 77; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). Accordingly, the Court should preclude the defense from attempting to smuggle inaccurate legal instructions to the jury in the form of purported expert testimony.

**III.    The Court Should Exclude Portions of Mr. Savoldelli's Proposed Testimony**

Certain portions of Mr. Savoldelli's proposed testimony are thinly disguised efforts to provide opinions as to Hwang's and Archegos's motives, intents, and states of mind. Other parts of Mr. Savoldelli's proposed testimony either are irrelevant and unhelpful to the jury or appear designed offer legal opinions. All of those parts of Mr. Savoldelli's proposed testimony should be excluded.

**A.    The Court Should Exclude Mr. Savoldelli's Proposed Testimony About Motives, Intents, and States of Mind**

As noted above, experts are not permitted to testify "concerning the motive, intent, and state of mind" of people or entities. *Rezulin Prods.*, 309 F. Supp. 2d at 545. At least eight parts of Mr. Savoldelli's proposed testimony are impermissibly about Hwang's or Archegos's motives, intents, and states of mind:

1.   The defense proposes that Mr. Savoldelli will testify that "family offices can be run in a variety of ways, in accordance with the wishes, goals, and risk profile of the family or individual whose funds the office manages." Savoldelli Notice ¶ 1. That proposed testimony is improper to the extent that it is about *Hwang's* "wishes, goals, and risk profile."

2.   The defense proposes that Mr. Savoldelli will testify that a family office's investment manager "has sole discretion to adjust the office's investment style, portfolio composition, leverage, or other investment parameters in response to personal developments . . . ." Savoldelli Notice ¶ 2. That proposed testimony is improper to the extent that it is about *Hwang's* "investment style" or "personal developments."

3.   The defense proposes that Mr. Savoldelli will testify that "family offices make investment decisions in accordance with any reasoning, process, or data they wish . . . ." Savoldelli Notice ¶ 4. That proposed testimony is improper to the extent that it is about the "reasoning, process, or data" in accordance with which *Hwang* or *Archegos* made "investment decisions."

4.   The defense proposes that Mr. Savoldelli will testify that "a concentrated investment strategy is a strategy used by investors who focus their investments in a small number of companies they see as offering opportunities for profit . . . ." Savoldelli Notice ¶ 5. That proposed testimony is improper to the extent that it is about why *Hwang* or *Archegos* used "a concentrated investment strategy."

5. The defense proposes that Mr. Savoldelli will testify that "a private equity approach to public equity investment may involve taking a long-term view of a security with deep knowledge of the company." Savoldelli Notice ¶ 6. That proposed testimony is improper to the extent that it attempts to interject through an expert a rationalization that *Hwang* has offered for his conduct, and thus presents hearsay and inadmissible evidence about *Hwang's* intent.

6. The defense proposes that Mr. Savoldelli will testify that, "generally speaking, markets are most liquid at or near closing, and that greater liquidity minimizes slippage because it allows traders to buy or sell assets quickly and at a price closer to the pre-execution market price." Savoldelli Notice ¶ 13. That proposed testimony is improper to the extent that it is about why *Hwang* or *Archegos* traded "at or near closing."

7. The defense proposes that Mr. Savoldelli will testify that "traders may decide to trade and build a position quickly or slowly depending on a variety of factors, including the portfolio manager's objectives and strategy . . . ." Savoldelli Notice ¶ 14. That proposed testimony is improper to the extent that it is about *Hwang's* "objectives and strategy" or the factors that informed *Hwang's* or *Archegos's* decision to "build a position quickly or slowly."

8. The defense proposes that Mr. Savoldelli will testify that "limit prices . . . allow portfolio managers and/or traders to adjust their execution strategy if the price unexpectedly changes." Savoldelli Notice ¶ 15. That proposed testimony is improper to the extent that it is about *Hwang's* or *Archegos's* use of "limit prices" or *Hwang's* or *Archegos's* "execution strategy."

As an initial matter, the foregoing proposed testimony should be excluded simply because it is unreliable. Mr. Savoldelli is not an expert on Hwang or Archegos, and Mr. Savoldelli's background in trading does not make him an expert on Hwang's or Archegos's trading strategies. Like Professor Johannes, Mr. Savoldelli did not work for Hwang or for Archegos, and Mr. Savoldelli has no firsthand knowledge of their trading strategies. Indeed, the defense's notice for Mr. Savoldelli reveals that his proposed testimony is *not* based on his review of any records pertaining to Hwang or Archegos. Mr. Savoldelli thus has no basis to opine about Hwang's or Archegos's actions and intents. *See Fosamax Prods.*, 645 F. Supp. 2d at 192 (expert did not have "ability to read minds"). Mr. Savoldelli might know about certain trading strategies. But he cannot speak in general about how traders, writ large, structure portfolios or manage risk. Traders are not a homogenous block, and Mr. Savoldelli is not an expert about the myriad ways different traders

might intend to structure their portfolios or to manage risk. Those decisions depend on trader-specific motives, objectives, and appetites for risk—topics about which Mr. Savoldelli cannot testify reliably. For that reason alone, the foregoing proposed testimony should be excluded.

Separately, the foregoing proposed testimony impermissibly delves into Hwang's and Archegos's motives, intents, and states of mind. Testimony about Hwang's and Archegos's "wishes," "goals, "risk profile," "investment style," "personal developments," "reasoning," "investment decisions," "investment strategy," "objectives," and "execution strategy" amounts to testimony that Hwang did not intend to manipulate the market. That is testimony about "whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged" and is thus barred by not only Rule 702, but also Rule 704(b). *See, e.g.*, *Rezulin Prods.*, 309 F. Supp. 2d at 546 (expert cannot testify about "intent or motives underlying . . . certain business transactions"). A defendant may not "tell the jury [his] intentions through the mouth[] of" an expert witness. *Rahman*, 189 F.3d at 138. Accordingly, the foregoing proposed testimony should be excluded.

### B.    The Court Should Exclude Mr. Savoldelli's Proposed Testimony Offering Legal Opinions

As noted above, a basic principle of Rule 702 is that "an expert's testimony on issues of law is inadmissible." *Bilzerian*, 926 F.2d at 1294. The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). "The rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001).

At least three parts of Mr. Savoldelli's proposed testimony impermissibly offer legal opinions:

1. The defense proposes that Mr. Savoldelli will testify about "industry standards and practices in connection with the United States Securities and Exchange Commission's Family Office Rule (Advisers Act Rule 202(a)(11)(G)-1), commonly referred to as the 'Family Office Rule,' which exempts family offices from a variety of regulations that apply to other asset management firms." Savoldelli Notice ¶ 3.

2. The defense proposes that Mr. Savoldelli will testify that, "due to their particular nature and regulation, family offices operate in a manner distinct from other trading structures." Savoldelli Notice ¶ 4.

3. The defense proposes that Mr. Savoldelli will testify that "investors often seek to structure their business activities so as to minimize the burden of regulatory filings." Savoldelli Notice ¶ 11.

Those parts of Mr. Savoldelli's proposed testimony, individually and collectively, seem designed to instruct the jury—incorrectly—that family offices effectively operate outside regulatory scrutiny and thus, by implication, are not subject to the Securities Act of 1933 or the Securities Exchange Act of 1934.

As an initial matter, the foregoing proposed testimony should be excluded simply because it is unreliable. Mr. Savoldelli is not a legal expert and has no reliable basis to testify about legal opinions. Separately, the foregoing proposed testimony should be excluded because it usurps both the Court's role "in instructing the jury as to the applicable law" and the jury's role "in applying that law to the facts before it." *Lumpkin*, 192 F.3d at 290. "[T]estimony on issues of law is inadmissible," *Bilzerian*, 926 F.2d at 1294, and it should be excluded here.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court (a) order the defense to supply additional detail regarding the anticipated testimony of Michael Johannes and Fabio Savoldelli, and (b) exclude certain improper opinions reflected in the Johannes and Savoldelli Notices. In the alternative, the Government respectfully requests the opportunity to examine Professor Johannes and Mr. Savoldelli at a *Daubert* hearing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Dated: New York, New York          By:      s/
        December 19, 2023                       Matthew Podolsky
                                               Alexandra Rothman
                                               Samuel P. Rothschild
                                               Andrew Thomas
                                               Assistant United States Attorneys