**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.                                                    22 Cr. 240 (AKH)

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,

　　　　Defendants.

---

**DEFENDANT SUNG KOOK (BILL) HWANG'S MOTION TO EXCLUDE**
**EVIDENCE AND COMPEL DISCOVERY**
**ON THE PROSECUTION'S RULE 16 VIOLATION**

---

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    I.      Investigation, Charges, and Discovery ................................................................. 3

    II.    The Defense's Request for Trading Data............................................................... 5

    III.   Motion Practice Over Rule 17 Subpoenas ............................................................ 7

    IV.   Expert Disclosure, *Daubert* Briefing, and Prosecution Disclosure ...................... 9

ARGUMENT .......................................................................................................................... 13

    I.      The Court Should Preclude the Undisclosed Trade Data ................................... 13

    II.    The Court Should Order Discovery ..................................................................... 17

CONCLUSION........................................................................................................................ 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States v. Ahuja,*
   18 Cr. 328 (KPF) (S.D.N.Y. Dec. 28, 2021)........................................................................2, 3

*United States v. Jain*,
   19 Cr. 59 (PKC), 2020 WL 6047812 (S.D.N.Y. Oct. 13, 2020)..............................................18

*United States v. Lee*,
   834 F.3d 145 (2d Cir. 2016)....................................................................................................14

*United States v. Mason*,
   06 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) ...........................13, 14, 15, 16

*United States v. Nejad,*
   487 F. Supp. 3d 206 (S.D.N.Y. 2020)................................................................................2, 18

*United States v. Pineros,*
   532 F.2d 868 (2d Cir. 1976)....................................................................................................14

*United States v. Wynder,*
   22 Cr. 240 (PKC), 2022 WL 3572881 (S.D.N.Y. Aug. 19, 2022) ...........................15, 16, 18

**Other Authorities**

Rule 16(d)(2)(C) ...................................................................................................................2, 13

Rule 16(d)(2)(D) ........................................................................................................................2

## PRELIMINARY STATEMENT

On Friday, January 5, 2024, the prosecution informed the defense of a grave failure in its discovery obligations:  it had failed to produce spreadsheets of trading data underlying its charges (the "Undisclosed Trade Data"), which had been obtained from Bloomberg and in the prosecution's possession since 2021.  The defense now has the data, which is approximately 14 gigabytes and contains over 27 million rows of trading data and 63 columns, for a total of over 1.7 *billion* data points.  The volume of information in the Undisclosed Trade Data is extraordinary, and it is magnitudes larger than the Archegos trade data previously produced.

The production of this voluminous data 17 months after it should have been produced is astonishing.  But what makes it even worse is that the defense has been asking for this trading data for well over a year, and the prosecution repeatedly told the defense that it had produced all the trade data it had received.  As it turns out, the prosecution's statements were false.  The defense made a motion for Rule 17 subpoenas to get the data in July of last year, again emphasizing why it was so important to the defense.  But the prosecution opposed those efforts, all the while failing to reveal that it had the sought-after information on trade execution in its possession the whole time.  Indeed, the prosecution obtained the Undisclosed Trade Data in November 2021 and has been able to rely on it for years, despite its failure to turn over the data as Rule 16 material.  As a result, the defense has been left to defend this market manipulation case—the most aggressive one ever pursued—with the incomplete trading data previously produced in discovery, which omits critical information about the execution of the swaps and hedges at the center of this case.

The prejudice to the defense cannot be overstated.  The prosecution has alleged a market manipulation scheme lasting over a year and involving millions of trade executions.  But the defense has been hamstrung the entire pretrial period by the prosecution's extraordinary and

egregious failure to produce the data for the underlying trades.  Defense counsel and their experts have spent well over a year preparing for trial based on incomplete data, including the many months spent most recently preparing expert analyses and disclosures that now need to be re-evaluated in light of the prosecution's belated disclosure.

The severity of the prosecution's failure warrants an equally serious sanction.  The Court should exercise its discretion to prohibit the prosecution from relying on the Undisclosed Trade Data at trial.  Rule 16(d)(2)(C) authorizes the Court to "prohibit that party from introducing the undisclosed evidence," and Rule 16(d)(2)(D) authorizes the Court to "enter any other order that is just under the circumstances."  Fed. R. Crim. P. 16.  Likewise, the Rule 5(f) Order in this case authorizes "evidentiary sanctions" for failure to comply with the order.  *See* Rule 5(f) Order (ECF 13). Given the gravity of the prosecution's discovery failure, and consistent with basic principles of fairness, the prosecution should be precluded from introducing the Undisclosed Trade Data, and its experts should be precluded from presenting any analyses relying on it.

The Court should also order discovery to determine (i) how and why the prosecution failed to disclose the data underlying the manipulation allegations and repeatedly—and inaccurately—assured the defense it had no further data in its possession, and (ii) whether additional sanctions are warranted.  Such discovery is necessary in light of the continued failures by the United States Attorney's Office ("USAO") to comply with its discovery obligations, even in the face of recent condemnations and sanctions by judges in this District.  In *United States v. Nejad*, Judge Nathan dismissed the indictment and vacated the defendant's guilty verdict because of the USAO's repeated disclosure failures and misstatements to the court.  487 F. Supp. 3d 206, 207-08 (S.D.N.Y. 2020).  And in *United States v. Ahuja*, Judge Failla granted defendants a new trial after an AUSA informed the Court that the USAO had complied with disclosure obligations when it had not.

Transcript at 8, 11-12 in *United States v. Ahuja*, 18 Cr. 328 (KPF), (S.D.N.Y. Dec. 17, 2021) (ECF 457); Order in *United States v. Ahuja*, 18 Cr. 328 (KPF) (S.D.N.Y. Dec. 28, 2021) (ECF No. 460).

Despite these sanctions, the USAO proved it was unable to police itself effectively. In fact, in October 2022, after another significant discovery violation similar to the one here, the Chief of the Criminal Division at the USAO informed Judge Castel of various measures the USAO was undertaking to try to address ongoing discovery issues, including improvement in tracking systems and improved trainings. *See* October 16, 2022 Letter in *United States v. Wynder*, 20 Cr. 470 (PKC) (ECF 160).

Yet here we are again. At the same time the USAO was purportedly implementing these new measures to ensure compliance with its discovery obligations, the prosecution made an even more egregious error in this case. Worse still, the prosecution lulled the defense for well over a year into believing the Undisclosed Trading Data did not exist with repeated assurances that it had produced all the trade data in its possession. In doing so, the prosecution and its experts have gained an enormous informational advantage that jeopardizes the defendants' right to a fair trial. To both remedy this error and deter future discovery violations, the Court should exclude the evidence and order discovery to determine whether additional sanctions and remedial measures are warranted.

## BACKGROUND

### I.    Investigation, Charges, and Discovery

On September 27, 2021, before any charges in this case were brought, the USAO obtained search warrant 21 Mag. 9335 for "all content and other information," associated with seven Bloomberg accounts, as well as "[a]ll Bloomberg Execution Management Data associated with" Archegos accounts, including "records of stock, option, and swaps trades with broker-dealers." *See* Declaration of Jordan Estes ("Estes Decl."), Ex. A, at SDNY_001_00000281,

SDNY_001_00000282.  On November 23, 2021, Bloomberg produced data to the USAO in connection with the warrant, including the Undisclosed Trade Data recently produced to the defense on January 5, 2024.  *See* Estes Decl. Ex. B.

On April 27, 2022, the Indictment against Bill Hwang and Patrick Halligan was unsealed. That same day, Magistrate Judge Jennifer Willis entered an order pursuant to Federal Rule of Criminal Procedure 5(f) requiring the prosecution to (i) disclose to the defense all information "'favorable to an accused,'" and (ii) make that disclosure "promptly…so that the defense may make effective use of the information in the preparation of its case."  Rule 5(f) Order (ECF 13).

The prosecution made multiple discovery productions to the defense in the following months.  In particular, on May 23 and June 24, 2022, the prosecution produced trade data from Bloomberg's Execution Management System (referred to as "EMSX") maintained by Archegos (the "Archegos Trade Data").  The Archegos Trade Data does not include the critical trading details contained in the Undisclosed Trade Data that are central to the manipulation allegations in the case.  Specifically, the Archegos Trade Data (i) reflects only Archegos's final order quantity, rather than the initial quantity and any changes made thereto (and when those changes occurred); (ii) reflects only the final limit price, rather than the initial limit prices and any changes thereto (and when those changes occurred); and (iii) and does not reflect the time when any hedging transactions were executed, the size, location and nature of those transactions, or even the number of transactions in the equities markets that were undertaken as a hedge; rather, it reflects only the first time a given Archegos swap order was placed with the Counterparty and the final quantity of the Archegos swap order after all modifications.  Indeed, the discrepancy in the data is apparent by comparing the spreadsheets.  While the Undisclosed Trade Data contains over 27 million rows of data showing the granular details of how and when the swaps were executed, the

Archegos Trade Data contains approximately 17,000 rows for the same period of time. Similarly, while the Undisclosed Trade Data totals approximately 14 gigabytes, the Archegos Trade Data is approximately 7.5 megabytes.

The prosecution also produced trade data it obtained from certain Counterparties. That data is also significantly more limited than the Undisclosed Trade Data. Certain Counterparties produced no trade execution data at all. Other parties produced trade data that contains far less information than even the Archegos Trade Data. And although one Counterparty produced trade data with a similar level of detailed execution information, that data begins only in September 2020, in contrast to the Undisclosed Trade Data, which begins on January 2, 2020.

On August 4, 2022, the prosecution produced thousands of documents described as "Responsive Bloomberg Search Warrant Returns (21 Mag 9335)." *See* Estes Decl. Ex. C. That production did not include the Undisclosed Trade Data.

The Court held a status conference on September 8, 2022. At the conference, the prosecution stated that: "[t]he government has made a number of substantial discovery productions and **has completed its Rule 16 productions**." Sept. 8, 2022 Transcript at 2 (emphasis added) (ECF 40). We now know the prosecution's representation to the Court was untrue.

## II.     The Defense's Request for Trading Data

On October 18, 2022, the defense wrote the prosecution to raise various issues with discovery. In particular, the defense emphasized the need for additional trading data:

> Additionally, we note that the Archegos-related trading data that the Government obtained from the Banks and has produced to us provides varying levels of detail… Accordingly, **please clarify whether the Government has provided all trading data in its possession**, and, if there is more, please supplement the production accordingly.

Estes Decl. Ex. D (emphasis added).  On October 24, 2022, the prosecution responded by email that "the **government has provided all trading data currently in its possession**."  Estes Decl. Ex. E (emphasis added).

On November 15, 2022, the defense again wrote the prosecution regarding trade data. The letter focused on trade data from the counterparties, because the defense had no way of knowing the prosecution had obtained and failed to produce trade data from Bloomberg. Specifically, the defense stated:

> Relatedly, **we reiterate the request in our letter of October 18, 2022, for clarification whether the Government has produced all of the Archegos-related trading data obtained from the counterparties**.  As we noted in that prior letter, we have not located any trading data at all from Bank of Montreal, Jefferies, or Wells Fargo.  And, for those counterparties for whom we have received data, much of the data is missing key details, such as whether the trade was done via cash or swap, order-level transaction times and lots, and even, in at least one case, the name of the security being traded.

Estes Decl. Ex. F. (emphasis added).

On December 2, 2022, the prosecution responded:

> **We believe we have produced to you all the trading data that we obtained**, and we do not intend to withhold any trading data in this matter.  **That said, we have not intended to suggest that we obtained all data about all trading that occurred in the relevant time period for any of Archegos's top positions; we did not**.

Estes Decl. Ex. G (emphasis added).  The prosecution also suggested a call "to discuss precisely what appears to be missing or incomplete."  *Id.*

Shortly thereafter, on December 22, 2022, the defense wrote the prosecution about the trade data and why it was important to preparing the defense:

> [W]e write to take you up on the offer extended in your December 2 letter to have a call about the market and trading data produced to date…. Regarding trading data, it would be helpful to know precisely what the Govt subpoenaed from the counterparties.  **To be completely transparent, and as I am sure you understand, we need counterparty trade execution data, including order lots**

6

> **and times, for all Archegos-related trades and for all hedging transactions related to those trades.**  As best we can tell from the CPs' cover letters, we only have hedging data from MUFG and UBS.  And as to Archegos-related trades, there is no consistent set of data across banks; by way of example, some data is missing order-level lots and times; no differentiation is made between cash and swap trades in some instances; some data is provided on a monthly instead of a daily level; and in at least one case, the name of the security being traded is missing.  **We would appreciate knowing whether there is or will be a uniform set of Archegos-related trading data** and, if not, whether, as you said in your correspondence, you "may be willing to re-engage with counterparties to request additional or clarifying material to assist your preparations for trial.

Estes Decl. Ex. H (emphasis added).

The government did not immediately respond, and on January 13, 2023, the defense followed up on the December 22 email and asked for a call to discuss the trade data.  *See* Estes Decl. Ex. I.  The prosecution responded that "it may be more productive at this point to speak shortly after the motions conference.  **Your email on the trade and market data requests has given us some specific avenues to consider and we should be in a more informed position to address your requests soon**."  Estes Decl. Ex. J (emphasis added).

On February 28, 2023, the parties held a call on the market and trade data.  Notes of that call indicate that the defense told the prosecution they intended to file a Rule 17 subpoena motion to obtain the additional trading data, and the prosecution responded by wishing them luck.  *See* Estes Decl. Ex. K.

## III.   Motion Practice Over Rule 17 Subpoenas

Believing the necessary data was with the Counterparties, on July 27, 2023, the defense moved for Rule 17(c) subpoenas.  *See* Motion for Rule 17(c) Subpoenas (ECF 79).  In the motion, the defense emphasized the importance of the trading data:

> In addition, given the Government's allegation that Mr. Hwang strategically timed his swap transactions so as to manipulate the market at certain times of the day, **it is critical to Mr. Hwang's defense that he be able to ascertain the timing and extent of the Counterparties' hedging activity**. For example, evidence that a Counterparty hedged through multiple transactions over the course of a day, in a

manner designed to minimize the price impact of the hedges, would undermine the Government's theory that Mr. Hwang's trades led to the artificial inflation of the stock price.

*Id.* at 6 (emphasis added).  In connection with that request, the defense sought "[a]n electronic blotter reflecting… parent order and time, any changes to the order, such as increases to the limit price, and the time of the changes, and the child orders and times that were used in the execution of the transaction."  *See* Exhibit A to Motion for Rule 17(c) Subpoenas (ECF 79-1).

The prosecution opposed the request for subpoenas.  In doing so, it represented that it "obtained trading records from Archegos itself and from Archegos's fund administrator, Citco, as well as trade data from the New York Stock Exchange and NASDAQ."  Opposition to Motion for Rule 17(c) Subpoenas at 3-4 (ECF 84).  It did not reference the Undisclosed Trade Data, which contains the execution-level trade data being sought by the subpoenas.  The prosecution's opposition also mocked the defense's request for an electronic blotter similar to the one contained in the Undisclosed Trade Data, indicating that no such blotter likely existed, even though it had a blotter containing this data:

> **And the most specific request—for 'an electronic blotter reflecting all of [a counterparty's] transactions** with respect to the At-Issue Securities, in both swaps and equities'—appears to call for the creation and production of a master record of trades that, based on the Counterparty's responses to grand jury subpoenas, **almost certainly does not exist at all.**

*Id.* at 10 (emphasis added).

The defense's reply brief likewise emphasized the need for trade data with "order entry, route, and execution time stamps" because it was "necessary to address the government's allegation that Mr. Hwang timed his swap transactions to manipulate the market at certain times of the day."  Reply in Support of Motion for Rule 17(c) Subpoenas at 2 (ECF 85).  And at the oral argument on the subpoena motion, defense counsel again emphasized the need to obtain the

trade data with the timing of the transactions, and reiterated that this would be contained in a

spreadsheet:

> MR. BERKE: Yes, with one caveat, if I may. In the indictment, they also allege
> one tactic of manipulation was the timing of the swap orders. But we know the
> timing of the contracts, which is just a bet, which doesn't translate into an
> immediate share, was at the timing of the share purchase. **For most of the
> counterparties, we do not have the timing of the purchase, and that's critical**
> because, your Honor, on the first page I cite where they say in the indictment –
>
> THE COURT: **Wouldn't the orders given over by government show you the
> time, the date?**
>
> MR. BERKE: In most instances they do not. **We know they exist. It is just a
> spreadsheet. It's not a burden**. We know from other cases they exist.
>
> THE COURT: It has to be prepared.
>
> MR. BERKE: It already exists, your Honor. We would not ask them to prepare
> anything. We only need to know the timing of the purchase.

Nov. 14, 2023 Transcript at 26 (ECF 93).

Despite the defense's arguments, the prosecution made no effort to confirm that

the defense had all of the relevant trading data.

## IV.    Expert Disclosure, *Daubert* Briefing, and Prosecution Disclosure

On December 8, 2023, the parties exchanged expert disclosures.  The prosecution's

experts proposed to testify about supposed "Archegos-linked orders," which one of the

prosecution's experts had determined by reviewing trading records and "matching" Archegos's

swaps with equity transactions on the NYSE, the Nasdaq, and dark pools.  Disclosure of Robert

Battalio ¶ 5 (ECF 106-1).  Based on the trading records that had been produced, the defense did

not understand how this analysis could have been conducted.  As the defense argued in its

*Daubert* motion, filed on December 19:

> However, the trade blotter reflecting Archegos's swap orders (which comes from
> Bloomberg's Execution Management System and is referred to as "EMSX") **does
> not contain the data needed to undertake this analysis.**  For example, the

> EMSX data reflects only Archegos's final order quantity, rather than the initial order quantity and any changes made thereto.  Similarly, the EMSX data reflects only the final limit price, rather than the initial limit prices and any changes thereto.  And finally, the EMSX data does not reflect the time when any hedging transactions were filled, or the number of transactions in the equities markets that were undertaken as a hedge; it reflects only the first time a given Archegos swap order was placed with the Counterparty and the final quantity of Archegos's swap orders after all modifications.  *See* Estes Decl. Ex. J.  **Given the limitations of this data, Battalio could not have reliably matched Archegos's swap orders with any hedging transactions in the equities markets**.

Motion to Exclude Testimony at 16 (ECF 105).  These arguments again made clear that the defense did not have the relevant data.

On January 3, 2024, the parties appeared before the Court to discuss the Rule 17 subpoenas and expert disclosures.  The Court recognized the difficulties in defending a manipulation case and emphasized the need "to maximize disclosure."  Jan. 3, 2024 Conference Transcript at 18.  The prosecution made no mention of its failure to disclose spreadsheets with millions of rows of trade data.

On January 4, 2024, the parties had a call to discuss the timing and content of supplemental expert disclosures.  During the call, the defense requested prompt disclosure of the analyses referenced in the prosecution's December 8 expert disclosures, but the prosecution resisted, stating that it would not make any such analyses available until later in the month.  Noting that the prosecution's position was inconsistent with the Court's directive at the January 3 conference, the defense advised the prosecution it would be seeking relief from the Court and urged the prosecution to reconsider its position.  As a result, the parties agreed to have a follow-up call on the next day.

The parties had a follow-up call on January 5, during which they agreed to a schedule for disclosure of the analyses and other information.  Only at the conclusion of that call did the prosecution reveal for the first time that there was a "discovery issue" relating to trading data.

They stated that in going back through their productions, they noticed that the defense has EMSX data from Archegos's side showing trades, but that there was a mirror production of EMSX data from Bloomberg that contained "additional metadata" on trades.  *See* Estes Decl. Ex. L.  The prosecution explained that as best as they could tell the data was "not ingested into Relativity" (a platform for reviewing documents), and thus they could not confirm it was produced to the defense.  *Id.*

The prosecution produced the Undisclosed Trade Data later that afternoon.  *See* Estes Decl. Ex. M.  The Undisclosed Trade Data contains two spreadsheets with 14 gigabytes of trading data.  The data spans January 2, 2020 to April 22, 2021.  Each spreadsheet contains over 13 million rows and 63 columns.  According to the defense's experts, the Undisclosed Trade Data is over 1,000 times larger than the previously produced Archegos Trade Data.

The Undisclosed Trade Data contains an enormous amount of critical, timestamped information on Archegos's trades that the Archegos Trade Data does not contain. For any particular trade, the Archegos Trade Data indicates the time when the order was initially placed by Archegos.  After the initial trade order, other order details, including order quantity, limit price (the maximum price at which Archegos was willing to execute a buy order, or minimum price at which Archegos was willing to execute a sell order), and the trading algorithm used by the counterparty to execute purchases in the market for an initial underlying hedge, were often modified in real time.  The Archegos Trade Data only shows the initial time of the order and the final quantity, limit price, and algorithm.  Because these order details were often modified, it is impossible to determine, based on the Archegos Trade Data, what order quantity, limit price, and trading algorithm was in place at any particular time.

For example, if an order was entered by Archegos at 9:35 a.m. at a limit price of $10, for a swap on 100,000 shares using a volume-weighted algorithm, and then was last modified at 10 a.m. to a limit price of $8 for a swap on 150,000 shares using a time-weighted algorithm, the Archegos Trade Data would inaccurately show that Archegos entered an order at 9:35 a.m. at a limit price of $8 for a swap on 150,000 shares using a time-weighted algorithm.  Moreover, the Archegos Trade Data lacks critical information about the trading activity by Archegos's Counterparties to initially hedge any particular Archegos order, including timestamped information on the quantity and price of each individual execution, and the time at which the trading activity ended.

In contrast, the Undisclosed Trade Data contains, for any particular trade, critical information including:

(a) the precise time Archegos sent an order through EMSX, along with the order quantity, limit price, and trading algorithm that was in place when the order was sent;

(b) the precise times Archegos modified an order in EMSX, along with the modified order quantity, limit price, and/or trading algorithm;

(c) the precise times Archegos' Counterparties executed individual transactions in the stock market to initially hedge their swaps with Archegos or buy or sell shares for Archegos when it wanted to take a stock position, along with the quantity of executed shares in that individual execution, the price at which they executed, the cumulative quantity of executed shares at that time, the location where the shares were executed and the average price of executed shares at that time; and

(d) the precise time at which an Archegos order was filled or cancelled.

Based on the Jencks Act information produced by the prosecution, it is clear that the prosecution's experts have been working with the Undisclosed Trade Data. The prosecution's reliance on the data is further illustrated by its production of additional derivative files of the Undisclosed Trade Data, which break out the data for each security. The prosecution informed the defense that these derivative files were created by its vendor. The metadata on the derivative files indicates they were created in November 2021, indicating that the vendor has had the files since then.

## ARGUMENT

### I.    The Court Should Preclude the Undisclosed Trade Data

The Court should prohibit the prosecution from introducing the Undisclosed Trade Data or eliciting expert testimony that relies on the Undisclosed Trade Data because of the prosecution's egregious failure to produce this data *for 17 months*, despite the defense's repeated requests for this information. To allow the prosecution to introduce such evidence at this late date would not only gravely prejudice the defense but would also reward the prosecution's wholesale and unexplained failure with a tactical advantage at trial. Such a result cannot be countenanced on the particular facts of this case, nor in light of the continued discovery failings by the USAO. The prosecution had numerous opportunities over the past year-plus to remedy this critical deficiency in its Rule 16 production and its failure to do so until the eve of trial calls for a swift and serious sanction, as well as additional discovery to get to the bottom of what happened and why.

This Court has broad discretion to impose a sanction for violating Rule 16, including discretion to prohibit the party in violation from introducing the undisclosed evidence. *See* Fed. R. Crim. P. 16(d)(2)(C); *see also United States v. Mason*, 06 Cr. 80 (NRB), 2008 WL 281970, at *4 (S.D.N.Y. Jan. 25, 2008) (precluding the government from introducing evidence after

discovery violation).  In exercising its discretion, the Court should consider "the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Lee*, 834 F.3d 145, 159 (2d Cir. 2016) (quoting *United States v. Pineros*, 532 F.2d 868, 871 (2d Cir. 1976)).

On the facts of this case, it is clear that preclusion, at a minimum, is warranted.[1]  The prosecution has not explained and cannot explain its failure to produce the detailed order information contained in the Undisclosed Trade Data that the defense has been requesting for well over a year.  While we cannot know without the benefit of additional discovery the reason for the failure to produce the data, there is no doubt that there was ample opportunity for the prosecution to have identified and rectified any production failure long before we were mere

---

[1] A continuance would not effectively ameliorate the prejudice the defense has suffered and would only impose additional, unwarranted burdens on the defense.  As Judge Buchwald explained in *Mason*, a case involving analogous facts:

> Under a different set of circumstances, we would be willing to entertain alternate remedies such as adjourning the trial date for all defendants or severing defendants Patterson and Mazier. However, the trial date was set nine months ago and the **government had over nineteen months to fulfill its obligation to disclose** all of the Miramar materials. **We are particularly troubled by the fact that the government ignored a specific request for the documents by Patterson's counsel** and failed to disclose the fingerprint evidence for eleven months. **The government's eleventh hour effort to change the evidentiary landscape of this case in a way that prejudicially impacts the defendants should not be remedied by a scheduling change** which has a concomitant, adverse impact on the defendants, defense counsel, and the Court. **It is not too much to ask the government, with all its resources, to respect a trial date set many months ago.**

*Mason*, 2008 WL 281970, at *4 (emphasis added).

weeks from trial.  For example, the prosecution could have recognized that the data had not been

disclosed on one or more of the following occasions:

- In October 2022, when defense counsel asked the prosecution to "clarify whether
  the Government has provided all trading data in its possession," Estes Decl. Ex.
  D, and the prosecution responded that "the government has provided all trading
  data currently in its possession."  Estes Decl. Ex. E.

- In November and December 2022, when the defense again requested clarification
  on the trading records, and the prosecution responded "[w]e believe we have
  produced to you all the trading data that we obtained."  Estes Decl. Exs. F-G.

- On December 22, 2022, when defense counsel emphasized that it did not have a
  "consistent set of data across banks," "including order lots and times, for all
  Archegos-related trades" and asked whether there "is or will be a uniform set of
  Archegos-related trading data."  Estes Decl. Ex. H.

- On February 28, 2023, when defense counsel explained that the defense intended
  to move for Rule 17 subpoenas to obtain trading data.  Estes Decl. Ex. K.

- On July 27, 2023, when defense counsel filed Rule 17(c) subpoenas seeking
  trading data.

- On November 14, 2023, when defense counsel argued that the trading data, and in
  particular the detailed order information, was critical and likely consisted of
  spreadsheets.

*See Mason*, 2008 WL 281970, at *4 (explaining that the court was "particularly troubled by the

fact that the government ignored a specific request for the documents by [defense] counsel and

failed to disclose the [] evidence for eleven months").

On none of these occasions did the prosecution indicate that much of the granular

information the defense was seeking was contained in the Undisclosed Trading Data, nor did any

of these occasions prompt the prosecution to produce the Undisclosed Trading Data.  Those

failings are all the more concerning in light of the fact that, as of October 2022, the USAO had

represented to Judge Castel that it was improving its training and discovery tracking in light of

another discovery error involving a hard drive and the Relativity database.  *See United States v.*

*Wynder*, 22 Cr. 240 (PKC), 2022 WL 3572881, at *5 (S.D.N.Y. Aug. 19, 2022) ("The Chief of the Criminal Division has advised the undersigned that the executive staff of the [USAO] is undertaking a review of ameliorative measures to reduce the risk of recurrence in other cases."). According to the letter filed by the Chief of the Criminal Division in that case, every AUSA in the USAO was directed to read Judge Castel's opinion in *Wynder*, and the USAO "emphasized to AUSAs that we have an obligation to do what we can to minimize the chances that errors occur by staying on top of the discovery process, tracking what comes in and goes out, and maintaining adequate supervision over our paralegals." *See* October 16, 2022 Letter at 2, *United States v. Wynder*, 22 Cr. 240 (PKC) (ECF 160). That obviously did not happen here.

More importantly, the defense will suffer substantial prejudice if the documents are introduced. The prosecution has had the Undisclosed Trade Data for years, and the prosecution's testifying experts have been preparing testimony based on the Undisclosed Trade Data for months. In contrast, the defense and its experts have expended substantial time and resources preparing for trial based on a different, incomplete set of data. Allowing the prosecution to inject millions of rows of undisclosed trading data into the case, at this late stage, would greatly expand the scope of government evidence in play at trial and would require the defense to re-evaluate and potentially revamp the expert testimony it intends to offer at trial, all mere weeks before trial. *See Mason*, 2008 WL 281970, at *3 (excluding late-disclosed evidence "because it cannot be reasonably concluded that there is no prejudice to the defendants from the fact that they did not have this information for the better part of a year or more").

Moreover, the differences in data are enormous and have given the prosecution an unfair advantage. The prosecution has alleged that Mr. Hwang timed his swap transactions to manipulate stock prices at certain times of day. *See* Indictment ¶ 35. But, prior to January 5, the

defense's information on these transactions has been grossly incomplete, because for transactions with all but one Counterparty, the defense did not have data on (i) the initial price and quantity of Archegos's order or (ii) modifications to Archegos's order. This data is critical because Archegos's orders were frequently modified. In other words, the defense has been trying to defend allegations that Archegos's orders moved stock prices without knowing what most of Archegos's orders were.

Similarly, without the Undisclosed Trade Data, the defense has been unable to evaluate whether particular transactions hedging Archegos's swaps moved stock prices. The Counterparties' hedging executions in the equities markets typically consisted of hundreds or thousands of "child orders" executed in smaller quantities, and at different prices and times than reflected in the Archegos Trade Data. The Archegos Trade Data did not contain these child orders, and most of the Counterparties did not produce data with child orders. Without information on these child orders, the defense's experts have had no way to analyze how and whether particular hedging transactions may have affected market prices, as the prosecution alleges.

The prosecution's experts, of course, have been working with this data for months, if not years. The prosecution should not be permitted to gain a tactical advantage through its own discovery failings. Instead, the evidence should be excluded, and the prosecution should be forced to rely on the more limited trade data originally produced to the defense. Leveling the playing field in this manner is the only way to ensure the defense gets a fair trial.

## II. The Court Should Order Discovery

In addition to precluding the prosecution from relying on or otherwise introducing the Undisclosed Trade Data, the Court should order discovery into how and why the prosecution failed to disclose the data underlying the manipulation allegations and repeatedly—and

inaccurately—assured the defense it had no further data in its possession.  Judges in this district have admonished the USAO for a string of serious discovery violations in recent years.  *See Nejad*, 487 F. Supp. 3d at 207, 225-26 (ordering prosecutors in the USAO to read the court's opinion after federal prosecutors "repeatedly violated their disclosure obligations" and "failed to live up to these ideals"); *United States v. Jain*, 19 Cr. 59 (PKC), 2020 WL 6047812, at *12 (S.D.N.Y. Oct. 13, 2020) (directing the Acting United States Attorney for the USAO and the Special Agent in Charge for the New York Field Office of the FBI to "meet and confer on the corrective actions they will undertake" to ensure a discovery error was not repeated); *Wynder*, 2022 WL 3572881, at *5 (noting that the executive staff of the USAO was "undertaking a review of ameliorative measures" to reduce the risk of recurring discovery violations).  And it was only after discovery was conducted in these cases that the full scope of the failures came to light.

The defense is entitled to the same kind of discovery here to understand what happened and why.  In particular, the Court should order the prosecution to provide: (i) documents in the USAO's possession regarding the defense's requests for trade data and the prosecution's assurances that the data had been produced; and (ii) documents reflecting the circumstances that led to the recent disclosure of the Undisclosed Trade Data.  Only with this evidence can it be determined whether further sanctions or remedial measures should be imposed.

## <u>CONCLUSION</u>

For the above-stated reasons, the Court should (i) preclude the prosecution from offering or using the Undisclosed Trade Data; and (ii) order discovery to determine whether further sanctions or remedial measures are warranted.

Dated:    January 8, 2024

Respectfully submitted,

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By:    _____
Barry H. Berke
Dani R. James
Jordan Estes
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
bberke@kramerlevin.com

*Attorneys for Defendant Sung Kook (Bill) Hwang*