O13NHWAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                           22 Cr. 240 (AKH)

SUNG KOOK HWANG and PATRICK
HALLIGAN,

              Defendants.

------------------------------x      Conference

                                     New York, N.Y.
                                     January 3, 2024
                                     2:30 p.m.

Before:
                 HON. ALVIN K. HELLERSTEIN,

                                 District Judge

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ALEXANDRA ROTHMAN
ANDREW THOMAS
SAMUEL ROTHSCHILD
MATTHEW PODOLSKY
     Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
     Attorneys for Defendant Hwang
BARRY BERKE
JORDAN ESTES
SHAKED SIVAN

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS, LLP
     Attorneys for Defendant Halligan
TIMOTHY HAGGERTY
RUPITA CHAKRABORTY
MARY MULLIGAN

1             (Case called)
2             MS. ROTHMAN:  Good afternoon, your Honor.  Alexandra
3    Rothman, Andrew Thomas, Matthew Podolsky, and Sam Rothschild,
4    for the United States.
5             THE COURT:  Hello.
6             MR. THOMAS:  Happy new year, Judge.
7             MR. BERKE:  Good afternoon, happy new year.  Good to
8    see you.  Barry Berke, Jordan Estes, and Shaked Sivan here for
9    Bill Hwang, who is in the courtroom as well.
10            MS. ESTES:  Good afternoon, your Honor.
11            THE COURT:  Good afternoon.
12            MR. HAGGERTY:  Good afternoon, your Honor.  Tim
13   Haggerty, Mary Mulligan, and Rupita Chakraborty, for Patrick
14   Halligan, who is seated next to me.
15            THE COURT:  How do you do?  Happy new year, everybody.
16            The purpose of this session was to expand further on
17   the issues of the Rule 17(c) subpoenas, and I want to take up a
18   matter of disclosures on the expert reports.
19            So let's do the Rule 17 subpoenas first, and either
20   Ms. Mulligan or Mr. Berke will report.
21            MR. BERKE:  Thank you, Judge.  I appreciate it.
22            As your Honor no doubt recalls, it seems like a long
23   time ago, but on November 14, when we were last before you,
24   your Honor very practically and helpfully directed both parties
25   to meet with counsel for the counterparties to try to get to

the bottom of the issue, the principal issue we raised:  What happened to the hedges behind the swaps after the initial purchase?

That directive from your Honor turned out to be extraordinarily productive and helpful.  Shortly after your Honor issued your order, we met with virtually all of the counterparties through their counsel, a very big meeting, and certainly all of the significant counterparties who played a significant role in the facts underlying the case.

Those discussions are continuing.  Most fundamentally, though, what we learned is that for the significant counterparties following the initial swap being placed, they either did not or could not track what happened to the hedges for those swaps.  This was significant.  What we have learned in our discussions --

THE COURT:  Tell me more about that.

MR. BERKE:  Yes.  What we learned in our discussions, as well as our review of the documents that are informed by these discussions -- and the counsel for, again, virtually all of the counterparties and certainly all of the significant counterparties have been very helpful in our exchanges.  We have had a lot of back and forths, a lot of calls.  What they have explained to us is that, after the swaps were purchased and an initial hedge is placed on, they then no longer track the hedge by counterparties.  Instead, they look at their

1    overall holdings for all their portfolios.  So they are not
2    able to say when they bought a swap and they may have hedged it
3    initially for Archegos what happened after that initial hedge.
4            More fundamentally, for virtually all of these
5    counterparties, what we have found and learned through our
6    discussions and the documents is that they hedged their swap
7    with Archegos in ways other than a one-by-one hedge for the
8    duration of the swap.  In other words, what we have learned is
9    these banks were internalizing Archegos's positions as well,
10   meaning if they had a swap going long on a stock --
11           THE COURT:  I understand.  They created fungibility --
12           MR. BERKE:  Of course.
13           THE COURT:  -- to the situation and looked at their
14   overall positions in hedging, which is what banks do.
15           MR. BERKE:  Exactly.
16           They also lend out shares for short sellers.
17           THE COURT:  Where does that lead us?
18           MR. BERKE:  Here is where it leads us.  Our
19   discussions are continuing and, again, moving in a very
20   positive direction, so we are encouraged by that.
21           THE COURT:  You have a trial date coming up very
22   quickly.
23           MR. BERKE:  We do.  What we have, your Honor, is we
24   intend to file a motion when we make our motions *in limine* on
25   January 24.  Because, your Honor, the indictment has

1    allegations that we now know are based on facts and assumptions
2    about documents that are inaccurate.
3              Your Honor, if I may pass up just an excerpt of the
4    four main indictments.  Given the length of the indictment, I
5    thought it might be easier if that would be helpful.
6              THE COURT:  Is the government --
7              MR. BERKE:  I have a copy for the government.
8              THE COURT:  You can tell me what paragraph it is.  I
9    have the indictment in front of me.
10             MR. BERKE:  Thank you, your Honor.  They're paragraphs
11   25 through 27.
12             THE COURT:  Page 16, right?
13             MR. BERKE:  I believe that is correct, your Honor.
14             THE COURT:  Okay.
15             MR. BERKE:  Your Honor, if I may first -- I will give
16   your Honor an opportunity to look at it.
17             THE COURT:  I have it.
18             MR. BERKE:  Okay.  Your Honor, if I may first direct
19   your attention to the last sentence of paragraph 25.
20             THE COURT:  Yes.
21             MR. BERKE:  Which says, thus -- I'm sorry.  It is the
22   beginning of that sentence.  It says, "Thus, as Archegos's swap
23   positions grew, so did the counterparties' purchases of the
24   corresponding stock."
25             That is the second-to-last sentence, excuse me, Judge.

1           THE COURT:  Yes.
2           MR. BERKE:  Then if you go to paragraph 26, it says,
3    "By in or about 2021, Archegos's total position in the
4    securities of certain companies equated to more than
5    approximately 30 percent, 40 percent, and 50 percent of the
6    freely traded shares or float of those companies."
7           It gives some examples.
8           Then if you turn to the next page, the same paragraph,
9    it has a chart of what it claims to be those total positions.
10          THE COURT:  Right.
11          MR. BERKE:  It goes on to say, the first sentence in
12   paragraph 27, that "market participants had no way to know that
13   Archegos had come to dominate the marketplace for these
14   securities."
15          All of those allegations are based on the
16   prosecution's assumption that when Archegos placed a swap with
17   the counterparties, the counterparties purchased the share of
18   that security and held on to it for the duration of the swap.
19          THE COURT:  You think they agree with that?
20          MR. BERKE:  That is the only way they can get to those
21   numbers.  Because it's based on the initial purchase --
22          THE COURT:  All right.  Let's assume you are right.
23          Where do we go from there?
24          MR. BERKE:  Your Honor, we intend to file a motion
25   with our motions *in limine* to preclude the prosecution from

1    making the argument that a swap by Archegos is equivalent to
2    purchasing of shares or make any arguments that flow from that,
3    such as Archegos dominated the --
4               THE COURT:  It's going to be a complicated fact
5    situation.  Let's hear from the government and see what they
6    say about that.
7               MR. THOMAS:  Sure, your Honor.
8               I think this is the point of having the trial, so we
9    can establish the facts and have the jury find them.  What the
10   government will present at the trial is testimony from
11   representatives of every counterparty that Archegos was trading
12   effectively in the shares underlying this --
13              THE COURT:  Are you going to back this up with
14   quantifications?
15              MR. THOMAS:  Yes, your Honor.  Because what
16   Archegos --
17              THE COURT:  It is not enough that they say it.  You
18   have to show it.
19              MR. THOMAS:  Absolutely.
20              THE COURT:  All right.
21              MR. THOMAS:  Archegos used an electronic --
22              THE COURT:  Mr. Berke, it looks to me like it is
23   argument.  You are both going to be arguing your propositions
24   to the jury.  I don't know how can I preclude or want to
25   preclude it.

1        MR. BERKE:  Judge, if I may -- and, again, we will
2   spell this out in a motion -- what the prosecution is talking
3   about is the initial swap.  Their evidence that they are
4   pointing to, unless they haven't produced documents to us, is
5   what happens initially.  In our discussions with the
6   counterparties, that have now gone on for over a month thanks
7   to your Honor's directive, the counterparties' counsel have
8   told us that the banks, the principal banks do not track and
9   could not track what happened to those hedges.
10       THE COURT:  They have overall positions.
11       MR. BERKE:  Right.  If your Honor remembers --
12       THE COURT:  I know enough about this from the
13  background.  At the end of the day, they add up all their
14  outstanding risks and, to the extent they wish to, hedge those
15  risks.  You would think that a bank would not want to be long
16  or short on any position at the end of the day.
17       So if a swap transaction is done with Archegos, it
18  will add to the risk, and that risk could be hedged.  But
19  depending on what that and many other things do, it will all
20  work out on an aggregate basis.
21       The government can prove that, but for the initial
22  transaction, the aggregates would have been lower and not that
23  much concentration, and the concentration in the stock would
24  have been diminished.  I'm guessing.
25       Am I right, Mr. Thomas.

1           MR. THOMAS:  Yes, your Honor.

2           MR. BERKE:  Your Honor, if I may.

3           THE COURT:  Mr. Berke it's argument.  You are a very
4    persuasive chap, but it is argument.

5           MR. BERKE:  Your Honor, I will say thank you.  But can
6    I make one point?  Because here's the challenge we face as the
7    defense that we are going to raise:  It is the prosecution is
8    going to present evidence of initial purchases.  Your Honor is
9    right, one way they can hedge is by having total holdings in
10   stock.  But we also have evidence, and looking at documents
11   talking to the counterparties we know that they don't have
12   documents for the significant counterparties.  Virtually all of
13   them do not have documents that show what happened with
14   Archegos.

15          THE COURT:  Mr. Berke, it is going to be argument.  It
16   is going to be argument.  Maybe the experts are going to be
17   talking about this as well.

18          Look, you make whatever motion you want to make.  I
19   don't have preclearance on motions.  You decide what motions
20   you want to make and I will rule.  But from what you say now
21   and what I know and what Mr. Thomas says, it strikes me it is
22   going to be an issue of fact for the jury.

23          MR. BERKE:  I appreciate that, Judge.

24          Can I make just one clarification so your Honor
25   understands one thing I was referring to, and your Honor may

already. That was the offsetting-swap-position issue, which doesn't require purchasing of securities in the market at all. If you remember, one of the mysteries we were trying to figure out is how could Archegos -- and we had some exhibits -- how could Archegos have millions of dollars in swaps with the counterparty? Then we learned through certain 13(f) filings that the counterparty was not holding stocks anything that came close to that number. We have now gotten to the bottom of it, and it shows that when the prosecution assumes in these percentages that when Archegos has a swap it dominates the market, it is based on something that can't be proven. And I take your Honor's point; there certainly are plenty of factual disputes.

THE COURT: You will argue to the jury that such and such a thing was alleged, but it is not proved.

MR. BERKE: Your Honor, we appreciate -- I will say this: We are going to continue our discussion with the counterparties. One of the things we are working on --

THE COURT: Are you going work into depositions of some sort? Oh, you can't. You are just getting documents.

MR. BERKE: The challenge we have is they don't have the documents, right? Because they say they are not able to track it. We have documents that show examples of the sorts of things they do other than hedge on a one-to-one basis. But one of the challenges we are facing is -- again, we appreciate the

1   counsel for the counterparties are being very productive and
2   engaging in these good-faith discussions, but they say they did
3   not and feasibly cannot track what happened after the initial
4   purchases.  Those discussions are continuing.
5            THE COURT:  I take your point.
6            MR. BERKE:  Okay.  Thank you, Judge.
7            THE COURT:  There is nothing for me to do today with
8   regard to the 17(c) issue.
9            MR. BERKE:  That is correct, your Honor.  Thank you.
10           THE COURT:  Does the government have anything for me
11  to do on those issues?
12           MS. ROTHMAN:  No, your Honor.
13           THE COURT:  No.  Okay.
14           I have read the expert's report.  I have known about
15  and reread Judge Rakoff's opinion in *United States v. Mrabet*.
16  I think it is a well reasoned decision, and I intend to follow
17  it.  I don't think that the experts' reports measure up to the
18  requirements of 16(b) in terms of giving the reasons and bases
19  for the various opinions and the documents that will be used to
20  demonstrate those points and the like.
21           I think that's true of both sides.
22           MR. THOMAS:  Does the Court have a proposed plan of
23  action moving forward?  I know both parties --
24           THE COURT:  Yes.  If I were you, I would look to amend
25  and satisfy the rule.  It's pretty much like a Rule 26 rule.  I

know Mr. Berke has experience with it I am not sure you do. But the expert's reports are not given to the jury.

You are blocking the second row, Mr. Thomas. If you would be so kind to move to your left or to the podium or sit down.

The reports under Rule 26 tend to be extensive. They are not given to the jury. The expert testifies in the way that you're used to in the normal way. However, if he delivers an opinion that has not been presaged by what he wrote, it is subject to an objection. So what must be done is that the expert has to make sure that all the opinions in good faith that he expects to deliver have been disclosed, any charts that he wishes to use to illustrate his points must have been disclosed.

In other words, it is unfair for a defendant, particularly in a highly technical case like this one, not to know the full extent of the expert's opinions and the reasons and bases he has for those opinions and not to know in advance the demonstrative proofs that would illustrate the point.

Here there are various stocks. Your position, the government's position is that there was a large-scale increase in the concentration of those stocks induced by the kinds of transactions that were engendered by the defendant.

That needs to be illustrated. The experts are going to be doing that. Other people may be doing that as well. But

if an expert doesn't deliver a report on it, then a defendant must be given notice of that. That's what I have in mind.

MR. THOMAS: Understood, your Honor. I think both parties were aware of the *Mrabit* decision, and certainly understand this Court's and Judge Rakoff's commentary. The government for its part endeavored to provide reports that enumerated each of the opinions, but we take the Court's commentary, and we will work to promptly supplement.

THE COURT: You will work out a schedule with each other.

MR. THOMAS: Yes, your Honor. In light of the Court's directive, we will probably also --

THE COURT: Could you step to the podium.

MR. THOMAS: In light of the Court's comments I think we would also take up with defense counsel the possibility of adjusting the opposition brief deadline for the *Daubert* motions to accommodate --

THE COURT: A comment on *Daubert*: These fellows are highly qualified people. The real essence of the objection I think is a lack of notice. If there were more notice, I don't think there would be *Daubert* objections.

Certainly the experts are qualified to say what they are saying. Whether what they are saying is sound or not is a different issue, which I would much rather take up by the specific objections at the time the expert wanted to deliver

1  this or will be subject of arguments to the jury.  I don't

2  think there's much room for *Daubert* arguments in this case.

3  That's my initial view.

4           MR. THOMAS:  Yes, your Honor.  Perhaps then we will

5  confer with defense counsel and see if the existing *Daubert*

6  conference could provide a reference point for the parties to

7  have supplemental disclosures.

8           THE COURT:  I believe if there is adequate disclosure

9  there will be no need for *Daubert* motions.

10          MR. THOMAS:  Thank you, your Honor.

11          THE COURT:  Do you agree, Mr. Berke?

12          MR. BERKE:  Your Honor, I am going to defer to a much

13  better expert advocate than myself in Jordan Estes.

14          THE COURT:  Ms. Estes.

15          MS. ESTES:  Hi, your Honor.  And thank you so much for

16  raising the disclosure issue.  We have really been hamstrung on

17  the defense side because we still don't know the government's

18  manipulation case is.

19          THE COURT:  I will take that with a grain of salt, but

20  go ahead.

21          MS. ESTES:  No, but I mean just few points, that I

22  think when we get these revised disclosures I think the

23  government really needs to provide, they have referenced

24  multiple complicated analyses from their disclosures.

25          THE COURT:  That is why I said what I said.

1           MS. ESTES:  Right.  And then one thing, your Honor,
2   that I did want to mention is we are two months from trial.  We
3   still do not know the dates they are claiming there was
4   manipulation, the times they are claiming there was
5   manipulation.  And this stuff is really important.
6           THE COURT:  I don't know that they can have a date for
7   a manipulation.  I think you could have a date for a false
8   statement, you can have a date for a specific action, but
9   manipulations are consequences of conduct.  You can have
10  specific dates of the conduct, but I don't think you can have
11  specific dates of the manipulation.
12          MS. ESTES:  Your Honor, we are looking for the
13  specific trading dates that they allege are manipulative.
14          THE COURT:  I think you're right there.
15          MS. ESTES:  They need to provide those.
16          THE COURT:  Yes.
17          MS. ESTES:  Because we have real defenses to a lot of
18  this trading.  Mr. Hwang really liked these companies.
19          THE COURT:  That is exactly what I have in mind.  The
20  specificity of the trades that are said to be manipulative.
21          MS. ESTES:  Thank you.
22          THE COURT:  Specificity of the misrepresentations.  I
23  understand you need to make defense and the government needs to
24  be specific.  The more we work this out in pretrial the better
25  a trial we will have.

1    MS. ESTES:  Thank you, your Honor.
2              We appreciate that.
3              MR. THOMAS:  Your Honor, two points in response if I
4    may go to the podium.
5              THE COURT:  Yes.  Do you need to?
6              MR. THOMAS:  Just two things.  One to clarify --
7              THE COURT:  Do you need to respond?
8              MR. THOMAS:  Only to make clear for the record that
9    the Court expects disclosure of both parties to be --
10             THE COURT:  Both sides.  Absolutely.
11             MR. THOMAS:  Second, with respect to the particular
12   dates, as this Court already ruled in connection with the bill
13   of particulars litigation, the manipulation that is alleged
14   here is not just isolated trades.  It's both a series of
15   transactions and the enterprise writ large.  The experts, of
16   course, are not going to be opining on the ultimate issue.  So
17   the notice can't have an expert who opines that these trades
18   were manipulative for a number of reasons.
19             THE COURT:  Your experts have to say something about
20   the artificiality of the market, no?
21             MR. THOMAS:  Yes.  And that's --
22             THE COURT:  What is the definition of manipulation?
23             MR. THOMAS:  What is the definition of manipulation?
24             THE COURT:  Yes.
25             MR. THOMAS:  One definition is a trade undertaken with

1    the intent to rig the prices.

2              THE COURT:  You have to disclose the trade.

3              MR. THOMAS:  Yes, your Honor.  I think we take the

4    Court's instruction, but we just --

5              THE COURT:  Also the consequences that you allege

6    happened.  It is your burden to prove to the jury that there

7    was this trade on this particular day and it had this

8    consequence.  That is your burden, no?

9              MR. THOMAS:  Your Honor, the trading proof -- yes.  It

10   certainly is the government's burden to prove that Mr. Hwang

11   intended to manipulate the prices of the securities that were

12   alleged.  And we will work to provide --

13             THE COURT:  And in support of that intent, you have to

14   show actual events that occurred.  No?

15             MR. THOMAS:  That's correct, your Honor.  I guess what

16   I am getting at here --

17             THE COURT:  You are looking surprised.  I mean, I

18   assume that is what you are going to do.

19             MR. THOMAS:  Not surprised at all.

20             THE COURT:  You don't have an x-ray into Hwang's mind.

21   You can only see what he did by his conduct.  So you will talk

22   about that conduct, and the defendants want to know what you

23   are going to talk about.  And I want them to know what you are

24   going to talk about.

25             MR. THOMAS:  We certainly intend to give them fair

1  notice and comply with the rule and comply with the Court's
2  instructions.
3             THE COURT:  There is this theory there that I have
4  been talking about, and I don't want to make this into a
5  technical exercise.  A manipulation case is very hard to prove
6  and very hard to defend against.  I know.  So I am wanting to
7  push you to maximize disclosure.  It will make a better trial,
8  it would make an easier issue to understand for the jury, and
9  it will benefit everyone, including the interest of justice.
10            This kind of a trial is subject to an enormous amount
11 of haggling as we go through.  The objections will be numerous.
12 If we don't have clarity before we enter this trial, we are
13 going to suffer from this, and the jury is going to suffer from
14 this.  So we need to be working very hard in the pretrial to
15 create a situation where this trial can go forward efficiently
16 and so the jury can understand what is happening.  You are
17 taking lay people to understand highly sophisticated market
18 behavior.  They will understand, but we have to do our jobs to
19 make it possible for them to understand.  That's my purpose.
20            MR. THOMAS:  Understood, your Honor.
21            All very well taken.
22            THE COURT: Okay.  Is there anything else for me to do
23 except to wish you all a happy new year?
24            MR. BERKE:  Not from the defense, your Honor, except
25 to do the same back to you.

O13NHWAC

1          Thank you, Judge.
2          THE COURT:  Thank you.
3          MR. THOMAS:  Thank you, your Honor.
4          (Adjourned)