O1GJHWAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

        v.                              22 Cr. 240 (AKH)

SUNG KOOK (BILL) HWANG AND
PATRICK HALLIGAN,

                               Conference

        Defendants.

-------------------------------x

                             New York, N.Y.
                             January 16, 2024
                             2:30 p.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                             District Judge

                   APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
ANDREW M. THOMAS
MATTHEW D. PODOLSKY
ALEXANDRA ROTHMAN
SAMUEL ROTHSCHILD
    Assistant United States Attorneys

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
    Attorneys for Defendant Sung Kook (Bill) Hwang
BY:  BARRY H. BERKE
    JORDAN L. ESTES
    DANI R. JAMES
    SHAKED SIVAN

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
    Attorneys for Defendant Patrick Halligan
BY:  MARY E. MULLIGAN
    TIMOTHY M. HAGGERTY
    RUPITA CHAKRABORTY

O1GJHWAC

1              THE COURT:  We have Alexandra Rothman and Andrew

2      Thomas?

3              MR. THOMAS:  Yes, your Honor.

4              THE COURT:  And Samuel Rothschild?

5              MR. ROTHSCHILD:  Yes, your Honor.

6              THE COURT:  Matthew Podolsky?

7              MR. PODOLSKY:  Yes, your Honor.

8              THE COURT:  Assistants.

9              And we have Barry Berke?

10             MR. BERKE:  Yes.  Good afternoon, your Honor.

11             THE COURT:  Jordan Estes?

12             MR. ESTES:  Yes, your Honor.

13             THE COURT:  And Shaked Sivan somewhere?

14             MR. SIVAN:  Yes, your Honor.

15             We have Timothy Haggarty?

16             MR. HAGGARTY:  Yes, your Honor.

17             THE COURT:  Rupita Chakraborty?

18             MS. CHAKRABORTY:  Yes, your Honor.

19             THE COURT:  Mary Mulligan?

20             MS. MULLIGAN:  Good afternoon, your Honor.  Nice to

21     see you.

22             THE COURT:  Okay.  Who is going to say a nice thing

23     about the government?  Not you, Mr. Berke.

24             MR. THOMAS:  We're happy to say what happened, Judge.

25             THE COURT:  Yes.  I'm anxious to hear what happened.

O1GJHWAC

1              MR. THOMAS:  What happened was a mistake.  It was an

2     error.  And it's an error that --

3              THE COURT:  Who made it?

4              MR. THOMAS:  I'm sorry, your Honor?

5              THE COURT:  Who made it?

6              MR. THOMAS:  The members of the prosecution team,

7     which would include me and Mr. Podolsky at the time that

8     discovery was assembled, your Honor.

9              What happened is in the investigation of this case we

10    collected something on the order of 3 million different

11    records, including all manner of trade data.  We undertook our

12    best efforts to log what came in, including by subpoena, what

13    came in by search warrant, and then ultimately what went out to

14    the defendants.  And as we have learned in more detail over the

15    last week, looking into old emails and the like, discovered

16    that very early on — the earliest version I could see is

17    January 2022 — we had a log that only partially reflected the

18    materials that had been obtained from Bloomberg.  So it

19    correctly captured that a number of communications records had

20    been received, but it incorrectly omitted that in addition to

21    those communications records, there were two trade files,

22    Judge.  Those are the files.

23             THE COURT:  We've been talking about trade files for a

24    long time.

25             MR. THOMAS:  Yes, your Honor, that's true.

O1GJHWAC

1          THE COURT:  And kind of basic to this kind of case

2     that you look at trades, buys, sells, so on.

3          MR. THOMAS:  We agree, your Honor.

4          We very much regret not catching this error until now,

5     and we could have caught it sooner.

6          THE COURT:  So Mr. Berke, what's plan B if I don't

7     give you the motion to preclude, which I'm not going to do?

8          MR. BERKE:  Your Honor, could I --

9          THE COURT:  What can I do to make life bearable for

10    you?

11         MR. BERKE:  Your Honor, again, we've spent a lot of

12    time trying to understand that data.

13         THE COURT:  I know.  I know.

14         MR. BERKE:  Your Honor --

15         THE COURT:  I know what it is to be up against a trial

16    and not to have the basic information and to have it all sprung

17    on you at the last minute.  I'm very much aware.  I have a

18    great deal of empathy for what you do, but I won't preclude the

19    government.  So what can I do to make life better for you?

20         MR. BERKE:  Our experts tell us, given the complexity

21    of the data and what the prosecution seeks to do with it, they

22    would need approximately six months, best case, to work with

23    the data.  And what happened here, your Honor, just so you

24    understand, is this data is actually detailed execution data.

25    And what the prosecution's experts apparently have done over

O1GJHWAC

1    the last two years is they have tried to match these Archego

2    execution data, millions of data points involved in all of the

3    trades and try to match what was going on in the market.  They

4    have ten separate analyses, at least, things called vector

5    autoregression, things that I don't even pretend to understand.

6    But our experts tell us --

7             THE COURT:  But you will for trial.

8             MR. BERKE:  I will at the trial.  Sounds like

9    something you'd see at a NASA launch.

10            They said it's extraordinarily complex, even if you

11   can do it.  But to rebut what the prosecution is seeking to do

12   and to use it affirmatively to respond to those allegations,

13   they would have to redo the analysis they've done over a year.

14   And even then, they would then have to do new analysis --

15            THE COURT:  Mr. Thomas, do you have any spreadsheets

16   to analyze all this data?

17            MR. THOMAS:  It depends, your Honor.  We --

18            THE COURT:  Work product.

19            MR. THOMAS:  We have turned over extensive work

20   product at this point that relates to the data.

21            THE COURT:  Do you have one extensive spreadsheet that

22   takes in all the things you're going to use at trial?

23            MR. THOMAS:  I would have to inquire, but I don't

24   believe such a comprehensive spreadsheet exists.  As the Court

25   knows, we obtain data from multiple different places.

O1GJHWAC

```
 1              THE COURT:  Yes, I know, in prepping for trial,
 2    because I've been there.  In order to use and comprehend the
 3    data and not be swallowed by it, you have to organize it in
 4    some fashion, and we do that by a spreadsheet or a series of
 5    spreadsheets, ultimately get reduced to some document or series
 6    of documents that we display to the jury.  An expert takes a
 7    pointer or an electronic pointer, and he says this is this and
 8    that is that and explain to the jury in a very convincing
 9    fashion.  Maybe you can give some of that to Mr. Berke.
10              MR. THOMAS:  Your Honor, we're open to assisting
11    Mr. Berke and his team in advancing their work.  I don't want
12    to speak out of turn.  I'm not myself a data scientist, but
13    we're happy to and have already identified for him the fields
14    from this particular file that our experts have relied on, and
15    we've identified how these fields --
16              THE COURT:  You haven't even done that with your
17    expert's reports.
18              MR. THOMAS:  Your Honor, it was in working to comply
19    with the Court's order that we identified this error.  But
20    we're happy to look or assemble a spreadsheet that collects
21    just the relevant part, from the government's perspective, and
22    produces that to Mr. Berke.
23              MR. BERKE:  Your Honor, if I may say one --
24              THE COURT:  Give me a moment.
25              MR. BERKE:  Of course.
```

O1GJHWAC

1              THE COURT:  We're supposed to start the trial

2       February 20.  You want me to start that day, Mr. Berke?

3              MR. BERKE:  No, your Honor.

4              THE COURT:  Are you speaking to Ms. Mulligan also?

5              MS. MULLIGAN:  Your Honor, I speak --

6              THE COURT:  She may have a good idea.  I know that she

7       does.

8              MS. MULLIGAN:  Thank you, your Honor.

9              Obviously, I speak for myself and my client.  But

10      given the prejudicial volume of this evidence, we won't be in a

11      position to start on February 20, so I join Mr. Berke in his

12      application.

13             THE COURT:  What would you like me to do?

14             MS. MULLIGAN:  Yes, your Honor.

15             I think, as Mr. Berke has indicated, the experts

16      require at least six months to analyze this data.

17             THE COURT:  You don't need six months.

18             MS. MULLIGAN:  Your Honor, it's extraordinarily

19      complicated.

20             THE COURT:  I know.  But --

21             MS. MULLIGAN:  And the government's experts have had

22      this advance --

23             THE COURT:  I know.

24             MS. MULLIGAN:  And it's embedded, your Honor.

25             THE COURT:  I've worked with experts.  You don't need

O1GJHWAC

1    six months.  You need as much time as the client says you'll

2    have.

3              MS. MULLIGAN:  Your Honor, with all respect — and I

4    appreciate your Honor's experience — the experts have given us

5    an estimate, and these are very hardworking individuals, as are

6    we.

7              THE COURT:  I'm not going to give you six months.

8              MR. BERKE:  Your Honor, if I may — and I understand

9    your Honor's concerns — we spent a lot of time with our

10   experts.  What is unusual in this case is our experts have

11   never seen this done in this way where the prosecution has

12   tried to do with their experts --

13             THE COURT:  Mr. Berke, I have it.  You got the relief

14   last time with the experts.  I'm giving you relief now, but be

15   reasonable with me.  How about a month?

16             MR. BERKE:  Your Honor --

17             THE COURT:  Two months.

18             MR. BERKE:  If I could just explain the challenge is

19   the prosecution has said they're relying on every trade during

20   this period and they're matching all of the subtrades, which

21   sometimes involve a hundred to thousands of lines of data.

22             THE COURT:  What do you want me to do?  Maybe I'll do

23   it.

24             MR. BERKE:  Judge, that's why we said six months.

25             And if I can add, your Honor, in response to your

O1GJHWAC

1    Honor's questions.  This isn't great for us.  Mr. Hwang has

2    already spent so much resources and time on experts that have

3    to be repeated.  And it really is extraordinarily expensive,

4    time consuming, and the like, and he's ready to go to trial.

5    Beyond that, your Honor, just if I can, what we said in our

6    papers is we can do it in six months if the prosecution

7    actually disclosed what they did --

8         THE COURT:  I have an idea.  I meet with you on the

9    24th, and in the meantime, you and your experts and the

10   government and its experts meet and see if you can get some

11   kind of a definition of what really is at stake.  And then come

12   back on the 24th and make a reasonable recommendation for

13   trial.  I'm anxious to try this case.  I want to get it done.

14   The longer we put if off, the more fighting we'll have.

15        And if you were called in on the last minute and you

16   had your expert called in the last minute, you would find a way

17   to do it, and I want that to be done.  I don't want to put it

18   off more than a month, but I want to make sure you get adequate

19   notice to try this case.

20        Let's go off the record.

21        (Discussion off the record)

22        THE COURT:  Mr. Thomas asked me what the normal trial

23   day is, and I said more words than I can say now, but it tends

24   to be Monday through Thursday, 10:00 a.m. to 5:00 p.m., an hour

25   and a quarter lunch break, short midmorning break, sometimes a

O1GJHWAC

short midafternoon break.  No sidebars, quick objections,

limited arguments.  That's the ideal.

          MR. BERKE:  Your Honor, if I can, couple of different

things.  And we said this in our papers and sometimes we're

talking about experts and we're talking about how complex it

is.  This is truly something that is extraordinarily complex,

even with a huge team to try to do.  And to your question to

the prosecution, one of the things we said, just taking it one

step at a time, one step is our experts can't even understand

how they matched.

          And so the meeting with our consulting experts — and

our consulting experts, when they answer and explain the

analysis they did, what they're claiming they did, that's

obviously critical.  And we have a million questions because

our experts said they can't even figure out what they did or

what they're referring to.  And also other analysis they may

have done and didn't produce to us, we would need everything to

even begin to think about how to approach this.

          THE COURT:  If this was a civil case, I would preside

over a sort of tutorial, which either the lawyers or the

experts or both tell me what the case is all about in some

detail.  No one does this in a criminal case, but we can do it.

          MR. BERKE:  Your Honor, if your Honor will offer a

deposition of their consulting experts about that they did,

interrogatories, whatever it is, it's just not clear to us.

O1GJHWAC

1    And our experts are guessing what they tried to do.  And they

2    have at least a 21-month head start on this.

3         THE COURT:  But they have the burden of prosecution

4    and you don't, and you're very good at reacting to what they

5    do.  That's the way it is with cases like this.  The government

6    has a long lead time, much longer than the defendant.

7         MR. BERKE:  Judge, if I could just explain why we're

8    surprised.  The indictment alleges total domination.  We're

9    preparing for that case.  It alleges trading techniques.  We're

10   preparing for that case.  It does not allege intramarket

11   trading changes to affect the market, nor did we prepare for

12   that case because we didn't think it could be done.

13        That's why the defense repeatedly for the last year

14   and a half have asked for more trading data.  Not only that,

15   we've said at least three times why are you giving us market

16   data?  We don't understand it.  Because it's meaningless

17   without the execution data.  We've said it again and again and

18   again.  Our experts have put in thousands of hours with the

19   wrong data --

20        THE COURT:  Let me understand what you just said.

21   What did you get and what did you want?

22        MR. BERKE:  So what we didn't get until January 5 is

23   execution data, how they executed each of these trades.  We

24   didn't think it was available.

25        THE COURT:  What did you get?

O1GJHWAC

1        MR. BERKE:  Instead, we got information about the

2   initial trade order and we got information about the trade that

3   was put on so we could look at the total trades that were put

4   on through the swaps, both the requests and what was done --

5        THE COURT:  You didn't get the actual execution

6   tickets?

7        MR. BERKE:  The actual execution information we did

8   not have.  The prosecution now is basing virtually their entire

9   case, as far as we can tell through their experts, on this

10  intraday trading that we not only didn't do, we haven't even

11  been preparing for --

12       THE COURT:  Are you telling me that the confirmations

13  that came back on the trade differs from the executions?

14       MR. BERKE:  Judge, what has changed is the prosecution

15  is now claiming that after an initial order was put in, there

16  were different changes made throughout, and it can be

17  literally — we give some examples --

18       THE COURT:  Say if you're buying a block of X, Y, Z

19  stock, 10,000 shares, and they're executed at different times,

20  the confirmations will mirror the executions, won't they?

21       MR. BERKE:  No, Judge, that's not what happened.

22       So we have the initial 10,000 order -- if I can, your

23  Honor, I'm going to let Ms. Estes give you the exact detailed

24  recitation of it because it really is quite striking for our

25  experts.

O1GJHWAC

1              MR. ESTES:  Sure, your Honor.

2              So your Honor, what we had in the initial trade data

3       is the swap that Archegos put on.  And it would have the

4       initial time of the swap that Archegos put on, say, 9:37 a.m.

5       And then it would have the final order, the number of shares

6       that were used, and the final limit price and the final

7       strategy that was used, if there was an algorithm that was used

8       to execute the trade.  But each trade --

9              THE COURT:  I need to understand this.

10             So in my simple mind, I thought you have a contract

11      one way and another contract another way and then execution

12      each time of that contract.  Now, the execution may not be one,

13      may be a number, but the trades are confirmed.  And the

14      confirmation — what I've been used to, is the records that I've

15      been using when I used to be in practice on paper, it's

16      different now — is the same as the execution, no difference

17      between the confirmation of the trade and the trade itself.

18             MR. ESTES:  Your Honor, what we have is strikingly

19      different from the execution data.  The initial time may be

20      9:37 a.m.  It could have been executed over the course of three

21      or four hours throughout the day.  We don't know when any of

22      those times are because they're being put on, and that's data

23      the government had --

24             THE COURT:  So in other words, the information you

25      have is a summary of numerous executions.

O1GJHWAC

1          MR. ESTES:  Yes.

2          THE COURT:  Like an average?

3          MR. ESTES:  It's not an average.  It's the initial

4     time and the final order amount, but we don't have any way that

5     it's carried out throughout the day.

6          THE COURT:  Why is that important?

7          MR. ESTES:  That's important because their experts

8     have done this matching analysis to try to show price impact

9     incrementally throughout the day.  And they're trying to focus

10    on very micro price impact from these trades.  And what we

11    cannot do, we have been completely unable to match the

12    executions and the market data they're going to use to show

13    this price impact because we don't have any of these millions

14    of executions that they have had for 17 months, maybe even

15    longer.  And the reason it's so complicated is because to

16    even --

17         THE COURT:  So if the government were to give you the

18    data relating to the specific trades that they want to prove,

19    you would have all the information you need?

20         MR. ESTES:  So here's the problem, Judge, not exactly.

21    So the problem is their experts have matched millions of

22    executions with millions of market price data.  We certainly

23    don't have or I haven't seen any sort of work product showing

24    the millions of matching, and so our experts are telling us --

25         THE COURT:  So a consulting expert will do that, but

O1GJHWAC

1    it boils down to a more specific number and --

2              MR. ESTES:  I think they're alleging millions --

3              THE COURT:  You don't have to retrace everything that

4    the prosecution's expert has done to come up with the specific

5    numbers.  You need the specific end results.

6              MR. ESTES:  Your Honor, first of all --

7              THE COURT:  Can we get Mr. Thomas's thoughts on what

8    you just said so far because I'm having trouble absorbing the

9    information.

10             MR. THOMAS:  Yes, your Honor.

11             It's certainly true at trial our experts will testify

12   to summary information.  We have at the Court's encouragement

13   already turned over preliminary summary results.  We're happy

14   to identify the data set that the Court just referenced that

15   underlies the model that the expert used to come to the summary

16   results.  But the nature of this analysis is not quite so, I

17   think, far flung and difficult as the defense is suggesting.

18             Carmen Taveras, who we expect to call from the SEC,

19   she was able to do this work in the space of three or four

20   weeks.  She first received the data about a month before expert

21   notices.  So the notion that it needs six months, I think is

22   proven true, at least by the good folks at the SEC.  We

23   absolutely take the Court's point that disclosure here will

24   ensure a fair and smooth trial for everyone.  We want that.

25   We're happy to work to do even more disclosure.

O1GJHWAC

1         But at this point, the defense has the raw data.  They

2    have detailed information from us about which aspects of that

3    data fed into the analysis, and we're going to comply with the

4    Court's prior instructions to produce a detailed notice that

5    will spell out exactly how the experts got from A to Z.  And

6    then at trial we'll have summary charts, as the Court

7    anticipated.

8         THE COURT:  Recommend a path for me to order.

9         MR. THOMAS:  Your Honor, I think in light of the

10   record here, we have no opposition to granting a month

11   adjournment to the defense so that there's --

12        THE COURT:  I'm worried as to what you're going to do

13   within that month.  What do you do to make Mr. Berke's and

14   Ms. Mulligan's life easier?  I understand what you say.

15        MR. THOMAS:  Let me propose --

16        THE COURT:  I understand.  But they're now confronted

17   with a huge mess, and it's very hard to make sense of that.

18        MR. THOMAS:  Here's what --

19        THE COURT:  So it needs you to give them more to show

20   how it's reduced to comprehensible information.

21        MR. THOMAS:  What we propose to do is to file by the

22   26th of this month the detailed disclosure that the Court

23   provided.  And that, I think, will be a roadmap for the

24   defendants to unpack the data to anticipate precisely what the

25   government will do and let the Court then give the defense

O1GJHWAC

1    time, even as much as a month, to file corresponding defense

2    notices based on that data.

3            THE COURT:  What do you mean by notices?

4            MR. THOMAS:  The Court directed both parties to

5    supplement their notices.  The defense experts right now

6    purport to rely on the discovery without distinguishing what it

7    is.  So we would propose that the 26th be the government's

8    deadline for a supplemental disclosure, and that sometime in

9    the next month the defense provide its supplemental disclosure.

10   We're confident that on that record there will be no prejudice

11   and the defense can make full use of the data.

12           MR. BERKE:  Your Honor, if I may briefly respond, I

13   just want to say one thing to be clear.  What makes this so

14   hard to respond to is we're responding to essentially a science

15   experiment, so it's not simply an argument.  They're going to

16   say they did a science experiment and the result is

17   manipulation.

18           THE COURT:  Tell me what that means.

19           MR. BERKE:  It means it's not enough to have the data.

20   It's not enough to know how they're matching it.  They did ten

21   separate science experiments.  So at minimum, to begin --

22           THE COURT:  What's a science experiment?

23           MR. BERKE:  Your Honor, they call it a vector

24   autoregression analysis, a probative order change analysis, a

25   midpoint price change analysis, a shortfall analysis, a

O1GJHWAC

1   realized spread analysis, the algorithm and exchange analysis,

2   and analysis on size and aggressiveness of trades.  And what

3   they're going to say is, based on the experiments they did,

4   they're going to come with conclusions.  What our experts are

5   saying, seeing their conclusions doesn't help them at all to

6   understand what they claim to be the experiments they did.  So

7   just to get started, your Honor --

8             THE COURT:  And the jury's going to understand this

9   stuff?

10            MR. BERKE:  Your Honor, I think they're going to

11  understand the conclusions, and the problem is we need to be

12  able to challenge, assuming there's a basis, which we think

13  there will be, challenge actually the experiments they did to

14  produce these results.  And to do that, we need a lot more

15  information from their experts.  We would ask to actually have

16  access to their experts so we can find out exactly what

17  experiments they did and support what they claim to be this

18  result.

19            And then our own experts are going to have to do their

20  own experiments, which we understand is extraordinarily time

21  consuming because it's not only using the data, it's using the

22  entire stock market on the days in question.  And the

23  prosecution, far from taking your Honor's direction to identify

24  trades, have told us on January 5 they're relying on every

25  trade during this time period.  Every trade they claim is

O1GJHWAC

manipulative.

So unless that is limited, our experts now have to do this experiment for every trade to try to match it up with everything going on in the stock market for those stocks.  And that is why it is so extraordinarily complicated.  So if we are going to try to go forward with -- which again, your Honor, you understood our request, the prosecution has to give us access to their experts and full disclosure of every bit of experiments they did so our experts can understand it before they can do their own.

THE COURT:  I have no way of knowing all these analyses you're mentioning.  I never heard of these before. I've heard of vectors, but not the others.

What I understand is that the characteristic of a manipulated price is a price that differs from the natural price on a market.  And so what one does is take a particular stock, match it to the category of stocks that tend to rise and fall together, and show the manipulation by way of an artificiality that crept into the pricing of one of those stocks.  That's how I understand what goes on.

It's not an entire market, it's a sector.  And you're entitled to know the sector.  You're entitled to know the model.  You're entitled to know whatever methodology they use to construct their model of comparison.  It's going to be a comparison, the manipulated price, alleged manipulated price

O1GJHWAC

1    against some kind of conflict of what the market would be.

2    That's difficult.  I understand that.  But it's comprehensible

3    without all these fancy names.

4              MR. BERKE:  Judge, what you just described, that's the

5    case we thought we were going to try.  We had that data.  They

6    made those allegations.  We were ready to try that case on

7    February 20.  We were ready.  But now what we see is they're

8    doing something we've never seen before.  We think it's

9    unprecedented.  What they're trying to do is claim that certain

10   incremental changes in very specific offers at times of day,

11   that those intramarket changes affected the price in such a way

12   to be manipulative.

13             THE COURT:  That's always been the case.

14             MR. BERKE:  Not like this, your Honor.  We didn't

15   believe it could be because that data didn't exist, as far as

16   we knew.  And that's why for the last two years, we've

17   continually come back to them to ask for more data and also why

18   they gave us this market data.

19             THE COURT:  If they are saying that they timed their

20   trades, you're entitled to know when those trades took place.

21   Did you not get that information?

22             MR. BERKE:  The timing of the trades, that's fine.  We

23   have information about when it was initially entered.  They're

24   doing something more.  That's not what they're relying on.

25             MR. ESTES:  Your Honor, just to be clear, that is

O1GJHWAC

1    precisely the problem.  We did not have the timing the trades

2    were executed.  We had the timing Archegos put in the initial

3    order, but all of those executions over the course of the day,

4    we did not have the timing of those --

5            THE COURT:  You're arguing that Archegos did not

6    execute in a timely fashion from placing the order?

7            MR. ESTES:  No, your Honor.

8            So usually these trades are done using algorithms, and

9    then the algorithm will execute the trade in the way the

10   algorithm is supposed to do it.  But it may take place over the

11   course of hours.  It could take place over the course of

12   several minutes, but bottom line is we did not know when the

13   timing of those trades happened.  And that's why this is such a

14   problem that we are getting this amount of data this late.

15           MR. BERKE:  And without doing this similar

16   experiment --

17           THE COURT:  Mr. Thomas, did they know when the

18   executions were?

19           MR. THOMAS:  Your Honor, there are, I think really for

20   the Court's thinking, should think about three different data

21   sets.  There's the data that Archegos itself downloaded from

22   Bloomberg and saved daily.  That's the kind of summary data

23   that Ms. Estes was referring to.  Then, in the stock market

24   there are precise to the millisecond executions of particular

25   stocks at particular times in particular --

O1GJHWAC

1        THE COURT:  Did they get that?

2        MR. THOMAS:  That they got on day one.

3        What we omitted, what we erred to provide was the file

4   that Archegos had at EMSX that showed which of those market

5   trades related to the summary data that they had.

6        THE COURT:  I don't understand.

7        MR. THOMAS:  Your Honor, when you look at the stock

8   market data, it will show that someone purchased 100 shares of

9   Viacom, but that data won't say who purchased it, and it won't

10  say when the order to purchase it necessarily was first

11  conveyed.

12       THE COURT:  Correct.

13       MR. THOMAS:  So what the file that the two Bloomberg

14  files we're talking about show is they show that, in fact, when

15  Archegos put in an order to buy Viacom, a bank then went to the

16  market and conveyed that order in the form of an equity order,

17  even though it was a swap.  And then an execution took place,

18  and that execution is reflected in the trade data for the stock

19  market.

20       THE COURT:  Swaps are the label put on.  What they're

21  looking for is the date of the order, the nature of the order,

22  and the dates, times of executions of the order.  Do they have

23  that information?

24       MR. THOMAS:  They do, your Honor, yes.  We fully

25  acknowledge that --

O1GJHWAC

1          THE COURT:  Ms. Estes, you'll get your chance.  I

2    promise.

3          MR. THOMAS:  We fully acknowledge that a meaningful

4    collection of the data, the part that overlaps those two

5    markets, was this file which we produced.

6          THE COURT:  What didn't you give them?

7          MR. THOMAS:  We failed to produce the EMSX data

8    obtained directly from Bloomberg.

9          THE COURT:  What does that mean?

10         MR. THOMAS:  It means Archegos, the system Mr. Hwang

11   used to put in his trade orders, that was through Bloomberg.

12   He would go onto a computer screen and hit "buy Viacom."  When

13   Archegos, his fund, would extract data daily from EMSX, it only

14   extracted the summary data.  It didn't extract the particular

15   minute-by-minute executions.

16         THE COURT:  You have to get that from Bloomberg.

17         MR. THOMAS:  So we got that from Bloomberg.  But what

18   we didn't do — and again, we acknowledge the error — was turn

19   over that piece of Archegos's recordkeeping.

20         THE COURT:  So now they have the times of executions?

21         MR. THOMAS:  They do, your Honor.

22         THE COURT:  Dates and times.

23         MR. THOMAS:  They do.  We're confident now they have

24   the same data sets that our experts have.

25         THE COURT:  And how do they match the executions to

O1GJHWAC

1    the orders?

2            MR. THOMAS:  So in our very first notice and in

3    subsequent disclosures, we provided examples.  The experts take

4    the size, the stock, the time of the order, and they take those

5    variables and they look in the stock market data and find the

6    order with the same time and the same size in the same ticker.

7            THE COURT:  Did you get a sampling?

8            MR. THOMAS:  We did, your Honor.

9            THE COURT:  Was there a methodology to the sampling?

10           MR. THOMAS:  There is.  I think it is, at a

11   superficial level as simple as I've conveyed it, but I'm sure

12   at a computer level more complicated to do the actual pairing,

13   but we're happy to include in our disclosure a detailed

14   description of that methodology or even, if it's possible --

15           THE COURT:  And that methodology will be one that you

16   will stick to, not be able to switch it to something else for

17   the purpose of trial?

18           MR. THOMAS:  It is not our intention to switch it.

19           Obviously, if the defense were to say, Hey, make this

20   tweak, it would be unreliable if you didn't, we would want to

21   be able to react to a defense argument.  But we think that we

22   have a reliable approach.  And we're happy to mark as an

23   exhibit -- I don't know if it's practical to convey, but at

24   some point before trial — the matched data set that the Court

25   conceives of here.  But it may assist the defense.  But your

O1GJHWAC

1    Honor, I think that proposing a roadmap here making concrete

2    dates would probably help all the parties.  Based on the

3    Court's schedule, if the Court is going to be gone in --

4            THE COURT:  Hold that for a minute.

5        Ms. Estes, you can respond now to Mr. Thomas.  He's

6    telling me that he's going to tell you the methodology of the

7    sampling that's going to be used at trial.

8            MR. ESTES:  Yes, your Honor.

9            THE COURT:  A subset of which would be used at trial,

10    and he's going to tell you the order information and the

11    execution information.  Does that give you everything you need?

12            MR. ESTES:  So the problem is, your Honor, our experts

13    need to do their own matching analysis because their experts,

14    the matching didn't work perfectly.  I think it's 90 percent,

15    90-something percent.  So they have not done a perfect match.

16            THE COURT:  It would not be unusual for the experts to

17    have different samples, and it will be then a contest of whose

18    sample is right.

19            MR. ESTES:  That's true, your Honor.  But our experts

20    will need time to do their own matching analysis, if possible.

21    And they've told us that that would involve reviewing

22    approximately 180 million trade executions.  That is an

23    extraordinary number.

24            THE COURT:  I am sure that there is a way to pierce

25    that information and identify what you need.  You've got your

O1GJHWAC

1    own models, I'm sure.

2             MR. BERKE:  Your Honor, can I address the timing?

3             THE COURT:  Yes.

4             MR. BERKE:  So Judge, just to try to be practical and

5    work with your Honor --

6             THE COURT:  I'm not going to give you what you want.

7             MR. BERKE:  I understand.  Would it be possible to try

8    this case when you return after the April 18 trip?  Because we

9    don't believe we would be able to do this trial before then and

10   actually have this material.  And if your Honor were to

11   schedule it when you returned, if the prosecution were actually

12   to give us the experiments that I've described and all the

13   data, we would move heaven and earth, your Honor, with our

14   experts with everything we can do with a new expert who we're

15   likely to retain to get the work done to be able to try it

16   after you return.

17            MS. MULLIGAN:  Your Honor, and that would be agreeable

18   to Mr. Halligan.  I think that's a very fair compromise.  Thank

19   you.  So we appreciate that, your Honor.  Thank you.

20            THE COURT:  Okay.  We're going to take a short recess.

21            (Recess)

22            THE COURT:  Here's what we're going to do.  I think

23   neither of you is going to like this.  The government's

24   supplementation of its experts' reports will be due by

25   January 24, cutting it down by two days.  Defendant's

O1GJHWAC

supplementation of its experts will be due by February 14.

Final pretrial conference will be held on February 21, at which

time I will decide all motions *in limine*.  I don't think

there's much to the Daubert motions at this point, and we can

go into it later.  And trial will begin February 27.  That

gives us six weeks before Passover.

MR. BERKE:  Your Honor, if I may, with all respect,

the defense would be severely prejudiced.  We can't meet that

deadline for our experts.  We can't be prepared with those

dates.  And it's not our fault.  The prosecution didn't give

the defense the critical data it's been relying on and it's had

for two years.  We just can't do that, your Honor --

THE COURT:  I don't think they were sitting on it for

two years.

MR. BERKE:  They had it for two years.  The disclosure

was not produced for 17 months.  Our experts literally have

been working extraordinarily hard for a year with what they

have, and we can't meet that, your Honor.  We would be severely

prejudiced in our defense.  And given how the prosecution is

relying on that, the heart of the manipulation case now, it's

simply unfair, Judge.  And I don't say that lightly, especially

to your Honor.  I always want to be ready for trial.  But I'm

telling you, Judge, with what happened here and what we need to

do, we can't meet those deadlines and we can't be ready by that

date.

O1GJHWAC

1          THE COURT:  Thomas?

2          MR. THOMAS:  Your Honor, we're talking about two files

3     that I think, as we've represented in our papers, can be made

4     readily usable by qualified experts which they've already

5     retained.  We're prepared to meet the Court's schedule and

6     proceed to trial.

7          MR. BERKE:  Your Honor, we need to retain a new expert

8     on intraday trading.  We need to get up to speed.  We need

9     to --

10          THE COURT:  I don't understand why because that's

11     always been the case.  The details you didn't have, but the

12     government has been arguing that there were manipulations by

13     trades placed at the end of the day and by the different swaps

14     and the like.

15          MR. BERKE:  Your Honor, this is very different.  This

16     is completely different.  Because we're prepared to address all

17     of those issues, which the prosecution could do with the other

18     data.  But if they're allowed to use this data, now they're

19     doing this calculation, these science experiments, and we need

20     somebody with that expertise in order to do those science

21     experiments and testify about why this matching.

22          And again, Judge, it's not just using the millions of

23     trades for each trade.  It's also matching it up to what was

24     going on in the market for those stocks.  And Judge, I'm not

25     saying this lightly, and I'm not going to stand up, certainly

O1GJHWAC

1    before your Honor, and say this lightly.  I now obviously don't

2    have the same technical understanding as Ms. Estes, but I've

3    been speaking to our experts and they tell us with great fear

4    about what is required.  We reached out yesterday to try to

5    find another expert.  We're saying that we're doing everything

6    we can to try to see what we can do, but we cannot meet that --

7            THE COURT:  Why do you need another expert?

8            MR. BERKE:  Your Honor, what the prosecution is doing

9    we don't think is a proper way of analyzing what happened in

10   the market.  But if they're doing it, we have to rebut it.  We

11   have to have testimony from somebody who can talk about how the

12   matching that they're trying to do with this issue with this

13   new execution data that we're just getting now, how they're

14   trying to match it to suggest some improper price influence

15   from the trades.

16           Obviously, trading may influence price, but they're

17   suggesting it was done in an improper way.  We have to rebut

18   how they're trying to match what Archegos did because we did

19   not have the Archegos execution data, and we have to look at

20   what was going on in the market to contradict what they're

21   claiming was done by not just the trades, Judge, because we're

22   not talking about the trades.  We're talking about how they

23   were changed and implemented on incremental intraday basis --

24           THE COURT:  Did Archegos not have its own data?

25           MR. BERKE:  No.  And we were told, because the

O1GJHWAC

1    prosecution said they produced everything that they received

2    from Bloomberg — this was in response to their search warrant —

3    we believed it didn't exist.  That's why we kept asking for

4    other trading data.  We were here before your Honor --

5        THE COURT:  In the ordinary course of business,

6    Archegos gave Bloomberg orders, Bloomberg executed the orders.

7    And you didn't know what the executions were?

8        MR. BERKE:  We're talking about what happened after

9    the order and continued on, and that data we never had --

10        THE COURT:  In the course of your business, you give

11    Bloomberg a trade to execute a block of stock, and they do it

12    over a course of a period of time and they report back, and

13    they don't give you bit by bit the information that you say you

14    don't have?

15        MR. BERKE:  They don't give it to your Honor, they

16    don't.  Archegos didn't have it.  And in fact, we were relying

17    on the Archegos trade data, not the undisclosed trade data.

18    When the prosecution represented over and over we had all the

19    trade data --

20        THE COURT:  How does a business not know what the

21    executions are?

22        MR. BERKE:  That level of detail of what happened in

23    the market is not something that is produced and is in

24    Archegos's possession.  And we believed it didn't exist.

25    That's why we kept going back to the prosecution.  They said

O1GJHWAC

1      they gave us everything they had.

2                  THE COURT:  Of course it existed.  It's got to exist.

3                  MR. BERKE:  Your Honor, what we need --

4                  THE COURT:  It's required to exist.

5                  MR. BERKE:  So your Honor, given what the prosecution

6      has done with that data, we cannot meet that date.  We --

7                  THE COURT:  I don't think it's so.  I don't think

8      you're prejudiced in the way you're saying.

9                  MR. BERKE:  Your Honor, can we make further

10     submissions from our experts in terms of what's involved?

11     Because I don't think I'm doing an adequate job of explaining

12     it.  We have documents and documents that go through the

13     extraordinary steps that they have to do.  Because, Judge, what

14     the government is trying to do through these permits is

15     literally take the entire trading in stock and try to

16     cherrypick what Archegos did by the way they traded

17     incrementally.

18                  Their indictment alleges domination by how big their

19     overall percentage was.  To say that the change in the market

20     order, the change in the limit order, what they did on an

21     incremental basis on information we never had, to match that up

22     to how the market price changed in the overall market, that is

23     extraordinarily complex, Judge, and we cannot meet to deadline

24     and meet this evidence, and we believe it would be severely

25     prejudicial.

O1GJHWAC

1          And your Honor, I say this with great love because I

2     don't want to screw up the Court's schedule.  We wish we had

3     this evidence.  We were shocked we didn't have it.  That's why

4     we kept asking for it.  Your Honor's heard us in here saying we

5     want counterparty trading data so that we can come and try to

6     recreate some of this --

7          THE COURT:  If I have to adjourn this, I have to

8     adjourn it into the end of June, and I'm reluctant to do that.

9     And I don't accept what you're saying, Mr. Berke.  I don't feel

10    on solid grounds, and I don't think you are on solid grounds

11    either.

12         What does interim data have to do with this case,

13    Mr. Thomas?

14         MR. THOMAS:  What does which data?

15         THE COURT:  Interim data.  I don't know what he's

16    talking about.  You can do manipulation on a position.  What do

17    you care about slight movements of stocks in the interim?

18         MR. THOMAS:  Your Honor, it's a link in the chain.

19    The slight movements, we're not so much focused on the slight

20    movements as that Mr. Hwang can see when he puts in the order

21    that the price goes up, and he puts in a bigger order and the

22    price goes up more, and he puts in an even bigger order and the

23    price goes up more --

24         THE COURT:  That I understand.

25         MR. THOMAS:  That's the --

O1GJHWAC

1          THE COURT:  What's the difference on minute

2     differences between an order price and an execution price?

3          MR. THOMAS:  Well, what I think is being lost perhaps

4     in the shuffle here is that at the end of the day when Archegos

5     wend to Bloomberg and downloaded data, it just downloaded

6     summary data.  So it didn't download that at 11:00 a.m.

7     Mr. Hwang said "buy more" and at 12:00 p.m. --

8          THE COURT:  That's what they did in the ordinary

9     course of business, Bloomberg's not out to screw its clients.

10          MR. THOMAS:  We agree with that, your Honor.

11          I might propose --

12          THE COURT:  This is going to be the schedule.  I think

13     you can do it.

14          MS. MULLIGAN:  Your Honor, with respect to

15     Mr. Halligan, the prejudice is very clear, because we are also

16     a defendant in this case and it's --

17          THE COURT:  I know.  But it's the same point, isn't

18     it?

19          MS. MULLIGAN:  It's extremely difficult for us to

20     analyze this data and cross-examine the government's witnesses.

21          Your Honor, we came into court today and your Honor

22     very wisely suggested an extension of one month or two months,

23     and now we have a one-week extension, which, frankly, puts me

24     on the back of my heels, and it's impossible for me, your

25     Honor.  I can barely find a magnifying glass to look at this

O1GJHWAC

1    data.

2              THE COURT:  What do you mean one week?

3              MS. MULLIGAN:  Well, your Honor, you're essentially

4    telling us we have to be ready for trial February 27.  And when

5    we came in, the Court was entertaining the notion of a

6    one-month extension, if I recall correctly.

7              THE COURT:  I wasn't entertaining anything.  I was

8    throwing out ideas.

9              MS. MULLIGAN:  In any respect, your Honor, it's highly

10   prejudicial to Mr. Halligan to analyze this data, to understand

11   it, and to be prepared for trial February 27.  The government

12   has come in and conceded appropriately to a very serious

13   discovery error of epic magnitude, which they've accepted full

14   responsibility for.  It's a voluminous set of data, and here we

15   are trying to prepare for this trial.  And with all respect,

16   your Honor, February 27 is highly prejudicial to Mr. Halligan.

17             THE COURT:  Isn't your case the same in terms of

18   denying the manipulation as Mr. Hwang's case?

19             MS. MULLIGAN:  Your Honor, we have to analyze the data

20   and review the data, and we are in a very difficult position to

21   do that by February 27.

22             THE COURT:  You have different experts?

23             MS. MULLIGAN:  Your Honor, we've joined in the

24   application of their experts, and we are even further behind

25   than Kramer Levin is at this point.  So it's a very difficult

O1GJHWAC

1    position for us to be in with respect to Mr. Halligan.

2              MR. BERKE:  Can I just add to the arguments, your

3    Honor.  The defense did everything we were supposed to do.

4    Over two years we repeatedly asked for this data.  We tried to

5    get it through Rule 17(c).  We said explicitly that we couldn't

6    understand how they were matching and they can't in our Daubert

7    opposition.  The prosecution, until January 5, never told us

8    why don't you just look at this data that we have?  You have

9    it, you have the execution data.  They never said that.

10             Again, it's their discovery violation.  For the

11   defense to be prejudiced because of their discovery violation,

12   they have had this problem before.  They told Judge Castel they

13   fixed it; they didn't.  It's incredibly significant.  We've

14   tried everything.  We were ready to go to trial on February 25

15   with the charges, with the data we had, with what we thought

16   this case would be.

17             THE COURT:  I don't see any substantial differences in

18   what was and is now.  That's the schedule.  We'll live by it.

19             MR. BERKE:  Your Honor, can I raise this?  We can't

20   produce our expert report.  If we have to go to trial on

21   February 27, we would try to produce it by the defense case, if

22   we can.  We got to get a new expert.  We have to be able to

23   cross-examine their expert.  We might have Daubert challenges

24   to the science experiments.  There are ten new ones.  We don't

25   even understand how they did it.

O1GJHWAC

1          THE COURT:  What science experiments?  There's no

2     science experiments here.

3          MR. BERKE:  Well, it's what they did to match it,

4     Judge.  So if we --

5          THE COURT:  Are you challenging the formulas used by

6     Hwang and his business, Mr. Thomas?

7          MR. THOMAS:  Your Honor, I'm not sure I appreciate

8     the --

9          THE COURT:  I don't know what to say.

10          MR. THOMAS:  The Court's precise question, the

11     formulas?

12          THE COURT:  Algorithms.

13          MR. THOMAS:  Here, the algorithms factor in the case,

14     Judge, because the defendant selected particular ways for the

15     bank to fill his order.  One of those ways, just to take an

16     example, was to do something called volume-weighted average

17     price, which tells the computer --

18          THE COURT:  Ms. Estes, don't do that.

19          MR. THOMAS:  Which tells the computer that you must

20     finish the order by the end of the day.  Mr. Hwang put that

21     order in with only a few minutes or maybe 40 minutes to spare,

22     causing the --

23          THE COURT:  What's the algorithm got to do with it?

24     Did he change his algorithm?

25          MR. THOMAS:  He did.

O1GJHWAC

| | |
|---|---|
| 1 | THE COURT:  He modified his algorithm?  He walked away |
| 2 | from what he was doing?  He didn't have a different algorithm, |
| 3 | he just manipulated it. |
| 4 | MR. THOMAS:  The algorithms here we're talking about |
| 5 | are the bank's algorithms. |
| 6 | THE COURT:  Which bank? |
| 7 | MR. THOMAS:  The counterparties here, including Morgan |
| 8 | Stanley, UBS, and Credit Suisse. |
| 9 | Mr. Hwang would select different algorithms to achieve |
| 10 | the manipulation, but a number of that -- |
| 11 | THE COURT:  So they have to understand each bank's |
| 12 | algorithm. |
| 13 | MR. THOMAS:  We've produced in discovery everything |
| 14 | we've received from the banks about how their algorithms work, |
| 15 | and we're going to call as witnesses representatives from the |
| 16 | banks who have already been reflected on a witness list we |
| 17 | provided to the defense. |
| 18 | THE COURT:  I'm sticking with the dates I gave you. |
| 19 | MR. BERKE:  Your Honor, can I ask again, your Honor |
| 20 | has our objections, and I appreciate the challenge with the |
| 21 | scheduling.  Your Honor, just at minute -- |
| 22 | THE COURT:  Mr. Berke, I know you for a long time.  I |
| 23 | give you respect.  I understand what you're saying.  Each of us |
| 24 | is driven by different needs.  My need is to give you a fair |
| 25 | trial, and I believe these dates will give you a fair trial. |

O1GJHWAC

```
 1            MR. BERKE:  Can I make two requests, your Honor?

 2            THE COURT:  Am I wrong?  I'll know it on the way.

 3            MR. BERKE:  Can I make two requests, your Honor?

 4            THE COURT:  Yes.

 5            MR. BERKE:  One, after we get the January 24 full

 6    disclosure from the prosecution, can we then put in followup

 7    questions regarding what we need and also have the meeting with

 8    our expert that your Honor suggested at the beginning to

 9    actually learn what they did?  And then, two, the second --

10            THE COURT:  Sit down, Mr. Thomas.

11            What are the two requests?

12            MR. BERKE:  So the first is that we get further

13    disclosures after the 24th that we believe we need to

14    understand what they did.

15            THE COURT:  Like what?

16            MR. BERKE:  Including meeting with their experts, as

17    your Honor suggested is a possibility, so we can ask specific

18    questions about what they did.

19            And then the second request is can we then submit a

20    letter to your Honor about how much time we would need with

21    this schedule to put in our report.  It may not be before the

22    start of the trial, because we are going to get a new expert,

23    they're going to do experiments.  We will lay out in a letter

24    what we need, your Honor, and would ask your Honor to consider

25    the date.
```

O1GJHWAC

| | |
|---|---|
| 1 | THE COURT:  This is my reaction.  I'm not asking for |
| 2 | further disclosures.  If the government's expert is not given |
| 3 | sufficient disclosures to support his opinions, he can bring |
| 4 | that out in cross-examination.  I think you can get enough |
| 5 | information from your experts to do a very effective |
| 6 | cross-examination.  I'm tempted by the meeting between experts, |
| 7 | and I would be prepared to preside over such a meeting to make |
| 8 | sure it doesn't go out of bounds. |
| 9 | Mr. Thomas, what do you say? |
| 10 | MR. THOMAS:  Your Honor, I think perhaps it would be |
| 11 | prudent to have each side do their disclosures and then for the |
| 12 | Court to have a conference to see if such a meeting would be |
| 13 | productive. |
| 14 | THE COURT:  We don't have time for that.  You have the |
| 15 | schedule.  I have set the final pretrial conference a week |
| 16 | after the defense disclosures.  You don't have time in between |
| 17 | to have two steps.  We have time for one step. |
| 18 | MR. THOMAS:  It could be just after the government's |
| 19 | disclosures, your Honor, but we don't think that in advance |
| 20 | questioning of the government witness is necessary for the |
| 21 | defendants to achieve -- |
| 22 | THE COURT:  So for example, can you get your |
| 23 | government supplementation before the 24th? |
| 24 | MR. THOMAS:  Your Honor, I don't believe that we could |
| 25 | do that and provide the level of detail that the Court is |

O1GJHWAC

1    expecting.

2            THE COURT:  I'm intrigued by your suggestion,

3    Mr. Thomas, that the meeting between experts can occur soon

4    after January 24, but I don't know that Mr. Berke will be

5    ready.

6            MR. THOMAS:  Your Honor, I was proposing a meeting

7    between the parties to discuss the government's disclosure to

8    see if meeting with the experts would be productive, but we're

9    happy to accommodate the Court.  We expect that our disclosure

10   is going to lay out precisely how it is that the expert

11   obtained the results that they did and what they did with the

12   data to assess it in the first place.  So we think that the

13   defendants will have more disclosure than the Court would

14   expect --

15           THE COURT:  Well, I can't meet with you next week

16   because I have a trial.

17           MR. THOMAS:  So your Honor, perhaps just sticking to a

18   more conventional schedule would make sense in the sense that

19   we'll produce our revised expert reports on the 24th, and the

20   defense will identify to us either in informally or to the

21   Court in a letter what further questions they have, and we can

22   take it up from there as to whether there's more information to

23   be supplied.

24           MR. BERKE:  Your Honor, we're trying to address

25   obviously the prejudice caused by the government's discovery

O1GJHWAC

1    violation.  What we were envisioning is having an opportunity

2    to actually have our experts question their expert through us

3    or however we do it in an informal way so we can learn exactly

4    the detail of what they did to try to make it actually a more

5    efficient way of being able to understand it.  That's why we're

6    suggesting it, Judge.  And we're happy to do it here, we're

7    happy to do it elsewhere.  And again, it's for our experts to

8    actually --

9            THE COURT:  If I let you do it, it's going to be

10   running out of bounds.  Someone's going to complain.  I don't

11   have the capability that week.  And if I sent you to a

12   magistrate judge, there's too much background that he wouldn't

13   or she wouldn't have.

14           MR. BERKE:  Your Honor, could we begin with we'll give

15   detailed questions that we'll submit from our experts to them

16   and hope that they'll give us the answers?  Because the

17   questions will be very technical questions.

18           THE COURT:  Why can't they be in the form of

19   objections rather than --

20           MR. BERKE:  Because your Honor, we want to be able to

21   do a test of their analysis to determine what the flaws are

22   with it and how to cross-examine it.  And to do that, we need

23   to know what they did.  And again, based --

24           THE COURT:  So what do you want, Mr. Berke?

25           MR. BERKE:  Two things, Judge, the opportunity to ask

O1GJHWAC

1      them detailed questions following the report to them for their

2      expert to answer.

3                THE COURT:  What date?

4                MR. BERKE:  We're happy to do it, if they give us the

5      24th, we'll take five days after that.  So if I may, your

6      Honor, I will submit it to them by --

7                THE COURT:  31st?  29th?

8                MR. BERKE:  We will submit it to them if you give us

9      till the 30th.

10               THE COURT:  30th.

11               MR. BERKE:  Thank you, Judge.

12               And then, your Honor, after that, if we were able to

13     submit a letter regarding what would be required for a new

14     expert, we presume, to submit a report, we'll be able to do

15     that after we have that information.  And we can do that

16     shortly after that letter to the Court.

17               THE COURT:  I think it could be part of your expert's

18     report.

19               MR. BERKE:  Judge, what I'm saying is I don't believe

20     we can get an expert report by February 14, but we will do our

21     best to get the best date possible after we get the

22     disclosures.  And again, I don't want to overstate it, but if

23     we could have the opportunity to submit a proposal to your

24     Honor once we get that information.

25               THE COURT:  You can do that any time.

O1GJHWAC

1          MR. BERKE:  Thank you.

2          THE COURT:  I'll let you make proposals to me.  I

3     don't need to set a date for that.

4          MR. BERKE:  Your Honor, if we could have --

5          THE COURT:  You don't have to set a date.  Any time

6     you want to propose something or object to something, you can.

7     I don't have any premotion clearances.

8          MR. BERKE:  I should know that by now, Judge.  So I'll

9     tell your Honor if we could have a week, so by --

10         THE COURT:  You can have the questions, you can ask

11    the questions by January 30, and then the government will

12    either address them or not.

13         MR. BERKE:  Could we have a deadline for the

14    government to respond, your Honor?

15         THE COURT:  What should it be?

16         MR. BERKE:  I would suggest, if that Friday would be

17    sufficient time, or that Monday, the 2nd or 5th.

18         THE COURT:  February 5.

19         MR. BERKE:  Thank you, Judge.

20         And then your Honor, I would propose to your Honor if

21    we could submit our proposal by February 8 for our expert

22    analysis, to the extent we can get it done.

23         THE COURT:  What do you mean by your proposals?  You

24    have until the 14th.

25         MR. BERKE:  Your Honor, I don't believe there's any

O1GJHWAC

1    chance we'll get a new expert and get our analysis by the 14th.

2    It can't be done.  I don't believe we can make meet that

3    deadline.  And your Honor, not only did the prosecution have

4    this data for two years --

5            THE COURT:  Wait a minute.

6        I'm looking at your qualifications of Mr. Savoldelli,

7    and they look to be highly qualified including for the subjects

8    that you want to discuss.

9            MR. BERKE:  Your Honor, Mr. Savoldelli is not someone

10    talking about data crunching.  He is really talking about the

11    operations of a home office and hedge funds and the like.  He

12    is actually not testifying at all about trading.  Our other

13    expert will be talking some measure about overall trading, but

14    he did not deal with intraday price movement because they did

15    not have the data, and that is predominantly the focus.  So

16    while our other expert dealt with big changes that your Honor

17    was talking about that we thought this case was about, none of

18    our experts have dealt with intraday trade data and could not

19    because the data was not produced to us.

20            THE COURT:  A lot of my thinking is focused on my

21    belief that this so-called interim price movements is not very

22    important.  I will reconsider after I see the government's

23    analysis.  So you'll have questions to address on the 30th, and

24    there will be opportunity for you to make whatever complaints

25    you want at that time.

O1GJHWAC

1              MR. ESTES:  Your Honor, may I say one thing?

2              THE COURT:  Yes.  You can say anything you want.  Just

3      don't jump up when Mr. Thomas is talking.

4              MR. ESTES:  Understood, your Honor.  I won't do that

5      again.

6              Just on the point that intraday price movements is not

7      very important, I just want to underscore it appears their

8      entire expert analysis is based on that, and that is what we

9      are not prepared for and will not be prepared for on

10     February 27.

11             THE COURT:  So what did I just say to Mr. Berke?

12             MR. ESTES:  I understand, your Honor.  There is a

13     solution to going to --

14             MR. BERKE:  Your Honor, if I understood, maybe --

15             THE COURT:  Ms. Estes, what did I just say to

16     Mr. Berke?

17             MR. ESTES:  I'm not sure precisely.

18             THE COURT:  I said he could complain after he reads

19     the government's disclosure.

20             MR. BERKE:  And by "complain," your Honor would then

21     consider whether preclusion is appropriate?

22             THE COURT:  You can do whatever you want, Mr. Berke.

23             MR. BERKE:  Thank you, Judge.

24             THE COURT:  And I'll respond.  All right.

25             I think we have finished the day.  The motions to

O1GJHWAC

1    exclude are denied in light of the revised schedule I've given

2    to you.  And that revised schedule is as follows:

3            We record it again in a summary order to be filed.

4    The government will supplement its expert's report by

5    January 24.  Defendant can submit questions that in its opinion

6    and their opinion, Ms. Mulligan and Mr. Berke and their staffs,

7    that the expert has not answered or documents have not been

8    disclosed, offer whatever they want to do by January 30.

9            Government will respond by February 5.  By

10   February 14, defendants will file their supplement to their

11   expert's report.  Final pretrial conference will be held

12   February 21 at 10:00.  The trial will begin February 27 at

13   10:00 with the picking of a jury.

14           How long a trial do you anticipate, Mr. Thomas?

15           MR. THOMAS:  Based on the estimates for the daily

16   schedule the Court provided, we expect the government's case is

17   going to be about five to six weeks, your Honor.  We're

18   anticipating about 55 witnesses.

19           THE COURT:  You've got to shorten it because I'm

20   leaving on April 18.  If you feel that you can't finish your

21   case and the jury can do its evaluation before then, then we

22   have to adjourn the trial.

23           MR. BERKE:  Your Honor, we expect our defense case

24   will be approximately two weeks.

25           THE COURT:  Well, what we can do after the government

O1GJHWAC

1   finishes its case, we can adjourn and pick it up again after

2   two weeks.

3           MR. THOMAS:  That's acceptable to the government, your

4   honor, if we come to that situation.

5           THE COURT:  I think we'll have a shorter trial than

6   you think.  Okay.  We've got the schedule.

7           MR. BERKE:  Your Honor, I'm only saying this because I

8   have an ethical obligation.  I believe the February 14 date is

9   probably not a date in which we can put an expert report on

10  this new data that wasn't disclosed to us.

11          THE COURT:  Somehow I think I've heard you say that a

12  few times.

13          MR. BERKE:  I know, Judge.  I just wanted to say it

14  because I would feel bad if I left here, especially before your

15  Honor, and didn't say it.  I know.  Thank you.

16          THE COURT:  You heard what I said.

17          MR. BERKE:  I did.  I appreciate that, Judge.

18          THE COURT:  So you work very hard to do it, and I

19  think you can do it.

20          MS. MULLIGAN:  Thank you, your Honor.

21          (Adjourned)

22

23

24

25