UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
UNITED STATES OF AMERICA
                                              :
          - v. -                                        No. 22 Cr. 240 (AKH)
                                              :
SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,                             :

              Defendants.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


THE GOVERNMENT'S MOTIONS *IN LIMINE*


                              DAMIAN WILLIAMS
                              United States Attorney
                              Southern District of New York
                              The Jacob K. Javits Federal Building
                              26 Federal Plaza, 37th Floor
                              New York, New York 10278


Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    I.    Origins of the Archegos Enterprise .................................................................... 4

        A.    Tiger Asia ................................................................................................ 4

        B.    The Early Days of Archegos .................................................................. 6

    II.    Hwang and Halligan Operate the Archegos Enterprise Through Fraud ............ 8

    III.    Archegos's Collapse ........................................................................................ 11

    IV.    After the Collapse ............................................................................................ 13

ARGUMENT ................................................................................................................... 14

    I.    The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial ................................................................... 14

        A.    The Court Should Exclude Evidence and Argument that Fraud Should Be Excused on the Basis of Victim Sophistication or Purported Culpability.................................................. 15

        B.    The Court Should Exclude Evidence and Argument that the Counterparties Were Negligent or Failed to Conduct Adequate Due Diligence .................................................... 17

        ███████████████████████████████████████████████████ .......................................................... 20

        D.    The Court Should Exclude Evidence and Argument that Regulators or a Lack of Certain Regulation Are to Blame or Provide a Defense to Manipulation or Fraud.............. 23

        E.    The Court Should Exclude Evidence and Argument about the Purportedly "Novel," "Unprecedented," or "Aggressive" Nature of the Government's Case ................................. 24

        F.    The Court Should Exclude Evidence and Argument About the Defendants' Good Acts to Prove Their Innocence .................................................................................................... 26

        G.    The Court Should Exclude Evidence and Argument About the Defendants' Personal Circumstances, Including Religious Devotion and Potential Punishment.......................... 29

        H.    The Court Should Exclude Evidence or Argument About the Presence of Attorneys, Absent Further Disclosures from the Defendants ................................................................ 30

    II.    Statements of the Defendants' Coconspirators and Agents Are Not Barred by the Rule Against Hearsay ................................................................................................................. 33

        A.    Applicable Law ...................................................................................... 33

        B.    Discussion .............................................................................................. 35

    III.    The Court Should Preclude the Defendants from Using Their Experts to Introduce Inadmissible Evidence ...................................................................................................... 40

        A.    The Court Should Preclude State of Mind Testimony ............................... 41

        B.    The Could Should Preclude Opinion that Instructs on, or Applies, the Law ............. 46

C.      The Could Should Preclude "What if" Testimony as Unreliable and Unhelpful ....... 51

IV.     The Court Should Admit Hwang's Proffer Statements If and When He Takes a Contrary
Position ........................................................................................................................ 53

CONCLUSION ................................................................................................................ 55

# TABLE OF AUTHORITIES

Cases

*Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*,
  No. 08 Civ. 7508 (SAS), 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) ................................. 24
*Atlantic Specialty Ins. v. AE Outfitters Retail Co.*,
  970 F. Supp. 2d 278 (S.D.N.Y. 2013) ................................................................................. 52
*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................................ 47, 48
*AU New Haven, LLC v. YKK Corp.*,
  No. 15 Civ. 3411 (GHW), 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ......................... 41, 42
*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank*,
  No. 09 Civ. 686 (SAS), 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ................................. 41
*Bourjaily v. United States*,
  483 U.S. 171 (1987) ..................................................................................................... 34, 38
*City of Provid., R.I. v. Bats Glob. Mkts.*,
  No. 14 Civ. 2811 (JMF), 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ................................. 46
*Daubert v. Merrell Dow Pharms.*,
  509 U.S. 579 (1993) ..................................................................................................... 41, 52
*Deutsch v. Novartis Pharms. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ................................................................................. 42
*Feis v. United States*,
  394 F. App'x 797 (2d Cir. 2010) ........................................................................................ 33
*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .......................................................................................................... 51
*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990) ................................................................................................ 33
*GST Telecom. Inc. v. Irwin*,
  192 F.R.D. 109 (S.D.N.Y. 2000) ......................................................................................... 42
*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) .............................................................................................. 46
*In re Elysium Health-ChromaDex Litig.*,
  No. 17 Civ. 7394 (LJL), 2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) .................................. 43
*In re Fosamax Prods. Liability Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................................................................. 41
*In re Initial Pub. Offering Sec. Litig.*,
  174 F. Supp. 2d 61 (S.D.N.Y. 2001) ................................................................................... 47
*In re Reserve Fund Sec. Litig.*,
  No. 09 Civ. 4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ............................... 39
*In re Rezulin Prods. Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ........................................................................... passim
*Kewazinga Corp. v. Microsoft Corp.*,
  No. 18 Civ. 4500 (GHW), 2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021) .............................. 41
*Levine v. SEC*,
  436 F.2d 88 (2d Cir. 1971) ................................................................................................ 28

*LinkCo, Inc. v. Fujisu Ltd.*,
  No. 00 Civ. 7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) .................................. 43

*Pappas v. Middle Earth Condo. Ass'n*,
  963 F.2d 534 (2d Cir. 1992)............................................................................................... 33

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
  140 F.3d 420 (2d Cir. 1998)............................................................................................... 46

*Rogers v. United States*,
  422 U.S. 35 (1975)............................................................................................................. 29

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)............................................................................... 31

*Set Capital LLC v. Credit Suisse Group AG*,
  996 F.3d 64 (2d Cir. 2021)........................................................................................... 47, 48

*Shannon v. United States*,
  512 U.S. 573 (1994)........................................................................................................... 29

*United States v. Adelekan*,
  567 F. Supp. 3d 459 (S.D.N.Y. 2021)............................................................................... 17

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011)............................................................................................... 26

*United States v. Amico*,
  486 F.3d 764 (2d Cir. 2007)............................................................................................... 17

*United States v. Bailey*,
  444 U.S. 394 (1980)........................................................................................................... 14

*United States v. Bakhtiari*,
  913 F.2d 1053 (2d Cir. 1990)............................................................................................. 14

*United States v. Bankman-Fried*,
  No. 22 Cr. 673 (LAK), 2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023)...................... 16, 19, 24

*United States v. Bankman-Fried*,
  No. 22 Cr. 673 (LAK), 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) ...................................... 31

*United States v. Barrow*,
  400 F.3d 109 (2d Cir. 2005)............................................................................................... 53

*United States v. Battaglia*,
  No. 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008)................................. 29

*United States v. Benchick*,
  No. 13 Cr. 20453 (RHC), 2014 WL 4181970 (E.D. Mich. Aug. 21, 2014) ......................... 17

*United States v. Benedetto*,
  571 F.2d 1246 (2d Cir. 1978)............................................................................................. 26

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)........................................................................................ 46, 49

*United States v. Borello*,
  766 F.2d 46 (2d Cir. 1985)................................................................................................. 16

*United States v. Boykoff*,
  67 Fed. App'x 15 (2d Cir. 2003)........................................................................................ 27

*United States v. Carton*,
  No. 17 Cr. 680 (CM), 2018 WL 5818107 (S.D.N.Y. Oct. 19, 2018) .................................. 18

*United States v. Castillo*,
  924 F.2d 1227 (2d Cir. 1991)............................................................................................. 52

*United States v. Chambers,*
  800 Fed. Appx. 43 (2d Cir. 2020) ............................................................................... 27
*United States v. Cheung Kin Ping,*
  555 F.2d 1069 (2d Cir. 1977) ..................................................................................... 23
*United States v. Colasuonno,*
  697 F.3d 164 (2d Cir. 2012) ....................................................................................... 30
*United States v. Connolly,*
  No. 16 Cr. 370 (CM), 2019 WL 2125044 (S.D.N.Y. May 2, 2019) ........................... 15
*United States v. Demosthene,*
  334 F. Supp. 2d 378 (S.D.N.Y. 2004) ........................................................................ 25
*United States v. DiDomenico,*
  985 F.2d 1159 (2d Cir. 1993) ..................................................................................... 42
*United States v. Dupree,*
  706 F.3d 131 (2d Cir. 2013) ....................................................................................... 33
*United States v. Eisenberg,*
  No. 21 Cr. 10 (AS), 2023 WL 8720295 (S.D.N.Y. Dec. 18, 2023) ........................... 47
*United States v. Evangelista,*
  122 F.3d 112 (2d Cir. 1997) ....................................................................................... 30
*United States v. Fazio,*
  No. 11 Cr. 873 2012 WL 1203943 (S.D.N.Y. Apr. 11, 2012) .................................... 26
*United States v. Fiumano,*
  No. 14 Cr. 518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ........................ 28
*United States v. Gigante,*
  166 F.3d 75 (2d Cir. 1999) ......................................................................................... 34
*United States v. Gomez,*
  210 F. Supp. 2d 465 (S.D.N.Y. 2002) ........................................................................ 53
*United States v. Grimm,*
  568 F.2d 1136 (5th Cir. 1978) .................................................................................... 27
*United States v. Gupta,*
  747 F. 3d 111 (2d Cir. 2013) ................................................................................ 22, 34
*United States v. Harris,*
  491 F.3d 440 (D.C. Cir. 2007) .................................................................................... 29
*United States v. Harvey,*
  991 F.2d 981 (2d Cir. 1993) .................................................................................. 16, 22
*United States v. Jamil,*
  707 F.2d 638 (2d Cir. 1983) ....................................................................................... 16
*United States v. Josephberg,*
  562 F.3d 478 (2d Cir. 2009) ....................................................................................... 23
*United States v. June,*
  No. 10 Cr. 30021 (MAP), 2012 WL 245243 (D. Mass. Jan. 25, 2012) ..................... 17
*United States v. Korogodsky,*
  4 F. Supp. 2d 262 (S.D.N.Y. 1998) ...................................................................... 21, 22
*United States v. Kwong,*
  69 F.3d 663 (2d Cir. 1995) ......................................................................................... 14
*United States v. Lumpkin,*
  192 F.3d 28 (2d Cir. 1999) .................................................................................... 46, 49

*United States v. Lyle*,
    919 F.3d 716 (2d Cir. 2019)..................................................................... 53

*United States v. Mendlowitz*,
    No. 17 Cr. 248 (VSB), 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ..................................... 15

*United States v. Mezzanatto*,
    513 U.S. 196 (1995)............................................................................. 53

*United States v. Miller*,
    626 F.3d 682 (2d Cir. 2010).................................................................... 14

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001).................................................................... 51

*United States v. Mustaga*,
    753 F. App'x 22 (2d Cir. 2018) ............................................................... 28

*United States v. Nekritin*,
    No. 10 Cr. 491 (KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2021) .................................. 18

*United States v. O'Connor*,
    580 F.2d 38 (2d Cir. 1978).................................................................... 27

*United States v. Paccione*,
    949 F.2d 1183 (2d Cir. 1991).................................................................. 29

*United States v. Padilla*,
    203 F.3d 156 (2d Cir. 2000)................................................................... 34

*United States v. Paul*,
    110 F.3d 869 (2d Cir. 1997)................................................................... 14

*United States v. Petit*,
    No. 19 Cr. 850 (JSR) (S.D.N.Y.), Oct, 26 2020 ............................................ 32, 53

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999)................................................................ 42, 45

*United States v. Reese*,
    933 F. Supp. 2d 579 (S.D.N.Y. 2013).......................................................... 25

*United States v. Regan*,
    103 F.3d 1072 (2d Cir. 1997).................................................................. 24

*United States v. Rivera*,
    22 F.3d 430 (2d Cir. 1994).................................................................... 34

*United States v. Rivera*,
    No. 13 Cr. 149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ................................. 26

*United States v. Rosado*,
    728 F.2d 89 (2d Cir. 1984).................................................................... 24

*United States v. Rosemond*,
    841 F.3d 95 (2d Cir. 2016).................................................................... 53

*United States v. Russo*,
    302 F.3d 37 (2d Cir. 2002).................................................................... 39

*United States v. Saldarriaga*,
    204 F.3d 50 (2d Cir. 2000).................................................................... 25

*United States v. Saneaux*,
    392 F. Supp. 2d 506 (S.D.N.Y. 2005).......................................................... 38

*United States v. Scarpa*,
    897 F.2d 63 (2d Cir. 1990).................................................................... 25

*United States v. Scully*,
   877 F.3d 464 (2d Cir. 2017)..................................................................................... 30

*United States v. Shea*,
   No. 20 Cr. 412 (AT) (S.D.N.Y.) May 31, 2022 ....................................................... 32

*United States v. Stewart*,
   No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ....................... 25

*United States v. Stroming*,
   838 F. App'x 624 (2d Cir. 2021) .............................................................................. 28

*United States v. Tagliaferri*,
   No. 13 Cr. 115 (RA) (S.D.N.Y. 2014) ..................................................................... 31

*United States v. Tarantino*,
   846 F.2d 1384 (D.C. Cir. 1988) .............................................................................. 34

*United States v. Thomas*,
   116 F.3d 606 (2d Cir. 1997)..................................................................................... 28

*United States v. Thomas*,
   377 F.3d 232 (2d Cir. 2004)..................................................................................... 17

*United States v. Tiger Management, LLC,,*
   *12 Cr. 808 (SRC) (D.N.J. 2012)* ............................................................................. 5

*United States v. Tracy*,
   12 F.3d 1186 (2d Cir. 1993)..................................................................................... 38

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999)..................................................................................... 27

*United States v. Weaver*,
   860 F.3d 90 (2d Cir. 2017)....................................................................................... 17

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007)..................................................................................... 51

Rules

Fed. R. Evid. 104 ...................................................................................................... 34
Fed. R. Evid. 401 ................................................................................................ 27, 31
Fed. R. Evid. 402 ................................................................................................ 14, 16
Fed. R. Evid. 403 ............................................................................. 14, 16, 19, 26, 46
Fed. R. Evid. 404 ........................................................................................ 4, 26, 27
Fed. R. Evid. 405 ...................................................................................................... 26
Fed. R. Evid. 702 ................................................................................. 40, 41, 42, 45
Fed. R. Evid. 704 ................................................................................................ 42, 45
Fed. R. Evid. 801 ............................................................................. 32, 33, 34, 38, 39, 40
Fed. R. Evid. 802 ...................................................................................................... 32

## PRELIMINARY STATEMENT

In advance of the trial of defendants Sung Kook ("Bill") Hwang and Patrick Halligan, the Government respectfully submits the following motions *in limine*. *First*, the Government moves to preclude irrelevant and unfairly prejudicial evidence and argument, including evidence and argument: (a) that fraud should be excused on the basis of victim sophistication or purported culpability; (b) that counterparties were negligent or failed to conduct adequate due diligence; (c) ████████████████████████████████████████████████████;[1] (d) that regulators or a lack of certain regulation are to blame or provide a defense to manipulation or fraud; (e) about the purportedly "novel," "unprecedented," or "aggressive" nature of the Government's case; (f) about the defendants' good acts to prove their innocence; (g) about the defendants' personal circumstances, including religious devotion and potential punishment; and (h) about the presence of attorneys, absent further disclosures from the defendants. *Second*, the Government moves to permit admission of out-of-court statements of the defendants' coconspirators and agents. *Third*, the Government moves to preclude the defendants from using their experts to introduce inadmissible evidence. *Fourth*, the Government moves to admit Hwang's proffer statements if and when he takes a contrary position.

## INTRODUCTION

The evidence at trial will show that Hwang operated his investment company, Archegos Capital Management, L.P., and its affiliated funds and entities ("Archegos," "ACM," or the "fund") through deception and fraud. Hwang's schemes required and received the support of other senior members at Archegos, including Halligan, ACM's Chief Financial Officer; William Tomita,

---

[1] ████████████████████████████████████████████████████████████
████████████████████

ACM's Head Trader; and Scott Becker, ACM's Director of Risk Management, all of whom worked for Hwang at his prior firm, Tiger Asia, and continued to work with Hwang after Tiger Asia was forced to close after Hwang engaged in market manipulation and insider trading in 2008 and 2009. Together, from 2020 to March 2021, the conspirators brought themselves to the brink of staggering wealth—transforming Archegos's capital from approximately $1.5 billion to more than $35 billion in the span of a year—and did so through manipulative trading and fraud.

The conspirators' misconduct also built Archegos into an unsteady economic force. By late 2020 and early 2021, Hwang commanded billions of dollars in risk. Hwang used his influence to increase the prices of securities in his portfolio, enabling further and bigger trades, and making the success of his trades a self-fulfilling prophecy. At company meetings, Hwang began to compare himself to Warren Buffet and Jeff Bezos, and, in conversation, Hwang began to speak of his ambition to amass personal capital of $50 billion or more. But Hwang's apparent success had come at the cost of basic risk management. As a result of Hwang's stock manipulation, Archegos became highly sensitive to adverse market moves in just a few stocks and, to prop up the prices of those stocks, Hwang took to buying them at ever-increasing prices. Employees outside the conspiracy began to raise concerns that Archegos's positions had become illogical. Hwang, however, rebuked anyone who dared to question him—asserting, in substance, that he knew best—and over time he restricted what ordinary Archegos employees could learn about what he was doing.

The markets had even less information about Hwang's activities than his employees did. Archegos personnel, including Becker and Tomita, falsely assured counterparties that Archegos's positions were less concentrated and more liquid than they were in order to obtain additional capacity to sustain Hwang's trading schemes. And Hwang used multiple brokers to place orders in the market and overwhelmingly placed his orders as swaps, concealing his interest in certain

stocks behind blind spots in the Securities and Exchange Commission's reporting requirements. Hwang orchestrated his scheme so that, to the markets, it appeared as though many informed traders were active in the market for the stocks in Archegos's portfolio. The markets were unaware that the outperformance of these stocks traced back to one person: Hwang.

Hwang's ambition and deception ultimately led to Archegos's demise. Hwang so significantly manipulated the stock of ViacomCBS, for example, that the company's executives thought that investors may be responding to the company's content offerings and issued more stock to the market. ViacomCBS's stock price wavered, then crashed as few investors other than Hwang were willing to pay inflated prices for it. The downward slide presaged a substantial margin call that Archegos did not have the cash to pay. To obtain the funds, Hwang would have had to sell off chunks of his biggest positions, but those sales would have further unraveled his price manipulation, leading to additional margin calls. So Hwang instead took Archegos's remaining cash and credit and gambled it on a buying spree—a Hail Mary aimed at overpowering the market and reversing the price declines. The buying spree failed, and negative news pushed down the prices of other stocks in the portfolio, making the crisis even worse. Halligan and other coconspirators attempted to stall Archegos's counterparty banks from collecting their collateral by misleadingly informing the counterparties that Archegos had a "liquidity problem" not "a solvency problem," and that it was developing a plan to sell positions to cover the calls. But eventually counterparty banks ran out of patience and began to liquidate Archegos's positions. In doing so, the banks discovered that Archegos's portfolio was not constructed in the way it had been described to them and that, without Hwang propping up the prices of Archegos's core securities, Archegos's securities traded at a fraction of their prior prices.

# BACKGROUND

## I.      Origins of the Archegos Enterprise

What became the Archegos Enterprise began with Hwang's prior hedge fund, Tiger Asia. At Tiger Asia, Hwang established the business entities that would later take the Archegos name, and Hwang employed many of the people that would later form the core of the racketeering conspiracy charged in the Indictment, including Halligan, Tomita, and Becker.[2]

### A.      Tiger Asia

Hwang ran Tiger Asia as a hedge fund that purported to focus on Asian equities. In 2008, however, Hwang lost approximately two billion dollars shorting Volkswagen, the European car manufacturer. Hwang blamed the losses on Goldman Sachs and, in particular, Goldman Sachs's demand for more margin as the Volkswagen trade moved against him. In the aftermath of that loss, Hwang turned to fraud, including market manipulation and insider trading, that—at least temporarily—enabled him to demonstrate gains to his investors.

As to market manipulation, Hwang, with the assistance of his traders, including Raymond Park and Tomita, engaged in a manipulative practice known as "window dressing," which, in this instance, consisted of placing trades in certain Chinese bank stocks at the end of monthly reporting periods in 2008 with the intention of driving up the price of those stocks, thereby compensating for losses associated with Hwang's Volkswagen trade and increasing the value of Tiger Asia's portfolio at month-end and, with it, Hwang's management fees. Hwang also engaged in manipulative day trading. Specifically, in early 2009, Hwang directed trading at the end of the

---

[2]      The Government has previously notified Hwang and Halligan of its intent to offer evidence relating to Tiger Asia, the formation of Archegos, and Hwang and Halligan's pre-charge misconduct, among other things, as direct evidence of the charged racketeering conspiracy or, in the alternative, pursuant to Rule 404(b) of the Federal Rules of Evidence. The Government's notice is attached hereto as Exhibit A.

trading day to drive down the price of a block sale of stock at the end of trading, so that he could cover a short position at more favorable rates through his purchase of a large block of the stock, the price of which was determined by the close-of-day price. Additionally, in March 2009, Hwang placed a series of purchase orders in Yahoo! Japan Corporation through multiple brokers using escalating limit prices, causing the prices of Yahoo! Japan stock to rise.

As to insider trading, Hwang, Park, and Tomita used non-public information about upcoming block sales of stock to make favorable—and forbidden—trades. More specifically:

- On or about December 18, 2008, a UBS representative informed Park of an upcoming large block of Bank of China, Ltd ("BOC") shares that would be sold to investors on the condition that Tiger Asia treat the information as confidential. Tiger Asia agreed to participate in the transaction. Though Park and Tiger Asia were forbidden to trade based on that material non-public information ("MNPI") based on Park's agreement with the UBS representative, Hwang and Park short-sold BOC's stock. When the block sale subsequently occurred, it depressed market prices, and Hwang and Park bought shares, covering the prior short positions and realizing a profit.

- On or about January 5, 2009, a UBS representative informed Park of the opportunity to participate in a block sale of shares of China Construction Bank Corporation ("CCB") on the condition that Tiger Asia treat the information as confidential. Park said Tiger Asia would participate. Once again, after Park received that MNPI, Hwang and Park short-sold CCB and then bought CCB shares as part of the block transaction, covering the short and realizing a profit.

- On or about January 11, 2009, a Morgan Stanley representative informed Park of the opportunity to participate in a block sale of shares of BOC. Tiger Asia agreed to participate. Once again, after Park received that MNPI, Hwang and Park short-sold BOC and then bought BOC shares as part of the block transaction, covering the short and realizing a profit.

Regulators in multiple countries eventually discovered Hwang's misconduct, the result of which made crystal clear to Hwang that these manipulative practices were wrongful and unlawful. In 2012, Tiger Asia pled guilty to wire fraud in a case before the U.S. District Court for the District of New Jersey.[3] The guilty plea related to Tiger Asia's 2008 and 2009 insider trading conduct.

---

[3]     *See United States v. Tiger Management, LLC*, 12 Cr. 808 (SRC) (D.N.J. 2012).

During the plea allocution, Hwang, speaking on behalf of his fund, admitted that, contrary to the firm's promises otherwise, Tiger Asia Management traded on confidential information it had obtained from UBS and, separately, Morgan Stanley. (*See, e.g.*, GX 2701, 22:18-22 (Court: "Did Tiger Asia Management violate Raymond Park's agreement with UBS to keep the information concerning China Construction Bank stock confidential and not to trade on it?" Hwang: "Yes, Your Honor."); 24:04-08 (Court: "Did that violate Raymond Park's agreement with Morgan Stanley H.K. to keep the information concerning Bank of China stock confidential and not to trade on it?" Hwang: "Yes, Your Honor.")). Hwang entered into a no-admit, no-deny settlement with the Securities and Exchange Commission on the insider trading and market manipulation conduct and accepted a multi-year bar from managing outside investments. Tiger Asia also entered into a settlement with a Hong Kong regulator, acknowledging in a stipulation of fact, through counsel that, "Hwang and Park . . . engaged in false trading within the meaning [of Hong Kong law]" when "Park carried out and instructed Tomita to assist him to carry out [certain trades] on 6 January 2009 with the intention of creating a false or misleading appearance with the respect to the market for, or the price for dealings in," a specific security. (GX 2706). In the aftermath of the felony conviction and the SEC order, Hwang returned outside investor money, changed Tiger Asia's name to "Archegos," and committed to operate Archegos as "family office" that managed Hwang's wealth.

###### B.     The Early Days of Archegos

Once it rebranded, Archegos began to tell its counterparties that it had entered a new era and moved beyond its Tiger Asia issues. Hwang hired additional senior executives, such as Andy Mills and Diana Pae, and gave them big titles, such as Co-CEO and Co-President, respectively. Hwang hired a compliance executive, Michael Satine, and the firm instituted training that periodically reminded all employees—including Hwang—that insider trading and market

manipulation were wrong. To assuage concerns by counterparties about dealing with Archegos following the conduct at Tiger Asia, Archegos represented to multiple counterparties that "All trades are reviewed daily" by compliance. (*E.g.*, GX 1002A). To maintain, and later to increase, the number of banking counterparties Archegos worked with, Archegos began sending its brokers a letter summarizing these changes and implying that Hwang, although the final investment authority, operated within the constraints of an ordinary, compliance-minded fund run, in part, by independent executives.

But these changes were illusory. Hwang remained the ultimate authority on any matter he took an interest in; Hwang continued participating in the stock markets with no meaningful oversight by Archegos's compliance personnel, who, for the most part, policed the personal trading of the firm's analysts; and Hwang continued to be supported by the same senior people who had enabled him at Tiger Asia, including Halligan, Becker, and Tomita. Halligan, for his part, took to repeatedly and deliberately misleading counterparties with respect to important information about Archegos's portfolio and, at times, intentionally withheld information about the portfolio's performance. Specifically, in conversations with Archegos's counterparties, Halligan would repeatedly understate the relative size of the firm's largest positions. In addition, in or about 2017, when Becker took over the role of liaising with the credit teams at the counterparties, Halligan instructed Becker, in substance, to tell the counterparties that Archegos's largest position was 35% of Archegos's capital, even if that was not the truth. Relatedly, Halligan at times would purposefully withhold information from counterparties regarding Archegos's monthly performance and assets under management. Halligan explained, in part, that the banks were too ignorant to understand the information anyway.

## II.     Hwang and Halligan Operate the Archegos Enterprise Through Fraud

In 2020, Archegos's misleading practices developed into pervasive fraud: the defendants pursued two interrelated criminal schemes, one involving manipulative trading in the marketplace and the other involving false and misleading statements to Archegos's trading counterparties.

The schemes picked up in the months that followed the start of the COVID-19 pandemic. Archegos's portfolio, which had been worth approximately $2.7 billion at the end of February 2020, fell to less than $1.5 billion by March 12, 2020, as the U.S. markets declined and lockdowns began. Hwang, however, soon began to talk about not being afraid of a "war scare" and the need to "play offense."

As with many organizations, COVID-19 shifted Archegos's workplace and rhythms. Employees left the office. Remote work became the norm. Soon, Hwang took to working in a Central Park apartment leased by Grace & Mercy, his foundation, with one analyst and no senior executives. In the months that followed, Hwang became obsessed with trading, and specifically with using his trading power to influence the prices of the stocks that underlay his positions. By autumn, Hwang spent much of every day on a continuous Zoom with his traders and on a parallel Instant Bloomberg chat, dictating trade orders down to limit prices and timing. Archegos continued to hold itself out as an investor focused on company fundamentals with a three- to five-year investment horizon, but Hwang spent his time—and nearly all the firm's capital—on constant trading in the same core names. Hwang began deploying strategies aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio, including techniques he had used at Tiger Asia. These techniques included purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market.

Hwang found that his trading could pay for itself. Based on the margin rules in place at the time, daily price moves would typically result in a change in how much margin Archegos owed the bank or, conversely, the bank owed Archegos. For the stocks where Hwang bet the prices would go up, a daily price increase would mean that variation margin moved in his favor, too, permitting him to access more cash. Hwang took that cash and used it to fund additional buying, further driving up the prices of the stocks, and thus freeing up still more cash. As position sizes—and thus margin impact—grew over 2020 and into 2021, the margin framework became both an engine for fraud and a liability: a decrease in prices would trigger a margin call and potentially threaten to unwind the price inflation Hwang had achieved. To avoid this, Hwang began to focus much of Archegos's trading at the end of day, in large sizes and in relatively outsized proportions of the market.

Hwang's trading schemes were sustained and furthered by lies and misrepresentations made to Archegos's counterparties. As Hwang's trading led to large position sizes, Archegos encountered risk, capacity, and margin lending limits at its counterparties. To enable Hwang to continue to trade the same names at larger sizes, Halligan, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to Archegos's counterparties. Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. These false and misleading statements were designed to fraudulently induce the counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos.

Hwang further accomplished his manipulative trading by structuring it to avoid any public reporting requirements that would reveal Archegos's concentration. Most significantly, Hwang used derivatives known as total return swaps that, unlike traditional equity securities, did not have a public reporting requirement. The Archegos conspirators, however, treated their swaps as the functional equivalent of purchasing or selling the equity itself. To trade swaps at all, Archegos understood that its counterparties would first buy or sell a corresponding security in the market to price and hedge the swap for Archegos. In fact, Archegos in most circumstances instructed the counterparty on how it should buy or sell the stock that would underlie the swap. Accordingly, Hwang and the traders could and did place orders for swaps and then watch in real time as their orders hit the equities markets. And they also followed along as their counterparties became the top holders of the equities underlying their swaps.[4]

Hwang's trading strategies and use of multiple counterparties led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in fact, they were the artificial product of Hwang's manipulative trading and deceptive conduct that caused trading by others.

---

[4]       Misreading the Indictment and misunderstanding the proof, the defense now claims that there will be no evidence that "Archegos controlled any percentage of the float of these stocks" or that it "effectively controlled" portions of the float. *See* Dkt. 154 at 2. The trial evidence will flatly reject these assertions. Though the Government will respond to the promised motion on this subject, it should be noted that Archegos owned outright nearly 5% equity (or ADRs) in each of the stocks it manipulated, so the claim that it did not control "any percentage of the float" is simply false. The related claim, that the banks did not accrue significant holdings on Archegos's behalf, is equally flawed. For one thing, the banks contemporaneously filed public reports disclosing their ownership of the stocks they purchased to hedge Archegos's positions. For another, when the banks closed Archegos's swaps—and unwound the hedges on those positions—the market for the securities in Archegos's portfolio collapsed and remained at pre-manipulation prices for months thereafter. In any event, the Government looks forward to a trial on the charges in the Indictment.

### III.    Archegos's Collapse

By March 2021, Hwang's manipulative trading scheme—which relied in part on continually increasing the size of Archegos's positions in a handful of equities—had profoundly reshaped Archegos's portfolio and risk profile. Though Archegos often had concentrated positions in the past, those positions typically had been in highly liquid stocks, such as Amazon or Netflix. Now Archegos had concentrated its investments in a grab bag of stocks with markets that Hwang found he could distort, including ViacomCBS, Discovery, and iQiyi. Archegos's internal reporting estimated that it would take months to unwind these positions without crashing the markets. At the same time, individual counterparty banks began charging higher margin rates because even the slices of the Archegos portfolio they could see appeared to be large and concentrated in a handful of names. Because it was essential to the scheme to continue buying the same stocks, Archegos was forced to do so at margin rates of 30%, 50%, and even 100%. The combined effect of these trends was that Archegos's portfolio became highly vulnerable to external events that might deflate the artificial prices Hwang had created and it sapped Archegos of the liquidity or cash to respond to such a development.

Hwang began to explore ways to extract money from his scheme. Among other things, he investigated block sales. He considered advocating for corporate takeovers, such as convincing Apple to acquire Viacom. But he did not act quickly enough. In late March 2021, the markets exposed Hwang's price manipulation. On March 22, 2021, ViacomCBS announced a seasoned equity offering. Immediately, the conspirators perceived that the announcement threatened to unwind their work by depressing the prices of Viacom stock. Halligan, for example, remarked, "get ready for a ride" (GX 3745), and the traders prepared for a wild trading day. What followed was a brazen attempt to overpower the markets: On March 23, Hwang directed nearly a billion dollars in additional Viacom purchases, even as Halligan, Becker, and Tomita informed him that

the firm may not have the cash to cover the trading. When the day ended, the conspirators understood that the following day the firm would face margin calls it could not meet. The problems compounded on March 24, 2021, when the SEC announced new disclosure requirements that would apply to some of the foreign issuers in Archegos's portfolio, which had the effect of further depressing their stock price. On March 24, 2021, using what cash and capacity remained, Hwang made one final attempt to reverse market forces but he failed. As he did so, Halligan and Becker strategized about how best to ignore and mislead counterparties that were inquiring about the situation. When the markets closed, Archegos faced substantial margin calls that it could not meet.

Archegos's senior executives pleaded with the firm's counterparties for more time to meet the margin calls. In a series of late-night phone calls seeking forbearance, Archegos asserted that it faced a "liquidity" problem, not a "solvency" problem, and that its portfolio comprised "household names" that it knew well. (*E.g.*, GX 51). But Archegos refused to provide the banks with specific details about its positions or its plan to unwind positions to cover the margin calls. After multiple additional phone calls where various combinations of personnel, including Halligan, Tomita, Becker, and Mills, tried to put off the banks, counterparties lost patience and declared a default. In the following days, the counterparties sold the stocks they held in connection with their agreements with Archegos. The prices that had been artificially supported by the trading directed by Hwang, and funded by lies told to the counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days.

Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized a wide swath of market participants, including banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit, ordinary investors who purchased and sold the relevant securities at artificial prices, and securities

issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

## IV.   After the Collapse

By Friday, March 26, 2021, Archegos was no longer a viable business. Mills convened an all-hands video conference and announced that Archegos would be winding down. For some employees—most of whom had limited access to portfolio performance data—this was the first they had heard that Archegos was in distress. The news that the fund was closing arrived as a shock and carried with it the prospect that they would lose both their jobs and their deferred compensation, which was invested in the fund.

Hwang quickly pivoted to damage control. The firm interviewed public relations professionals with experience in crisis management. Archegos senior leaders convened a series of firmwide meetings. In at least one of these meetings, Mills demanded that nobody attempt to resign and thereby trigger the payout of their deferred compensation based on pre-collapse values because doing so would be disloyal. And during at least one meeting, Hwang informed Archegos employees that if they remained loyal to him, he would take care of them.

In the months that followed, Hwang did take care of many of those that had been closest to him. As regulatory authorities and the Government began to demand documents about the collapse, Hwang "hired" certain senior Archegos personnel at Grace & Mercy, such as the traders Tomita and Daiki Taniguchi, Archegos's compliance head, Michael Satine, and Archegos's co-president and human resources officer, Diana Pae. Hwang made efforts to hire others, too, but his offers were ignored or declined. At the same time, those that had previously done part-time work

for Grace & Mercy, like Halligan and Mills, suddenly received massive pay increases.[5] As a result, Grace & Mercy has spent millions of its purportedly charitable funds on the salaries of the people who witnessed Hwang's crimes at Archegos.

## ARGUMENT

### I.     The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

---

[5]     In Grace & Mercy's publicly filed Form PF for Tax Year 2019, Halligan was identified as treasurer, was reported to work an average of five hours per week, and received no compensation. In Tax Year 2020, Halligan was identified as treasurer and was reported to have worked five hours per week, and received no compensation. In Tax Year 2021, Halligan was again identified as treasurer, but now purportedly worked 40 hours per week and received base pay of more than $400,000.

**A.      The Court Should Exclude Evidence and Argument that Fraud Should Be Excused on the Basis of Victim Sophistication or Purported Culpability**

The defendants have suggested in various court appearances, filings, and notices that they intend to argue to the jury that, notwithstanding any manipulation or fraud undertaken by the defendants, the jury should view the conduct as excusable in light of the sophistication of the victim counterparties or because individuals associated with the counterparties might have engaged in entirely unrelated, undesirable conduct. For example, during the first status conference before this Court, counsel for Halligan sought to portray the fraud conduct at issue in this case as "Shaq versus LeBron," because "[t]he banks were sophisticated." In response to the Court's inquiry as to whether counsel was claiming that there no misrepresentations, counsel responded, "It's sharp elbows left and right," and continued,

> [w]ith respect to the alleged misrepresentation, just like the NBA, everybody knows the rules of the game. Everybody is on the court. They're playing to win. No one is anyone's fiduciary. The elbows fly. It's a rough-and-tumble game.

(June 1, 2022 Tr. 12-13). Similarly, Hwang has noticed expert testimony in which he seeks to place before the jury alleged misconduct, such as frontrunning, at various counterparties, which has no relevance or connection to any fact or issue in this case. (*See, e.g.*, Savoldelli Supplemental Notice ¶ 9). Such evidence and argument constitute a thinly disguised effort to portray the counterparties as unsympathetic and thereby to encourage a verdict based not on whether the facts establish the elements of the charged offenses, but instead on the sympathies and prejudices of jurors, and should be precluded.

First, evidence and argument suggesting that the counterparties used "sharp elbows" or had employees who on other occasions, in other circumstances, may have engaged in unsavory or even unlawful conduct does not make any fact in dispute here more or less probable. Indeed, the fact that conduct may be widespread in an industry—that "everyone is doing it"—is "not a defense to

15

the crime of wire fraud or conspiracy to commit wire fraud; just as 'everyone speeds' is not a defense if your car happens to get picked up on the radar." *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2125044, at *13 (S.D.N.Y. May 2, 2019); *see also United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *5 (S.D.N.Y. Dec. 20, 2019) ("the fact that certain conduct may be common or general practice in an industry was not relevant to the jury's consideration of the conduct of [the defendant], and is not a defense to wire fraud"). It is therefore simply irrelevant to the question of whether the defendants engaged in the unlawful conduct alleged in the Indictment that Archegos's counterparties may have been sophisticated or could have used sharp elbows, and such evidence is therefore inadmissible pursuant to Federal Rule of Evidence 402.

Moreover, evidence or argument about conduct of employees at counterparties that might suggest that they have "sharp elbows" or engaged in unrelated misconduct is inadmissible under Rule 403 because any probative value is substantially outweighed by the prospect of undue delay, unfair prejudice, confusion of the issues, and misleading the jury. Such evidence and argument would require potentially lengthy and confusing detours into the conduct of individuals not on trial. Perhaps most importantly, however, such evidence and argument would do nothing but suggest to the jurors that they should decide the case not based on whether the Government has sustained its burden of proof, but rather based on whether the jurors believe that financial institutions are sympathetic or unsympathetic—that is, on the basis of unfair prejudice. *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993); *see also United States v. Borello*, 766 F.2d 46, 59 (2d Cir. 1985); *United States v. Jamil*, 707 F.2d 638, 644 (2d Cir. 1983). Such evidence and argument should therefore be precluded under Federal Rule of Evidence 403 as well.

16

**B.    The Court Should Exclude Evidence and Argument that the Counterparties Were Negligent or Failed to Conduct Adequate Due Diligence**

Conversely, the defendants should be precluded from arguing or adducing evidence that Archegos's victim counterparties were negligent, insufficiently vigilant, or otherwise at fault for not detecting or preventing Archegos's fraud, whether because they were eager for Archegos to become a client or for any other reason. "Such evidence routinely is excluded from trials on wire and mail fraud charges because 'reliance is not an element of criminal fraud,' and 'the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023) (quoting *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017)). Indeed, "[t]he Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *Weaver*, 860 F.3d at 96). Accordingly, the defendants may not argue that the counterparties were to blame for a lack of due diligence.

In particular, the defendants should be precluded from cross-examining witnesses from the counterparties about whether they did adequate diligence on Archegos, or whether they were reckless, negligent, or irresponsible in continuing to engage in transactions with Archegos. Because a defendant may not assert a victim's negligent failure to discover the fraud, *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004), the defendants here should not be permitted to cross-examine counterparty witnesses in a manner that implies that their due diligence was inadequate.

Nor should the defendants be heard to contend that evidence or argument regarding alleged inadequacies in the counterparties' due diligence is intended only to cast doubt on the materiality

of the misrepresentations made to the counterparties. *See, e.g.*, *United States v. June*, No. 10 Cr. 30021 (MAP), 2012 WL 245243, at *2 (D. Mass. Jan. 25, 2012) ("Defendant's argument that these documents would be helpful to the defense in demonstrating that the alleged misrepresentations made by Defendant were not 'material,' in the sense that they lacked the natural tendency to influence the lender's decisions merely re-clothes the forbidden 'blame the victim' defense in a slightly different costume." (citations omitted)); *see also United States v. Benchick*, No. 13 Cr. 20453 (RHC), 2014 WL 4181970, at *3 (E.D. Mich. Aug. 21, 2014) ("Defendant has not successfully shown that evidence relating to Washington Mutual's and National City's lending practices is relevant to the materiality of his alleged misrepresentations (and hence his guilt). . . . Because Defendant's allegedly false statements could influence a bank's decision whether to approve a loan, Defendant's argument on materiality and his 'blame-the-victim' approach fails."). As described above, the materiality of the misrepresentations alleged in this case is measured by an objective standard, and any suggestion that a particular victim was foolish, conducted insufficient diligence, or eager to credit Archegos goes, not to objective materiality, but rather to subjective reliance, which is not an element of the charged offenses.

In particular, the Court should exclude evidence, including cross-examination of witnesses who worked at Archegos's counterparties, about internal investigations undertaken by their employers following Archegos's collapse, including any outcomes of those internal investigations, such as discipline against any of the counterparty employees. Any such investigation, undertaken to determine whether employees could have or should have further mitigated risk for the purpose of improving a counterparty's business operations, would have no probative value with respect to whether the defendants engaged in a scheme to defraud those counterparties (or a market manipulation scheme, or any other criminal conduct). To the contrary, such evidence or claim

could serve only to invite the jury to blame the victims for the crimes of the defendants. *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 5818107, at *4, *6 (S.D.N.Y. Oct. 19, 2018) (evidence that victim hedge fund did not exercise sufficient oversight of its investment inadmissible; "[w]hether the Hedge Fund performed due diligence or is a sophisticated investor in the ticket market is wholly irrelevant to these charges, and is merely a facile attempt to blame the victim—which is an impermissible strategy in a fraud case"); *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2021) ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

Even if there were any probative value with respect to any fact in dispute offered by the admission of evidence about an internal investigation into the job performance of employees at a counterparty—which there is not—it would be far outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay. Fed. R. Evid. 403. As noted, such evidence would invite the jury wrongly to believe that it is their task to evaluate the job performance of a victim in this case and would risk suggesting to the jury that whether a victim could have avoided loss or detected fraud has any bearing on the guilt or innocence of the defendants. Finally, the introduction of this evidence would require time-consuming and irrelevant inquiries into the methods and bases of such investigations and the validity of their results— focused as they were on internal job performance without the benefit of knowledge of the criminal conduct of the defendants. This evidence, which has no probative value and brings great risk of unfair prejudice, confusion, and delay, should be precluded. *See Bankman-Fried*, 2023 WL 6283509, at *3 (granting motion to preclude such evidence "because such evidence is not relevant

to the claims at issue at trial and any limited probative value would be outweighed substantially by the risk of unfair prejudice and jury confusion").



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

**D.** **The Court Should Exclude Evidence and Argument that Regulators or a Lack of Certain Regulation Are to Blame or Provide a Defense to Manipulation or Fraud**

Counsel for Hwang has provided notice that he intends to offer expert testimony suggesting that SEC regulations permitted certain conduct of the defendants. (*See* Savoldelli Supplemental Notice ¶¶ 3-4). Any attempt to blame regulatory choices by the SEC or any other entity—including concerning disclosure regimes regarding family offices or swap positions—should be precluded, as should evidence regarding any proposed or actual changes to any regulatory regime in response to Archegos's collapse.[6]

---

[6]     As set forth below, the proposed expert testimony regarding regulation is improper for additional reasons.

The Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public policy considerations." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977); *see id.* at 1073 (affirming instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"); *see also United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service was 'arrogant,' … and that because of this, Defendant should be acquitted"). This evidence not only would be irrelevant to the defendants' criminal intent, but also would be confusing to the jury and turn the trial into a referendum on the role of regulatory agencies in preventing the defendants' conduct and its outcome. *See Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"); *see also Bankman-Fried*, 2023 WL 6283509, at *5 (precluding the defendant from arguing for acquittal based on the failure of regulators). Because such evidence and argument would have no probative value, and would serve only to create a danger of undue prejudice, confusion of the issues, and misleading the jury, it should be precluded.

### E. The Court Should Exclude Evidence and Argument about the Purportedly "Novel," "Unprecedented," or "Aggressive" Nature of the Government's Case

The defendants' pretrial motions have repeatedly sought to denigrate the Government's investigation and prosecution of the defendants, claiming that the Government has put together an "unprecedented" market manipulation case. (*See* Dkt. 110 at 1 (describing case as "the most aggressive one ever pursued"); Dkt. 48 at 1 (claiming the Government has engaged in an

"[u]nprecedented attempt to rewrite the law"); Nov. 14, 2023 Tr. at 4 (labeling this as "not the typical case")). The Court should exclude such claims in front of the jury because they amount to attempts at jury nullification.

It is well established that the Government's motives for the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (finding that defendant's trial arguments involving, *inter alia*, "invit[ation of] jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them for contempt" functioned as a defense "ploy for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"). The same is true of the Government's techniques in investigating and prosecuting crimes. *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) ("The jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged."). And more generally, invitations for jury nullification based on the overall propriety of the Government's investigation are not allowed. *See, e.g.*, *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that

the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

### F.   The Court Should Exclude Evidence and Argument About the Defendants' Good Acts to Prove Their Innocence

The defendants should be precluded from presenting evidence or argument concerning their prior commissions of "good acts" or to offer evidence of their noncriminal activities to disprove their guilt of the crimes charged. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification."

*United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendants should accordingly be precluded from offering evidence or argument, including in their opening statements, regarding their prior good deeds, including charity and philanthropy, or the lack of commission of other bad acts. As a specific example, the defendants should be precluded from offering this type of evidence and argument insofar as it relates to the Grace & Mercy Foundation (Hwang's private philanthropic foundation), as any prior good acts by that entity have no bearing on the defendants' guilt or innocence.

The defendants should likewise be precluded from seeking to establish their good faith by introducing evidence of their trading in financial instruments that are not the subject of the allegations in this case. Whether analyzed under the rubric of relevance, pursuant to Rule 401, or character propensity evidence, under Rule 404(b), courts uniformly hold that evidence that a defendant engaged in legal, honest business conduct on some occasions may not be introduced to rebut allegations that the defendant engaged in charged offenses involving bribery or fraud on other occasions. *See, e.g., United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) ("Chambers's argument that his running of a legitimate law practice makes it less likely that he had corrupt intent to bribe Villanueva is precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit."); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming the district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether

the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *see also United States v. Boykoff*, 67 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." (quoting *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978))).

Thus, for example, in *Levine v. SEC*, 436 F.2d 88 (2d Cir. 1971), the Second Circuit rejected a broker-dealer defendant's claim that he was entitled to offer testimony by certain of his clients that they had not been lied to, as such testimony would not negate the testimony of the customers who testified that false and misleading statements had been made to them. *Id.* at 91; *see also, e.g.*, *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.").

So too here, any evidence or argument that the defendants did not engage in market manipulation with respect to stocks other than those at issue in this case, or that there were occasions in which they were candid with their counterparties, is irrelevant to the question of whether the defendants committed the acts charged in the Indictment.

### G. The Court Should Exclude Evidence and Argument About the Defendants' Personal Circumstances, Including Religious Devotion and Potential Punishment

Evidence and argument that makes a defendant appear sympathetic for reasons unrelated to the charges at issue should also be excluded as inviting the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt. Juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustaga*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy."). Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent").

The Government is unaware of any lawful basis for the defendants to offer evidence or argument concerning their religious devotion, family backgrounds, health, ages, or any other similar personal factors. They should be precluded from doing so, and from mentioning such subjects in their opening statements, absent a showing that such a factor bears on their guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy for whom defendant had devoted his life to care); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

29

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

### H.    The Court Should Exclude Evidence or Argument About the Presence of Attorneys, Absent Further Disclosures from the Defendants

The defendants have informed the Government that they do not intend to advance a formal advice of counsel defense to any charge contained in the Indictment. The defendants have nonetheless declined to state whether they might point to the presence of attorneys at Archegos or the involvement of attorneys in any decision-making as evidence that the defendants lacked criminal intent. Because such a "presence of counsel" defense and any emphasis on the presence of attorneys would almost certainly be improper, the Court should direct the defendants to provide notice to the Government at least four weeks prior to the beginning of trial as to whether either defendant intends to offer evidence or argument regarding the presence of attorneys, to permit sufficient time for any necessary litigation. In the absence of such notice, and subject to any litigation following such notice, the Court should preclude the defense from presenting evidence to the jury regarding the presence of attorneys at Archegos or arguing to the jury that an attorney's presence indicates that either defendant lacked criminal intent.

"In a fraud case . . . the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but rather "is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government

30

has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). "That said, defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense." *Id.* (citing *United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)). Specifically, "[t]here must be evidence such that a reasonable juror could find that the defendant 'honestly and in good faith sought the advice of counsel,' 'fully and honestly laid all the facts before his counsel,' and 'in good faith and honestly followed counsel's advice.'" *Id.* (quoting *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012)).

In the absence of evidence to support an advice-of-counsel instruction, defendants have sometimes sought to offer evidence of lawyers' involvement in allegedly inculpatory events to support an argument that the defendant lacked intent to defraud. As judges have observed, however, such evidence "can pose a substantial risk of misleading the jury." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024). A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such a misunderstanding would unfairly prejudice the Government because it would "give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Id.*

Accordingly, even those courts that have permitted such evidence have required detailed pretrial disclosures and, consistent with Rules 401 and 403, carefully policed references to counsel in testimony and argument to ensure that the defendant does not unfairly hide behind the attorney-client privilege or attempt to mount a "disguised reliance argument." *SEC v. Stoker*, No. 11 Civ.

7388 (JSR) (S.D.N.Y. July 23, 2012), Trial Tr. at 973; *see also Bankman-Fried*, 2024 WL 477043, at *2 (permitting certain lines of evidence and argument and precluding others after hearing testimony outside the presence of the jury); *United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial Tr. (Dkt 63) at 83-85 (limiting defendant's testimony regarding the presence of counsel to avoid the "misleading impression" that the defendant relied upon the advice of counsel).

Because the defendants have disclaimed any intent to assert an advice-of-counsel defense, they should be precluded from unduly focusing on the fact of attorneys' involvement in Archegos matters or suggesting that attorneys blessed, for instance, Archegos's trading practices, including, but not limited to, during its final week of trading. To the extent that the defendants still believe that evidence or argument regarding the presence of counsel is relevant and admissible for some other reason, the Court should direct them to provide notice of that fact, along with an offer of proof, at least four weeks before trial to allow sufficient time for the Court to resolve any disagreements regarding the admissibility of such evidence and to rule on whether the defendants' plans would require a waiver of the attorney-client privilege. *See Tagliaferri*, Trial Tr. (Dkt 63) at 84-85 (permitting defendant to offer evidence regarding presence of counsel to establish good faith but finding that such evidence constituted a waiver entitling the Government to discovery).

Finally, even if the Court ultimately concludes that the defendants may introduce at trial some evidence or argument regarding the involvement of attorneys, the Court should provide a cautioning instruction as has been done in other cases in this District. *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.), May 31, 2022 Tr. (Dkt. 245) at 787 ("A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful

because he acted in good faith on the advice of a lawyer."); *United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Oct. 26, 2020 Tr. at 2402 ("there is no defense in this case of so-called reliance on counsel").

## II.    Statements of the Defendants' Coconspirators and Agents Are Not Barred by the Rule Against Hearsay

### A.    Applicable Law

#### 1.    The Rule Against Hearsay

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

#### 2.    Rule 801(d)(2)(D)

Federal Rule of Evidence 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." To admit a statement under this rule, the court must find "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter

within the scope of the agency." *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992)). As the Second Circuit has explained, "admissibility under this rule should be granted freely," and there is a "liberal" standard for admissibility rooted in the understanding that agents and employees are usually the people "best informed about certain acts committed in the course of [their] employment." *Pappas*, 963 F.2d at 537.

### 3.      Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181). To be in furtherance of a conspiracy, a statement "must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a coconspirator statement is admissible if it "can reasonably be interpreted as encouraging a co-conspirator or other person

to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

### B.     Discussion

At trial, the Government will seek to introduce for their truth certain out-of-court statements by Archegos employees, all of whom were agents of the defendants, and some of whom were coconspirators of the defendants, including Tomita, Becker, two managing directors at Archegos (Dave Park and Felicity Tan), and three traders at Archegos (Peter DeSanto, Daiki Taniguchi, and Austin Scholl). These statements are not barred by the rule against hearsay.[7]

As representative examples:

- On June 23, 2020, Becker sent an instant message to other members of the operations team at Archegos stating that, "I don't need will to tell me again that bill wants to urgently trade." (GX 3072).

- On September 8, 2020, Becker emailed Halligan that "Will is still looking for more GSX capacity…We still have some capacity left, ~$240-290m, but Bill wants more." (GX 123).

---

[7]     Many of the out-of-court statements made by Archegos employees will be offered not "to prove the truth of the matter asserted" in the statement, Fed. R. Evid. 801(c)(2), but rather for some other purpose that does not implicate the rule against hearsay. By way of example, on August 18, 2020, Archegos analyst Kevin Yu wrote Archegos analyst Joshua Chuang, "maybe time to collude with Tao." (GX 2900). And on November 19, 2020, Chuang wrote to Felicity Tan, Yu, and two other analysts, "Come on [T]ao, hurry and step in!" Those messages are relevant and admissible as reflecting the states of mind of the declarant, which themselves are relevant because they reflect an awareness of Hwang's relationship with Tao Li, supporting the conclusion that Hwang participated in coordinated trading on certain occasions with Li—a close friend and colleague, and former Tiger Asia analyst—and Li's hedge fund, Teng Yue Partners ("Teng Yue"). Hwang and Li maintained frequent contact in 2020 and 2021 via WhatsApp, email, telephone, and in-person meetings. Hwang frequently consulted with Li about, among other things, Chinese company investments. Hwang also occasionally directed analysts to speak with Li or Li's analysts to educate them about a topic or company Hwang's analysts had studied. The frank communications between Hwang and Li represented a notable exception to Hwang's ordinary insistence on secrecy. The apparent coordination between Archegos and Teng Yue drew the attention of short-sellers active in GSX, leading one investment research firm to tweet about it. Within Archegos, Tomita became aware of at least some of the coordinated activity based on statements Hwang made to him, and the coordination was obvious to at least certain analysts, as evidenced by the representative examples quoted above.

- On October 21, 2020, Tomita sent an instant message to DeSanto, Scholl, and Taniguchi that he was "sitting in front of a gas station" because "Bill had me pull over" to engage in pre-market trading. (GX 3754).

- On December 15, 2020, Becker sent an instant message to DeSanto, asking whether Hwang was in the office, and DeSanto responded, "he is yes," "in [the] trading room per usual." (GX 3275).

- On March 15, 2021, Dave Park emailed Archegos analyst Steven Chen, among other things, "We should revisit our price target for VIAC." Chen responded, among other things, "Sounds good, will do." Park then replied, among other things, "Thank you! Bill's price target for VIAC is $150 and for DISCK (vs. DISCA) is $90 (unchanged). Let's help him justify it." (GX 178).

- On March 21, 2021, during a Zoom call with Hwang, Tomita, and Halligan, Becker wrote down in the notebook he maintained at Archegos, "think about next batch of onboarding" and that "Bill getting HSBC contact from [Tao]." (GX 51).

- On March 22, 2021, Tomita and Scholl exchanged instant messages about buying and selling Viacom stock ("VIAC"), and Scholl wrote, "[l]ast time I tried to sell he cancelled the order and moved the buy limit above the sell li[]mit….Im just going with his flow now bc it always results in same." (GX 3753).

- On March 24, 2021, when the price of VIAC was falling, the following group chat took place between Chuang and two other Archegos analysts, Brendan Sullivan and Brandon Berger:

| Name | Message |
|---|---|
| Berger | Now this viac is starting to hurt |
| Sullivan | Yes. Problem is we pushed the price to $100 ourselves so someone else needs to recognize its value besides us |
| Berger | Yeah |
| Sullivan | I did ask Bill why we had to rush the stock to these levels<br>Because we could've acquired more stock at lower prices over time instead of defending high levels |
| Berger | And?<br>Why not be a seller at these levels<br>Capital gains? |
| Sullivan | He said the stock needed to be much higher to help the Viacom employees<br>And we can't sell because we are the market. So the stock would crater even more |
| Berger | So does it hit a floor?<br>If we got other investors in<br>I guess |
| Sullivan | There is clearly some floor but clearly lower<br>The old Bill when we joined was more like Buffett where he was happy to let the stock drop and then buy more at cheaper levels because it benefited us |

36

| Name | Message |
|---|---|
| Berger | But it might not have gotten here |
| *** | |
| Sullivan | Do we know the avg price that Viacom's offering got filled? |
| | Look at foxa and dis versus our names. Shows you the risk of market of one |
| | I wonder what all the street chatter is saying. We could get found out |
| Berger | You think? |
| Chuang | I think so |
| | Cause this is extreme moves |
| Sullivan | Everyone is going to say why are foxa and dis hardly down |
| | But Viacom and disca down big |
| Chuang | And China |
| Sullivan | We were literally the market |
| Chuang | If every stock takes 10% off performance |
| | It's looking like 40-50% down |
| Sullivan | We manipulated the stock price |
| *** | |
| Sullivan | https://www.google.com/amp/s/www.barrons.com/amp/articles/heres-why-viacomcbs-and-discovery-stocks-are-tumbling-today-51616610549 |
| *** | |
| Chuang | So they couldn't fill the full $2bn? |
| | Could only do 1.7? |
| | Even with that discount |
| Berger | Wow |
| Sullivan | That's really really bad |
| | Doing equity deal also dumb |
| | Viacom clearly misread the market demand because of us |
| Berger | When you say us as the market and why viac is down is because we are the only buyers? |
| Sullivan | Yes |
| Chuang | Viacom thought they were in a stronger position than they were |
| Sullivan | the stock wouldn't be anywhere close to where it was without us |
| Chuang | They thought investors loved them even at $100 |
| Berger | Yeah. That makes sense |
| Chuang | So of course it made sense |
| | To raise equity |
| Sullivan | I haven't heard of a single investor who likes this stock |
| Berger | Me either |
| *** | |
| Berger | Most investors I know are short viac |
| Chuang | Yup |
| Sullivan | Yup |
| Chuang | I'll bet pressing it too |
| Sullivan | All my friends are short viac |

| Name | Message |
|------|---------|
| Berger | Yeah |
| | Hubris by the company |
| | And our fault for not telling them |
| | If they knew it was us |
| Sullivan | Shame on us for not getting engaged |
| Berger | It could work out better |
| | I agree |
| | I made a plan |
| Sullivan | We own a massive stake |
| Berger | No one sent the letter |
| Sullivan | We were almost irresponsible too for not telling them we were the market |
| Berger | Yeah I think so |
| | You are right |
| Chuang | Did some broker write a report saying they should raise capital? |
| | Apparently we saw that and wanted to tell them not too |
| | But it was too late |
| Berger | Really? |
| Sullivan | Seriously |
| Chuang | We wanted to send a letter |
| | Saying who we were and why they shouldn't |
| Sullivan | We talk about being proactive and then we sit on this stuff |
| Berger | I didn't know we wanted to stop them |
| | Argh |
| | This is why when you own a lot of a company you need to have a voice |

(GX 2991).

As an initial matter, out-of-court statements, including those in text messages or journals, for example, made by the defendants' coconspirators in furtherance of their conspiracy are not hearsay, pursuant to Federal Rule of Evidence 801(d)(2)(E). The evidence at trial will readily show by a preponderance that the defendants conspired with a number of Archegos employees, including Tomita and Becker, both of whom pled guilty to conspiring with the defendants, as well as Park, Tan, DeSanto, Taniguchi, and Scholl. The Court can make a preliminary ruling that statements they made in furtherance of the conspiracy are admissible, subject to the introduction of trial evidence (including the statements themselves) that is sufficient to show the existence of a conspiracy. *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as

co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" establishing that a conspiracy involving the defendant existed.). Notably, the Court may consider the coconspirators' sworn plea allocutions to support a finding that a conspiracy with the defendant existed. *See United States v. Saneaux*, 392 F. Supp. 2d 506, 513-14 & n.10 (S.D.N.Y. 2005) (while proffer statements and plea allocutions are generally not admissible at trial, the court may consider them in determining that there was a conspiracy and that coconspirator statements made in furtherance of the conspiracy may be admitted); *Bourjaily*, 483 U.S. at 178 ("Rule [104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.").

With respect to statements made by Archegos employees who were not coconspirators of the defendants, and statements of coconspirators not made in furtherance of the conspiracy, these statements too are not hearsay because they are statements of the defendants' agents under Rule 801(d)(2)(D). First, an agency relationship existed between Hwang and Archegos employees, inasmuch as Hwang was their employer and directed and controlled all of Archegos's operations. Similarly, at a minimum, at least certain of Archegos's employees were agents of Halligan, who was the Chief Financial Officer of Archegos and directed the firm's accounting, cash management, and operations functions. Out-of-court statements that the Government anticipates offering made by Archegos employees, such as text messages, reports, and other statements made within the scope of these individuals' employment at Archegos are therefore not hearsay. *See, e.g.*, *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("the objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all"); *In re Reserve Fund Sec. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7-8 (S.D.N.Y. Oct. 3, 2012)

(statements made by an employee of an entity are admissible when offered against the person who controls the entity).

Second, as alleged in the Indictment, and as the evidence will show at trial, Hwang and Halligan were leaders of the Archegos Enterprise, which included Archegos Fund, LP; Archegos Capital Partners, LLC; Archegos Capital Management, LP, and its employees. (S1 Indictment ¶¶ 1, 11-12). Accordingly, Archegos's employees operated as agents of this association in fact, and of Hwang and Halligan in particular. Because the Court will be able to find, by far more than a preponderance of the evidence, that Hwang and Halligan were leaders of this organization, which included Archegos's employees, the Court can conclude that out-of-court statements made by Archegos employees are statements of the defendants' agents, and admission of these statements is not barred by the rule against hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

## III.   The Court Should Preclude the Defendants from Using Their Experts to Introduce Inadmissible Evidence

The Government does not challenge the qualifications of Hwang's three proposed expert witnesses: Michael Johannes, Fabio Savoldelli, and Sunil Wahal.[8] But the March 14, 2024 notices Hwang provided with respect to those witnesses reflect a plan to use expert testimony for an array

---

[8]       On December 8, 2023, Hwang provided notice with respect to Professor Johannes and Mr. Savoldelli. On March 14, 2024, Hwang provided supplemental notice with respect to Professor Johannes and Mr. Savoldelli, and provided initial notice with respect to Professor Wahal. Halligan has provided no expert notice. Hwang's March 14, 2024 notices are attached hereto as Exhibits B through D. Those notices fail to separately identify the basis for each proposed expert opinion. Instead, the notices list in appendices the documents on which the witnesses rely, and state, vaguely, that the opinions are based on, in the case of Professor Johannes, "research, teaching, and industry experience, as well as his review of academic literature, documents produced in discovery, and publicly available information," Johannes Supplemental Notice p. 3, in the case of Mr. Savoldelli, "research, academic literature, publicly available information including industry news, and . . . professional experience," Savoldelli Supplemental Notice pp. 2-3, and, in the case of Professor Wahal, "analyses of public data and documents produced in this litigation, his academic research, and his professional experience," Wahal Notice p. 2. Consistent with this Court's previous directives, the defense should be directed to state, with specificity, the basis for each proposed expert opinion.

of impermissible purposes: to opine on motives, intentions, and states of mind, to usurp the role of

the Court, and to miseducate the jury on the legal framework by which it should decide the case.

The Federal Rules of Evidence forbid expert witnesses from acting as a conduit for a defendant's

(or any other person's) state of mind, however, and from intruding on the Court's role to instruct

the jury on the law. The Court should exercise its gatekeeping authority and preclude this

inadmissible testimony.

### A.    The Court Should Preclude State of Mind Testimony

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by

knowledge, skill, experience, training, or education" may offer an opinion if "the expert's

scientific, technical, or other specified knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue," and the testimony is the product of reliable facts and

methods that the expert has reliably applied to the case. Fed. R. Evid. 702. District courts play a

"gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and

is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The first requirement—that the "expert's scientific, technical, or other specified knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue"—"ensures that

expert witnesses will not testify about lay matters" that are properly left for the jury, such as

"interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liability

Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Interpretations of certain actions and inferences

about "the intent and motive" of an individual "lie outside the bounds of expert testimony." *Id.* at

547; *see, e.g.*, *Kewazinga Corp. v. Microsoft Corp.*, No. 18 Civ. 4500 (GHW), 2021 WL 4066597,

at *15 (S.D.N.Y. Sept. 1, 2021) ("Expert opinions about beliefs, intents, or motives are

inadmissible."); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank*, No. 09 Civ. 686 (SAS),

2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("[O]pinions concerning state of mind are an inappropriate topic for expert opinion.").

Experts are not permitted to testify "concerning the motive, intent, and state of mind" of people or entities. *Rezulin Prods.*, 309 F. Supp. 2d at 545. Such testimony is inadmissible for two reasons. First, "[b]ecause science has not yet invented a way to read minds, 'inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019) (quoting *Rezulin Prods.*, 309 F. Supp. 2d at 547); *accord In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (opinions about "intent, motives, or state of mind . . . have no basis in any relevant body of knowledge or expertise"); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 442-43 (E.D.N.Y. 2011) (same). "Instead, juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility." *AU New Haven*, 2019 WL 1254763, at *14. Second, and relatedly, expert testimony about a defendant's motive, intent, or state of mind is prohibited under Rules 702 and 704 because it "does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Rezulin Prods.*, 309 F. Supp. 2d at 541 n.23; *see* Fed. R. Evid. 702 (requiring that the testimony "will help the trier of fact to understand evidence or determine a fact in issue); Fed. R. Evid. 704(b) (prohibiting an expert in a criminal case from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense"). "Expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). Accordingly, a defendant may not make an "effort to tell the jury the defendant's intentions through the mouth[] of" an expert

witness. *United States v. Rahman*, 189 F.3d 88, 138 (2d Cir. 1999); *see also GST Telecom. Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000).

Here, Hwang has signaled a plan to use expert witnesses to offer improper opinion about the motives, intents, and states of mind of Hwang, Archegos, and even the counterparties. As for Hwang's and Archegos's states of mind, for example, Professor Johannes plans to testify that "Archegos's investment strategy in the indictment period was consistent with Archegos's prior practice of maintaining a concentrated and levered portfolio." (Supplemental Johannes Notice ¶ 7). But the nature of Archegos's (read, Hwang's) "strategy" in 2020 and 2021 is the central jury question in the case: If Hwang's strategy was to manipulate the prices of multiple stocks, then the Government will have established an essential element of market manipulation; if Hwang's strategy was to innocently invest, then the Government will not have met its burden. Inviting Professor Johannes to opine on Hwang's actual strategy—as opposed to opining from trading orders that those orders were consistent or inconsistent with a particular approach—runs afoul of the rule that experts cannot testify about a person's intent or motives, including the "intent or motives underlying . . . certain business transactions." *Rezulin Prods.*, 309 F. Supp. 2d at 546. Professor Johannes would essentially be opining that Hwang lacked the criminal intent necessary to commit the charged offenses, which Professor Johannes may not do.

Professor Johannes's opinion about Archegos's and Hwang's strategies also rests on an improper and unreliable basis. Professor Johannes has no special expertise in Archegos's or Hwang's approach to investing. Professor Johannes did not work at Archegos—or, for that matter, Tiger Asia—and has no firsthand knowledge of the firms Hwang has run. Rather, he is simply reviewing select discovery materials, then "propound[ing] a particular interpretation" of that evidence. *LinkCo, Inc. v. Fujisu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y.

July 16, 2002). But an expert may not provide his own narrative gloss on the facts of a case. *See In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at \*29 (S.D.N.Y. Feb. 11, 2022) (collecting cases). That rule applies with particular force here, where Professor Johannes's gloss would take the form of expert opinion about the thought processes of one of the defendants.

As for Mr. Savoldelli, multiple parts of his proposed testimony are impermissibly about Hwang's or Archegos's motives, intents, and states of mind, or about the motives, intents, and states of mind of other, unnamed or hypothetical investors used as a proxy for Hwang's motives, intents, and states of mind:

- The defense proposes that Mr. Savoldelli will testify that "family offices can be run in a variety of ways, in accordance with the wishes, goals, and risk profile of the family or individual whose funds the office manages." (Savoldelli Supplemental Notice ¶ 1). That proposed testimony is improper to the extent that it represents an opinion on Hwang's or Archegos's or some investor at some unnamed family office's "wishes, goals, and risk profile."

- The defense proposes that Mr. Savoldelli will testify that a family office's investment manager "has sole discretion to adjust the office's investment style, portfolio composition, leverage, or other investment parameters in response to personal developments . . . ." (Savoldelli Supplemental Notice ¶ 2). That proposed testimony is improper to the extent that it represents an opinion on Hwang's or Archegos's or an investor at some unnamed family office's "investment style" or "personal developments."

- The defense proposes that Mr. Savoldelli will testify that "family offices make investment decisions in accordance with any reasoning, process, or data they wish . . . ." (Savoldelli Supplemental Notice ¶ 4). That proposed testimony is improper to the extent that it represents speculation regarding how Hwang or Archegos or investors at unnamed family offices think about their investment decisions.

- The defense proposes that Mr. Savoldelli will testify that "a concentrated investment strategy is a strategy used by investors who focus their investments in a small number of companies they see as offering opportunities for profit" and that "[d]iversification is best for investors who do not have the skill, interest, conviction, or risk tolerance to make finance bets that they believe will perform better than their market price indicates." (Savoldelli Supplemental Notice ¶ 6). That proposed testimony is improper insofar as it represents speculation about what unnamed or hypothetical investors might be "see" or "believe" or what might be "best" for some unnamed, hypothetical investor.

44

- The defense proposes that Mr. Savoldelli will testify that "a private equity approach to public equity investment may involve taking a long-term and high conviction view of a security with deep knowledge of the company." (Savoldelli Supplemental Notice ¶ 6). That proposed testimony is improper to the extent that it attempts to interject through an expert a rationalization that Hwang has offered for his conduct, and thus presents hearsay and inadmissible evidence about Hwang's or Archegos's intent.

- The defense proposes that Mr. Savoldelli will testify that "limit prices . . . allow portfolio managers and/or traders to adjust their execution strategy if the price unexpectedly changes." (Savoldelli Supplemental Notice ¶ 22). That proposed testimony is improper to the extent that it represents an opinion on Hwang's or Archegos's or some unnamed portfolio manager's strategy.

This proposed testimony impermissibly delves into the motives, intents, and states of mind of Hwang and Archegos or speculative and hypothetical proxies for Hwang or Archegos—subjects on which Hwang's experts have no expertise or useful information to offer. Testimony about Hwang's and Archegos's "wishes," "goals, "risk profile," "investment style," "personal developments," "reasoning," "investment decisions," "investment strategy," "objectives," and "execution strategy" amounts to testimony that Hwang did not intend to manipulate the market. That is testimony about "whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged" and is thus barred by not only Rule 702, but also Rule 704(b). *See, e.g.*, *Rezulin Prods.*, 309 F. Supp. 2d at 546 (expert cannot testify about "intent or motives underlying . . . certain business transactions"). A defendant may not "tell the jury [his] intentions through the mouth[] of" an expert witness. *Rahman*, 189 F.3d at 138. Accordingly, this proposed testimony should be excluded.

The defense proposes to have its expert witnesses opine on the motives and intentions not just of Hwang and Archegos, but also of the counterparties. For example, the defense proposes:

- Professor Johannes will testify that "a swap counterparty that purchases underlying shares as hedges has economic incentives to lend out those shares to third parties, including for use in a short sale, which would result in those shares being sold on the open market." (Johannes Supplemental Notice ¶ 21(c)).

45

- Professor Wahal will testify that "[t]he sales by certain Archegos counterparties of at-issue securities over a few days at the end of March 2021 are an example of institutions choosing to trade large numbers of shares quickly," and that "[s]uch large and rapid sales are not unusual and are conducted by many institutions." (Wahal Notice ¶ 10).

The Court should preclude proposed testimony regarding the counterparties' motives and intentions not only because it is impermissible for experts to opine on motives and intentions for all the reasons stated above, but also because the Government will call witnesses who were employees of the counterparties during the relevant time period, and who will be able to speak directly to relevant decision-making processes within the counterparties during the relevant time period. Indeed, Hwang seeks to offer testimony about what his expert speculates could have happened at the various counterparties. (*See* Johannes Supplemental Notice ¶ 21(a)-(c)). This utter speculation is of no use to a juror, and offering testimony in the guise of an "expert" who has no personal knowledge of how these counterparties operated poses a severe risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time, and should be precluded under Rule 403.[9] And even if, contrary to fact, the Government were not planning to call counterparty witnesses, the defense could seek to compel the testimony of such witnesses. What the defense may not do is have its expert witnesses opine on the counterparties' motives and intentions, and the Court should preclude such testimony.

**B.     The Could Should Preclude Opinion that Instructs on, or Applies, the Law**

The requirement that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" demands that the proposed testimony "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This condition requires

---

[9]     Of course, if the intention is to substitute Professor Johannes's opinion for what Hwang might have thought occurred at the counterparties, such an opinion would also be wholly improper.

the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541.

"As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). "The rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle." *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001).

Here, the defense proposes to offer legal opinion masquerading as expert testimony. For example, Professor Johannes plans to testify that "the economic evidence is inconsistent with the government's theory that Archegos dominated/controlled the market for the at-issue securities" (Johannes Supplemental Notice ¶ 21), and that "economic evidence contradicts the government's theory that the prices of the at-issue securities were artificially inflated over the indictment period" (Johannes Supplemental Notice ¶ 22). Professor Johannes has no legal training, let alone experience in interpreting indictments or discerning prosecutorial strategy. And what Professor Johannes thinks of the Indictment or the Government's theories of the case is utterly irrelevant. It is the Court's role to instruct the jury on the law, and the jury's role to determine if the Government has proven the charges in the Indictment beyond a reasonable doubt. Accordingly, Professor

Johannes should not be permitted to express any opinions in the form of commentary on the Indictment or the Government's theory of the case.

Moreover, in the context of market manipulation, trading "'artificially' affect[s] a security's price" when it "'sends a false price signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded," *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 76 (2d Cir. 2021) (footnotes omitted), though the "false" signal may arise solely from the trader's intent to rig the prices, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *see also, e.g.*, *United States v. Eisenberg*, No. 21 Cr. 10 (AS), 2023 WL 8720295, at *5 (S.D.N.Y. Dec. 18, 2023) (discussing what it means to "artificially affect" prices in the context of a commodities fraud case). To the extent Professor Johannes understands "artificial" to have a different meaning than it has in common law, any testimony he may give on this subject risks confusing the jury into applying Professor Johannes's understanding of the term in its deliberations rather than the legal instructions supplied by the Court.

Similarly, and most troublingly, it appears that the defense may be trying to invite Professor Johannes to suggest that the securities laws do not forbid open market manipulation. (*See, e.g.*, Johannes Supplemental Notice ¶ 22 n.10 (claiming that "[t]he at-issue securities traded in an efficient market, and therefore, any purportedly artificial prices would tend to revert")). Professor Johannes has no legal expertise, however, and the view that open market activity cannot be the basis for a manipulation claim has been repeatedly rejected by the Circuit and has been rejected by this Court in this case. *See, e.g.*, Dkt. 66 at 3; *Set Capital*, 996 F.3d at 77; *ATSI Commc'ns*, 493 F.3d at 102. Accordingly, the Court should preclude the defense from attempting to smuggle inaccurate legal instructions to the jury in the form of purported expert testimony.

As for Mr. Savoldelli, at least three parts of his proposed testimony impermissibly offer legal opinions:

- The defense proposes that Mr. Savoldelli will testify about "industry standards and practices in connection with the United States Securities and Exchange Commission's Family Office Rule (Advisers Act Rule 202(a)(11)(G)-1, which took effect in 2011), commonly referred to as the 'Family Office Rule,' which exempts family offices from a variety of regulations that apply to other asset management firms." (Savoldelli Supplemental Notice ¶ 3).

- The defense proposes that Mr. Savoldelli will testify that, "due to their particular nature and regulation, family offices operate in a manner distinct from other trading structures." (Savoldelli Supplemental Notice ¶ 4).

- The defense proposes that Mr. Savoldelli will testify that "investors often seek to structure their business activities so as to minimize the burden of regulatory filings." (Savoldelli Supplemental Notice ¶ 14).

Those parts of Mr. Savoldelli's proposed testimony, individually and collectively, seem designed to instruct the jury—incorrectly—that family offices effectively operate outside regulatory scrutiny and thus, by implication, are not subject to the Securities Act of 1933 or the Securities Exchange Act of 1934. As an initial matter, the foregoing proposed testimony should be excluded simply because it is unreliable. Mr. Savoldelli is not a legal expert and has no reliable basis to testify about legal opinions. Separately, the foregoing proposed testimony should be excluded because it usurps both the Court's role "in instructing the jury as to the applicable law" and the jury's role "in applying that law to the facts before it." *Lumpkin*, 192 F.3d at 290. "[T]estimony on issues of law is inadmissible," *Bilzerian*, 926 F.2d at 1294, and it should be excluded here.

There are additional examples of the defense proposing to use its expert witnesses not just to instruct the jury on the law, but also to apply the law to the facts. The defense's notices are replete with characterizations of what is "standard," "usual," "typical," "normal," or the like. For example, the defense proposes:

- Professor Johannes will testify that "many of Archegos's trading methods are consistent with industry standards and commonly used by other investors in the

industry," and that "it is standard for investors to take steps to avoid disclosing their positions to the market, because the public disclosure of an investor's position in a security can impact the price of that security, and lead to copycat investing, frontrunning, or other trading that could be disadvantageous to the investor." (Johannes Supplemental Notice ¶ 15).

- Mr. Savoldelli will testify that "transacting with multiple counterparties is commonplace for, and may be advantageous to, institutional asset managers and funds," and that "transacting with multiple counterparties may allow investors to negotiate better terms (including margin rates) and pricing from each of them." Savoldelli Supplemental Notice ¶ 9. Mr. Savoldelli will also testify that "it is not unusual for investors to transfer positions between counterparties, including for the purpose of optimizing margin." (Savoldelli Supplemental Notice ¶ 9).

- Mr. Savoldelli will testify that "it is standard industry practice for funds to tightly control disclosure of the names and/or magnitudes of their positions, including by gradually building a position in a company, trading in swaps, using multiple counterparties, and having confidentiality agreements, regarding positions and sizes, with employees and counterparties." (Savoldelli Supplemental Notice ¶ 11).

- Mr. Savoldelli will testify that "it is standard industry practice for investors to use indicative portfolios and/or decoy or sample names when negotiating with counterparties, including for the purpose of avoiding frontrunning." (Savoldelli Supplemental Notice ¶ 15).

- Professor Wahal will testify that "it is perfectly normal and expected for trading to affect prices, even when a trader undertakes maximal effort not to do so; there is nothing unusual about Archegos's trades moving prices." (Wahal Notice ¶ 4).

- Professor Wahal will testify that "[t]rading is normally completed anonymously in electronic markets," and that "[i]t is not unusual for large traders to use multiple brokers." (Wahal Notice ¶ 13).

- Professor Wahal will testify that "Archegos used standard algorithms that are provided by many broker-dealers and are routinely used by many institutional investors." (Wahal Notice ¶ 18).

Testimony that Hwang's and Archegos's behavior was "normal," "typical," or "standard," amounts to testimony that Hwang and Archegos behaved lawfully. It is testimony beyond the useful role of an expert and improperly usurps the jury's role of applying the law to the facts. For that reason, it should be excluded.

**C.      The Could Should Preclude "What if" Testimony as Unreliable and Unhelpful**

The Court should preclude Professor Johannes from testifying about what "could have" happened if market events the week of March 22, 2021, had unfolded differently than they did. (*See* Johannes Supplemental Notice ¶ 34). Wishful thinking, even when presented by an expert, is not of evidentiary value.

As set forth in the Johannes Supplemental Notice, the defense aims to have Professor Johannes engage in counterfactual "what if" guesswork: "Professor Johannes will further testify that if only the Viacom and Discovery declines had happened that week, Archegos could have had billions of dollars of additional capital on March 25, 2021, all else equal. Similarly, he will testify, if only the at-issue Chinese ADR declines had happened that week, Archegos could have had billions of dollars of additional capital on March 25, 2021, all else equal." (Johannes Supplemental Notice ¶ 34). These opinions lack any reliable methodology, however, and would be entirely unhelpful to the jury.

The "what if" testimony envisioned by the Johannes Supplemental Notice appears to be rank speculation. The Johannes Notice does not describe any analysis Professor Johannes undertook to identify the counterfactual scenarios he posits, to assess which, if any of those scenarios would be plausible, or that might enable him to opine in any rigorous way that the Archegos portfolio—that is to say, Hwang—would have responded to these imaginary scenarios in the manner Professor Johannes assumes. Indeed, it is not clear that Professor Johannes's opinions derive from any analysis that could be replicated or tested, is of a sort used by economists, or has been applied in accordance with any particular professional standards. *Cf. United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (describing indicia of reliability). Instead, Professor Johannes's "what if" musings rest on his view of "the declines of Archegos's investments in the at-issue U.S. streaming companies and Chinese ADRs, as well as its portfolio as a whole, in the

context of Archegos's historical performance." (Johannes Supplemental Notice ¶ 34). Although the defense has not specified which data actually underpins the professor's work, it is not obvious that any data reflects counterfactual events that did not occur. Accordingly, the connection between the facts as they existed and Professor Johannes's "what if" forecasts appears to simply be the professor's own *ipse dixit* assertions, which renders his opinions inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In addition to being unreliable, the "what if" testimony envisioned by the Johannes Supplemental Notice will also be unhelpful to the jury. A trial court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (*quoting United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Atlantic Specialty Ins. v. AE Outfitters Retail Co*., 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert"). As the crux of Professor Johannes's "what if" testimony appears to be that Archegos's portfolio "could have" survived the week of March 22, 2021, if its largest positions had not declined in value, then the jury will not need expert assistance to understand it: if stock prices had not gone down, a portfolio tied to those stock prices would not have gone down either.

Moreover, speculation about what "could have" happened the week of March 22, 2021, is not relevant to the jury's task of assessing whether the charged schemes existed and if so whether Hwang and Halligan joined them. No element of the charged offenses relates to proving or disproving the counterfactuals posited by Professor Johannes and, of course, there will be no

52

evidence that Hwang or Halligan acted in reliance on some similar type of counterfactual analysis. The helpfulness standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. No such connection exists here.[10]

## IV.   The Court Should Admit Hwang's Proffer Statements If and When He Takes a Contrary Position

Hwang voluntarily sat for two interviews with the Government—on March 14 and 30, 2022. Those interviews were conducted pursuant to the standard proffer agreement used by the U.S. Attorney's Office (the "Proffer Agreement"). Under the terms of the Proffer Agreement, if Hwang testifies at trial, the Government is permitted to question him regarding all of his statements during the interviews. Even if Hwang does not testify, the Government may offer his proffer statements to rebut contrary arguments and evidence offered by his counsel at trial.

"Like all contracts, proffer agreements must be interpreted to give effect to the intent of the parties." *United States v. Rosemond*, 841 F.3d 95, 107 (2d Cir. 2016) (internal quotation marks and citations omitted). The provisions of the Proffer Agreement at issue here—which permit the Government to cross-examine the defendant with his proffer statements and use those statements to rebut contrary arguments made by the defense—have been upheld repeatedly by courts. *See United States v. Mezzanatto*, 513 U.S. 196 (1995); *United States v. Lyle*, 919 F.3d 716, 732-33 (2d Cir. 2019). Moreover, it is well-settled in this Circuit that, once defense counsel makes a "factual assertion . . . that contradicts a statement made during the proffer session, the Government may then offer the earlier proffer statement to rebut the assertion being made at trial." *Rosemond*, 841 F.3d at 107.

---

[10]   The principles prohibiting "what if" testimony furnish an additional basis, separate from that set forth in Part III.A above, to preclude the proffered expert speculation about what Archegos's counterparties could or might have done.

The concept of rebuttal evidence is a flexible one and may encompass "any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." *Id.* at 108 (citations and internal quotation marks omitted); *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) ("Rebuttal is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary."). Indeed, to permit the defendant to present evidence or make arguments that are contrary to the admissions in his proffer session—without also permitting the jury to assess that evidence in light of that proffer—would thwart the truth-seeking purpose of a trial and mislead the jury. *See United States v. Gomez*, 210 F. Supp. 2d 465, 476 (S.D.N.Y. 2002) ("[E]nforcement of a proffer agreement does not preclude defense counsel from taking a position or presenting evidence inconsistent with a defendant's proffer statements . . . . [b]ut if she does, . . . it is only fair that the Government then be permitted to present the defendant's own words in rebuttal.").

While the Government does not yet know what defenses Hwang may present to the jury, his counsel's statements to the Court and his expert notices suggest multiple areas of contradiction will arise. To take but one example, Hwang informed the Government, in substance, that "Hwang was not aware that his trading could be moving the market because the market 'is a complicated thing.'" The defense position now appears to be that it is so obvious that trading moves the market that the fact of moving the market is inconsequential. As Hwang's counsel put it at the initial pretrial conference, "Everybody knows when they trade it's going to affect the price." (June 10, 2022 Tr. at 10; s*ee also* Wahal Notice ¶ 4 ("Professor Wahal is prepared to further testify that many of the results presented in the government's disclosures, even if correct, amount to

54

suggesting that trading affects prices."); *id.* ¶ 28 ("[E]ven if Archegos' trades were shown to affect prices, this simply shows that trading has price impact")).

      If the defense introduces evidence or makes arguments inconsistent with Hwang's proffer statements, including, but not limited to, the statements noted above, the Government should be permitted to use the defendant's proffer statements to rebut that evidence and those arguments.

## CONCLUSION

      For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
      March 21, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

              By: _____

                              Matthew Podolsky
                              Alexandra Rothman
                              Samuel P. Rothschild
                              Andrew Thomas
                              Assistant United States Attorneys
                              Tel.: (212) 637-1947/-2580/-2504/-2106