UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
:
UNITED STATES OF AMERICA,                              :
:
    - v -                                              :
:            No. 22-cr-240 (AKH)
SUNG KOOK (BILL) HWANG and PATRICK             :
HALLIGAN                                               :
:
                          Defendants.        :
:
-------------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF
## PATRICK HALLIGAN'S MOTIONS *IN LIMINE*


FRIEDMAN KAPLAN SEILER
 ADELMAN & ROBBINS LLP

7 Times Square
New York, NY 10036-6516
(212) 833-1100

March 21, 2024                          *Attorneys for Patrick Halligan*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................v

PRELIMINARY STATEMENT ............................................................................................1

SUMMARY OF MOTIONS................................................................................................1

INCORPORATION OF MR. HWANG'S ARGUMENTS AND MOTIONS...........................8

BACKGROUND ................................................................................................................8

ARGUMENT ....................................................................................................................11

1.      THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
        EVIDENCE OF MISREPRESENTATIONS THAT PRE-DATE THE
        CHARGED CONSPIRACY ....................................................................................11

        1.1     The Government Failed to Give Proper Notice of the Pre-Conspiracy
                Misrepresentations at Issue .........................................................................12

                1.1.1    The Government Failed to Identify Any Pre-Conspiracy
                         Misrepresentations In Response to the Court's June 1, 2022
                         Directive.............................................................................................12

                1.1.2    The Government's 404(b) Notice Is Deficient Because It Fails
                         to Specifically Identify any Pre-Conspiracy Misrepresentations..........13

        1.2     Evidence of Pre-Conspiracy Misrepresentations Is Inadmissible as Direct
                Evidence of the Crimes Charged in the Indictment .............................................16

                1.2.1    Applicable Law ..................................................................................16

                1.2.2    Applying the *Carboni* Standard, Evidence of Pre-Conspiracy
                         Misrepresentations Is Inadmissible as Direct Evidence.......................16

        1.3     Evidence of Pre-Conspiracy Misrepresentations Is Inadmissible Under
                Rules 404(b) and 403 ........................................................................................18

                1.3.1    Applicable Law ..................................................................................18

                1.3.2    The Government Has Failed To Meet Its Burden of Showing
                         Any Proper Purpose for the Admission of Evidence of Pre-
                         Conspiracy Misrepresentations, and Such Evidence Would
                         Unfairly Prejudice Mr. Halligan and Confuse the Issues.....................22

**Page**

2.   THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
TESTIMONY FROM COUNTERPARTY WITNESSES THAT
MISREPRESENTATIONS WERE "MATERIAL"...........................................................24

3.   THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
IMPROPER SPECULATIVE AND CONCLUSORY EVIDENCE  OF MR.
HALLIGAN'S STATE OF MIND ...........................................................27

4.   THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING
EVIDENCE OF MISSTATEMENTS THAT IT OMITTED FROM NOTICES
TO THE DEFENSE ...........................................................28

5.   THE GOVERNMENT SHOULD BE PRECLUDED FROM ASSERTING
WITHOUT ANY GOOD FAITH BASIS IN ADMISSIBLE EVIDENCE THAT
MR. HALLIGAN SIGNED MUFG TRADE CONFIRMATIONS WITH
KNOWLEDGE THEY CONTAINED A FALSE STATEMENT ...................................30

    5.1   The Government Appears to Have No Evidence That Mr. Halligan Was
Aware of the False Statement Buried in MUFG's Trade Confirmations .............31

    5.2   The Government Should Be Precluded From Arguing That Mr. Halligan
Signed False Trade Confirmations With Knowledge of Their Falsity .................34

6.   THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
EVIDENCE OR ARGUMENT ABOUT THE TIMING OF MR. HALLIGAN'S
DELIVERY TO COUNTERPARTIES OF ACCURATE MONTHLY
FINANCIAL DISCLOSURES ...........................................................35

    6.1   Evidence about the Timing of Monthly Financial Disclosures Is
Inadmissible as Direct Evidence Against Mr. Halligan....................................38

    6.2   Evidence about the Timing of Monthly Financial Disclosures Is
Inadmissible Under Rule 404(b) Because It is Irrelevant....................................39

    6.3   Evidence about the Timing of Monthly Financial Disclosures Should Be
Excluded Under Rule 403 ...........................................................41

7.   THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING
EVIDENCE AND MAKING ARGUMENTS REGARDING TAX-RELATED
"WASH SALE" OR "WASH TRADE" TRANSACTIONS...............................................41

    7.1   The Two Meanings of "Wash Sale" or "Wash Trade" ...........................................42

    7.2   Special Measures Are Required To Enable The Defense to Prepare for
Trial and to Avoid Juror Confusion and Unfair Prejudice....................................43

**Page**

8.    THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
      INCORRECT EVIDENCE AND ARGUMENT ABOUT ARCHEGOS'S
      PURPORTED FILING AND DISCLOSURE OBLIGATIONS .......................................45

9.    THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING
      ANY EVIDENCE OF DISCUSSIONS ON OR AFTER MARCH 26, 2021
      CONCERNING A POSSIBLE BANKRUPTCY FILING OR WIND-DOWN BY
      ARCHEGOS ...................................................................................................................48

10.   THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING
      ANY EVIDENCE OF DECADE-OLD MISCONDUCT AT TIGER ASIA ...................51

      10.1   Relevant Facts ....................................................................................................52

             10.1.1   The Domestic and Foreign Enforcement Proceedings..........................52

                      10.1.1.1   The New Jersey Criminal Case...........................................52

                      10.1.1.2   The SEC Civil Suit and Parallel Administrative
                                 Action...................................................................................53

                      10.1.1.3   The Hong Kong MMT Matter .............................................54

                      10.1.1.4   The Japan SESC Matter ......................................................55

             10.1.2   The Formation of the Archegos Family Office.....................................55

      10.2   All Evidence of the Tiger Asia Matters Should Be Excluded ..............................56

             10.2.1   Admission of Testimonial Statements Made by Mr. Hwang in
                      Connection with the Tiger Asia Matters Would Violate Mr.
                      Halligan's Sixth Amendment Confrontation Clause Rights.................56

             10.2.2   The Tiger Asia Evidence Is Inadmissible as Direct Evidence
                      Against Mr. Halligan.............................................................................60

             10.2.3   The Tiger Asia Evidence Is Inadmissible Against Mr. Halligan
                      Under Rule 404(b)..................................................................................62

                      10.2.3.1   The Tiger Asia Evidence Is Not Relevant, Nor is it
                                 Admissible Against Mr. Halligan for Any Purpose
                                 Permitted by Rule 404(b)....................................................62

             10.2.4   The Tiger Asia Evidence Is Inadmissible Against Mr. Halligan
                      Under Rule 403, and No Limiting Instruction Could Cure the
                      Prejudice................................................................................................65

4873-2223-4288.1

**Page**

10.2.4.1    The Tiger Asia Evidence Is Profoundly and Unfairly Prejudicial to Mr. Halligan ................................ 65

10.2.4.2    Admission of the Tiger Asia Evidence Would Waste Time, Necessitate Multiple Trials Within a Trial, and Confuse the Issues .............................................. 68

10.2.4.3    Additional Arguments as to Specific Categories of Tiger Asia Evidence ............................................................. 71

10.2.4.4    Limiting Instructions Cannot Cure the Extreme Unfair Prejudice to Mr. Halligan of the Tiger Asia Evidence .......................................................................... 73

CONCLUSION ........................................................................................ 75

4873-2223-4288.1

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*In re Aegon N.V. Sec. Litig.*,
  No. 03-cv-0603 (RWS), 2004 WL 1415973 (S.D.N.Y. June 23, 2004)...............................27

*Arlio v. Lively*,
  474 F.3d 46 (2d Cir. 2007).........................................................................................71

*In re Blech Sec. Litig.*,
  No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ...........................71

*Bruton v. United States*,
  391 U.S. 123 (1968).................................................................................................73

*Bullcoming v. New Mexico*,
  564 U.S. 647 (2011).................................................................................................59

*Cameron v. City of New York*,
  598 F.3d 50 (2d Cir. 2010).........................................................................................25

*Chadbourne & Parke LLP v. Troice*,
  571 U.S. 377 (2014).................................................................................................17

*City of Brockton Ret. Sys. v. Avon Prods. Inc.*,
  No. 11-cv-4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)...............................27

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ......................28

*City of Roseville Employees' Ret. Sys. v. Nokia Corp.*,
  No. 10 CV 00967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ...........................................49

*Crawford v. Washington*,
  541 U.S. 36 (2004)........................................................................................57, 58, 59

*CSX v. Children's Inv. Fund Mgmt. (UK) LLP*,
  654 F.3d 276 (2d Cir. 2011).......................................................................................46

*Discover Growth Fund v. 6D Glob. Techs. Inc.*,
  No. 15-CV-7618 (PKC), 2015 WL 6619971 (S.D.N.Y. Oct. 30, 2015) ...............................71

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976).................................................................................................42

v

**Page(s)**

*Highland Cap. Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008)..................................................................72

*Huddleston v. United States*,
    485 U.S. 681 (1988)..........................................................................................19

*In re Interpublic Sec. Litig.*,
    No. 02-cv-6527 (DLC), 2003 WL 21250682 (S.D.N.Y. May 29, 2003) .........................27, 28

*Jean-Laurent v. Hennessy*,
    840 F. Supp. 2d 529 (E.D.N.Y. 2011) ...................................................................30

*Krulewitch v. United States*,
    336 U.S. 440 (1949)..........................................................................................65

*Matsumura v. Benihana Nat'l Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008).................................................................27

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009)..........................................................................................59

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)..........................................................................38, 39

*Neder v. United States*,
    527 U.S.1 (1999)...............................................................................................24

*Park W. Radiology v. CareCore Nat. LLC*,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009)................................................................72

*Reddy v. Commodity Futures Trading Comm'n*,
    191 F.3d 109 (2d Cir. 1999)..............................................................................42

*Ruffalo's Truck. Serv. v. Nat'l Ben–Franklin Ins. Co.*,
    243 F.2d 949 (2d Cir.1957)...............................................................................71

*Securities and Exchange Commission v. Citigroup Glob. Mkts. Inc.*,
    827 F. Supp. 2d 328 (S.D.N.Y. 2011), *vacated and remanded on other
    grounds*, 752 F.3d 285 (2d Cir. 2014) ................................................................71

*Securities and Exchange Commission v. Hwang*,
    22-CV-3402 (JPO), 2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023) ...................................3, 27

*Shields v. Citytrust Bancorp. Inc.*,
    25 F.3d 1124 (2d Cir.1994)...............................................................................49

*In re Sotheby's Holdings, Inc.*,
    No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...........................27

4873-2223-4288.1

Page(s)

*Stevenson v. Hearst Consol. Publ'ns,*
  214 F.2d 902 (2d Cir.1954)..................................................................................71

*United States v. Aboumoussallem,*
  726 F.2d 906 (2d Cir.1984)..................................................................................70

*United States v. Affjehei,*
  869 F.2d 670 (2d Cir. 1989)............................................................................39, 63

*United States v. Araujo,*
  79 F.3d 7 (2d Cir. 1996).......................................................................................19

*United States v. Awadallah,*
  436 F.3d 125 (2d Cir. 2006).................................................................................26

*United States v. Barnwell,*
  No. 15 CR. 620 (NSR), 2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) .................25

*United States v. Becker,*
  502 F.3d 122 (2d Cir. 2007).................................................................................58

*United States v. Bellomo,*
  954 F. Supp. 630 (S.D.N.Y. 1997) .......................................................................74

*United States v. Benedetto,*
  571 F.2d 1246 (2d Cir. 1978)...............................................................................21

*United States v. Bradley,*
  No. 3:21-CR-00087 (VAB), 2022 WL 1708400 (D. Conn. May 27, 2022)............25

*United States v. Canales,*
  718 F. Supp. 2d 327 (S.D.N.Y. 2010)..................................................................13

*United States v. Carboni,*
  204 F.3d 39 (2d Cir. 2000)................................................................16, 23, 38, 60

*United States v. Colon,*
  880 F.2d 650 (2d Cir. 1989).................................................................................19

*United States v. Curley,*
  639 F.3d 50 (2d Cir. 2011).......................................................................... *passim*

*United States v. D'Amato,*
  39 F.3d 1249 (2d Cir. 1994).................................................................................38

*United States v. DeCicco,*
  435 F.2d 478 (2d. Cir 1970)...................................................................20, 64, 65

Page(s)

*United States v. DiCarlo*,
  131 F. Supp. 2d 537 (S.D.N.Y. 2001) ........................................................22, 29, 41

*United States v. Figueroa*,
  618 F.2d 934. (2d Cir. 1980) ....................................................................66, 73, 74

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002) ............................................................................26, 63

*United States v. Gardell*,
  No. S400 CR. 632 (WHP), 2001 WL 1135948 (S.D.N.Y. Sept. 25, 2001) .................... *passim*

*United States v. Gelzer*,
  50 F.3d 1133 (2d Cir. 1995) ...................................................................................66

*United States v. Gilbert*,
  668 F.2d 94 (2d Cir. 1981) ...............................................................................71, 72

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006) ....................................................................................58

*United States v. Hatfield*,
  685 F. Supp. 2d 320 (E.D.N.Y. 2010) ...............................................................40, 41

*United States v. Hatfield*,
  724 F. Supp. 2d 321 (E.D.N.Y. 2010) .....................................................................24

*United States v. Heatley*,
  994 F. Supp. 483 (S.D.N.Y. 1998) .....................................................................13, 14

*United States v. Kahn*,
  472 F.2d 272 (2d Cir. 1973) ....................................................................................70

*United States v. Kurland*,
  No. 20-CR-0306 (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ................................61

*United States v. Leonard*,
  524 F.2d 1076 (2d Cir. 1975) ..................................................................................21

*United States v. Levy*,
  731 F.2d 997 (2d Cir. 1984) ....................................................................................14

*United States v. Levy*,
  No. S5 11 Cr. 62 (PAC), 2013 WL 655251 (S.D.N.Y. Feb. 22, 2013) ..................................70

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) ...........................................................................24, 47, 48

viii

**Page(s)**

*United States v. Martoma*,
    No. 12 CR 973 PGG, 2014 WL 31191 (S.D.N.Y. Jan. 6, 2014) .................................... *passim*

*United States v. Massino*,
    319 F. Supp. 2d 295 (E.D.N.Y. 2004) ...............................................................58, 67

*United States v. McCallum*,
    584 F.3d 471 (2d Cir. 2009)..........................................................20, 21, 22, 64

*United States v. McClain*,
    377 F.3d 219 (2d Cir. 2004)..........................................................................57

*United States v. McDermott*,
    245 F.3d 133 (2d Cir. 1980)....................................................................73, 74

*United States v. Mundle*,
    15-CR-315 (NSR), 2016 WL 1071035 (S.D.N.Y. Mar. 17, 2016)........................................21

*United States v. Nachamie*,
    101 F. Supp. 2d 134 (S.D.N.Y. 2000).......................................................................19

*United States v. Napout*,
    No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017)................................72

*United States v. Olivieri*,
    740 F. Supp. 2d 414 (S.D.N.Y. 2010).......................................................................71

*United States v. Quinones*,
    417 F. App'x 65 (2d Cir. 2011) ...............................................................................30

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992)..............................................................................25, 26

*United States v. Riggi*,
    541 F.3d 94 (2d Cir. 2008)....................................................................................58

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998)....................................................................................66

*United States v. Schatzle*,
    901 F.2d 252 (2d Cir. 1990)..................................................................................70

*United States v. Smith*,
    283 F.2d 760 (2d Cir. 1960)..................................................................................19

*United States v. Stein*,
    521 F. Supp. 2d 266 (S.D.N.Y. 2007)................................................................. *passim*

ix

Page(s)

*United States v. Townsend,*
No. S1 06 CR 34 (JFK), 2007 WL 1288597 (S.D.N.Y. May 1, 2007), *aff'd sub nom. United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009) ............................................15, 39

*United States v. Williams,*
596 F.2d 44 (2d Cir. 1979) .................................................................................................20

*United States v. Zhong,*
26 F.4th 536 (2d Cir. 2022) ................................................................................16, 61, 62, 64

**Statutes, Rules, and Regulations**

15 U.S.C. § 78j(b) ...............................................................................................................24

18 U.S.C. § 1343 .................................................................................................................52

18 U.S.C. § 1348(2) ............................................................................................................24

26 U.S.C. § 1091 .............................................................................................................6, 42

17 C.F.R. 240.10b-5 ...........................................................................................................24

17 C.F.R. § 275.202(a)(11)(G) ....................................................................................6, 9, 46

26 C.F.R. § 1.1091–1 .........................................................................................................42

Fed. R. Crim. P. 14 ............................................................................................................74

Fed. R. Crim. P. 26.1 .........................................................................................................69

Fed. R. Evid. 103 ...............................................................................................................30

Fed. R. Evid. 401 ....................................................................................................... *passim*

Fed. R. Evid. 402 ...............................................................................................19, 20, 35

Fed. R. Evid. 403 ....................................................................................................... *passim*

Fed. R. Evid. 404 ....................................................................................................... *passim*

Fed. R. Evid. 408 .........................................................................................................71, 72

Fed. R. Evid. 801 .........................................................................................................71, 72

Fed. R. Evid. 802 ...............................................................................................................72

**Other Authorities**

*Wigmore on Evidence*, Section 58.2 (Tillers rev. 1983) ...................................................19

4873-2223-4288.1

Patrick Halligan, by his undersigned attorneys, respectfully submits this memorandum of law in support of his motions *in limine*.[1]

## PRELIMINARY STATEMENT

The defendants in this case have now been provided with the government's Rule 404(b) notice, its exhibit list, and its witnesses' 3500 material. Read together, these disclosures presage an effort by the government to divert the jury's focus away from the conduct underpinning the charged offenses and toward improper, irrelevant, and highly prejudicial matters, including decade-old criminal and administrative matters in which Mr. Halligan was neither accused nor charged with any wrongdoing, conjecture about Mr. Halligan's state of mind, and impermissible lay opinion testimony that the misrepresentations at issue in this case were "material." Mr. Halligan moves *in limine* to preclude the government from confusing the issues, misleading the jury, unduly prolonging the proceedings, and fundamentally impairing his right to a fair trial.

## SUMMARY OF MOTIONS

1. **Motion to Preclude Evidence of Unspecified Statements that Pre-Date the Charged Conspiracy**

In its 404(b) notice, the government disclosed its intention to offer evidence of false or misleading statements allegedly made by Mr. Halligan to Archegos's counterparties prior to the charged conspiracy, either as direct evidence or as "other crimes" evidence. The government did not identify these statements, did not specify when or to whom these statements were made, and did not explain the specific basis of their admissibility.

---

[1]  The supporting Declaration of Mary E. Mulligan is referred to as the "Mulligan Decl." The Superseding Indictment filed on January 18, 2024 is referred to as "the Indictment" or "Ind." ECF No. 134. The government's Rule 404(b) notice, served on December 12, 2023, is referred to as the "404(b) notice" or the "404(b) letter," and is attached to the Mulligan Declaration as Exhibit A.

As discussed more fully below in Point 1, the time set by the Court for the government to identify all the false statements it intends to introduce as direct evidence has long since passed. In any event, because the government has neither specifically identified these statements nor demonstrated how they relate to the charged offenses, as required by the relevant caselaw, and because the jury could not help but use such statements impermissibly as evidence of Mr. Halligan's criminal propensity, they are inadmissible as direct evidence.

Insofar as pre-conspiracy false statements could conceivably be relevant under Rule 404(b), the government has not even attempted to meet the stringent notice requirements of that rule. Moreover, whatever legitimate purpose such statements might arguably serve, they would be inadmissible under Rule 403 because they would confuse and mislead the jury, and because their probative value would be substantially outweighed by the overwhelming likelihood that the jury would use them to establish propensity.

The plain theory underlying the Indictment is that Mr. Halligan allegedly made or directed the making of misstatements *during* the charged conspiracy to induce banks to offer Archegos trading capacity and favorable margin terms, which Archegos *thereafter* used to supposedly engage in open-market manipulation. Statements made *before* any allegedly manipulative trading have no proper bearing on the issues to be tried and should therefore be excluded.

### 2. Motion to Preclude the Government From Offering Testimony From Counterparty Employees that Misrepresentations Were "Material"

Materiality is an essential element of every count charged against Mr. Halligan, and the jury must decide whether misstatements were "material" based on this Court's legal instructions. The 3500 material produced to the defense suggests that the government will seek to usurp the jury's function by eliciting conclusory testimony from lay witnesses about the

"materiality" of alleged misrepresentations. As discussed further in Point 2, the government's witnesses should be precluded from using the conclusory legal term "material." Such testimony would constitute impermissible lay opinion testimony under Rule 701, would be inadmissible under Rule 403, and would short-circuit both the jury's role and the Court's legal instructions.

> **3.** **Motion to Exclude Improper Speculative and Conclusory Evidence Concerning Mr. Halligan's State of Mind**

Mr. Halligan's state of mind is an ultimate issue for the jury to decide, and as discussed below in Point 3, he moves to preclude the government from introducing evidence on that essential element or arguing that Mr. Halligan's knowledge or intent can be inferred from his title as the CFO of Archegos. In dismissing claims filed by the SEC against Mr. Halligan in a parallel action, Judge Oetken recently held that "conclusory argument that conscious misbehavior or recklessness can be inferred from Halligan's position as CFO does not withstand scrutiny." *Securities and Exchange Commission v. Hwang*, 22-CV-3402 (JPO), 2023 WL 6124041, at \*7 (S.D.N.Y. Sept. 19, 2023) ("*SEC v. Hwang*"). The government should not be permitted to advance arguments to a criminal jury that do not pass muster on a civil motion to dismiss.

> **4.** **Motion to Preclude the Government from Introducing Evidence of Misstatements That It Omitted from Notices to the Defense**

Mr. Halligan moves to preclude the government from introducing evidence or making arguments about misstatements that it failed to disclose to the defense in (a) the list of misstatements that it served in response to the Court's directive to identify *all* the alleged misrepresentations it intended to introduce at trial, and (b) the 404(b) notice.

While the government's failure to give proper notice constrains the defense's ability to anticipate what undisclosed statements the government might seek to introduce, one example is gleaned from Mr. Becker's 3500 material, where he makes a cryptic statement that Mr. Halligan allegedly created a false internal record regarding the gross exposure of Archegos's investment

portfolio, and suggests that the purpose of this record was to facilitate Mr. Becker's false statements to Archegos's counterparties. But neither the Indictment nor the government's disclosure of the misstatements it intends to introduce at trial alleges a single false statement regarding Archegos's gross exposure. Nor has the government provided any notice regarding who allegedly received the record; what it looked like; when, how, or where it was created; or when, how, or where it was used. As discussed in Point 4 below, the government should not be permitted to sandbag the defense in this fashion, and any reference to this document at trial should therefore be precluded.

5.  **Motion to Preclude the Government From Asserting Without Any Good Faith Basis In Admissible Evidence That Mr. Halligan Signed MUFG Trade Confirmations With Knowledge They Contained A False Statement**

Based on the 3500 material and the government's witness list, it is clear that the government's theory with respect to certain statements it previously identified as false will not find support in the evidence. Specifically, the Indictment charges in paragraph 59(b) that on multiple occasions, Mr. Halligan knowingly and intentionally signed swap transaction confirmations with Mitsubishi UFJ Financial Group ("MUFG"), that contained a false statement concerning the composition of Archegos's portfolio. As discussed more fully in Point 5 below, the 3500 material reveals that neither of the two government witnesses who were involved in reviewing those confirmations and submitting them for Mr. Halligan's signature was aware that a false statement was buried in their boilerplate. Because there will be no evidence from which a jury could reasonably infer that Mr. Halligan was aware of the false statement buried in these confirmations, any reference to the confirmations should be precluded.

6.      **Motion to Preclude the Government from Offering Evidence
or Argument Concerning the Timing of Mr. Halligan's Disclosure
of Accurate Monthly Information to Counterparties**

In its 404(b) notice, the government suggests that it intends to introduce evidence of

uncharged conduct concerning the timing of Mr. Halligan's disclosure to the banks of certain

monthly financial information (in particular, Archegos's monthly performance and assets under

management). In particular, the government's 404(b) letter states that this information was "at

times, intentionally withheld." The government does not anywhere – not in the Indictment and not

in the 404(b) letter – suggest that this information was ever inaccurate.

Consequently, as explained in Point 6 below, evidence concerning the provision of

*accurate* information is not admissible as direct evidence of the crimes charged, which relate

solely to the provision of false and misleading, i.e., *inaccurate*, information. Nor is it admissible

under Rule 404(b) because it is wholly dissimilar to the charged conduct. Additionally, because

evidence or argument concerning the accurate, but belated, disclosure of Archegos's monthly

performance is not probative of whether Mr. Halligan made misrepresentations to counterparties,

such evidence and argument should be excluded because they are likely to confuse and mislead the

jury, invite jurors to draw impermissible propensity inferences regarding Mr. Halligan's dealings

with Archegos's counterparties, and unfairly prejudice Mr. Halligan.

7.      **Motion to Preclude the Government from Introducing
Evidence and Making Arguments Regarding Tax-Related
"Wash Sale" or "Wash Trade" Transactions**

Mr. Halligan moves to ensure that the jury is not misled or confused by the fact that

the term "wash sale" or "wash trade"– which appears in approximately 100 documents on the

government's exhibit list and in one of its expert disclosures – has two distinct meanings, one

relating to the tax treatment of lawful transactions and the other describing manipulative trades.

The Rule 16 discovery material produced by the government makes clear that Archegos employees

often referred to "wash sales" within the lawful meaning of the Internal Revenue Code and its implementing regulations. *See* 26 U.S.C. § 1091. Elsewhere, including in Archegos's compliance manual, the term "wash sale" is included among potentially manipulative trading practices. To avoid unfair confusion  and prejudice arising from these different meanings, the government should be precluded from introducing evidence or making arguments about tax-related "wash sales" or "wash trades." There is no allegation that Archegos violated the IRS "wash sale" rule, or any other tax obligation, and the introduction of evidence about tax-related "wash trades" is therefore irrelevant, unduly confusing, and ultimately prejudicial to Mr. Halligan. *See* Point 7, below.

8.      **Motion to Preclude the Government From Offering Incorrect Evidence and Argument About Archegos's Purported Filing and Disclosure Obligations**

The 3500 material and the government's witness list suggest that the government will seek to offer evidence, in the form of documents or testimony, in which bank employees misstate or misconstrue Archegos's supposed regulatory filing obligations. For example, as discussed further in Point 8, the 3500 material for Goldman Sachs witness Nastassia Locasto reveals her mistaken view that Archegos was subject to disclosure or filing obligations as to which it was plainly exempt by virtue of its status as a family office under SEC rules. *See* 17 C.F.R. § 275.202(a)(11)(G)-1.

As the government concedes in the Indictment, Archegos, a family office, was *not* subject to the disclosure obligations and regulatory oversight that govern hedge funds and investment advisors. Ind. ¶ 9.  Accordingly, Rule 403 warrants exclusion of such evidence, which will only confuse and mislead the jury and unfairly prejudice Mr. Halligan.

The government should likewise be precluded from arguing that a witness's mistaken – and plainly incorrect – view of Archegos's disclosure obligations renders an alleged

misstatement material, because this would merely magnify and compound the confusion. Finally, testimony or documents evincing counterparty witnesses' plainly incorrect understanding of Archegos's disclosure obligations are irrelevant to any matter the government must prove and are therefore inadmissible as well under Rule 401.

**9.      Motion to Exclude Evidence Regarding Discussions On or After March 26, 2021 of Archegos's Potential Bankruptcy Filing or Wind-Down**

The government has notified the defense of its intention to prove that on March 24 and March 25, 2021, representatives of Archegos falsely told counterparties that Archegos was facing a "liquidity" situation rather than a "solvency" situation. While discussions concerning the possibility of a bankruptcy filing or wind-down of operations on either of those two dates might be relevant to the government's allegation, Mr. Halligan moves to preclude the government from introducing evidence of any such discussions that occurred *on or after* March 26, 2021. As discussed in Point 9 below, evidence of bankruptcy or wind-down discussions *after* the allegedly false statements has no bearing whatsoever upon whether Archegos was solvent when the statements were made, and would therefore be improper, misleading, and unfairly prejudicial.

**10.     Motion to Exclude Evidence Regarding Decade-Old Allegations of Misconduct at Tiger Asia**

Mr. Halligan moves to preclude the government from conducting a trial-within-a-trial through the introduction of voluminous evidence concerning allegations of misconduct from 2008 and 2009 at defendant Bill Hwang's long-closed hedge fund, Tiger Asia. That conduct gave rise to a series of criminal, civil, and administrative investigations and proceedings, some in the United States and some abroad, none of which charged or accused Mr. Halligan of wrongdoing.

The government's 404(b) notice reveals that it not only plans to offer testimony about those Tiger Asia matters, but also intends to introduce a barrage of Tiger Asia documents that bear no relationship to the open-market manipulation conduct charged in this case. Worse still, in

4873-2223-4288.1

what appears to be an effort to either imply Mr. Halligan's involvement in the alleged 2008/2009 insider trading conduct or else to suggest his guilt by association, the government intends to offer two Tiger Asia emails from fifteen years ago that mention Mr. Halligan's name but fail to suggest the slightest culpability on his part.

For the reasons discussed more fully below in Point 10, as well as the reasons set forth in the related motion filed on behalf of Mr. Hwang, all testimony and documents concerning the Tiger Asia matters should be excluded from this trial. They are inadmissible as against either defendant for a variety of compelling reasons, they are especially prejudicial and improper with respect to Mr. Halligan, they would present Confrontation Clause issues, they would hopelessly confuse the issues presented here, and they would substantially prolong this already lengthy and complicated matter by requiring multiple trials within this trial.[2]

### INCORPORATION OF MR. HWANG'S ARGUMENTS AND MOTIONS

Mr. Halligan incorporates and adopts as if fully set forth herein all arguments and motions *in limine* filed on behalf of Mr. Hwang, and seeks on his own behalf all relief sought by Mr. Hwang's motions *in limine*.

### BACKGROUND

Archegos Capital Management (together with its related entities, "Archegos") was the family office of Sung Kook (Bill) Hwang. All of the assets it managed belonged to Mr. Hwang and his family. Mr. Hwang made all investment decisions at Archegos, and was supported by a large staff of experienced analysts as well as traders and other professionals. As a family office,

---

[2]  In their pretrial motions, Messrs. Hwang and Halligan moved to strike the Indictment's reference to Tiger Asia. ECF No. 48 at 88-98. In its March 23, 2023 order, the Court denied the motion as academic because the Indictment will not be provided to the jury and ruled that "the question of whether the parties may introduce evidence or arguments related to Tiger Asia Management may be addressed by motions *in limine*." ECF No. 66 at 3.

Archegos was exempt from most of the regulations applicable to investment advisors, hedge funds, and public companies. *See, e.g.*, 17 C.F.R. § 275.202(a)(11)(G)-1(a).

Mr. Halligan was the chief financial officer ("CFO") of Archegos from its creation in 2013 until its effective demise in 2021. As the CFO of an entity with no public reporting requirements and no outside investors, as distinct from a public company or a regulated investment advisory firm, Mr. Halligan's work comprised what the SEC referred to as "manag[ing] back office functions and operations."[3]

Archegos invested using leverage, in a limited number of concentrated positions, trading in both common stock and total return swaps. Archegos's trading counterparties were among the most sophisticated financial institutions in the world. Its relationships with its counterparties were contractual; they were governed by various industry-standard agreements, including agreements promulgated by the International Swaps and Derivatives Association ("ISDA").

The total return swaps were contractual agreements between Archegos and its counterparties, pursuant to which they agreed to exchange payments based on the market price movements of specified securities. Ind. ¶ 15. In general, the terms provided that the counterparty would pay Archegos an amount equal to any increase in the value of the referenced security and Archegos would pay the counterparty the amount of any decrease in the value of that referenced security. *Id.* Thus, the swaps were derivative instruments that represented synthetic exposure to an underlying stock – they did not represent actual purchases of shares in the underlying company or direct stock market activity by Archegos. *Id.* ¶¶ 15, 17.

---

[3]  *See* Amended Complaint, *SEC v. Sung Kook (Bill) Hwang, et al.*, No. 1:22-cv-3402 (JPO), ECF No. 47 at ¶ 25 (Mulligan Decl. Ex. B).

Archegos's performance was volatile over the years, but it had a particularly strong run during the Covid-19 pandemic. From March 2020 up until the week of March 22, 2021, Archegos grew from approximately $1.5 billion in capital to more than $35 billion in capital. Ind. ¶ 3.

During the week of March 22, 2021, the value of Archegos's investment portfolio declined suddenly and sharply as the result of multiple unexpected events that impacted different components of its portfolio. Its position in Viacom declined after the company's secondary offering was unfavorably received by the market, and the decline in Viacom's stock price triggered declines in the price of other media companies whose stocks often moved in tandem with Viacom. Coincidentally, Archegos's positions in a number of Chinese ADRs declined in value that same week after the SEC announced new rules regarding the auditing and reporting of certain foreign companies.

As the value of Archegos's investments declined, it faced margin calls from its counterparties. Ind. ¶ 60. When Archegos became unable to meet its margin calls, its counterparties placed it into default and liquidated many of its positions.

On April 25, 2022, a grand jury indicted Messrs. Hwang and Halligan. The Indictment, like the Superseding Indictment returned on January 18, 2024, charges eleven counts based on alleged misconduct that took place "from in or about 2020, up to and including in or about March 2021." Ind. ¶ 1. Mr. Halligan is charged with participating in a racketeering conspiracy (Count One), securities fraud (Count Ten), and wire fraud (Count Eleven).

According to the Indictment, Messrs. Hwang and Halligan "corrupted the operations and activities" of Archegos through "two interrelated criminal schemes." Ind. ¶¶ 1, 2. The first allegedly involved open-market trading to artificially inflate the price of certain

securities. The Indictment does not allege that Mr. Halligan was aware of – much less participated in – illegal, manipulative trading activity. Indeed, there is not a single allegation that Mr. Halligan had a knowing role in that alleged strategy. The Indictment charges Mr. Hwang in eight substantive securities fraud counts (Counts Two through Nine) related to this trading activity, but Mr. Halligan is not named in any of them. *Id.* ¶¶ 75-78.

Rather, the Indictment alleges that Mr. Halligan made or participated in making false and misleading statements to Archegos's counterparties, which caused them to put on or enter into swap agreements on supposedly favorable margin terms and extend additional trading capacity to Archegos. Ind. ¶¶ 1-3, 21, 41.  According to the government, those statements induced the counterparties to do business with Archegos and, in turn, "enabl[ed] and facilitate[d] the market manipulation scheme." *Id.* ¶ 2.

## ARGUMENT

### 1.
### THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING EVIDENCE OF MISREPRESENTATIONS THAT PRE-DATE THE CHARGED CONSPIRACY

According to the government's 404(b) notice, the government intends to "offer evidence that, prior to the conduct charged in the Indictment, Mr. Halligan repeatedly and deliberately misled counterparties with respect to certain information about Archegos's portfolio and, at times, intentionally withheld information about the portfolio's performance." Mulligan Decl. Ex. A, at 5. The government states that its proof includes "witness testimony, contemporaneous emails, and notes by counterparties of representations made by Archegos regarding its compliance program and regulatory history." *Id.* at 6. This evidence, the government contends, constitutes direct proof of the charged schemes or, in the alternative, constitutes "other act" evidence "admissible pursuant to Rule 404(b), as it demonstrates the defendants' motive,

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident[.]" *Id.* at 2.

The government is wrong on both counts. The government's 404(b) letter provides no specifics about the misrepresentations to which it refers, leaving the defense to try to identify this evidence from the government's exhibit list (which includes thousands of documents).[4] To the extent we have been able to hypothesize about what evidence the government might seek to introduce on this topic, that evidence is inadmissible as direct evidence and also inadmissible under Rule 404(b). Moreover, the evidence should be excluded because: (1) the government failed to give proper notice of it; and (2) there is no basis to conclude that such evidence would serve a purpose other than to demonstrate Mr. Halligan's criminal propensity, and the grave risk of unfair prejudice flowing from that inference renders it inadmissible under Rule 403.

## 1.1    The Government Failed to Give Proper Notice of the Pre-Conspiracy Misrepresentations at Issue

The Court need not reach the question of whether this evidence is admissible as direct or "other act" evidence, because it should be excluded based on the government's failure to give the defense proper notice.

### 1.1.1    The Government Failed to Identify Any Pre-Conspiracy Misrepresentations In Response to the Court's June 1, 2022 Directive

While adequate notice is important in every case, the Court has specifically and repeatedly underscored the requirements of fair and adequate notice in this particular case. At a status conference on June 1, 2022, the Court ordered the government to identify all the alleged misrepresentations it intended to introduce at trial. *See* ECF No. 29 (June 1, 2022 Tr. at 15-17).

---

[4] The latest iteration of the government's exhibit list, which it served at approximately 10:30PM on the eve of this filing, is 104 pages.

The Court specifically directed the government to "mak[e] sure that there is identification of each and all the alleged misrepresentations, by the person who made it, by their nature, persons who received it, date, time, place." *Id.* at 16-17.

To the extent the government seeks to offer pre-conspiracy statements as direct evidence, its effort is untimely because it did not comply with the Court's June 1, 2022 directive. On August 18, 2022, the government filed a letter in response to the Court's directive. *See* ECF No. 38. In that letter, the government failed to identify a single pre-conspiracy misrepresentation allegedly made by Mr. Halligan, let alone specify its "nature, persons who received it, date, time, place." Accordingly, the government should be precluded from offering any such misrepresentations as direct evidence.[5]

### 1.1.2   The Government's 404(b) Notice Is Deficient Because It Fails to Specifically Identify any Pre-Conspiracy Misrepresentations

Furthermore, the government's subsequent 404(b) letter fails to comport with the notice requirements of that rule, which requires that the government must provide the defense with "reasonable notice" of its intent to offer "other act" evidence. Fed. R. Evid. 404(b). Where requested by a criminal defendant, the prosecution must provide "reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial," giving "sufficient information to establish the relevance and probative value of the proffered [evidence]." Fed. R. Evid. 404(b)(2)(A); *United States v. Canales*, 718 F. Supp. 2d 327, 329 (S.D.N.Y. 2010); *see also United States v. Heatley*, 994 F. Supp. 483, 491 (S.D.N.Y. 1998) (requiring "a full and

---

[5]  Mr. Halligan does not concede the sufficiency of the government's disclosures regarding the misstatements allegedly made during the course of the conspiracy, but the government's 404(b) notice refers only to misstatements allegedly made "prior to the conduct charged in the Indictment," Mulligan Decl. Ex. A, at 5, ¶ 6, and thus those statements are the focus of this motion.

particularized explanation of the grounds for [its] admissibility"). Thus, courts in this Circuit routinely require the government specifically to identify Rule 404(b) material and "explain in detail the purposes for which the evidence is sought to be admitted." *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984).

The purpose of this requirement is to "reduce surprise and promote early resolution on the issue of admissibility." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendment ("Advisory Note"). As a matter of discretion, a District Court may determine that a particular "notice was not reasonable, either because of the lack of timeliness or completeness." *Id*. Moreover, "[b]ecause the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met." *Id.; Heatley*, 994 F. Supp. at 491 ("adequate advance notice to the defendants and the Court of the use of such evidence is necessary for a defendant to prepare for trial, prevent unfair surprise, and for the Court to rule upon the admissibility of such evidence").

In its 404(b) letter, the government again failed to identify any specific pre-conspiracy misrepresentations. Instead, it referred to this category of evidence generically, with no particularization of when, to whom, or on what particular subjects these supposed pre-conspiracy statements were made. Moreover, that letter does not identify the specific permissible purpose or purposes for which that evidence would be offered under Rule 404(b), but instead merely recites *all* the options available under the rule.

On December 19, 2023, we informed the government by letter of the deficiencies of the government's notice. Mulligan Decl. Ex. C1. Three months later, the day before the deadline for *in limine* motions, the government responded, asserting that its disclosures satisfied Rule 404(b) and Second Circuit authority. *Id.* Ex. C2. While claiming it was under no obligation to do

so, the government directed us to ten pages of notes from Mr. Becker's meetings with the government, and a single exhibit. *Id.* That exhibit does not relate to any pre-conspiracy conduct at all, as it is an email from August 31, 2020. We asked the government whether this exhibit was the only document on its exhibit list that it intended to offer in support of the at-issue allegations, and by email, the government refused to provide an answer. *Id.* Ex. C3.

The government's failure to identify any specific pre-conspiracy misrepresentations it intends to offer, or to provide the specific basis to admit any such statement, has left Mr. Halligan to wade through the government's proposed exhibits seeking to decipher what the government has in mind, and to speculate about how the government might seek to use those statements. Rule 404(b) requires more. The government has not met and cannot meet its burden of demonstrating that pre-conspiracy misrepresentations allegedly made by Mr. Halligan are offered for a proper purpose, that they are relevant to the charged conduct, that their probative value is not substantially outweighed by unfair prejudice, and that their admission would not otherwise impermissibly burden the trial process. Without that showing, the defense cannot adequately prepare for trial and this Court cannot possibly make the careful and deliberate determination the law requires. *See United States v. Townsend*, No. S1 06 CR 34 (JFK), 2007 WL 1288597, at *6 (S.D.N.Y. May 1, 2007) (holding that the government's general proffer of Rule 404(b) evidence was "far too vague to allow the Court to determine whether the evidence is admissible under Rule 404(b)"), *aff'd sub nom. United States v. Mercado*, 573 F.3d 138 (2d Cir. 2009).

Accordingly, the government should be precluded from offering any evidence of supposed pre-conspiracy misrepresentations. But even if the Court were to overlook the government's serial notice failures, this evidence would nonetheless be inadmissible under applicable law, for the reasons discussed below.

**1.2    Evidence of Pre-Conspiracy Misrepresentations Is Inadmissible as Direct Evidence of the Crimes Charged in the Indictment**

**1.2.1    Applicable Law**

Uncharged conduct can be admitted as direct evidence of the crimes charged only "if (1) it arose out of the same transaction or series of transactions as the charged offense, (2) if it is inextricably intertwined with the evidence regarding the charged offense, or (3) if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (cleaned up). When assessing whether uncharged acts constitute direct evidence of the crimes charged, courts in this District employ a narrow construction. *United States v. Martoma*, No. 12 CR 973 PGG, 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014). Uncharged conduct is "inextricably intertwined" with charged conduct if "[the] details of the uncharged transaction are necessary to understand the charged transaction," *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007), but is not inextricably intertwined where "[t]he charged crimes are straightforward and may be fully understood without reference to the uncharged conduct" or where the indictment "tells a compelling, complete, and detailed story with almost no mention of the uncharged conduct." *Martoma*, 2014 WL 31191, at *3 (cleaned up). "If necessary, the government may introduce evidence of uncharged criminal conduct to complete the story of the crime on trial, *not to tell a new one*." *United States v. Zhong*, 26 F.4th 536, 552 (2d Cir. 2022) (cleaned up, emphasis added).

**1.2.2    Applying the *Carboni* Standard, Evidence of Pre-Conspiracy Misrepresentations Is Inadmissible as Direct Evidence**

As discussed above, the government's deficient disclosure has prevented the defense and the Court from properly identifying the specific pre-conspiracy statements at issue. In any event, such evidence would not meet the test set out in *Carboni* for the admission of uncharged acts as direct evidence.

First, the Indictment refers to alleged misconduct that began in March 2020, and in particular, to alleged misstatements that were intended to obtain trading capacity and favorable margin rates during the following year. The Indictment does not allege any unlawful transactions before 2020, nor does it allege that any supposed misstatements before 2020 had any connection to transactions in 2020 or 2021.[6]

Moreover, any alleged pre-conspiracy misstatements are not inextricably intertwined with the charged offenses. The details, or even the existence, of alleged pre-conspiracy misrepresentations are completely unnecessary to understand the charged misconduct. *Stein*, 521 F.Supp.2d at 271. As noted, the indictment alleges two "interrelated criminal schemes" – one involving trading conduct beginning in March 2020, and the other involving alleged misstatements to banks to facilitate the trading misconduct. *See* Ind. ¶ 2. Thus, the government's own allegations undermine its claim that prior conduct is "inextricably intertwined" with the charged offenses.

To take one example, in the category of documents we have identified that pre-date the charged conspiracy, the government's exhibit list includes a 2018 document apparently obtained from Wells Fargo. Mulligan Decl. Ex. D (GX-2302). This document purports to recount information obtained from Archegos over a series of meetings and conversations, generally without distinguishing which information was obtained at which meeting, or from whom (different participants are noted to have attended different meetings). But the Indictment does not allege that Mr. Halligan or any other alleged co-conspirator *ever* made any misrepresentation to Wells Fargo.

---

[6] Nor could it. Governing law is very clear that to maintain a securities fraud claim under Section 10(b) and Rule 10b-5, a misrepresentation must be made "in connection with the purchase or sale" of a security. *See, e.g., Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'").

Indeed, the Indictment does not even mention Wells Fargo, nor does the government's August 2022 letter responding to the Court's directive to identify all of the misrepresentations at issue. Thus, whatever the government might seek to prove by offering evidence of a pre-conspiracy statement to Wells Fargo, that evidence is patently unnecessary to understand the charged conduct.

Finally, nothing in these proposed government exhibits would complete the "story" of the crimes alleged in this case. See *Martoma*, 2014 WL 31191, at *3. Instead, they would belatedly introduce a new narrative altogether, such as a narrative somehow now involving interactions with Wells Fargo in 2018. Because the Indictment alleges that the misrepresentations made during the conspiracy were made for the specific purpose of obtaining capacity to engage in manipulative trading conduct, and any such manipulative trading occurred thereafter, misrepresentations made prior to the conspiracy are logically part of a different narrative.[7]

Accordingly, evidence about alleged pre-conspiracy misrepresentations may not be admitted as direct evidence of the charged offenses.

## 1.3 Evidence of Pre-Conspiracy Misrepresentations Is Inadmissible Under Rules 404(b) and 403

### 1.3.1 Applicable Law

"Rule 404(b) . . . governs the admissibility of evidence . . . of 'crimes, wrongs, or acts' other than those charged in the indictment" as indirect evidence of the crimes charged. *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011). Under this rule, evidence of "other crimes, wrongs, or acts" is *not* admissible to demonstrate a defendant's propensity or proclivity to engage

---

[7] Moreover, the admission of pre-conspiracy statements as direct evidence would further prolong and complicate the trial by requiring the presentation of evidence and argument regarding, among other things, the context in which those statements were made, their truth or falsity, and their materiality. This collateral litigation would be complicated by the passage of time since such statements were allegedly made, which is before 2020 based on the government's current disclosures.

in such conduct. As the Second Circuit explained in *United States v. Smith*, 283 F.2d 760, 763 (2d Cir. 1960):

> Such evidence is indeed not irrelevant; it is the kind of proof that in ordinary affairs we constantly use; we reason that, if a man has been guilty of unlawful or immoral conduct on other occasions, especially those that concern the same subject matter, there is an initial probability that he was guilty of the specific charge at bar. It is inadmissible, however, because it unduly confuses the decision of the issue on which the case must finally turn, and makes it likely that the jury may substitute the general moral obliquity of the accused.

*See also Wigmore on Evidence*, Section 58.2 (Tillers rev. 1983) (noting concern about "the overstrong tendency to believe the accused guilty of the charge merely because he is a likely person to do such acts").

Under Rule 404(b), evidence of "other acts" may be admissible for purposes *other than* propensity, such as to "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The government bears the burden of demonstrating admissibility under Rule 404(b). *United States v. Nachamie*, 101 F. Supp. 2d 134, 137 (S.D.N.Y. 2000). It must show that: (1) the evidence is offered for a proper purpose, (2) the evidence is relevant under Rules 401 and 402, and (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice under Rule 403. *Huddleston v. United States*, 485 U.S. 681, 691 (1988); *United States v. Colon*, 880 F.2d 650, 656 (2d Cir. 1989). Additionally, where the "other act" evidence is being offered to prove a defendant's intent or knowledge, there is a "requirement that the past act and the charged conduct be similar." *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996) (explaining that "the similarity requirement is simply a rule of relevance.").

The Second Circuit takes an inclusionary approach which admits other act evidence "that does not serve the sole purpose of showing the defendant's bad character and that is neither

overly prejudicial under Rule 403 nor irrelevant under Rule 402." *Curley*, 639 F.3d at 56. However, this approach "does not invite the government to offer, carte blanche, any prior act of the defendant in the same category of crime." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (cleaned up). Thus, even if a court finds that evidence is offered for a permissible purpose under Rule 404(b), "this does not end the inquiry . . . . [T]he court must also determine whether the proffered evidence is relevant to that proper purpose under Federal Rules of Evidence 401 and 402, and if so, whether that probative value is substantially outweighed by any risk of unfair prejudice under Federal Rule of Evidence 403." *Martoma*, 2014 WL 31191, at *4; *see also United States v. Williams*, 596 F.2d 44, 51 (2d Cir. 1979) (court must carefully scrutinize the basis for the claimed relevance and the balance between probative value and prejudicial effect, the key to a fair trial being the "careful determination by the trial judge of both issues, particularly the latter.").

   The Second Circuit has recognized that even a limiting instruction may be ineffective in preventing jurors from drawing an impermissible propensity inference based on the introduction of prior conduct. In *United States v. DeCicco*, 435 F.2d 478 (2d. Cir 1970), the defendants had been convicted of conspiring to transport artworks in interstate commerce that they knew had been stolen, and evidence of prior art thefts and sales was admitted at trial with a limiting instruction that the evidence "could be considered only on the question of whether the defendants had knowledge and intent … [and] acted willfully and with specific intent, and not because of a mistake or accident or other innocent purpose." *Id*. at 482 and n.4 (cleaned up).  On appeal the Second Circuit reversed the conviction, finding that the prejudice engendered by admission of the prior art thefts so far outweighed their legitimate probative value that it was an abuse of discretion to allow the evidence, notwithstanding the limiting instruction. *Id*. at 484 ("whatever probative value the prior crimes of [the defendants] added to the prosecution's case on

the issue of defendants' intent to commit the conspiracy here claimed was far outweighed by the unwarranted inference the jury was permitted to draw that the defendants … were a continuing band of art treasure thieves and 'fencers'").[8]

   In weighing the probative value against the unfair prejudice of evidence proffered under Rule 404(b), the Second Circuit has repeatedly stated that it is preferable to withhold such evidence until the end of the defendant's case. *See, e.g., United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978) ("[W]e have emphasized that admission of such strongly prejudicial evidence should normally await the conclusion of the defendant's case, since the court will then be in the best position to balance the probative worth of, and the Government's need for, such testimony against the prejudice to the defendant."); *United States v. Leonard*, 524 F.2d 1076, 1092 (2d Cir. 1975) ("It would doubtless have been wiser for the judge to have excluded the evidence or, at the least, to have excluded it until after the presentation of the defendant's case when there would have been a better opportunity to appraise the prosecution's need for it"); *see also McCallum*, 584 F.3d

---

[8] Jurors can draw improper propensity inferences based on both similar and dissimilar prior conduct. For example, in *United States v. Mundle*, 15-CR-315 (NSR), 2016 WL 1071035 (S.D.N.Y. Mar. 17, 2016), the defendant was charged with transmitting a threat in interstate commerce in connection with a telephone call during which he threatened to kill his mother and his sister. To prove the defendant's knowledge, intent, and absence of mistake under Rule 404(b), the government sought to introduce two prior instances in which the defendant had also threatened to kill his mother and his sister, and had physically attacked his sister. *Id.* at *3. Given the broad similarities between the prior conduct and the charged conduct (and notwithstanding some dissimilarities as well), the court excluded the evidence under Rule 403, stating that it "is gravely concerned that the introduction of evidence concerning the [earlier incidents] would unduly persuade the jury to conclude that the Defendant has a propensity to threaten [his sister], and allowing [the sister] to testify that he threatened her on other occasions would improperly influence the jury to conclude that the Defendant must have threatened her in regards to the charged conduct. The Court will not permit the introduction of such propensity evidence. While the Government contends the purpose of the other acts evidence is to demonstrate the Defendant's knowledge, intent, and absence of mistake, the practical effect of admitting such evidence will prompt the jury to generalize the Defendant's earlier bad act into bad character and take that as raising the odds that he did the later bad act now charged." *Id.* at *5 (cleaned up).

at 477 (reviewing the other evidence available to the government to prove the matter at issue and stating, "[W]e are at a loss to understand how the court or the government could believe that the prior convictions were necessary to prove McCallum's intent and knowledge and that they passed muster under Rule 403.").

Finally, unfair prejudice is not the only reason to exclude "other acts" evidence under Rule 403. The rule itself provides that relevant evidence may also be excluded where it would confuse the issues, mislead the jury or create undue delay. *See, e.g.*, *United States v. DiCarlo,* 131 F. Supp. 2d 537, 539 (S.D.N.Y. 2001) (precluding introduction of Rule 404(b) material where "the introduction of proof of such broad, vague, and ephemeral matters in this already complex but reasonably focused case would so hopelessly confuse the jury as to substantially outweigh, both in terms of unfair prejudice and of confusion, any possible probative value").

### 1.3.2   The Government Has Failed To Meet Its Burden of Showing Any Proper Purpose for the Admission of Evidence of Pre-Conspiracy Misrepresentations, and Such Evidence Would Unfairly Prejudice Mr. Halligan and Confuse the Issues

As discussed above, "other acts" evidence may only be admitted for a proper purpose. *Curley*, 639 F.3d at 57. To carry its burden of establishing the admissibility of 404(b) evidence, "the government must explain the uncharged transactions, identify similarities between the charged and uncharged transactions, and articulate how the similarities identified support" a purpose other than proving character. *Stein*, 521 F. Supp. 2d at 270; *McCallum*, 584 F.3d at 477 (holding that trial court abused discretion in admitting evidence of defendant's prior convictions, which were no more than "propensity evidence in sheep's clothing"); *Martoma*, 2014 WL 31191, at *5 (excluding evidence that defendant had received confidential information from doctors on another occasion because it impermissibly suggested that defendant had a propensity to obtain

such information from doctors); *United States v. Gardell*, No. S400 CR. 632 (WHP), 2001 WL 1135948, at *7 (S.D.N.Y. Sept. 25, 2001) (excluding evidence of defendant's uncharged misstatements that "unduly tends to suggest that [defendant] has a propensity to commit unlawful or deceitful acts").

        The government made no effort to meet its burden here. Absent the requisite showing, this Court can only assume that the evidence to which the government vaguely refers would support an inference that because Mr. Halligan supposedly made misrepresentations to Archegos's counterparties before the charged conspiracy, he is more likely to have made, or participated in making, the misrepresentations charged in the Indictment. Yet that is ***exactly*** the sort of inference Rule 404(b) forbids.

        The risk that jurors will draw this impermissible inference is in no way lessened by the fact that prior misrepresentations (whatever they are) fail the *Carboni* test for admission as direct evidence. If the jury is allowed to hear evidence that uncharged misrepresentations were made to banks, neither distinctions between that conduct and the charged conduct—such as, if the statements were made to different banks (e.g., Wells Fargo), at different times, for different alleged reasons, in different contexts, and by different people—nor a limiting instruction will prevent the forbidden propensity inference and resulting prejudice to Mr. Halligan.

        Without any showing that pre-conspiracy misrepresentations have a purpose other than to demonstrate propensity, such misrepresentations would be unfairly prejudicial to Mr. Halligan and would also create jury confusion. Accordingly, the government should be precluded under both Rule 404(b) and Rule 403 from offering evidence that Mr. Halligan made misrepresentations to Archegos's counterparties prior to the commencement of the charged conspiracy.

**2.**

**THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING TESTIMONY FROM COUNTERPARTY WITNESSES THAT MISREPRESENTATIONS WERE "MATERIAL"**

Mr. Halligan moves to preclude the government from eliciting testimony from counterparty witnesses that any alleged misrepresentation was "material" to the counterparties. Under the statutes charged in the Indictment, "material" has a specific legal meaning that the Court will describe in its final instructions to the jury. Use of this conclusory legal term by the government's witnesses would constitute impermissible lay opinion testimony under Rule 701 and would usurp the jury's function. Moreover, such testimony would be inadmissible under Rule 403.

Mr. Halligan is charged in Count Ten with securities fraud based on allegations that he made or participated in making false and misleading statements to Archegos's counterparties, which in turn enabled and facilitated the alleged market manipulation scheme. While Section 10(b) and Rule 10b-5 proscribe the use of deception "in connection with the purchase or sale of any security," that language prohibits only those misrepresentations that are material. *See* 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5. The Second Circuit has made clear that materiality is an essential element of this offense, and the government concedes as much in its Requests to Charge. *See, e.g*., *United States v. Litvak,* 889 F.3d 56, 64 (2d Cir. 2018) (holding that materiality is an element of securities fraud under Section 10(b)); ECF No. 127 at 12-13 (government's request to charge).[9] Thus, the jury will be called upon to determine the ultimate question of whether the facts elicited by the government establish the element of materiality beyond a reasonable doubt, and it will be guided by the Court's instructions regarding the legal definition of that term.

---

[9] Materiality is a required element of all three counts against Mr. Halligan. *Litvak*, 889 F.3d at 64 (securities fraud); *Neder v. United States*, 527 U.S.1, 25 (1999) (wire fraud); *United States v. Hatfield,* 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010) (fraud in the sale of securities under 18 U.S.C. § 1348(2)).

The 3500 material produced by the government suggests that instead of merely eliciting *facts* that bear upon the legal conclusion of materiality, the government may seek to elicit from its witnesses the legal conclusion itself. *E.g.* Mulligan Decl. Ex. E, 3584-001 at 4 (Nomura's Shuyi Xu told the government that if she had known that "Archegos's positions were greater than 30% of NAV . . . [i]t would have had a material impact.").

However, a lay witness may not "present testimony in the form of legal conclusions." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010). Such testimony would be improper under Rule 701(b), which renders lay opinion testimony inadmissible if it is not "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue," and which prevents the admission of testimony "which would merely tell the jury what result to reach." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (cleaned up). Where "attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by Rule 701." *Id.* at 1215-16 (cleaned up). This is particularly so where the lay testimony would consist of legal conclusions, or would employ legal terminology that lay witnesses could interpret in ways that differ from the Court's legal instructions. *See United States v. Barnwell*, No. 15 CR. 620 (NSR), 2017 WL 1063457, at *5 (S.D.N.Y. Mar. 20, 2017) (in prosecution for filing fraudulent tax returns, granting defense motion to exclude documentary evidence or lay testimony that defendant's tax returns were "frivolous" or constituted a "scheme" because "statements embodying legal conclusions exceed the permissible scope of opinion testimony") (cleaned up); *United States v. Bradley*, No. 3:21-CR-00087 (VAB), 2022 WL 1708400, at *3–4 (D. Conn. May 27, 2022) (precluding lay witness testimony that "implicitly communicates a legal standard to the jury").

Consistent with Rule 602, which requires witnesses to testify on the basis of personal knowledge, the counterparty witnesses can testify about their own knowledge and experience – for example, about the kind of information that is sought from clients, and how, if at all, it is considered by bank employees when making a decision to extend capacity or margin to a client – but not to "materiality." Once they testify to the *facts*, rather than a conclusory opinion, the jury will be in as good a position as the witnesses to determine the issue of materiality. *Rea*, 958 F.2d at 1216.

Even where lay opinion evidence is arguably helpful to a jury, a court may exclude such testimony where "helpfulness is substantially outweighed by the danger of unfair prejudice." *Id.* at 1216.  If witnesses are permitted to offer not only *factual* testimony but *opinion* testimony on an ultimate issue, there is a grave risk that such testimony will impermissibly "direct the jury what to conclude on a matter that it should decide in the first instance." *United States v. Garcia*, 291 F.3d 127, 142 (2d Cir. 2002). It will also cause the jury to "place undue weight on that evidence, to the neglect of their duty to evaluate the trial evidence for themselves." *United States v. Awadallah*, 436 F.3d 125, 133-34 (2d Cir. 2006) (testimony of grand juror regarding defendant's demeanor during grand jury testimony was properly excluded under Rule 403 because it "indisputably has potential to be highly prejudicial" and "it could be interpreted as a grand juror giving the petit jurors advice on how to determine the central issue of the case").

Permitting the counterparty witnesses in this trial to testify about the "materiality" of false or misleading statements would create the extreme and unavoidable risk that jurors would automatically conclude that this essential element had been proven. Moreover, the jurors could make that determination on the basis of the government's witnesses' idiosyncratic definitions of "materiality," rather than the Court's instructions regarding the meaning of that term. For that

reason, any probative value that could conceivably be ascribed to such testimony would be far outweighed by unfair prejudice, and Rule 403 requires its exclusion.

### 3.
### THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING IMPROPER SPECULATIVE AND CONCLUSORY EVIDENCE OF MR. HALLIGAN'S STATE OF MIND

The Court should preclude the government from arguing that Mr. Halligan had the requisite scienter, or would have or should have known one thing or another, merely because he was the CFO of Archegos. Indeed, in his opinion dismissing the 10b-5 claim that the SEC brought against Mr. Halligan in a parallel civil action, Judge Oetken held that the SEC had failed to sufficiently allege Mr. Halligan's scienter, explaining that the "conclusory argument that conscious misbehavior or recklessness can be inferred from Halligan's position as CFO does not withstand scrutiny." *SEC v. Hwang*, 2023 WL 6124041, at *7.

Courts in this circuit and elsewhere routinely recognize that even at the pleading stage, allegations that a defendant knew or should have known of misconduct based on executive positions are insufficient to plead scienter. *In re Sotheby's Holdings, Inc.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *City of Brockton Ret. Sys. v. Avon Prods. Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) (courts in the Second Circuit "have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight"); *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) ("[I]t is well-established that a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation."); *In re Aegon N.V. Sec. Litig.*, No. 03-cv-0603 (RWS), 2004 WL 1415973, *17 (S.D.N.Y. June 23, 2004) (dismissing securities fraud complaint based on allegations that "[d]efendants had access to adverse undisclosed information because of their senior positions with the company"); *In re*

*Interpublic Sec. Litig.*, No. 02-cv-6527 (DLC), 2003 WL 21250682, at \*13-14 (S.D.N.Y. May 29, 2003) (allegation that defendants' roles "gave them an *intimate knowledge* of corporate affairs, and imposed on each of them the duty to be familiar with IPG's finances" is insufficient to allege defendants' scienter in securities fraud case) (emphasis added); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 399 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ("Mere allegations that a defendant 'should have known' of fraud because of his supervisory role within a company or because his subordinates were aware of it, are insufficient.").

What would be insufficient at the pleading stage would be doubly improper argument before the jury. Accordingly, the government should be precluded from arguing Mr. Halligan's state of mind based on his title as Archegos's CFO.

**4.**
**THE GOVERNMENT SHOULD BE PRECLUDED**
**FROM INTRODUCING EVIDENCE OF MISSTATEMENTS**
**THAT IT OMITTED FROM NOTICES TO THE DEFENSE**

The government's time to disclose alleged misrepresentations has long passed, and it should be precluded from introducing evidence of any alleged misrepresentation that it omitted from the Indictment and the August 2022 disclosure that it served in response to the Court's directive to identify all of the misrepresentations the government intends to prove at trial. Mr. Halligan reserves the right to supplement and renew this application if the government comes forward with new allegations of previously undisclosed misrepresentations.

Based on our review of the 3500 material, we move specifically to exclude the government from seeking to introduce evidence and/or argue that Mr. Halligan allegedly created a false record relating to Archegos's gross exposures. A glancing reference to such a record appears in notes of Mr. Becker's meetings with the government, but it has never been identified to the defense by the government. Notes of Mr. Becker's proffer on August 3, 2021 state:

> In early 2020, ACM had a large short position in TESLA that had
> not performed well, and by February 2020, the firm was down
> roughly 70% year-to-date, largely as a result of the TESLA position.
> ACM's gross exposure and leverage had grown extremely high
> because of this poor performance, and between February and April
> 2020, ACM's prime brokers were calling more frequently for
> updates.
>
> BECKER asked HALLIGAN what he should tell the banks about
> ACM's gross exposure. In response, HALLIGAN created a monthly
> report that calculated ACM's year-to-date average gross exposure, a
> number that significantly understated the firm's true gross exposure
> at the time. HALLIGAN told BECKER to provide that misleading
> figure to the banks in response to their questions.

Mulligan Decl. Ex. F, 3501-001 at 4; *see also* Mulligan Decl. Ex. G, 3501-002 at 9 ("[Mr.

Halligan] made monthly report – w/year to date avg. gross exp. His was lower than the real # [.]

[Mr. Halligan] told me to use this # w/banks").

      The government should be precluded from introducing evidence or argument about

any such "gross exposure" report because it has *never* provided notice to the defense of its intent to

do so – not in response to this Court's June 1, 2022 directive to the government to identify each

and all alleged misrepresentations (ECF No. 29 at 16-17); nor in the government's August 18, 2022

letter following that directive (ECF No. 38); nor in its 404(b) notice; nor by any other means. Even

the references to the gross exposure chart in the 3500 material, cited above, remain vague and

cryptic – there is no indication of who allegedly received the report; what it looked like; when,

how, or where it was created; or when, how, or where it was used. The Court should reject the

government's attempt to sandbag the defense with additional, previously unidentified

misrepresentations. *See, e.g., DiCarlo,* 131 F. Supp. 2d at 539 (precluding introduction of 404(b)

material due to inadequacy of notice).

**5.**

**THE GOVERNMENT SHOULD BE PRECLUDED FROM ASSERTING WITHOUT ANY GOOD FAITH BASIS IN ADMISSIBLE EVIDENCE THAT MR. HALLIGAN SIGNED MUFG TRADE CONFIRMATIONS WITH KNOWLEDGE THEY CONTAINED A FALSE STATEMENT**

Based on our review of the government exhibit list and the 3500 material produced to date, it appears that the government may seek to distract the jury with arguments based on speculation or inadmissible evidence unrelated to relevant issues. As set forth below, the Court should exercise its duty to "conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means," Fed. R. Evid. 103(d), and preclude the government from making such arguments. *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 548-49 (E.D.N.Y. 2011) (granting defendant's motion *in limine* to preclude plaintiff from arguing that his prior arrest was "unlawful" where argument lacked basis in admissible evidence); *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (where no factual predicate existed in the record to support an argument, it was appropriate for court to preclude counsel from making that argument).

The government's case against Mr. Halligan is premised largely – indeed, almost exclusively – on the theory that he was involved in making material false statements to Archegos's counterparties. Its proof will show, however, that the false statements made to those counterparties were made *not* by Mr. Halligan, but instead by the government's two cooperating witnesses, Messrs. Becker and Tomita. In its apparent zeal to link Mr. Halligan directly to the making of some false statement, the government has crafted language by which it strongly *implies*, but does not actually charge, that Mr. Halligan knowingly signed false MUFG trade confirmations. In fact, as revealed by the Rule 16 and 3500 materials produced to date, the government has *no* evidence upon which to claim that Mr. Halligan knowingly signed any false trade confirmations. To the contrary, the government knew before it sought the original Indictment in this case, and it knew when it obtained the Superseding Indictment, that the only rational inference to be drawn from its

own witness statements was that *nobody noticed* the false statement buried in those trade confirmations. The government should therefore be precluded from implying what it knows full well it cannot prove: that Mr. Halligan's signature on the trade confirmations reflects his knowing participation in the charged offenses.

**5.1     The Government Appears to Have No Evidence That Mr. Halligan
        Was Aware of the False Statement Buried in MUFG's Trade Confirmations**

        The government alleges in the Superseding Indictment, as it did in the original Indictment, that "certain Counterparties required Archegos to certify that its exposure to individual positions was below particular thresholds[,]" and that Mr. Halligan "falsely signed these certifications knowing that, in fact, Archegos's positions exceeded the warranted thresholds." Ind. at ¶ 59. The Indictment goes on to allege, more specifically, that "on multiple occasions," Mr. Halligan "signed swap transaction confirmations with MUFG, representing that Archegos's stock and derivative positions together represented less than 5% of the outstanding shares of the issuer's stock." *Id*. at ¶ 59(b). This language clearly implies that Mr. Halligan *knowingly signed false swap transaction confirmations;* however, it does not actually make that specific claim, alleging instead that Mr. Halligan knew Archegos's positions exceeded the 5% threshold. While in other circumstances this odd formulation might be viewed as trivial, here it serves to disguise a serious proof problem facing the government; none of the government's witnesses has provided *any* basis for an inference of Mr. Halligan's awareness that the 5% threshold in these trade confirmations covered both shares and derivative positions.

        A copy of an MUFG trade confirmation is attached as Exhibit H to the Mulligan Declaration (GX-1903). The language upon which the government premises this allegation – that the 5% threshold refers to shares of an issuer beneficially owned "combined with the notional

amount of Shares underlying any long derivative position" – appears in boilerplate on page 10 of this 12-page document.

Review of the government's Rule 16 material reveals that, except for MUFG's trade confirmations, none of the confirmations Archegos used to trade with its numerous counterparties contained a threshold that covered *both* shares and derivatives. In this regard, MUFG's trade confirmations were unusual. The Rule 16 material also demonstrates that Archegos's Operations team had responsibility for reviewing trade documents before forwarding them to Mr. Halligan for electronic signature. Some of the MUFG trade confirmations were reviewed and forwarded to Mr. Halligan by Scott Becker, who supervised the Operations team, while others were reviewed and forwarded to Mr. Halligan by an employee Mr. Becker supervised, Jesse Martz.

In a proffer on December 20, 2021, four months before the government obtained the initial Indictment, Mr. Becker informed prosecutors that he was not aware of the specific language used by MUFG in its trade confirmations. Mulligan Decl. Ex. I, 3501-021 at 6-7. The significance of this concession did not escape the prosecutors' notice, as evidenced by their inclusion of his statement in the "Brady letter" they sent to defense counsel on October 19, 2022.

In another proffer on April 15, 2022, ten days before obtaining the original Indictment, the government again asked Mr. Becker about the MUFG trade confirmations. Nothing he told them on that date suggested Mr. Halligan's awareness of the false statement in the confirmations. He informed prosecutors that he had no discussions with Archegos's outside counsel concerning the confirmations, presumably implying that he had no basis to notice the false statement. Mulligan Decl. Ex. J, 3501-050 at 6.  He also explained that after the Operations team reviewed the confirmations, the team used the automated DocuSign system to obtain Mr. Halligan's signature:

> MUFG sent an automated email to the operations team and then someone from team reviewed the documents. . . . Starting in or about March 2020, the operations team started using DocuSign for HALLIGAN to sign them instead of mailing the physical document to HALLIGAN'S house to sign . . . . HALLIGAN would go into DocuSign to give his signature and then the document could be downloaded through DocuSign. The brokers accepted the document signed in this fashion.

*Id.* at 3501-050 at 5.

Jesse Martz, the other member of the Operations team who reviewed MUFG trade confirmations before forwarding them to Mr. Halligan for signature, was also interviewed by prosecutors. In a proffer on April 12, 2022, almost two weeks before the government obtained the initial Indictment, Mr. Martz was asked about these documents. He explained that when reviewing the confirmations, his assigned task – as per his supervisor, Mr. Becker – was merely to verify the information specific to the individual trades:

> Swap confirms for brokers were typically automatic, but MUFG did not have an automatic system set up to trade swap. Because of this, MARTZ had to confirm each trade that had to be done. BECKER walked MARTZ through the process of how to confirm a trade order, price, and trade date, which was done through order manager through Axio. MARTZ then sent this information to HALLIGAN to electronically sign before sending it to MUFG.

> * * *

> When ARCHEGOS traded with MUFG, MUFG sent the swap confirms and then Martz would open them to make sure the trade dates and settlement dates matched as well as to confirm the name traded, number of shares, price, and notional amount, which was found in the Axio system. Once Martz made the checks, he would email it to HALLIGAN and HALLIGAN would respond back "signed." MARTZ would then send it to MUFG. MARTZ did not recall conversations with HALLIGAN about the confirm process. MARTZ did not play a role in Archegos's relationship with MUFG. MARTZ was not responsible for negotiating contracts and ISDAs.

Mulligan Decl. Ex. K, 3542-003 at 5-6.  Mr. Martz was so clear in explaining the very limited

parameters of his document review that the government apparently did not bother to inquire

whether he had ever noticed the boilerplate language setting a 5% threshold on shares combined

with derivative positions. Although Mr. Martz's statements plainly undermined the government's

theory with respect to the MUFG trade confirmations, the government did *not* include his

statements in its "Brady letter" of October 19, 2022.

   Based on all the materials produced to the defense to date, the government

apparently lacks a scintilla of evidence that Mr. Halligan was aware of the false statement in the

trade confirmations he signed. Accordingly, insofar as ¶ 59 of the Indictment purports to charge

him with signing the confirmations *with knowledge of their falsity*, it lacks any good faith basis and

is instead based on sheer speculation.

## 5.2 The Government Should Be Precluded From Arguing That Mr. Halligan Signed False Trade Confirmations With Knowledge of Their Falsity

   The fact that neither of the two government witnesses whose job responsibilities

specifically included reviewing the MUFG trade confirmations realized that those confirmations

contained a false statement buried in the boilerplate gives rise to three obvious questions:

   (1) Why did the government choose to include this allegation against Mr. Halligan

in both the original Indictment and the Superseding Indictment?

   (2) If this allegation is indeed intended to accuse Mr. Halligan of signing false

MUFG trade confirmations *with knowledge of their falsity*, what evidence could prosecutors

possibly have presented to the grand jury on the issue of his knowledge?

   (3) If this allegation is *not* intended to accuse Mr. Halligan of signing false MUFG

trade confirmations *with knowledge of their falsity*, what conceivable relevance or probative value

could the signed confirmations have, and what purpose could they serve other than to unfairly prejudice Mr. Halligan at trial?

Of course, the jury cannot convict Mr. Halligan of making a false statement based on sheer speculation that he had knowledge of the false statement contained in the MUFG trade confirmations. And as the Court stated in its March 23, 2023 Opinion and Order denying the defense motion to strike prejudicial allegations from the Indictment, the jury will not be given a copy of the Indictment itself. ECF No. 66, at 3. Nonetheless, this specific allegation carries extreme risk of unfair prejudice, not only because the government will apparently be unable to back up its claim with admissible evidence, but also because it is the *only* allegation charging that Mr. Halligan *personally* made a false statement to one of Archegos's counterparties. Under the circumstances, the only way to protect Mr. Halligan's right to a fair trial is for the Court to preclude the government, under Fed. R. Evid. 402 and 403, from offering the MUFG trade confirmations in evidence, and to further preclude the government from eliciting that Mr. Halligan signed them, and that they contain a false statement.

**6.**
**THE GOVERNMENT SHOULD BE PRECLUDED**
**FROM OFFERING EVIDENCE OR ARGUMENT ABOUT**
**THE TIMING OF MR. HALLIGAN'S DELIVERY TO COUNTERPARTIES**
**OF ACCURATE MONTHLY FINANCIAL DISCLOSURES**

The government's case against Mr. Halligan rests almost entirely on the theory that he had a role in misrepresentations that other former colleagues – principally Messrs. Becker and Tomita – made to Archegos's counterparties. The government seeks to hold Mr. Halligan accountable for these alleged misrepresentations under the racketeering, securities, and wire fraud statutes. To meet its burden under those statutes, the government must prove, among other things,

that Mr. Halligan engaged in deceptive conduct and made materially false statements to the counterparties.[10]

Mr. Halligan moves to preclude the government from introducing evidence or making arguments about uncharged conduct that involves, at most, the timing of the delivery of *accurate* information. Because even the delayed delivery of accurate information would not be deceptive or misleading—nor constitute fraud—evidence and argument about any such alleged conduct would mislead and confuse the jury.

This motion is prompted by the government's statement in the 404(b) notice that it intends to introduce evidence purporting to prove that "Halligan at times would purposefully withhold information from counterparties regarding Archegos's monthly performance and assets under management." Mulligan Decl. Ex. A, at 6.[11] It is unclear to the defense what evidence the government might believe bears upon this contention, as the government has declined to provide meaningful detail in both the 404(b) notice and subsequent correspondence. In response to our request for such detail, the government identified twelve pages of notes from its interviews with a cooperating witness and one (and only one) exhibit from its exhibit list "as a courtesy," but that document – GX-119 – does not relate to the delivery of monthly financial information at all. *See* Mulligan Decl. Ex. C3. Instead, GX-119 relates to the delivery of Archegos's annual financial statements, which are not alleged to have been inaccurate and do not appear to be the subject of the 404(b) notice, which refers to "monthly performance and assets under management."[12]

---

[10]  *See* above n. 9.

[11]  The government's 404(b) notice is unclear as to whether this description relates to conduct that allegedly occurred only before the charged conduct, or whether it also relates to conduct that allegedly occurred contemporaneously with the charged conduct. Regardless, Mr. Halligan moves to preclude *all* such evidence, whenever the alleged conduct supposedly occurred.

[12]  To the extent the government intended for its 404(b) notice to disclose its intent to introduce evidence regarding the delivery of Archegos's annual financial statements, the notice failed to do

Based on that description, and notwithstanding the government's stonewalling, we surmise that its anticipated evidence may include an April 7, 2020 email exchange between Mr. Tomita and Mr. Halligan, which the defense identified among the government's many thousands of anticipated exhibits. *Id.* Ex. L (GX-204). This email concerns, among other topics, the timing of Mr. Halligan's delivery to Archegos's counterparties of the family office's monthly and year-to-date performance, and its assets under management (AUM). This is information that the counterparties negotiated to receive each month. *Id.* Ex. M, at 6 (excerpt of GX-311, Goldman Sachs ISDA). To be sure, this document does not even hint that the monthly financial information that Mr. Tomita and Mr. Halligan discussed was in any way false, misleading, or inaccurate—they discuss only the timing of its delivery. Nor does the Indictment allege that Archegos or any of its employees—and certainly not Mr. Halligan—*ever* provided false, inaccurate, or misleading monthly performance or AUM information to its counterparties.

Evidence regarding the timing of Archegos's monthly delivery of financial information should be precluded because the timing of accurate disclosures has nothing to do with deceptive conduct or misrepresentations, which is what the government's case against Mr. Halligan is all about. Evidence about the timing of the monthly disclosures thus cannot constitute direct evidence of the crimes charged, nor can it satisfy the relevance test for admissibility under Rule 404(b). Moreover, because the admission of such evidence risks confusing the jury and would be unfairly prejudicial to Mr. Halligan, its exclusion is warranted under Rule 403.

---

so. *See* Mulligan Decl. Ex. A. The government should not be allowed to interject new issues into the case at this late stage, having failed to give proper notice. Beyond that, any allegations regarding the timing of the delivery of Archegos's annual financial information would suffer from all of the same defects discussed in this motion with respect to the timing of the delivery of the monthly financial information.

**6.1     Evidence about the Timing of Monthly Financial Disclosures
        Is Inadmissible as Direct Evidence Against Mr. Halligan**

As set forth above at Point 1.2.1, uncharged conduct may be admitted as direct

evidence only "if (1) it arose out of the same transaction or series of transactions as the charged

offense, (2) if it is inextricably intertwined with the evidence regarding the charged offense, or (3)

if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (cleaned up).

Evidence about the timing of Archegos's monthly disclosures flunks all prongs of

this standard. This case is about the alleged making of "materially false and misleading statements

about Archegos's portfolio of securities" to Archegos's counterparties. Ind. ¶ 2. Whether monthly

information was provided early, late, or right on time has no bearing at all on whether the

defendants intended to deceive the counterparties. Put simply, the timing of the delivery cannot be

deceptive because the counterparties know exactly when they receive the financial information—

and, for that matter, when they have not yet received it.

At most, to the extent that the counterparties had a contractual entitlement to

receive Archegos's monthly AUM and performance information on a specified date, a material

delay in providing this data might, depending on the circumstances, give rise to a garden variety

breach of contract dispute, but certainly not a claim of civil—far less criminal—fraud. *See United

States v. D'Amato,* 39 F.3d 1249, 1261, n.8 (2d Cir. 1994) (vacating mail fraud conviction noting

that "[f]ailure to comply with a contractual obligation is only fraudulent when the promisor *never

intended* to honor the contract. . . To infer fraudulent intent from mere nonperformance, therefore,

would eviscerate the distinction between a breach of contract and fraud.") (emphasis added); *Mills

v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (refusing to infer fraudulent intent

from fact that defendant made contracts to register shares and never performed any of them

because "[a] contract may be breached for legitimate business reasons. Contractual breach, in and of itself, does not bespeak fraud[.]") (cleaned up).

Nor is the timing of Archegos's provision of accurate monthly financial information "inextricably intertwined" with the charged conduct or necessary to "complete the story" of alleged market manipulation and misrepresentation that the government alleges in the Superseding Indictment. The jury will not be "confused [n]or [will] the government's theory of the case [be] unfairly curtailed" if the Court precludes this evidence. *Townsend*, 2007 WL 1288597, at *2; *see also Martoma*, 2014 WL 31191, at *3 (excluding evidence that doctors provided defendant with confidential information about certain drugs because such evidence was not necessary for jury to understand the government's theory that the defendant obtained material, nonpublic information from the doctors about a different drug which the defendant then traded on.). Indeed, the government chose to omit any reference to this evidence from the Indictment, the Superseding Indictment, and the August 2022 letter, and it should not be allowed to interject this new and different issue now.

## 6.2   Evidence about the Timing of Monthly Financial Disclosures Is Inadmissible Under Rule 404(b) Because It is Irrelevant

Evidence about the timing of Archegos's monthly disclosures is inadmissible under 404(b) because it is not relevant to the conduct charged in Superseding Indictment. "Other act" evidence offered to show knowledge or intent must be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge and intent inferences advocated by the proponent of the evidence." *Martoma,* 2014 WL 31191, at *4 (cleaned up); *see also United States v. Afjehei*, 869 F.2d 670, 674 (2d Cir. 1989) (vacating conviction where evidence of defendant's prior international travel was not sufficiently similar to charged conduct of traveling with heroin in suitcase); *Stein*, 521 F. Supp. 2d at 270, n. 11 (S.D.N.Y. 2007) (holding that in

prosecution for conspiracy to commit tax fraud and tax evasion revolving around four tax shelters, evidence of uncharged tax shelters was inadmissible under Rule 404(b) due to insufficient similarity, including that uncharged tax shelters relied on different sections of the IRS Code "and used different maneuvers to trigger the purported losses.").

The charges against Mr. Halligan concern alleged *misrepresentations* to Archegos's counterparties. The evidence at issue on this motion, in contrast, concerns, at most, the timing of the delivery of *accurate* information. These two types of conduct – false statements to counterparties and delivery of *accurate* information (regardless of its timing) – are not in any way similar. Because the conduct underlying the evidence at issue on this motion is manifestly *dissimilar* to the charged misconduct, it fails to satisfy the relevancy prong of the 404(b) analysis and is inadmissible for that reason alone. *See, e.g., United States v. Hatfield*, 685 F. Supp. 2d 320, 323 (E.D.N.Y. 2010) (evidence of defendants' prior alleged misstatements to NASDAQ inadmissible as direct or 404(b) evidence in prosecution for accounting and securities fraud where, *inter alia,* indictment made no mention of NASDAQ misstatements and alleged NASDAQ misstatements "did not concern any kind of financial or accounting fraud"); *Gardell*, 2001 WL 1135948, at *7 (S.D.N.Y. Sept. 25, 2001) (denying government's motion to admit under Rule 404(b) evidence that defendants regularly caused publicly traded REITs under their control to misstate their cash positions, because this evidence was "not sufficiently similar to the conduct charged, i.e., the failure to report material information to union pension fund investors in a preferred stock offering").[13]

---

[13]  Strangely, the government's 404(b) notice lumps (i) evidence about supposed delays in the delivery monthly financial information together with (ii) Mr. Becker's alleged false statements to counterparties regarding the concentration of Archegos's largest single position. Mulligan Decl. Ex. A, at 5-6. The government's decision to combine these dissimilar categories of evidence into a single bullet does not make them related or similar.

### 6.3    Evidence about the Timing of Monthly Financial Disclosures Should Be Excluded Under Rule 403

Evidence about the timing of monthly financial disclosures also warrants exclusion under Rule 403 because its probative value is substantially outweighed by the danger of confusion of the issues, misleading the jury, and unfair prejudice.

First, such evidence is likely to confuse the jury because while it relates to Mr. Halligan's communications with the counterparties, it does not concern false statements, misrepresentations or deceit, which are the gravamen of the government's case against him. *E.g., DiCarlo*, 131 F. Supp. 2d at 539.

As a consequence of this confusion, this evidence is also unfairly prejudicial to Mr. Halligan because the jury may mistakenly and improperly infer from it that Mr. Halligan has a propensity to deceive Archegos's counterparties, and/or that the timing of the delivery of *accurate* information might somehow bear upon a person's propensity to provide *inaccurate* information. Both such propensity inferences are squarely proscribed by Rule 404(b)(1). *Gardell*, 2001 WL 1135948, at *7 (evidence inadmissible as unfairly prejudicial under Rule 403 "because it unduly tends to suggest that [defendant] has a propensity to commit unlawful or deceitful acts and may influence the jury to decide this case on an improper basis"); *Hatfield*, 685 F. Supp. 2d at 324 (excluding evidence of misstatements to NASDAQ under Rule 403 because it suggested defendants' propensity to lie to investigative authorities).

### 7.
### THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE AND MAKING ARGUMENTS REGARDING TAX-RELATED "WASH SALE" OR "WASH TRADE" TRANSACTIONS

The term "wash sale" – which is sometimes called a "wash trade" – has two distinct meanings. In one context, the term describes a transaction involving the simultaneous purchase and sale of securities in a manner commonly understood to be manipulative. Alternatively, the term

describes an entirely lawful purchase and sale transaction that is ineligible for certain tax deductions. While such tax-related "wash sales" have no bearing upon the government's market manipulation allegations, the government appears to intend to introduce evidence about such transactions. This would needlessly confuse the issues and cause unfair prejudice to Mr. Halligan. Accordingly, the government should be precluded from offering any evidence or arguments about tax-related "wash sales" or "wash trades."

### 7.1    The Two Meanings of "Wash Sale" or "Wash Trade"

Under the Internal Revenue Code ("the Code") and related IRS regulations, a "wash sale" is an entirely lawful transaction in which an investor sells or disposes of a security at a loss and purchases "a substantially identical" security within 30 days of that sale, or acquires an option to do so. *See* 26 U.S.C. § 1091(setting forth the tax treatment of losses "from wash sales of stock or securities"); *see also* 26 C.F.R. § 1.1091–1; Internal Revenue Service 2023 Instructions for Schedule D at D-5 (www.irs.gov/pub/irs-prior/i1040sd--2023.pdf). These provisions set forth the appropriate tax treatment of such a transaction.

Distinct from this usage, the term "wash sale" or "wash trade" is used to refer to a transaction in which a simultaneous purchase and sale take place, typically by related entities without any change in beneficial ownership, and without incurring market risk or changing the entities' financial exposure. *See Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 115 (2d Cir. 1999) ("A wash trade is a transaction made without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position."). "Wash trades" of this sort are commonly viewed as deceptive or manipulative market conduct. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205, n. 25 (1976) ("'Wash' sales are transactions involving no change in beneficial ownership.").

Indeed, Archegos's compliance manual correctly notes that "wash sales" may be manipulative. See

Mulligan Decl. Ex. N (excerpt from GX-269).

**7.2    Special Measures Are Required To Enable The Defense to
Prepare for Trial and to Avoid Juror Confusion and Unfair Prejudice**

In this case, these two different usages of the terms "wash sale" and "wash trade"

make juror confusion all but certain unless the Court adopts protective measures. Approximately

100 documents on the government's exhibit list mention the term "wash sale," but there is no way

to determine whether, in the government's view, Archegos engaged in any *manipulative* "wash

sales" at all. Likewise, the government's disclosure of anticipated opinions from Prof. Amit Seru

states that "Professor Seru will explain well-known trading strategies that create or abuse market

inefficiencies, such as wash trading, cornering, and short squeezes." Mulligan Decl. Ex. O (Seru

Supp. Disc. At 2 ¶ 5). The disclosure, however, does not indicate that Prof. Seru will opine that any

particular trade in this case actually constituted a manipulative "wash trade."

Moreover, some jurors may be familiar with the term, and may wrongfully assume

that *any* mention of the term – including its mere presence in a document in a document offered for

a completely different purpose related to tax treatment of lawful transactions – suggests improper

manipulative conduct. For example, one email on the government's exhibit list reflects the

following exchange between William Tomita and Mr. Halligan:

> Tomita:    Hey Pat, FYI we're going to move half of the IQ position out tomorrow
> from DB. Jefferies and Nomura can take it at better rates but it has a small
> wash sale. DB has been getting restless and the muddy waters report didn't
> help, but we will get better margin away in any case…

> Halligan:    Got – the wash sale won't be relevant to worry about – it's been laundry day
> these days!

Mulligan Decl. Ex. P (GX-102). It is impossible to ascertain from the document itself whether the

government will contend this exchange refers to an improper manipulative transaction, whether the

government will concede it refers to a lawful transaction, or whether the government's purpose in offering this email is entirely unrelated to its use of the term "wash sale," and the government has given no consideration whatever to the confusion that will follow from its presentation to the jury here.

The 44-page Indictment in this case defines many terms and explains many types of transactions but makes no mention of "wash sales" or "wash trades." Nor does the 404(b) notice. And certainly neither the Indictment nor the 404(b) notice allege that Archegos claimed any tax deduction to which it was not entitled under the Code, or otherwise engaged in any improper tax-related conduct. Plainly, tax-related "wash sales" have no bearing at all to the issues being tried, and evidence regarding the application of the "wash sale" rule should be excluded as irrelevant. Moreover, the dual meanings of the term create an undue risk of juror confusion, and resulting unfair prejudice to Mr. Halligan.

Finally, if the Court declines to preclude the government from offering evidence regarding tax-related "wash sales," the government should be required to identify, in advance of trial, (i) which of its exhibits it contends relate to tax-related "wash sales" and (ii) which of its exhibits, *if any*, refer to allegedly manipulative conduct. Additionally, given the unavoidable risk of jury confusion and resulting prejudice to Mr. Halligan if this distinction is not clearly and consistently drawn, the Court should instruct the jury the first time the term "wash sale" or "wash trade" is used at trial, whether in testimony or in an exhibit received in evidence, that the term has two distinct meanings, one reflecting an entirely lawful transaction and the other reflecting improper manipulative conduct.

**8.**

**THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING
INCORRECT EVIDENCE AND ARGUMENT ABOUT
ARCHEGOS'S PURPORTED FILING AND DISCLOSURE OBLIGATIONS**

Mr. Halligan moves to preclude the government from offering evidence or argument that misstates and confuses the Archegos family office's filing and disclosure obligations. Such evidence and argument will confuse the issues, mislead the jury, prolong the trial, and are irrelevant.

For example, the government has listed Goldman Sachs employee Nastassia Locasto on its witness list, and has produced notes of her August 12, 2021 FBI interview:

> If ARCHEGOS had significant positions at other dealers and were already in the names that they were representing to be new names they were taking on with Goldman, this would have mattered and would have been very significant for LOCASTO and Goldman to know. There are Section 16 rules for considerations around disclosures in regards to ownership thresholds, so it would have been important for LOCASTO to know about ARCHEGOS's holdings for escalation purposes to raise to Goldman's legal team. There is a general guideline that at approximately 5% ownership of a company's stock, there has to be a representation that clients sign that they will fulfill their filing obligations. The rule is approximately 10% for U.S. issued companies.

Mulligan Decl. Ex. Q, 3538-002 at 9.

The government may seek to argue that Ms. Locasto's statement or others like it (whether in documents or testimony), if permitted and credited, might bear upon the materiality of certain alleged misstatements concerning the composition of Archegos's portfolio. That is, that alleged misstatements may be material if they prevented counterparties from determining whether Archegos had complied with supposed regulatory filing obligations.[14]

---

[14]  Mr. Halligan does not concede such an argument would be supported by the facts or the law.

4873-2223-4288.1

There is, however, a fundamental defect in Ms. Locasto's proffered explanation of

Archegos's filing obligations, and any argument that might follow from such an explanation: she is

simply wrong, and the filing obligation she describes does not apply to the Archegos family office.

As a family office under SEC rules, in contrast to a hedge fund or registered

investment advisor, Archegos was exempt from the filing obligations that Ms. Locasto described.

*See* 17 C.F.R. § 275.202(a)(11)(G)-1. Indeed, the Superseding Indictment concedes as much,

explaining that because Archegos

> did not hold itself out as an investment adviser, Archegos operated
> as a "family office" under the Family Office Rule of the SEC. **The
> SEC's Family Office Rule effectively exempts "family office"
> investment funds from regulatory oversight pursuant to the
> Investment Advisers Act of 1940** on the theory that a "family
> office" manages its own wealth and thus the investor protections of
> the Investment Advisers Act are unnecessary. **For Archegos, this
> exemption meant that, unlike typical hedge funds, it was not
> subject to examination or inspection by the SEC and was not
> required to report information regarding its holdings and
> borrowing to the SEC and the Financial Stability Oversight
> Council**.

Ind. ¶ 9 (emphases added).

Moreover, under then-existing SEC rules, Archegos's total return swaps were

generally not subject to the reporting requirements that apply to cash shares (particularly Section

13(d) of the Exchange Act), meaning that investors could acquire large positions through swaps

without any requirement that the positions be publicly disclosed. *CSX v. Children's Inv. Fund

Mgmt. (UK) LLP*, 654 F.3d 276, 305-307 (2d Cir. 2011) (Winter, J., concurring).  The Indictment

does not allege that Archegos's accumulation of large unreported swap positions violated any then-

existing rules or regulations. Nor do the government's expert disclosures indicate that any of its four expert witnesses intend to opine on any violation of regulatory reporting rules.[15]

To permit the government to introduce evidence suggesting that the Archegos family office was subject to disclosure or filing obligations as to which it was plainly exempt will confuse and mislead the jury, and unfairly prejudice Mr. Halligan. Such testimony – including testimony from Ms. Locasto, other witnesses, and documents bearing upon this subject – should be precluded under Rule 403. *Litvak*, 889 F.3d at 69 (vacating conviction for securities fraud where witness from one of defendant's counterparties gave factually incorrect testimony stating that defendant acted as his agent, when in reality, defendant transacted at all times as a principal, because "testimony about the supposed agency relationship had a high probability of confusing the jury by asking it to consider as relevant the perception of a counterparty representative that was entirely wrong[.]")

Moreover, the prejudice to Mr. Halligan would be compounded by any effort to bootstrap a mistaken view of Archegos's disclosure obligations (as, for example, reflected in Ms. Locasto's statement to the FBI) to an argument about the materiality of alleged misstatements.

---

[15] Nor could they. The SEC Chair has acknowledged that the Commission's rules fostered an "opaque" market, and has argued that more proactive rulemaking by the SEC might have "helped" prevent or avoid issues that arose during and after Archegos's March 2021 collapse. *See* Gary Gensler, "Speech: A 'New' New Era," (May 11, 2022), *available at* https://bit.ly/3HEeu2Y ("New Era"); *see also* Gary Gensler, "Speech: Prepared Remarks Before the American Bar Association Derivatives and Futures Law Committee Virtual Mid-Year Program," (July 21, 2021), *available at* https://bit.ly/3yzBzk7 (explaining that "[t]he limited transparency in [the security-based swap] market, combined with potential shortcomings in market participants' [i.e., Counterparties'] risk management, contributed to . . . system-wide tremors . . . . I believe additional public disclosure of that fund's position . . . may have helped."). Gensler also announced in May 2022 that the SEC was "embarking on yet another 'new era'" in swap regulation, *see* New Era *supra*, and commentators have referred to the Commission's recent rulemaking proposals as "The Archegos Rules." *See* Futures Industry Association, "The Archegos Rules: What the SEC's security-based swap proposals mean for your business," (March 3, 2022), *available at* https://bit.ly/3Cs2S10.

Such an argument would amplify the misunderstanding about these disclosure obligations and require yet further efforts by Mr. Halligan to unscramble the underlying confusion. *Id.* (holding that counterparty testimony could also potentially "mislead the jury based on the government's argument that a perceived relationship of trust showed materiality"). Given the government's concession in the Indictment as to Archegos's exemption from the reporting rules that govern traditional hedge funds and investment advisors, any effort to sow such confusion could only be tactical.

Finally, because evidence such as Ms. Locasto's statements about Archegos's disclosure obligations would be incorrect as a matter of law, it is irrelevant to any consideration of materiality under Rule 401 and inadmissible for that independent reason as well. *Id.* (holding that because no agency relationship exists between a broker-dealer and its counterparties as a matter of law, a counterparty witness's contrary testimony that such an agency relationship *did* in fact exist would be both erroneous and idiosyncratic, and therefore irrelevant to materiality under the objective, "reasonable investor" standard).

For these reasons, Mr. Halligan respectfully requests that the Court enter an order precluding the government from introducing evidence or arguments that rely on a misunderstanding of the Archegos family office's reporting and disclosure obligations.

## 9.
## THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING ANY EVIDENCE OF DISCUSSIONS ON OR AFTER MARCH 26, 2021 CONCERNING A POSSIBLE BANKRUPTCY FILING OR WIND-DOWN BY ARCHEGOS

The Court should preclude the government from introducing evidence of any discussions that took place at Archegos on or after March 26, 2021, concerning the possibility of a bankruptcy filing or wind-down of operations by or on behalf of the family office. Evidence of any such discussions, and any argument by the government that such discussions are relevant to

whether Archegos was solvent during the preceding week, would be improper and inadmissible under Fed. R. Evid. 401 and 403.

The question of Archegos's solvency during the week of its collapse is relevant in light of the government's allegation that Archegos employees made false and misleading statements about Archegos's condition during that week.[16] *See* Ind. ¶¶ 60-67. Mr. Halligan does not through this motion seek to exclude any statements regarding Archegos's financial condition that were made before March 26, 2021.[17]

However, whether Archegos personnel engaged in discussions about a potential bankruptcy filing or wind-down of operations *on or after* March 26 is irrelevant to Archegos's condition over the *preceding* week, and is therefore inadmissible because it is not probative of any material fact. *See* Fed. R. Evid. 401. *Cf. Shields v. Citytrust Bancorp. Inc*., 25 F.3d 1124, 1129–30 (2d Cir.1994) (in the pleading context, finding insufficient allegations of scienter and "reject[ing] the legitimacy of alleging fraud by hindsight," i.e., measuring defendants' statements at the time "against the backdrop of what actually transpired"); *City of Roseville Employees' Ret. Sys. v. Nokia Corp*., No. 10 CV 00967, 2011 WL 7158548, at *6 (S.D.N.Y. Sept. 6, 2011) (expressions of corporate optimism and a favorable view of a company's prospects "do not give rise to securities violations regardless of whether that optimism was, by hindsight, unwarranted"). Since the statements at issue were made on March 24 and 25, Ind. ¶¶ 64-66, the relevant question is what was known *at the time of those statements*. In contrast, even if, hypothetically, Archegos was evaluating a bankruptcy filing on or after Friday, March 26, that would not have any necessary

---

[16]  The week began on Monday, March 22, 2021; the government does not allege any false statements on or after Friday, March, 26, 2021. *See* Ind. ¶¶ 66-67.

[17]  Mr. Halligan reserves all rights to later seek additional or different relief as to these and all other matters.

bearing on what was known on March 24 or March 25,[18] because an entity's assets and obligations for the purposes of a bankruptcy filing are measured as of the petition date.

Moreover, while discussions about Archegos's financial condition on or after March 26 are not probative of Archegos's financial condition before that date, such evidence is highly misleading and prejudicial to Mr. Halligan and should be excluded under Rule 403. Evidence or argument concerning discussions about Archegos's solvency on or after March 26 will mislead the jury by inviting them to draw the impermissible inference that whatever Mr. Halligan knew about Archegos's financial condition *on or after* March 26, he must also have known *before* March 26. Such an inference would find no basis in fact, would be solely the result of juror confusion, and would unfairly prejudice Mr. Halligan.

Finally, any discussions of a potential bankruptcy or wind-down on or after March 26 are likely to confuse the issues, prolong the trial, and waste the jury's time, because the topic would require testimony on corporate insolvency, including its triggers and thresholds, and would inject new issues into an already complex and lengthy trial. Evidence or argument about discussions of a potential bankruptcy filing or wind-down on or after March 26, 2021 should be excluded for this reason as well. *Gardell,* 2001 WL 1135948, at *6 (excluding minimally probative evidence that had potential to lengthen "an already protracted trial," create a mini-trial on tangential issues, and create confusion).

---

[18]  This is particularly so given that Archegos's counterparties had taken control of the portfolio and were actively unwinding their swap trades as of March 26. *See* Ind. ¶ 67.

**10.**

## THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING ANY EVIDENCE OF DECADE-OLD MISCONDUCT AT TIGER ASIA

In its 404(b) letter, the government gave notice of its intention to offer – either as direct evidence of the charged offenses or, alternatively, as evidence of "other crimes" under Rule 404(b) – wide-ranging testimonial and extensive documentary evidence of "market misconduct" allegedly undertaken by Tiger Asia between December 2008 and March 2009. Mulligan Decl. Ex. A, at 2-5. These decade-old allegations gave rise to a total of four criminal, civil, and administrative proceedings brought by authorities in the United States and abroad (the "Tiger Asia matters"). Although most of the specific transactions identified by the government bear little or no resemblance to the charged conduct, the government elides that issue by lumping them together under the catch-all category "market misconduct." The government plans to introduce proof of the conduct underlying these Tiger Asia matters, as well as evidence of "the existence and resolution" of all of these enforcement proceedings. *Id.* at 3-4.

Mr. Halligan ran back-office operations at Tiger Asia as the CFO. He was neither accused of, nor charged with, any wrongdoing in the various Tiger Asia matters.

Nevertheless, according to the government, the resurrected Tiger Asia evidence is admissible as direct evidence establishing the background to the charged RICO conspiracy, including the formation and purpose of the conspiracy, as well as "the defendants' willfulness and knowledge of the charged offenses" and "the falsity of the defendants' statements about Archegos's compliance program." *Id.* at 2. The government makes no effort to identify the specific 404(b) purposes for which it claims the Tiger Asia evidence is admissible, but instead recites all the options provided by the rule, asserting that the evidence "demonstrates the defendants' motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident." *Id.*

For the myriad reasons below, as well as those set forth in Mr. Hwang's motion to exclude this evidence, the Tiger Asia evidence is inadmissible whether offered as direct evidence or pursuant to Rule 404(b). It should be excluded in its entirety.

## 10.1   Relevant Facts

The "market misconduct" identified by the government in its 404(b) letter includes: (1) a series of three alleged short sales undertaken by Tiger Asia in connection with the private placement of Chinese bank stocks in late 2008 and early 2009 that were placed while in possession of material non-public information ("MNPI"), *id.* at 2; (2) other instances during the period from November 2008 through February 2009 in which Tiger Asia allegedly sold short shares during the Hong Kong Stock Exchange's afternoon auction period to claim higher management fees from its investors, *id.* at 2-3; and (3) alleged unlawful purchases of Yahoo Japan Corporation stock in March 2009 in Japan, *id.* at 2.

### 10.1.1   The Domestic and Foreign Enforcement Proceedings

These prior allegations against Tiger Asia ultimately formed the basis of four separate enforcement proceedings by four separate governmental authorities or regulators in three separate jurisdictions. As discussed further below, each of those proceedings addressed only certain of the alleged conduct. The government plans to introduce all of these proceedings at trial:

#### 10.1.1.1   The New Jersey Criminal Case

The first proceeding was a criminal case brought against Tiger Asia in 2012 by the United States Attorney's Office for the District of New Jersey. In that case, the Tiger Asia entity – but no individual – was charged in a criminal Information with a single count of wire fraud under 18 U.S.C. § 1343. The allegations in the Information related to the three alleged short sales that Tiger Asia undertook in connection with Chinese bank stocks' private placements in late 2008 and early 2009, while in possession of MNPI.

On December 12, 2012, pursuant to a plea agreement signed by Mr. Hwang on behalf of Tiger Asia, Mr. Hwang appeared – again, on behalf of the hedge fund– and entered a corporate guilty plea. Sentencing took place the same day, with the court imposing on Tiger Asia a one-year term of probation and a forfeiture order of $16,257,918.  Mulligan Decl. Ex. R (GX-2703).

In addition to introducing testimony concerning the underlying allegations arising from conduct nearly fourteen years ago, the government intends to offer four documents related specifically to the New Jersey criminal case:

- the plea agreement, Mulligan Decl. Ex. R (GX 2703);

- the Information, *id.* Ex. S (GX 2704);

- the transcript of the plea and sentencing, *id.* Ex. T (GX 2701); and

- the judgment, *id.* Ex. U (GX 2705).

The government also intends to introduce seven emails from December 2008 and January 2009, all of which appear to relate to the three trades in question. *Id.* Exs. V – BB (GX 2751-2757).

Mr. Halligan was neither accused nor charged. Yet, the Information, the plea agreement, and the transcript of the plea all refer to criminal acts committed by "Tiger Asia," an entity that employed Mr. Halligan. Moreover, Mr. Halligan's name appears in two of the emails the government seeks to introduce, in one as a recipient and in the other as a "cc." *Id.* Exs. Z and AA (GX 2755 and GX 2756, respectively).

### 10.1.1.2    The SEC Civil Suit and Parallel Administrative Action

In December 2012, the United States Securities and Exchange Commission ("SEC") filed a civil complaint in the District of New Jersey against two Tiger Asia entities, Mr. Hwang and Raymond Park ("the New Jersey civil case"). That action was based in part on the three short sales at issue in the New Jersey criminal case, and in part on other instances in which

Tiger Asia placed short sales on the Hong Kong Stock Exchange for the alleged purpose of claiming a higher management fee from its investors. Mulligan Decl. Ex. CC (SEC Complaint). The SEC's civil case was resolved as against Mr. Hwang with a final judgment entered on consent without any admission of liability. *Id.* Ex. DD.

On January 22, 2013, the SEC initiated a corresponding administrative proceeding against Mr. Hwang. Like the SEC's civil case, the administrative proceeding was resolved on the basis of Mr. Hwang's consent, without any admission of liability. *Id.* Ex. EE (GX-2702).

In its 404(b) notice, the government states that it intends to elicit testimony concerning these two SEC matters, and its exhibit list includes the SEC's administrative order as GX 2702.[19]

### 10.1.1.3   The Hong Kong MMT Matter

The same three short sales at issue in the New Jersey criminal case also formed the basis of a civil enforcement action brought by the Hong Kong Market Misconduct Tribunal ("MMT") more than ten years ago. The MMT initiated an investigation into potential violations of Hong Kong's Securities and Futures Ordinance ("SFO") in 2013, and issued a 50-page final report of its findings and orders in October 2014. Mulligan Decl. Ex. FF (GX-2706).

Mr. Halligan was not mentioned anywhere in the MMT's lengthy report, nor was he named as a suspect or party in the MMT matter. The MMT matter was resolved based upon a "Statement of Agreed and Admitted Facts" executed by the parties' attorneys "solely for the purpose of a full and final resolution of the proceedings." *Id*. Annexure B at A8. The document specifically provided that the facts contained therein "do not constitute any admission by the

---

[19] Although to date the SEC's civil complaint and the final judgment entered in the New Jersey civil case have not been identified as trial exhibits, the government specifically mentioned both documents in its 404(b) letter. Mulligan Decl. Ex. A, at 4, bullet 2.

specified persons herein for any other purpose(s) whatsoever." *Id.* The MMT found violations of Hong Kong law—again, not as to Mr. Halligan—and imposed various civil penalties. *Id.* at ¶¶ 52, 57, 136-145.

In addition to offering testimony about this matter, the government intends to offer:

- the MMT's final report, Mulligan Decl. Ex. FF (GX-2706), and

- the "Statement of Agreed and Admitted Facts" executed by Mr. Hwang's attorney, *id.* Annexure B at A8 - A20.

### 10.1.1.4    The Japan SESC Matter

The government also intends to prove that over fifteen years ago, on March 17, 2009, Tiger Asia allegedly employed unlawful trading strategies while purchasing shares of Yahoo Japan Corporation in Japan. Mulligan Decl. Ex. A, at 2, bullet 4.

On December 13, 2012, Japan's Securities and Exchange Surveillance Commission ("JSESC") issued a "Recommendation for Administrative Monetary Penalty Payment Order for Market Manipulation of the Shares of Yahoo Japan Corporation." *Id*. Ex. GG (GX-2707). The JSESC found that Tiger Asia had engaged in the trades described above, that those trades constituted a violation of Article 159(2)(i) of Japan's Financial Instruments and Exchange Act, and that Tiger Asia should pay a monetary penalty. *Id.* at 1.[20]

The government intends to offer witness testimony, as well as GX-2707, the JSESC's Recommendation for Administrative Monetary Penalty.

### 10.1.2  The Formation of the Archegos Family Office

Tiger Asia wound down its operations in 2012 and returned funds to its outside investors. Subsequently, Mr. Hwang formed the Archegos family office to manage his personal

---

[20] According to the 404(b) notice, the amount of the monetary penalty imposed in Japan in yen equals approximately $816,500. Mulligan Decl. Ex. A, at 4.

wealth. Contrary to the government's claim in the 404(b) notice that Tiger Asia was "rebranded" as Archegos, Archegos was not a hedge fund subject to wide-ranging regulatory oversight, but was instead a largely unregulated family office whose investments consisted primarily of the assets of Mr. Hwang and his family. *See* Mulligan Decl. Ex. A, at 4, ¶ 3.

## 10.2  All Evidence of the Tiger Asia Matters Should Be Excluded

The Tiger Asia evidence is improper on a multitude of independent grounds. It should be excluded in its entirety for all the reasons that follow.

### 10.2.1  Admission of Testimonial Statements Made by Mr. Hwang in Connection with the Tiger Asia Matters Would Violate Mr. Halligan's Sixth Amendment Confrontation Clause Rights

Mr. Halligan was not charged or accused in any of the Tiger Asia matters described above, yet the government's 404(b) letter leaves wide open the possibility, and indeed even *suggests*, that the government will seek to link him to that alleged misconduct during the upcoming trial. In addition to citing in its letter the fact that Mr. Halligan was employed at Tiger Asia and that his relationship to Mr. Hwang and the government's two cooperating witnesses dates to their time at that entity, the government refers to *both* defendants when describing the relevance of the Tiger Asia evidence, stating that it demonstrates "*the defendants'* willfulness and knowledge with respect to the charged offenses" and "the falsity of *the defendants'* statements about Archegos's compliance program[.]" Mulligan Decl. Ex. A, at 2 (emphases added).

Moreover, the fact that Mr. Halligan was the CFO of Tiger Asia – a fact the government would undoubtedly seek to elicit – would invite an inference in the minds of at least some jurors that Mr. Halligan would have been aware of, and might even have helped execute, the alleged unlawful trades. Likewise, baseless as this inference would be,[21] the government might

---

[21] *See* Point 3 above.

seek to further strengthen it by introducing Tiger Asia emails that show Mr. Halligan as a recipient, although they show no response from him. Mulligan Decl. Exs. Z and AA (GX-2755 and GX-2756). Indeed, the fact that the government has not proposed redacting Mr. Halligan's name from those emails suggests such current intentions.

Under these circumstances, where the government has not clearly and unequivocally conceded that none of the Tiger Asia evidence is admissible against Mr. Halligan and that no inference of Mr. Halligan's involvement can be drawn from that evidence, the admission at a joint trial of *any* testimonial statement made by Mr. Hwang that implicated himself and/or Tiger Asia in criminal conduct would violate Mr. Halligan's rights under the Confrontation Clause of the Sixth Amendment.

The Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI. The Supreme Court has made clear that where the Government seeks to introduce a testimonial statement against a criminal defendant, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Sixth Amendment, in other words, establishes a "per se bar on the admission of out-of-court testimonial statements made by unavailable declarants where there was no prior opportunity for cross-examination." *United States v. McClain*, 377 F.3d 219, 221 (2d Cir. 2004).

Since *Crawford*, the Second Circuit has held that plea allocutions accompanying guilty pleas are testimonial statements under the Confrontation Clause, precluding their admission. The Second Circuit in *United States v. Hardwick* described plea allocutions as "testimonial hearsay . . . inadmissible under the Confrontation Clause unless the co-conspirator testifies at trial, or is

unavailable at trial and the defendant had a prior opportunity for cross-examination." 523 F.3d 94, 98 (2d Cir. 2008); *see also United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008) ("It is thus constitutional error to admit as substantive evidence a plea allocution by a co-conspirator who does not testify at trial unless the co-conspirator is unavailable and there has been a prior opportunity for cross-examination") (cleaned up); *see als*o *United States v. Becker*, 502 F.3d 122, 129-30 (2d Cir. 2007) ("[P]lea allocutions are testimonial, and are therefore subject to the requirements set forth in *Crawford*."); *United States v. Gotti*, 459 F.3d 296, 343 (2d Cir. 2006) ("It is undisputed that under *Crawford*, which was decided one year after this trial, the admission of these guilty pleas . . . was error").

A plea agreement, which necessarily contemplates a plea allocution, is likewise testimonial. *See United States v. Massino*, 319 F. Supp. 2d 295, 299 (E.D.N.Y. 2004) ("a guilty plea is testimonial within the meaning of *Crawford* because it embodies an allocution. In order for there to be a guilty plea, there must be both an allocution and a judicial finding that the allocution is valid and sufficient.").

The government plans to offer the December 12, 2012 plea allocution that Mr. Hwang delivered in the New Jersey criminal case, Mulligan Decl. Ex. T (GX-2701), and the plea agreement that Mr. Hwang signed on behalf of Tiger Asia, *id.* Ex. R (GX-2703), to resolve the one-count Information charging Tiger Asia with wire fraud, *id.* Ex. S (GX-2704). Mr. Halligan was not a party to that matter, nor did he have any opportunity to cross examine Mr. Hwang (or Tiger Asia[22]) in connection with the plea allocution and plea agreement. Under the law of this Circuit,

---

[22]  In *United States v. Usher*, individual defendants moved to exclude corporate guilty pleas entered by their employers. No. 17 CR. 19 (RMB), 2018 WL 4573009, at *2 (S.D.N.Y. Sept. 24, 2018). While the court's decision did not express any reservation about the proposition that a corporate plea is subject to *Crawford*, it concluded that the Confrontation Clause concerns in that case were resolved by requiring the government to call as witnesses either the signatories to the

these documents fall squarely within the definition of testimonial statements of alleged co-conspirators who will not testify at trial. As a result, any reference to Tiger Asia's guilty plea, or to Mr. Hwang's allocution or acceptance of a plea agreement on behalf of Tiger Asia, would violate Mr. Halligan's rights under the Confrontation Clause. The Court should preclude such references and documents at trial.

For similar reasons, evidence of Mr. Hwang's adoption of the Statement of Agreed and Admitted Facts submitted to resolve the MMT's proceeding in Hong Kong must also be excluded. The Sixth Amendment's bar against admission of out-of-court testimonial statements made by unavailable declarants where there was no prior opportunity for cross-examination applies not just to statements made under oath, but to documents that are "functionally identical to live, in-court testimony[.]" *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009). As the U.S. Supreme Court recognized in *Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011), "in *Crawford*, this Court rejected as untenable any construction of the Confrontation Clause that would render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements 'perfectly OK.'"

The "Statement of Agreed and Admitted to Facts" entered in the MMT proceeding was a formal unsworn statement signed by Mr. Hwang's counsel on his behalf.   Accordingly, that statement is the functional equivalent of the testimonial hearsay that *Crawford* and its progeny bar, and its admission would violate Mr. Halligan's Sixth Amendment rights. Any reference to GX-

---

corporate plea agreements or other competent corporate representatives. *Id.* at *2. Here, unlike *Usher*, the government cannot secure testimony from the signatory of the corporate plea agreement because the signatory to the Tiger Asia agreement is Mr. Halligan's co-defendant. Therefore, unlike the individual defendants in *Usher*, Mr. Halligan cannot be guaranteed that he will have the opportunity to cross examine any corporate witness regarding the Tiger Asia guilty plea.

2706, the MMT Report or to the "Statement of Agreed and Admitted to Facts," should therefore be excluded.

Accordingly, the Sixth Amendment requires the exclusion of the (1) plea allocution in the New Jersey criminal case (GX-2701), (2) plea agreement in the New Jersey criminal case (GX-2703), and (3) Statement of Agreed and Admitted Facts in the MMT matter (GX-2706), as well as any reference to the foregoing.

### 10.2.2  The Tiger Asia Evidence Is Inadmissible as Direct Evidence Against Mr. Halligan

The government seeks to introduce testimony and documents concerning Tiger Asia as direct evidence of the charges in the Indictment on the theory that it "demonstrates (a) the formation, existence, and purpose of the racketeering enterprise charged in Count One, (b) the defendants' willfulness and knowledge with respect to the charged offenses, (c) the falsity of the defendants' statements about Archegos's compliance program and the institutional changes made following enforcement actions in 2012 and 2013, and (d) essential background to the crimes charged in the Indictment." Mulligan Decl. Ex. A, at 1-2. The evidence is inadmissible as against Mr. Halligan under all of these theories.

As discussed above in Point 1.2.1, uncharged conduct can be admitted as direct evidence of the crimes charged only "if (1) it arose out of the same transaction or series of transactions as the charged offense, (2) if it is inextricably intertwined with the evidence regarding the charged offense, or (3) if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (cleaned up).

The Indictment itself refutes any claim that conduct committed by Tiger Asia in 2008 or 2009 is admissible as direct evidence of the charges against Mr. Halligan in this case. The government has advanced no claim that Mr. Halligan was involved in the Tiger Asia trading

activities, which pre-date the conduct alleged in the Indictment by 11 years or more, involve a hedge fund that returned its investors' funds a decade ago, and concern securities not at issue in this case. Nor does the Government allege similar conduct by Mr. Halligan in the current case. Thus, the Tiger Asia evidence plainly did not arise from the same transactions as the conduct with which Mr. Halligan is currently charged. *See United States v. Kurland*, No. 20-CR-0306 (NGG), 2022 WL 2669897, at *5 (E.D.N.Y. July 11, 2022) (noting that the schemes "involve different parties and different types of transactions").

Nor are the Tiger Asia matters inextricably intertwined with the conduct charged in this case because the Indictment is complete and detailed "with almost no mention" of Tiger Asia. *Martoma*, 2014 WL 31191 at *3. Indeed, in the 44-page, 86-paragraph Indictment, only *one* paragraph even mentions Tiger Asia, and that paragraph refers only to Mr. Hwang. Ind. ¶ 8.  The charges against Mr. Halligan "may be fully understood without reference to [the Tiger Asia details]," indeed the Indictment recites those charges as against Mr. Halligan without any reference to Tiger Asia at all. *Martoma*, 2014 WL 31191, at *3. Thus, the Tiger Asia matters fail to meet the second prong of the relevant test.

Finally, nothing in the Tiger Asia evidence "completes the story" of Mr. Halligan's alleged involvement in the charged conduct. The Indictment alleges, in essence, that Mr. Halligan participated in a scheme, along with others, to make misleading statements to Archegos's counterparties. Ind. ¶ 47. But none of the Tiger Asia matters involved allegations of misrepresentations by Mr. Halligan, and none of the charges in those matters arose from alleged misrepresentations to trading counterparties. The underlying Tiger Asia allegations and the many enforcement proceedings that ensued are not only superfluous to the "story" of Mr. Halligan's

alleged involvement in the charged offenses, they tell a different story altogether.[23] *Zhong*, 26 F.4th at 552.

For these reasons, the Tiger Asia evidence is inadmissible as direct evidence against Mr. Halligan.

### 10.2.3  The Tiger Asia Evidence Is Inadmissible Against Mr. Halligan Under Rule 404(b)

The government contends that if the Tiger Asia evidence is inadmissible as direct evidence, it is nonetheless admissible under Rule 404(b).[24] This argument fares no better. As discussed above in Point I, to be admissible under Rule 404(b), evidence must have a purpose other than to show propensity, it must be relevant, and its probative value must not be outweighed by unfair prejudice. None of these requirements is satisfied.

#### 10.2.3.1  The Tiger Asia Evidence Is Not Relevant, Nor is it Admissible Against Mr. Halligan for Any Purpose Permitted by Rule 404(b)

To the extent the government seeks to admit evidence of the Tiger Asia matters to prove Mr. Halligan's "willfulness and knowledge with respect to the charged offenses," or to show his intent, plan, knowledge, or absence of mistake, that effort fails for lack of sufficient similarities

---

[23]  Much of the indictment concerns alleged market manipulation conduct. Ind. ¶¶ 22-31, 39. But Mr. Halligan was not a trader, the government does not allege that Mr. Halligan made investment decisions at Archegos, and Mr. Halligan is not charged with any of the substantive market manipulation counts in the Indictment. *See* Ind. ¶¶ 75-78 (Counts Two through Nine). Rather, Mr. Halligan's role at Archegos was to help supervise the accounting and cash management functions at Archegos. *Id.* ¶ 12(b). He "managed back office functions and operations." *See* Mulligan Decl. Ex. B, at ¶ 25. While the Tiger Asia matters are absolutely superfluous to the trading conduct alleged in this case (which occurred more than a decade later, involving different securities, and different legal entities, among other things), they are uniquely extraneous to the allegations against Mr. Halligan.

[24] While the government "articulate[d] in the [Rule 404(b)] notice the permitted purpose[s] for which [it] intends to offer the evidence," it did not provide "the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B). *See Gardell,* 2001 WL 1135948, at *4 (excluding 404(b) evidence where government's notice failed to provide "a detailed explanation of the purpose for which this evidence is sought to be admitted").

or connections between the Tiger Asia matters and the conduct with which he is charged. *E.g.,* *Garcia,* 291 F.3d at 137 (knowledge and intent); *Martoma*, 2014 WL 31191, at *4-5 (knowledge, intent, background of conspiracy, and relationship with coconspirators); *Gardell*, 2001 WL 1135948, at *7 (intent, knowledge, and absence of mistake).

The connection necessary to establish relevance is satisfied when the "other act" evidence is "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the [state of mind] inference advocated by the proponent of the evidence." *Curley*, 639 F.3d at 57. "If the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent." *Garcia*, 291 F.3d at 137 (holding that in absence of substantive connections between prior drug conviction and present drug charge, defendant's participation in a minor drug sale twelve years earlier was not meaningfully probative to demonstrate that drug dealers communicate in code and that defendant must have known taped conversation was a coded drug conversation); *Afjehei*, 869 F.2d at 674 (finding abuse of discretion where district court allowed evidence of prior international trips to show that defendant knew he was trafficking heroin).

According to the government's 404(b) notice, the Tiger Asia conduct did not involve Mr. Halligan at all. That alone would be fatal to the government's position, but there is more. Among other differences, the Tiger Asia matters involved a hedge fund and not a family office like this case; involved allegations of trading while in possession of MNPI and a scheme to obtain increased management fees, neither of which is alleged here; involved different securities than those at issue here; and took place more than a decade before the events at issue here. *See*, *e.g., Gardell*, 2001 WL 1135948, at *4 (excluding 404(b) evidence on grounds of temporal

remoteness, where uncharged conduct took place *one to two years* before charged fraud and kickback conspiracy began).

   The manifest dissimilarity between the Tiger Asia matters and the conduct with which Mr. Halligan is charged underscores the complete absence of probative value. *Zhong,* 26 F.4th at 552-53 (violent uncharged crimes that were unconnected to defendant and that pre-dated indictment by almost a decade were insufficiently similar, and therefore inadmissible to show intent under 404(b)); *Stein,* 521 F. Supp. 2d at 270, 272-73 (evidence of uncharged tax shelters and side payments among coconspirators inadmissible under 404(b) to show knowledge and intent in prosecution for conspiring to defraud government and tax evasion, where uncharged conduct was dissimilar to charged tax-evasion transactions); *Gardell,* 2001 WL 1135948, at *7 (evidence that entity under defendant's control had misstated cash positions excluded as "not sufficiently similar" to charge of failing to report material information to pension fund investors in stock offering).

   Furthermore, allowing the government to use the Tiger Asia evidence to link Mr. Halligan to uncharged conduct at Archegos would carry two extreme risks of unfair prejudice: (1) the risk of unfairly implicating Mr. Halligan in the Tiger Asia proceedings (discussed below); and (2) the risk of suggesting that Mr. Halligan had a propensity to facilitate market misconduct, which is precisely what Rule 404(b) forbids. *See, e.g., McCallum,* 584 F.3d at 477; *Martoma*, 2014 WL 31191, at *5; *Gardell,* 2001 WL 1135948, at *7.

   The *only* purpose that would be served by admitting the Tiger Asia evidence against Mr. Halligan is suggesting to the jury that Mr. Halligan is guilty of the crimes charged in the Indictment based on his long-standing employment relationship with Mr. Hwang and the position he occupied at Tiger Asia. But as the Second Circuit has made clear, using 404(b) evidence to infer a defendant's guilt by association is patently improper. *DeCicco,* 435 F.2d at 483 ("Little

discussion is needed to demonstrate that prior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct, unless it be under a 'birds of a feather' theory of justice.").

### 10.2.4  The Tiger Asia Evidence Is Inadmissible Against Mr. Halligan Under Rule 403, and No Limiting Instruction Could Cure the Prejudice

#### 10.2.4.1   The Tiger Asia Evidence Is Profoundly and Unfairly Prejudicial to Mr. Halligan

Even if the government had a permissible purpose for introducing the Tiger Asia evidence against Mr. Halligan – and for the reasons above it does not – that evidence must nevertheless be excluded under Rule 403 because any minimal probative value it might have is substantially outweighed by the extreme danger of unfair prejudice. In his concurrence in *Krulewitch v. United States*, 336 U.S. 440 (1949), Justice Robert Jackson noted the challenges of a large-scale conspiracy trial: "the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about . . . ." *Id.* at 453. As Justice Jackson emphasized, there can be a real risk of guilt by association: "A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Id.* at 454.

Here, Mr. Halligan occupies the "uneasy seat" of a co-defendant facing a joint trial at which the government seeks to present extensive evidence of the Tiger Asia matters. In addition to time-consuming testimony about the underlying conduct and the four separate domestic and foreign enforcement proceedings that ensued, the government would seek to introduce more than

130 pages of documents as well as a series of adverse findings against Mr. Hwang and/or his long defunct hedge fund, none of which implicates Mr. Halligan.

Were this Court to conclude that some or all of the Tiger Asia evidence is admissible against Mr. Hwang – and it is not, for the many reasons discussed below, as well as those cited in Mr. Hwang's motion – the danger of prejudicial spillover onto Mr. Halligan would be overwhelming. The risk that the jury would unfairly convict Mr. Halligan based on his prior employment relationship with Mr. Hwang at Tiger Asia is profound, and because that risk would threaten Mr. Halligan's right to a fair trial on the charges in this case, the evidence should be excluded in its entirety from the defendants' joint trial.

The Second Circuit has made clear that "[w]here allegedly prejudicial evidence is admitted solely against one defendant in a multi-defendant trial, the prejudice this might cause to his co-defendants is an appropriate consideration for Rule 403 balancing and may result in the exclusion of such evidence in the joint trial." *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995); *see also United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (spillover prejudice "occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper."). Where, as here, the danger of unfair prejudice to Mr. Halligan is great, "the prosecution must be put to a choice of forgoing either the evidence or the joint trial." *United States v. Figueroa,* 618 F.2d 934, 945. (2d Cir. 1980) (reversing convictions of two co-defendants because of the possibility that the jury might infer their guilt from improperly admitted evidence about third co-defendant).

The documents from the New Jersey criminal case – which identify the criminal actors as Raymond Park and "Tiger Asia" – leave open to the jury an easy but unfair inference that because Mr. Halligan was Tiger Asia's CFO, he was, or might have been, involved in Tiger Asia's

decade-old insider trading conduct. That inference, in turn, would support an unfair and profoundly prejudicial inference of his criminal propensity and/or his guilt by association.[25]

The substantial risk of unfair prejudicial spillover from the Tiger Asia evidence is also fed by the government's characterization of Archegos's creation as a mere "rebranding" of Tiger Asia, and its reference to the fact that Archegos continued to employ many of the same individuals who were previously employed by Tiger Asia, including Mr. Halligan. Mulliagn Decl. Ex. A, at 4 (404(b) letter). This transparent effort to equate the two entities, even though a hedge fund and a family office differ in fundamental ways that are critical to Mr. Halligan's defense, invites the jury to infer that Mr. Halligan is guilty of criminal conduct by virtue of his prior and continued association with Mr. Hwang.[26] In a case where the government must prove the existence of a very specific conspiracy between Mr. Hwang and Mr. Halligan, any suggestion of "guilt by association" is profoundly prejudicial.

Admission of the plea agreement and the plea transcript from the New Jersey criminal case would create an additional risk to Mr. Halligan. Because the only defendant charged in that case was Tiger Asia, those documents indicate that the maximum penalty for wire fraud – the same crime with which Mr. Halligan is charged in Count Eleven – is a term of five years' probation. Mulligan Decl. Ex. R, at 2 (plea agreement); Ex. T, at 6 (plea transcript). The jurors in the upcoming trial would naturally assume that the same maximum penalty applies to Mr.

---

[25] As the *Massino* court explained, even if introduction of plea evidence was constitutional, Rule 403 bars its admission where, as here, the evidence "is substantially more prejudicial than probative" and presents "an enormous risk that the jury . . . would find the fact that co-defendants pleaded guilty to be probative of the defendant's culpability[.]" *Massino*, 319 F. Supp. 2d at 300.

[26] Indeed, the government's reference to "rebranding" is characteristic of the central theory of this case, which advances an inference of wrongdoing from perfectly lawful conduct (e.g., opening a family office, Ind. ¶ 9; trading in swaps, *id.* at ¶ 17; engaging in business with multiple sophisticated counterparties, *id.* at ¶ 16).

Halligan, and if they made that mistake, their belief that he would not face prison time if convicted would create an almost irresistible temptation to convict him on Count Eleven if they believed he was in any way involved in the charged conduct, even if proof beyond a reasonable doubt was lacking.

### 10.2.4.2   Admission of the Tiger Asia Evidence Would Waste Time, Necessitate Multiple Trials Within a Trial, and Confuse the Issues

As described above, the Tiger Asia matters involved three unrelated sets of allegations (the insider trading conduct, a scheme to increase management fees, and allegedly manipulative trading in Yahoo Japan Corporation stock), comprised at least eight distinct transactions, and entailed enforcement proceedings brought by four separate regulators in three jurisdictions. Allowing the government to bloat this already complex and lengthy trial with evidence of those decade-old matters would waste time and judicial resources, result in multiple trials within a trial, and hopelessly confuse the issues. The Tiger Asia evidence should therefore be excluded under Rule 403.

To be sure, nothing in the record forecloses the defense from contesting the facts underlying all of the Tiger Asia allegations. Mr. Hwang was not charged individually in the New Jersey criminal case (but only entered a guilty plea on behalf of the corporate entity), so may challenge in this case evidence of his purported involvement in the decade-old conduct that gave rise to the criminal case against Tiger Asia. Mr. Hwang did not admit liability in either of the proceedings initiated by the SEC (he consented only to jurisdiction), so he could contest the facts underlying those proceedings. Likewise, the Statement of Agreed and Admitted Facts submitted to the MMT by Mr. Hwang's attorney expressly stated that it was entered into "solely for the purpose of a full and final resolution of [those] proceedings" and "do[es] not constitute any admission … for any other purpose(s) whatsoever," Mulligan Decl., Ex. FF at Annexure B, A8, and the order

ultimately imposed on Tiger Asia by the JSESC, *id.* Ex. GG, includes no indication that Mr. Hwang conceded any personal involvement in the alleged violation addressed there. Thus, permitting the government to offer the Tiger Asia evidence would likely result in numerous trials within the Archegos trial.

Furthermore, for the jurors to understand the insider trading claims and the related enforcement proceedings, the government would have to introduce the underlying facts, and the Court would then have to instruct the jury on the elements of insider trading, which could only serve to confuse the issues by suggesting that insider trading is somehow a part of the charges in this case, when it is not. Additionally, the two SEC cases involved allegations of fraud in the calculation of a hedge fund's management fees, but Archegos was not a hedge fund and did not charge management fees. It would therefore be necessary to explain those differences to the jury, which would compound the confusion. The Court would also have to instruct the jury on the differences among criminal, civil, and administrative proceedings, which would further complicate the issues and confuse the jury.

Making matters even worse, the MMT and the JSESC proceedings involved alleged violations of foreign law. Violations of foreign law are completely irrelevant here, but even if they were minimally relevant, they would require legal instructions on foreign law to be understood. Moreover, the government failed to provide timely notice of foreign law under Federal Rule of Criminal Procedure 26.1, which provides that "[a] party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice."  Fed. R. Crim. P. 26.1. Permitting the government to introduce conclusions reached by foreign regulators, applying foreign law to decade-old transactions that are totally different transactions than those charged

here, could only confuse and mislead the jury about what evidence and law is appropriate to consider and what is genuinely at issue in this trial.

Finally, given the Court's stated practice of not giving the jury a copy of the Indictment during its deliberations,[27] admission of GX-2704, the Information filed in the New Jersey criminal case, would create the bizarre situation where the jury has available for its review the charging document from another case *but not* the charging document for the case it is considering.

In short, evidence of the Tiger Asia matters is inadmissible under Rule 403 because it would introduce a whole new set of legal disputes; inject remote and irrelevant issues; unduly prolong the trial; hopelessly confuse the jury; and "divert the jury's attention from the charged transactions, which are sufficiently complicated in themselves[.]" *Stein*, 521 F. Supp. 2d at 271; *see also Gardell,* 2001 WL 1135948, at *6; *United States v. Schatzle*, 901 F.2d 252, 256 (2d Cir. 1990) (evidence of event remote in time properly excluded when "potential delay from allowing a mini-trial" outweighed probative value and presented "risk of focusing the jury upon the wrong event"); *United States v. Aboumoussallem*, 726 F.2d 906, 912–13 (2d Cir.1984) (affirming exclusion of 404(b) evidence where trial court determined that its admission would amount to a trial within a trial risking jury confusion and unduly delaying trial); *United States v. Kahn*, 472 F.2d 272, 279 (2d Cir. 1973) (upholding exclusion of proffered evidence because it "presented the very real danger of degenerating into a side trial"); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013) (excluding evidence of decades-old fraud charges that "would lead to a confusing 'mini-trial'" and potentially confuse jury tasked with determining charged conduct of securities fraud, wire fraud, and conspiracy).

---

[27]  ECF No. 66, at 3.

### 10.2.4.3   Additional Arguments as to Specific
###            Categories of Tiger Asia Evidence

As set forth below, specific items of Tiger Asia evidence are inadmissible for a

variety of additional reasons:

- *The judgment of conviction entered in the New Jersey criminal case against Tiger Asia* (*Mulligan Decl. Ex. U, GX 2705*) – an entity that is not a defendant in this case constitutes hearsay under Fed. R. Evid. 801(c) and is therefore inadmissible. *See, e.g., United States v. Olivieri,* 740 F. Supp. 2d 414, 418–19 (S.D.N.Y. 2010) (non-defendant's judgment of conviction inadmissible hearsay).

- *Charging instruments and civil/regulatory complaints – including the criminal Information filed against Tiger Asia in New Jersey (Mulligan Decl. Ex. S, GX 2704) and the civil complaint filed by the SEC against Tiger Asia and Mr. Hwang in New Jersey (id. Ex. CC)* – are inadmissible because a mere allegation "has no evidentiary value."  *Securities and Exchange Commission v. Citigroup Glob. Mkts. Inc.*, 827 F. Supp. 2d 328, 333 (S.D.N.Y. 2011), *vacated and remanded on other grounds*, 752 F.3d 285 (2d Cir. 2014).  In addition, these documents contain inadmissible hearsay, *Ruffalo's Truck. Serv. v. Nat'l Ben–Franklin Ins. Co.*, 243 F.2d 949, 953 (2d Cir.1957) ("The indictment, since it was only hearsay, was clearly inadmissible for any purpose."), and their admission "inevitably results in trying those cases before the jury, and the merits of the other cases would become inextricably intertwined with the case at bar." *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) (cleaned up).[28]

- *Testimony and documents concerning the SEC's settlement with Tiger Asia and/or Mr. Hwang – including the SEC's January 22, 2013 Order Instituting Administrative Proceedings (Mulligan Decl. Ex. EE, GX-2702) and the Final Judgment entered as to Mr. Hwang on consent in the New Jersey civil case (id., Ex. DD)* – are inadmissible under Rules 408 and 403.  The SEC Order states that it was the product of a settlement and that Mr. Hwang was not "admitting or denying the findings" therein, and the same order states that the New Jersey civil case was resolved "*by consent, without admitting or denying the allegations in the complaint*, against Hwang." Mulligan Decl. Ex. EE, at §§ II, III.2 (emphasis added).  Consent orders are inadmissible to prove the facts of liability under Rule 408. *See United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) ("[A] civil consent decree, as the

---

[28]  *See also In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *11 (S.D.N.Y. Mar. 26, 2003) (SEC's complaint was "not evidence of anything other than the existence of an accusation"); *Stevenson v. Hearst Consol. Publ'ns*, 214 F.2d 902, 907 (2d Cir.1954) (complaint from separate suit inadmissible as hearsay to prove the truth of matter asserted); *Discover Growth Fund v. 6D Glob. Techs. Inc.*, No. 15-CV-7618 (PKC), 2015 WL 6619971, at *7 (S.D.N.Y. Oct. 30, 2015) ("The charge in the indictment and the allegation in the SEC complaint are not evidence of the truth of the assertions therein.").

settlement of a civil suit, is governed by Fed. R. Evid. 408.").[29] In addition, because of the substantial risk, described above, that unfair prejudice would spill over onto Mr. Halligan were this evidence introduced, these documents and the events they reflect are inadmissible under Rule 403.

- *The 2014 Report issued by the MMT (Mulligan Decl. Ex. FF, GX-2706), the Statement of Agreed and Admitted Facts submitted on behalf of Mr. Hwang to the MMT (id. at Annexure B), and the JSESC's 2012 Recommendation for Administrative Monetary Penalty Payment Order for Market Manipulation of the Shares of Yahoo Japan (id. Ex. GG, GX-2707)* – are inadmissible for a variety of reasons in addition to those discussed above under Rule 403. First, evidence concerning the determination of a foreign regulator is relevant if it (a) "has a[ ] tendency to make a fact more or less probable than it would be without [evidence of the foreign regulator's determination]; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. But no determination made by these foreign regulators concerning conduct in 2008-09 is relevant to any material issue at trial, and their conclusions are therefore irrelevant.[30] *See, e.g.*, *United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 6375729, at *10 (E.D.N.Y. Dec. 12, 2017) (holding evidence of whether foreign law prohibited the conduct underlying the charged conspiracy was irrelevant and inadmissible under Rule 401, noting, "[t]he requirements of foreign law" were "simply not [a] relevant fact[.]"). Moreover, the findings of both the MMT and the JSESC reflect consensual resolutions. The "Statement of Agreed and Admitted Facts" was expressly entered into for the sole purpose of resolving the MMT allegations and accordingly stated that it did not "constitute any admission … for any other purpose(s) whatsoever." Mulligan Decl. Ex. FF, at Annexure B, A8. It is therefore inadmissible under Rule 408. Although the JSESC Recommendation does not contain such express language, it indicates that Tiger Asia "cooperated with the SESC during this investigation," suggesting that the final resolution was a negotiated settlement. *Id.* Ex. GG, at ¶ 4.

- *Both the MMT Report (Id. Ex FF, GX-2706) and the JSESC Recommendation (Id. Ex. GG, GX-2707)* – are hearsay to the extent they are offered for the truth of the matters asserted, they are therefore inadmissible under Rules 801 and 802. *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 329-30 (S.D.N.Y. 2009) (arbitration decision reflecting conclusion of arbitration brought against defendant's predecessor entity excluded as hearsay, where its only purpose was to "prove the substance and outcome of the arbitration," or the truth of the matter).

---

[29] Rule 408 "embodies the strong federal policy favoring settlement of disputes by precluding the use of settlement-related materials as a means of establishing or disproving liability." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 196 (S.D.N.Y. 2008).

[30] While this is true for both defendants, it applies with special force to Mr. Halligan, who was not named in the proceedings in Hong Kong or Japan.

For all the foregoing reasons, the government should be precluded from introducing *any* evidence related to Tiger Asia in the upcoming trial.

### 10.2.4.4    Limiting Instructions Cannot Cure the Extreme Unfair Prejudice to Mr. Halligan of the Tiger Asia Evidence

The unfair prejudice of the Tiger Asia evidence and the hopeless confusion it would engender could not be cured by limiting instructions. Even where the trial court issues an instruction limiting the purpose to which a jury may put evidence, "limiting instructions cannot be regarded as a guaranty against prejudice." *Curley*, 639 F.3d at 60. "The trial judge, sensitive to the realities of the courtroom context as in all other trial rulings, must simply include a sound estimate of the likely force of limiting instructions in the overall Rule 403 determination." *Figueroa*, 618 F.2d at 943. As the Supreme Court cautioned in *Bruton v. United States*, 391 U.S. 123 (1968), "[t]he naïve assumption that prejudicial effects can be overcome by instructions to the jury … all practicing lawyers know to be unmitigated fiction." *Id.* at 129 (cleaned up); *see also United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 1980) (holding the presumption that jurors will adhere to limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity").

As discussed above, the Tiger Asia evidence is wholly inadmissible as against Mr. Halligan, and its introduction would prejudice his right to a fair trial by allowing the jury to draw unfounded, unfair, and impermissible conclusions about his involvement in the charged conduct. For any limiting instruction to be effective, the Court would have to instruct the jurors that they could not consider that evidence with respect to Mr. Halligan *at all*. However, given the sweeping scope of the Tiger Asia evidence, the amount of trial time that would necessarily be devoted to that evidence if it were permitted, and the unavoidable confusion the evidence would engender, it

would be unrealistic for the jurors to entirely set aside that evidence when evaluating the charges against Mr. Halligan.

Because a limiting instruction would be insufficient to cure the substantial prejudice to Mr. Halligan, the Court should exclude the Tiger Asia evidence in its entirety.

However, if the Court declines to exclude the Tiger Asia evidence in its entirety, then severance is the only remedy sufficient to protect Mr. Halligan's right to a fair trial. *See United States v. Bellomo*, 954 F. Supp. 630, 650-651 (S.D.N.Y. 1997) (granting severance in favor of defendants who would be substantially prejudiced by the introduction of evidence relating to the co-defendants' alleged criminal activity, where the evidence was not admissible as against the defendants seeking severance and related to alleged criminal activity in which they were not charged). Severance is required where evidence admitted solely against one defendant but inadmissible against another may create a danger of unfair prejudice so high that it cannot be cured by a limiting instruction. *See Figueroa*, 618 F.2d at 944; *see also McDermott*, 245 F.3d at 139-40. That is so here, given the extreme spillover prejudice that Mr. Halligan would suffer if the government is allowed to introduce its extensive noticed evidence regarding the Tiger Asia matters. Thus, if evidence of the Tiger Asia matters is allowed as against Mr. Hwang, then severance is required under Fed. R. Crim. P. 14.[31]

---

[31] The potential need for severance has ripened only with the government's 404(b) notice specifying the nature and extent of the Tiger Asia evidence that it intends to introduce. Mr. Halligan previously moved to strike from the Indictment all references to Tiger Asia. ECF No. 48, at 88-98. The government opposed the motion, including on the ground that it was "premature," and explained that "[t]he Government will provide notice before trial, pursuant to Rule 404(b), of any evidence related to the civil suit against Tiger Asia, or Tiger Asia's criminal conviction for wire fraud, that should be admitted." ECF No. 53, 70-71. The Court denied the motion as academic, holding that "the question of whether the parties may introduce evidence or arguments related to Tiger Asia Management may be addressed by motions *in limine*." ECF No. 66, at 3.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Halligan respectfully requests that the Court grant his motions *in limine*.

Dated:   New York, New York
March 21, 2024

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP

<u>*s/ Mary E. Mulligan*</u>
Mary E. Mulligan (mmulligan@fklaw.com)
Timothy M. Haggerty (thaggerty@fklaw.com)
Bonnie M. Baker (bbaker@fklaw.com)
Anil K. Vassanji (avassanji@fklaw.com)
Rupita Chakraborty (rchakraborty@fklaw.com)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Patrick Halligan*