# Exhibit FF

The report of the Market Misconduct Tribunal into dealings
in the shares of Bank of China Limited and
China Construction Bank Corporation
on and between 19 December 2008 to 13 January 2009

**A report pursuant to section 252(3)(a), (b) and (c) of the Securities and
Futures Ordinance, Cap. 571**

<u>INDEX</u>

|  |  |  | Paragraphs |
|---|---|---|---|
| Chapter 1 | Introduction |  | 1-63 |
|  | A. The share placement of 31 December 2008 | 6-15 |  |
|  | B. The share placement of 7 January 2009 | 16-23 |  |
|  | C. The share placement of 13 January 2009 | 24-29 |  |
|  | *Putting the conduct into context* | 30-33 |  |
|  | *Hong Kong proceedings pursuant to section 213 of the Ordinance* | 34-40 |  |
|  | *Proceedings in the United States* | 41-47 |  |
|  | *The issue of the Notice* | 48 |  |
|  | *Proceedings following the issue of the Notice* | 49-56 |  |
|  | *The findings of the Tribunal in respect of market misconduct* | 57-58 |  |
|  | *No request for an order pursuant to section 257(1)(d)* | 59-61 |  |
|  | *Costs* | 62 |  |
|  | *The sole issues in dispute* | 63 |  |
| Chapter 2 | The two Disputed Orders |  | 64-80 |
|  | *Cold shoulder orders* | 67-73 |  |
|  | *Cease and desist orders* | 74-77 |  |
|  | *Overview* | 78-80 |  |

i

SDNY_P030_0000000005

Paragraphs

Chapter 3    Raymond Park                                    81-96

Chapter 4    Bill Hwang and Tiger Asia                       97-135

    *Background*                          97-100

    *Is there any purpose to be served in imposing the orders?*    101-103

    *Looking to matters of mitigation*    104-124

    *A.  The culpability, being civil, is less serious than criminal culpability*    105-108

    *B.  The losses already sustained*    109-110

    *C.  No personal gain*    111-113

    *D.  Admissions of liability*    114-117

    *E.  Previous good character*    118-121

    *F.  Setting up compliance controls*    122-124

    *The Tribunal's determination in respect of Bill Hwang*    125-133

    *The Tribunal's determination in respect of Tiger Asia*    134-135

Chapter 5    A summary of the orders made by the Tribunal    136-145

    *Tiger Asia*    137

    *Bill Hwang*    138

    *Raymond Park*    139

    *William Tomita*    140

    *Costs*    141-144

    *Section 264(1) of the Ordinance*    145

SDNY_P030_0000000006

                                                              Paragraphs

            Attestation to the Report


                                                                Page

Annexure A    The Securities and Futures Commission's Notice    A1-A7


Annexure B    Statement of Agreed and Admitted Facts            A8-A20

iii

SDNY_P030_0000000007

CHAPTER 1

INTRODUCTION

1.          By a Notice[1] dated 11 July 2013 ("the Notice"), the Securities and Futures Commission ("the SFC") required the Market Misconduct Tribunal to conduct enquiries to determine whether market misconduct may have taken place in respect of dealings in the securities of Bank of China Limited ("BOC") and China Construction Bank Corporation ("CCB"), both being listed on the Hong Kong Stock Exchange.   The nature of the market misconduct was, first, "insider dealing" and, second, "false trading" within the meaning respectively of section 270 and section 274 of the Securities and Futures Ordinance, Cap 571 ("the Ordinance").

2.          This Tribunal was constituted pursuant to the Notice.

3.          The full content of the Notice is referred to later in this chapter and is annexed to this report as Annexure A.

4.          In the Notice, the SFC stated that the following four parties were suspected to have engaged in the identified market misconduct, namely, Tiger Asia Management LLC, Mr Bill Hwang Sung Kook, Mr Raymond Park and Mr William Tomita.   The following can be said in respect of the four:

---

[1]     Issued pursuant to sections 252(1) and (2) of, and Schedule 9 to, the Ordinance.

SDNY_P030_0000000008

i.  Tiger Asia Management LLC ("Tiger Asia") was a limited liability company registered in the state of Delaware with its principal place of business being in New York.   Tiger Asia was the corporate body through which (in particular) two hedge funds ("the Tiger Asia funds") were managed.   These two funds specialised in Asian-traded equities including equities listed on the Hong Kong Stock Exchange.[2]

ii.  Mr Bill Hwang Sung Kook ("Bill Hwang") was the controlling shareholder of Tiger Asia[3] and had overall responsibility for managing its investments.   He was the sole principal and portfolio manager of the two Tiger Asia funds.

iii.  Mr Raymond Y H Park ("Raymond Park"), an employee of Tiger Asia, held the position of Managing Director and Head of Trading.   Raymond Park reported to Bill Hwang and executed his trading instructions.

iv.  Mr William Tomita ("William Tomita") was also an employee of Tiger Asia responsible for supporting trading activities.

5.      As to the conduct said to constitute the market misconduct, this took place in December 2008 and January 2009.   The conduct fell into three segments, each course of conduct following a similar pattern.   For ease of reference, this overview will demarcate the three segments in the manner in which they are demarcated in the Notice.

---

[2]      As at May 2014, Tiger Asia changed its name to Archegos Capital Management LLC and is apparently no longer entitled to conduct trading in securities on behalf of the investing public.   It now manages funds – the Archegos funds – which comprise the assets of Mr Bill Hwang Sung Kook and family members only. It has become what is called a 'family office' company.

[3]      He held (and continues to hold) 99% of the shares with his wife holding the remaining 1%.

SDNY_P030_0000000009

A.      The share placement of 31 December 2008

6.      On or about 19 December 2008, a representative of UBS AG ("UBS") contacted Raymond Park concerning the intended sale by UBS of a large block of shares in BOC.   It was intended to sell the block of shares on a private basis, placing them with a small number of investors.   The purpose of the call was to ascertain the level of demand for the securities by investors.

7.      Prior to divulging any information about the intended sale, the representative informed Raymond Park that he had non-public, price-sensitive information to disclose and asked Raymond Park if he agreed to be "wall crossed".

8.      In an affidavit dated 30 November 2009, the representative, Mr Peter Guenthardt, explained that the phrase "wall crossed" is a term commonly used in the securities industry -

> "... to describe the situation when non-public price sensitive information concerning a potential transaction is disclosed to a client for the purpose of ascertaining whether they are interested in participating in the transaction. When the client has been "wall crossed" they cannot trade in the stock concerned and they must keep the information strictly confidential. Non-public information will not be disclosed to a client unless they agree to be wall crossed."[4]

---

[4]   In his affidavit, Mr Guenthardt went on to say: "During my telephone conversation with Mr Park, I told him that if he agreed to be wall crossed, I would provide him with information which would be inside information.   He would be subject to insider dealing laws and/or market abuse regulations and that would restrict him from dealing in the securities which were the subject of the information.   I told him that he would also be obliged to maintain strict confidence in relation to the information until it was disclosed to the public or until he was notified by UBS Investment Bank that the information was no longer confidential. I made it clear to him that the information was being provided to him for the purpose of ascertaining demand for the securities by investors and was not a solicitation for the purchase of securities."

3

SDNY_P030_0000000010

9.      Prior to giving details of the intended transaction, the representative obtained from Raymond Park his agreement to be "wall crossed".

10.     The representative then informed Raymond Park that UBS was intending to sell its entire shareholding of approximately 3,378 million H-shares in BOC.   He said that both the trade and value dates would be 31 December 2008, the price to be at a discount of 8% to 10% to the closing price on 30 December 2008[5].

11.     Raymond Park informed Bill Hwang of the information given to him. Bill Hwang, clearly anticipating that the release of such a large number of shares would result in a decline in their value, gave instructions that the Tiger Asia funds should participate in the private placement of BOC shares but that, prior to 31 December 2008, they should short sell the stock[6].

12.     Following Bill Hwang's instructions, Raymond Park, assisted by William Tomita, was able to short sell 104 million BOC shares at an average price of HK$2.23.

13.     On 31 December 2008, the two Tiger Asia funds were allocated 199 million BOC shares at a discounted price of HK$1.93 per share.

---

[5]     BOC's H-shares have been listed on the Hong Kong Stock Exchange (Stock Code 3988) since 2006.   It is important to note that UBS had been a pre-IPO strategic investor, agreeing to hold its shares until 30 December 2008.

[6]     To "short sell" describes the practice of selling stock that has been borrowed from a third party with the intention of buying the stock back at a later date in order to return it to the lender.   The short seller hopes to profit from a decline in the price of the stock between the sale and the repurchase.

4

14.     On 31 December 2008 and 2 January 2009, BOC shares sold at an average of HK$2.14[7].   In the result, by short selling the shares ahead of the news of the private placement being made known to the market, a net profit in excess of HK$9 million was obtained.

15.     In respect of this course of conduct, the Tribunal was asked to investigate whether market misconduct by way of insider dealing had taken place.

B.     The share placement of 7 January 2009

16.     On or about 6 January 2009, another representative of UBS contacted Raymond Park, this time concerning the intended block sale by Bank of America ("BOA") of shares in CCB[8].   Again, prior to the giving over of any price sensitive information, Raymond Park was asked if he agreed to be wall crossed.    Again, he agreed.

17.     The representative then informed Raymond Park that BOA intended to sell approximately 5.6 billion CCB shares at a discount of approximately 15% of the market price.    The representative said that the deal would close in 48 hours.

18.     Raymond Park conveyed the information to Bill Hwang who instructed that the Tiger Asia funds should participate in the block sale but that, prior to the sale taking place, the stock should be short sold.

---

[7]     For ease of reference, we have reduced all share price figures to 2 digits after the decimal point.

[8]     CCB's H-shares have been listed on the Hong Kong Stock Exchange (Stock Code 939) since October 2005. BOA had been a pre-IPO strategic investor in CCB, agreeing to hold its shares until 27 October 2008.

5

SDNY_P030_0000000012

19.    Throughout the day on 6 January 2009 Raymond Park, assisted by William Tomita, short sold approximately 93 million shares in CCB at an average price of HK$4.52.

20.    In addition, on 6 January 2009, 17 million CCB shares were purchased at an average price of HK$4.59.   Those 17 million shares were then sold that same day during the closing auction session at the lesser price of HK$4.45.

21.    On 7 January 2009, the Tiger Asia funds were allocated 1,977 million CCB shares at a discounted price of HK$3.92 per share.   On that date, that is, 7 January 2009, the average traded price of CCB shares was HK$4.17.

22.    In the result, by short selling the shares ahead of the news of the block sale being made known to the market at an average price of HK$4.52, the two funds secured a net profit in excess of HK$32 million.

23.    In respect of this course of conduct, the Tribunal was asked to investigate whether market misconduct by way of insider dealing and false trading had taken place.

C.    The share placement of 13 January 2009

24.    On or about 12 January 2009, a representative of Morgan Stanley, contacted Raymond Park concerning the intended block sale by the Royal Bank of Scotland ("RBS") of shares in BOC.   Again, prior to giving over any price sensitive information, Raymond Park was asked if he agreed to be wall crossed.

6

Again, he agreed.

25.    The representative then informed Raymond Park that RBS was seeking to sell approximately 10.8 billion shares of BOC at a discount to the market price of between 7% and 11%.   The representative said that the deal would close within 24 to 48 hours.

26.    This information was conveyed to Bill Hwang who instructed that the Tiger Asia funds should participate in the block sale but that, prior to the sale taking place, there should again be short selling of the stock.

27.    Accordingly, on the 12th and 13th January 2009, the Tiger Asia funds short sold in excess of 256 million BOC shares at an average price of HK$1.87 per share.

28.    On 13 January 2009, after the market closed, the Tiger Asia funds were allocated 450 million BOC shares at a discounted price of HK$1.71 per share.

29.    However, on the following day (14 January 2009), instead of declining, the share price rose, closing the day at HK$1.90.   In the result, this translated into a net loss of some HK$10.3 million.

*Putting the conduct into context*

30.    Bill Hwang has not sought to resile from the courses of conduct detailed above.   However he has sought to reject the suggestion that he

7

SDNY_P030_0000000014

committed himself to a course of dishonest cheating on a systemic level.   On his behalf, it was said that while the decisions were made quickly – as many decisions in the market must be – they were not made without any consideration of their true nature or consequence.   The Tiger Asia funds had maintained short positions in these banking stocks for a long time and had anticipated using the private placements – which were widely anticipated would be made upon the expiration of certain 'lock-up' agreements – as part of their strategy to cover their short positions.   It was said on Bill Hwang's behalf that, when the opportunities presented themselves to put the strategies into effect, he did not give the appropriate consideration to the circumstances that prevailed and in that regard made a profound error of judgment.   But it was no more than that, namely, an error of judgment, albeit profound and nothing more sinister.

31.      In order to consider this submission, the Tribunal is of the view that it must be considered in light of a pivotal fact, namely, that each set of dealings was preceded by a formal and unequivocal undertaking to be wall crossed.

32.      We have earlier, through the words of Mr Peter Guenthardt[9], described the nature and purpose of 'wall crossing'.   In direct terms, it may be said that wall crossing is the act of making a third party an 'insider' by providing that third party with information which is considered by the person giving it, invariably a market professional, to constitute inside information.   It is a widely accepted market practice in the international financial market.   It is however much more than a mere convenience.   Invariably, especially on the part of and among institutional investors, confidential soundings take place in advance of

---

[9]      See paragraph 8 and its accompanying footnote.

SDNY_P030_0000000015

financial exercises which seek to raise capital in order to gauge interest in, or seek support for, an identified financial transaction including, where relevant, its potential pricing.   Wall crossing is therefore an important tool in ensuring the efficient operation of financial markets.    It is a tool built on trust. In agreeing to be wall crossed, a market practitioner accepts that he will be given information considered – invariably by another market practitioner – to be non-public price sensitive information, that is, inside information.   As such, in agreeing to be wall crossed, a market practitioner accepts obligations of strict confidence in respect of the information passed to him.   He further accepts that he may not deal (or otherwise act) on the basis of the information given to him until that information has clearly moved into the public domain.

33.      Bill Hwang and Raymond Park were highly experienced and successful dealers in the equity markets.   At the very least, both must have understood that the well-established importance of the practice of wall crossing would be in jeopardy of being undermined if market practitioners, who had agreed to be wall crossed and had obtained information on that basis, were then able to finesse matters by arguing that, as they saw it, that information did not constitute non-public price sensitive information and could therefore be dealt with as they saw fit to their own advantage no matter that others in the industry, having given the same undertaking, would have honoured it.   We have observed earlier that wall crossing is built on trust. In the present case, on three occasions formal undertakings to be wall crossed were given.   Bill Hwang knew of those undertakings.   On three occasions, however, those undertakings were cast to one side.   In the view of the Tribunal, that constituted much more than an error of judgment, profound or otherwise.   It amounted to acts of

9

insider dealing aggravated by what Bill Hwang and Raymond Park must have known at the time constituted blatant breaches of trust on their part.

*Hong Kong proceedings pursuant to section 213 of the Ordinance*

34.     Some seven months after these events, in August 2009, the SFC commenced proceedings in the Hong Kong Court of First Instance against Tiger Asia, Bill Hwang, Raymond Park and William Tomita, the proceedings being founded on the allegation that, in their dealings in the shares of BOC and CCB, they had been guilty of market misconduct, more particularly insider dealing. These proceedings – separate from the later proceedings instituted before this Tribunal – were instituted by the SFC pursuant to section 213(2)(b) of the Ordinance, the section giving the Court the power, if it appears that there has been market misconduct, to order that remedial measures be put into effect, including freezing injunctions and orders that steps be taken to restore the position of affected parties.[10]   Such proceedings are essentially remedial.

35.     At or about the time when these Court of First Instance proceedings were instituted, it appears that insider trading was disputed.   By way of example, in an earlier letter to the SFC dated 29 April 2009, Tiger Asia's New York attorneys[11] had written in respect of the dealings in CCB shares:

> "At the time it made the relevant trades, it did not appear that [Tiger Asia] was in possession of material non-public information.   Among other things, on 6 January 2009, Bank of America's decision to sell a block of its CCB

---

[10]   Section 213(2)(b) directs that:   "... where a person has been, or it appears that a person has been, is or may become, involved in any of the matters referred to in subsection (1)(a)(i) to (v), whether knowingly or otherwise, an order [may be made] requiring the person to take such steps as the Court of First Instance may direct, including steps to restore the parties to any transaction to the position in which they were before the transaction was entered into."

[11]   The attorneys were Ropes & Gray LLP.

SDNY_P030_0000000017

shares was already well-known to the market.    Thus, any possible effect of the block sale would have already been priced-in to the shares."

36.    The Court of First Instance proceedings were only resolved following a judgment of the Court of Final Appeal.    However, the principal issue in those proceedings was not one of whether there had or had not been market misconduct.    The single, determining issue was one of jurisdiction.    The challenge to jurisdiction was made on the basis that, in the absence of a prior determination by a criminal court or by the Market Misconduct Tribunal that there had been insider dealing, the Court of First Instance did not have jurisdiction in a section 213 application to determine whether there had been such a contravention and to make orders accordingly.

37.    The trial court found that the challenge was correct in law.    However, that Court's decision was reversed by the Court of Appeal and the matter then went to the Court of Final Appeal which, in a judgment handed down on 10 May 2013, upheld the decision of the Court of Appeal[12].

38.    It was on 11 July 2013, following the judgment of the Court of Final Appeal, that the Notice constituting this Tribunal was issued.

39.    On 16 December 2013, Tiger Asia, Bill Hwang and Raymond Park signed a statement of agreed and admitted facts for the purpose of resolving the section 213 proceedings which had been remitted back to the Court of First

---

[12]    See *Securities and Futures Commission v Tiger Asia Management LLC and Others* (as yet, unreported) FACV Nos 10, 11, 12 and 13 of 2012.

11

SDNY_P030_0000000018

Instance for determination.   In that statement, they admitted contraventions of section 291(5), namely insider dealing, and section 295(1)(b), namely false trading.

40.      On 20 December 2013, the Court of First Instance approved the terms of a consent order which provided that a sum of HK$45,266,610.00 paid into court by Tiger Asia would be used to provide financial restitution to those persons who had entered into transactions with Tiger Asia when it had engaged in insider dealing in the BOC and CCB shares.   There were 1,426 counterparties to Tiger Asia's insider dealing in BOC shares and 373 counterparties to Tiger Asia's insider dealing in CCB shares.

*Proceedings in the United States*

41.      In December 2012, a year before the making of the consent order by the Court of First Instance, the United States Attorney's Office ("the USAO") and the Securities and Exchange Commission ("the SEC") had announced the completion of criminal and civil proceedings in the United States arising out of the same acts of insider dealing.   It appears that this was done by way of an overall plea agreement.

42.      As part of the agreement, Tiger Asia, represented by Bill Hwang, pleaded guilty to one criminal charge of wire fraud[13] brought by the USAO, the criminal court making a forfeiture order in a sum in excess of US$16.25 million and imposing a one-year probation order on the company.

---

[13]     In violation of Title 18, United States Code, Section 1343.

SDNY_P030_0000000019

43.      As part of the same agreement, the SEC filed civil proceedings in the
United States District Court for the District of New Jersey against Tiger Asia,
Bill Hwang and Raymond Park[14] for various breaches of United States securities
law.   Without admitting or denying the allegations in the complaints, the three
nevertheless consented to judgment[15].

44.      In terms of the judgments, Tiger Asia and Bill Hwang were held
jointly and severally liable to disgorge a sum in excess of US$16.75 million
(plus pre-judgment interest), representing profit gained as a result of their
conduct alleged in the complaints.   Both further submitted to orders that each
pay an amount in excess of US$8.29 million as a civil penalty and that each be
permanently restrained from future violations of United States securities law[16].
For his part, Raymond Park was held liable to disgorge a sum of US$34,897.00
(plus pre-judgment interest) and to pay a sum of US$34,897.00 as a civil penalty.
He too was permanently restrained from future violations of United States
securities law.

---

[14]   A further party, an associated corporation, was the subject of the civil complaint, namely, Tiger Asia
Partners LLC.

[15]   In later orders concluding separate administrative proceedings, the SEC's civil complaints were described
in abbreviated form.   By way of example, the order imposing administrative sanctions on Bill Hwang
summarised the civil complaints made against him in the following terms: "The SEC's complaint alleged
that Hwang engaged in insider trading when Tiger Asia entered into wall crossing agreements during
December 2008 and January 2009 for three private placements of Chinese bank stocks, subsequently
violated the wall crossing agreements by short selling the stocks, and then covered the short positions with
private placement shares purchased at a discount.   The complaint further alleged that by trading after
receiving the material non-public information concerning the private placements, Hwang breached a duty
owed to the provider of the private placement information, the placement agents representing the sellers of
the securities.   The complaint also alleged that Hwang violated the Advisers Act by directing trades to be
placed in certain Chinese bank stocks at month's end in November and December 2008 and January and
February 2009 in an attempt to manipulate the price of the stocks to increase assets under management,
which in turn would increase management fees during those four months."

[16]   A "permanent restraint" under United States law is, broadly speaking, equivalent to a "cease and desist"
order made pursuant to section 257(1)(c) of the Securities and Futures Ordinance, Chapter 571.

13

SDNY_P030_0000000020

45.     It has been estimated[17] that the civil orders made against Tiger Asia, Bill Hwang, Raymond Park and the associated corporation, Tiger Asia Partners LLC, totalled around US$44 million, some of this money being used to settle the criminal forfeiture order.

46.     It is to be noted that the SEC instituted administrative proceedings in terms of which, pursuant to section 203(f) of the Advisers Act, Bill Hwang and Tiger Asia were barred from working in the financial industry in the jurisdiction of the United States in a representative capacity for a period of five years and Raymond Park for a period of three years.   At the time of the hearing before this Tribunal, Bill Hwang was occupied in investing its own assets and those of family members while the company, under the new name of Archegos Capital Management LLC, managed those invested assets.

47.     Finally, in respect of the proceedings in the United States, it is to be noted that William Tomita was not a cited party.

*The issue of the Notice*

48.     It was against this background that on 11 July 2013 the SFC issued its Notice.   As earlier mentioned, the terms of the Notice are set in Annexure A to this report.

---

[17]   See the statement of Cheng Tak Ka dated 12 March 2014, Mr Cheng being an Associate Director of the SFC.

SDNY_P030_0000000021

*Proceedings following the issue of the Notice*

49.      Prior to the appointment of members of the Tribunal, a preliminary hearing to map the way forward was held before the Chairman, Mr Justice Hartmann, on 5 September 2013. The presenting officer was Mr Simon Westbrook SC leading Mr Norman S P Nip.    All the specified persons - Tiger Asia, Bill Hwang, Raymond Park and William Tomita - were represented by counsel and where so represented at subsequent hearings.

50.      Notwithstanding the resolution of legal proceedings in the United States in the manner described earlier in this chapter, the preliminary hearing proceeded on the basis that there would be no admissions of liability as to the matters to be determined by the Tribunal.   It was on this basis that the full month of May 2014 was reserved for the substantive hearing with a pre-hearing conference to be held on 19 December 2013.

51.      On 17 December 2013, however, the Secretary to the Tribunal was informed that a Statement of Agreed and Admitted Facts ("the Statement") had been signed by all parties for the purpose of resolving the proceedings.    A copy of the Statement is annexed as Annexure B to this report.

52.      In the Statement, three of the specified persons - Tiger Asia, Bill Hwang and Raymond Park - accepted that they had engaged in market misconduct in respect of their dealings in the securities of BOC and CCB, specifically insider dealing, contrary to section 270(1)(e) and false trading, contrary to section 274(1)(b) of the Ordinance. In this regard, the first paragraph of the Statement commenced -

15

SDNY_P030_0000000022

"During the period from 19 December 2008 to 13 January 2009, Tiger Asia Management LLC, Mr Bill Hwang Sung Kook and Mr Raymond Park engaged in market misconduct in the securities of China Construction Bank Corporation (CCB) and Bank of China Limited (BOC) within the meaning set out in sections 270(1)(e) and 274(1)(b) of the Securities and Futures Ordinance."

53.     Agreed details of the market misconduct were set out in paragraphs 13 to 41 of the Statement.

54.     In the statement, the total notional profit made by Tiger Asia as a result of the market misconduct was agreed in the sum of HK$41,193,734.00.

55.     As for William Tomita, in paragraph 2 of the Statement the SFC accepted that at all material times he had been a junior member of staff, acting always on the instructions of Bill Hwang and/or Raymond Park and had not engaged in market misconduct as described in Part XIII of the Ordinance.   This exoneration was, of course, consistent with the fact that William Tomita had not been cited in any of the United States proceedings.

56.     For the avoidance of doubt, therefore, the Tribunal confirms that William Tomita's actions have not been the subject of any further consideration by it and no findings have been made against him.

*The findings of the Tribunal in respect of market misconduct*

57.     Having considered all relevant evidence before it, having heard submissions from counsel on the three days of the substantive hearing, that is, on 7 and 8 May and 16 June 2014, and having been directed as to law by the

16

Chairman, the Tribunal came to the finding that Tiger Asia, Bill Hwang and Raymond Park had engaged in market misconduct on the occasions described in the Statement and in the manner so described.   The Tribunal was further satisfied that the amount of profits gained was as set out in the Statement.

58.      In respect of William Tomita, the Tribunal came to the finding that he should not be identified as a person who had engaged in the market misconduct that formed the subject of the enquiry.

*No request for an order pursuant to section 257(1)(d)*

59.      In respect of orders to be made consequent upon the Tribunal's finding of liability, Mr Westbrook, informed the Tribunal that the SFC did not seek any order pursuant to section 257(1)(d) for the payment of monies equivalent to the amount of any profit gained by reason of any of the parties' market misconduct. In this regard, the section provides that the Tribunal may make an order that a person identified as having engaged in market misconduct should "pay to the Government an amount not exceeding the amount of any profit gained or loss avoided" as a result of his or her misconduct.

60.      Mr Westbrook informed the Tribunal that the SFC was of the view that such an order would not be appropriate in this case by reason of the financial impositions that had already been levied. In this regard, he made reference to the following:

    i.    the civil and criminal penalties imposed on the parties in the proceedings in the United States in an amount totalling approximately US$44 million, and

17

    ii.    the sum of HK$45,266,610.00 paid into the Court of First Instance in this jurisdiction in order to provide financial restitution to the 1,426 counterparties to Tiger Asia's insider dealing in BOC shares and 373 counterparties to Tiger Asia's insider dealing in CCB shares.

61.    The Tribunal agrees that, having regard to all the circumstances, no order pursuant to section 257(1)(d) should be made.

*Costs*

62.    As it was, costs were not an issue.   The three identified parties consented to orders being made against each of them for the payment of costs (to be taxed if not agreed), first, to the Government pursuant to section 257(1)(e) and, second, to the SFC pursuant to section 257(1)(f).   The Tribunal considers these to be appropriate orders.

*The sole issues in dispute*

63.    As it was, therefore, the only matters in contention were whether the Tribunal should impose orders pursuant to section 257(1)(b) and (c) of the Ordinance.

18

SDNY_P030_0000000025

CHAPTER 2

THE TWO DISPUTED ORDERS

64.     Mr Westbrook, the presenting officer, informed the Tribunal that, with all other matters settled, the SFC sought two orders only to be imposed upon each of the parties, the purpose of the orders being solely to protect the integrity of the Hong Kong financial market.

65.     The orders sought are, first, orders pursuant to section 257(1)(b) of the Ordinance, commonly known as "cold shoulder orders" and, second, orders pursuant to section 257(1)(c), commonly known as "cease and desist orders".

66.     On behalf of each of the parties, counsel submitted that, while the Tribunal possessed the discretionary power to impose the orders, having regard to the circumstances of each party, there was no purpose in their imposition and that they should not be imposed: put shortly (but not exhaustively), that the parties no longer posed any threat to the integrity of the Hong Kong financial market and accordingly it would be inequitable to impose the orders.

*Cold shoulder orders*

67.     Section 257(1) directs that at the conclusion of any proceedings the Tribunal may make orders pursuant to section 257(1)(b) in respect of any person identified as having engaged in market misconduct.   The power is therefore discretionary.   Section 257(1)(b) provides that the Tribunal may order that a person identified as having engaged in market misconduct -

19

"… shall not, without the leave of the Court of First Instance, in Hong Kong, directly or indirectly, in any way acquire, dispose of or otherwise deal in any securities, futures contract or leveraged foreign exchange contract, or an interest in any securities, futures contract, leveraged foreign exchange contract or collective investment scheme for the period (not exceeding five years) specified in the order."

68.      Unless the leave of the Court of First Instance is first obtained, a cold shoulder order has the effect of prohibiting a person who is the subject of the order from any dealings, direct or indirect, in the Hong Kong financial market for the life of the order.    Put succinctly, the person is shut out entirely from the market for the life of the order.    For a person whose profession is based on the ability to have access to the market it is potentially a Draconian prohibition.    It is not therefore an order to be imposed as a matter of course.

69.      Experience has shown that a cold shoulder order may be difficult to enforce, more especially as nominee arrangements may be used as a smoke screen.    To try and avoid this, section 257(1)(9) provides that, when the Tribunal makes a cold shoulder order, the SFC may notify any licensed person or registered institution of the order in such manner as it considers appropriate.

70.      A failure to comply with a cold shoulder order constitutes a criminal offence.    A conviction on indictment attracts a fine of HK$1 million and imprisonment for two years; on summary conviction a fine at level 6 may be imposed and imprisonment for six months.

SDNY_P030_0000000027

71.     It follows that if a licensed person or registered institution aids and abets the avoidance of a cold shoulder order they commit a criminal offence.

72.     Even though a cold shoulder order may result in financial loss, it is now settled that this effect is incidental and subservient to the primary intention of protecting the public.    In this regard, see for example the observations of the Court of Appeal in *Cheung Sau Lin and Another v Market Misconduct Tribunal and Another*[18] (paragraphs 34 and 35):

> "In our judgment, a "cold shoulder order" serves the same essential purpose as a disqualification order. It is not penal in character. It is protective. The integrity of the financial markets must be safeguarded and, if it has been demonstrated that a person cannot be trusted to operate in the markets in accordance with the requirements of the Ordinance, then he can be prevented from doing so for such period of time as the Tribunal considers appropriate. A "cold shoulder order" serves to protect financial institutions as well as the investing public.

> Yes, of course, the consequence of a "cold shoulder order" may be damaging to the identified person but that does not detract from the primary purpose and essential character of the order. In this regard, it is important to note that the Court of First Instance is given the power to alleviate any burden created by a "cold shoulder order" which, while detrimental to the interests of the identified person, may not serve to advance the protective purpose of the order."

73.     A cold shoulder order may be imposed for a maximum of five years. What is the appropriate length of an order lies within the discretion of the Tribunal, that discretion being exercised in the light of all relevant circumstances.    Clearly, one of the relevant circumstances in determining the length of an order will relate to the nature of the market misconduct that has

---

[18]     Unreported, HCAL 123/2007, 124/2007 and 22/2008 dated 22 September 2008.

SDNY_P030_0000000028

been proved.   The more systematic that conduct, the clearer the intent to disregard the statutory provisions, regulations and codes of conduct governing the principled participation in the market, the greater the damage actually occasioned or intended, then, absent other compelling factors, the longer the life of the order is likely to be.   This is not because the order is imposed as a punishment.   It is because the greater the threat to the integrity of the market exhibited by proven conduct the more extensive the need for protective measures.

*Cease and desist orders*

74.      Section 257 (1)(c) provides that the Tribunal may order that a person identified as having engaged in market misconduct -

> "… shall not again perpetrate any conduct which constitutes such market misconduct as is specified in the order (whether the same as the market misconduct in question or not)."

75.      The Ordinance clearly permits the making of cease and desist orders in perpetuity: a form of permanent injunction. In addition, it clearly permits the Tribunal, if it believes it to be appropriate in order to protect the integrity of the market, to specify forms of market misconduct which have not been the subject of a finding by the Tribunal in the proceedings.

76.      As with an order made under section 257(1)(b), breach of a cease and desist order constitutes a criminal offence, attracting the same maximum punishment.

SDNY_P030_0000000029

77.      Cease and desist orders do not shut out the person who is the subject of the order from the market. Instead, on pain of criminal punishment, they seek to ensure that all future dealings by that person avoid the market misconduct set out in the order.   In *Cheung Sau Lin and Another v Market Misconduct Tribunal and Another* (cited earlier), the Court of Appeal found such orders to be preventative and not penal, looking to the future protection of the market.

*Overview*

78.      In the view of the Tribunal, cold shoulder orders and cease and desist orders, while of the same genus, seek to protect the market in different ways. They are not therefore mutually exclusive, the Tribunal being able to impose one or the other but not both.   A cold shoulder order imposes a prohibition on an identified person from dealing for a specified time; a cease and desist order permits dealing subject, as a reminder at all times to do so lawfully, to the sword of Damocles being held over his head.

79.      When looking to the purpose of protective orders such as cold shoulder and cease and desist orders it is important, we think, to take into the account the importance of what is sought to be protected.   What is sought to be protected is the integrity of Hong Kong's financial markets.   Our courts (in both the criminal and regulatory jurisdictions) have pointed out on numerous occasions the degree to which the prosperity of Hong Kong relies on its financial industry and the degree to which the strength of that industry in its turn

23

is reliant on the perception of all market participants, both local and international, that it is an orderly-run, transparent market.[19]

80.      Finally, for the avoidance of ambiguity, it needs to be clearly stated that cold shoulder orders and cease and desist orders, being imposed in order to protect the integrity of the market and not by way of a penalty, are only to be imposed when, in the view of the Tribunal, there is a requirement for protection.

---

[19]   In this regard, in *HKSAR v Du Jun* (paragraph 158) [*Unreported, CACC334/2009 dated 20 September 2012*] the Court of Appeal made the following observations: "This jurisdiction has its own circumstances in the context of which insider dealing - especially insider dealing by persons in a position of trust - is to be viewed. It is not a mere soundbite to talk of the importance of the integrity of this particular market. It is a self-evident importance not devalued by the fact that the point is so often made."

SDNY_P030_0000000031

CHAPTER 3

RAYMOND PARK

81.      Because of an intervening medical crisis which, on the evidence, has left Raymond Park with permanent intellectual impairment, his case is exceptional and stands to be considered apart from those of Bill Hwang and the company, Tiger Asia.

82.      The uncontested evidence is to the effect that on 7 January 2014 Raymond Park, who at the time was just 41 years of age, suffered what in lay terms is described as a 'stroke'.   This was caused by a cerebral aneurysm which ruptured.   He suffered widespread brain damage to the left temporal lobe and surrounding tissue.   His condition required a craniectomy (removal of portion of his skull) in order to extract a blood clot and to allow for swelling of the brain.   After some 10 days, he was able to return home.   By then, neurologically, he was showing signs of improvement.   He was able to move his arms and legs and to follow simple commands.   His speech, however, was severely impaired, his words being garbled and not understandable in English or Korean.

83.      On 30 January 2014, Raymond Park was taken back to hospital with blood oozing from the right side of his head.   He was found to have a fresh haemorrhage, setting back the progress earlier made.   Thereafter he underwent additional brain surgery.   He was discharged on 6 March 2014.

25

SDNY_P030_0000000032

84.      So that Raymond Park's prognosis could be fully (and independently) assessed, he was examined on 23 May 2014 by Dr Hal Gutstein, an assistant clinical professor of neurology at the New York University School of Medicine. Dr Gutstein's report is dated the same day.

85.      In making his report, the doctor confirmed that he had read the 'Code of Conduct for Expert Witnesses', the code which governs the giving of evidence by experts in Hong Kong, and agreed to be bound by it.

86.      Having reviewed the records and examined all MRI and CT images, the doctor concluded: "The upshot of all these studies is that there is significant and widespread brain damage to the left temporal lobe and surrounding brain tissue due to brain haemorrhage, infarction (death of tissue) and swelling."

87.      The doctor explained the consequences of the brain damage by saying: "The temporal lobes are involved in the retention of comprehending language, visual memories, processing sensory input, storing new memories, emotion, and deriving meaning."   He continued: "The left temporal lobe holds the primary auditory cortex which is important for the processing of semantics in both speech and vision.   Wernicke's area, which spans the region between temporal and parietal lobes, plays a key role (in tandem with Broca's area in the frontal lobe) in speech comprehension.   The functions of the left temporal lobe are not limited to low-level perception but extend to comprehension, naming and verbal memory."

26

SDNY_P030_0000000033

88.    Raymond Park's wife reported to Dr Gutstein that her husband was able to express himself in short sentences but was incapable of obtaining depth or complexity of language.   She estimated that he had lost about 90% of his vocabulary. She said that he spoke gibberish about 40 to 50% of the time, his Korean language skills being no better than his English. She said that he had speech therapy sessions several times a week.   This had resulted in improvements initially but his condition had plateaued.

89.    Dr Gutstein's own examination confirmed what was reported to him. In respect of Raymond Park's mental state, the doctor's report states that he was at the time awake, alert and pleasant.   However, his speech output was limited and was notable for the neologisms (gibberish) that punctuated his speech together with its general lack of clarity and precision.   The doctor reported that Raymond Park could not name simple objects such as a watch, ring or pen; that he could not do simple mathematical calculations and was unable to give his address other than saying "New York".   In respect of his physical abilities, the doctor reported, among other matters, that he was unable to follow right-left commands (such as "take your left hand and touch your right ear"), either being perplexed by the instruction or doing it incorrectly[20].

90.    Dr Gutstein's prognosis was poor.   In this regard, having set out the nature of the brain damage sustained, he continued in his report to conclude:

---

[20]   Dr Gutstein's report also spoke about the impairment to Raymond Park's motor skills, for example, the fact that he had a tendency to stumble and knock into things on his right side due to an impairment of his vision on that side. However, in this report we have not concentrated on this aspect of Mr Park's impairments as we are more concerned with his ability, now and in the foreseeable future, to meet the intellectual challenges of dealing in financial instruments of all kinds.

SDNY_P030_0000000034

"Hence, damage to the left temporal lobe, as in this case, impairs retention of visual memories, processing sensory input, comprehending and expressing language, storing new memories, emotion, and deriving meaning of written and spoken language.

Expressly, I can state with a reasonable degree of medical certainty that these brain injuries and residua have produced meaningful and partial permanent impairment of Mr Park's every day activities...

Consequently, I can state with a reasonable degree of medical certainty that these traumatic brain injuries and residua, including residual cognitive deficits of adaptive, cognitive, executive and language functions with right side motor abnormalities, have caused and are going to continue to produce chronic symptoms of variable severity that are going to progress over time. Unfortunately for Mr Park the brain injuries and residua will impair most of Mr Park's recreational, occupational, social and personal activities. Because of his stroke, related brain injuries, residual deficits with limitations of adaptive, cognitive, executive and language functions with right side motor abnormalities, Mr Park is subject to future and recurrent aggravations and exacerbation of his symptoms.

Sadly for Raymond, as a result of these brain haemorrhages and injuries, in the future he is at higher risk to suffer from some combination of seizures, pneumocephalus, recurrence of haematoma, subdural empyema, meningitis, brain abscess and hydrocephalus as a result of his brain injuries sustained on 7 January 2014. Raymond is [also] at higher risk for early onset Parkinson's disease, Alzheimer's disease and severe depression...

...

Appropriately, because of these stroke-related brain injuries, Mr Park will require ongoing and long-term treatments that includes speech and occupational therapy, medications, and restriction of activities, and a home-care programme consisting of cognitive rehabilitation and counselling. None of these treatments are likely to reverse his brain injuries."

91.    Dr Gutstein went on to state his opinion that Raymond Park's brain injuries must therefore be considered permanent.    In the result, he concluded as follows:

28

SDNY_P030_0000000035

"Categorically, Raymond's prognosis for full and complete recovery from these injuries is poor. I do not see any meaningful improvement in any of his neuro cognitive or physical deficits nor, therefore, any prospect that he would be able to resume his former employment as a stock trader in the foreseeable future.

I do not see any meaningful improvement in any of his neuro cognitive or physical deficits in the foreseeable future. I find him [to be] totally disabled and unable to work in any capacity primarily due to his neuro cognitive deficits and motor impairments as described in this report."

92.     In the opinion of the Tribunal, the report is unequivocal in coming to the conclusion that, as a result of a severe stroke, one that has affected his cognitive and intellectual abilities far more than his motor skills, Raymond Park is unable to engage in any form of decision-making that requires any form of understanding of numbers other than perhaps the most simple.

93.     Read as a whole, the Tribunal has no reason to doubt the accuracy of the report both as to the nature and extent of Raymond Park's brain injuries and the prognosis for any form of recovery.

94.     What then, in the opinion of the Tribunal, is the consequence?   The consequence is that, as a proven fact, over the span of the next several years, indeed in all probability for the rest of his life, Raymond Park will not have the required cognitive powers to grasp – let alone to attempt to apply - the required skills to buy and sell shares on the stock market even at the most modest level. Certainly, in the view of the Tribunal, Dr Gutstein's report would reject any suggested ability to comprehend and manage the multi-layered dynamics of

SDNY_P030_0000000036

investing in shares, derivatives and other financial instruments by way of business.

95.     That being the case, the Tribunal is of the opinion that no purpose will be served in imposing either a cold shoulder or a cease and desist order on Raymond Park.  It has come to this conclusion in light of the fact that a protective order is only to be imposed if and when the person (who is the proposed subject of the order) poses a threat to the integrity of our market; put simply, when there is a need for protection.   Raymond Park poses no threat. The Tribunal is satisfied that his cognitive skills are, for both the present and the foreseeable future, too catastrophically damaged.   He therefore poses no threat either at the more modest level of trading for his own benefit, even with limited funds, or at the more elevated level of trading day by day by way of business using third-party funds.

96.     Neither order will therefore be imposed upon Raymond Park.

SDNY_P030_0000000037

CHAPTER 4

BILL HWANG AND TIGER ASIA

*Background*

97.　　As we have indicated earlier, Bill Hwang established the two Tiger Asia funds.　At all times, he owned 99% of the issued share capital in Tiger Asia, the company through which the two funds were managed, and appears still to enjoy the same holding. He has therefore at all material times controlled the company through which the funds were managed and, when the funds were in operation, controlled their day-to-day activities too.　It is not disputed that the ultimate responsibility for the market misconduct which is the subject of this report was his.

98.　　During their years of operation, the two Tiger Asia funds were very successful.　It appears that the funds provided investors with a return over the lifetime of the funds of approximately 15.8% per annum.　At or about the end of 2008, at the time of the market misconduct, investors had placed approximately US$4.7 billion into the two funds. Bill Hwang had become a very wealthy man and, so we are told, was a noted philanthropist.　However, as a result of the adverse publicity generated by the SEC investigation, investors withdrew their funds, forcing the closure of both funds.

99.　　At the time of the hearing before us, as a result of the five-year bar imposed by the SEC preventing him from engaging in the finance industry in a representative capacity,　Bill Hwang was investing as a private individual, that is, for his own benefit (and perhaps of family members) only.　In addition, as

31

SDNY_P030_0000000038

earlier indicated[21], Tiger Asia had changed its name to Archegos Capital Management LLC and, being itself no longer permitted to conduct trading in securities on behalf of the investing public, was reduced to managing funds – the Archegos Funds - which are made up of Bill Hwang's financial assets.   As it was expressed during the course of the hearing, Tiger Asia now exists solely as a 'family office'[22].

100.     That being said, although we have not been told the extent of Bill Hwang's financial assets, they would appear to be very substantial.   In a statement dated 8 May 2014, Mr Alan Linning of the firm of Sidley Austin, Hong Kong solicitors, said that the company employs about 17 staff in the family office and in its administrative functioning is responsible for paying overheads such as the rents of the office space and the cost of 'Bloomberg terminals'.   Put simply, on the basis of that primary evidence it has to be inferred that the company continues to manage very substantial funds which are used to trade not only within the United States but, whether actually or potentially, on international stock markets including Hong Kong.

*Is there any purpose to be served in imposing the orders?*

101.     What is to be remembered is that, if a cold shoulder order is not imposed, there appears to be nothing to prevent Bill Hwang from deploying his

---

[21]   See footnote 2 of this Report.

[22]   It appears that a 'family office' is excluded from regulation under the US Investment Advisers Act of 1940 because it benefits from the private adviser exemption. Permissible family clients include family members (fairly broadly defined), executive officers of the company and family charities and trusts. No evidence was put before the Tribunal as to the procedures that are to be followed in altering the status of a family office company so that it may accept and manage funds given to it by the investing public.

SDNY_P030_0000000039

own very substantial funds, or funds raised from third parties outside of the United States, in the Asian markets including the Hong Kong market.

102.     It has been said that, as a result of the investigations into his market misconduct, Bill Hwang's professional reputation has been all but destroyed. We accept, of course, that his professional reputation will have been very seriously diminished.  However, that being said, it is unlikely that his past successes in the Asian market will have been entirely forgotten and, if it is put out that he is seeking investment funds again (whether alone or in conjunction with other recognised dealers) in order to deal outside of the jurisdiction of the United States in the Asian market, we do not see it as being in any way incredible that he will be able to attract considerable financial backing.

103.     In summary, as a statement of generality only and without looking to the several matters of mitigation to which we refer below, it does not follow – in respect of the Hong Kong market – that the closure of the two Tiger Asia funds and the regulatory restrictions placed on Bill Hwang and/or his company have rendered any need for protective orders redundant.

*Looking to matters of mitigation*

104.     The Tribunal turns now to consider the various matters of mitigation which were advanced on behalf of Bill Hwang and Tiger Asia.

*A.   The culpability, being civil, is less serious than criminal culpability*

105.     It was submitted on behalf of the parties that, although all forms of insider dealing and market manipulation are undoubtedly serious, it must follow

33

SDNY_P030_0000000040

that the criminal species of market misconduct is more serious than the civil having regard to the penalties that may be imposed upon a criminal conviction when compared with the essentially protective measures only that may be imposed by this Tribunal in its civil jurisdiction.   On the basis of this general submission, and recognising that a cold shoulder order with a duration of up to 5 years may be imposed pursuant to the Securities and Futures Ordinance upon a finding of criminal guilt and/or a finding of civil culpability, it was said that a cold shoulder order in the upper range is plainly appropriate for more serious criminal misconduct while the lower range is appropriate for civil misconduct.

106.    We confess to having some difficulty with this submission.   If, pursuant to the Ordinance, cold shoulder orders of the same duration are permitted upon a criminal conviction *and* a finding of civil culpability, it must follow that the legislators have envisaged circumstances in which, in both the criminal and civil jurisdictions, protective orders of the maximum duration are warranted.   It is therefore the nature of the market misconduct under consideration that matters, be it proved in a criminal or civil context, and the perceived need to protect against a repetition of it or of similar misconduct.

107.    We would add that, in our view, when the nature of the statutory provisions are taken into account, it is too simplistic to say that all forms of more serious misconduct go before the criminal courts while all forms of less serious misconduct come before this Tribunal.   While practice may show that often to be the case, there may be a number of reasons not directly related to the seriousness of alleged misconduct that determine the jurisdiction in which it is judged.   For example, persons alleged to be responsible for market misconduct

34

SDNY_P030_0000000041

may no longer be within the jurisdiction.    As such, they are beyond the reach of our criminal courts but are still amenable to the civil jurisdiction of the Tribunal.

108.      As it is, in the present case we have been informed that one of the reasons why the decision was made to bring the present proceedings before the Tribunal rather than the criminal courts lay in the fact that the three parties had negotiated a settlement with the US authorities which raised an issue of possible double jeopardy.    That issue, taken together with the fact that the parties had already paid extensive penalties, led to the decision to proceed on a civil basis.

*B.   The losses already sustained*

109.      Mr Peter Duncan SC, counsel for Bill Hwang and Tiger Asia, estimated that the criminal, civil and administrative proceedings in the United States had resulted in penalties of just under HK$342 million while in Hong Kong itself the proceedings before the Court of First Instance had resulted in compensatory orders of some HK$45 million: a total in both jurisdictions, therefore, of some HK$387 million.    In addition, Bill Hwang and Tiger Asia had been excluded from licensed activities in the United States financial markets. To this was to be added the profound consequence that, as a result of the adverse publicity, Bill Hwang had been left with no alternative other than to close the Tiger Asia funds.

110.      We accept that the losses already sustained have been most substantial. As we have indicated, one of the factors that apparently persuaded the SFC to institute these proceedings before this Tribunal and not in the criminal courts is the extent of the losses and the fact that further penalties may be oppressive.

35

But of course we are not considering whether to inflict further penalties, we are limited to determining whether protective orders are necessary to secure the integrity of the Hong Kong market. That being said, we accept that the deterrent effect of the losses already inflicted is a relevant factor.

## C.  No personal gain

111.     On behalf of Bill Hwang, it was said that he did not seek to gain by way of bonus, commission or the like from the market misconduct. Tiger Asia was compensated by way of incentive fees (which in any event, for various reasons, were not applicable at that time) and management fees measured annually at 1.5% of the total of outside capital under management. More than that, Bill Hwang was "a highly successful fund manager and very wealthy in his own right, such that any indirect or notional benefit from the misconduct was insignificant in the scheme of things."

112.     While that may be so, the Tribunal cannot dismiss the fact that Bill Hwang had invested a significant portion of his own liquid assets in the Tiger Asia funds and therefore when the funds prospered so he prospered.

113.     What must also be taken into account, we think, is that Bill Hwang had created the funds. He had built his reputation on their success. It is apparent that his reputation, not only among investors but among his peers, was founded very materially on the continued success of the funds. In such circumstances, ambition and pride can be equally compelling motivators as the hope for a direct cash benefit. In that context, we are satisfied that the gains sought by Bill Hwang were personal gains.

36

SDNY_P030_0000000043

*D.  Admissions of liability*

114.      It was submitted on behalf of both Bill Hwang and Tiger Asia that, in respect of proceedings in Hong Kong, both before this Tribunal and before the Court of First Instance, a co-operative approach had been adopted resulting in admissions of liability and a shortening thereby of proceedings.

115.      Mr Westbrook SC, the presenting officer, was not prepared to accept this submission without qualification.   Mr Westbrook pointed to the fact that, when proceedings were first instituted in the Court of First Instance, there was no ready admission of liability; indeed, if anything, it was Bill Hwang and Tiger Asia's position that market misconduct was not conceded.

116.      The Tribunal accepts that there was no ready admission of liability in the First Instance proceedings until after the Court of Final Appeal judgment, the indicators being to the effect that market misconduct was disputed.   That being said, as we have noted earlier in this report, the First Instance proceedings went all the way to the Court of Final Appeal on the single issue of jurisdiction.   It was an important issue and even though the challenge was unsuccessful, having looked to the relevant judgments, it would be harsh, we think, to say that the challenge was utterly misconceived[23].   In context, it is our view that it is understandable that the parties may not from the outset have unequivocally admitted liability for market misconduct in the United States but left that issue until the issue of jurisdiction had finally been settled.   As it was, once that issue

---

[23]      On behalf of Bill Hwang, it was emphasised that his jurisdictional challenge had in fact been successful at First Instance.

SDNY_P030_0000000044

had been finally settled, timely admissions of liability were made both in the Court of First Instance proceedings and before this Tribunal.

117.    The Tribunal is therefore prepared to accept that the parties adopted a responsible approach in the conduct of proceedings here in Hong Kong, one that understandably, and quite properly, looked to their own interests first and thereafter to co-operation with the court processes.   Such an approach cannot be criticised and, taken together with the admissions of liability, can be given some limited weight as an indicator of a desire to avoid future market misconduct.

*E.   Previous good character*

118.    In the submissions made on behalf of Bill Hwang, it was said that the three instances of market misconduct "reflected a terrible error of judgment against the backdrop of an otherwise unblemished record spanning more than 20 years in the financial services industry".   It was further submitted that Bill Hwang's actions were "highly out of character" and had been devastating for him.

119.    While the Tribunal accepts that until late 2008 neither Bill Hwang's actions nor those of Tiger Asia had been the subject of any criminal, civil or administrative censure, as we have emphasized earlier, it is unable to accept that the three instances of misconduct which are the subject of this report were simply errors of judgment, the implication being that, although bad errors, they were made in good faith.   As we have said earlier, the market misconduct was made up of three separate incidents, similar in nature but independent of each

38

other.   In respect of each incident, Bill Hwang must have known that Raymond Park had given an undertaking to treat the information received as inside information and not to act on it.   In respect of each incident, therefore, Bill Hwang must have appreciated that at the very least he was ignoring undertakings given.   One incident of this kind may perhaps be viewed more benignly, especially if there was evidence before us that steps had immediately been taken by way of legal advice (or similar advice) to confirm that what had been done did not contravene the law or any code of professional conduct. But no such evidence was put before us.   Bill Hwang's actions were therefore systematic, clearly they were calculated, equally clearly they were calculated with an eye to profit or the avoidance of loss.   It is difficult in such circumstances not to come to the conclusion that there was a measure of bad faith in Bill Hwang's actions.   It was never suggested to us during the course of mitigation that solemn undertakings made to other professionals in the industry can be ignored with impunity.   That Bill Hwang was prepared to ignore those undertakings must raise the gravest doubts as to his sense of professionalism, propriety and, yes, his sense of honour as a leading figure in the finance industry.

120.     In addition, on the evidence put before the Tribunal, it is apparent that in or about March 2009, shortly *after* the three instances of market misconduct which are the subject of this report, the Securities and Exchange Surveillance Commission of Japan (the "SESC") imposed an administrative penalty of approximately US$816,500 on Tiger Asia Partners LLC, one of Bill Hwang's

SDNY_P030_0000000046

companies, in relation to the market manipulation of the shares of Yahoo Japan Corporation[24].

121.     In the view of the Tribunal, when considered as a whole, these acts of market misconduct suggest that not only was Bill Hwang prepared to ignore undertakings solemnly given on three separate occasions but that, in pursuing profit for his fund, he was less than scrupulous in ensuring compliance with the statutes, regulations and codes of conduct governing the markets in which he was participating.

*F.   Setting up compliance controls*

122.     The Tribunal was informed that the Tiger Asia, although now a 'family office' company, has undergone a rigorous overhaul of its compliance procedures.   In this regard, we were informed that in early 2010 an experienced compliance officer was recruited and that he has been responsible for regular compliance training by all staff members and that he has in addition been responsible for the creation of a compliance manual.   In particular, the officer has been responsible for the establishment of a written wall crossing procedure and personally conducts independent checks on all the company's market activities including – so it must follow – activity resulting from market-related decisions made by Bill Hwang himself.

---

[24]    It was the finding of the SESC (contained in its written recommendations of 13 December 2012) that, the culpable conduct of Tiger Asia Partners LLC consisted in part of a series of purchases of shares in Yahoo Japan Corporation made through multiple brokers in the form of discretion orders with a limit on the prices that were higher than the latest execution price, that manoeuvre bringing about a material rise in the market price. It was the finding of the SESC that the conduct of Tiger Asia Partners LLC was in violation of Article 159(2)(i) of the Financial Instruments and Exchange Act.

SDNY_P030_0000000047

123.     That compliance procedures have been put in place is of direct relevance when considering possible future threats to the integrity of the Hong Kong market on the part of both of Bill Hwang and Tiger Asia.   However, without seeking to undermine the importance of setting up such procedures, we must take into account two limiting factors. First, Bill Hwang still controls Tiger Asia.   It is therefore open to him at any time to change the present position, reducing, compromising or even removing compliance controls.   Second, there is nothing to prevent Bill Hwang from moving outside of the protective arm of Tiger Asia's compliance regime by acting in his personal capacity, in joint venture with others or through new corporations.

124.     In our view, there is also some force in the observation of Mr Westbrook that a failure of compliance procedures was not the reason why the market misconduct which is the subject of this report came about.   These transgressions, said Mr Westbrook, came directly from the top, they came in defiance of solemn undertakings given and must, on each of the three occasions, have constituted a calculated risk.

*The Tribunal's determination in respect of Bill Hwang*

125.     On behalf of Bill Hwang, it was said that his "isolated misconduct" did not make him a threat to the integrity of the Hong Kong market.   The misconduct occurred some six years ago and since that time he has continued to trade on the Hong Kong market without incident.   It was said that to deny him the ability to trade on his own account and to limit his ability thereby to pursue charitable objectives which are now part of his philanthropy would be oppressive.

41

SDNY_P030_0000000048

126.      We do not agree.   As we have said, the incidents of misconduct which have come to light satisfy us that at the relevant times Bill Hwang was less than scrupulous in ensuring compliance with the statutes, regulations and codes of conduct governing the markets in which he was participating.   It would be inaccurate to describe the misconduct which has been the subject of this report as constituting a single fall from grace.   There were three independent episodes of misconduct.   To compound matters, within months there had been a finding of market manipulation on the Japanese market.

127.      We have placed emphasis on the fact that, first, Bill Hwang must have known of the three undertakings given by Raymond Park, his Head of Trading, not to act on information received and, second, that, whichever way it is looked at, he made the decision to ignore those undertakings.   Whether a failure to comply with such undertakings constitutes of itself a breach of market rules is not really to the point.   What is to the point, we believe, is that patently any such undertaking, when given to a third party who then divulges information on the basis of the undertaking, underpins the efficient and honest workings of the market.   That being the case, a willingness to ignore such undertakings - three in a row - points to a state of mind, the more so when the person whose motivation is being examined is personally very wealthy and is the creator of successful funds.   We have said earlier that Bill Hwang's actions raise the gravest doubts as to his sense of honour as a leading figure in the finance industry.   That itself gives rise to the question: how much trust can be placed in a man who places such little store by his personal integrity?

42

128.     It has been said before on many occasions that the sustainability of the Hong Kong market, that is, the sustainability of its reputation as an orderly market, transparent and conducted in accordance with a code of conduct, a market that is free from manipulation, is critical to Hong Kong's on-going prosperity.   Public policy therefore demands that, if any individual threatens the reputation of the market, measures should be taken to protect against that threat.

129.     In our view, Bill Hwang's misconduct, whether classified as civil misconduct or administrative misconduct (as in Japan) was serious misconduct and, far from revealing one momentary lapse, revealed a pattern of behaviour. Importantly, it was a pattern of behaviour exhibited by an experienced and highly skilled market operative, a man who still has the means available to him, financial and otherwise, of repeating such misconduct or misconduct of a similar nature.   We are satisfied therefore that this is very much a case in which orders should be imposed to protect the integrity of the Hong Kong market.

130.     We have therefore determined that a cold shoulder order must, in the best interests of the Hong Kong market, be imposed.   The duration of such an order is a more difficult matter.   During the course of submissions we were referred to a number of past reports by this Tribunal.   While they were of assistance, we repeat that each case must be determined according to its own circumstances.   We cannot say that Bill Hwang's actions are of the most serious kind that can reasonably be anticipated to threaten the Hong Kong market.   In our view, it would therefore be wrong to impose an order enduring

43

for a full five years.   That being said, as we have made plain, we are satisfied that the actions were of a serious nature and, for the reasons given, little trust can be placed in Bill Hwang's integrity.   We are further satisfied that it is not beyond his means, outside of the jurisdiction of the United States, to attract very substantial funds for investment and to lead the deployment of those funds in the Asian market. Looking to the protection of the Hong Kong market, we have therefore come to the view that a cold shoulder order of four years should be imposed.

131.    We appreciate that this heralds a sterner approach in respect of protective measures provided under our law.   We are, however, unanimously of the view that the protection of our market is a matter of such public importance, and cold shoulder orders so central to providing that protection, that market operators who, by their actions, show they cannot be trusted must from now on expect orders that exclude them from the market for more lengthy periods of time.

132.    During the course of submissions, mention was made of Mr Hwang's philanthropy and that a cold shoulder order would place major obstacles in his attempts to raise funds for his charitable work. If that is an incident of the order then, even though regrettable, it must be accepted.   The position, however, is not that bleak.   The wording of the Ordinance permits dealing if the Court of First Instance gives leave.   Accordingly, should it be desired to make a major investment on behalf of a charitable fund or trust or for clearly identified charitable purposes there is no reason why an application to court cannot be made.

44

133.     We are further satisfied that a cease and desist order should be imposed, that order to specify conduct which constitutes insider dealing, false trading, price rigging or stock market manipulation.

*The Tribunal's determination in respect of Tiger Asia*

134.     Tiger Asia is the corporate vehicle through which Bill Hwang has acted in the past and continues to act.   While we accept that the provision of compliance procedures gives a measure of assurance as to continued dealing in accordance with market rules, so long as Bill Hwang is the controlling shareholder he has the power, as we have said, to weaken those procedures or indeed to do away with them.   In our judgment, a cold shoulder order of four years should also be imposed on Tiger Asia.

135.     We are further satisfied that a cease and desist order should be imposed, that order to specify conduct which constitutes insider dealing, false trading, price rigging or stock market manipulation.

SDNY_P030_0000000052

CHAPTER 5

A SUMMARY OF THE ORDERS MADE BY THE TRIBUNAL

136.     For the reasons given in the body of this report, pursuant to section 257 of the Ordinance, the Tribunal has made the following orders in respect of the following persons.

*Tiger Asia*

137.     The following orders are made in respect of Tiger Asia (Tiger Asia Management LLC):

    i.     Pursuant to section 257(1)(b) that it shall not, without the leave of the Court of First Instance, in Hong Kong, directly or indirectly, in any way acquire, dispose of or otherwise deal in any securities, futures contract or leverage foreign exchange contract, or an interest in any securities, futures contract, leverage foreign exchange contract or collective investment scheme for a period of four years, that period to commence on the date of this report.

    ii.     Pursuant to section 257(1)(c) that it shall not again perpetrate any conduct which constitutes insider dealing, false trading, price rigging or stock market manipulation as that misconduct is defined in the Ordinance.

*Bill Hwang*

138.     The following orders are made in respect of Bill Hwang Sung Kook:

46

i.      Pursuant to section 257(1)(b) that he shall not, without the leave of the Court of First Instance, in Hong Kong, directly or indirectly, in any way acquire, dispose of or otherwise deal in any securities, futures contract or leveraged foreign exchange contract, or an interest in any securities, futures contract, leveraged foreign exchange contract or collective investment scheme for a period of four years, that period to commence on the date of this report.

ii.     Pursuant to section 257(1)(c) that he shall not again perpetrate any conduct which constitutes insider dealing, false trading, price rigging or stock market manipulation as that misconduct is defined in the Ordinance.

*Raymond Park*

139.     It being recorded that no orders pursuant to section 257 (1)(b) and (c) have been made in respect of him, only the orders as to costs set out below are made.

*William Tomita*

140.     It is recorded that, no culpability having been identified on his part, no orders are made in respect of him.

*Costs*

141.     In respect of costs payable to the SFC pursuant to section 257(1)(f)(i) and (ii) of the Ordinance, by letter dated 4 July 2014 we were informed that agreement had been reached that Tiger Asia would pay the following costs on

SDNY_P030_0000000054

behalf of all the parties, the total of such costs being HK$3,162,562, that total being defined in the letter of 4 July 2014 in the following terms:

1.  pursuant to section 257(1)(f)(i) of the Ordinance, a sum of HK$3,007,046 on account of the costs and expenses reasonably incurred by the SFC in relation or incidental to these proceedings, being HK$482,046 in respect of experts costs and HK$2,525,000 in respect of legal costs and disbursements; and

2.  pursuant to section 257(1)(f)(ii) of the Ordinance, a sum of HK$155,516 on account of the costs and expenses reasonably incurred by the SFC in relation or incidental to investigations carried out before these proceedings were instituted.

142.    By consent, therefore, in order is made in those terms.

143.    As to costs payable pursuant to section 257(1)(e) of the Ordinance in respect of costs and expenses incurred by the Government (the Tribunal) in relation to or incidental to these proceedings, those costs are in the sum of $451,511.    In light of the agreement reached in respect of the costs of the SFC, an order *nisi* is made that these costs shall be paid by Tiger Asia on behalf of all the parties.    However, should Tiger Asia or any party seek a different order then application shall be made to this Tribunal within 30 days of the date of this report.    Should there be no such application this order shall then become final.

144.    Whatever may have been agreed between the parties as to costs, and whatever steps may be taken by this Tribunal to give effect to an agreement

SDNY_P030_0000000055

made by the parties that it considers reasonable, at the end of the day the issue of costs lies within the discretion of the Tribunal.   Accordingly, the orders made above, both final and provisional, are made subject to the condition that Bill Hwang and Raymond Park shall remain jointly and severally liable for all costs together with Tiger Asia until they have been paid in full.

*Section 264(1) of the Ordinance*

145.     Pursuant to section 264(1) of the Ordinance, the Tribunal directs that written notice be given in order to register these orders in the Court of First Instance.

SDNY_P030_0000000056

The Hon Mr Justice Hartmann NPJ

(Chairman)

Mr Cheung Ka Li

(Member)

Ms Chan Yuen Shan

(Member)

Dated 7th October 2014

50

SDNY_P030_0000000057

**IN THE MATTER OF THE LISTED SECURITIES OF
BANK OF CHINA LIMITED (STOCK CODE 3988) AND
CHINA CONSTRUCTION BANK CORPORATION (STOCK CODE 939)**

**NOTICE TO THE MARKET MISCONDUCT TRIBUNAL
PURSUANT TO SECTION 252(2) OF AND SCHEDULE 9 TO THE
SECURITIES AND FUTURES ORDINANCE CAP 571
("THE ORDINANCE")**

Whereas it appears to the Commission that market misconduct within the meaning of section 270 ("Insider Dealing") and section 274 ("False Trading") of Part XIII of the Ordinance has or may have taken place arising out of the dealings in the securities of Bank of China Limited (Stock Code 3988) ("BOC") and China Construction Bank Corporation (Stock Code 939) ("CCB"), the Market Misconduct Tribunal is hereby required to conduct proceedings and determine:

(a)  whether any market misconduct has taken place;

(b)  the identity of any person who has engaged in the market misconduct found to have been perpetrated; and

(c)  the amount of any profit gained or loss avoided, if any, as a result of the market misconduct.

**Persons and/or corporate bodies suspected to have engaged in market misconduct activities**

Tiger Asia Management LLC ("Tiger Asia"), Mr Bill Hwang Sung Kook ("Hwang"), Mr Raymond Park ("Park") and Mr William Tomita ("Tomita").

**Statement for institution of proceedings**

1.  At all material times, Tiger Asia was a limited liability company incorporated in Delaware, USA which managed hedge funds carried on through Tiger Asia Fund LP and Tiger Asia Overseas Fund Ltd ("the 2 Funds").

1
A1

SDNY_P030_0000000058

2.      Hwang was at all material times the managing member of Tiger Asia and had overall responsibility for managing its investments.  He was the sole principal and portfolio manager for the 2 Funds.

3.      Park was at all material times a director or employee of Tiger Asia.  Since April 2006, his job title at Tiger Asia has been Managing Director, Head of Trading. He was responsible for managing Tiger Asia's trading desk, supervising its orders and managing its broker relationships. Park was the head trader for the 2 Funds managed by Tiger Asia.

4.      Tomita was at all material times a director or employee of Tiger Asia.  He was responsible for supporting Tiger Asia's trading activities.

5.      At all material times, Park and Tomita were authorised by Tiger Asia to place orders for securities trading on its behalf with CLSA Singapore Pte ("CLSA") (Tiger Asia maintained an account with Calyon Securities (USA) Inc and CLSA handled Calyon Securities (USA) Inc's orders for trading stocks in Hong Kong and other Asian countries), Nomura International (Hong Kong) Ltd ("Nomura") (as agent for Nomura Securities International Inc), Fox-Pitt Kelton (Asia) Ltd ("Fox Pitt") (as agent for Fox-Pitt New York or Fox-Pitt London), Daiwa Securities SMBC Hong Kong Ltd ("Daiwa") (on behalf of Daiwa Securities America Inc), BNP Paribas Securities (Asia) Ltd ("BNP"), China International Capital Corporation Hong Kong Securities Ltd ("CICC"), and Hong Kong and Shanghai Banking Corporation Ltd ("HSBC") (on behalf of HSBC Securities (USA) Inc).

6.      On 31 December 2008, UBS AG on its own behalf placed 3,377,860,684 H-shares in BOC at HK$1.93 per share ("31 December Placement").

7.      On 7 January 2009, UBS AG, on behalf of Bank of America Corporation ("BOA"), placed 5,623,655,000 H-shares in CCB at HK$3.92 per share ("7 January Placement").

8.      On 13 January 2009, Morgan Stanley & Co International PLC and ABN AMRO Bank N.V. Hong Kong Branch and BOCI Asia Limited, on behalf of The Royal

SDNY_P030_0000000059

Bank of Scotland Group PLC ("RBS"), placed 10,809,154,259 H-shares in
BOC at HK$1.71 per share ("13 January Placement").

<u>31 December Placement</u>

9.   On 19 December 2008, Park, after giving an undertaking that Tiger Asia would
     not thereafter trade BOC shares, received the following information from Mr
     Peter Guenthardt of UBS AG, who was connected with BOC within the
     meaning of section 247 of the Ordinance:

     a.   UBS AG wished to sell its entire shareholding in BOC of 3,378 million
          shares worth approximately US$1 billion via a club deal after the expiry of
          the lock-up period on 31 December 2008;

     b.   The trade date and value date would be 31 December 2008 so settlement
          would be on a T+0 basis (i.e. trade date);

     c.   The price would be at a discount to the closing price on 30 December 2008
          and the discount would be between 8% - 10%;

          (together the "UBS Placing Information").

10.  The UBS Placing Information was relevant information as defined in section
     245 of the Ordinance in that it was specific information about BOC, a
     shareholder of BOC, namely UBS AG, and/or the listed securities of BOC,
     which information was not generally known to the persons who are accustomed
     or would be likely to deal in the listed securities of the corporation but which
     would, if it were generally known to them, be likely to materially affect the
     price of the listed securities.

11.  Park relayed the UBS Placing Information to Hwang who (1) decided on behalf
     of Tiger Asia to subscribe to the 31 December Placement and (2) procured Park
     and/or Tomita to place short selling orders of BOC shares ahead of 31
     December 2008.

12.  Between 19 to 30 December 2008, Tiger Asia and Park and/or Tomita (acting as
     agents for and on behalf of Tiger Asia) being in possession of the relevant

SDNY_P030_0000000060

information (i.e. the UBS Placing Information) which they received from a person (Mr Guenthardt) whom they knew or had reasonable cause to believe was connected with BOC, dealt in the listed securities of BOC by short selling 104 million BOC shares through Daiwa, BNP, HSBC and CICC at the average price of HK$2.2359 per share.

13.   On 31 December 2008, the 2 Funds managed by Tiger Asia were allocated a total of 199 million BOC shares at the price of HK$1.93 per share.   On 31 December 2008 and 2 January 2009, the average traded price of BOC shares was HK$2.1478.   By short selling the shares ahead of the placing news being publicly known to the market after it closed on 31 December 2008 at an average price of HK$2.2359 per share, Tiger Asia was able to sell the 104 million shares at HK$0.0881 per share higher than the average traded price on 31 December 2008 and 2 January 2009.   This resulted in a profit of HK$9,126,116 after taking into account the transaction costs.

7 January Placement

14.   On 6 January 2009, Park, after giving an undertaking that Tiger Asia would not thereafter trade CCB shares, received information from Mr Samuel James Kendall of UBS AG, who was connected with CCB within the meaning of section 247 of the Ordinance that BOA wished to sell its 5.6 billion shares in CCB on similar terms to a previous proposal in mid-December 2008, which was at a discount of about 15% to the closing price (the "BOA Placing Information").

15.   The BOA Placing Information was relevant information as defined in section 245 of the Ordinance in that it was specific information about CCB, a shareholder of CCB, namely BOA, and/or the listed securities of CCB, which information was not generally known to the persons who are accustomed or would be likely to deal in the listed securities of the corporation but which would, if it were generally known to them, be likely to materially affect the price of the listed securities.

16.   Park relayed the BOA Placing Information to Hwang who (1) decided on behalf of Tiger Asia to subscribe to the 7 January Placement and (2) procured Park

4

A4

and/or Tomita to place long, short selling and long selling orders of CCB shares ahead of 7 January 2009.

17. On 6 January 2009, Tiger Asia and Park and/or Tomita (acting as agents for Tiger Asia) being in possession of the relevant information (i.e. the BOA Placing Information) which they received from a person (Mr Kendall) whom they knew or had reasonable cause to believe was connected with CCB, dealt in the listed securities of CCB by buying 17 million CCB shares through CLSA throughout the day at an average price of HK$4.5912 per share and then sold these 17 million shares during the closing auction session on the same day at HK$4.45 per share through Daiwa.

18. In addition, Tiger Asia short sold 93 million shares of CCB on 6 January 2009 (50 million through Nomura and 43 million through Fox Pitt) at an average price of HK$4.5263 per share.

19. On 7 January 2009, Tiger Asia was allocated a total of 1,977 million CCB shares at the price of HK$3.92 per share.  On 7 January 2009, excluding the placing shares, the average traded price of CCB shares was HK$4.1788.  By short selling the 93 million shares ahead of the placing news being publicly known on 7 January 2009 at an average price of HK$4.5263, Tiger Asia was able to sell the 93 million shares at HK$0.3475 per share higher.  This resulted in a profit of HK$32,067,618 after taking into account the transaction costs.

20. Further, the placing of some of the buy and short sell orders by Park and Tomita on 6 January 2009 resulted in transactions that did not involve a change in the beneficial ownership of them.

21. The purpose and effect of the buy order of 17 million shares was to acquire shares so that a sell order of 17 million shares (placed through Daiwa) could be inputted during the closing auction session on 6 January 2009 so as to depress the closing price of CCB shares.  Accordingly, so long as the share price reacted as intended, Tiger Asia would be able to receive the CCB placing shares on 7 January 2009 at a lower price.

SDNY_P030_0000000062

22.   The buy and sell orders of 17 million CCB shares on 6 January 2009 were carried out with the intention that, or being reckless as to whether, such transactions had, or were likely to have, the effect of creating a false or misleading appearance with respect to the market for, or the price for dealings in, CCB securities traded on the Stock Exchange of Hong Kong.

13 January Placement

23.   On 12 January 2009, Park, after giving an undertaking that Tiger Asia would not thereafter trade BOC shares, received information from Mr Justin Haik of Morgan Stanley, who was connected with BOC within the meaning of section 247 of the Ordinance, that RBS intended to sell its entire holding of 10.8 billion shares in BOC if there was such demand from investors; the timing to launch the BOC block sale was expected to be within the next 24 to 48 hours and the indicative discount would be within the range of 7 to 11% to the closing price on that day ("RBS Placing Information").

24.   The RBS Placing Information was relevant information as defined in section 245 of the Ordinance in that it was specific information about BOC, a shareholder of BOC, namely RBS, and/or the listed securities of BOC, which information was not generally known to the persons who are accustomed or would be likely to deal in the listed securities of the corporation but which would, if it were generally known to them, be likely to materially affect the price of the listed securities.

25.   Park relayed the RBS Placing Information to Hwang who (1) decided on behalf of Tiger Asia to subscribe to the 13 January Placement and (2) procured Park and/or Tomita to place short selling orders of BOC shares ahead of 14 January 2009.

26.   On 12 and 13 January 2009, Tiger Asia and Park and/or Tomita (acting as agents for Tiger Asia) being in possession of the relevant information (i.e. the RBS Placing Information) which they received from a person (Mr Haik) whom they knew or had reasonable cause to believe was connected with BOC dealt in the listed securities of BOC by short selling 256,432,000 BOC shares (through

6

A6

SDNY_P030_0000000063

short selling shares directly onto the market and by entering into an equity swap) through CLSA and BNP at the average price of HK$1.8718 per share.

27. On 13 January 2009 after the market closed, Tiger Asia was allocated 450 million BOC shares at the price of HK$1.71 per share. On 13 January 2009, the closing price of BOC shares was HK$1.85. On 14 January 2009, the share price closed at HK$1.90. By short selling the shares ahead of the placing news being publicly known after the market closed on 13 January 2009, Tiger Asia was able to sell 256,432,000 shares at HK$1.8718 per share. However, this turned out to be lower than the average traded price of the BOC shares on 14 January 2009 of HK$1.9121, which translated into a loss of HK$10,307,816 after taking into account the transaction costs. The emergence of Hopu Investment Management Company as an important placee in the RBS Placement and the rumours of Central SAFE Investments Ltd being one of the placees and that China Investment Corporation was buying the shares in the market after the placement would have had a significant effect on the share price performance after the placement. These unexpected events tend to explain the unexpected share price rise when the RBS Placing Information was publicly known on 14 January 2009.

28. Accordingly, by reason of all the matters set out above, Tiger Asia, Hwang, Park and Tomita engaged or may have engaged jointly or severally in market misconduct contrary to sections 270 and/or 274 of the Ordinance.

Dated this 11th day of July 2013

*Securities & Futures Commission*

Securities and Futures Commission

SDNY_P030_0000000064

**PROCEEDINGS BEFORE THE MARKET MISCONDUCT TRIBUNAL**

**IN THE MATTER OF THE LISTED SECURITIES OF
BANK OF CHINA LIMITED (STOCK CODE 3988) AND
CHINA CONSTRUCTION BANK CORPORATION (STOCK CODE 939)**

**STATEMENT OF AGREED AND ADMITTED FACTS**

The contents of this Statement of Agreed and Admitted Facts are solely for the purpose of a full and final resolution of the proceedings instituted by the Securities and Futures Commission ("the Commission") before the Hong Kong Market Misconduct Tribunal under section 252(2) of the Securities & Futures Ordinance, Cap. 571 ("**SFO**") by way of notice dated 11 July 2013 and do not constitute any admission by the specified persons herein for any other purpose(s) whatsoever.

1.      During the period from 19 December 2008 to 13 January 2009, Tiger Asia Management LLC ("**Tiger Asia**"), Mr Bill Hwang Sung Kook ("**Hwang**") and Mr Raymond Park ("**Park**") engaged in market misconduct in the securities of China Construction Bank Corporation ("**CCB**") and Bank of China Limited ("**BOC**") within the meaning set out in sections 270(1)(e) and 274(1)(b) of the SFO. Details of the market misconduct are set out in paragraphs 13 to 41 below. Details of the notional profit made by Tiger Asia is set out in paragraphs 42 to 45 below.

2.      For the purposes of this Statement of Agreed and Admitted Facts, the Commission accepts that Mr William Tomita ("Tomita") did not engage in market misconduct as described in Part XIII of the SFO and that at the material time he was a junior member of staff, consistently acting on the instructions of Hwang and Park.

1

A8

**Background to the relevant parties**

3.      At all material times, Tiger Asia was a limited liability company incorporated in
        Delaware, United States of America with its principal place of business situate at 101
        Park Avenue, New York, New York 10178.  Tiger Asia is the management company
        responsible for administrative matters of Tiger Asia Fund LP, a Delaware limited
        partnership, specializing in equity investments in China, Japan and Korea.  Tiger Asia
        is the investment manager of Tiger Asia Overseas Fund Limited, a corporation
        organized under the laws of the Cayman Islands, a parallel fund for non-United States
        and certain US tax-exempt persons.  Tiger Asia Fund LP and Tiger Asia Overseas
        Fund Limited are herein after collectively referred to as the 2 Funds.  All of Tiger
        Asia's employees are located in New York and it has no place of business or presence
        in Hong Kong.

4.      Hwang was at all material times the principal and sole managing member of Tiger
        Asia and was directly responsible for all investment decisions for the 2 Funds.  He
        was directly responsible for all investment decisions for Tiger Asia Fund LP under
        the terms of Tiger Asia Fund LP's Confidential Private Offering Memorandum dated
        December 2008, and for Tiger Asia Overseas Fund Limited, under the terms of
        Confidential Explanatory Memorandum dated December 2008.  Further, Hwang was
        the principal and sole managing member of the General Partner in Tiger Asia Fund
        LP, namely Tiger Asia Partners LLC, a limited liability company incorporated in
        Delaware, USA, which had responsibility for managing the investments of Tiger Asia
        Fund LP.

5.      Park was at all material times a director or employee of Tiger Asia.  Park joined Tiger
        Asia in April 2006.  At all times since April 2006,  Park's job title at Tiger Asia has

SDNY_P030_0000000066

been Managing Director, Head of Trading, and he has had responsibility under Hwang for, inter alia, managing the Tiger Asia's trading desk, supervising its orders and managing its broker relationships. Park was the head trader for the 2 Funds managed by Tiger Asia.

6.  Tomita was at all material times an employee of Tiger Asia. He was a junior member of staff responsible for supporting Tiger Asia's trading activities, under the instructions of Hwang and Park.

7.  At all material times, Park and Tomita were authorised by Tiger Asia to place orders for securities trading on its behalf with CLSA Singapore Pte ("CLSA") (Tiger Asia maintained an account with Calyon Securities (USA) Inc and CLSA handled Calyon Securities (USA) Inc's orders for trading stocks in Hong Kong and other Asian countries), Nomura International (Hong Kong) Ltd ("Nomura") (as agent for Nomura Securities International Inc), Fox-Pitt Kelton (Asia) Ltd ("Fox Pitt") (as agent for Fox-Pitt New York or Fox-Pitt London), Daiwa Securities SMBC Hong Kong Ltd ("Daiwa") (on behalf of Daiwa Securities America Inc), BNP Paribas Securities (Asia) Ltd ("BNP"), China International Capital Corporation Hong Kong Securities Ltd ("CICC"), and Hongkong and Shanghai Banking Corporation Ltd ("HSBC") (on behalf of HSBC Securities (USA) Inc).

**The listed corporations**

8.  CCB is a joint stock company with limited liability incorporated in the People's Republic of China. CCB's H-shares have been listed on the Stock Exchange of Hong Kong Limited with stock code 939 since 27 October 2005. Bank of America Corporation ("BOA") was a pre-IPO strategic investor and a substantial shareholder in CCB who had agreed to hold its shares until 27 October 2008.

SDNY_P030_0000000067

9.   BOC is a joint stock commercial bank with limited liability incorporated in the People's Republic of China.   BOC's H-shares have been listed on the Stock Exchange of Hong Kong Limited with stock code 3988 since June 2006.  UBS AG and RBS China Investments Sarl ("**RBS China**") were pre-IPO strategic investors, and RBS China was a substantial shareholder, in BOC who had agreed to hold their shares until 30 and 31 December 2008 respectively.

10.   On 31 December 2008, UBS AG on its own behalf placed 3,377,860,684 H-shares in BOC at HK$1.93 per share ("**31 December Placement**").

11.   On 7 January 2009, UBS AG, on behalf of BOA, placed 5,623,655,000 H-shares in CCB at HK$3.92 per share ("**7 January Placement**").

12.   On 13 January 2009 after market close, Morgan Stanley & Co International PLC and ABN AMRO Bank N.V. Hong Kong Branch and BOCI Asia Limited, on behalf of The Royal Bank of Scotland Group PLC ("**RBS**"), placed 10,809,154,259 H-shares in BOC at HK$1.71 per share ("**13 January Placement**").

## 31 December Placement – Market Misconduct – Insider Dealing (section 270(1)(e) of the SFO)

13.   From about 19 December 2008, UBS AG sounded out potential placees for the 31 December Placement, securing an undertaking from them that they would not trade in the shares after they had heard the sales promotion.

14.   On 19 December 2008, Park, after giving an undertaking that Tiger Asia would not thereafter trade BOC shares, received the following information from Mr Peter Guenthardt of UBS AG, who was connected with BOC within the meaning of section 247 of the SFO:

4

A 11

a.    UBS AG wished to sell its entire shareholding in BOC of 3,378 million shares worth approximately US$1 billion via a club deal after the expiry of the lock-up period (i.e. 31 December 2008).

b.    The trade date and value date would be 31 December 2008 so settlement would be on a T+0 basis (i.e. trade date).

c.    The price would be at a discount to the closing price on 30 December 2008 and the discount would be between 8% - 10%.

(together the "**UBS Placing Information**")

15.    The UBS Placing Information was relevant information as defined in section 245 of the SFO in that it was specific information about BOC, a shareholder of BOC, namely UBS AG, and/or the listed securities of BOC, which information was not generally known to the persons who are accustomed or would be likely to deal in the listed securities of the corporation but which would, if it were generally known to them, be likely to materially affect the **price** of the listed securities.

16.    Park relayed the UBS Placing Information to Hwang who (1) decided on behalf of Tiger Asia to subscribe to the 31 December Placement and (2) procured Park and/or Tomita to place short selling orders of BOC shares ahead of 31 December 2008, thereby engaging in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

17.    Between 19 to 30 December 2008, **Tiger** Asia and Park being in possession of the relevant information (i.e. the UBS Placing Information) which they received from a person (Mr Guenthardt) whom they knew was connected with BOC, dealt in the listed securities of BOC by short selling 104 million BOC shares through Daiwa, BNP, HSBC and CICC at the average **price** of HK$2.2359 per share and engaged in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

SDNY_P030_0000000069

18.  Acting on instructions, Tomita assisted Park by placing orders with various brokers.

19.  In summary, the orders placed by Park and/or Tomita and executed by the various brokers are as follows:

| Date | Brokers | Short Sell BOC Shares |
|---|---|---|
| 19 Dec 2008 | Daiwa | 17,000,000 |
| 22 Dec 2008 | BNP | 17,000,000 |
| 23 Dec 2008 | HSBC | 17,000,000 |
| 24 Dec 2008 | CICC | 17,000,000 |
| 29 Dec 2008 | HSBC | 18,000,000 |
| 30 Dec 2008 | Daiwa | 18,000,000 |

20.  On 31 December 2008, the 2 Funds managed by Tiger Asia were allocated a total of 199 million BOC shares at the price of HK$1.93 per share.  On 31 December 2008 and 2 January 2009, the average traded price of BOC shares was HK$2.1478.  By short selling the shares ahead of the placing news being publicly known to the market after it closed on 31 December 2008 at an average price of HK$2.2359 per share, Tiger Asia was able to sell the 104 million shares at HK$0.0881 per share higher than the average traded price on 31 December 2008 and 2 January 2009 and Tiger Asia, Hwang and Park thereby engaged in insider dealing within the meaning of section 270(1)(e) of the SFO.  This resulted in a profit of HK$9,126,116 after taking into account the transaction costs.

**7 January Placement – Market  Misconduct – Insider Dealing and  False  Trading (sections 270(1)(e) and 274(1)(b) of the SFO)**

A13

21.     On 6 January 2009, UBS AG sounded out potential placees for the 7 January Placement, securing an undertaking from them that they would not trade in the shares after they had heard the sales promotion.

22.     On 6 January 2009, Park, after giving an undertaking that Tiger Asia would not thereafter trade CCB shares, received information from Mr Samuel James Kendall of UBS AG, who was connected with CCB within the meaning of section 247 of the SFO that BOA wished to sell its 5.6 billion shares in CCB on similar terms to a previous proposal in mid-December 2008, which was at a discount of about 15% to the closing price (the **"BOA Placing Information"**).

23.     The BOA Placing Information was relevant information as defined in section 245 of the SFO in that it was specific information about CCB, a shareholder **of CCB**, namely BOA, and/or the listed securities of CCB, which information was not generally known to the persons who are accustomed or would be **likely** to deal in the listed securities of the corporation but which would, if it were generally known to them, be likely to materially affect the price of the listed securities.

24.     Park relayed the BOA Placing Information to Hwang who (1) decided on behalf of Tiger Asia to subscribe to the 7 January Placement and (2) procured Park and/or Tomita to place long, short selling and **long** selling orders of CCB shares ahead of 7 January 2009 thereby engaging in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

25.     On 6 January 2009, Tiger Asia and Park being in possession of the relevant information (**ie** the BOA Placing Information) which they received from a person (Mr Kendall) whom they knew was connected with CCB dealt in the listed securities of CCB by buying 17 million CCB shares through CLSA throughout the day at an

7

A14

average price of HK$4.5912 per share and then sold these 17 million shares during the closing auction session on the same day at HK$4.45 per share through Daiwa and engaged in insider dealing within the meaning set out in section 270(1)(e) of the SFO, which resulted in a trading loss of HK$2,952,385.

26.   Acting on instructions, Tomita assisted Park by placing orders with various brokers.

27.   In summary, the orders placed by Park and/or Tomita and executed by the brokers are as follows:

| Date | Brokers | CCB Shares |
|---|---|---|
| 6 Jan 2009 | CLSA | Buy 17,000,000 |
| 6 Jan 2009 | Daiwa | Sell 17,000,000 |

28.   In addition, Tiger Asia short sold 93 million shares of CCB on 6 January 2009 (50 million through Nomura and 43 million through Fox Pitt) at an average price of HK$4.5263 per share and Tiger Asia, Hwang and Park engaged in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

29.   In summary, the orders placed by Park/Tomita and executed by the brokers are as follows:

| Date | Brokers | Short Sell CCB Shares |
|---|---|---|
| 6 Jan 2009 | Nomura | 50,000,000 |
| 6 Jan 2009 | Fox Pitt | 43,000,000 |

30.   On 7 January 2009, Tiger Asia was allocated a total of 1,977 million CCB shares at the price of HK$3.92 per share. On 7 January 2009, excluding the placing shares, the

8

A15

average traded price of CCB shares was HK$4.1788. By short selling the 93 million shares ahead of the placing news being publicly known on 7 January 2009 at an average price of HK$4.5263, Tiger Asia was able to sell the 93 million shares at HK$0.3475 per share higher and Tiger Asia, Hwang and Park thereby engaged in insider dealing within the meaning of section 270(1)(e) of the SFO. This resulted in a profit of HK$32,067,618 after taking into account the transaction costs.

31.   Further, the placing of some of the buy and short sell orders by Park (assisted by Tomita), on 6 January 2009 resulted in transactions of a total of 2,017,000 CCB shares that did not involve a change in the beneficial ownership of them.

32.   The purpose and effect of the buy order of 17 million shares was to acquire shares so that a sell order of 17 million shares (placed through Daiwa) could be inputted during the closing auction session on 6 January 2009. No new short sell order was allowed to be inputted during the closing auction session. As Tiger Asia had no holding of CCB shares at the market open on 6 January 2009, if it wanted to sell shares during the closing auction session, it had to buy the shares first from the market. The purpose of the sell order was to stop the closing price of CCB shares from rising. Accordingly, so long as the share price reacted as intended, Tiger Asia would be able to receive the CCB placing shares on 7 January 2009 at a lower price than if Tiger Asia had not placed the sell order.

33.   Park carried out and instructed Tomita to assist him to carry out the buy and sell orders of 17 million CCB shares on 6 January 2009 with the intention of creating a false or misleading appearance with respect to the market for, or the price for dealings in, CCB securities traded on the Stock Exchange of Hong Kong and Tiger

9

A16

Asia, Hwang and Park thereby engaged in false trading within the meaning set out in section 274(1)(b) of the SFO.

## 13 January Placement – Market Misconduct – Insider Dealing (sections 270(1)(e) of the SFO)

34.     On 12 January 2009, Morgan Stanley sounded out potential placees for the 13 January Placement, securing an undertaking from them that they would not trade in the shares after they had heard the sales promotion.

35.     On 12 January 2009, Park, after giving an undertaking that Tiger Asia would not thereafter trade BOC shares, received information from Mr Justin Haik of Morgan Stanley, who was connected with BOC within the meaning of section 247 of the SFO, that RBS intended to sell its entire holding of 10.8 billion shares in BOC if there was such demand from investors; the timing to launch the BOC block sale was expected to be within the next 24 to 48 hours and the indicative discount would be within the range of 7 to 11% to the closing price on that day ("**RBS Placing Information**").

36.     The RBS Placing Information was relevant information as defined in section 245 of the SFO in that it was specific information about BOC, a shareholder of BOC, namely RBS, and/or the listed securities of BOC, which information was not generally known to the persons who are accustomed or would be likely to deal in the listed securities of the corporation but which would, if it were generally known to them, be likely to materially affect the price of the listed securities.

37.     Park relayed the RBS Placing Information to Hwang who (1) decided on behalf of Tiger Asia to subscribe to the 13 January Placement and (2) procured Park and/or Tomita to place short selling orders of BOC shares ahead of 14 January 2009 thereby

SDNY_P030_0000000074

engaging in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

38.   On 12 and 13 January 2009, Tiger Asia and Park being in possession of the relevant information (i.e. the RBS Placing Information) which they received from a person (Mr Haik) whom they knew or had reasonable cause to believe was connected with BOC dealt in the listed securities of BOC by short selling 256,432,000 BOC shares (through short selling shares directly onto the market and by entering into an equity swap) through CLSA and BNP at the average price of HK$1.8718 per share and Tiger Asia, Hwang and Park thereby engaged in insider dealing within the meaning set out in section 270(1)(e) of the SFO.

39.   Acting on instructions, Tomita assisted Park by placing orders with various brokers.

40.   In summary, the orders placed by Tomita and executed by the brokers are as follows:

| Date | Brokers | Short Sell BOC Shares |
|---|---|---|
| 12 Jan 2009 | CLSA | 82,733,000[1] |
| 13 Jan 2009 | BNP | 173,699,000[2] |

41.   On 13 January 2009 after the market closed, Tiger Asia was allocated 450 million BOC shares at the price of HK$1.71 per share.  On 13 January 2009, the closing price of BOC shares was HK$1.85.  On 14 January 2009, the share price closed at HK$1.90.  By short selling the shares ahead of the placing news being publicly known after the market closed on 13 January 2009, Tiger Asia was able to sell 256,432,000 shares at HK$1.8718 per share.  However, this turned out to be lower than the average

---

[1]   The total short sell order placed and executed was in fact 142,733,000 but part of this comprised of a short sell order placed at 10:06:23 which was before the wall crossing at 11:58:06 and therefore does not form part of the current insider dealing allegations.  "Wall crossing" here refers to Tiger Asia's undertaking not to trade BOC securities after receiving the Placing Information.

[2]   The short sell position was due to the entering of an equity swap.

SDNY_P030_0000000075

traded price of the BOC shares on 14 January 2009 of HK$1.9121, which translated into a loss of HK$10,307,816 after taking into account the transaction costs.

**Amount of profit gained**

42.     In the 31 December Placement, Tiger Asia made a profit of some HK$9,126,116 by short selling the BOC shares after it was wall crossed but before the placement news was made public.

43.     In the 7 January Placement, Tiger Asia made a profit of some HK$32,067,618 by short selling the CCB shares after it was wall crossed but before the placement news was in public domain. This profit figure **did not** take into account the trading loss of HK$2,952,385 incurred by Tiger Asia from buying and selling the 17 million CCB shares on 6 January 2009.

44.     In the 13 January Placement, Tiger Asia made a loss of HK$10,307,816 by short selling the shares after it was wall-crossed but before the placement news was made public.

45.     The total notional profit made by Tiger Asia as a result of Hwang, Park and Tiger Asia engaging in Market Misconduct in the 31 December and the 7 January Placements was HK$41,193,734.

Signed by the Plaintiff:

Signed by:
Name:       MARK STEWARD
Date:       17 / 12 / 13
Witnessed by:
Name:       MAUREEN GARRETT
Date:       17 / 12 / 13

12

A19

SDNY_P030_0000000076

Annexure B
(Page 13 of 13)

For and on behalf of the 1st Defendant

Signed by:

Name:                       A.H. Leung

Date:                       16 DECEMBER 2013

Witnessed by:

Name:                       LEE SHEUNG SHAN

Date:                       16 DECEMBER 2013


For and on behalf of the 2nd Defendant

Signed by:

Name:                       Alexander David Morrison
                            Solicitor
                            Reed Smith
Date:                       Richards Butler          16 DEC 2013.
                            20/F Alexandra House
                            Hong Kong SAR
Witnessed by:

Name:                       VERONICA SIWANG TO       Veronica Siwang To
                                                     Solicitor
Date:                       16TH DECEMBER 2013       Reed Smith
                                                     Richards Butler
                                                     20/F Alexandra House
                                                     Hong Kong SAR


For and on behalf of the 3rd Defendant

Signed by:

Name:                       BENJAMIN DOMINIC CHAN     16/12/2013
                            Solicitor, Hong Kong SAR
                            Robertsons
Witnessed by:

Name:                       YEUNG TAK YI STEPHANIE
                            Solicitor, Hong Kong SAR   16/12/2013
                            Robertsons


13

A20