UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                    :
  UNITED STATES OF AMERICA
                                                    :
        - v. -                                           No. 22 Cr. 240 (AKH)
                                                    :
  SUNG KOOK (BILL) HWANG and
  PATRICK HALLIGAN,                                 :

              Defendants.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTIONS *IN LIMINE***


                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York
                                        The Jacob K. Javits Federal Building
                                        26 Federal Plaza, 37th Floor
                                        New York, New York 10278

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .........................................................................................................................2

I.    Evidence of Market Manipulation and Fraud Is Admissible ........................................ 2

    A.    Evidence of Stock Price Changes is Admissible ................................................. 2

    B.    Argument About Archegos's Effective Control of Relevant Securities Is Proper and Supported by the Evidence ............................................................................................ 8

    C.    Evidence and Argument Regarding the Use of Swaps and of Price Impact Are Admissible ................................................................................................................ 11

    D.    Evidence of the Defendants' States of Mind Is Admissible ............................. 15

        1.    Relevant Evidence from Archegos Research Analysts Is Admissible.................. 15

            a.    Relevant Background ....................................................................... 16

            b.    Applicable Law ................................................................................ 18

            c.    Discussion ........................................................................................ 19

        2.    Relevant Evidence and Argument Regarding Halligan's Job Function Is Admissible 24

    E.    Evidence Using the Words "Manipulation" and "Material" Are Admissible ............. 25

        1.    Evidence Using the Word "Manipulation" Is Admissible..................................... 26

        2.    Evidence Using the Word "Material" Is Admissible............................................ 30

    F.    Evidence of Halligan's Misconduct Is Admissible................................................... 31

        1.    Evidence that Halligan Participated in Creating False Reports Is Admissible....... 31

        2.    Evidence that Halligan Signed False Trade Confirmations Is Admissible............ 34

        3.    Evidence that Halligan Sought to Delay Providing Information to Counterparties Is Admissible ........................................................................................................ 36

    G.    Evidence Regarding Tax-Related Trades Is Admissible ............................... 40

    H.    Evidence Regarding Archegos's "Wind-Down" Is Admissible .................................. 41

II.    Halligan's Motion Regarding Purportedly "Incorrect Evidence" Should Be Denied ...... 44

III.    Evidence Regarding Tiger Asia and Hwang's and Halligan's Pre-2020 Misconduct Is Admissible ........................................................................................................ 45

    A.    Applicable Law ............................................................................................. 48

        1.    Direct Evidence ............................................................................................. 48

        2.    Rule 404(b) Evidence ................................................................................... 50

    B.    The Tiger Asia Evidence Is Admissible Both as Direct Evidence and Pursuant to Rule 404(b) 50

        1.    Background ...................................................................................... 52

2.      The Tiger Asia Evidence Is Admissible Direct Evidence ..................................... 54

3.      The Tiger Asia Evidence Is Admissible Pursuant to Rule 404(b) ......................... 57

4.      The Tiger Asia Evidence's Substantial Probative Value Far Outweighs Any Risk Unfair Prejudice or Undue Delay .................................................................................... 62

5.      The Defendants' Other Procedural and Evidentiary Objections to the Tiger Asia Evidence Lack Merit.................................................................................................. 66

    a.      The Government Provided Sufficient Notice.................................... 66

    b.      Tiger Asia Evidence Cannot Be Precluded as Inviting a Foreign Legal Determination ....................................................................................... 67

    c.      The Anticipated Tiger Asia Evidence Is Not Barred by the Rule Against Hearsay 68

6.      The Hong Kong Statement of Admitted Facts Does Not Pose a Confrontation Clause Issue  71

7.      The Charges Against Halligan Should Not Be Severed ......................................... 72

C.      Evidence of Hwang's Concealment of His Role in the Tiger Asia Misconduct Is Admissible................................................................................................................. 73

D.      Evidence of Halligan's Pre-Conspiracy Misstatements and Deception Is Admissible Both as Direct Evidence and Pursuant to Rule 404(b) ............................................ 75

1.      The Government Has Provided Halligan With Sufficient Notice ......................... 75

2.      Halligan's Misstatements Demonstrate the Existence of the Charged Conspiracy and Halligan's Participation in It ................................................................................... 78

IV.      The Government's Expert Testimony Is Admissible................................................... 78

A.      Applicable Law ........................................................................................................ 79

B.      The Defendants' General Objections Rest on Mistakes of Law and Fact .................. 82

1.      Price Movement Evidence Is Relevant to Price Manipulation Charges ................ 82

2.      There Is No "Event Study" Requirement for Stock Price Evidence...................... 83

3.      The Government's Experts May Make Inferences from the Trading Data So Long as They Do Not Describe the Defendant's State of Mind ................................................... 85

4.      The Governments' Trade Matching Is Reliable.................................................... 86

C.      Halligan's Motion to Preclude Purportedly Duplicative or Cumulative Evidence Should Be Denied ................................................................................................................. 90

D.      The Defendants' Expert-by-Expert Challenges Should Be Rejected .......................... 92

1.      Professor Robert Battalio ...................................................................................... 92

2.      Doctor Carmen Taveras ......................................................................................... 95

3.      Professor Amit Seru ............................................................................................... 98

4.      Doctor Joseph Mason ........................................................................................... 101

CONCLUSION.....................................................................................................................103

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)................................................................. 76

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................ 4

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988)............................................................................ 15

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996).................................................................... 76

*Brady v. Wal-Mart Stores, Inc.*,
   531 F.3d 127 (2d Cir. 2008)................................................................ 65

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010).................................................................. 26

*Cary Oil Co. v. MG Refining & Mktg., Inc.*,
   No. 99 Civ. 725 (VM), 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003).................................... 75

*City of Roseville Employees' Ret. Sys. v. Nokia Corp.*,
   No. 10 Civ. 967 (GBD), 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)................................... 41

*Crawford v. Washington*,
   541 U.S. 36 (2004).............................................................................. 67

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)....................................................................... 76, 84

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)............................................................................ 77

*Gurary v. Winehouse*,
   190 F.3d 37 (2d Cir. 1999)............................................................... 2, 10

*Heredia v. Americare, Inc.*,
   No. 17 Civ. 06219 (RWL), 2020 WL 3961618 (S.D.N.Y. July 13, 2020)............................. 66

*Hester v. BIC Corp.*,
   225 F.3d 178 (2d Cir. 2000)................................................................ 20

*Highland Cap. Mgmt., L.P. v. Schneider*,
   551 F. Supp. 2d 173 (S.D.N.Y. 2008)...................................................... 97

*Huddleston v. United States*,
   485 U.S. 681 (1988)............................................................................ 54

*In re Petrobras*,
   *Sec.*, 862 F.3d 250 (2d Cir. 2017)....................................................... 4, 5

*In re Zyperxa Prods. Liab. Litig.*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................... 75

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
   No. 04 Civ. 7369 (LTS), 2006 WL 2128785 (S.D.N.Y. July 28, 2006)......................... 75, 76

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)....................................................................... 76, 83

*Munn v. Hotchkiss School*,
　24 F. Supp. 3d 155 (D. Conn. 2014) ................................................................. 89
*Old Chief v. United States*,
　519 U.S. 172 (1997) .......................................................................................... 59
*SEC v. Hwang*,
　No. 22 Civ. 3402 (JPO), 2023 WL 6124041 (S.D.N.Y. Sept. 19, 2023) ........ 12, 22, 24
*SEC v. Masri*,
　523 F. Supp. 2d 361 (S.D.N.Y. 2007) ............................................................... 11
*SEC v. Vali Mgmt. Partners*,
　No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) .................................. 11
*Set Capital LLC v. Credit Suisse Grp. AG*,
　996 F.3d 64 (2d Cir. 2021) ........................................................................... 11, 12
*Shields v. Citytrust Bancorp, Inc.*,
　25 F.3d 1124 (2d Cir. 1994) .............................................................................. 41
*Smith v. New York and Presbyterian Hospital*,
　440 F. Supp. 3d 303 (S.D.N.Y. 2020) ............................................................... 18
*Sullivan v. Ford Motor Co.*,
　No. 97 Civ. 593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ............. 75
*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
　No. 95 Civ. 8136 (RCC), 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) .......... 93
*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
　546 F.3d 196 (2d Cir. 2008) ................................................................................ 4
*United States v. Aminy*,
　15 F.3d 258 (2d Cir. 1994) ........................................................................... 54, 55
*United States v. Anderson*,
　747 F.3d 51 (2d Cir. 2014) ................................................................................ 21
*United States v. Ansah*,
　No. 22-623, 2023 WL 7320859 (2d Cir. Nov. 7, 2023) ................................... 56
*United States v. Awadallah*,
　401 F. Supp. 2d 308 (S.D.N.Y. 2005) ............................................................... 20
*United States v. Baez*,
　349 F.3d 90 (2d Cir. 2003) ................................................................................ 35
*United States v. Barnwell*, No. 15 Cr. 620 (NSR),
　2017 WL 1063457 (S.D.N.Y. Mar. 20, 2017) .................................................. 27
*United States v. Bellomo*,
　954 F. Supp. 630 (S.D.N.Y. 1997) .................................................................... 68
*United States v. Bonventre*,
　646 F. App'x 73 (2d Cir. 2016) ................................................................ 7, 11, 12
*United States v. Bortnovsky*,
　820 F.2d 572 (2d Cir. 1987) ......................................................................... 27, 30
*United States v. Cadet*,
　664 F.3d 27 (2d Cir. 2011) ..................................................................... 54, 55, 56
*United States v. Carboni*,
　204 F.3d 39 (2d Cir. 2000) ........................................................................... 45, 46
*United States v. Chambers*,
　No. 17 Cr. 396 (WHP), 2018 WL 1726239 (S.D.N.Y. Apr. 9, 2018) ............. 31

*United States v. Coonan*,
    938 F.2d 1553 (2d Cir. 1991)...........................................................................45

*United States v. Crowley*,
    318 F.3d 401 (2d Cir. 2003)...........................................................................21

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011).............................................................................47

*United States v. Cuti*,
    720 F.3d 453 (2d Cir. 2013)......................................................................15, 16

*United States v. Daly*,
    842 F.2d 1380 (2d Cir.)..................................................................................45

*United States v. Davis*,
    690 F.3d 127 (2d Cir. 2012)...........................................................................21

*United States v. Davis*,
    No. 21-1486, 2023 WL 4582002 (2d Cir. July 18, 2023)..............................17

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999)......................................................35, 45, 47, 53

*United States v. DiDomenico*,
    985 F.2d 1159 (2d Cir. 1993)....................................................................80, 97

*United States v. Discala*,
    2023 WL 4118637 (2d Cir. 2023)........................................................24, 25, 27

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994)...............................................................................23

*United States v. Dupree*,
    870 F.3d 62 (2d Cir. 2017).............................................................................47

*United States v. Farrell*,
    921 F.3d 116 (4th Cir. 2019) .........................................................................25

*United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2011) ........................................................................3, 4

*United States v. Flores*,
    945 F.3d 687 (2d Cir. 2019)......................................................................16, 32

*United States v. Forbes*,
    249 F. App'x 233 (2d Cir. 2007) .....................................................................4

*United States v. Garcia*,
    291 F.3d 127 (2d Cir. 2002)...........................................................................28

*United States v. Gelzer*,
    50 F.3d 1133 (2d Cir. 1995)...........................................................................33

*United States v. Ghavami*,
    23 F. Supp. 3d 148 (S.D.N.Y. 2014)..............................................................17

*United States v. Giovannetti*,
    919 F.2d 1223 (7th Cir. 1990) .......................................................................15

*United States v. Gonzalez*,
    110 F.3d 936 (2d Cir. 1997)..................................................................45, 53, 77

*United States v. Grady*,
    645 F. App'x 1 (2d Cir. 2016) .................................................................80, 81

*United States v. Gramins*,
    939 F.3d 429 (2d Cir. 2019)......................................................................28, 32

*United States v. Greer,*
   631 F.3d 608 (2d Cir. 2011)...................................................................... 46

*United States v. Hampton,*
   676 F. Supp. 3d 283 (S.D.N.Y. 2023).......................................................... 32

*United States v. Hild,*
   644 F. Supp. 3d 7 (S.D.N.Y. 2022) ........................................................ 17, 30

*United States v. Hoffecker,*
   530 F.3d 137 (3d Cir. 2008)........................................................................ 25

*United States v. Hoffner,*
   777 F.2d 1423 (10th Cir. 1985) .................................................................. 20

*United States v. Hsu,*
   669 F.3d 112 (2d Cir. 2012)........................................................................ 46

*United States v. Jamil,*
   707 F.2d 638 (2d Cir. 1983)........................................................................ 86

*United States v. Johnson,*
   469 F. Supp. 3d 193 (S.D.N.Y. 2019).......................................................... 36

*United States v. Joseph,*
   542 F.3d 13 (2d Cir. 2008).......................................................................... 76

*United States v. Kaiser,*
   609 F.3d ...................................................................................................... 46

*United States v. Kaplan,*
   490 F.3d 110 (2d Cir. 2007)................................................................... 19, 20

*United States v. Kogan,*
   283 F. Supp. 3d 127 (S.D.N.Y. 2017).......................................................... 31

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015)................................................................... 32, 35

*United States v. Martoma,*
   993 F. Supp. 2d 452 (S.D.N.Y. 2014)................................................ 2, 78, 80

*United States v. Martoma,*
   No. 12 Cr. 973 (PGG), 2014 WL 31213 (S.D.N.Y. Jan. 6, 2014)................... 62, 63

*United States v. Miller,*
   116 F.3d 641 (2d Cir. 1997)........................................................................ 35

*United States v. Offill,*
   666 F.3d 168 (4th Cir. 2011) ...................................................................... 25

*United States v. Peterson,*
   808 F.2d 969 (2d Cir. 1987)........................................................................ 69

*United States v. Phillips,*
   No. 22 Cr. 138 (LJL), 2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) ................. 6

*United States v. Phillips,*
   No. 22 Crim. 138 (LJL), 2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023) ......... 12, 90

*United States v. Pierce,*
   224 F.3d 158 (2d Cir. 2000)........................................................................ 63

*United States v. Quattrone,*
   441 F.3d 153 (2d Cir. 2006)........................................................................ 33

*United States v. Quinones,*
   511 F.3d 289 (2d Cir. 2007)........................................................................ 45

*United States v. Ramirez,*
   894 F.2d 565 (2d Cir. 1990)............................................................... 47

*United States v. Rankin,*
   422 F. Supp. 3d 564 (D. Conn. 2019) .............................................. 31

*United States v. Rea,*
   958 F.2d 1206 (2d Cir. 1992)................................................ 16, 19, 20

*United States v. Rigas,*
   490 F.3d 208 (2d Cir. 2007).......................................................... 18, 46

*United States v. Robinson,*
   702 F.3d 22 (2d Cir. 2012)............................................................... 46

*United States v. Roldan-Zapata,*
   916 F.2d 795 (2d Cir. 1990)............................................................. 46

*United States v. Romano,*
   794 F.3d 317 (2d Cir. 2015).......................................................... 76, 83

*United States v. Rosa,*
   11 F.3d 315 (2d Cir. 1993)............................................................... 68

*United States v. Sampson,*
   385 F.3d 183 (2d Cir. 2004)............................................................. 67

*United States v. Sampson,*
   898 F.3d 270 (2d Cir. 2018)............................................................... 7

*United States v. Schiff,*
   538 F. Supp. 2d 818 (D.N.J. 2008) ................................................ 78

*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1988)............................................................. 26

*United States v. Siddiqui,*
   699 F.3d 690 (2d Cir. 2012)............................................................. 47

*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006)............................................................. 67

*United States v. Suarez,*
   588 F.2d 352 (2d Cir. 1978).......................................................... 7, 11

*United States v. Teitler,*
   802 F.2d 606 (2d Cir. 1986)............................................................. 21

*United States v. Thai,*
   29 F.3d 785 (2d Cir. 1994)........................................................... 36, 45

*United States v. Tin Yat Chin,*
   371 F.3d 31 (2d Cir. 2004).............................................................. 95

*United States v. Townsend,*
   No. 06 Cr. 34 (JFK), 2007 WL 1288597 (S.D.N.Y. May 1, 2007) ......................................... 63

*United States v. Vargas,*
   702 F. Supp. 70 (S.D.N.Y. 1998) ................................................... 21

*United States v. Wexler,*
   No. 22-067, 2022 WL 17413982 (E.D.N.Y.) ................................. 24

*United States v. Yannotti,*
   541 F.3d 112 (2d Cir. 2008)................................................ 17, 18, 33

*United States v. Zackson,*
   12 F.3d 1178 (2d Cir. 1993)........................................................ 47, 54

*Zafiro v. United States*,
   506 U.S. 534 (1993) ................................................................................................ 67, 68

**Rules**

Fed. R. Evid. 401 ............................................................................................... *passim*
Fed. R. Evid. 402 ...................................................................................................... 7
Fed. R. Evid. 404 ................................................................................................. 47, 62
Fed. R. Evid. 408 ..................................................................................................... 65
Fed. R. Evid. 701 ........................................................................................ 13, 16, 17, 25
Fed. R. Evid. 704 ..................................................................................................... 80
Fed. R. Evid. 801 ..................................................................................................... 17

## PRELIMINARY STATEMENT

The Government respectfully submits this consolidated memorandum of law in opposition to (1) Defendant Sung Kook (Bill) Hwang's Omnibus Motions *in Limine* ("Hwang's MILs") (Dkt. 156); (2) Hwang's Motion *in Limine* to Preclude Evidence and Argument Relating to Tiger Asia Management ("Hwang's Tiger Asia Motion") (Dkt. 158); (3) Defendant Patrick Halligan's Motion to Exclude Proposed Expert Testimony of Robert Battalio, Amit Seru, Carmen Taveras, and Joseph Mason ("Halligan's Daubert Motion") (Dkt. 160); (4) Hwang's Motion to Exclude Proposed Expert Testimony of Robert Battalio, Amit Seru, Carmen Taveras, and Joseph Mason ("Hwang's Daubert Motion") (Dkt. 163); and (5) Halligan's Motions *in Limine* ("Halligan's MILs") (Dkt. 166).

The defendants' motions seek to prevent the jury from receiving even basic evidence about the charged offenses. In the defendants' vision of this trial, the jury may not learn anything that would tend to incriminate them: no evidence that Archegos's trading moved market prices; no evidence that Halligan signed false documents or intentionally withheld information from Archegos's counterparties; no evidence that the manipulated stock prices receded once the scheme ended; no evidence that Hwang engaged in market manipulation at Tiger Asia or that Tiger Asia is where Hwang, Halligan, Tomita, and Becker first worked together; and no evidence that Hwang's own employees noticed what was going on and called it for what it was: manipulation. To justify the extraordinary outcomes they seek, the defendants rely on incorrect descriptions of the law, mischaracterizations of the evidence and facts, and often ask the Court to rely on the defendants' mere say-so. The motions should be denied and the Court should permit the Government to present its evidence to a jury.

**ARGUMENT**

**I.      Evidence of Market Manipulation and Fraud Is Admissible**

The defendants move to preclude the following eight categories of evidence and argument

at trial, all of which are directly relevant to the Government's allegations of market manipulation

and fraud:

- Evidence of stock price changes, *see infra* Point I.A;

- Evidence of Archegos's effective control of the relevant securities, *infra* Point I.B;

- Evidence of Archegos's use of swaps and price impact, *infra* Point I.C;

- Evidence of the defendants' states of mind, including evidence from Archegos's research analysts and evidence of Halligan's job title and function, *infra* Point I.D;

- Evidence using the words "manipulation" and "material," *infra* Point I.E;

- Evidence of Halligan's misconduct, including his creation of false reports, his signing of false trade confirmations, and the fact that he sought to delay providing information to counterparties, *infra* Point I.F;

- Evidence of tax-related trades, *infra* Point I.G; and

- Evidence of Archegos's wind-down, *infra* Point I.H.

For the reasons set forth below, each motion should be denied.

**A.  Evidence of Stock Price Changes is Admissible**

In this market manipulation case, the Government intends to offer evidence of the decline

in the prices of the stocks that Hwang manipulated after his scheme was interrupted. This evidence

shows that the price of relevant stocks outperformed their peers while Hwang actively traded them

and reverted to ordinary levels once Hwang's trading stopped.

The evidence will also demonstrate, among other things, that the counterparties did in fact

maintain hedges as a result of Hwang's swap trades, which had to be sold at substantial losses;

will explain to the jury what happened to the price of these stocks at the conclusion of Hwang's

scheme, which will explain the impact of Hwang's conduct and substantiate the risks associated with the misrepresentations made to the counterparties; and will provide proof of Hwang's scheme to set artificial prices by demonstrating what the price of relevant securities was when based on "the natural interplay of supply and demand," [and] "not rigged by" Hwang. *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). This evidence is uncontrovertibly relevant and the defense does not argue otherwise. Perhaps recognizing the probative value of this evidence, however, Hwang instead seeks to interpose a rule—created of whole cloth—that evidence of price changes cannot be admitted at a trial without a so-called "event study." (Dkt. 156 at 2-6). This argument mischaracterizes the use of event studies, the relevance of the evidence, and the law. It is also wrong and should be rejected.

Hwang seeks, on the basis that the Government has not provided an event study, to "preclude the prosecution from offering evidence or argument—including in the form of charts, graphs, or expert witness testimony—that the decline in the prices of the securities at issue in the indictment in the months following Archegos's collapse was *caused by Archegos's trading*." (Dkt. 156 at 2 (emphasis added)). As Hwang's own explanation of event studies makes clear, however, event studies are used to determine whether an *event* caused the trading that resulted in a change in a stock's price, and not whether *trading* caused the change in price. As quoted by Hwang, "'[e]vent studies are used to determine whether the price changes at issue in [a] case were [related or] unrelated to the representations in dispute by eliminating other factors, such as the effects on stock price of market and industry information.'" (Dkt. 156 at 4 (quoting *United States v. Martoma*, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) (internal quotation marks and citation omitted) (alterations in original))).

3

The Government's evidence, including the charts identified by Hwang in his brief, however, is not intended to and does not demonstrate that the revelation of some disputed misrepresentation led to a change in price. Rather, the evidence demonstrates, as Hwang appears to recognize (Dkt. 156 at 2), that the price of relevant securities in which Hwang held a long position declined when Hwang's positions were sold off by his counterparties and further that, once Hwang was no longer able to drive up the prices of those securities with his trading, the price of those securities remained far lower. And, indeed, the question of whether the selling off of Hwang's positions drove the price down will not be in serious dispute: traders will describe how they sold the positions at lower and lower prices in order to liquidate them. In any case, Hwang's demand for an event study to justify evidence of the change in the prices of securities as a result of Hwang's trading and later non-trading is simply inapposite.

Even if Hwang were correct that an event study might be used to show a causal relationship between his trading and the price decline when his scheme ended, Hwang is simply wrong that "Second Circuit precedent prohibits the admission of stock-price-decline evidence in the absence of an event study." (Dkt. 156 at 2). The single Second Circuit case that Hwang cites to support that purported evidentiary principle is *United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011). But *Ferguson* announced no such rule. In fact, *Ferguson* did not even use the term "event study." That case addressed a circumstance where the Government sought to prove the materiality of misstatements and omissions concerning a particular fraudulent transaction based on stock price movements after corrective disclosure of those misstatements and omissions through public articles about the fraudulent transaction. There, the Second Circuit held that the district court abused its discretion in admitting as evidence of materiality charts showing single-day stock price drops in the aftermath of the publication of articles about the fraudulent transaction, not because

of a general failure to provide an event study, but because, in that case, the corrective disclosures publicized not only the fraudulent transaction but also "[u]nrelated allegations of bid-rigging, improper self-dealing, earnings manipulations, and more" at the same issuer that the court decided had to be redacted. *Id.* at 273-74. As a result, the charts admitted unfairly made it appear that all of the price change was attributed to the only event that the jury was permitted to learn about, whereas, in fact, it resulted from the disclosure of multiple forms of misconduct. *Id.* at 273-75. *Ferguson* did not reference let alone impose a special rule of relevancy that stock drop evidence must be accompanied by expert causation testimony in the form of an event study. In fact, contrary to Hwang's argument, *Ferguson* did not even announce a categorical rule that *expert testimony* at all must always be used to establish stock-drop materiality. Quite the reverse, the Second Circuit has affirmed the admission of stock-drop materiality evidence presented by lay witnesses. *See, e.g.*, *United States v. Forbes*, 249 F. App'x 233, 236 (2d Cir. 2007) ("The District Court correctly ruled that references to the decline in . . . stock price or investor losses were probative on the issue of materiality and permissible under [Rule 403].").

In fact, far from endorsing the rule Hwang claims exists, the Second Circuit has already rejected the claim that event studies are particularly reliable, useful, or necessary. In *In re Petrobras Sec.*, 862 F.3d 250, 277-78 (2d Cir. 2017), the Second Circuit rejected the defendants' efforts to impose a *per se* rule that would have required plaintiffs to conduct an event study in order to show market efficiency and to trigger the presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). According to the Second Circuit:

> [T]he Petrobras Defendants are attempting to relabel a sufficient condition as a necessary one. We noted in [*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008),] that an event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie*

> evidence of the existence of such a causal relationship. We never
> suggested, however, that such evidence was the only way to prove
> market efficiency; indeed, we explicitly declined to adopt any
> particular test for the market efficiency of stocks or bonds.

*Petrobras*, 862 F.3d at 278 (citations, alterations, emphasis, and internal quotation marks omitted).

The Second Circuit went on to observe that "[e]vent studies offer the seductive promise of hard

numbers and dispassionate truth, but methodological constraints limit their utility in the context

of" the type of event study typically used in securities litigation. *Id.* (citing Alon Brav & J.B.

Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93

Wash. U. L. Rev. 583 (2015)).

Finally, Hwang seeks to draw a false equivalence by pointing to a position the Government

took in another case. (*See* Dkt. 156 at 6). In *United States v. Phillips*, No. 22 Cr. 138 (LJL)

(S.D.N.Y.), the Government alleged that, in December 2017, the defendant manipulated the rate

of the U.S. dollar-South African Rand currency pair to drive the rate below 12.50 to trigger an

option contract that paid out only if the rate touched 12.50 before January 2, 2018. The defendant's

scheme succeeded: on December 26, 2017, the defendant's trading drove the rate through the 12.50

barrier, and, by the end of the day on December 28, 2017, the scheme was complete, in that the

defendant had triggered the option, been paid on the option, and disposed of the instrumentalities

of the crime. Following the triggering of the barrier, the rate retreated above 12.50, before later

crossing the barrier again.

In that case, the Government argued that the defense should not be permitted to offer

evidence that the rate again crossed the barrier sometime after the defendant's scheme had ended

specifically to prove (1) that the defendant believed that the defendant thought the barrier would

be crossed without his manipulative efforts because the defendant "could not have, and did not,

know the future" or (2) that the rate "was going to go through the 12.50 barrier even without his

conduct, unless such argument is tethered to evidence of his own expectations and beliefs at the time of his conduct, or that his deception caused no harm to [the victim in that case] or the market because the rate eventually fell below 12.50." (No. 22 Cr. 138 (LJL), Dkt. 41 at 12-13. These arguments are not the same as what Hwang now presses, which is that evidence of price movements after a manipulative scheme has been stopped can never be admissible for any purpose regardless of its relevance. (Dkt. 156 at 6). For this reason, Hwang's out-of-context quotations of the Government's position in *Phillips* are of no value to him here.

What Hwang does not acknowledge in his papers, and makes his reference to *Phillips* remarkable, though, is that the District Judge—the Hon. Lewis J. Liman—rejected the Government's position and, indeed, did so on a basis directly contrary to Hwang's position here. Specifically, Judge Liman permitted evidence of the so-called "after the fact" rate movements on the ground that such evidence was relevant to the defense theory that the "rate dropped below 12.50 due to undistorted forces of supply and demand." *United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 6620146, at *4 (S.D.N.Y. Oct. 10, 2023). In other words, Judge Liman permitted the introduction of the later price movements as evidence of what price the natural interplay of supply and demand would produce, which is precisely the same reason the Government seeks to offer this evidence here. The Government ultimately introduced into evidence several charts in that case illustrating price movements of the Dollar-Rand that showed the jury the manner in which the defendant's manipulation altered the natural interplay of supply and demand—and did so without the use of an event study. Thus, the precedential value of *Phillips*—which comes from the District Judge's decision rather than the position of the Government—supports the Government here, not Hwang.

Hwang has offered no reason that this Court should preclude relevant evidence concerning the stock price of relevant securities, including what happened to the price of those stocks when Hwang's positions were liquidated and he was no longer able to support those prices. The motion should be denied.

### B. Argument About Archegos's Effective Control of Relevant Securities Is Proper and Supported by the Evidence

The Government has alleged, and expects to prove at trial, that Hwang manipulated the market for the stocks of a number of publicly traded companies, in part, by engaging in swap transactions with counterparties knowing that those transactions would cause the counterparties to buy (or sell, depending on whether Hwang was taking a long or short position) an equivalent number of shares in the marketplace, resulting, among other things, in Hwang's effective control over those shares. (*See, e.g.*, S1 Indictment ¶¶ 16-17, 25-26). Evidence tending to make these facts, which are undoubtedly "of consequence in determining the action," "more probable . . . than [they] would be without the evidence" is relevant, Fed. R. Evid. 401, and therefore presumptively admissible, Fed. R. Evid. 402. And the prosecution—like the defense—is entitled to argue inferences that the jury may draw from the evidence. *See, e.g.*, *United States v. Bonventre*, 646 F. App'x 73, 88 (2d Cir. 2016) (government may argue "fair—if aggressive—inferences" from the evidence); *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978) ("Both prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments.").

Perhaps recognizing that evidence that Hwang's swaps trades resulted in effective control over shares purchased as a hedge by the counterparties is relevant and admissible, Hwang seeks to avoid facing such evidence at trial based on his own assertion that the claim is "factually untrue." (Dkt. 156 at 7). Indeed, apparently in the hope of escaping trial as to this allegation altogether and

instead being awarded summary judgment, Hwang claims that "[t]he Court must preclude the prosecution from offering evidence or argument characterizing Archegos's swap positions as a percentage of the total equity shares outstanding," because his position (at least for the purposes of trial) is that the Government is wrong. (*Id.* at 6-7; *see also id.* at 10 ("we already know that the prosecution cannot make that showing")). But "summary judgment does not exist in federal criminal procedure," *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018), and, even if it did, Hwang could not meet that standard by asserting that his view of the facts (again, at least the view he appears to be taking in time for trial) is correct.

Hwang also attempts an argument under Federal Rule of Evidence 403, suggesting that it would be "misleading" to claim that Hwang dominated the market for particular securities "without any evidence that Archegos's swap purchases dictated the counterparties' free economic choices." (Dkt. 156 at 10). In addition to identifying no problem Rule 403 is designed to address, this argument reveals that Hwang's attempt to preclude the Government's evidence and argument is completely hollow. True enough, the Government should not be permitted to argue that Archegos's swap purchases dictated the counterparties' hedging "without any evidence that Archegos's swap purchases dictated the counterparties'" hedging (Dkt. 156 at 10)—but that is precisely what the trial is for: affording an opportunity to put that evidence before the jury. And the evidence to support the Government's assertion will be substantial.

In support of his motion, Hwang offers a handful of records produced by the Government in discovery as support for his factual assertion that Archegos's trading did not cause its counterparties to control a quantity of shares equivalent to Archegos's swap positions. (*See* Dkt. 156 at 8-9). As an initial matter, these documents do not support the defendant's claim, let alone prove his theory about bank hedging practices. Hwang's argument also ignores basic facts. Hwang

purchased substantial equity in each of these companies outright before switching to swaps. By the end of the scheme, Hwang had caused the counterparties to hold even more. When the counterparties ultimately unwound Archegos's positions, they sold hundreds of millions of shares worth billions of dollars, all of which they linked back to Archegos. (*See, e.g.,* GX 1148, 1149 (Credit Suisse holdings at time of collapse); GX 2178A (UBS holdings at time of collapse)). That point, of course, will be further confirmed by the evidence that counterparties would not engage in swaps trading at all without first purchasing equity shares and by the fact that multiple counterparties reported their significant ownership levels in public disclosures. The trial will feature substantial evidence that Archegos's trading caused the counterparties to obtain significant—and, indeed, dominant—shareholdings in the stock of the relevant issuers.

Equally important, the contemporaneous evidence will show that Hwang believed that the counterparties maintained hedges equivalent to his swap positions. To take but two examples drawn from the evidence in this case: Hwang and others at Archegos used spreadsheets summarizing the firm's positions in which Archegos's positions were expressed by a number of shares corresponding to the total number of shares owned by Archegos both directly as equities and indirectly through its swap positions. In other words, Hwang's position spreadsheets treated direct equities ownership no different from swap ownership and, in fact, did not distinguish between them. And Hwang and others at Archegos also used tables that summarized how long it would take to unwind Archegos's positions by selling (for long positions) at 10% of the average daily trading volume—that is, how long would it take for Archegos to monetize its positions without impacting the market in a way that would reduce Archegos's profits. Such tables would make no sense if Hwang did not understand that unwinding his swap positions would have market impact due to the counterparties' selling their hedges. These tables calculated that number based

on how long it would take to sell both the shares that Archegos owned directly as equities and the shares that the counterparties owned as a result of their swap positions with Archegos and which the counterparties would sell if Archegos exited its swap positions. In other words, Hwang well understood that his counterparties maintained shares corresponding to his swap positions that would be sold when he exited.

Nonetheless, if the defendant does believe that the records to which he points in his motion support his view of the facts, he is entitled to offer them into evidence—assuming they are otherwise admissible—or use them to cross-examine a relevant witness—again assuming such cross-examination is otherwise permissible. And if the defendant succeeds in introducing into the record evidence that undermines the Government's case, he is entitled to argue to the jury that the Government has not carried its burden or that the jury should accept his interpretation of the facts. What the defendant may not do, is prevent the Government from offering relevant evidence and arguing inferences from that evidence to the jury.[1] The motion should be denied.

### C. Evidence and Argument Regarding the Use of Swaps and of Price Impact Are Admissible

In Hwang's next attempt to prevent the Government from offering central, relevant evidence and from arguing fair inferences from that evidence, he seeks an order from the Court precluding the Government from arguing to the jury that the manner in which Hwang used swaps transactions or the fact that his trading did impact the prices of securities provide evidence of his manipulative intent. (Dkt. 156 at 11-14). These arguments should be rejected.

---

[1]     In an argument perhaps more revealing of his litigation strategy than intended, Hwang suggests that he might accuse the Government of prosecutorial "misconduct" were the Government to argue inferences that Hwang claims are untrue. (Dkt. 156 at 10-11). As noted above, however, both parties are permitted to argue their cases based on the evidence admitted at trial. Presenting evidence of Hwang's conduct to the jury is not prosecutorial misconduct, it is prosecution.

Hwang contends that, because the purchase of a swap is "perfectly lawful," "[t]he purchase of swap derivatives alone is not probative of manipulative intent" and the Government should be precluded from arguing to the jury that Hwang's use of swap transactions is evidence of his intent. (Dkt. 156 at 11-12). Similarly, from the uncontroversial proposition that price impact is not, standing alone, market manipulation, the defense purports to infer the evidentiary principle that evidence of price impact cannot be evidence of market manipulation. (Dkt. 156 at 13-14). Those arguments are non-sequiturs and none of the authorities cited by Hwang describes or employs the evidentiary rule he seeks here.

"The gravamen of [market] manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary*, 190 F.3d at 45. "Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021); *see also SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (open market transactions may constitute market manipulation if the defendant intended to control or artificially affect the price). In fact, as the Second Circuit has made clear, "'[i]n some cases, a defendant's 'scienter,' that is, a defendant's intent to manipulate the securities market, is all that distinguishes legitimate trading from manipulative trading.'" *SEC v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022).

It is natural and indeed necessary, therefore, for the Government to argue that the manner in which a defendant used otherwise lawful transactions leads to the inference that the defendant intended to manipulate the market. There is nothing surprising or uncontroversial about this proposition. There is nothing unlawful about an individual having multiple bank accounts and

moving money between them. But when an individual moves money in succession between multiple bank accounts, the government may well argue to the jury in a money laundering case that the fact of those otherwise legal transactions provides evidence of an intention to launder money. There is nothing unlawful about a politician voting for a bill or about a friend giving a politician a gift. But in a bribery case, the government may well argue to the jury that those facts provide evidence of an intention to engage in a *quid pro quo*. So too here: the Government is perfectly entitled to argue to the jury that it should make natural inferences from the fact that the defendant chose to use swap transactions—which, among other things, would not result in public disclosure of Hwang's positions while nonetheless causing price-moving purchases by Hwang's counterparties. *See, e.g.*, *Bonventre*, 646 F. App'x at 88; *Suarez*, 588 F.2d at 354.

Hwang goes even further though, arguing that the Government may not argue to the jury that the fact that Hwang made undisclosed trades knowing that those trades altered the prices of the underlying securities provides evidence that Hwang made those trades intentionally to influence the price of the securities. (Dkt. 156 at 13-14). According to Hwang, "the prosecution cannot argue manipulative intent based on the natural consequence of swap transactions impacting the price of a security." (Dkt. 156 at 14). But the Second Circuit has "held that 'a jury may conclude that an actor intended the foreseeable consequences of his actions.'" *United States v. Clarke*, 979 F.3d 82, 96 (2d Cir. 2020) (quoting *United States v. Nelson*, 277 F.3d 164, 197 (2d Cir. 2002)) (brackets omitted). Certainly, the Government may argue that a person acting with knowledge intended the consequences of his actions, and that the defendant's conduct is a fact that the jury may consider, along with all others, in reaching a decision about the defendant's intent. For much the same reasons noted above, the Government is entitled to encourage the jury to make inferences

13

from the evidence, particularly as to a defendant's intent, which is often proven circumstantially. *Bonventre*, 646 F. App'x at 84.

Finally, Hwang claims that an argument that a juror could make inferences as to Hwang's intent from his use of price-moving swaps "not only misstates the governing law, but it encourages the jury to draw the unfair conclusion, in violation of Federal Rule of Evidence 403, that Mr. Hwang intended to manipulate the market because he knew that his swap transactions would not be disclosed or that they could have price impact." (Dkt. 156 at 14). First, such an argument cannot "misstate the governing law" because it does not include any statement of law at all; it is merely an argument about what conclusions one can reach from evidence based on reason and common sense. Second, such an argument cannot "violat[e]" Rule 403 because Rule 403 concerns certain bases permitting the exclusion of evidence, not argument. Third, even if the principles of Rule 403 did apply here, it is clear that there is absolutely nothing unfair about asking a juror to make inferences based on the admitted evidence; that is precisely what is permitted at trial. *See United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995); *see also Bonventre*, 646 F. App'x at 84.[2]

---

[2]     To support his argument that the jury would be invited to draw an "unfair conclusion" by asking it to draw inferences based on Hwang's conduct, Hwang takes out of context quotations from two cases that have no application here. (Dkt. 156 at 14). First, Hwang points to *Colson v. Cupp*, 449 F.2d 730 (9th Cir. 1971), for the quotation that, "'[w]hen the lawfulness of the act depends upon the guilty intent with which the act was done, it is patently wrong to tell a jury that it can infer the requisite intent simply from proof that a defendant did the act.'" (Dkt. 156 at 14 (quoting *Colson*, 449 F.2d at 731)). But this reasoning has nothing to do with the point Hwang would like to make here; instead, the Court of Appeals for the Ninth Circuit was merely explaining that a jury instruction "'[t]he law also presumes that an unlawful act was done with an unlawful intent' . . . is hopelessly circuitous" where the lawfulness of the act depends on the actor's intent. *Colson*, 449 F.2d at 731.

Hwang also quotes *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017), as concluding that a jury instruction that "'captured lawful conduct'" was not "'a correct interpretation of the law,'" apparently in an effort to suggest that permitting a jury to make inferences from otherwise lawful conduct would be unfair or contrary to precedent (Dkt. 156 at 14 (quoting *Silver*, 864 F.3d at 118)). But this is not what *Silver* was about at all. *Silver* simply held that the jury instruction in that case was rendered erroneous by the Supreme Court's intervening decision in *McDonnell v. United*

### D.  Evidence of the Defendants' States of Mind Is Admissible

Hwang and Halligan both seek to preclude the Government from offering evidence and making arguments about their respective states of mind. (Dkt. 156 at 14-17; Dkt. 166 at 27-28). For his part, Hwang seeks to prevent the Government from offering evidence obtained from certain of his employees—individuals he hired as research analysts—relevant to his state of mind, while Halligan seeks, apparently, to hide from the jury his job title and to prevent the Government from arguing and the jury from making natural inferences from relevant evidence. But particularly where, as here, the central question in the case is the defendants' knowledge and intent, the Government should be permitted to offer competent evidence and make appropriate arguments that bear on the defendants' states of mind. The motions to the contrary should be denied.

### 1.  Relevant Evidence from Archegos Research Analysts Is Admissible

Hwang argues that the Government should be precluded from presenting exhibits or testimony from research analysts incorporating purported analyst speculation about Hwang's state of mind in executing trades. (Dkt. 156 at 14-17). The Government agrees with the defense that witness speculation about Hwang's intent is improper, which is why the Government has moved to preclude the defense's experts from offering many of their proposed opinions at trial. (*See* Dkt. 164 at 40-53). As to the Archegos analysts, however, the Government will present factual testimony from the analysts regarding what they observed during their tenure at Archegos, including changes to practices at Archegos in its final year that provide probative evidence of the defendants' conduct and especially of Hwang's state of mind. To the extent any of this testimony is construed as opinion testimony, it falls squarely within the scope of Fed. R. Evid. 701 because

---

*States*, 579 U.S. 550 (2016), which held that certain conduct previously thought to come within the ambit of the bribery statutes was not illegal. *Silver*, 864 F.3d at 118-19.

it is firmly rooted in objective facts the analysts personally observed, and will be helpful to the jury in assessing Hwang's state of mind in trading. Hwang's motion should be denied.

### a.    Relevant Background

At trial, the Government intends to introduce testimony and text messages from one or more research analysts at Archegos, including Brendan Sullivan. Sullivan was hired by Hwang in 2014, and rose through the ranks to become a Managing Director. Sullivan, like all members of the research team, was responsible for following the markets, assessing the value of companies, and making investment recommendations to Hwang. Viacom was one of the companies that Sullivan was assigned to cover. Analysts like Sullivan would prepare research memos, often referred to as Cap Sheets, which included "target prices" that reflected the analyst's view of a company's value, and would discuss these memos with Hwang at regular investment meetings. As a Managing Director, Sullivan also received daily portfolio reports, referred to as Combo Sheets, which listed Archegos's holdings and tracked which securities (including the price and amount) Hwang had purchased or sold the previous day. (*See, e.g.*, GX 6445 (January 8, 2021 message to Sullivan with Combo Sheet)).[3]

Beginning in 2020, Sullivan noticed significant changes at Archegos. Hwang no longer held regular investment meetings. Hwang worked out of the corporate apartment with one or two analysts. Analysts churned out memos for dozens of companies, but Hwang took on positions only in a small number of companies, such as Viacom, GSX, Discovery, and TME. As to these select companies, the analysts faced internal pressure to raise their target prices even when company

---

[3]    At the end of January 2021, when Archegos's positions had ballooned to more than $20 billion, Hwang cut off access to these daily reports, thereby preventing others from seeing the size of his new positions. Thereafter, Sullivan received a pared down version of the report that only listed the names that Hwang bought each day, which by late January 2021 was typically the same handful of names—e.g., Viacom, GSX, Discovery, TME.

fundamentals did not match those prices. Moreover, Hwang kept adding to these same positions at ever increasing prices—all of which was visible from the Combo Sheets that Sullivan reviewed. Then, in late-March 2021, Sullivan and the other analysts watched as Archegos's portfolio collapsed, beginning with a steep decline in the price of Viacom.

GX 2918, cited by the defense, is a text message exchange between Sullivan and fellow analyst Joshua Chuang from October 19, 2020, when the price of GSX, one of the securities in which Hwang had a large position, was dropping, and Archegos was buying large volumes to "tr[y] to defend GSX." (GX 2918 at 2). Chuang, who occasionally worked at the corporate apartment with Hwang, told Sullivan that Hwang was "literally watching every tick," a reference to Hwang watching each change in the share price of GSX, while the other analysts at the corporate apartment tried "to not say anything stupid." (GX 2918 at 3).

GX 2946, also cited by the defense, is a text message exchange between Sullivan and Chuang from March 24, 2021. That day, the price of Viacom was down markedly, causing a steep decline in Archegos's portfolio. From reviewing the Combo Sheets, Sullivan knew that Archegos's position in Viacom had grown to more than 60% of Archegos's portfolio. Sullivan told Chuang that Archegos had "wasted so many bullets in the $90 - $100 range . . . fighting for ticks," and the traders had been "manipulating the market." (GX 2946 at 6). Earlier that day, Sullivan told Chuang and another analyst Brandon Berger that he had asked "Bill why we had to rush [Viacom] to these levels" when Archegos "could've acquired more stock at lower prices over time instead of defending high levels," to which Hwang responded that he was trying to "help the Viacom employees." (GX 2991 at 2). That answer made little sense to Sullivan.

### b.      Applicable Law

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013). "[T]he distinction between statements of fact and opinion is, at best, one of degree." *Id*. (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988)); *see id.* (acknowledging "essential truth" of "Judge Posner's observation that '[a]ll knowledge is inferential, and the combined effect of [Federal] Rules [of Evidence] 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable'" (alterations in original) (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990)). "[P]ersonal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception.'" *Cuti*, 720 F.3d at 458-59 (quoting Fed. R. Evid. 602 advisory committee's note).

Rule 701 provides that lay opinion testimony is admissible as long as it is limited to opinions that are: "(a) rationally based on the witness' perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A rational perception is one involving first-hand knowledge or observation. *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). Testimony is "helpful" to the jury if it "affords the jury an insight into an event that was uniquely available to an eyewitness." *United States v. Flores*, 945 F.3d 687, 709 (2d Cir. 2019). Lay opinion testimony may cover any subject matter, including "ultimate issues" of fact for the jury. *Rea*, 958 F.2d at 1214-15.

c.      **Discussion**

Hwang moves to preclude the Government from offering exhibits and testimony containing opinions from Archegos's research analysts regarding Hwang's trading decisions and goals. (Dkt. 156 at 14). As an initial matter, much of the proposed testimony from Sullivan or any other analyst should be properly construed as fact testimony, not opinion testimony under Rule 701. Sullivan and other analysts will testify about what they observed during their many years at Archegos, and how, in the final year, Hwang seemed to abandon much of the investment strategy that he previously touted and instead adopted a strategy of taking on massive positions in a small number of securities at ever increasing prices. The result of this strategy was to push up, or manipulate, the market prices of the stocks, as Sullivan will explain. As to this *fact* testimony, the requirements of Rule 701 simply do not apply.

To the extent that the Court construes aspects of Sullivan's or any other analysts' testimony as opinion testimony, this testimony easily satisfies the requirements of Rule 701.[4] First, any offered opinions will be based on the analysts' first-hand experiences and personal observations from their time at Archegos. Second, any offered opinions will be helpful to the jury in evaluating Hwang's intent because they will give the jury an insider's perspective on what was happening at Archegos and show the jury just how unusual, atypical and nonsensical Hwang's buying was. Nor would this evidence constitute speculation regarding Hwang's mental processes; instead, the text message evidence and related testimony will reflect the witness's observations regarding conduct that the witness him or herself perceived, such as what investment purpose a trade that he observed

---

[4]      As noted above, Rule 701 imposes three requirements for the admission of opinion testimony. Hwang has not challenged the Government's proposed testimony under the third prong of Rule 701, thereby conceding that this prong would be satisfied and that the analysts' testimony is "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

in his role could have served. Courts routinely permit this type of lay opinion testimony at trial. *See, e.g.*, *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008); *United States v. Ghavami*, 23 F. Supp. 3d 148, 171 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Heinz*, 607 F. App'x 53 (2d Cir. 2015); *United States v. Hild*, 644 F. Supp. 3d 7, 50-52 (S.D.N.Y. 2022).

None of the arguments Hwang advances for excluding this evidence is persuasive. First, Hwang argues the analysts' text messages, including GX 2946 and 2918, are barred by the rule against hearsay because the analysts are not co-conspirators. But, as set forth in the Government's motion *in limine* (Dkt. 164 at 35-40), Sullivan and the other analysts were acting in their capacities as agents of Archegos and Hwang, and thus, their out-of-court statements are not hearsay, inasmuch as they are statements of a party's agent under Fed. R. Evid. 801(d)(2)(D).[5]

*Smith v. New York and Presbyterian Hospital*, 440 F. Supp. 3d 303, 338-39 (S.D.N.Y. 2020), which Hwang cites in his motion, is distinguishable. (Dkt. 156 at 16). In *Smith,* on a motion for summary judgment in an employment discrimination case, the Court held that text messages sent by a *former* employee of the defendant were inadmissible against the defendant under Rule 801(d)(2)(D) because the employee did not work for the defendant when she sent the messages. But the text messages here are contemporaneous with the analysts' employment and were sent within the scope of their employment, and therefore are admissible under Rule 801(d)(2)(D).

Second, Hwang claims this testimony should be excluded because "it is untethered to any first-hand knowledge or observations." (Dkt. 156 at 15). But Hwang is conflating the first-hand

---

[5]    These text messages also would be admissible as prior consistent statements under Fed. R. Evid. 801(d)(1)(B) to the extent the analyst testifies at trial, and the defense suggests the analyst has "recently fabricated" his testimony or "attack[s]" the analyst "on another ground." Fed. R. Evid. 801(d)(1)(B); *see United States v. Davis*, No. 21-1486, 2023 WL 4582002, at *4 (2d Cir. July 18, 2023) (affirming district court's admission of witness prior statement under Rule 801(d)(1)(B) when offered to "rebut[] the defense's implication . . . that [the declarant] fabricated" his testimony).

knowledge requirement of Rule 701 with a made-up rule that a witness must be "sitting" next to Hwang, and taking his trade orders, to provide competent evidence about Hwang's intent in trading. The question is not whether the witness could see the defendant at any particular time; it is whether the witness's testimony is rationally based on his own observations, whatever they may be. Not surprisingly, the Second Circuit does not impose the limitation sought by the defendant, and instead routinely upholds lay opinion testimony on similar facts. *See United States v. Rigas*, 490 F.3d 208, 223 (2d Cir. 2007) (upholding lay opinion testimony about complicated accounting issues relevant to a criminal case, even though the witness did not become familiar with those issues until "after [the defendants] were indicted"); *Yannotti*, 541 F.3d at 125-26 (upholding lay opinion testimony about the meaning of certain loansharking terms in a phone call, even though the witness was not part of that call). To be sure, the Archegos traders who sat with Hwang are *also* in a position to provide lay opinion testimony about Hwang's intent, particularly based on their observations of how and when Hwang executed trades. But so too can Sullivan—a Managing Director at Archegos who watched as Hwang sidelined his research team and bought increasing quantities of the same securities day after day, raising the prices of these securities to levels that were unsupported by company fundamentals, such that when Hwang stopped buying—because he ran out of cash—the prices collapsed.

As a fallback position, the defense argues that this testimony will be unhelpful to the jury because the "jury [would] be in as good a position as the witness to draw the inference as to whether or not the defendant knew." (Dkt. 156 at 17). But that argument fails twice over. First, the central question in this case as to Hwang's trading is intent, not knowledge. And as to intent, the Second Circuit has been clear that lay opinion testimony can be helpful. *See Rea*, 958 F.2d at 1216 (distinguishing the helpfulness of testimony when the issue is "a party's knowledge, which is

perhaps a more easily fathomed state of mind than, for example, intent or motivation"); *see also id.* at 1215 ("there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others")*.* Second, the analysts who worked at Archegos and, in the case of Sullivan, the analyst who covered Viacom, will undoubtedly have "helpful" opinions on Hwang's intent based entirely on their experiences at Archegos, including their experiences in Archegos's investment decision-making. To suggest otherwise displays nothing more than desperate attempt by Hwang to preclude the Government from fairly presenting its case at trial.

In seeking to preclude this testimony, Hwang relies on *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007), and *United States v. Rea*. But both cases involved situations far afield from the facts here. In *Kaplan*, for example, the Circuit held the district court erred in admitting lay opinion testimony from a witness who, after a single conversation with the defendant, opined "[the defendant] knew exactly what he was getting into." 490 F.3d at 117. When pressed on the "basis for his opinion," the witness gave a "response [that] was extremely vague," and thus, the Circuit in *Kaplan* held the witness's opinion was not "rationally based on facts he had observed." *Id.* at 119. Likewise, in *Rea*, the Circuit found it was harmless error to allow a witness to testify the defendant "had to" have known he was participating in a tax fraud scheme, describing that testimony as "unhelpful" to the jury where it did "no more than instruct the jury as to what result it should reach." 958 F.2d at 1217-21. Here, by contrast, Sullivan and any other analysts who testify will be prepared to articulate the bases for their opinions that Hwang was "manipulating" the market and "defending" the stock prices. These include, among other things, their many years

22

at Archegos, their personal observations of Archegos's portfolio and the market, and, as to at least Sullivan, specific conversations he had with Hwang about Hwang's trading.[6]

Finally, the probative value of this evidence is not substantially outweighed by any unfair prejudice. Hwang claims in conclusory fashion that this testimony "presents a danger of unfair prejudice, misleading the jury, and waste of time." (Dkt. 156 at 17). But Hwang fails to articulate the prejudice, confusion, or delay that would result from this testimony. To be sure, that a Managing Director at Archegos will testify that he believed Hwang was manipulating stock prices is unhelpful to Hwang's defense, but the fact that "evidence was 'damning' does not render it inadmissible." *United States v. Vargas*, 702 F. Supp. 70, 73 (S.D.N.Y. 1998) (citation omitted). Nor is there any basis for Hwang to claim this testimony will be a "waste of time." (Dkt. 156 at 17). The vast majority of Sullivan's testimony will be fact testimony, not opinion testimony, about what he observed during his tenure at Archegos. The handful of narrow opinions that Sullivan is prepared to offer will not expand the length of his testimony in any meaningful way, and, even if they did, the time spent providing relevant, firsthand observations of Hwang's conduct will hardly have been wasted. Hwang's motion should be denied.

---

[6]     The other cases cited by Hwang are no more helpful. In *Hester v. BIC Corp.*, 225 F.3d 178, 184-85 (2d Cir. 2000), an employment discrimination case, the Second Circuit upheld the preclusion of opinion testimony regarding the reason the plaintiff was fired when offered by witnesses who lacked "personal knowledge" of that firing. Likewise, in *United States v. Hoffner*, 777 F.2d 1423, 1425-46 (10th Cir. 1985), the Tenth Circuit affirmed the preclusion of opinion testimony that a doctor's prescriptions were legitimate when offered by witnesses who had not observed the doctor write the prescriptions. And finally, in *United States v. Awadallah*, 401 F. Supp. 2d 308, 314-15 (S.D.N.Y. 2005), a case involving a perjury charge before the grand jury, this Court limited the grand jurors' testimony to "objective manifestations of confusion or composure" they observed, holding anything beyond that would "not be helpful" to the jury because the jury would have its own copy of the grand jury transcript and could "draw its own inferences from [the defendant's] words." None of the proposed witness testimony in *Hester*, *Hoffner*, or *Awadallah* bears any resemblance to the opinion testimony contemplated in this case.

### 2. Relevant Evidence and Argument Regarding Halligan's Job Function Is Admissible

Halligan moves to preclude the Government from arguing that Halligan "had the requisite scienter, or would have or should have known one thing or another merely because he was the CFO of Archegos." (Dkt. 166 at 27). But the Second Circuit has repeatedly held that a jury may infer a defendant's knowledge based on, among other things, the defendant's position within an organization. *See United States v. Anderson*, 747 F.3d 51, 69 (2d Cir. 2014) (holding that "the jury could reasonably find that [the defendant] enjoyed a trust position within the conspiracy such that one may infer his knowledge of the conspiracy's goal of distributing controlled substances"); *United States v. Davis*, 690 F.3d 127, 132 (2d Cir. 2012) ("The evidence in this case established, either directly or by inference, that [the defendant] played a principal role, even a managerial one, in the drug conspiracy and for that reason would have reasonably possessed the requisite criminal knowledge."); *United States v. Teitler*, 802 F.2d 606, 614 (2d Cir. 1986) (holding "a jury could reasonably infer that [the defendant] knew" of the charged conduct "[b]ased on [the defendant's] position as a partner at the firm and evidence of his knowledge of these firm practices," among other evidence); *see also United States v. Crowley*, 318 F.3d 401, 409 (2d Cir. 2003) (recognizing that "the question of [a defendant's] intention" must generally be inferred because it is "rarely susceptible to proof by direct evidence"). Halligan's argument is therefore squarely foreclosed by the law of this Circuit.

Rather than engage with this authority, Halligan instead points to a handful of cases that concern the pleading standards for scienter in civil securities fraud cases. (*See* Dkt. 166 at 27-28 (collecting cases)). But these cases have no bearing on what evidence the Government may offer and what arguments the Government may make to prove the defendant's knowledge and intent at a criminal trial. That an isolated allegation in a civil complaint about a defendant's job title might

be insufficient to plead scienter does not prevent the Government from arguing at trial that a defendant would have learned certain facts as a result of his job function. Indeed, the two concepts have little, if any, logical connection, and the uncited and unsupported assertion by Halligan that "[w]hat would be insufficient at the pleading stage would be doubly improper argument before the jury" (Dkt. 166 at 28) is entirely meaningless.

Halligan's reliance on the Hon. J. Paul Oetken's observation in *SEC v. Hwang*, 2023 WL 6124041, at *7, that "the SEC's conclusory argument that conscious misbehavior or recklessness can be inferred from Halligan's position as CFO does not withstand scrutiny" is, if anything, even less persuasive than his citation to other decisions regarding civil pleading standards. Indeed, Judge Oetken's statement that "*conscious misbehavior or recklessness*" cannot immediately be inferred from Halligan's position as CFO (at least based on "conclusory argument" only), *id.*, has no meaningful bearing on whether it is fair inference that Halligan knew "or would have or should have *known* one thing or another" as a result of his role at Archegos, which is what Halligan seeks to preclude the Government from arguing here (Dkt. 166 at 27).

In any event, Halligan is certainly entitled to argue at trial that the jury should not infer any particular knowledge or mental state from his role as the CFO of Archegos, but by the same token, the Government is certainly entitled to argue, based on the facts adduced at trial concerning Halligan's job function and role at Archegos, fair and natural inferences that flow from those facts concerning his knowledge or other mental state. Halligan's motion should be denied.

### E.  Evidence Using the Words "Manipulation" and "Material" Are Admissible

Hwang and Halligan both seek to hinder the presentation of evidence by preventing witnesses from using ordinary terms naturally used to describe events. For his part, Hwang moves to preclude the Government from offering at trial what he describes as "any evidence expressing a legal conclusion that Mr. Hwang manipulated the market." (Dkt. 156 at 17-20). Halligan

similarly requests an order from the Court precluding witness's from using the word "material" to describe the relevance or importance of events to them. (Dkt. 166 at 24-27). Were these motions directed at the Government seeking to offer testimony through expert witnesses that elements of a charge had been met, the Government would have no objection, because it is well-settled that expert witnesses may not offer legal conclusions at trial. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Hwang's and Halligan's motions, however, sweep far more broadly and instead seek to impose a case-wide ban on *any* witness's use of the term "manipulation" (Dkt. 156 at 19) or "material" (Dkt. 166 at 24). That request is as impractical as it is improper, and should be denied.

### 1.  Evidence Using the Word "Manipulation" Is Admissible

As noted above, *see supra* Point I.D.1, the Government intends to call former Archegos analysts, including Brendan Sullivan, to testify about what they observed during their time at Archegos. Sullivan is expected to testify, among other things, that Hwang was engaging in trading that was manipulating the market in certain securities, including Viacom. Sullivan's text messages from the time of his employment are consistent with this anticipated testimony. (*See* GX 2915, GX 2946 at 9).

When testifying, Sullivan should be permitted to use terms like "manipulation" that accurately describe the conduct he observed. In doing so, he will not be expressing a "legal conclusion," but rather using the plain meaning of the term to describe what he saw. This type of testimony is routinely upheld by courts, and indeed admission of testimony using the terms "manipulation" or "manipulated" and even "artificially inflate[d]" has been affirmed by the Second Circuit. For example, in *United States v. Discala*, the defendant argued on appeal that the district court erroneously permitted a cooperator "to repeatedly use the terms 'illegal' and 'manipulation'" and a law enforcement agent to provide improper opinion testimony, based on specialized knowledge, that evidence gathered in the investigation showed illegal manipulation.

No. 22-675, 2023 WL 4118637, at *3 (2d Cir. June 22, 2023); *see United States v. Discala*, Oral

Arg. at 14:00-21:09 (June 5, 2023) (describing law enforcement agent's testimony). The Second

Circuit rejected the claim that the cooperator's testimony regarding manipulation was improper;

to the contrary, in assessing whether admission of the *law enforcement agent's* opinion that

evidence gathered in the case demonstrated illegal manipulation—which the government conceded

should not have been admitted—was harmless (which it was), the Second Circuit relied on the

testimony of multiple cooperating witnesses that they had "manipulated the price of certain stocks"

and "artificially inflate[d] the price of the stocks" to show that the admissible evidence against the

defendant was overwhelming. *Id.* at *4.[7] In other words, even if it was arguably improper for a

law enforcement witness to opine that evidence gathered in the investigation demonstrated that

charged conduct was illegal, it was perfectly admissible (indeed, highly probative) for a witness

to describe conduct as manipulation or artificially inflating the price of a security. *Id.*; *see United*

*States v. Offill*, 666 F.3d 168, 177-78 (4th Cir. 2011) (affirming the admission of lay-opinion

testimony under Rule 701 in a securities-fraud case and held that the district court "acted well

within its broad discretion" in admitting a cooperating witness's testimony describing his own

conduct as "fraudulent," "securities manipulation," and "illegal"); *see also United States v.*

*Farrell*, 921 F.3d 116, 144-45 (4th Cir. 2019) (attorney properly gave lay opinion testimony that

certain conduct would contravene legal ethics rules where the testimony "was based on personal

knowledge and on [the witness's] experience as a lawyer"); *United States v. Hoffecker*, 530 F.3d

---

[7]     The opinion's language that "the government concedes that the district court erred in
allowing *some* of the challenged testimony to be admitted at trial," *Discala*, 2023 WL 4118637, at
*4 (emphasis added), refers to the government's concession that portions of the law enforcement
agent's testimony should not have been admitted, *see* Brief of the Gov't, *United States v. Wexler*,
No. 22-067, 2022 WL 17413982, at *100-01 (E.D.N.Y.); *United States v. Discala*, Oral Arg. at
14:00-21:09 (June 5, 2023); *see also Discala*, 2023 WL 4118637, at *4 (explaining that the law
enforcement agent's testimony was "not central to the government's case").

137, 170-71 (3d Cir. 2008) (holding that lay witness properly opined under Rule 701 that the defendant's company was a "scam").

Here, the testimony or documentary evidence that Hwang seeks to prevent the jury from hearing is well within the scope of admissible evidence that the Second Circuit blessed in *Discala*. The Government does not intend to elicit from Sullivan or other analogous witnesses that any conduct was "illegal." *See Discala*, 2023 WL 4118637, at *3. Rather, the witnesses or related records may reflect the percipient observation that certain acts were manipulative—a perfectly reasonable and useful way for a percipient witness to describe his or her observations, and one useful to the jury that does not instruct the jury on the legality of any action or the elements of a crime. *See id.* at *4; *see also Offill*, 666 F.3d at 178 (analogizing a witness describing conduct as "fraudulent," "securities manipulation," and "illegal" to a witness stating "that she saw the victim on the floor with what looked like blood on his shirt, even though she was not an expert and had not tested the substance to confirm that it was blood").

In seeking to preclude this testimony, Hwang cites to *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), a case involving *expert*, not lay testimony, and one cherry-picked line of dicta from *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010). Both cases are inapposite. In *Scop*, the Second Circuit held an expert witness's repeated use of the terms "manipulation," "scheme to defraud," and "fraud" exceeded the permissible scope of opinion testimony, where the expert "drew directly upon the language of the statute," and made "repeated use of statutory and regulatory language indicating guilt." 847 F.2d at 140-42.[8] But Sullivan is a lay witness, not an expert, and he will not parrot back the statutory language as the expert did in *Scop*. Likewise, in

---

[8]     The expert in *Scop* also impermissibly based his opinion testimony on his "positive assessment of the trustworthiness and accuracy of the testimony of the government's witnesses." *Scop*, 846 F.2d at 142.

*Cameron*, a case involving a claim of malicious prosecution, the Circuit noted in dicta that it would be improper for lay witnesses to testify in the form of a legal conclusion. 598 F.3d at 62 n.5. But the legal conclusion in *Cameron* was whether there was "probable cause" to arrest the defendant, *id.* at 62—a legal term that lacks any plain meaning—and, in any event, the Circuit ultimately excluded the testimony on relevance grounds, and not because it was legal conclusion.  In contrast, and consistent with the analysis of the Second Circuit in *Discala*, courts in this District and around the country regularly allow cooperating witnesses to describe their own conduct as "fraudulent" and "illegal," recognizing that such testimony is "helpful to the jury because it shed[s] light, based on [the witness]'s personal knowledge of his own illegal conduct, on the nature and purpose of the conspiracy and [the defendant]'s interaction with [the witness] in furthering its illegal aims." *Offill*, 666 F.3d at 178.

Finally, the probative value of this testimony is not substantially outweighed by the risk of unfair prejudice. Hwang argues the introduction of this testimony risks the jury "unfairly substitut[ing] those lay witness conclusions for its own." (Dkt. 156 at 20). But the Court will instruct the jury on the legal definition of market manipulation, and further instruct that whether or not Hwang committed market manipulation is for the jury to decide consistent with the Court's instructions. Moreover, if the defense requests, the Government has no objection to the Court providing an additional limiting instruction when a witness uses the term "manipulation" to remind the jury that the Court will instruct on the definition of manipulation. These steps will adequately protect Hwang's rights at trial, while also ensuring that the Government can fairly present its case.

*United States v. Barnwell*, No. 15 Cr. 620 (NSR), 2017 WL 1063457, at *5 (S.D.N.Y. Mar. 20, 2017), does not suggest otherwise. There, in a tax fraud case, the Court ordered the Government to redact the terms "frivolous" and "scheme" from the titles of certain IRS documents, and further

ordered that "witnesses . . . should refrain from characterizing or predetermining whether the tax returns are fraudulent, frivolous, or part of a scheme." *Id.* But those superficial adjustments, which still preserved the substance of the documents and testimony, are far different than Hwang's thinly veiled attempt to prevent witnesses from providing relevant testimony at trial.

In short, the testimony that Hwang seeks to preclude is testimony that is helpful to the jury and explains to the jury the observations of a percipient witness using plain language. Hwang's attempt to prevent the jury from receiving useful and admissible evidence is not supported by the law of this Circuit. *Discala*, 2023 WL 4118637, at *4.

### 2.  Evidence Using the Word "Material" Is Admissible

Relying on the very same cases, Halligan seeks to preclude witnesses from using the term "material" to describe the importance of facts or events to them. (Dkt. 166 at 24-27). For the same reasons articulated above, this motion should be denied. While the Government does not know whether, in answering a question regarding whether a particular fact or circumstance mattered to a witness, that witness might choose to use the word "important" or "material" or any other word in the English language conveying the same concept, there is no basis to instruct any witness on what words he or she might use to provide factual testimony in plain terms understandable to the jury.

Halligan asserts that "[i]f witnesses are permitted to offer not only *factual* testimony but *opinion* testimony on an ultimate issue, there is a grave risk that such testimony will impermissibly 'direct the jury what to conclude on a matter that it should decide in the first instance.'" (Dkt. 166 at 26 (quoting *United States v. Garcia*, 291 F.3d 127, 142 (2d Cir. 2002))). This fear is entirely misplaced. As noted above, the Court will instruct the jury on its duty to find the facts in this case, and indeed no witness will be asked to express an opinion on the ultimate issue of materiality, because the materiality inquiry for the jury is an "objective one," *see, e.g.*, *United States v.*

*Gramins*, 939 F.3d 429, 448 (2d Cir. 2019). Witnesses will not offer testimony stating that any fact or circumstance was material to a reasonable investor or decision-maker, but rather will offer testimony specifically as to whether a particular fact or circumstance was important or material *to him or her* as evidence from which the jury can infer, or not infer as the jury chooses, that a reasonable person making an investment or a relevant decision would have considered the fact or circumstance in making his or her decision. There is no basis on which to ban a witness from using the word "material" to express his or her observations, and the motion should be denied.

### F.  Evidence of Halligan's Misconduct Is Admissible

Halligan, for assorted reasons, seeks an order from the Court precluding the admission of (1) evidence that Halligan participated in the creation of false and misleading records as part of the charged conduct; (2) evidence of false and misleading certifications signed by Halligan in the course of the charged conduct; and (3) evidence that Halligan sought, at various times and as part of the charged conduct, to delay providing information to counterparties in lieu of or in addition to providing affirmatively false and misleading information. (Dkt. 166 at 28-41). But Halligan cannot avoid presentation to the jury of relevant and admissible evidence that directly bears on his guilt or innocence in this case. The motions should be denied.

#### 1.  Evidence that Halligan Participated in Creating False Reports Is Admissible

Halligan seeks to preclude the Government from offering evidence that Halligan created reports that falsely understated Archegos's gross exposure and were provided to Archegos counterparties. He seeks to preclude this evidence not on the ground that it is inadmissible, but rather because, he claims, the Government has not provided sufficient notice of its intention to suffer such evidence. This argument is wrong, has already been rejected by the Court, and is belied by the very facts on which it purports to rely.

31

Halligan asserts—not for the first time in this case—that the Court ordered, on July 1, 2022, the Government to identify all misrepresentations that the Government intends to point to at trial. (*See* Dkt. 166 at 29). It is true that on July 1, 2022, during a colloquy with the Government, the Court told the Government to provide additional detail regarding misrepresentations to the defense (*see* June 1, 2022, Tr. at 15-17), and it is also true that in response, the Government supplemented the detailed speaking Indictment in this case by providing the defense with a letter containing extensive evidentiary detail, including approximately nine pages of itemized false and misleading statements, more than 50 citations of particular pages produced in discovery, and descriptions of specific factual support for the charges, including numerous references to and quotes from specific documents produced in discovery, as well as references to statements made by witnesses to the Government (Dkt. 38). Then, advancing the same argument Halligan makes now, the defense sought an order from the Court directing the Government to provide a bill of particulars, arguing that such an order was required because the Government had not provided a list of every misrepresentation in the case, as, according to the defense, the Court had ordered. (*See* Dkt. 47 at 109-11). The Court denied that motion, concluding that "[t]he Indictment and the Government's August 18, 2022 letter regarding alleged misrepresentations made by Hwang, Halligan, and their co-conspirators . . . are sufficient to allow the defendants to 'prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted for a second time for the same offense.'" (Dkt. 66 at 3 (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987))). Halligan's latest attempt to mischaracterize the Court's prior order and revive an argument previously rejected by the Court in an effort to prevent the jury from receiving the evidence against him should be denied once again.

Moreover, the fallacy of the claim that "[t]he government should be precluded from introducing evidence or argument about any such 'gross exposure' reported because it has *never* provided notice to the defense of its intent to do so." (Dkt. 166 at 29 (emphasis in original)) is self-evident. The reason that Halligan is able to move to preclude evidence of this fact at all is that the Government produced reports reflecting what a cooperating witness has said about the matter to the Government—a report which Halligan quotes in his motion claiming that he has had not notice of these facts. (*See id.* at 29 (quoting 3501-001 and 3501-002)). Those reports were produced to the defendants on December 26, 2023, some two months before the date this trial had previously been scheduled to start and four and a half months before jury selection in this trial will actually begin. The assertion that Halligan "*never*" (Dkt. 166 at 29 (emphasis in original)) received notice of this evidence is, to put it mildly, unsupported.

It is worth further observing that the defendants' frequent claims to having been "sandbag[ged]" have no foundation whatsoever and are a hollow refrain in a case where the Government has, in addition to providing the extensive evidentiary detail described above, voluntarily supplied the defense with Jencks Act material and exhibit and witness lists (updated and revised on a rolling basis as the Government prepares for trial) far in advance of the deadlines mandated by law and even those customarily observed in this District. As noted above, the Government began producing Jencks Act material to the defense on December 16, 2023, and produced an initial exhibit list to the defense on December 20, 2023, and an initial witness list on January 9, 2024. Yet the defense complains of having "to wade through the government's proposed exhibits seeking to decipher what the government has in mind, and to speculate about how the government might seek to use" its evidence. (Dkt. 166 at 15). What is left unsaid is that an indictment, discovery, Jencks Act material, exhibit list, and witness list are precisely the tools that

attorneys use to prepare for trial. It appears that what the defense seeks is not notice, but an explanation and justification of the Government's strategy and plans. But "[d]efendants are not entitled to a roadmap of how the Government will attempt to prove its case, a laundry list of each act the Government considers significant, or a flow chart of the Government's advocacy theories." *United States v. Rankin*, 422 F. Supp. 3d 564, 594 (D. Conn. 2019) (citing *United States v. Chambers*, No. 17 Cr. 396 (WHP), 2018 WL 1726239, at *2 (S.D.N.Y. Apr. 9, 2018), and *United States v. Kogan*, 283 F. Supp. 3d 127, 132 (S.D.N.Y. 2017)).

Halligan's claims that he has not received "notice" should be rejected and his motion to preclude competent evidence of his guilt, including evidence that he created false records as part of an effort to mislead Archegos's counterparties, should be denied.

### 2. Evidence that Halligan Signed False Trade Confirmations Is Admissible

Halligan moves to preclude evidence and argument that Halligan falsely signed trade confirmations that were required by the Mitsubishi UFJ Financial Group ("MUFG"). (Dkt. 166 at 30-35). This motion too should be denied.

The Government expects that the evidence at trial will show that Halligan and others at Archegos made materially false and misleading statements about Archegos' portfolio of securities to Archegos's counterparties. As just one example, the Government intends to offer trade confirmations with one of the counterparties, MUFG, which were signed by Halligan and in which Halligan represented that "the aggregate amount of all Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative position, is less than 5% of the outstanding Shares." (*See, e.g.*, GX 1903). That representation was false. As Halligan knew, Archegos beneficially owned far in excess of 5% of the outstanding shares in several securities, including IQ, TME, VIAC, GSX, and DISCA. Halligan's signing of these trade confirmations is direct evidence of the charges in this case—in

fact, it proves a specific allegation set forth in the Indictment (*see* S1 Indictment ¶ 59(b))—and should be admitted at trial.

Halligan argues this evidence should be precluded because there is not "a scintilla of evidence" that Halligan was aware of the false statements in the trade confirmations. (Dkt. 166 at 34). But Halligan signed the trade confirmations, and that fact, in and of itself, is sufficient proof to make the trade confirmations relevant at trial. *See* Fed. R. Evid. 401; *United States v. Litvak*, 808 F.3d 160, 179-80 (2d Cir. 2015) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt."); *see also Gramins*, 939 F.3d at 450 ("Relevance . . . is a low threshold" that is "easily satisfied.").

In moving to preclude, Halligan seems to be arguing that because no witness *told* the Government that Halligan knew the trade confirmations were false, the trade confirmations are inadmissible.[9] But that fact is as unsurprising as it is irrelevant. As the Second Circuit has held, "it is rare to have direct evidence of a person's state of mind." *Flores*, 945 F.3d at 715. Instead, a jury may "infer a person's knowledge . . . from, for example, his or her statements or conduct, or from the circumstances." *Id.*; *see also United States v. Hampton*, 676 F. Supp. 3d 283, 297 (S.D.N.Y. 2023). Here, the jury can infer that Halligan was aware of the false statements in the trade confirmations from his conduct and the circumstances, including that Halligan signed them; that Halligan knew Archegos's positions far exceeded 5% of shares outstanding; that Halligan directed Becker to provide false information to the counterparties; and that Halligan understood that having multiple counterparties was essential to Hwang's scheme, and that if the counterparties found out

---

[9]     Halligan also faults the Government for not including Jesse Martz's statements about the trade confirmations in its *Brady* notice. (Dkt. 166 at 34). Martz's statements are not *Brady* but, in any event, the Government produced the notes from Martz's interview to the defense several months ago, and Halligan seems to have had no problem making use of them in advance of trial.

just how large Archegos's positions were, then Hwang's scheme would stumble. *See United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

Finally, the probative value of this evidence is not substantially outweighed by any unfair prejudice. Halligan claims the admission of this evidence carries an "extreme risk of unfair prejudice" because it is the only proof of Halligan "personally" making false statements to Archegos's counterparties. (Dkt. 166 at 35). This argument fails for at least two reasons. First, the Government will present other evidence that Halligan "personally" made misstatements to counterparties, even though no such evidence is required to secure his conviction at trial. *See, e.g.*, *Yannotti*, 541 F.3d at 129 ("to secure [defendant's] conviction for RICO conspiracy, the government was not required to prove the actual commission of a single predicate act by [the defendant] or any other conspirator"). Second, the only prejudice Halligan will face from the admission of this evidence is that the jury will learn that Halligan lied to counterparties, which is the same reason this evidence is probative. There is absolutely nothing about this evidence that is inflammatory or would encourage a verdict based on some factor or view outside of the allegations in this case and there is therefore nothing unfairly prejudicial about this evidence. *Gelzer*, 50 F.3d at 1139.

### 3.   Evidence that Halligan Sought to Delay Providing Information to Counterparties Is Admissible

Halligan moves to prevent evidence and argument regarding the timing of Halligan's delivery of Archegos's monthly financial disclosures to its counterparties. (Dkt. 166 at 35-41). This motion too should be denied.

At trial, the Government intends to present evidence that Halligan, as CFO, would send monthly reports to the counterparties that listed Archegos's assets under management, or AUM, and the fund's performance. (*See, e.g.*, GX 1015A). As reflected in GX 204, which Halligan cites in his motion, Halligan, at times, would intentionally withhold the monthly performance reports in order to avoid presenting the counterparties with unfavorable information about Archegos's performance. For example, as of April 7, 2020, Halligan had still not yet provided counterparties with Archegos's performance numbers for February or March 2020, and was planning to "delay" the report even further until he could provide a "current MTD [month to date] estimate" that would be more favorable. (*See* GX 204).[10]

Halligan contends that "[e]vidence regarding the timing of Archegos's monthly delivery of financial information should be precluded because the timing of accurate disclosures has nothing to do with deceptive conduct or misrepresentations, which is what the government's case against Mr. Halligan is all about." (Dkt. 166 at 37). Setting aside whether Halligan's assessment of "what the government's case . . . is all about" is correct, it is easy to discern why evidence that Halligan deflected requests for information until he could provide data that looked more favorable is relevant to proving that he engaged in "deceptive conduct": Whether or not such conduct itself constitutes fraud, it certainly evidences an intention to be deceptive toward the requestor of the information. Inasmuch as the Government must prove that Halligan conspired to and did engage in schemes to defraud the counterparties, evidence that he agreed with another to and did delay

---

[10]     Halligan suggests the Government was "stonewalling" by not including GX 204 in its 404(b) notice or in its supplemental 404(b) letter. (Dkt. 166 at 37). But the Government marked GX 204 as an exhibit several weeks ago, thereby putting the defense on notice that it intended to offer this exhibit at trial. Moreover, despite Halligan's complaint about the "many thousands of anticipated exhibits" that the Government marked for trial, Halligan seems not to have had a problem in locating GX 204 and then drafting a motion to exclude this evidence from trial.

provision of information, with the intention of causing the counterparty not to learn of the true state of affairs at Archegos has a tendency to make the fact of Halligan's agreement and participation in a scheme to mislead the counterparty more probable than it would be without the evidence, and it is therefore admissible. *See* Fed. R. Evid. 401; *see also United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged"). Despite Halligan's argument to the contrary, this evidence is not rendered inadmissible simply because it does not, by itself, establish proof beyond a reasonable doubt that Halligan participated in the making of material misrepresentations. *Litvak*, 808 F.3d at 179-80 ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt.").

Even if this evidence were to be considered evidence of "uncharged conduct," as Halligan suggests (Dkt. 166 at 36), evidence of the timing in which Halligan sent these monthly disclosures is admissible as direct proof of the charges. It is well-settled in the Second Circuit that evidence of "uncharged conduct" is admissible to prove the existence of the racketeering enterprise, and the agreement among enterprise members to conduct the affairs of the enterprise through a pattern of racketeering activity. *See, e.g.*, *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) ("It is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."); *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (rejecting argument that introduction of evidence of uncharged murders should have been excluded under Rule 404(b), because such evidence may be admitted to prove "the existence and nature of the enterprise and the conspiracy"); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"); *United States v. Johnson*, 469 F. Supp. 3d 193, 204 (S.D.N.Y. 2019).

Here, Halligan's agreement with another member of the Archegos Enterprise to delay the sending of Archegos's financials proves the existence of the Archegos Enterprise as well as the agreement among enterprise members to specifically mislead counterparties. Thus, this evidence should be admitted as direct evidence at trial.

The evidence is also admissible under Rule 404(b) as proof of Halligan's knowledge and intent. In arguing otherwise, Halligan tries to draw a distinction between "false statements to counterparties" and the belated "delivery of accurate information." (Dkt. 166 at 40). But Halligan overlooks what GX 204 makes obvious—that Halligan belatedly sent out monthly performance numbers in order to hide unflattering information about Archegos and deceive the counterparties for as long as possible. That deception is of a piece with the lies that he and other Archegos employees told to the same counterparties about other aspects of Archegos's portfolio. Thus, if not admitted as direct evidence, this evidence is properly admitted under Rule 404(b).[11]

Finally, the probative value of this evidence is not substantially outweighed by any unfair prejudice. Halligan claims this evidence is "likely to confuse the jury" but it is hard to see how. (Dkt. 166 at 41). In a case in which there are complicated financial concepts to explain to the jury, Halligan's delay in sending monthly financials to the counterparties is fairly straightforward. Halligan also argues the admission of this evidence is unfairly prejudicial because it will suggest that Halligan "has a propensity to deceive Archegos's counterparties." (Dkt. 166 at 41). But that

---

[11]    In a footnote, Halligan also seeks to preclude the Government from offering evidence about Archegos's delivery of its annual financial statements to the counterparties, claiming the Government's 404(b) notice was somehow deficient and the Government should not "be allowed to interject new issues into the case at this late stage." (Dkt. 166 at 36 n.12). But Halligan has been on notice that the Government intended to offer evidence about Archegos's annual financial statements, both as direct evidence and under Rule 404(b), since December 12, 2023, and the Government identified exhibits on this very topic, including GX 119, which Halligan cites, several months ago. The Government addresses Halligan's general Rule 404(b) arguments below, *infra* Point III.

Halligan lied to and deceived the counterparties on more than one occasion and in more than one manner does not turn otherwise admissible evidence into propensity evidence. This evidence is prejudicial only in that it proves the defendant's guilt and certainly does not inject anything inflammatory or provide any basis for the jury to reach its verdict for some reason outside of the charges in this case. Therefore, its probative value is not substantially outweighed by any unfair prejudice.

### G.  Evidence Regarding Tax-Related Trades Is Admissible

Hwang and Halligan make materially identical arguments seeking to preclude evidence about Archegos's "wash sales" under the Internal Revenue Code. (Dkt. 156 at 20-23; Dkt. 166 at 41-44). Those arguments are misguided.

The Government does not intend to prove or to argue that Archegos violated any Internal Revenue Code guidance regarding "wash sales" or to argue guilt based on "wash trading." To the extent that Government exhibits include the phrase "wash sales," such as GX 102 and GX 3070, which are the two examples that Hwang invokes, that phrase is ancillary to the Government's intended proof. The Government seeks to introduce GX 102 because it is evidence of Hwang's near-obsession with margin rates and with the tax consequences of his trading, regardless of the labels used to describe those consequences, and it corroborates anticipated witness testimony on those topics. (Dkt. 157, Ex. G). Hwang tried mightily to limit Archegos's margin rates so that he could borrow as much as possible and thus trade as much as possible, in service of his goal to manipulate the prices of Archegos's top names. And Hwang's sensitivity to realizing taxable gains helps explain why Hwang delayed in attempting to cash out his manipulated positions. Therefore, with respect to the points that the Government wishes to make with GX 102, it is immaterial that the exhibit includes the particular phrase "wash sale."

Similarly, the Government seeks to introduce GX 3070 for reasons unrelated to its inclusion of the phrase "wash sale." For example, that exhibit shows that Archegos employees understood that, notwithstanding Archegos's boasting a nominal compliance program, Hwang completely controlled the operation. Thus, when Archegos employees received a directive to divest any personal Apple stock, one employee, in response to the comment that that directive was a "Compliance rule," said that it was a "Bill rule," to which Becker added, "Bill = compliance." (Dkt. 157, Ex. H at 12). Additionally, GX 3070 is evidence of the work that the defendants demanded that the operations group perform to allocate trades to different counterparties in efforts to minimize margin and to maximize capacity. (*E.g.*, Dkt. 157, Ex. H at 26-29). Accordingly, as with GX 102, the points that the Government wishes to make with GX 3070 do not depend on that exhibit's inclusion of the phrase "wash sale."

Nevertheless, passing references to "wash sales" in Government exhibits do not render their probative value "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" under Rule 403. To the extent that during the trial the phrase "wash trade" is used to refer to a manipulative trading practice, any potential prejudice or confusion could easily be remedied by an instruction that references in Government exhibits to "wash sales" are references to a type of lawful transaction that the Internal Revenue Code treats in a particular way and are not references to unlawful manipulative "wash trades." That said, the jury is not likely to confuse the two because the Government's theory of the case does not involve any allegations of "wash trades."

### H.  Evidence Regarding Archegos's "Wind-Down" Is Admissible

Halligan seeks to preclude evidence of discussions at Archegos on or after Friday, March 26, 2021, about a possible bankruptcy or wind-down. (Dkt. 166 at 48-50). Halligan argues that

such evidence is not relevant under Rule 401, is unfairly prejudicial under Rule 403, and would confuse the issues and waste time under Rule 403. These arguments do not pass muster.

Evidence of discussions at Archegos on or after Friday, March 26, 2021, about a possible bankruptcy or wind-down is relevant under Rule 401. As an initial matter, Halligan's apparent effort to prevent the jury from learning that Archegos declared bankruptcy or wound down is without merit. These facts complete the story of this case and provide a necessary explanation for what various witnesses have done since Archegos's collapse and why individuals and entities suffered losses. Nor is the fact that Archegos, after all of its investments failed, defaulted on its obligations to its counterparties in any way controversial or inflammatory; it is simply a natural and obvious fact that Archegos wound down and ceased to exist.

Furthermore, on March 24 and 25, 2021, Archegos personnel, including Halligan, attempted to lull counterparties into believing that Archegos had merely experienced an unexpected liquidity event, and that it just needed time to orderly unwind some of its positions. During conversations with the counterparties, they repeated the refrain that Archegos faced a liquidity issue, not a solvency issue. Evidence that Archegos was contemplating bankruptcy on March 26, 2021 "has a[] tendency to make [it] more . . . probable" that, just one day earlier, on March 25, 2021, Halligan and others *knew* that it was misleading to state that Archegos did not face a solvency issue. Fed. R. Evid. 401(a). Accordingly, evidence of discussions about these topics are relevant to understand the knowledge and intent of the defendants.

Against the foregoing, Halligan asserts that what was contemplated on March 26 does "not have any necessary bearing on what was known on March 24 or March 25." (Dkt. 166 at 49-50). But Rule 401 does not prescribe a "necessary bearing" standard for relevance; all that the Rule requires is "any tendency to make a fact more or less probable than it would be without the

evidence." Fed. R. Evid. 401(a). And the nature and content of those communications adds light to the knowledge and expectations of the participants going into the discussions.

The cases that Halligan cites in support of his position are off base. In *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994), the Second Circuit affirmed the district court's determination that the allegations in a civil complaint were "insufficient to support an inference of fraud" where, for example, the company announced that it was expecting "record earnings," but then, two months later, the company announced that it would instead report a loss; or where the company stated that it believed its loss reserves were adequate, but two months later it turned out that the reserves were not adequate. Similarly, in *City of Roseville Employees' Ret. Sys. v. Nokia Corp.*, No. 10 Civ. 967 (GBD), 2011 WL 7158548, at *6 (S.D.N.Y. Sept. 6, 2011), the court concluded that the civil plaintiff had "set forth no factual allegations that, if true, would demonstrate that any of the Defendants' statements went beyond good faith expressions of corporate optimism." This case, by contrast, does not involve corporate actors making "rosy" predictions about something down-the-road. Instead, here, the evidence will show that, on March 23, 2021, Halligan expressed concern that Archegos would not be able to pay for its trades, on March 24 and 25, 2021, Halligan and others devised the idea to tell counterparties that Archegos was dealing with a liquidity issue, and not with a solvency issues, and then, on March 26, 2021, there were discussions at Archegos about a possible bankruptcy or wind-down—in other words, about a solvency issue.

As for unfair prejudice under Rule 403, Halligan argues that evidence about Archegos's solvency on or after March 26 "will mislead the jury by inviting them to draw the impermissible inference that whatever Mr. Halligan knew about Archegos's financial condition *on or after* March 26, he must also have known *before* March 26." (Dkt. 166 at 50). Halligan nowhere explains why

such an inference is impermissible. The jury will hear testimony suggesting that Halligan knew on March 24 and 25, 2021, that Archegos faced a solvency issue, notwithstanding the statements to the contrary that Archegos made to counterparties those days. That there were then discussions at Archegos about insolvency the very next day corroborates that testimony. There is nothing impermissible under Rule 403 about the use of such evidence.

Finally, contrary to Halligan's assertions, evidence of discussions at Archegos on or after Friday, March 26, 2021, about a possible bankruptcy or wind-down would not confuse the issues or waste time. Such evidence would not require "testimony on corporate insolvency, including its triggers and thresholds." (Dkt. 166 at 50). There are no bankruptcy charges in this case, and the jury will not need to be instructed on bankruptcy law. The notion that a company was considering bankruptcy on a particular date is not a difficult concept or one that will confuse the jury. Halligan's motion to preclude evidence of discussions at Archegos on or after Friday, March 26, 2021, about a possible bankruptcy or wind-down should be denied.

## II. Halligan's Motion Regarding Purportedly "Incorrect Evidence" Should Be Denied

Halligan moves to preclude the Government from introducing evidence or argument suggesting that Archegos was subject to disclosure or filing obligations as to which it was exempt. (Dkt. 166 at 45-48). In making this argument, Halligan cites to notes from an interview with Goldman Sachs employee Nastassia Locasto, but *omits* the relevant portion of the notes, and thus makes a motion that is as unnecessary as it is unfounded.

Locasto was interviewed by the Government in August 2021. Notes summarizing her interview include the following paragraph:

> If ARCHEGOS had significant positions at other dealers and were already in the names that they were representing to be new names they were taking on with Goldman, this would have mattered and would have been very significant for LOCASTO and Goldman to know. There are Section 16 rules for considerations around

> disclosures in regards to ownership thresholds, so it would have been important for LOCASTO to know about ARCHEGOS's holdings for escalation purposes to raise to Goldman's legal team. There is a general guideline that at approximately 5% ownership of a company's stock, there has to be a representation that clients sign that they will fulfill their filing obligations. The rule is approximately 10% for U.S. issued companies. **Significant holdings of a company's stock create credit and concentration risk, and LOCASTO would generally want to escalate these types of concerns if she knew about them.**

(emphasis added).

Halligan quotes these notes in his motion but omits the final bolded sentence. (Dkt. 166 at 45). That sentence, however, makes clear that Locasto's testimony on "materiality" has nothing to do with Archegos's regulatory filings, or the lack thereof, but instead is focused on Archegos's statements or omissions regarding the significant and similar portfolio it was holding at other brokers. That testimony is entirely proper, and Halligan has not argued otherwise. The Government does not intend to prove that Archegos violated disclosure rules they were not subject to, and Halligan has identified no other testimony that should be precluded on this basis, and therefore the motion should be denied.

## III.  Evidence Regarding Tiger Asia and Hwang's and Halligan's Pre-2020 Misconduct Is Admissible

Using a limited number of records and the testimony of witnesses who will be called at the trial anyway, the Government will seek to offer certain specific evidence about the Tiger Asia misconduct and its aftermath (generally, the "Tiger Asia Evidence"). The defendants oppose. (Dkt. 156 at 11-20, 51-72 (Halligan); Dkt. 158 (Hwang)). Though the defendants repeat and recycle their arguments in dozens of different ways, most arguments reduce to the assertion that what happened at Tiger Asia has no relevance to the charged racketeering conspiracy and that it would be unfair for the jury to learn that Hwang and his business have been in trouble in the past.

The defendants' arguments should be rejected. The Tiger Asia Evidence bears on central issues in the case, not least the formation of the Archegos Enterprise and the origins of the racketeering conspiracy, and, critically, central issues surrounding the defendants' intent and willfulness. Tiger Asia and its regulatory issues are so inextricably bound up with the events of this case that the Indictment summarizes them as essential background. (*See* S1 Indictment ¶ 8). Moreover, the four central players in the charged conspiracies—Hwang, Halligan, Tomita, Becker—all first worked together at Tiger Asia. And even more importantly, Tiger Asia features in one of the recurring lies that the conspirators told Archegos's counterparties during the charged conspiracies: in assessing the risks of doing business with Archegos, banks would inquire about Tiger Asia and Archegos's compliance practice and in response, various conspirators would lie, falsely telling banks that they had created a compliance regime that would prevent another episode of misconduct. Conduct and events that occurred at Tiger Asia are, in short, part of the very scheme that this trial is about.

Somewhat separately from the Tiger Asia Evidence, each defendant also asks the Court to exclude unfavorable proof about other personal misbehavior. Halligan, for example, seeks to preclude any evidence that he misled banks prior to the time-period of the charged conspiracy (the "Halligan Deception Evidence"). Halligan's motion ignores that the Halligan Deception Evidence proves the beginning of his criminal relationship with Becker, reflects his awareness that his co-conspirator Becker was telling lies during the period of the charged offenses, and demonstrates Halligan's awareness that the Archegos Enterprise would be operated through systematic fraud. Similarly, Hwang seeks to preclude any evidence that he concealed his role in the Tiger Asia misconduct, such as by telling employees at Archegos a self-serving version of events. This

evidence illustrates that Hwang had people at Archegos he trusted—namely, his conspirators—and those he did not.

The defendants' motions should also be denied because it reflects an effort to pick-and-choose what aspects of their professional history the jury will be permitted to hear. The defense has given notice of its plan to introduce testimony that "Archegos's investment strategy in the indictment period was consistent with Archegos's prior practice of maintain a concentrated and levered portfolio." (Dkt. 164, Ex. B ¶ 7). But the Tiger Asia episode reveals that Hwang had previously been told, for example, that concentrated transactions designed to affect stock prices were improper. Similarly, the defendants have given notice of their plan to introduce testimony about the "desirable benefits" of operating a family office and how family office managers do not have the same incentives to manipulate the market as investment advisors. (*See, e.g.*, Dkt. 164, Ex. C ¶ 1). And Halligan has asserted that Archegos's nature as a family office are important aspects of his defense. (Dkt. 166 at 67 ("[A] hedge fund and a family office differ in fundamental ways that are critical to Mr. Halligan's defense")). But inviting the jury to infer that Hwang established a family office to obtain its "desirable benefits," or that his operating a family office somehow speaks to his good intentions, would be counterfactual and misleading to the jury; Hwang had no choice to stop acting as an investment advisor, as the Tiger Asia Evidence proves.

The Tiger Asia Evidence and the Halligan Deception evidence provide fair and powerful proof on multiple elements of the charged offenses and rebut the defendants proffered evidence. Accordingly, the Court should deny Hwang's motion to "preclude evidence and argument relating to Tiger Asia Management" (Dkt. 158), Halligan's motion to preclude "evidence of misrepresentations that pre-date the charged conspiracy" (Dkt. 166 at 11-23), and Halligan's motion to preclude "evidence of decade-old misconduct at Tiger Asia" (Dkt. 166 at 51-74).

### A. Applicable Law

#### 1. Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Thus, where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *Diaz*, 176 F.3d at 79; *see Thai*, 29 F.3d at 812 (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)).

The Second Circuit has repeatedly affirmed the admissibility of evidence fitting one or more of these descriptions, whether it relates to conduct during the period of the charged crime or

48

before it. *See, e.g.*, *United States v. Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (following conviction

after trial on campaign finance related charges, affirming district court's admission, as direct

evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with,

and arguably related to, the campaign finance violations); *United States v. Robinson*, 702 F.3d 22,

37-38 (2d Cir. 2012) (in child sex trafficking case, affirming admission as direct evidence and

necessary to complete the story of the crimes on trial proof of defendant's calls, contemporaneous

with the charged conduct, in which he discussed uncharged crimes related to prostitution and

trafficking); *United States v. Greer*, 631 F.3d 608, 614 (2d Cir. 2011) (where defendant was

charged with being a felon in possession of a firearm, affirming admissibility as direct evidence

necessary to complete the story of the crime charged testimony regarding defendant's uncharged

plan to commit a robbery, which preceded the charged conduct); *United States v. Kaiser*, 609 F.3d

556, 570-71 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy

were admissible as direct evidence, without regard to Rule 404(b), because they had "carry-over

effects" during the conspiracy); *Rigas*, 490 F.3d at 238-39 (affirming district court's decision to

permit Government to adduce evidence of uncharged fraudulent acts predating the charged

conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was

"'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete

the story of the crime on trial'"); *Carboni*, 204 F.3d at 44 (in case charging false statements to

maintain a line of credit, affirming admissibility of uncharged acts of falsification of business

inventory, which occurred at or around the same time as the charged crimes, as direct proof

inextricably intertwined with charged conduct); *United States v. Roldan-Zapata*, 916 F.2d 795,

804 (2d Cir. 1990) (evidence of "pre-existing drug trafficking relationship" between defendant and

co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

### 2.   Rule 404(b) Evidence

Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act' evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). Such evidence is admissible if (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust between coconspirators." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (citing *Diaz*, 176 F.3d at 79).

### B.   The Tiger Asia Evidence Is Admissible Both as Direct Evidence and Pursuant to Rule 404(b)

The defense motions to exclude the Tiger Asia Evidence rests on the false assumption that what happened at Archegos in 2020 and 2021 had no relationship to its past. But the Tiger Asia

Evidence forms essential background to, and proof of, the charged conspiracies in multiple respects:

- First, and most simply, during the period of the charged conspiracies, the conspirators discussed Tiger Asia's misconduct with counterparty victims and, to obtain the trading capacity they desired to advance the racketeering conspiracy, misrepresented how Archegos had addressed its Tiger Asia issues.

- Second, the events at Tiger Asia form essential background to the schemes on trial: Archegos began its corporate existence as Tiger Asia. Hwang first hired Halligan, Tomita, and Becker at Tiger Asia and kept each of them on the payroll at Archegos. Multiple Archegos counterparties began their business relationships with Tiger Asia and their trading contracts identify Tiger Asia as the client.

- Third, Tiger Asia's regulatory history explains why Tiger Asia renamed itself "Archegos" and why it operated as a family office and not as an investment advisor. Hwang took the name "Archegos" for his business firm only after Tiger Asia pled guilty to wire fraud. Hwang transitioned Tiger Asia from an investment advisor to a family office because the SEC forbade Hwang from managing outside money.

- Fourth, regulatory and civil orders and injunctions issued in connection with the Tiger Asia market manipulation allegations specifically put Hwang and his co-conspirators on notice that open-market trading intended to move the price of a security was wrongful and proscribed. The warnings themselves are direct proof of Hwang's intent and willfulness.

Taken together, the Tiger Asia Evidence tends to prove the existence and formation of the Archegos Enterprise charged in the Indictment; the relationships between the conspirators; and certain of the fraudulent racketeering acts pursued by the conspirators as they managed the Enterprise's affair. This is proper direct evidence.

Additionally, the Tiger Asia Evidence is also admissible pursuant to Rule 404(b). The Tiger Asia Evidence demonstrates, among other things, Hwang's and Halligan's knowledge and Hwang's intent. For example, proof that Hwang had been specifically enjoined from violating Rule 10b-5, which he was and which Halligan knew, is probative of their awareness that United States securities laws forbid manipulative schemes related to securities. Similarly, proof that Hwang and Halligan were aware the regulators in multiple jurisdictions, including the SEC, viewed price-

moving trades as subjects of enforcement action shows how Hwang and Halligan were warned that open market trading could be wrongful. Further still, the Tiger Asia Evidence shows how the conspirators developed a loyalty and trust with one another, which helps explains Halligan's, Becker's, and Tomita's motivations for assisting Hwang in the charged schemes. None of these uses invite the jury to make forbidden propensity inferences, and the Court can instruct the jury not to use the evidence in that manner.

Finally, the defendants' many other arguments—ranging from hearsay to notice to the Confrontation Clause—misconceive of the evidence and misapply the law. The Government here is proposing to use limited evidence and will do so in compliance with the Rules of Evidence. Accordingly, the defendants' assorted ancillary motions should be denied.

### 1. Background

The Tiger Asia Evidence at issue generally relates to Hwang's efforts in 2008 and 2009 to manipulate the prices of securities to benefit his portfolio and to commit insider trading and to the criminal and regulatory enforcement that followed in the United States, Hong Kong and Japan.[12]

Hwang's and Halligan's motions read as though the Government will be introducing piles of documents and dozens of witnesses to prove-up ancient conduct. They are mistaken. Presently the Government expects to offer only five limited aspects of this evidence:

- First, the Government will offer partnership formation and name change records that demonstrate that Hwang founded and legally controlled Tiger Asia and later renamed that business entity to "Archegos" while retaining control. (*See, e.g.*, GX 253). The Government will also elicit from witnesses who were hired at Tiger Asia that the business rebranded as Archegos in 2013.

---

[12]    A detailed description of the Tiger Asia misconduct is included in the Government's December 12, 2023 Letter. (Ex. A to Dkt. 164). A general description of how the Tiger Asia Evidence fits into the racketeering proof can be found in the Government's motions *in limine*. (Dkt. 164 at 4-9.)

- Second, the Government will offer court records to demonstrate that Hwang was barred from acting as investment advisors in the United States for a period of years (*see* GX 2702 (SEC order)), and specifically enjoined from violating Rule 10b-5 (*see* GX 2709); and that Hwang and Tiger Asia were barred for a period of time from participating in the Hong Kong markets (*see* GX 2706 (MMT order)).[13]

- Third, the Government will offer counterparty records, and testimony from counterparty representatives, to show (a) the counterparties were aware of Tiger Asia's regulatory history, including its wire fraud conviction, investment advisor bar, and fines; (b) counterparties confronted Archegos representatives about Tiger Asia's misconduct and considered Archegos's explanations and remediation for Tiger Asia's misconduct when making credit assessments; and (c) Archegos personnel provided information about Archegos's remediation efforts, including the state of its compliance program, that were false. (*See, e.g.*, GX 2302).

- Fourth, the Government will offer SEC, Hong Kong, and Japanese regulatory accusations that demonstrate that the conspirators, including Hwang and Halligan, were aware that United States and foreign regulators viewed stock transactions designed to move market prices as improper. (*See* GX 2708 (SEC complaint); GX 2706 (Hong Kong MMT Report); GX 2707 (SESC Recommendation)).

- Fifth, the Government will prove that Hwang, in fact, traded with manipulative intent and fraudulent intent at Tiger Asia, through the testimony of William Tomita, who was involved in the Tiger Asia trading as well as the Archegos trading, as well as through Hwang's factual admissions in the Hong Kong case, which takes the form of a single attachment to the MMT Report. (GX 2706 at 61-73). The Government will also corroborate Tomita's testimony through a small number of contemporaneous email messages.

The Government anticipates this evidence will add little trial time because most of the evidence will be presented through witnesses—like Tomita and Becker—whom the Government will be calling anyway and through a handful of documents.

---

[13] The Government has marked as potential exhibits the criminal information charging Tiger Asia with wire fraud (GX 2704), Tiger Asia's plea agreement (GX 2703), Tiger Asia's plea colloquy (GX 2701), and Tiger Asia's judgment of conviction in the United States District Court for the District of New Jersey (GX 2705). The Government does not presently intend to offer these documents in its case-in-chief.

## 2. The Tiger Asia Evidence Is Admissible Direct Evidence

The Tiger Asia Evidence is not "other act" evidence at all, but rather direct evidence of the conduct charged in the Indictment.

First, the Tiger Asia Evidence is necessary context for, and proof of, lies and deception during the period of the racketeering conspiracy. As alleged in the S1 Indictment, one method of the racketeering conspiracy was to obtain "trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages." (*See* S1 Indictment ¶ 74(b)). The banks and brokerages that Archegos contacted—even during 2020 and 2021— uniformly inquired into the events at Tiger Asia and Archegos's responses to them, in order to assess whether to do business with Archegos at all. Archegos conspirators, including Halligan, Becker, and Austin Scholl, misled banks and counterparties into concluding that Archegos had developed a system to provide meaningful oversight of Hwang's trading when no such system existed.

For example, in or about October 2020, the conspirators attempted to open accounts at BMO to expand its access to swaps trading to enable the fraud. Representatives at BMO flagged Archegos as "a reputation risk concern" in light of the fact that Hwang "traded 3x with MNPI after being wall crossed," a reference to Tiger Asia's insider trading. (*See* GX 1022). BMO ultimately approved the relationship, in part, because of how Archegos explained its response to Tiger Asia events, specifically that "the company has implemented a code of conduct, robust policies and procedures, trading surveillance for firm and employee trading, and a training plan that is mandatory for all employees"; that "Archegos has added a new Co-CEO, Executive Chairman, two Presidents and Chief Compliance Officer since the settlement" of the Tiger Asia charges (GX 1023); and that "a significant portion of the management team was replaced" following the Tiger Asia conduct (GX 1004A). But, as the Archegos conspirators intended, BMO misunderstood what

had happened at Archegos. Compliance did not conduct "surveillance" of the firm's trading in any ordinary sense, the various executives touted by Archegos had no ability to restrain Hwang's trading, and the Tiger Asia management team had not been "replaced." Rather, the same individuals who enabled Bill Hwang at Tiger Asia, such as Halligan, Tomita, and Becker, had been promoted to new titles at Archegos, and Hwang traded as he wished without any intervention by compliance.

Proving that the conspirators lied to the counterparties about the Archegos compliance program necessarily involves providing the jury with context about the Tiger Asia misconduct. If the Tiger Asia Evidence were stripped from the trial, as the defendants wish, the jury would have no way to assess why the banks had specific concerns about doing business with Hwang and why Archegos conspirators were motivated to provide misleading assurances in response to those concerns. These distortions will only be magnified if the defense follows through on its plan to critique the banks for their diligence failures because it will hide from the jury the fact that the banks did make meaningful risk inquiries and were met with misleading responses.

Second, the Tiger Asia Evidence shows the formation of the Archegos Enterprise, which the Indictment alleges to comprise Hwang, Halligan, Tomita, Becker, Archegos Fund LP, Archegos Capital Partners, Archegos Capital Management, LP, and its employees; and Archegos Capital, LLC. (*See* S1 Indictment ¶ 11). Specifically, corporate records demonstrate the creation of the Archegos entities, including where the entity was rebranded from Tiger Asia. Witness testimony will show Hwang, Halligan, Tomita, and Becker associated themselves with those entities and with each other and did so from Archegos's earliest moments.

Third, the Tiger Asia Evidence proves how illegal relationships and mutual trust developed between the racketeering conspirators and is therefore admissible as direct proof for that reason.

*See Diaz*, 176 F.3d at 79-80 ("In this case, for example, testimony of Morales' drug dealing for Burgos was admitted because it informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between co-conspirators."). As witness testimony will show, Hwang, Halligan, Tomita, and Becker forged their bonds during Hwang's first round of misconduct and through the investigation that followed. The jury should be permitted to understand why Hwang felt he could enlist Halligan, Tomita, and Becker to assist his schemes in 2020, and to further understand why Halligan, Tomita, and Becker could—and did—understand even implicit directions on how to do their work, criminal or otherwise.

Fourth, the Tiger Asia Evidence is essential to show, for example, "the circumstances surrounding the events" and "to furnish an explanation of the understanding or intent with which certain acts were performed," which renders it admissible as direct evidence. *Gonzalez*, 110 F.3d at 941. Hwang and Halligan argue that the Tiger Asia Evidence cannot possibly supply context for what happened at Archegos because it preceded it by years. But every witness who worked under both eras would say otherwise. Multiple witnesses will describe, for example, how the Tiger Asia episode left Hwang and Halligan with bitterness toward certain counterparties who they felt abandoned Tiger Asia in a time of need, either because they dropped Hwang as a client following Tiger Asia or because they raised margin rates on Hwang with little notice, harming his positions. That attitude continued—and was expressly discussed—by the conspirators during the charged schemes. In fact, at times Tomita would invoke the fact that a bank had previously harmed the fund in an effort to shame or pressure the bank to extend more capacity or lower margin. Moreover, the witnesses' arc of experiences with Hwang and Halligan over more than a decade enables them

to describe the significance of the changes they observed in 2020 that, in the Government's view, coincided with the defendants' decision to embrace fraud as an operating principle.

Fifth, certain aspects of the Tiger Asia Evidence—in particular regulatory and civil orders and injunctions—provide direct evidence of Hwang's intent and willfulness, which it is the Government's burden to prove. As described in greater detail below, this evidence provides essential proof that Hwang was well aware that it was improper and impermissible to engage in open-market trades with the goal of artificially affecting the price of stocks, and that he did it anyway. Specifically, this evidence described forms of market manipulation—like marking positions up and marking the close—which were precisely the same as some of the conduct Hwang engaged in here and made clear that such trading was improper. Setting aside whether Hwang engaged in these prior acts, the orders and injunctions are direct evidence of mens rea.

### 3. The Tiger Asia Evidence Is Admissible Pursuant to Rule 404(b)

In addition to its value as direct evidence, the Tiger Asia Evidence is also admissible pursuant to Rule 404(b). The Tiger Asia Evidence goes directly to Hwang's and Halligan's mental states during the commission of the charged offenses. Of course, state of mind is not susceptible to direct proof and must be proven circumstantially. For that reason, the Supreme Court has recognized that this is precisely the type of issue about which other act evidence should be admitted:

> Federal Rule of Evidence 404(b) . . . generally prohibits the introduction of extrinsic acts that might adversely reflect on the actor's character, unless the evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge. Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.

*Huddleston v. United States*, 485 U.S. 681, 685 (1988); *accord Zackson*, 12 F.3d at 1182 ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged.").

It is the Government's burden to prove the defendants' mens rea, which is always at issue. *Cf. United States v. Shurtleff*, 43 F.2d 944, 947 (2d Cir. 1930) ("Intent is always vital when fraud is in issue . . . ."). And based on the defendants' arguments and representations so far, there is no doubt that intent and knowledge will be centrally at issue in this case. Among other things, it appears that the defense intends to argue, among other things, that during 2020 to 2021 neither man had reason to think that they were doing anything wrong and every reason to believe that Archegos was acting as would any family office. These defense arguments make Rule 404(b) evidence on the contested issue particularly probative. *See United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994). But even if the defendants were not making them, this evidence would be admissible under the Second Circuit's inclusionary approach, because it is the Government's burden to prove knowledge and intent.[14]

Hwang's primary objection to Tiger Asia Evidence offered as intent or knowledge evidence appears to be the purported dissimilarity between Hwang's Tiger Asia market manipulation misconduct and the charged market manipulation misconduct. Hwang, however, misstates the law and the evidence to justify his desired result. The basic legal principle is that "[w]hen 'other act' evidence is offered to show knowledge or intent in particular, as opposed to

---

[14]     Of course, a defendant may stipulate to an element to avoid the admission of Rule 404(b) evidence that he deems damaging to his interests. *See, e.g.*, *United States v. Mohel*, 604 F.2d 748, 753 (2d Cir. 1979). But the defendants have given no indication they are prepared to concede these elements.

other non-propensity purposes such as proof of identity or corroboration of witnesses, such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011) (quotation marks omitted). But the level of "similarity" is not as exacting as Hwang implies. Indeed, "evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent." *Id.* at 32-33.

Here, the circumstances of the Tiger Asia market manipulation misconduct and the charged market manipulation misconduct are sufficiently similar to form a reasonable basis for inferring intent. In both instances: Hwang was in the business of securities investing and trading; Hwang made final portfolio decisions; Hwang directed traders to execute his decisions in the market; Hwang employed William Tomita as one of the traders who worked for him; Hwang through his trading manipulated the prices of certain stocks to benefit his portfolio, including through concentrated trading and end-of-day trading; and Hwang did so following material drawdown in the value of the assets he managed. Hwang labors to make the Tiger Asia conduct seem substantially different, noting, for example, that the Tiger Asia manipulation related, in part, to a closing auction, that it focused on overseas exchanges, and that the scheme sought greater management fees, which Archegos does not charge. (Dkt. 158 at 24-26). But none of these differences diminish the probative strength of the intent inference and, in some ways, highlights it. The fact that one manipulation was achieved through a closing auction while another was achieved through last-minute buy orders is of no consequence; in both cases, Hwang tried to manipulate end-of-day prices because end-of-day marks benefited him. The fact that at Tiger Asia the orders were placed with an exchange abroad while at Archegos they were placed in the United

States does not alter Hwang's relationship to the trading; In both cases, Hwang placed orders remotely, through traders in New York. Finally, the fact that in one case the motivation was to obtain management fees and the other to obtain a direct increase in welath does nothing to negate the underlying motive of greed; in both cases, Hwang acted to benefit his portfolio and his bottom line.

Hwang's promised trial defense in this matter—that he just traded based on fundamentals and the stock price happened to move in his favor—is precisely the sort of "fortuitous" circumstances defense that illustrates the propriety of contrary 404(b) evidence. *Aminy*, 15 F.3d at 260 (affirming admission of prior drug possession offered to show defendant's intent and to rebut claim his "connection with the heroin importation was merely fortuitous"); *see also United States v. Ansah*, No. 22-623, 2023 WL 7320859, at *2 (2d Cir. Nov. 7, 2023) (affirming admission of prior auto theft in stolen car case, notwithstanding defendant's challenge to the similarity of the acts, because it was similar enough to permit a reasonable basis for inferring knowledge or intent); *Cadet*, 664 F.3d at 33 (Because the defendant contested willfulness, "[e]vidence that Cadet knowingly and intentionally prepared a false tax return for Agent Green by inserting inflated deductions on the Form 1040 thus provided a reasonable basis to infer that the inflated deductions that formed the basis for the 16 counts of conviction were likewise entered knowingly and intentionally."). Though Hwang wishes to tell the jury that he did not form the intent to manipulate in 2020 and 2021, the prior evidence would enable a jury to conclude otherwise.

As to knowledge—and, specifically, the knowledge that the defendants knew what they were doing was wrong—the Tiger Asia Evidence is even more direct. For one thing, the SEC action against Tiger Asia and Hwang ended with a consent order that enjoined Tiger Asia and, separately, Hwang from, among other things, violations of Rule 10b-5. (GX 2709). The Consent

Orders are proof that Hwang and Halligan were on notice of Rule 10b-5 and, in fact, that Hwang

had been specifically directed not to violate it. Rule 10b-5, of course, is one of the same rules that

the defendants have been charged with violating in this matter. Moreover, in the SEC lawsuit, the

SEC alleges that the manipulation of prices at month's end is a violation of the securities laws (*see,*

*e.g.*, GX 2708 ¶¶ 2, 40, 62-63 (alleging violations of the Investment Advisers Act)). Further, the

Hong Kong MMT order and Japan SESC recommendation also advised the defendants that their

schemes were unlawful. The Hong Kong MMT order, for example, enjoined Tiger Asia and

Hwang from "again perpetrat[ing] any conduct which constitutes insider dealing, false trading,

price rigging or stock market manipulation as that misconduct is defined in the Ordinance" (GX

2706), and the Japan SESC recommended a fine based on "market manipulation," which it

described to be "plac[ing] a series of purchase orders for the shares through multiple brokers in

the form of discretion orders with a limit on the prices that were higher than the last execution

price at the time" (GX 2707). All of this evidence shows that, contrary to their claims now, the

defendants would have understood that Hwang's price-moving trades—which had the effect of

benefiting his portfolio—would have been improper.

     The proffered bases for introducing the Tiger Asia Evidence do not rest on a forbidden

propensity inference, and the Government will not advocate one at trial. For this reason, the

defendants' bald claims that the only reason the Government seeks to offer this evidence is to

"smear" Hwang or attack the defendants' character are flatly wrong. The Government seeks to use

the Tiger Asia evidence consistent with Rule 404(b) and, of course, consents to an instruction to

the jury to consider the evidence solely for the non-propensity purpose for which it is offered.

     Halligan, for his part, also argues that admitting any Tiger Asia Evidence against him

would be an unfair attempt to implicate him in the wrongful conduct of others. (*See* Dkt. 166 at

64). But Halligan's broad arguments, perhaps by design, misdescribe the Government's proof and its significance. For one thing, the Government is not seeking to introduce any evidence that Halligan committed misconduct in 2008 or 2009 or to argue to the jury that Halligan committed misconduct in 2008 or 2009. (*Cf.* Dkt. 166 at 63-64). For another, the Government will not argue that because Hwang manipulated markets in 2008 and 2009 it is more likely Halligan manipulated markets in 2020 and 2021. (Dkt. 166 at 64). So Halligan's fears that the Government will argue an inference about Halligan's intent based on Hwang's intent or conduct in 2008 and 2009 is unfounded. Nor is it likely the jury would independently draw any such inferences. After all, as Halligan takes pains to point out, he is not implicated in any wrongdoing in 2008 or 2009 and, so far as the Government is aware, he had no trading responsibilities in 2020 or 2021. Rather, as set forth above, the Government will offer certain Tiger Asia evidence as direct proof of the charged scheme and, under Rule 404(b), as evidence of Halligan's knowledge.

### 4.  The Tiger Asia Evidence's Substantial Probative Value Far Outweighs Any Risk Unfair Prejudice or Undue Delay

Hwang and Halligan also move to preclude the Tiger Asia Evidence as unfairly prejudicial pursuant to Rule 403. The arguments are meritless and confuse incriminating facts with "prejudicial" ones.

As described above, the various aspects of the Tiger Asia Evidence are highly probative of essential elements. Hwang and Halligan primarily challenge the significance of the evidence by asserting that it is dissimilar or old or simply not important. But each of the pieces of evidence the Government seeks to offer would tend to effectively establish its point. The corporate records, for example, illustrate that Tiger Asia became Archegos. The Consent Judgment shows that Tiger Asia and Hwang had plain and obvious notice that they could not commit fraud. And testimony from Tomita, and factual admission from Hwang himself, that show that Hwang gave trade orders

in 2008 and 2009 to move market prices for the benefit of his portfolio supports a clear inference that he formed a similar intent in 2020 and 2021 when he gave similar orders to the same trader.

Most confusingly, Hwang declares irrelevant any evidence that Hwang and Halligan attempted to, and did, mislead counterparties with respect to the Tiger Asia Schemes and the changes Archegos made in response to them. (*See* Dkt. 166 at 34). But evidence that Hwang and Halligan attempted to and did mislead counterparties—including during the charged conspiracy—demonstrates one of the core features of the alleged racketeering conspiracy. (*See, e.g.*, S1 Indictment ¶ 71 ("A further purpose of the racketeering conspiracy was to obtain trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages.")). Moreover, as explained above, the lies about Archegos's compliance response to the Tiger Asia episode aimed to assure counterparties that Archegos could be trusted as a business partner and thus should be permitted to trade swaps on margin, which was necessary for the manipulation scheme to continue.

Hwang's and Halligan's general arguments about the purported prejudice they will face ignore that "unfair prejudice" refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," not simply unfavorable facts. *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The many probative aspects of the challenged evidence—its direct proof of the Enterprise, the conspirators' relationship of trust, the defendants' awareness that market manipulation was wrong, Hwang's intent—outweigh any potential "unfair prejudice." There is little risk that a juror will have an irrational or emotional response to the Tiger Asia Evidence or to mention of the comparatively minor market manipulation Hwang undertook in 2008 and 2009. If anything, exclusion of this evidence would unfairly prejudice the Government and mislead the jury. There is no good reason

to permit a defendant, who was explicitly enjoined from and warned about engaging in the conduct undertaken here, to persist in making arguments that he is being subjected to an "unprecedented prosecution" (*e.g.*, Dkt. 156 at 1) or that he lacked the intent to do something forbidden, without being confronted with the proof that he was warned not to engage in this conduct, and did so anyway.

Without the ability to articulate prejudice from the proof itself, the defense repeatedly—and, at times, colorfully—asserts that admitting any Tiger Asia Evidence into the case will cause distraction and "weeks of testimony." (*See, e.g.*, Dkt. 158 at 3). These comments are bluster. As the defense filings themselves confirm, many of the Tiger Asia facts are undisputed and can be proven through, perhaps, an hour of testimony and a handful of documents. For example, based on the briefing so far, it appears that the defendants do not dispute the following facts:

- In December 2012, the SEC sued Tiger Asia, Hwang, and Ray Park. The suit ended with a consent judgment after a no-admit, no-deny settlement agreement. (*See* Dkt. 158 at 2-3; Dkt. 166 at 54).

- In December 2012, Japan's Securities & Exchange Surveillance Commission found that Hwang had manipulated the price of Yahoo! Japan corporation stock and recommended a fine. (*See* Dkt. 158 at 25; Dkt. 166 at 55).

- In late 2012, Tiger Asia returned investor funds. (*See, e.g.*, Dkt. 166 at 55).

- In January 2013, in an administrative proceeding, the SEC barred Hwang from acting as an investment advisor for a period of five years. (*See, e.g.*, Dkt. 166 at 54).

- In October 2014, the Hong Kong Market Misconduct Tribunal fined Hwang and barred him from operating in Hong Kong. (*See* GX 2706; Dkt. 166 at 54-55). The accompanying stipulated facts, agreed to by both Tiger Asia and Hwang, acknowledged that, at Hwang's direction, "Park carried out and instructed Tomita to assist him to carry out the buy and sell orders . . . with the intention of creating a false and misleading appearance with respect to the market for, or the price for dealings in, CCB securities traded on the Stock Exchange of Hong Kong . . . ." (GX 2706 at 68-69).

- Hwang adopted the name "Archegos" in 2013, when he caused "Tiger Asia Fund, L.P." and "Tiger Asia Partners, LLC" to be changed to "Archegos Fund, L.P." and "Archegos Capital Partners, LLC," respectively. (*See* GX-253 (State of Delaware Amendment to the Certificate of Limited Partnership)).

- Hwang operated Archegos pursuant to the family office rule. (*See* Dkt. 158 at 19; Dkt. 166 at 55-56 ("Mr. Hwang formed the Archegos family office to manage his personal wealth.")).

Hwang, Halligan, Tomita, and Becker, among others, began with Tiger Asia and continued with Archegos. (*See, e.g.*, Dkt. 166 at 51 ("Mr. Halligan ran back-office operations at Tiger Asia as the CFO.")).

The factual issue that Hwang and Halligan wish to contest is whether Hwang manipulated securities prices in 2008 and 2009. The defense does not describe how addressing that specific issue would add meaningfully to the trial length, such as which additional witnesses would need to be called or what exhibits would be offered. Nor do they explain why the Tiger Asia Evidence would lead to additional expert testimony. (*See* Dkt. 158 at 27). Nor could they. The Government will not be eliciting any expert testimony regarding Tiger Asia and the defense, which disclosed its expert opinions months after receiving the Government's letter about the Tiger Asia Evidence, did not notice any opinions or witnesses relevant to Tiger Asia.

More generally, the defense's many assertions that any Tiger Asia Evidence will result in a "trial within a trial" appear to be premised on the fiction that the Government will undertake to prove that Hwang violated foreign law or that Hwang personally violated the insider trading laws. (*E.g.*, Dkt. 158 at 27). The Government, however, has no such plans. None of the purposes for which the Government offers the Tiger Asia Evidence requires the jury to first find that Hwang violated foreign law or personally violated the laws against insider trading.

Fundamentally, the defense's warnings about the added time to offer the Tiger Asia Evidence are misguided, because there is no risk of "undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The evidence at issue is central to this case and critical for the jury to understand and evaluate the facts. There is nothing "undue" or "waste[ful]" about time spent on this evidence.

### 5. The Defendants' Other Procedural and Evidentiary Objections to the Tiger Asia Evidence Lack Merit

Perhaps recognizing that the law weighs against them on the merits, the defendants next fire scattershot procedural and evidentiary arguments to keep the Tiger Asia Evidence away from the jury. None of them should be credited.

#### a.    The Government Provided Sufficient Notice

Each defendant urges the Court to exclude pre-charge misconduct evidence for lack of notice. (*See* Dkt. 158 at 20-21; Dkt. 166 at 12-15).

The Indictment in this matter alleges that Archegos began as Tiger Asia but that Hwang rebranded it after he "faced regulatory and criminal sanctions." (S1 Indictment ¶ 8). Months ago, on December 12, 2023, the Government informed the defendants that it intended to offer, among other things, proof relating to pre-charge misconduct, including Hwang's Tiger Asia schemes and Halligan's lies to banks. (*See* Gov't Letter re Co-Conspirators and Rule 404(b), attached as Exhibit A to Dkt. 164). The Government's seven-page letter detailed, in writing, the evidence the government would offer and why. The Government further supplemented that letter in response to a letter from Halligan's counsel.

The defendants' complaint about the quality of the Government's notice founders from the start because it assumes that the Government's evidence could only be admitted as Rule 404(b) evidence. But Rule 404(b) is neither the only nor the primary reason to admit the pre-charge misconduct evidence. Rather, as the Government advised in its December 12, 2023 letter and explained more fully above, the prior misconduct evidence is direct proof of the charged schemes. The Government has no general obligation to provide "notice" of its direct proof and thus the Government's December 12, 2023 letter provided the defendants with more insight into the Government's case than the law requires. Moreover, the Government has also supplied witness

66

lists, exhibit lists, and early Jencks Act material that have, quite obviously, enabled the defendants to bring timely motions.

To the extent that the Court admits some part of the prior misconduct evidence pursuant to Rule 404(b), such as on the issues of intent and knowledge, rather than as direct evidence, the Government has complied with the notice requirements even so. The defendants fault the Government's December 12, 2023 letter for failing to provide "the reasoning supporting a specific non-propensity purpose." (Dkt. 158 at 21). But the Government's December 12, 2023 letter expressly advised that the prior misconduct would be offered as evidence of "intent" and "knowledge," among other things. In any event, the Government has provided, through this memorandum, further written elaboration of the reasons supporting the non-propensity purposes that support the admission of the evidence and it thus supplements the Government's prior notices.[15] When trial begins in a month, the defendants cannot credibly claim that will not have had a fair opportunity to meet or challenge the evidence, or that they lacked an understanding of the purposes to which the evidence would be put.

### b. Tiger Asia Evidence Cannot Be Precluded as Inviting a Foreign Legal Determination

Hwang also contends that the Hong Kong MMT Report and Japan SESC Recommendation cannot be admitted as evidence because the Government "failed to provide timely notice of foreign law under Federal Rule of Criminal Procedure 26.1." (Dkt. 158 at 13).

Hwang's argument is meritless. Rule 26.1, which is entitled "Foreign Law Determination, regards "[a] party intending to raise an issue of foreign law." Fed. R. Crim. P. 26.1. Because the

---

[15]     Of course, as the committee notes to the Rule itself advise, additional reasoning supporting the admission of the evidence may arise "because in some cases an additional permissible purpose for the evidence may not become clear until just before, or even during, trial." 2020 Amendment Notes to Fed. R. Evid. 404(b).

Government is not raising "an issue of foreign law," the Rule does not apply. In urging the Court to conclude otherwise, the defense cites cases, like *United States v. Pierce*, 224 F.3d 158 (2d Cir. 2000), where proof of the alleged scheme turned on a finding that foreign law operated in a particular way. *Id.* at 165 ("The Pierces are not accused of scheming to defraud the Canadian government of its property, but of its *right* to obtain property, its *right* to be paid money. To prove the existence of a scheme to defraud the Canadian government the prosecution had to prove the existence of such a right."). These authorities merely prove the evidence here is offered for another purpose: no aspect of the charges in this case require the Court to find that a foreign country had a particular law or that its law applied in a particular way. All that matters to make the Government's point is that Hwang and Halligan were aware of, and received, a notice that described price-moving trades as problematic. In any event, to the extent offering evidence of the outcomes of Hwang's foreign cases required notice under Rule 26.1, all that is required is "reasonable written notice." The Government's Rule 404(b) notice, which took written form and attached the very documents the defendants now challenge, plainly advised the defendants of the Government intent to offer evidence about the outcomes of Hwang's foreign cases.

### c. The Anticipated Tiger Asia Evidence Is Not Barred by the Rule Against Hearsay

The defendants also lodge misplaced objections to certain of the documentary evidence related to Tiger Asia's misconduct. Each should be denied.

*First*, Hwang argues that the Government may not introduce the Consent Order entered by consent on December 14, 2012, in the U.S. District Court for the District of New Jersey in *Securities & Exchange Commission v. Tiger Asia Management, LLC,* et al., No. 12 Civ. 7601 (DMC), GX 2709 (the "Consent Order"), because, to do so, would be an attempt to prove that Hwang committed the acts alleged in the SEC's complaint through the fact of a settlement in

violation of Rule 408. (Dkt. 158 at 11; *see also* Dkt. 166 at 71). The Government, however, has

no intention of arguing that the jury may conclude that Hwang manipulated markets in 2008 and

2009 because he settled the SEC's 2012 lawsuit. Nor, given that the Consent Order contains no

factual allegations about market manipulation, is it obvious how the Consent Order could be read

to imply liability for that conduct. Rather, the significance of the Consent Order is that it exists

and that it put Hwang (and Halligan, for that matter) on notice: it enjoins Hwang from, among

other things, violations of Rule 10b-5. The Consent Order is proof that Hwang knew of Rule 10b-

5 and, in fact, had been specifically directed not to violate it, and thus constitutes direct evidence

of the defendant's awareness that securities fraud was wrong. Because "[a] consent decree may

properly be admitted to demonstrate that a defendant was aware of its legal obligations," Rule 408

cannot justify its exclusion. *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008).

*Second*, Hwang objects to the admission of the Hong Kong MMT Report and the SESC's

Recommendation, asserting they are inadmissible hearsay statements. Hwang's motion is largely

misdirected. Hwang assumes both that the Government would offer the reports for their truth and

that it would do so pursuant to Rule 803(8), which relates to public records. (Dkt. 158 at 11-12).

Neither assumption is correct. The Government will offer the MMT Report and the SESC

Recommendation for the fact that each was published and furnished to the defendants.

*Third*, citing no law whatsoever, Hwang contends that because he caveated his factual

statements to the Hong Kong Market Misconduct Tribunal with the assertion that his statements

"do not constitute any admission," he may not be confronted with his own words now and that the

MMT Statement of Admitted Facts is inadmissible. As an initial matter, the MMT Statement of

Admitted Facts, an attachment to GX 2706, is a statement of Hwang's agent and therefore a non-

hearsay statement pursuant to Rule 801(d)(2)(c). The suggestion that the Government must defer

to a defendant's self-declared limitation on how his words may be used in the future has no support in the law. The United States was not a party to Hwang's settlements, never committed to treating his statements with special protections, and is not deprived of relevant evidence merely because Hwang prefers it to be so. Indeed, the law of evidence rejects the principle that Hwang advocates here: not only does Rule 801 define the statements of a party opponent to include an agent's statements, Hwang's statements are specifically admissible pursuant to Rule 408 because they were made to a "regulatory, investigative, or enforcement authority" and are being "offered in a criminal case[.]" Fed. R. Evid. 408(a)(2).

*Fourth*, Hwang objects to the admission of the SESC Recommendation on the grounds that it is a "provisional translation." (Dkt. 158 at 15-16). Hwang cites no rule of evidence that compels his result. Rather, he musters civil cases that discuss how litigants should authenticate foreign language declarations in connection with a summary judgment motion. *See, e.g., Heredia v. Americare, Inc.*, No. 17 Civ. 06219 (RWL), 2020 WL 3961618, at *4 (S.D.N.Y. July 13, 2020) ("When, as here, a party relies on an English-language declaration of a person whose native language is not English, that party must 'also submit documents sufficient to establish that [the declarant] understood what he was signing.'"). But this trial is not a civil summary judgment motion, the SESC Recommendation is not a declaration, and the Government can establish that the SESC Recommendation is what it purports to be—thereby satisfying Rule 901—in a variety of ways, including by reference to Japan's Financial Services Agency's public website containing its English-language press releases.[16] In any event, the Government does not offer the SESC

---

[16]     The Government is endeavoring to obtain the copy of the SESC Recommendation received by Tiger Asia. The Government requested a copy from counsel to Archegos and awaits word on whether Archegos will voluntarily supply it.

Recommendation as part of an effort to prove-up the contents of a foreign language document; it offers the SESC Recommendation as something the defendants received and understood.

### 6. The Hong Kong Statement of Admitted Facts Does Not Pose a Confrontation Clause Issue

Halligan also objects to the Statement of Admitted Facts but makes a *Crawford* argument, contending that its contents are "testimonial" and hearsay.[17] In so doing, Halligan confuses the law. Even assuming these statements were testimonial, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 58-59 & n.9 (2004); *see United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006). Accordingly, the admission of the MMT Statement of Admitted Facts and the Consent Judgment would not offend *Crawford* to the extent that its use simply demonstrated that Halligan was aware of it. Additionally, the MMT Statement of Admitted Facts and Consent Judgment can be used fully against Hwang and not Halligan and still comport with the Confrontation Clause. As Halligan himself points out, the MMT Statement of Admitted Facts and Consent Judgment does not implicate or even discuss Halligan and therefore would not be understood by the jury to be a confession of a non-testifying co-defendant that implicates Halligan in a crime. *See Richardson v. Marsh*, 481 U.S. 200 (1987); *United States v. Lung Fong Chen*, 393 F.3d 139 (2d Cir. 2004).

---

[17]     Halligan makes a similar argument with respect to the Tiger Asia plea colloquy and plea agreement, but that point is premature. The Government has no present plans to offer those documents during its case-in-chief, so the Court need not evaluate whether any *Crawford* issue is presented by offering the statements of the defendants' business firm.

### 7. The Charges Against Halligan Should Not Be Severed

Finally, Halligan argues for a severance. (Dkt. 166 at 73). The crux of the argument appears to be that the Tiger Asia Evidence is inadmissible as to him and to cure the prejudice of its admission he must be severed from trial with Hwang. But Halligan mistakes the facts and the law.

First, as discussed above, almost all of the Tiger Asia Evidence the Government seeks to use is admissible against both defendants. Though Halligan may wish the jury would assume otherwise, Halligan worked at Tiger Asia, he was aware of the Tiger Asia allegations, he knew of and discussed the regulatory consequences with counterparties, and he dealt with the counterparties' interest in how Archegos responded to them. Halligan also continued to work with Hwang after Tiger Asia became Archegos and, indeed, helped Hwang, Becker, and Tomita operate the Archegos Enterprise once it was formed.

Second, Halligan comes nowhere close to satisfying the standard for severance. To justify a severance under Rule 14, there must be "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). To prevail, the movant must show "not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quotation marks and citation omitted; emphasis in original). Few movants satisfy this burden, as "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Even if the defendant were to establish a serious risk of prejudice, "less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citation omitted).

Here, Halligan makes little effort to articulate the prejudice he faces, let alone how that prejudice may justify severance. Halligan instead just asserts that the Tiger Asia Evidence does

not apply to him and that "it would be unrealistic for the jurors to entirely set aside that evidence when evaluating the charges against Mr. Halligan." (Dkt. 166 at 73-74). Halligan compounds his mis-analysis by reference to *United States v. Bellomo*, 954 F. Supp. 630, 650-51 (S.D.N.Y. 1997), in which the Hon. Lewis A. Kaplan rejected the argument that certain defendants deserved to be severed from a trial that would include evidence of murders involving other defendants. As Judge Kaplan explained, a limiting instruction would suffice to cure the prejudice: "evidence of alleged murders involving other defendants would not be admissible at a separate trial and that such evidence, if admitted without explanation, might prejudice the jury against all defendants in a joint trial. However, numerous courts have held in similar situations that a jury instruction could counteract any possible prejudice to the defendants." *Id.* at 650. The Court here can easily protect Halligan's rights with appropriate limiting instructions.

### C. Evidence of Hwang's Concealment of His Role in the Tiger Asia Misconduct Is Admissible

In addition to the Tiger Asia Evidence described above, the Government may also elicit brief testimony from a few witnesses about Hwang's self-serving and false description of his role in the Tiger Asia misconduct. Hwang contends that the Government may not offer evidence that Hwang concealed his role in the Tiger Asia schemes because the Government's 404(b) notice does not sufficiently explain its non-propensity purpose, the evidence does not go to Hwang's intent, and, in Hwang's view, the evidence would be unfairly prejudicial. (*See* Dkt. 158 at 33-34). Each of Hwang's arguments is wrong.

Proof that Hwang concealed and misrepresented his Tiger Asia past is direct evidence of the charged racketeering scheme or admissible as non-propensity proof under Rule 404(b). Testimony that Hwang told some people—such as certain traders—the truth about what he had done and told others—like his co-CEO and his head of compliance—something different directly

illustrates who had his criminal trust and who did not, and it further demonstrates that Hwang used deception as a technique to conduct Archegos's business affairs.

Further, the Government expects that Archegos compliance personnel will testify that they were not informed that the Tiger Asia cases involved allegations of market manipulation and, as a result, did not run a compliance program aimed at detecting market manipulation. That aspect of the evidence demonstrates that Archegos's compliance department was not meaningfully independent or motivated—after all, the allegations against Hwang and Tiger Asia could be found through Google—and negates any suggestion that Hwang's creation of a compliance program demonstrates a good faith effort to comply with the law.

Hwang largely ignores the direct significance of the proof and attacks the evidence as improper under Rule 404(b), arguing that the concealment conduct is dissimilar to the charged conduct. But Hwang confuses. As the Second Circuit explained in *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987), the analytical question germane to acts offered under Rule 404(b) is whether the proffered other act evidence supports the inference advocated by the Government. *Id.* at 974. Here, one aspect of the concealment evidence—namely, testimony from one set of witnesses about what Hwang told them about Tiger Asia and testimony from another set of witnesses about a different account of what Hwang had actually done—directly supports the inference that Hwang had a trusted in-group of persons at Archegos, which included the racketeering conspirators, and that Hwang excluded others at Archegos.

Hwang's cursory Rule 403 arguments are meritless. First, as before, Hwang is simply wrong to claim that admitting this proof would add weeks to the trial. The core proof will take the form of a few minutes of testimony from witnesses the Government already plans to call and the defense no doubt already plans to cross-examine. Second, the suggestion that it would be improper

to admit this proof because the U.S. Attorney's Office for the District of New Jersey did not charge Hwang in 2012 provides no legal reason to exclude relevant evidence.[18] The argument is also misconceived: the point of the evidence is to show how Hwang acted *after* the DNJ investigation, including during the period of the conspiracies and schemes charged in this case, not to examine the veracity of what Hwang told the District Court in New Jersey.

### D. Evidence of Halligan's Pre-Conspiracy Misstatements and Deception Is Admissible Both as Direct Evidence and Pursuant to Rule 404(b)

Halligan moves to preclude evidence that he misled banks prior to the period of the charged conspiracy. (Dkt. 166 at 8-23).

Halligan's motion proceeds in two parts, with the first portion arguing that Halligan has been deprived of notice because it has not supplied Halligan with the precise wording he used to mislead banks in the period prior to the charged conspiracy (*see* Dkt. 166 at 13-14), and the second portion arguing that the Court should preclude whatever misrepresentations may have happened as propensity evidence (Dkt. 166 at 22-23). The Court should reject each of Halligan's arguments.

### 1. The Government Has Provided Halligan With Sufficient Notice

Halligan's claim that he lacks fair notice is meritless. The Government's December 12, 2023 Letter advised Halligan that the Government would show that Halligan began the practice of misleading banks about Archegos's portfolio prior to the conspiracy charged in the Indictment:

> The Government will offer evidence that, prior to the conduct charged in the Indictment, Halligan repeatedly and deliberately misled counterparties with respect to certain information about Archegos's portfolio and, at times, intentionally withheld information about the portfolio's performance. Specifically, Halligan would repeatedly understate the relative size of Archegos's largest position to its counterparties. In addition, in or about 2018, when Becker took over the role of liaising with the credit teams at

---

[18]   Of course, the fact that U.S. Attorney's Office for the District of New Jersey did not charge Hwang in 2012 is not proof of anything, does not create any Double Jeopardy concerns, and does not estop the Government from proving that Hwang, in fact, acted in a particular way.

> the counterparties, Halligan instructed Becker, in substance, to tell the counterparties that Archegos's largest position was 35% of Archegos's capital, even if that was not the truth. Relatedly, Halligan at times would purposefully withhold information from counterparties regarding Archegos's monthly performance and assets under management.

(December 12, 2023 Notice, Dkt. 164, at 5-6). In addition to that formal written notice, the Government has produced 3500 material, witness lists, and exhibit lists. And elsewhere in the December 12, 2023 letter, the Government further alerted Halligan that it would prove that he misled banks with respect to Archegos's compliance program. (December 12, 2023 Notice, Dkt. 164 at 5).

In light of these disclosures, Halligan's professed confusion cannot be credited. In late December 2023, for example, the Government produced 3500 that reflected Scott Becker has informed the Government, in substance, that Halligan trained him to lie to the banks and that while he was learning his role, he watched over Halligan's shoulder as Halligan himself misled the banks. *See, e.g.*, 3501-01. For example, the 3500 material includes the following passage:

> In or around 2016 and 2017, BECKER began shadowing HALLIGAN on credit calls with ACM's prime brokers and other counterparties in anticipation that BECKER would take over those responsibilities from HALLIGAN going forward. Although the calls were less frequent during this time period than they became in 2020, BECKER observed that, in response to the common questions, such as questions about the size of ACM's largest positions, HALLIGAN would provide false information to the banks; that is, HALLIGAN would routinely understate the relative size of ACM's largest position.

And, of course, there can be no doubt that Halligan has reviewed the Becker 3500 material because elsewhere in his motions *in limine* he seeks to preclude the Government from eliciting specific testimony from Becker regarding Halligan's efforts to deceive the banks. (*See, e.g.*, Dkt. 166 at 28-29 ("Based on our review of the 3500 material, we move specifically to exclude the government

seeking to introduce evidence and/or argue that Mr. Halligan allegedly created a false record relating to Archegos's gross exposures.")).

Similarly, with respect to exhibits, Halligan decries the purported prejudice of having to sift through the Government's exhibits to discern how the Government will prove its case. But what Halligan describes is not prejudice at all—it is basic trial preparation. Here, to his advantage, the Government has supplied lists of its anticipated trial exhibits beginning many months before trial, in addition to the December 12, 2023 Notice Letter and the August 2022 Misrepresentations Evidence letter.

Halligan's reference to GX 2302, a Wells Fargo credit risk memorandum, illustrates Halligan's blinkered approach. (*See* Dkt. 166 at 17-18). GX 2302 is an October 2018 memo prepared after Wells Fargo representatives met with Halligan and others. Among other things, this exhibit reflects that Archegos personnel told Wells Fargo that "Archegos has made substantial improvements to its compliance procedures and personnel" after the Tiger Asia misconduct and that its "[l]arger positions will start at around 10% and can get as high as 20-30%." (GX 2302). As advised in the Government's December 12, 2023 Notice Letter, and discussed at length above, each of these statements was misleading. In any event, by providing Halligan with various formal notices and early 3500, witness, and exhibit disclosures, the Government has more than satisfied its obligations.

In the end, Halligan's notice arguments reprise his quixotic efforts to obtain exacting detail about the Government's trial evidence. The Government has supplied Halligan with extensive notice and a fair opportunity to meet the evidence against him. Nothing more is required.

### 2. Halligan's Misstatements Demonstrate the Existence of the Charged Conspiracy and Halligan's Participation in It

The evidence that Halligan systematically misled banks at Archegos and trained his principal subordinate to do the same is direct evidence of the charged offenses. As described in the Government's December 12, 2023 Notice, and noted above, Scott Becker will testify that Halligan trained him to mislead the banks and then, during the period of the conspiracies charged in the Indictment, Becker did as he had been instructed by Halligan. Documentary proof, such as GX 2302, that reflects Halligan and Becker misinforming banks corroborates the point. That Halligan himself lied to the banks demonstrates that Halligan knew and expected that Becker would commit acts of fraud as part of the operations of the Archegos Enterprise. Accordingly, the proof touches multiple elements of the charged offenses, including the criminal agreement between Halligan and Becker, the objectives of the criminal conspiracies, and the conspirators' pattern of recurring misconduct in service of the Archegos Enterprise.

For these reasons, Halligan's generic claims that this evidence is merely propensity evidence must be rejected. The Government will not offer Halligan's early misrepresentations as separate and discrete acts offered to attack Halligan's character. (And, if Halligan wishes, the Court can so instruct the jury.)

## IV. The Government's Expert Testimony Is Admissible

As directed by the Court, the Government has supplied extensive notice of the anticipated opinions of its four experts—Professor Robert Battalio, Dr. Carmen Taveras, Professor Amit Seru, and Dr. Joseph Mason—each of whom is highly qualified in his or her respective field, and, indeed, two of whom are faculty at major research universities and one of whom is on staff at the Securities & Exchange Commission's Division of Economic Research and Analysis.

Even so, Hwang and Halligan move to preclude the Government from offering almost any expert evidence at all. Though couched in the language of *Daubert*, Hwang's motion, which Halligan joins, reprises many of the other motions *in limine* and thus reads like a wish list of evidence the defendants would prefer to avoid at trial:

- Evidence that links Hwang's swap orders to equity market executions (*see* Dkt. 163 at 2);

- Evidence that shows Hwang's swap orders moved market prices in his favor (*see* Dkt. 163 at 3);

- Evidence that stock prices reverted to the peer group baseline once Hwang stopped his buying activity (*see* Dkt. 163 at 2); and

- Evidence that Archegos's trade orders were consistent with a strategy to alter market prices and inconsistent with a strategy to build concentrated positions at the best available prices (*see* Dkt. 163 at 1).

To justify this wish list, however, Hwang misstates the law, misdescribes the facts, and does not contend with the actual testimony the Government will offer at trial. Halligan separately moves, also without merit, to preclude the Government from offering "duplicative or cumulative expert testimony." (Dkt. 160 at 3-7). In the end, the defendants' motions offer no valid basis to preclude any aspect of the Government's proposed experts' testimony, particularly in light of the Circuit's permissive standards for assessing expert qualifications and the relevancy of evidence.

### A.    Applicable Law

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the
> principles and methods to the facts of the case.

"In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006). Analyses of expert qualifications typically proceed in two parts. Courts "first ascertain whether the proffered expert has the educational background or training in a relevant field" to qualify as an expert. *Cary Oil Co. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)). Courts then "compare the expert's area of expertise with the particular opinion the expert seeks to offer." *Id.* (quoting *Zwillinger v. Garfield Slope Hous. Corp.*, No. 94 Civ. 4009 (SMG), 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998)).

In keeping with the "liberal" construction of the expert-qualification requirement, courts in the Second Circuit have emphasized that an "expert should not be required to satisfy an overly narrow test of his own qualifications." *Johnson & Johnson*, 2006 WL 2128785, at *5 (quoting *Valentin v. New York City*, No. 94 Civ. 3911 (CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *Sullivan v. Ford Motor Co.*, No. 97 Civ. 593 (RCC), 2000 WL 343777, at *4 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989))). That is because, in considering qualifications, the "only matter the

court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson*, 2006 WL 2128785, at *5 (quoting *Valentin*, 1997 WL 33323099, at *14). Other "quibble[s] with an expert's academic training" go to weight, not admissibility. *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (alterations omitted) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)), *abrogated on other grounds by Hedgpeth v. Pulido*, 555 U.S. 57 (2008).

Similarly, a district court must ensure that scientific and technical testimony is relevant to the case before the court and "rests on a reliable foundation." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 259 (2d Cir. 2002). The latter is a "flexible inquiry"; it requires examining "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 266-67. There is no "definitive checklist or test" for determining reliability. *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The "trial judge . . . ha[s] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith . . ., other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotation marks omitted) (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984), and *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

### B.  The Defendants' General Objections Rest on Mistakes of Law and Fact

Hwang begins his motion with a series of general objections that he repeats and restates for each of the Government's proposed experts. Each argument is meritless.

### 1.  Price Movement Evidence Is Relevant to Price Manipulation Charges

First, Hwang repeats his claim that price impact evidence has "limited probative value" in a market manipulation case. (*Compare* Dkt. 163 at 3 *with* Dkt. 156 at 11-13). This claim is not credible. Hwang is charged with multiple violations of the price manipulation statute, 15 U.S.C. § 78i, which makes it a crime to effect "a series of transactions . . . *raising or depressing* the price of [a] security, for the purpose of inducing the purchase or sale of such security." *Id.* (emphasis added). Hwang is also charged with multiple violations of Rule 10b-5, which requires the Government to establish Hwang's intent to deceive, defraud, or manipulate. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). And one of the core factual allegations in this case is that Hwang intentionally inflated market prices—indeed, variations of that claim recur throughout the Indictment. (*See, e.g.*, S1 Indictment ¶¶ 1-2, 21, 28).

Evidence tending to show that Hwang, in fact, moved prices provides a critical and powerful inferential step toward proving that he intended to do so. That the evidence does not conclusively prove Hwang's state of mind is of no moment because "[r]elevant evidence is not confined to that which directly establishes an element of the crime," *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997), and because a defendant's state of mind almost always must be proved circumstantially. Here, the Government's expert evidence tends to make the existence of a consequential fact more likely. Accordingly, it is relevant. *See* Fed. R. Evid. 401.

### 2.   There Is No "Event Study" Requirement for Stock Price Evidence

Second, the defendants invite the Court to make new law to claim that the Government may not tell the jury that the prices for stocks Archegos traded deflated once Hwang stopped trading in them. According to the defendants, this evidence is "improper absent an event study." (Dkt. 163 at 7). This claim is addressed above in response to Hwang's motion *in limine*, *see supra* § I.A, but, as set forth there, this argument is wrong in three ways: it misstates the law; it misapprehends the anticipated expert testimony and relevant facts; and it advances bad statistical science.

First, as to the law, the defendants are wrong to argue that the Second Circuit requires "event studies" to present any stock movement evidence. As the Government explained in its response to the *in limine* motion on this subject, the defendants' primary authority, *United States v. Ferguson*, neither holds that event studies are required nor discusses event studies at all. And the defendants' other authorities concern reliable ways to use stock-drop evidence to establish materiality based on an efficient markets theory following disclosure of fraud. (*See, e.g.*, Dkt. 163 at 8-9 (citing *United States v. Martoma*, 993 F. Supp 2d 452, 457-58 (discussing uses of events studies to determine whether price changes were related to the representations in dispute in a given case); *United States v. Schiff*, 538 F. Supp. 2d 818, 835 (D.N.J. 2008) ("[A]n observed stock price drop is probative of materiality of the alleged misstatements and omissions concealing excess inventory only with an analysis of whether the stock price drop is attributable to the public disclosures that relate to the charged conduct, rather than to disclosures that relate to other events at the company or in the market as a whole.")). That is not an issue presented in this case.

Second, as to the proffered expert opinions, the defendants appear to assume that the Government's experts will say that Archegos "caused" the stock price drop that immediately followed Archegos's default. (*See* Dkt. 163 at 9). But that is not an opinion that the Government

has sought to offer, as its notices reveal. (*See, e.g.*, Dkt. 167-1 ¶ 6(d) ("[S]tock price data in the months following Archegos's collapse further evidences an explanatory relationship between Archegos's orders in the Top Archegos Securities and changes in prevailing stock prices for those securities.")). The Government will, however, offer fact witness testimony on that point: Representatives from multiple counterparties will testify that the counterparty closed out its swaps positions by selling equities in the market and that, as they did so, the prices of those equities dropped substantially, causing losses.[19] By contrast, the Government's expert testimony is not about why the stock price declined but addressing whether it had been inflated to begin with. It is ironic, therefore, that Hwang complains that Professor Battalio has not offered sufficient testimony to associate the post-scheme stock price movements with Archegos's lack of trading (Dkt. 163 at 9), at the same time that Hwang laments as cumulative the total amount of analysis that demonstrates that Archegos's trading moved the market prices (Dkt. 163 at 22). As explained in the Government's various notices, the fact that the securities in which Hwang traded outperformed their peers while he traded in them and performed on par when he did not is quintessential proof that the securities prices had been inflated and had been inflated by Archegos's trading.

Finally, the defense is wrong as a matter of statistical science. Professor Battalio undertook multiple, sophisticated statistical analyses to understand whether, how, and to what degree Archegos's trading altered stock prices. Though the defendants are free to cross-examine Professor Battalio as well as Dr. Taveras on the absence of an event study from their work, the Government anticipates that, if asked, each expert would explain that an event study would be ill conceived

---

[19]     Hwang speculates that some stock prices may have fallen because ViacomCBS issued a secondary offering or because the SEC announced new rules regarding foreign issuers. (*See* Dkt. 163 at 9-10). Indeed, the Government will present evidence that those events did put pressure on certain stock prices, triggering margin calls, and exposing Hwang's trading scheme.

under the circumstances and unlikely to provide much statistically significant insight. Indeed, there is academic literature on when to use and not to use event studies that notes their diminished utility when used with broadly defined "events" and over long analysis windows. *See, e.g.*, MacKinlay, Craig A. "Event Studies in Economics and Finance." *Journal of Economic Literature*, March 1997. Moreover, as the defendants' own authorities explain, usually event studies are used to answer the question of whether a particular unexpected disclosure—such as a company's announcement of restated financials—affected the company's stock price. *See Martoma*, 993 F. Supp 2d at 457-58. There is no similar "revealed" information here that an event study would assess.

### 3. The Government's Experts May Make Inferences from the Trading Data So Long as They Do Not Describe the Defendant's State of Mind

Third, the defendants argue that none of the Government's experts may offer opinions that describe whether the trade evidence is consistent or inconsistent with various trading objectives. (Dkt. 163 at 1-2). Though the defendants decry this as testimony regarding the defendants' intents, they once again mischaracterize the Government's expert notices and misapply the law.

Although an expert's opinion generally "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), Rule 704(b) specifies that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," Fed. R. Evid. 704(b). Thus, an expert is forbidden from "expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993) (internal quotations omitted) (quoting *United States v. Richard*, 969 F.2d 849, 854 (10th Cir. 1992)).

"Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state. The rule means that the expert cannot expressly 'state the

inference,' but must leave the inference, however obvious, for the jury to draw." *United States v. Grady*, 645 F. App'x 1, 4 (2d Cir. 2016) (alterations and internal quotation marks omitted) (quoting *DiDomenico*, 985 F.2d at 1165); *see also* 3 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 7:21, at 899-901 & nn.25-26 (4th ed. 2013) (stating that Rule 704(b) does not prohibit "[e]xpert testimony at one remove from such ultimate issues as intent" and collecting cases).

None of the Government's proposed expert testimony would violate these principles. For one thing, the Government will not invite any expert to say that either defendant did or did not possess a certain mental state. For another, the Government's proposed opinions—namely, that certain trade evidence is consistent with or is inconsistent with various trading assumptions—leaves for the jury the task of assessing the inferences about the defendants' mental states to be drawn from those opinions. Indeed, the Government's proposed formulation accords with that approved by the Second Circuit in *United States v. Grady*, where the Court of Appeals affirmed expert testimony that the possession of a certain amount of crack was consistent with distribution and inconsistent with personal use. *See* 645 F. App'x at 4. Here, as in *Grady*, the ultimate issue of whether the defendants formed the requisite intent will remain with the jury.

### 4. The Governments' Trade Matching Is Reliable

The defendants next move to exclude the trade matching done by Professor Battalio and Dr. Taveras. Though styled as a *Daubert* reliability claim, the objection appears to rest on the defense's subjective understanding about what is accepted "in the academic microstructure community" and about how high frequency order routing and execution may diminish the reliability of a match. (*See generally* Dkt. 163 at 15-17). None of the defense's arguments justify the exclusion of the evidence, and most of the defense's points should be made, if they can be, on cross-examination.

The "matching analysis" the defendants attack is a comparison of Archegos's order records to stock market execution data.[20] The trade matching exercise aims to identify the subset of securities transactions that originated from Archegos swap and equity orders. On one side, Archegos typically conveyed order information to banks electronically through Bloomberg EMSX data (GX 4012), which recorded data about the size, price, and time of Archegos's orders. On the other side, stock exchanges, such as Nasdaq and NYSE, facilitated equity transactions routed to them by stock brokerages and captured data about the size, price, and time of executions. Because Nasdaq and NYSE do not capture data about who or what originally placed an order, however, identifying which stock market transactions originated with Archegos requires an expert to compare Archegos's order records to the execution data captured by the stock market. That is what Professor Battalio and Dr. Taveras have done here.

Hwang critiques Professor Battalio's approach in a series of paragraphs that muster no academic literature, cite no factual authorities, and offer no basis to credit the critique other than Hwang's say-so. (*See* Dkt. 163 at 15-19). Nothing about that broadside identifies any unreliable feature of Professor Battalio's approach, though it does reveal that Hwang misunderstands the order records.[21] Moreover, Hwang concludes his critique by asserting that "[t]hese untested assumptions and techniques lack support in the recent trading microstructure literature, and we are not aware of them having been subject to peer review." (Dkt. 163 at 20). Not surprisingly, given

---

[20]    Here, as described in the Battalio Notices, Professor Battalio specifically matched Archegos's orders to TAQ Data, which relates to all National Market System transactions, and to Nasdaq Orderbook data. (*E.g.*, Dkt. 167-1 ¶ 5; Dkt. 167-2 ¶ 27).

[21]    Hwang, for example, faults Professor Battalio for identifying trades "even when he could not match the trades to the same exchange." (Dkt. 163 at 18). But, as described in the expert notices and as evident from the data itself, the "exchange" field in the EMSX would contain a broker name, such as MSCS, instead of an exchange. Where the exchange field had that value or a similar non-venue value, the trade was allowed to match to any exchange because the trade could have been routed to any exchange.

that Hwang is not an expert in these matters, what he says is wrong, and his assertions on this point merit no weight whatsoever. For one thing, both Professor Battalio and Dr. Taveras independently arrived at similar approaches and would testify that their respective approaches are, in fact, consistent with prevailing standards of statistical analysis. Moreover, similar matching has been done and reported before, including in peer-reviewed publications.[22]

But these and Hwang's other arguments attempt to transform the *Daubert* factors into an admissibility checklist, which it is not. *Romano*, 794 F.3d at 330. As the Supreme Court noted in *Kumho Tire Co.*, "[t]oo much depends upon the particular circumstances of the particular case at issue" to categorically rule in or rule out "the applicability of the factors mentioned in *Daubert.*" 526 U.S. at 150. Indeed, with respect to peer review, which Hwang brandishes here as an essential aspect of reliability, the Supreme Court observed that "[i]t might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." *Id.* at 151. Here the quality of trade data available for analysis exceeds what is ordinarily available: Professors do not often get materials obtained from search warrants. That Professor Battalio and Dr. Taveras made use of this rare, high-quality data supports, rather than diminishes, their work.

---

[22]     Barber, Brad M., Xing Huang, Philippe Jorion, Terrance Odean, and Christopher Schwarz. "A (sub) penny for your thoughts: Tracking retail investor activity in TAQ." *Journal of Finance* forthcoming, available at SSRN 4202874 (2023); Battalio, Robert, Brian Hatch, Mehmet Saglam. "The Cost of Exposing Large Institutional Orders to Electronic Liquidity Providers." *Management Science* (2023); Battalio, Robert, Shane A. Corwin, and Robert Jennings. "Can Brokers Have It All? On the Relation between Make-Take Fees and Limit Order Execution Quality." *The Journal of Finance* (2016); Battalio, Robert H., Robert H. Jennings, Mehmet Saglam, and Jun Wu. "Identifying Market Maker Trades as 'Retail' from TAQ: No Shortage of False Negatives and False Positives." Available at SSRN 4579159 (2023); Ellis, Katrina, Roni Michaely, and Maureen O'Hara. "The Accuracy of Trade Classification Rules: Evidence from Nasdaq." *Journal of Financial and Quantitative Analysis* (2000).

It is also telling that neither Hwang nor his experts identify some other method that should have been used.

For similar reasons, Hwang's arguments about error rates do not justify the preclusion of the matching analysis. For one thing, Professor Battalio's description of his matching methodology included the percent of matches found at each step of his methodology and, at the conclusion, the total percent matched, so there is a reported rate of error in failing to identify trades that must have occurred. Dr Taveras reported a similar matching rate. The fact that there is not a known rate for erroneously matched trades does not render the analysis unreliable. As Professor Battalio will explain, his method comported with—and improved upon—methods used by his peers. Professor Battalio's steps and inferences are clearly stated and, as he would explain, reliable under the circumstances. Finally, that Professor Battalio and Dr. Taveras undertook similar but distinct approaches and obtained similar but not divergent results confirms the point.

Finally, though Hwang claims great prejudice from the matching evidence, his argument is essentially that perfection is required. But that is not what *Daubert* demands or what reality permits. Hwang is free to explore the imperfections of this analysis on cross-examination, and, indeed, those "are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Hwang also ignores that imperfections here likely redound to his benefit. As fact witnesses will demonstrate, virtually all of Hwang's trade orders resulted in equity executions, and virtually all of those executions took place in the stock market. Accordingly, Hwang's trades all exist in the stock market data, it is just a matter of identifying them. By matching less than 100% of Archegos's trades, Professor Battalio and Dr. Taveras conservatively undercount the equity executions they link back to Archegos.

### C. Halligan's Motion to Preclude Purportedly Duplicative or Cumulative Evidence Should Be Denied

For his part, Halligan primarily moves to preclude the Government from offering expert testimony because it would be cumulative. (Dkt. 160 at 3-6). Halligan is incorrect. The Government has noticed four different experts who, if called, will address four different subjects. Broadly speaking, the Government's experts will testify as follows:

- Professor Battalio will present the results of multiple statistical analyses that show that in the short- and long-term, changes to the prices of certain securities were the result of Archegos's trade orders.

- Dr. Joseph Mason will discuss discounted cash flow modeling, compute the days necessary to unwind Archegos's positions at prevailing market volumes, and highlight the temporal relationship between Hwang's Instant Bloomberg trading directives and contemporaneous market prices.

- Dr. Carmen Taveras will present summary information regarding Archegos's positions, including their size and value; the movement of stock prices during the period of the charged scheme and after; Archegos's use of multiple counterparties to expand capacity; and the observable relationship between Archegos's limit orders and the market prices.

- Professor Seru will explain generally how markets react to new information and how market distortion may cause buying and selling at inefficient prices, for example by investors who wrongly interpret certain trades to be a reflection of genuine demand at a given price.

The testimony of the Government's experts will not be cumulative.

The Government does not plan to present the same opinions multiple times, nor could it: Only Professor Battalio conducted micro-market statistical analysis. Only Dr. Mason has been noticed to address discounted cash flow. Only Professor Seru has been noticed to address economic theory regarding market inefficiencies. And only Dr. Taveras will present summary charts regarding Archegos's use of counterparties, its general trade activity, and the intraday price movements of ViacomCBS stock in late March 2021. Ignoring these fundamental differences, Halligan complains that four experts is too many for his liking. But there is no evidentiary principle that constrains the Government from calling four experts simply because the defendants would

rather not contend with that number, just as there is no evidentiary principle that constrains the defense from calling the three experts it has noticed. The defendants committed a crime involving specialized and sophisticated means, and the Government is entitled to ensure the jury has an opportunity to understand the full significance of the trade data and industry mechanics that demonstrate the defendants' guilt.

In any event, much of Halligan's motion is devoted to mischaracterizing the Government's expert notices in order to fashion his argument and to presenting a table that purports to identify overlapping subjects between the experts. This leads Halligan to highlight basic terms and concepts that are disclosed in each expert report, such as what a "swap" is or how securities exchanges function, and then to proclaim that the Government's experts "intend to provide the same conclusory opinion about the supposed impact of Archegos's trading on the markets." (*See*, *e.g.*, Dkt. 160 at 3, A-1 & A-2). The recurrence of background topics in each expert notice is not a sign that the Government plans to make duplicative presentations, however, but rather an indication that the Government has complied with Rule 16 and this Court's directives about expert notices containing complete statements of an expert's opinions. The Government has included in each notice any subject that it could expect may arise during direct examination, such as basic terms or the ability to refer to basic charts, even though each expert notice addresses a distinct set of evidence and opinions.

Finally, Halligan demands that the Court declare now that the Government's expert testimony is cumulative, rather than evaluate that assertion based on the actual testimony that is elicited at trial. (*See* Dkt. 160 at 6-7). As the Second Circuit has observed generally, "At this stage of the litigation, when the trial has not yet commenced and no evidence has yet been put before a jury, it is premature to conclude that this evidence is cumulative." *United States v. Jamil*, 707 F.2d

638, 643 (2d Cir. 1983). So too here. "Further, when the government possesses duplicative evidence, it has the discretion to decide which evidence it will present at trial, if it is required to make an election." *Id.* The Government here shares the Court's interest in an efficient and orderly trial and will continually adjust its trial presentation to pursue that goal, consistent with its evidentiary burden. Particularly in light of the substantial ongoing litigation in this case, even if there were a basis to think that some testimony offered by the Government's witnesses might overlap, there is no need to preclude any such evidence now.

### D.  The Defendants' Expert-by-Expert Challenges Should Be Rejected

In addition to the global objections, the defendants also make individual challenges to each expert, all of which should be denied. The Government addresses these additional arguments below.

#### 1.   Professor Robert Battalio

Hwang primarily contends that Professor Battalio's opinions are the "functional equivalent" of saying that Hwang did or did not have a particular mental state. (Dkt. 163 at 11-13). Hwang reveals that this argument is predicated on misdescribing the anticipated testimony by arguing that "purporting to know Mr. Hwang's strategy is no different than purporting to know what was in Mr. Hwang's mind." (Dkt. 163 at 11). Professor Battalio does not know what strategy Hwang had in his mind when he placed orders and will not tell the jury otherwise. On the other hand, Professor Battalio does know a lot about order submission strategies, and he is permitted to report fair inferences that can be drawn from the trade data, except for the inference that Hwang had a specific mental state. None of Professor Battalio's opinions will cross that line. Whether Hwang had a role in placing the trades, whether he had a strategy when he did so, and what his strategy may have been remain matters for the jury to determine.

Hwang attempts to raise a similar objection to Professor Battalio's opinion that "by March 23, 2021, the prevailing prices of Archegos Top Long Positions did not reflect the ordinary operation of supply and demand." (Dkt. 163 at 12). Hwang asserts that "if Mr. Hwang's intent was legitimate, his desire for exposure to these stocks *was* part of the ordinary operation of supply and demand," and therefore Professor Battalio must have "presumed that Mr. Hwang had manipulative intent." (Dkt. 163 at 12). Once again Hwang is simply wrong as a matter of economics. The "ordinary operation" of supply and demand do not break down only in the presence of criminal mental states; as economic history shows, markets can fail, bubbles can form, and dislocations can occur even without any intentional misconduct. Here, as Professor Battalio will explain, multiple measures of trade impact and market efficiency showed that the markets were not acting with ordinary efficiency, buy-sell imbalances had formed, and the prices of certain stocks had become dependent on one market actor buying them at increasing prices. Whether Hwang intended to achieve that state of affairs or not, that state of affairs existed.

Hwang goes further to complain that Professor Battalio is unqualified to offer opinions about "portfolio construction and management" and that he offers "generalizations about what constitutes a reasonable investment strategy." (Dkt. 163 at 12-13). But Professor Battalio will not offer general testimony about portfolio management or investment strategies at all—he will describe trading and order submission strategies, which is a subject of his expertise. The opinion that seems to offend Hwang is that investors typically try to buy low and sell high to maximize their returns and thus seek to implement positions at the lowest price possible. (*See, e.g.,* Dkt. 167-1 ¶ 7(a)). The Government expects that the commonsense point Professor Battalio will make is that efficient order submission involves obtaining the best available prices under the circumstances. Hwang on cross, or through other testimony, is certainly free to argue that it would

be sensible for investors to implement their positions by overpaying for trades. But Professor Battalio is well within his expertise to opine otherwise.[23]

Finally, Hwang attacks Professor Battalio's price impact opinions as unfairly prejudicial. (Dkt. 163 at 22). Other than acknowledging that Proffer Battalio conducted multiple analyses of Hwang's trading—which Hwang mistakenly summarizes as all relating to price impact—Hwang identifies no prejudice whatsoever posed by the testimony and does not engage in even a cursory Rule 403 analysis. Rather, Hwang once again argues that "price impact is of course not manipulation." (Dkt. 163 at 22). Hwang's repeated insistence that price impact does not matter in a price manipulation case strains credulity and, of course, is at odds with the law.

In support of the argument that the "cumulative nature" of Professor Battalio's price impact testimony will result in "unfair prejudice" (Dkt. 163 at 22), the defense cites a single source: *Munn v. Hotchkiss School*, 24 F. Supp. 3d 155 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018). But that case had nothing to do with cumulative expert testimony being unfairly prejudicial. In fact, the only expert testimony that was struck in *Munn* was testimony that the court determined was "false and misleading," 24 F. Supp. 3d at 201, which is not the basis for the defense's application here. In short, the defense offers no defensible reason to preclude Professor Battalio's price impact testimony. Contrary to the defense's baseless accusation, the Government has no "intent to conflate the[] two distinct [concepts]" of price impact and market manipulation (Dkt. 163 at 23), and the Court's instructions on the elements of the manipulation counts will ensure that the jury is educated that the mere fact of price impact is not, standing alone, market manipulation.

---

[23]    Hwang reprises the same argument but restyled as an attack on the reliability of the opinion. (Dkt. 163 at 14). The argument does not improve in the retelling. Professor Battalio's opinion rests on academic literature as well as his extensive research experience. That Hwang disagrees with Professor Battalio's opinion does not make the opinion unreliable.

## 2. Doctor Carmen Taveras

The parties' specific attack on Dr. Taveras's proposed expert testimony is equally flawed.

First, the defense seeks to preclude Dr. Taveras's testimony that as Archegos increased its swap exposure to the securities, the market prices for those securities generally increased and exceeded the relevant market and industry exchange-traded funds ("ETFs"). (Dkt. 163 at 30-32). As before, the defense claims that Dr. Taveras was required to conduct an "event study" to offer any "causation" testimony on the changes in exposure and price. But, as set forth above, *see supra* § IV.B.2, there is no requirement in the Second Circuit or elsewhere that a party conduct an event study to present the types of charts and testimony contemplated by Dr. Taveras, and, in any event, Dr. Taveras does not intend to opine on the topic of "causation."

Second, the defense objects to Dr. Taveras's testimony that the prices for the securities did not recover after the Archegos collapse. (Dkt. 163 at 32). Hwang again argues that the Government cannot introduce this testimony based on different statements the Government made in a different case, *United States v. Phillips*, No. 22 Cr. 138 (LJL), but this argument is no more successful when styled as a *Daubert* motion, and should be rejected for the same reasons described above, *see supra* § I.A. Moreover, Hwang also repeats his misunderstanding of the import of this prolonged price depression following the collapse. That evidence is directly responsive to Hwang's assertion that the decline in Archegos's portfolio can be explained by the ViacomCBS seasoned equity offering and the proposed delisting of Chinese ADRs. Had that been the case, as Dr. Taveras is expected to testify, the prices would have rebounded in the weeks following Archegos's collapse.

Third, the defense moves to preclude Dr. Taveras's trade matching analysis. In addition to the general arguments addressed above, *see supra* § IV.B.4, Hwang argues that Dr. Taveras is unqualified to conduct a matching analysis because she lacks the necessary background in "high-frequency trading." (Dkt. 163 at 34). But Dr. Taveras holds a Ph.D. in Economics from the

Massachusetts Institute of Technology. She has worked at the Division of Economic and Risk Analysis at the SEC for close to a decade, where she routinely analyzes trade data, including high-frequency trade data. Her professional experience confirms the Court's initial assessment that the parties' experts, including Dr. Taveras, "are highly qualified people." (Jan. 3, 2024 Tr. 13).

Hwang also criticizes Dr. Taveras because her analysis results in a different number of matched trades than does Professor Battalio's. But this is not a basis to preclude Dr. Taveras's testimony, or Dr. Battalio's for that matter. That two highly qualified experts approached the same task in different ways and both concluded that a meaningful percentage of Archegos's swap transactions could be matched to trades in the public equity markets lends credibility to their analysis; it does not detract from it. Moreover, any differences between the two experts' work might be a subject for cross-examination, but it is not a basis to preclude the testimony.

Fourth, Dr. Taveras prepared charts that illustrate the extraordinary risk concentration of Hwang's positions by comparing his position size (measured in shares and shares subject to swap) to the issuers stock (measured in shares). Given that Dr. Taveras's math is correct and the charts themselves have appropriate scale, Hwang is left to argue that the comparison itself is irrelevant and misleading. (Dkt. 163 at 35-36). Hwang is wrong on both scores.

As to relevance, Hwang claims that "there is no relationship between" Archegos's orders and the available shares outstanding for an issuer. In this respect, Hwang's argument retraces his motion *in limine* on the subject, repeats the same errors, and should be rejected for the same reasons. *See supra* § I.B. But Hwang's argument is especially unsuitable as a basis to preclude Dr. Taveras's charts because Dr. Taveras's charts do not depend on any causal relationship between Archegos's position sizes and an issuer's shares outstanding. Dr. Taveras's charts present an accurate relationship between two figures as an illustration of the scale of Archegos's positions

and do so using a common unit in investing: the share. Further, even if some relationship needed to exist, it did: In Archegos's recording keeping, position unwind computations, and contractual agreements, and in Hwang's own comments, Archegos evaluated its swap exposure as though it were the equivalent of shares. (*See* GX 2963 (Hwang message from July 2020 noting "I am one of the top shareholders of TME"); GX 467 (Combo Sheet from July 2020 reflecting that Archegos held more than 62 million "shares" of TME and that 22% of its portfolio was comprised of TME)). Indeed, Archegos was obligated to report to at least two of its counterparties when aggregate exposures of swaps (measured in shares) and cash shares exceeded certain thresholds. Thus, Dr. Taveras's charts merely present Archegos's position exposure in the same way that the evidence will demonstrate that members of Archegos did and agreed to do.

Dr. Taveras's charts are not rendered misleading by Hwang's factual claim that the counterparties did not maintain proportional hedges over the lifetime of a swap. Dr. Taveras will not testify at all about the counterparties' holdings, Dr. Taveras's charts do no imply that the banks did or did not hold any number of shares, and the Government will not argue that the charts prove that the banks held any particular number of shares. (To be clear: The Government will prove that point through other evidence, not least the records that show that the counterparties held hundreds of millions of shares worth billions of dollars when they needed to unwind Archegos's positions, all of which they linked back to Archegos. (*See* GX 1148, 1149 (Credit Suisse holdings at time of collapse); GX 2178A (UBS holdings at time of collapse)).)

Dr. Taveras's charts are admissible. They present accurate information. They helpfully illustrate the scale of Archegos's economic exposure to certain issuers, and they do so through a comparison that Archegos itself found meaningful during the course of the scheme. If Hwang

believes these charts do not present a fair comparison, the remedy is to permit cross-examination, not to preclude the charts.

Finally, the defense seeks to preclude Dr. Taveras from testifying regarding "some of the reasons why companies may choose to have a seasoned equity offering, including a belief that their share price is overvalued." (Dkt. 163 at 37). Hwang argues that this testimony is improper because the Government previously disclosed a statement from a Viacom employee that purports to reflect a different reason for its seasoned equity offering. But that a single Viacom employee may have had a different view on why Viacom chose to do its seasoned equity offering in no way limits the Government's ability to present expert testimony on seasoned equity offerings more broadly. That Hwang can point to only a single unpublished decision that is more than two decades old and arises on entirely different facts in support of his motion proves this point. *See Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136 (RCC), 2001 WL 1602976, at *5 (S.D.N.Y. Dec. 14, 2001). In any event, if Hwang's test were the rule—which it is not—the Government would prevail as the Government intends to present testimony at trial from Archegos analyst Brendan Sullivan, who believed that Viacom's share price was overvalued, as reflected in contemporaneous text messages he sent and received. (*See* GX 2991 (text message chain including statements that "Viacom clearly misread the market demand because of us," "Viacom thought they were in a stronger position than they were," and "All my friends are short viac")).

### 3. Professor Amit Seru

Hwang makes failing arguments in an effort to preclude Professor Seru's proposed testimony about "signals," "strategy," and "deceptive market practices." (Dkt. 163 at 23-30).

Hwang makes three arguments to preclude Professor Seru's testimony about "signals." First, Hwang argues that such testimony invades the province of the jury to determine whether Hwang intended to send a false pricing signal to the market. (Dkt. 163 at 24). But testimony about

what Archegos's trading *did* does not equate to testimony about what Hwang *intended* Archegos's trading to do. Professor Seru will testify that "the nature of Archegos's orders conveyed misleading information to the stock market through its market activities." (Dkt. 167-4 ¶ 8). Specifically, Professor Seru will testify, among other things, that, "because Archegos transacted through multiple counterparties, Archegos's orders conveyed the appearance of broad demand for the Archegos Top Long Positions from multiple different participants instead of acute demand from a single investor." (Dkt. 167-4 ¶ 8(C)). Professor Seru will further testify that "Archegos's orders were of sufficient price, size, volume, and frequency that they could influence the behavior of other participants in the market." (Dkt. 167-4 ¶ 9). Such testimony addresses what effects Archegos's trading *had*; that testimony does not address what effects Hwang *intended* Archegos's trading to have.

Second, Hwang argues that Professor Seru is not qualified to testify about the signals that Archegos's trading sent to the market. (Dkt. 163 at 25). That argument is difficult to square with Professor Seru's credentials. He is a chaired professor of finance at Stanford Business School, with expertise in, among other areas, trading and securities markets. (Dkt. 167-3 at 1). He has authored several book chapters and published numerous articles in peer-reviewed academic journals, as well as serving as a co-editor or an editor of the *Journal of Finance*, the *Review of Corporate Financial Studies*, the *Journal of Management Science*, the *Journal of Political Economy*, and the *Journal of Financial Intermediation*. (Dkt. 167-3 at 1).

Third, Hwang argues that Professor Seru's testimony about signals is unduly prejudicial because trading on swap is, standing alone, legal, and trading through multiple counterparties is, standing alone, legal. (Dkt. 163 at 25-26). Unsurprisingly, Hwang offers no authority for the remarkable position that experts may testify only about conduct that, standing alone, constitutes a

crime. On that logic, courts would preclude expert testimony about cellphone location evidence because using a cellphone is, standing alone, legal. That is not the law.

Hwang makes four arguments to preclude Professor Seru's testimony about "strategy." First, Hwang argues that such testimony involves speculation into Hwang's state of mind. (Dkt. 163 at 26-27). Not so. Professor Seru will testify that "investing in equities markets, like in all financial markets generally, follows the simple logic of 'buy low, sell high' where investors seek to gain by acquiring an asset at as low of a price as possible, and then to sell that asset at as high of a price as possible, with the intent of earning a profit." (Dkt. 167-4 ¶ 10(A)). Professor Seru will further testify that "the economically sensible strategy when buying or selling equities is to seek to minimize the price impact of that trading on the market." (Dkt. 167-4 ¶ 10(B)). Finally, Professor Seru will testify about instances where Archegos "made uneconomic trades during 2020 and 2021." (Dkt. 167-4 ¶ 10(C)). None of that testimony concerns Hwang's state of mind.

Second, Hwang argues that Professor Seru is not qualified to testify about strategy because of "his lack of portfolio management experience." (Dkt. 163 at 27). In support of that argument, Hwang relies exclusively on *United States v. Tin Yat Chin*, where the Second Circuit blessed the district court's determination that a language expert "was not qualified to determine whether a particular individual could deliberately fake a Mandarin accent." 371 F.3d 31, 37 (2d Cir. 2004). There, the bases for the proposed opinion were "a fifteen-second portion of a twenty-five minute conversation, in conjunction with general assumptions about a native Cantonese speaker's exposure to Mandarin in the 1950s and 1960s." *Id.* at 40. That case hardly supports the argument that a chaired professor of finance at a top business school, with expertise in trading and securities markets, is not qualified to testify about trading strategy, simply because he has not personally worked as a portfolio manager.

Third, Hwang argues that Professor Seru offers no methodology for deeming trades "uneconomic." (Dkt. 163 at 27-28). But, as noted above, Professor Seru will define "the economically sensible strategy when buying or selling equities [as being] to seek to minimize the price impact of that trading on the market." (Dkt. 167-4 ¶ 10(B)). Logically, then, conduct that does not seek to minimize the price impact of one's trading on the market is not economically sensible. And Professor Seru will testify about such conduct. (*See, e.g.*, Dkt. 167-4 ¶ 10(C)).

Fourth, Hwang argues that Professor Seru's testimony will be unfairly prejudicial because, according to Hwang, an investor may have goals other than minimizing price impact. (Dkt. 163 at 28). But the defense will have the opportunity to cross-examine Professor Seru on that point, which goes to the weight of Professor Seru's proposed testimony, and not its admissibility.

Finally, in an effort to preclude Professor Seru's testimony about deceptive market practices, Hwang argues that the proposed testimony will invade the province of the Court to instruct the jury on the law. (Dkt. 163 at 28-30). Professor Seru will testify that "certain trading strategies and market behaviors can be deceptive even when they involve open market transactions." (Dkt. 167-4 ¶ 5). It is difficult to see how that testimony—which nowhere uses the phrase "market manipulation"—amounts to improperly supplying the jury with a "definition of market manipulation." (*Contra* Dkt. 163 at 29).

### 4. Doctor Joseph Mason

Hwang's specific objections to Dr. Mason's proposed expert testimony should be denied. Hwang argues that it would be improper for Dr. Mason to testify that Hwang's trading was consistent or inconsistent with various industry practices, describing this testimony as a "thinly veiled attempt to testify to Mr. Hwang's intent." (Dkt. 163 at 37-39). But as set forth above, *see supra* § IV.B.3, Dr. Mason's testimony comports with language that the Second Circuit approved in *Grady* and leaves the question of Hwang's intent squarely for the jury. Hwang also argues that

Dr. Mason "has no expertise in *why* Mr. Hwang and Archegos traded in the ways that they did." (Dkt. 163 at 38). But because Dr. Mason does not intend to offer testimony on Hwang's intent, this argument is a non-starter.

Hwang's citations to *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008), and *DiDomenico*, 985 F.2d at 1162, are misplaced. (Dkt. 163 at 38-39). In *Highland Cap. Mgmt.*, the expert testimony at issue was that the defendant "*believed* that the value of [two promissory notes] was a deeply discounted price." 551 F. Supp. 2d at 182 (emphasis added). And in *DiDomenico*, the expert testimony at issue was that the defendant's "capacity to recognize [a fact] would have been seriously impaired as the direct result of [her] mental disorder." 985 F.2d at 1162 (alterations omitted). Thus, the experts in both *Highland* and *DiDomenico* planned to testify on the question of intent. Dr. Mason intends to do nothing of the sort.

Finally, Hwang argues that it would be improper for Dr. Mason to identify "instances in which Hwang directs trades to counter negative news or perceived market weakness in the stock." (Dkt. 163 at 39 (alterations and emphasis omitted)). But Hwang misconstrues the nature of Dr. Mason's testimony. Dr. Mason does not intend to testify that Hwang directed a "certain trade" on any particular day for any particular reason. Instead, and as disclosed, Dr. Mason will only identify those instances in which Hwang directed trades *when* there was "negative news or perceived market weakness." The task of deciding *why* Hwang directed those trades remains for the jury.

**CONCLUSION**

For the foregoing reasons, the defendants' motions *in limine* and *Daubert* motions should

be denied.

Dated:  New York, New York
        April 4, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                                   By:  s/
                                        _____
                                        Matthew Podolsky
                                        Alexandra Rothman
                                        Samuel P. Rothschild
                                        Andrew Thomas
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-1947/-2580/-2504/-2106