UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                :

UNITED STATES OF AMERICA

                                :

      - v. -                          No. 22 Cr. 240 (AKH)

                                :

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,             :

           Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## THE GOVERNMENT'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

   I.    The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial ....................................................................... 2

       A.    The Court Should Exclude Evidence and Argument that Fraud Should Be Excused on the Basis of Victim Sophistication or Purported Culpability ................................................. 2

       B.    The Court Should Exclude Evidence and Argument that the Counterparties Were Negligent or Failed to Conduct Adequate Due Diligence ..................................................... 3

       C.    ███████████████████████████████████████████████ ................................................. 5

       D.    The Court Should Not Permit the Defendants to Blame the Victims' Losses on the SEC or Argue SEC Regulation Provides a Defense to Manipulation or Fraud ............................ 6

       E.    The Court Should Exclude Evidence and Argument about the Purportedly "Novel," "Unprecedented," or "Aggressive" Nature of the Government's Case ................................. 8

       F.    The Defense Should Not Be Permitted to Offer Good Acts Evidence For Propensity Purposes ............................................................................................................................... 8

       G.    The Court Should Exclude Evidence and Argument About the Defendants' Personal Circumstances, Including Religious Devotion and Potential Punishment ............................ 9

       H.    The Court Should Exclude Evidence and Argument About the Presence of Attorneys, Absent Further Disclosures from the Defendants ............................................................... 11

   II.    Statements of the Defendants' Coconspirators and Agents Are Not Barred by the Rule Against Hearsay ....................................................................................................................... 13

   III.    The Court Should Preclude the Defendants From Using Their Experts to Introduce Inadmissible Evidence ............................................................................................................. 16

   IV.    The Court Should Admit Hwang's Proffer Statements If and When He Takes a Contrary Position ..................................................................................................................................... 19

CONCLUSION .................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Bruton v. United States*,
  391 U.S. 123 (1968)......................................................................................................... 20

*Crawford v. Washington*,
  541 U.S. 36 (2004)........................................................................................................... 20

*Gray v. Maryland*,
  523 U.S. 185 (1998)......................................................................................................... 20

*Hill v. Spiegel, Inc.*,
  708 F.2d 233 (6th Cir. 1983) .......................................................................................... 14

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992)............................................................................................ 18

*In re Rezulin Prods. Liability Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004).............................................................................. 17

*Kewazinga Corp. v. Microsoft Corp.*,
  No. 18 Civ. 4500 (GHW), 2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021)............................ 17

*Red Rock Commodities, Ltd. v. Standard Chartered Bank*,
  140 F.3d 420 (2d Cir. 1998)............................................................................................ 18

*Richardson v. Marsh*,
  481 U.S. 200 (1987)......................................................................................................... 20

*Rosario v. Att'y Gen. of State of New York*,
  No. 00 Civ. 6681 (LAK), 2001 WL 521828 (S.D.N.Y. May 15, 2001)................................. 5

*Rowell v. BellSouth Corp.*,
  433 F.3d 794 (11th Cir. 2005) ........................................................................................ 14

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013).............................................................................. 11

*SEC v. Treadway*,
  438 F. Supp. 2d 218 (S.D.N.Y. 2006)............................................................................ 5, 6

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)................................................................................................ 7

*Smith v. New York & Presbyterian Hosp.*,
  440 F. Supp. 3d 303 (S.D.N.Y. 2020)......................................................................... 14, 15

*Tennessee v. Street*,
  471 U.S. 409 (1985)......................................................................................................... 20

*United States v. Adelekan*,
  567 F. Supp. 3d 459 (S.D.N.Y. 2021)............................................................................. 10

*United States v. Bankman-Fried*,
  No. 22 Cr. 673 (LAK), 2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023)............................ 4, 7

*United States v. Bankman-Fried*,
  No. 22 Cr. 673 (LAK), 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023) ............................ 11, 12

*United States v. Bankman-Fried*,
  No. 22 Cr. 673 (LAK), 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024) ..................................... 12

*United States v. Benchick*,
  No. 13 Cr. 20453 (RHC), 2014 WL 4181970 (E.D. Mich. Aug. 21, 2014) ............................ 4

*United States v.Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991)....................................................................... 17
*United States v. Blackwell,*
   853 F.2d 86 (2d Cir. 1998) ......................................................................... 10
*United States v. Dawkins,*
   999 F.3d 767 (2d Cir. 2021)........................................................................ 8, 9
*United States v. DeJesus,*
   160 F. App'x 15 (2d Cir. 2005) .................................................................. 11
*United States v. Inniss,*
   No. 18 Cr. 134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ................ 10
*United States v. Jass,*
   569 F.3d 47 (2d Cir. 2009)........................................................................ 21, 22
*United States v. June,*
   No. 10 Cr. 30021 (MAP), 2012 WL 245243 (D. Mass. Jan. 25, 2012).................... 4
*United States v. Kurland,*
   20 Cr. 306 (NGG) (E.D.N.Y. July 11, 2022) ................................................ 5
*United States v. Logan,*
   419 F.3d 172 (2d Cir. 2005)........................................................................ 20, 22
*United States v. Lyle,*
   919 F.3d 716 (2d Cir. 2019)........................................................................ 21
*United States v. Rodriguez,*
   648 F. App'x 9 (2d Cir. Apr. 27, 2016) ...................................................... 5
*United States v. Rubio,*
   709 F.2d 146 (2d Cir. 1983)........................................................................ 22
*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1988)........................................................................ 15
*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006)........................................................................ 20
*United States v. Thomas,*
   377 F.3d 232 (2d Cir. 2004)........................................................................ 4
*United States v. Van Hise,*
   No. 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013) .................. 22
*United States v. Washington,*
   No. 21 Cr. 603 (VEC), 2023 WL 6219203 (S.D.N.Y. Sept. 22, 2023) ................ 10
*United States v. Wilkinson,*
   754 F.2d 1427 (2d Cir. 1985)...................................................................... 22
*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003)......................................................................... 21

## Rules

Fed. R. Evid. 104 ........................................................................................ 12
Fed. R. Evid. 401(a) .................................................................................... 10
Fed. R. Evid. 702 ........................................................................................ 19

## PRELIMINARY STATEMENT

The defendants Sung Kook ("Bill") Hwang and Patrick Halligan oppose the *in limine* motions filed by the Government. (*See* Dkt. 171 (Hwang's Opposition Brief); Dkt. 172 (Halligan's Opposition Brief)). In so doing, the defendants confirm they wish to introduce improper evidence at trial and to advance arguments calculated to secure a verdict based on extralegal considerations. To this end, the defendants aim to blame the banks for believing what the defendants and their conspirators told them; to conflate adherence to stock ownership disclosure requirements with a legal defense to a charge of intentional market manipulation; to present expert witnesses to offer legal conclusions and testimony on Hwang's intent; and to impress the jury with the defendants' good conduct, charity, and even religious piety. None of that evidence is admissible, much of it is unfairly prejudicial, and the Court should preclude all of it.

The defendants also attempt to dodge many of the Government's motions by answering them only in vague generalities or by feigning confusion about the subject the Government seeks to address. The defendants' strategy leaves obscured whether and why the defendants will seek to offer the very evidence the Government has moved to preclude. At times, the defendants offer to make an evidentiary proffer during trial, when it would be most convenient for the defense. But neither the Court nor the jury nor the Government must accept a wait-and-see approach on a range of predictable evidentiary disputes, such as whether the defendants seek to rely on the "presence" of counsel as a defense to the charges, which "good acts" the defendants wish to present and for what non-propensity reason, and if the defense intends to argue to the jury—as it has to the Court—that this case is "unprecedented" or "novel." Accordingly, the Court should require the defendants to make their evidentiary proffers now—if they can—so the Court can sort out these important evidentiary issues before the trial begins.

1

**ARGUMENT**

**I.     The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial**

**A.     The Court Should Exclude Evidence and Argument that Fraud Should Be Excused on the Basis of Victim Sophistication or Purported Culpability**

The defendants' opposition memoranda offer no valid reason to permit the defendants to present evidence and argument of the sophistication or purported culpability of their victims as an excuse for fraud. Hwang argues that his proposed expert Fabio Savoldelli "must . . . be permitted to testify regarding . . . frontrunning [at investment banks] in order to prove to the jury that Archegos's concerns [about dealing with a small number of counterparties] were legitimate, and combat the prosecution's argument that the use of multiple counterparties is evidence of fraudulent intent." (Dkt. 171 at 6). If Hwang wishes to explain how his concern about frontrunning at investment banks contributed to his decision-making, he may take the stand and do so. But Hwang proposes to have Mr. Savoldelli recount for the jury what Mr. Savoldelli has read in the newspaper and to testify about specific "front running allegations and settlements involving prominent Wall Street banks and other financial institutions," including "[r]ecent examples in the press," such as "Morgan Stanley in 2024." (Dkt. 164-3 ¶ 9). Because nothing reported in the press in 2024 could have informed Hwang's or Halligan's conduct in 2020 or 2021, and because Morgan Stanley was a counterparty of Archegos, Hwang's opposition confirms that Hwang's "evidence" will be nothing more than a thinly disguised effort to portray Archegos's counterparties as unsympathetic and thereby to impermissibly encourage a verdict based on the sympathy or prejudice.

Halligan, for his part, points out that "it would make no sense for Mr. Halligan to argue that the counterparties made misrepresentations to themselves" (Dkt. 172 at 4 n.1), and thus misapprehends the typical form of an impermissible "everyone is doing it" defense. The Government moved to preclude "everyone is doing it" type evidence not because the Government

thought that the defendants might argue that Archegos's counterparties made misrepresentations to themselves, but rather because Halligan's heavy reliance on rhetoric like "sharp elbows," "rough-and-tumble game," and "[n]o one is anyone's fiduciary" (June 1, 2022 Tr. 12-13), suggests that Halligan intends to pursue a strategy—impermissible under Rules 401, 402, and 403 of the Federal Rules of Evidence—of drawing the jury's attention to facts suggesting that individuals associated with Archegos's counterparties might have engaged in entirely unrelated, undesirable conduct.

Halligan betrays another misunderstanding when he argues that, because "any individual banker's subjective reliance on alleged misrepresentations is not an element of any charged offense" (Dkt. 172 at 6 n.2), the Government ought not be permitted "to elicit evidence from the bank witnesses suggesting that alleged misrepresentations did 'really matter' to them" (Dkt. 172 at 6). Halligan overlooks that such evidence could go, not to subjective reliance, but also to objective materiality.

The Court should exclude evidence and argument that fraud should be excused on the basis of victim sophistication or purported culpability.

### B.   The Court Should Exclude Evidence and Argument that the Counterparties Were Negligent or Failed to Conduct Adequate Due Diligence

Opposing a motion that the Government did not make, Hwang argues that the Government seeks to prevent him "from cross-examining the Counterparty witnesses on any matters related to materiality." (Dkt. 171 at 4). The Government does not, and could not, seek to prevent the defendants from cross-examining witnesses on matters within the scope of their direct testimony that are relevant to elements of the charged offenses, such as materiality. Instead, the Government seeks to preclude the defendants from pursuing an impermissible "blame the victim" defense. *See, e.g.*, *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004); *United States v. June*, No. 10 Cr.

30021 (MAP), 2012 WL 245243, at *2 (D. Mass. Jan. 25, 2012); *see also United States v. Benchick*, No. 13 Cr. 20453 (RHC), 2014 WL 4181970, at *3 (E.D. Mich. Aug. 21, 2014). On this subject, the defendants offer no legitimate reason why they may do so.

Nor does the Government seek to preclude Hwang from cross-examining witnesses about their purported biases against Hwang, if Hwang has a good faith basis for so inquiring. (*Contra* Dkt. 171 at 6-7). What the Government seeks to preclude is evidence "about internal investigations undertaken by the[] [counterparties] following Archegos's collapse." (Dkt. 164 at 18). Evidence about an internal investigation into the job performance of employees at a counterparty is impermissible under Rule 403 because it risks suggesting to the jury that whether a victim could have avoided loss or detected fraud has any bearing on the guilt or innocence of the defendants, when it does not. *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023).

Halligan, for his part, again seems to miss the distinction between the permissible and the prejudicial. Noting that he ought to able to elicit evidence regarding the element of materiality (permissible), Halligan argues that such evidence "includes not only the diligence practices that the banks actually employed, but [also] the diligence practices that they *should have* employed" (prejudicial). (Dkt. 172 at 8-9 (emphasis in original)). Halligan's own authority shows this to be flawed logic: In his effort to stake out a seemingly limitless view on the arguments he can make under the guise of addressing materiality, he cites *United States v. Kurland*, but in that case the court *granted* the "Government's motion to preclude testimony about the gullibility or negligence of the alleged victims," simply noting that the defendant was nonetheless "permitted to elicit testimony about materiality where it bears on elements of the fraud crimes with which he is charged." No. 20 Cr. 306 (NGG), 2022 WL 2669897, at *12 (E.D.N.Y. July 11, 2022).

The Court should exclude evidence and argument that the counterparties were negligent or failed to conduct adequate due diligence.

**C.**





**D.** **The Court Should Not Permit the Defendants to Blame the Victims' Losses on the SEC or Argue SEC Regulation Provides a Defense to Manipulation or Fraud**

The Government moved *in limine* to preclude the defendants from blaming the SEC's regulatory choices for the damage caused by Archegos's fraud, including by reference to rules proposed after Archegos's collapse to prevent the same fraud from recurring. (*See* Dkt. 164 at 23-24). Hwang states he will not make such arguments. (Dkt. 171 at 8 ("Of course, Mr. Hwang will make no such argument and has no intention of blaming the SEC.")). Halligan opposes the motion for lack of "particularity" and for intruding on his general right to present a defense (Dkt. 172 at 15-16), but he provides no authority that would allow him to blame the SEC's regulatory choices.

Accordingly, the Government's motion should be granted. *See Bankman-Fried*, 2023 WL 6283509, at *5 (precluding defense arguments that attempted to shift blame onto regulators and argue for acquittal based on purported lack of regulation).

The defendants also respond to the Government's motion by misreading it to be a motion to preclude the defense from informing the jury about, for example, regulatory reporting requirements for swap owners and for hedge funds that operate within the Family Office Rule.[2] But this is not the Government's motion. Indeed, the Government also seeks to educate the jury about the defendants' understanding of Archegos's reporting requirements—or, more specifically, the lack of such requirements—as part of explaining why the fraud took the form it did. But it would be contrary to law for the defendants to argue, as they appear eager to do, that intentionally fraudulent conduct can be excused because it comprised otherwise lawful acts. (Dkt. 172 at 15 ("[*I*]*t was not unlawful* to trade swaps in large volume and build highly concentrated positions and use leverage to do so." (emphasis original)); Dkt. 171 at 8 ("[T]he use of swaps is perfectly lawful.")). After all, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021). Neither transacting in swaps (as opposed to equities) nor acting within the Family Office Rule (as opposed to within the Investment Adviser Act) exempts a hedge fund from the antifraud provisions of the United States securities laws or provides a legal defense to intentionally manipulative conduct. In any event, whether the defendants formed manipulative intent is the central issue for the jury, and, as discussed below

---

[2] The Family Office Rule, 17 C.F.R. § 275.202(a)(11)(G)-1, defines "investment advisor" to exclude a "family office" for purposes of the Investment Advisors Act of 1940.

with respect to expert witnesses, the defendants cannot call witnesses to opine that Hwang and Halligan acted lawfully.

### E.    The Court Should Exclude Evidence and Argument about the Purportedly "Novel," "Unprecedented," or "Aggressive" Nature of the Government's Case

The Government has moved to preclude the defendants from putting before the jury evidence or argument that the Government's evidence is "novel," "unprecedented," "aggressive" or the like. (Dkt. 164 at 24-26). The defendants advance no argument that the Government's position is incorrect, but instead represent, opaquely, that the defendants have no intention to "argue for jury nullification" and ask the Court to deny the Government's motion as moot. (Dkt. 171 at 10; *see also* Dkt. 172 at 17-18). But the defendants make no representation that they will refrain from doing the very thing that the Government seeks to preclude; to the contrary, Hwang continues to decry the Government's prosecution as "unprecedented"—which is neither correct nor a defense—in his motions *in limine*. (Dkt. 156 at 1; Dkt. 158 at 1). The Government's motion is therefore not at all moot, *see Black's Law Dictionary* 1029 (8th Ed. 1999) (defining "moot" as, *inter alia*, meaning "[h]aving no practical significance"), and, particularly given that the defendants have implicitly conceded the merit of the Government's position, should be granted.

### F.    The Defense Should Not Be Permitted to Offer Good Acts Evidence For Propensity Purposes

The Government moved to preclude the defendants from offering improper "good acts" evidence and arguing, in essence, that because the defendants did not commit crimes on other occasions, they did not commit the crimes charged here. (Dkt. 164 at 26-28). In doing so, the Government's motion accords with settled law that forbids any party from urging propensity inferences. *See, e.g.*, *United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021).

The defendants, however, demand a free hand to point to instances where they did not manipulate securities prices or did not lie to banks or undertook some act of charity. (Dkt. 171 at

13; Dkt. 172 at 19-21). According to the defendants, they may adduce these specific good acts because they "respond" to the Government's racketeering allegations. (Dkt. 171 at 13-14; Dkt. 172 at 19-21). But Hwang's explanation reveals that he seeks to do precisely what the law forbids. For example, Hwang asserts, "Evidence that Mr. Hwang openly engaged in these trading practices for years, including in stock like Apple and Amazon that are incapable of manipulation, is highly probative of Mr. Hwang's legitimate investment purpose and good faith."[3] Because the Government has not alleged that Hwang attempted to manipulate Apple or Amazon stock, however, Hwang's claim that his conduct in trading in those stocks bears on his "legitimate investment purpose" in other securities depends upon a propensity inference the Second Circuit says he may not draw. *Dawkins*, 999 F.3d at 792. No more appropriate are Halligan's demands to answer specific proof that Hwang has paid Halligan to remain loyal to him with evidence of "the full extent of [Halligan's] lawful conduct" (Dkt. 172 at 21), or to show the Government "cherry-picked its evidence" of fraud by presenting the "prevalence of lawful conduct" (Dkt. 172 at 20). Like Hwang, Halligan's purported counterproof is merely an invitation to reason that Halligan acted in the circumstances of this case as he did on some other prior occasion.

### G. The Court Should Exclude Evidence and Argument About the Defendants' Personal Circumstances, Including Religious Devotion and Potential Punishment

The defendants oppose the Government's motion to preclude evidence and argument on their personal circumstances.[4] Hwang argues that courts "routine[ly] . . . admit[] biographical background evidence" at trial. (Dkt. 171 at 15). This argument misses the mark. While

---

[3]     It is unclear what the defense means when it asserts that Hwang "openly engaged in these trading practices for years," since the trial will demonstrate that Hwang did not "openly" discuss or advertise his trading on Wall Street. To the extent Hwang means to imply that lawyers reviewed and blessed his trading practices, the Court should require him to say so. *See infra* Point I.H.

[4]     The defendants have agreed not to introduce evidence about potential punishment.

"background information" may be admissible in specific situations, including to "demonstrate pertinent character traits" or "if a defendant chooses to testify," evidence of a defendant's personal characteristics is generally "irrelevant to any issue of consequence and therefore inadmissible." *See United States v. Washington*, No. 21 Cr. 603 (VEC), 2023 WL 6219203, at *10 (S.D.N.Y. Sept. 22, 2023) (collecting cases). The cases cited by Hwang prove as much. *See United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1998) (defendant "took the witness stand and testified" about personal background); *United States v. Inniss*, No. 18 Cr. 134 (KAM), 2019 WL 6999912, at *8 (E.D.N.Y. Dec. 20, 2019) (defendant sought to introduce personal circumstances if he "decide[s] to exercise his Sixth Amendment right to testify at his upcoming trial"); *United States v. Adelekan*, 567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021) ("As to the fact of Adelekan's profession, this evidence is admissible in the event that Adelekan takes the stand.").

Moreover, although it remains unclear which specific personal circumstances the defendants might seek to introduce at trial, evidence of Hwang's "religious devotion" should be precluded under Rules 401, 402, and 403. That Hwang may be religiously devout does not make it any "more or less probable" that he committed the crimes charged in this case. *See* Fed. R. Evid. 401(a). And even if this evidence had any marginal probative value, it would be substantially outweighed by the risk of unfair prejudice to the Government and real concern that a jury might reach a verdict based on sympathy to Hwang's religious views. *See United States v. DeJesus*, 160 F. App'x 15, 17-18 (2d Cir. 2005) (excluding evidence of witnesses' religious beliefs under Rule 403).

The Court should exclude evidence and argument about the defendants' personal circumstances.

**H.      The Court Should Exclude Evidence and Argument About the Presence of Attorneys, Absent Further Disclosures from the Defendants**

The Court should preclude the defendants from referring in their opening statements to the presence or involvement of attorneys and from offering any evidence, argument, or testimony on those subjects absent sufficient prior notice to the Court and the Government to permit the Court to rule on the admissibility or propriety of any such evidence or argument. Such a procedure is necessary because "the risk of confusion and unfair prejudice to the [G]overnment were defendant[s] to focus on the presence or involvement of lawyers . . . —without any degree of specificity about what they were present for or involved in, what their tasks were, what exactly they knew, and what the defendant knew about what the lawyers knew and were doing—is palpable." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6392718, at *3 (S.D.N.Y. Oct. 1, 2023).

Hwang responds, though without factual detail, that he "will 'make a specific proffer of evidence and argument as it becomes relevant at trial.'" (Dkt. 171 at 16 (quoting *SEC v. Tourre*, 950 F. Supp. 2d 666, 685 (S.D.N.Y. 2013))). Halligan also resists making any disclosures, claiming that "there is no authority for the government's demand that the admission of evidence related to the presence of counsel be conditioned on Mr. Halligan providing supplemental pretrial disclosures describing the evidence and argument he may introduce" (Dkt. 172 at 24), and "it is not the law" (Dkt. 172 at 23).

In fact, Judge Kaplan recently had occasion to address exactly this request in *United States v. Bankman-Fried*. There, due to the potential "risk of confusion and unfair prejudice to the [G]overnment," he precluded the defendant from "referring in his opening statement to the presence or involvement of attorneys and from offering any evidence, argument, or testimony on those subjects absent prior notice to the Court and the [G]overnment outside of the presence of the

jury." 2023 WL 6392718, at *3. The defendant ultimately provided both pretrial notice of his plans and additional notice when he intended to cross-examine witnesses on these topics. Indeed, as a result of the possibility that "evidence of the presence of attorneys" could "pose a substantial risk of misleading the jury," Judge Kaplan took an offer of proof directly from the defendant, subject to cross-examination, outside the presence of the jury, prior to the defendant's own testimony, to determine whether the defendant's intended testimony on the subject of the presence of lawyers would satisfy the requirements of admissibility under Federal Rule of Evidence 401 and not be inadmissible under Rule 403. *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *1-3 (S.D.N.Y. Feb. 7, 2024). Of course, this Court, much as in *Bankman-Fried*, is well within its discretion to require notice and a preliminary inquiry on the admissibility of evidence in this case. *See* Fed. R. Evid. 104.[5]

Consistent with this precedent, in order to prevent unfair prejudice, and to provide for the efficient presentation of evidence at trial, the Court should preclude the defendants from referring in their opening statements to the presence or involvement of attorneys and from offering any evidence, argument, or testimony on those subjects absent sufficient prior notice to the Court and the Government to permit the Court to rule on the admissibility or propriety of any such evidence or argument.

---

[5]     Both defendants also claim that the Government's request for notice of a presence-of-counsel defense is "striking" (Dkt. 171 at 16) or "peculiar" (Dkt. 172 at 24 n.11), because the Government has placed someone who is an attorney on its witness list. The one thing has nothing do with the other: the Government may well have admissible evidence to elicit from a witness who is an attorney and also be entitled to notice of a defendant's intention to place evidence and argument before the jury regarding the presence of counsel.

## II.    Statements of the Defendants' Coconspirators and Agents Are Not Barred by the Rule Against Hearsay

Hwang opposes the Government's motion to admit coconspirator statements on the ground that the Government cannot prove by a preponderance of the evidence that a conspiracy existed and that it included Hwang. (Dkt. 171 at 17). That argument proceeds from a flawed premise: Hwang contends that "[t]he prosecution alleges two conspiracies" and lacks any evidence that Hwang participated in one of the two (Dkt. 171 at 17). But the S1 Superseding Indictment alleges that both defendants participated in an overarching conspiracy count—namely, the racketeering conspiracy charged in Count One—and the record confirms that the allegation can easily be sustained by more than preponderance of the evidence. Indeed, there appears to be almost no dispute that Hwang directed Archegos's trading, Hwang's trades moved market prices, and, until March 2021, the prices of the securities subject to Hwang's trading moved in his favor. As to Hwang's intent, Hwang at once acknowledges that the Court may consider coconspirators' sworn plea allocutions, yet also argues that the allocutions of the cooperating witnesses "wholly fail to show that Mr. Hwang had knowledge of or played a role in the" conspiracy. (Dkt. 171 at 19). That argument overlooks, among other things, this statement from William Tomita's plea allocution:

> Acting at the direction of the head of the fund [*i.e.*, Hwang], I traded to increase the prices of names in which Archegos held long positions and reduced the prices of securities in which the fund hel[d] short positions. . . . I agreed with Bill [Hwang] and others to carry out the business of Archegos through a pattern of manipulating the prices of securities and deceiving counterparties. I did so knowing that I, Bill, or others committed at least two manipulative or deceptive acts in the course of conducting Archegos's affairs.

(April 22, 2022 Tr. 39-41). Given Tomita's plea allocution, the Government has satisfied its burden of establishing by a preponderance of the evidence Hwang's participation in the charged criminal conspiracy.

Hwang next contends that the representative examples of the types of statements that the Government seeks to introduce under Rule 801(d)(2)(D) as statements made by Hwang's agents or employees do not concern a "matter within the scope of that relationship." (Dkt. 171 at 21). Hwang points out that Archegos analysts did not, as part of their employment, "execute trades, observe Mr. Hwang execute trades, or see or hear what Mr. Hwang communicated to traders in executing trades," and argues that, as a result, the analysts' "statements about Archegos's trading and its consequences" do not concern a matter within the scope of their employment. (Dkt. 171 at 21-22). The cases that Hwang cites to support his argument are so distinguishable from the instant case that they serve only to underscore why the Government's motion is meritorious: In *Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005), *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983), and *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303 (S.D.N.Y. 2020), plaintiffs who brought employment discrimination suits sought to rely on Rule 801(d)(2)(D) for statements made by others suggesting why the plaintiffs had been squeezed out (or otherwise had faced an adverse employment consequence). But, as the *Rowell* court explained: "[T]here [wa]s no evidence that [the declarant] was involved in the decisions of how to structure the reduction in force or how to design the performance evaluations used during the involuntary stage of the reduction." 433 F.3d at 801. As the *Hill* court explained: "[S]ince there was no evidence that [the declarants] had any involvement in the decision to discharge [the plaintiff], there was no basis for finding that the statements of these declarants concerned a matter within the scope of their agency." 708 F.2d at 237 (alterations and internal quotation marks omitted). And as the *Smith* court explained: The relevant out-of-court statements were made by a declarant who, "at the time of the alleged [statement]s, no longer worked for the [company]." 440 F. Supp. 3d at 339. Those cases are a far cry from this one, where the Government seeks to introduce statements made by Archegos

analysts, among others, about their market observations, which is a quintessential matter within the scope of an analyst's employment relationship.

Finally, citing *United States v. Scop*, 846 F.2d 135, 136 (2d Cir.), *on reh'g*, 856 F.2d 5 (2d Cir. 1988), Hwang opposes the introduction of any testimony that uses words like "manipulated," on the ground that such testimony usurps the jury's role at trial. (Dkt. 171 at 22-23). That opposition was likely occasioned by statements in the analyst chat discussed above along the lines of, "We manipulated the stock price." Such statements, which were made by lay witnesses and were contemporaneously recorded, are nothing like the offending statements in *Scop*, where an expert in securities trading practices was asked his opinion as to whether there was a scheme to defraud investors in a particular stock:

> He answered, "It is my opinion that the stock of European Auto Classics was manipulated and that certain individuals were active participants and material participants in the manipulation of that stock. And that these individuals engaged in a manipulative and fraudulent scheme in furtherance of that manipulation." Whitten consciously used the same formulation throughout his testimony. For example, when asked to name the "participants" in the scheme and the roles that they played, he corrected himself in mid-sentence to include the same elements in his answer: "I believe that the role at the inception, in terms of the participants and the manipulation— excuse me, the fraudulent manipulative practices that were engaged in...." He also repeatedly described the defendants as "active participants" and "material participants" in the manipulation of EAC stock.

846 F.2d at 138. In any event, a jury instruction could cure any unfair prejudice resulting from the introduction of documentary evidence that contains words like "manipulate."

As for Halligan, he argues that the messages cited in the Government's motion that involve him are communications that "on their face relate to everyday activities of a family office engaged in legitimate investment activity." (Dkt. 172 at 31). Halligan erroneously reads into Rule 801(d)(2)(E) a requirement that the coconspirator's statement appear nefarious on its face. Under

that requirement, the Court could not admit, in a money laundering case, one coconspirator's statement to the other saying, "I'm going to withdraw cash from the account," because withdrawing cash from an account is, standing alone, a legitimate activity. That is not the law, and for good reason. Statements that might seem innocuous in one context may take on criminal significance in another context. Here, Scott Becker will be able to testify about the context of the "references to (i) a desire for increased investment capacity (GX-123) and (ii) onboarding a potential new counterparty (GX-51)" (Dkt. 172 at 31) and to explain why increasing capacity and onboarding new counterparties was crucial to the ongoing operation of the conspiracy.

The Court should grant the Government's motion to admit statements of the defendants' coconspirators and agents.

### III.   The Court Should Preclude the Defendants From Using Their Experts to Introduce Inadmissible Evidence

The Government has moved to preclude the defendants' experts from testifying about Hwang's state of mind and from offering legal instruction to the jury. (Dkt. 164 at 40-52). Hwang concedes that experts ought not be permitted to offer such opinions (Dkt. 171 at 25 ("The defense and prosecution agree that expert testimony on Mr. Hwang's state of mind is improper."); *see also* Dkt. 171 at 27). Accordingly, the Court should grant the Government's motion, and the defendants' experts should be precluded from speaking to Hwang's intent or to the application of securities law to the fact of the case.

Though he concedes the legal principles behind the Government's motion, Hwang disputes they constrain his proposed expert testimony. As to state of mind, Hwang contends that the Government has simply misread the defendants' expert notices, seized on "one line in [a] 26-page expert disclosure," and "taken words from his disclosure out of context." (Dkt. 171 at 25-26). But each of the defendants' expert notices—and the Savoldelli notice in particular—appears drafted to

enable the defense to wink and nod at Hwang's state of mind. They promise, for example, to offer testimony about why investment managements use a particular investment strategy, why such a strategy is beneficial, and why, in their view, such strategies are commonplace, and to do so based on the specific facts and circumstances of this case. (*See, e.g.*, Dkt. 164-2 ¶ 15; Dkt. 164-3 ¶¶ 1-2, 4, 6, 9, 11, 15, 22; Dkt. 164-4 ¶¶ 4, 13, 18). Because this kind of testimony will be understood by the jury to be the defense expert speaking on behalf of the defendants, the Court should preclude it. *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004); *Kewazinga Corp. v. Microsoft Corp.*, No. 18 Civ. 4500 (GHW), 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021).

As to legal opinion testimony, Hwang first says he will not offer any. Hwang then, however, confirms his plan to have Mr. Savoldelli offer testimony about "industry standards in light of the relevant regulatory structure." (Dkt. 171 at 29). Because the anticipated testimony involves merely asserting that what Hwang did was "standard," it is nothing more than conclusory legal argument cloaked as expert testimony and should be precluded. Hwang confirms the infirmity of his approach by analogizing his evidence to that in *United States v. Bilzerian*, where the Second Circuit affirmed the admission of limited expert testimony on the filing requirements of Schedule 13D but excluded defense testimony that "related directly to the issue of whether [the defendant's] actual 13D disclosures complied with the legal requirements."[6] 926 F.2d 1285, 1295 (2d Cir. 1991). In attempting to elicit testimony about whether Hwang complied with "industry standards," Hwang here proposes to do precisely what the Second Circuit said a defendant could not. Indeed, were Mr. Savoldelli merely to testify about the existence of the SEC's Family Office

---

[6]     The testimony was also accompanied by a limiting instruction: "Professor Coffee is here to furnish you with background concerning the meaning of terms, the procedures which are followed and his opinion as to the reason for these procedures. He is not here to give his opinion as to what the law requires. That is a matter which must be presented to you by the court." *Bilzerian*, 926 F.2d at 1295.

Rule, akin to the testimony in *Bilzerian* about Form 13D, Mr. Savoldelli's testimony would be inconsequential: after all, there is no legal or factual dispute in this case about whether Hwang operated Archegos as a family office exempt from registration under the Investment Advisers Act of 1940. The relevant force of Mr. Savoldelli's "industry standards" testimony will derive from its implied legal conclusions, rendering it inadmissible. *See, e.g.*, *Red Rock Commodities, Ltd. v. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992). That general admissibility problem is compounded by the fact that the legal conclusions Mr. Savoldelli will offer are wrong. According to Hwang, "Mr. Savoldelli will testify that family offices make investment decisions in accordance with any reasoning, process, or data they wish . . . ." (Dkt. 164-3 ¶ 4). But a family office may not make investment decisions to manipulate markets or otherwise violate the antifraud provisions of the U.S. securities laws.

Finally, Hwang defends his proposal to offer entirely conjectural testimony from his proposed expert Michael Johannes about what could have happened, but did not, the week of March 21, 2021. As Hwang explains it now, his point is to illustrate "hindsight bias" inherent in the Government's allegations and to show that "[w]hen Archegos traded on March 23, it had no way of knowing that an SEC announcement the following day would cause Chinese ADR prices to plummet . . . ." (Dkt. 171 at 32). The defendant's explanation for the purpose of the expert testimony cannot be squared with Hwang's expert notice, which also posits the entirely fictitious scenario where *only* Chinese ADR prices declined and Viacom did not. (*See* Dkt. 164-2 ¶ 34 ("Similarly, he will testify, if only the at-issue Chinese ADR declines had happened that week, Archegos could have had billions of dollars of additional capital on March 25, 2021, all else equal.")). If the purpose of Professor Johannes's testimony were to explain what information was available to Hwang on March 23 or 24, as the defense now contends, then assuming away the

events of March 22 would not serve the point. The purpose of the testimony is to signal to the jury that Hwang's trading schemes nearly succeeded. In any event, the other part of the defense hypothetical, which assumes *only* Viacom's stock price declined, is less fantastical but equally unreliable. Hwang imagines that Professor Johannes will say that, "[h]ad the Chinese ADRs not declined on March 24, Archegos would have ended the week with billions in capital." (Dkt. 171 at 32). But Professor Johannes's opinion assumes that none of the other highly concentrated positions in Archegos's portfolio declined in the interim, which, in fact, is not what happened. He supplies no facts or data to support the reasonableness of his assumptions, nor does he describe any "method" or "principles" he used to select them, nor is it obvious how any of this speculation assists the jury. Taken together, given the dubious purpose, reliability, and nature of these counterfactual scenarios, the Court should preclude them in their entirety. *See* Fed. R. Evid. 702.

## IV.    The Court Should Admit Hwang's Proffer Statements If and When He Takes a Contrary Position

The Government intends to offer Hwang's proffer statements if and when he takes positions contrary to those taken at his proffers with the Government. Hwang does not contest this principle, but instead contests the example provided by the Government of a potential inconsistency between Hwang's claim during his proffer that "Hwang was not aware that his trading could be moving the market because the market 'is a complicated thing,'" and the potential or apparent position now being taken that everyone is aware that trading moves this market. (*See* Dkt. 171 at 33-34). Hwang does so by pointing to an entirely different evidentiary argument (one utterly lacking in merit for the reasons stated in the Government's opposition to Hwang's motions *in limine*), but, in any case, the dispute is of no moment: Hwang apparently concedes that, should he take a position inconsistent with the statements made during his proffer, the Government may offer those statements into evidence.

Halligan contends that if Hwang's proffer statements are admitted into evidence, Halligan would suffer "unfair prejudice and infringement on Sixth Amendment rights," and that severance would be required. (Dkt. 172 at 32). The law is to the contrary.

At a joint trial, post-arrest statements made by a co-defendant are inadmissible if they name the non-declarant defendant as a perpetrator because their admission violates the non-declarant defendant's Sixth Amendment right to confrontation. *Bruton v. United States*, 391 U.S. 123, 135-36 (1968). The Confrontation Clause, however, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 56 n.9 (2004) (citing *Tennessee v. Street,* 471 U.S. 409, 414 (1985)); *see also United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006) ("*Crawford* expressly confirmed that the categorical exclusion of out-of-court statements that were not subject to contemporaneous cross-examination does not extend to evidence offered for purposes other than to establish the truth of the matter asserted."). A non-testifying defendant's false statements to law enforcement may therefore be admitted in a multi-defendant conspiracy trial, because the Confrontation Clause is not implicated when testimonial statements are offered for something other than the truth asserted. *See, e.g.*, *United States v. Logan*, 419 F.3d 172, 177-78 (2d Cir. 2005) (rejecting challenge to testimony by officer as to co-defendants' false alibi statements on the grounds that those statements, not offered for their truth, did not implicate Confrontation Clause).

Even where statements are offered for their truth, consistent with the Supreme Court's decisions in *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998), the Second Circuit has held that such statements may be admitted if they are properly edited or redacted so as not to directly identify the non-declarant co-defendant, *United States v. Jass*, 569 F.3d 47, 58-61 (2d Cir. 2009).

In order to determine whether a redaction is sufficient, district courts in the Second Circuit apply a two-part test, looking "first [to] whether [the] redacted confession indicated to the jury that the original statement contained actual names and, second, whether the redacted confession, even if the very first item introduced at trial would immediately inculpate [the non-declarant defendant] in the charged crime." *Jass*, 569 F.3d at 61.

With respect to the first part of the test, the Second Circuit has "consistently held that the introduction of a co-defendant's confession with the [non-declarant] defendant's name replaced by a neutral noun or pronoun does not violate" the Sixth Amendment. *United States v. Lyle*, 919 F.3d 716, 733 (2d Cir. 2019). References to co-defendants need not be eliminated entirely; rather, generic terms can be used to replace names present in the original statement. *See, e.g.*, *Jass*, 569 F.3d at 60 (upholding replacement of non-declarant defendant's name with "another person"); *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (upholding replacement of non-declarant defendant's name with "my neighbor").

With respect to the second part of the test, the redacted statement is viewed "separate and apart from any other evidence admitted at trial." *Lyle*, 919 F.3d at 733; *accord Jass*, 569 F.3d at 62. For that reason, the question is "not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant." *Jass*, 569 F.3d at 61. "Where a jury must look to other trial evidence to link a defendant to a redacted confession, the Confrontation Clause calculus changes sufficiently to remove the statement from *Bruton*'s protective rule." *Id.* at 64. Therefore, the admission of a co-defendant's statement that corroborates the Government's other evidence does not violate *Bruton* unless "the statement, standing alone, would clearly inculpate [the complaining defendant] without introduction of further independent

evidence." *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985). And cautionary instructions will avoid a *Bruton* issue "unless the admitted evidence is clearly inculpatory as to the complaining co-defendant and is vitally important to the government's case." *United States v. Rubio*, 709 F.2d 146, 155 (2d Cir. 1983) (internal quotation marks omitted).

Here, there is no plausible risk of any *Bruton* issue. Halligan points to no portion of the reports of Hwang's proffer statements to support his claims of prejudice, and this is not surprising: Halligan's name only appears a single time in the reports and does so in the entirely uncontroversial statement that "ANDY MILLS and PATRICK HALLIGAN were involved in some of the executive-level discussions with the counterparties." In fact, the main focus of the proffers was on Hwang's conduct and understanding, and there is no risk whatsoever that any proffer statement of Hwang's that might be offered in this case would be "clearly inculpatory" as to Halligan in a manner that would raise any Sixth Amendment problem with respect to Halligan. Halligan's assertion that "[t]he prejudice to Mr. Halligan from the introduction of his co-defendant's proffer statements is self-evident: the very reason that the government would seek to use these statements is because it believes that the statements advance this prosecution" (Dkt. 172 at 34) is wrong. The mere fact that a proffer statement might advance a prosecution against one defendant is not a basis for precluding that evidence. *See, e.g.*, *Jass*, 569 F.3d at 58-64; *United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2013 WL 6877319, at *7-12 (S.D.N.Y. Dec. 31, 2013) (rejecting severance motion based on *Bruton* issue). In any event, to the extent that the Government were to offer Hwang's proffer statements as false exculpatory statements exhibiting Hwang's consciousness of guilt, the Confrontation Clause would not be implicated at all. *See Logan*, 419 F.3d at 177-78. Halligan's effort to preclude the admission of Hwang's proffer statements based on an imagined threat of severance should be rejected.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
April 9, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
Tel.: (212) 637-1947/-2580/-2504/-2106

23