

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10007*

May 1, 2024

**VIA ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Hwang and Halligan*,
             S1 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

    The Government respectfully writes, consistent with the colloquy at the final pretrial conference on April 11, 2024, to provide the Court with additional detail regarding the specific evidence the Government intends to offer at trial regarding Tiger Asia, which later renamed itself Archegos. This evidence is relevant both as direct evidence and pursuant to Rule 404(b) of the Federal Rules of Evidence.

    The Government intends to offer the following evidence related to the defendants' conduct at Tiger Asia:

(1) Testimony from cooperating witness William Tomita, corroborated by contemporaneous communications, regarding market manipulation conduct directed by Bill Hwang in or about November 2008 through February 2009, as well as training and instruction Tomita received at Tiger Asia that carried forward to Archegos;

(2) Testimony from cooperating witness Scott Becker regarding training and instruction at Tiger Asia that carried forward to Archegos;

(3) Public documents reflecting that the U.S. Securities and Exchange Commission banned Hwang from acting, among other things, as an investment adviser; and

(4) Testimony from counterparty witnesses, corroborated by contemporaneous records, regarding representations made to them by Archegos regarding conduct that occurred at Tiger Asia and procedures purportedly instituted to prevent future misconduct.[1]

---

[1]     In addition, and unrelated to evidence of misconduct, numerous contractual and trading documents maintained by the counterparties refer to or otherwise identify Archegos as "Tiger

This evidence is tailored to the circumstances of this case, will not materially add to the length or complexity of trial, and is relevant and probative of and necessary to understand the charged schemes. Indeed, the Government will present the Tiger Asia proof described above exclusively through witnesses whom the Government will call in its case-in-chief anyway and for whom the Tiger Asia issues are intertwined with their understanding of, and interactions with, Archegos. Moreover, in order to streamline the presentation of this evidence, the Government has determined not to offer in its case-in-chief the foreign judgments, foreign orders, and factual stipulations from foreign proceedings that related to Tiger Asia, or records from the criminal case in the United States District Court for the District of New Jersey, unless doing so would directly respond to cross-examination of a witness or defense argument.[2] This evidence, described further below, should be admitted at trial.

### A.      Testimony of William Tomita and Related Records

William Tomita, who was the Head Trader at Archegos, is expected to testify, in substance and as relevant here, to the following facts:

- In 2008, when he was 24 years old, Tomita was hired to a junior position at Tiger Asia. Tomita soon became a junior trader, reporting to Raymond Park, who was the head trader at Tiger Asia, and to Hwang. All trades at Tiger Asia were directed by Hwang, and it was Tomita's job as a trader at Tiger Asia, as at Archegos, to learn to understand and implement Hwang's directions.

- Following significant losses in Tiger Asia's portfolio in October 2008, Hwang directed substantial trading on multiple exchanges in the final minutes of the relevant trading sessions for several months, for the purpose of affecting the prices of the stocks being traded and improving the apparent performance of Tiger Asia's portfolio. This practice is commonly referred to as "marking the close."

    - At the end of November 2008, Hwang directed large purchases for stocks in which Tiger Asia held long positions and large sales and/or short sales for stocks in which Tiger Asia held short positions.

        - Although Hwang directed these trades with respect to a number of stocks in which Tiger Asia had large positions, particular efforts were taken concerning several stocks in which Tiger Asia held significant short positions in Hong Kong.

---

Asia," typically because the bank did not modify its records after Tiger Asia rebranded as Archegos.

[2]      The Government may examine the defendants on these matters and make use of the associated exhibits should they elect to testify at trial.

- In Hong Kong, the final trades at the end of each trading day are referred to as the "auction," at which time parties can put in orders and a computer program matches buyers and sellers for final trades that are all executed at the same time at the close of the trading day.

- On November 27, 2018, before the final trading day of the month in Hong Kong, Hwang asked Park for information regarding how to use the auction, and Park explained to Hwang (and Tomita) that Park had learned that "there is NO transparency in the auction market," that "[g]uys are marking the close all the time," and that the "[b]est way" to mark the close is to place "a size MARKET order," i.e., to place a large order for the auction with no limit price. (GX 2765).

- Hwang then directed trades consistent with these instructions for marking the close: he directed substantial trading at the end of the trading day in Japan and Korea, and, in Hong Kong, directed his traders to make large trades at the end of the regular session followed by large trades in the auction with no limit price. (GX 2766).

- At some point after these trades were executed, Park explained to Tomita that these trades helped Hwang save face with his investors.

o At the end of December 2008, January 2009, and February 2009, Hwang directed similar trades, focusing on trades in the auction with no limit price.

- On January 29, 2009, when directing these trades, Hwang stated in writing that the purpose of large sales in the auction in stocks in which Tiger Asia had large short positions was "to prevent any pushing up at the end"—that is, that the sales were intended to counteract purchases that might have increased the price of these stocks, and thereby to maintain a depressed price. (GX 2798).

o In order to accomplish these trades, Hwang directed that his traders generate capacity to make large trades at the end of the session by making opposite trades earlier in the day or in the preceding day; for example, in order to be able to make large sales in the end-of-day auction for certain stocks in which Tiger Asia had short positions, Hwang would direct Park and Tomita to purchase shares earlier in the day in the same amount that he wanted to sell at the end of the day.

o Hwang instructed Park and Tomita to select particular counterparties to execute the trades to avoid visibility into the nature of Tiger Asia's trading.

• In December 2008 and January 2009, Hwang directed similar, large, end-of-day transactions the day before he purchased large blocks of stock to cover certain short positions, thereby reducing the price for purchasing those stocks.

- o Tiger Asia was aware that certain banks would be selling large blocks of stock, which Tiger Asia could use to cover short positions, in part because of certain public information and in part because Park was given access to material, non-public information regarding those sales.

- o Tomita asked Park, in substance, whether such trades were proper, and Park responded that Park had the same question, but that Hwang had told Park, in substance, that the trades were okay and should proceed.

- Tomita was trained during this time period to keep information regarding sensitive positions from others at Tiger Asia, and to discuss such trading with only certain individuals, including Hwang, Park, and Patrick Halligan.

The Government has also marked as exhibits approximately 66 pages of communications between and among Hwang, Park, and Tomita, as well as with others at Archegos and Archegos's counterparties that corroborate these facts, some of which are described above. These documents largely consist of brief trading instructions and related discussions.

Although "Rule 404(b) prohibits the admission of evidence of prior crimes, wrongs, or acts to prove the defendant's propensity to commit the crime charged," "[t]he rule does not bar admission if the evidence is used for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (internal quotation marks and citations omitted). In fact, "[u]nder [the Second] Circuit's inclusionary approach, prior act evidence is admissible if offered for any purpose other than to show a defendant's criminal propensity." *Id.* (citations and internal quotation marks omitted). The testimony and documents described above are not being offered to show either defendant's criminal propensity, and the Government will not describe or characterize it that way. *See id.* (affirming admission of other act evidence where "[t]he government offered the evidence for a purpose other than to show criminal propensity, *i.e.*, for a proper purpose under Rule 404(b), and did not characterize the testimony on summation as evidence of propensity"). To the contrary, this evidence is being offered for highly probative purposes that have been specifically and routinely endorsed by the Second Circuit and courts in this District.

*First*, the "evidence of prior acts [will] inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, [and will] explain the mutual trust that existed between coconspirators." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999). Evidence of Hwang instructing Tomita (and Park) on executing trades that affected the price of securities in Hwang's portfolio—and of instructing Tomita on maintaining secrecy regarding their stratagems—is crucial "background information to make the story of the crimes charged complete and to enable the jury to understand how the illegal relationship between the co-conspirators developed." *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *see also United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (affirming admission of evidence "not offered to show [the defendant]'s criminal propensity, but to show the existence of the illegal relationship between [co-conspirators] and how it developed"). Indeed, this

evidence is unusually relevant and probative here, because it explains how Tomita came to understand from Hwang how to execute the type of market-moving trades at issue in this trial and how Hwang came to trust that Tomita would recognize Hwang's intentions and execute these trades at Hwang's direction. "Were evidence of [Tomita's] longstanding criminal relationship [with Hwang and others] stripped away, it might well seem improbable to a reasonable juror that [Hwang] would trust the [cooperating witnesses] with such combustible information and/or such sensitive tasks." *United States v. Rivera*, 791 F. App'x 200, 206 (2d Cir. 2019) (citation and internal quotation marks omitted).

*Second*, testimony and evidence regarding this conduct at Tiger Asia is highly probative of Hwang's intent here. *See, e.g.*, *United States v. Zackson*, 12 F.3d 1178, 1182-83 (2d Cir. 1993) (affirming admission of other-act evidence demonstrating defendant's intent). Tomita's testimony and the related documentary evidence will demonstrate that Hwang departed from his typical trading strategies and employed particular strategies, such as trading in large quantities at the end of the trading day and building capacity to do so by trading in the opposite direction earlier in the trading session, specifically when he intended trade in order to affect market prices. This evidence therefore tends to make it more probable that Hwang intended to manipulate the market when turning to these techniques in 2020 to 2021, and accordingly the evidence is relevant and probative, and offered for a non-propensity purpose.

Indeed, Hwang himself has made clear just how relevant and important this evidence is. Hwang has projected that he intends to argue at trial that "[h]e had no intent to manipulate these stocks" (Apr. 11, 2024 Tr. at 88), and, as proof of that fact, to offer evidence that his prior trading was done "in the same way that is no different from what they did in 2020" (*id.* at 86). In other words, Hwang intends to argue to the jury that his trading patterns in 2020 to 2021 were consistent with his prior trading strategies. Hwang may well be entitled to claim that his trading strategies did not change in 2020 to 2021. But the Government is equally entitled to present evidence that Hwang's trading strategies in 2020 and early 2021 were inconsistent with the strategies he used when building positions legitimately and were consistent with the strategies he used when manipulating the market—facts directly relevant to the jury's determination of Hwang's intent when directing the trades for which he is charged here.

Hwang has previously argued that the manipulative conduct at Tiger Asia is not probative of intent because it concerned trading in Hong Kong's auction, which does not exist in the markets where Hwang's trades were executed in 2020 and 2021. (Dkt. 158 at 24-25). As discussed in the Government's opposition to the defendants' motions *in limine* (*see* Dkt. 173 at 58-60), however, this is a distinction without a difference. As an initial matter, Tomita will explain that Hwang directed trades at the close of regular trading in Hong Kong, as well as at the close in Japan and Korea, where there is no auction. In any case, the fact that the final trade each day in Hong Kong occurs in a so-called auction is immaterial. The point, as will be clear from the testimony and related documents, is that Hwang directed large, market-moving trades at the close of the trading day (i.e., marking the close) in order to impact prices and benefit his portfolio, both at the end of monthly reporting periods for his investors and prior to large block purchases. Hwang also traded

against his position in equal amounts early in the day to create so-called bullets for later moving the market. Hwang used these precise techniques in 2020 and 2021 to manipulate the prices of securities he held in his portfolio.[3]

Nor is there any risk of the dangers identified in Federal Rule of Evidence 403 that would outweigh the probative value of this evidence. There is no risk of unfair prejudice, and certainly none that cannot be addressed by an instruction to the jury. Indeed, proof of other acts—including acts substantially more inflammatory and less directly probative than those at issue here—are routinely admitted into evidence for the very same purposes the Government offers the evidence here. For example, recently, in *United States v. Bankman-Fried*, which concerned the theft of large amounts of money from customers, investors, and lenders of the cryptocurrency company FTX, Judge Kaplan admitted evidence, pursuant to Rule 404(b), demonstrating that the defendant engaged in schemes with his co-conspirators to make illegal campaign contributions, "to bribe a Chinese government official to gain the release of $1 billion frozen by the official's government," and to manipulate the value of FTX's cryptocurrency tokens, because, among other things, these schemes demonstrated how the relationship of trust between the defendant and his co-conspirators developed. No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *2 (S.D.N.Y. Sept. 26, 2023). Judge Kaplan also admitted evidence of the bribery scheme, as well as of misrepresentations that the defendant made to a bank, and other conduct, all to show the defendant's motive, knowledge, and intent when committing the crimes for which he was charged. *Id.* at *1-2. Judge Kaplan held that these acts were not more inflammatory than the conduct for which the defendant was charged, and, in any case, that any potential prejudice would be cured by an appropriate limiting instruction. *Id.* The Tiger Asia conduct at issue here is far less inflammatory, and, most importantly, this is no risk that the jury will be confused as to the use to which it may put the limited testimony and documents on this issue, because the Court can provide to the jury an appropriate limiting instruction.

The defendants have also argued in prior briefing that the introduction of this evidence might be time-consuming. But, as described above, this category of evidence consists solely of testimony, with related corroborating documents, of a single witness who will be testifying in any case, and which is intertwined with the testimony that the witness would provide simply to explain his background, experience with the defendants, and understanding of his role in the charged conspiracy. Certainly, the testimony will take *some* time, but it will not cause any undue delay, nor will it waste the jury's time, as required for preclusion under Rule 403, since the testimony will provide useful, relevant, probative evidence necessary for the jury to evaluate the facts in this case, including Hwang's intent, and to fairly judge the defense that Hwang intends to advance.

---

[3] To the extent that Hwang has lodged various objections to the use of foreign documents, the issue is moot, given that, as noted above, the Government does not intend to offer those documents into evidence, subject to the defendants opening the door to their admission.

B.     **Testimony of Scott Becker**

Scott Becker, who was the Director of Risk Management at Archegos, is expected to testify, in substance and as relevant here, to the following facts:

- In 2007, Becker reached out to Halligan about a job opportunity at Tiger Asia and was hired by Hwang as an operations associate. Hwang ran Tiger Asia in a secretive manner. Although Tiger Asia shared office space with other "Tiger Cubs," Hwang did not share his investment ideas. Instead, Hwang implemented a "clean desk" policy, where employees were required to keep their desks clean of any papers. Employees were also required to retrieve printed materials from the printers immediately, to prevent others from learning what was in Hwang's portfolio.

- Becker assisted with preparing Tiger Asia's yearly audited financial statements. At the time, Tiger Asia had two funds—the Tiger Asia Overseas Fund and the Tiger Asia Fund—each of which had its own audited financial statements. Tiger Asia was required to report in its audited financial statements any security that comprised more than 5% of its capital, based on the value of its equity position and the unrealized gain of any swap position. To avoid reporting any such names, Halligan directed Becker to reset Tiger Asia's swap contracts with its counterparties the night before the fiscal year ended for each fund. After doing this reset, Tiger Asia would reestablish the swap positions. This strategy enabled Tiger Asia to avoid reporting its actual holdings on its audited financial statements, even though its exposure to the securities remained the same.

- In late-October 2008, Tiger Asia's portfolio suffered significant losses in connection with a particular short position. At that time, the University of Notre Dame was an investor in Tiger Asia. Notre Dame representatives had invited Tiger Asia to attend a Notre Dame football game in South Bend, Indiana, at the beginning of November 2008. Becker and Halligan, among others, traveled to the game. In advance of the game, Halligan told Becker, in sum and substance, that if anyone at Notre Dame asked about the fund's performance, Becker should falsely state that he was unaware of the fund's performance.

Becker's testimony on these topics is admissible for much the same reasons as those described above with respect to Tomita's testimony. Significantly, these facts will demonstrate "how the illegal relationship between participants in the crime developed, [and will] explain the mutual trust that existed between coconspirators." *Diaz*, 176 F.3d at 79. Indeed, Becker will attest that he was trained to trust a small circle of people at Tiger Asia, including Hwang and Halligan, and to keep secrets when directed to do so. This testimony provides direct evidence as to the development of mutual trust between Becker, Hwang, and Halligan.

Similarly, Halligan's instructions to reset swaps in order to avoid disclosure of Tiger Asia's positions demonstrates the relationship between Halligan and Becker, and in particular that the

trust between Halligan and Becker was such that Halligan would and did direct Becker to engage in misleading and deceptive conduct, much as Halligan did during the later period at Archegos. These circumstances also show that it was no mistake or accident that Becker later made misrepresentations to counterparties at Halligan's direction; rather it was Halligan who deliberately trained Becker to engage in deceptive conduct. This evidence is therefore being offered for a non-propensity purpose and is probative as to the charges in this case.

The probative value of this evidence is also not outweighed by the risk of unfair prejudice, delay, or confusion referred to in Rule 403. There is nothing particularly inflammatory about this evidence—especially relative to the charges in this case—and the testimony is brief and being elicited by a witness who will be testifying anyway. Any theoretical prejudice may be addressed through an appropriate limiting instruction.

**C.      SEC Documents**

The Government will offer two exhibits relating to the SEC's enforcement proceedings against Hwang: the consent judgment (GX 2709), which enjoined Hwang from violations of Rule 10b-5, and an administrative order to which Hwang consented (GX 2702), which, among other things, barred Hwang from acting as an investment adviser for a period of years.[4] Specifically, these documents reference Hwang's conduct directing market-moving trades November and December 2008 and January and February 2009 as market manipulation that violates the securities laws (*see* GX 2702 at 2), and enjoin Hwang from further violations of the securities laws' fraud provisions (*see* GX 2709).

These two exhibits, as with the evidence described above, are not being offered for a propensity purpose. Rather, these documents provide direct evidence that Hwang was put on specific notice that he could not engage in end-of-day trades for the purpose of affecting the closing price of securities in his portfolio and, indeed, that such activity was manipulative and deceptive. These documents therefore provide evidence of Hwang's willful violation of the law, when he engaged in this conduct in 2020 and 2021. *Cf. United States v. Scali*, 820 F. App'x 23, 27-28 (2d Cir. 2020) (past tax evasion admissible to prove that charged tax fraud was done willfully). These documents also tend to prove Hwang's motive to engage in conduct intended to provide a cover explanation for his manipulative trading, in order to avoid further enforcement action.

Additionally, the administrative order provides proof of the circumstances requiring Hwang to operate Archegos as a family office, which, as explained below, was relevant to the consideration of certain counterparties when determining whether to transact with Archegos.

---

[4]     Hwang has claimed that his "five-year SEC bar from acting as an investment advisor expired in January 2018." (Dkt. 177 at 7). But this characterization of the SEC's order is wrong. In fact, Hwang was barred from acting as an investment adviser with the possibly of seeking reinstatement after five years, which has not occurred. (GX 2702 at 2).

D.    **Testimony of Counterparties**

Finally, many, if not all, of the witnesses from Archegos's counterparties who participated in evaluating Archegos's creditworthiness when onboarding Archegos as a client will testify that their due diligence analyses took account of Hwang's regulatory issues at Tiger Asia. Such testimony, corroborated by contemporaneous credit reports and emails (*see, e.g.*, GX 1901, GX 2302), will show, among other things, that, when making credit assessments, counterparties confronted Archegos representatives about Tiger Asia's misconduct and considered Archegos's explanations and remediation for Tiger Asia's misconduct. The Government's evidence will further show that Archegos personnel provided misleading information about Archegos's remediation efforts, including the state of its compliance program. (*See, e.g.*, GX 2302).

For example, in or about October 2020, the conspirators attempted to open accounts at the Bank of Montreal ("BMO") to expand Archegos's access to swaps trading to enable the charged manipulation. Representatives at BMO flagged Archegos as "a reputation risk concern" in light of the fact that Hwang "traded 3x with MNPI after being wall crossed," a reference to Tiger Asia's insider trading. (*See* GX 1022; *see also* GX 2702). BMO ultimately approved the relationship, in part because of how Archegos explained its response to the Tiger Asia events, specifically that "the company has implemented a code of conduct, robust policies and procedures, trading surveillance for firm and employee trading, and a training plan that is mandatory for all employees"; that "Archegos has added a new Co-CEO, Executive Chairman, two Presidents and Chief Compliance Officer since the settlement" of the Tiger Asia charges (GX 1023); and that "a significant portion of the management team was replaced" following the Tiger Asia conduct (GX 1004A). But, as the Archegos conspirators intended, BMO was misled as to what happened at Archegos. Compliance at Archegos did not conduct "surveillance" of the firm's trading in any ordinary sense, the various executives touted by Archegos had no ability to restrain Hwang's trading, and the Tiger Asia management team had not been "replaced." Rather, the same individuals who enabled Hwang at Tiger Asia, such as Halligan, Tomita, and Becker, had been promoted to new titles at Archegos, and Hwang traded as he wished without any intervention by compliance.

Proving that the conspirators lied to the counterparties about Archegos's compliance program necessarily involves providing the jury with context about the Tiger Asia misconduct. If the Tiger Asia evidence were stripped from the trial, the jury would have no way to assess why the banks had specific concerns about doing business with Hwang and why Archegos's conspirators were motivated to provide misleading assurances in response to those concerns. Accordingly, the anticipated testimony of counterparty witnesses, and the surrounding corroborative documents, is probative of important issues at this trial.

Moreover, the probative value of that evidence is not substantially outweighed by the risk of unfair prejudice, delay, or confusion under Rule 403. Notably, even if the Government did not present this limited evidence on Tiger Asia, the Government would nonetheless call as witnesses all the counterparty representatives who are prepared to testify about their awareness of the Tiger Asia misconduct, and the Government would nonetheless offer into evidence all the exhibits that

reflect those representatives' awareness of the Tiger Asia misconduct. That is because the counterparty representatives prepared to speak to their assessment of the Tiger Asia misconduct are the same individuals who were lied to as part of the crimes charged in this case. And the documents that reflect those representatives' understanding of the Tiger Asia issues are the same documents that reflect lies that Archegos told the counterparties about its portfolio—in other words, the lies charged in this case. There will be no undue delay or waste of time caused by the exceedingly marginal additional time that those witnesses will use to briefly address Tiger Asia.

For the foregoing reasons, the evidence regarding Tiger Asia described above should be admitted at trial.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: s/
Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
Tel.: (212) 637-1947/-2580/-2504/-2106

Cc: Counsel of Record (via ECF)