# Kramer Levin



**Michael Martinez**
Partner
T  212.715.9404
F  212.715.8404
mmartinez@KRAMERLEVIN.com

1177 Avenue of the Americas
New York, NY 10036
T  212.715.9100
F  212.715.8000

**May 6, 2024**

**BY ECF**
Hon. Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re: <u>United States v. Sung Kook (Bill) Hwang, et al.</u>, No. 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

      On behalf of defendant Bill Hwang, we respectfully write in response to the prosecution's May 1, 2024 letter regarding evidence that it intends to offer at trial relating to Tiger Asia.  *See* ECF No. 185 ("Govt Ltr.").

**I.     Preliminary Statement**

      At the April 11 pretrial conference, the Court asked the prosecution to submit a document identifying the admissions in the Hong Kong MMT Admitted Facts it wanted to introduce in evidence.  But rather than adhere to the Court's direction, the prosecution charted a new and vastly different course.  First, it mined the long-closed files of the parallel investigations of Tiger Asia by the U.S. Attorney's Office for the District of New Jersey ("DNJ") and the SEC to cherry-pick facially prejudicial documents.  Two weeks later, on April 25, it produced 60 such documents to the defense.  Then, approximately one week after that, on May 1, the prosecution submitted a supplemental letter that disregarded the Court's instruction and instead sought to relitigate the facts underlying the DNJ guilty plea (which it previously abandoned) and the SEC consent judgment (which it did not even raise to the Court during the pretrial conference).  In short, it now seeks to try a case that the DNJ chose not to bring and that the SEC chose to settle without admissions.  Its proposal wholly ignores the legal and factual complexities inherent in even attempting to introduce such evidence, which will undoubtedly add a *substantial* number of days, at minimum, to the trial.  The prosecution's last-minute gambit is inadmissible as a matter of law and would subject Mr. Hwang to an unduly high risk of unfair prejudice.

      The prosecution argues that the Tiger Asia evidence is probative of (1) the background of the charged conspiracy including William Tomita and (2) Mr. Hwang's intent.  But, by the prosecution's own account in its 404(b) notice, the alleged Tiger Asia conspiracy did not include

Mr. Tomita, and there is simply no admissible evidence that Mr. Hwang committed market manipulation at Tiger Asia that would support a reasonable inference of intent. The prosecution then regurgitates issues that were previously argued at length in the parties' motions *in limine* and should be rejected here. It purports to introduce the SEC consent judgment and administrative order to prove that Mr. Hwang was put on notice of market manipulation, even though, as this Court already found at the pretrial conference, the prosecution does not have to prove that Mr. Hwang was put on notice in order to prove that his conduct constituted market manipulation. Lastly, the prosecution argues that evidence of Tiger Asia is necessary to understand Archegos's misrepresentations about its compliance policies to counterparties. But these compliance policies were implemented *after* Tiger Asia folded, and thus any alleged Archegos misstatements about them do not implicate Tiger Asia. To be sure, the prosecution does not contend that there were any alleged Archegos misrepresentations to the counterparties about Tiger Asia at all.

But even if the Tiger Asia evidence were minimally relevant, any probative value would be substantially outweighed by the dangers of unfair prejudice, undue delay, and juror confusion. The prosecution's proposal would require considerable lay and expert testimony to describe the operations and regulatory framework of the *three* foreign exchanges the prosecutors plan to discuss, the application of the Hong Kong closing auction's unique rules to the specific 2008-2009 transactions at issue, and the direct and cross-examination of fact and expert witnesses with knowledge of those transactions, not to mention additional legal briefing regarding the jurisdictional reach of U.S. securities law to those transactions.

In the end, no matter how many changes of directions the prosecution employs, the Tiger Asia evidence remains classic propensity evidence. The prosecution's latest about-face is just another attempt in its long run to shore up holes in its case with uncharged conduct that the clear legal authority makes inadmissible.

**II.     Relevant Rule 404(b) Procedural History**

At the pretrial conference on April 11, after the prosecution informed the Court that it no longer intended to introduce evidence of Tiger Asia's guilty plea in the District of New Jersey, the Court directed the prosecution to "tell [the defense] what [the prosecution] wants to do, then [the defense] will know what to object to," Tr. 53:9-11, and followed up that "[m]y question is what proof will you be offering." Tr. 53:20-21.

In response, the prosecution represented to the Court that it would offer testimony from Mr. Tomita that "Mr. Hwang told me in 2008 to put in these orders," Tr. 53:25-54:1, and that this conduct at Tiger Asia "was followed by regulatory notices and lawsuits that told Mr. Hwang that that kind of conduct is improper." Tr. 54:15-17. Asked by the Court, "how are you going to prove what the regulators did?", the prosecution pointed the Court to "Exhibits B and C" to the prosecution's 404(b) Notice, the Hong Kong MMT Report and the Japan SESC Recommendation, respectively. Tr. 55:1-7; *see* ECF No. 164-1. At no point during the pretrial conference did the prosecution state that it intended to introduce any evidence relating to the SEC investigation of Tiger Asia.

Asked how it intended to use the Japan SESC Recommendation, the prosecution informed the Court that the "only purpose" for that document was that it "was delivered to Mr. Hwang and that he was on notice that buying through multiple brokers using escalating limit prices to raise share prices on the market was something that was wrongful." Tr. 97:24-98:3. The Court concluded that "the prejudicial effect [of introducing the Japan SESC Recommendation] outweighs the relevance," and informed the prosecution that "[y]ou are not allowed to use this," though the Court would revisit whether the document could be used for impeachment purposes if Mr. Hwang took the stand. Tr. 98:5-13.

As to the Hong Kong MMT Report, the prosecution represented that it intended to use two portions of the report, the MMT Order, *see* ECF No. 164-1 at Page 67 of 95, and the MMT Admitted Facts, *see id.* at Page 79 of 95. Tr. 59:22-60:16. The prosecution indicated that it was only offering the MMT Order for "the fact [that] Mr. Hwang received it and was alerted to the fact that his conduct could be—or conduct like it, could be criminal." Tr. 66:6-14. The Court concluded that "the prejudicial effect far outweighs the relevance of that point," and observed that "[i]f you prove a manipulation, you don't have to prove that he was put on notice before that something he did could be considered a manipulation." Tr. 66:15-20.

Moving to the MMT Admitted Facts, the Court expressed skepticism of their relevance, noting that "[i]t seems to me that it needs too many jumps to lead to the point that [Mr. Hwang] knew that he was engaged in manipulation." Tr. 67:20-23. The Court concluded that it would "need to judge this point on the basis of all that [the prosecution] want[s] to admit," and so directed the prosecution "to, in a separate document, submit to me those aspects of these admissions that you want to present into evidence." Tr. 67:15-18. The Court also requested "some more information" about the relevant Hong Kong law. Tr. 67:23-68:3. The prosecution agreed to "put[] in a supplemental submission with more granular examples of the exhibits," as well as a "discussion of the Hong Kong law." Tr. 69:18-21. At the end of the conference, the Court confirmed that it was asking the prosecution to provide "better notice about the misstatements in the Hong Kong matter." Tr. 139:17-19.

### III.   Testimony of Mr. Tomita and Related Documents Regarding Tiger Asia Are Inadmissible

Rather than follow this Court's instruction, the prosecution in its May 1 letter abandons any effort to offer the Hong Kong MMT Admitted Facts, and now, through the testimony of Mr. Tomita and apparently the 60 documents it just produced to the defense, seeks to try a Tiger Asia market manipulation case that the DNJ did not bring and that the SEC chose to settle with no admissions.[1] In doing so, the prosecution fails to contend with the factual differences between the Hong Kong closing auction and U.S. exchanges, and legal defenses that undercut any prosecutable charges of market manipulation. Without question, the admission of Tiger Asia

---

[1] In producing these hand-selected, prejudicial documents from the DNJ and SEC's parallel investigations, the prosecution has given no indication of the extent of the total universe of materials from these investigations. It should be noted that the *Brady* and *Giglio* material, and any other evidence *favorable* to the defense, would never have reached Mr. Hwang because neither case progressed to the discovery phase.

evidence would not be as simple as an afternoon of one-sided direct testimony from Mr. Tomita. Aside from rigorous cross-examination of Mr. Tomita, the Tiger Asia evidence would require *days* of testimony from lay or expert witnesses about the operations of the foreign securities exchanges, the details of the transactions themselves, the application of the Hong Kong closing auction's short-lived and idiosyncratic rules to Tiger Asia's transactions, and the cross-examination of hearsay declarants, such as Raymond Park, whom the prosecution alleges were involved in a criminal conspiracy.  It would be a full-blown trial within a trial.

First, the prosecution glosses over the factual differences between the Hong Kong closing auction and U.S.-based exchanges.  The Hong Kong closing auction was an experiment that lasted a mere ten months before it was shut down for lack of "orderliness, fairness, and transparency."[2]  The ten-minute auction was nothing short of a free-for-all.  During the last two minutes, only market orders were accepted—*i.e.*, orders with limit prices were prohibited.[3]  And no order could be modified or cancelled during the last two minutes.[4]  Not only do U.S.-based exchanges, like the New York Stock Exchange and Nasdaq, not have an analogous closing auction process, but even Hong Kong does not have one anymore.

Failing to account for the differences between U.S.-based exchanges and the short-lived Hong Kong closing auction, the prosecution proposes to introduce evidence that Mr. Hwang directed his traders to make "large trades in the auction with no limit price." Govt Ltr. at 3.  The implication is that placing a large order with no limit price is proof of market manipulation.  But, as the rules of the Hong Kong auction made clear, no orders with limit prices were permitted in the final two minutes of the auction.  Thus, no unlawful inference of market manipulation can fairly be drawn from such orders.

Second, the prosecution fails to account for legal defenses that precluded any securities fraud charge that could withstand judicial review.  As background, the DNJ accepted a guilty plea from Tiger Asia for *wire fraud* based on insider-trading conduct.  The decision to charge wire fraud and not *securities fraud* was not an accident.  By the time of the plea in December 2012, the Supreme Court had decided *Morrison v. National Australia Bank*, holding that securities claims brought under Section 10(b) and Rule 10b-5 were limited to "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities[.]" 561 U.S. 247, 267 (2010).  The transactions at issue in the Tiger Asia investigations were exclusively

---

[2] Press Release, *HKEx Proposes to Suspend Securities Market's CAS from 23 March*, Hong Kong Exchanges and Clearing Limited (Mar. 12, 2009).

[3] Consulting Paper, *The Introduction of a Closing Auction Session*, Hong Kong Exchanges and Clearing Limited at 8 (March 2007), https://www.hkex.com.hk/-/media/HKEX-Market/News/Market-Consultations/2006-to-2010/March-2007-Consultation-Paper/Consultation-paper/c_auction_e.pdf; Press Release, *HKEx Publishes Consultation Conclusions on the Proposed Introduction of a Closing Auction Session for its Securities Market*, Hong Kong Exchanges and Clearing Limited (July 19, 2007), https://www.hkex.com.hk/News/News-Release/2007/070719news?sc_lang=en.

[4] HKEx Consulting Paper, *supra* fn. 3 at 8; HKEx Press Release, *supra* fn. 3.

foreign transactions on foreign exchanges.  Its conduct was therefore beyond the purview of Section 10(b), impeding any argument by the prosecution that the transactions reveal manipulative intent under U.S. securities law.[5]

These legal and factual complications notwithstanding, the prosecution nonetheless offers two non-propensity purposes for introducing Tiger Asia evidence through Mr. Tomita under Rule 404(b).  Govt Ltr. at 4-5.  They both lack merit.

First, the prosecution argues that the proffered Tiger Asia evidence is admissible because it will "inform the jury of the background of the conspiracy charged."  Govt Ltr. at 4.  As already briefed extensively, evidence of the alleged misconduct at Tiger Asia is not relevant to such a purpose.  *See* ECF Nos. 158 at 16-20; 177 at 5-6.  Contrary to the purported "longstanding criminal relationship" between Mr. Hwang and Mr. Tomita described in the prosecution's letter, Govt Ltr. at 4-5, by the prosecution's own account the alleged Tiger Asia misconduct was a "prior securities fraud conspiracy" engaged in by Mr. Hwang and Mr. Park—but not Mr. Tomita—"in approximately 2008 and 2009."  404(b) Notice at 1, ECF No. 164-1.  Because the alleged Tiger Asia misconduct occurred more than ten years before the schemes charged in the indictment allegedly began, involved different alleged co-conspirators, and concerned different securities traded on different, foreign exchanges, such evidence cannot constitute background evidence "necessary to complete the [i]ndictment's story" of the crimes on trial.  *See United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013) (evidence of defendants' prior FTC fraud not admissible "as background to the charged conspiracy" because it "involved a separate, discrete incident of fraud or deceit that [wa]s not inextricably intertwined with the Indictment's charges or necessary to complete the Indictment's story").  And if the prosecution seeks to present evidence of a longstanding and close working relationship between Becker, Tomita, Halligan, and Mr. Hwang, it can do so without taking a long and unfairly prejudicial detour into criminal conduct allegedly committed by Mr. Hwang and someone else.  Indeed, these individuals worked together at Archegos for at least *seven* years before the alleged conspiracy began.  *See United States v. Nachamie*, 101 F. Supp. 2d 134, 142-143 (S.D.N.Y. Mar. 15, 2000) (prior conspiracy conviction inadmissible to show relationship of mutual trust with cooperator where cooperator could testify to longstanding relationship with defendant without reference to prior conviction).

Second, the prosecution argues that evidence of Tiger Asia's 2008-2009 trades in Hong Kong, and—for the first time—South Korea and Japan[6], tends to prove that Mr. Hwang intended to manipulate U.S. markets in 2020-2021.  Govt Ltr. at 5.  But, there is no admissible evidence that Mr. Hwang committed market manipulation back in 2008-2009 in Hong Kong, Japan, or

---

[5] The SEC did not try any securities fraud allegations, including for attempted market manipulation, against Mr. Hwang (or Tiger Asia or Mr. Park, for that matter).  Instead, against the backdrop of Hong Kong's now-defunct closing auction and the jurisdictional uncertainty arising from *Morrison*, the SEC accepted a settlement with no admissions from Mr. Hwang, thereby insulating its resolution from judicial scrutiny.

[6] Although the prosecution provided notice of Tiger Asia's trades of Yahoo! Japan on the Tokyo Stock Exchange in 2009, the trades referenced in its May 1 letter occurred in 2008.

South Korea. Moreover, this Court has already excluded the Hong Kong MMT Order regarding Tiger Asia's trades in 2008-2009, concluding that the prejudicial effect of the agency reports outweighs their relevance. Tr. 66:15-20; 98:5-13. Lastly, the prosecution nowhere provides any credible support for an inference that the newly raised trading in South Korea and Japan in 2008 (*see* Govt Ltr. at 3, 5) violated any market-manipulation statutes.

Even if the prosecution's proposed Tiger Asia evidence were minimally relevant (and it is not), its probative value would be far outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time under Rule 403. The prosecution's proposal would require extensive fact and expert testimony, and additional legal briefing, about the operation of the Hong Kong, Japanese, and South Korean securities exchanges, and the securities laws and regulations governing those foreign jurisdictions, not to mention the legal question about the extraterritorial reach of U.S. securities laws, so that the jury would not be confused and misled to believe that wholly appropriate trading was somehow unlawfully manipulative. In short, the prosecution seeks to have a trial within a trial to prove instances of market manipulation at Tiger Asia that U.S. prosecutors declined to prosecute more than a decade ago after a full investigation. *See United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) (rejecting the prosecution's "unduly optimistic" attempts to "minimize the prejudicial effect . . . by arguing that proof of the uncharged [acts] would be simple and short" where it "could not avoid tackling the complicated task of explaining the transactions because its probative value, if any, would be contingent upon establishing sufficient similarity").

Furthermore, the risk of undue delay and wasting time is substantial. The prosecution estimates that "the testimony will take *some* time." Govt Ltr. at 6 (emphasis in original). Of course, but how much? While the prosecution may believe that it can deliver an abridged presentation of these complex transactions devoid of necessary facts and regulatory context, a legally sufficient review of these *15-year-old* transactions on no fewer than *three* foreign exchanges implicating the securities laws of *four* countries will require *at least multiple* days of lay and expert testimony to unravel. And given the lateness in the prosecution's switch in Rule 404(b) strategy, it would unfairly prejudice the defense if the proposed Tiger Asia evidence were admitted.

### IV. The SEC Consent Judgment and Administrative Order Are Inadmissible

Revisiting an issue that was argued at length in the parties' motions *in limine* briefing, but that the prosecution chose not to rely on at the pretrial conference, the prosecution now seeks to offer the SEC consent judgment and administrative order to show that Mr. Hwang "had specific notice that he could not engage in end-of-day trades for the purpose of affecting the closing prices of securities in his portfolio and, indeed, that such activity was manipulative and deceptive." Govt Ltr. at 8. But evidence of notice is not required here. As this Court observed during the pretrial conference, "If you prove a manipulation, you don't have to prove that he was put on notice before that something he did could be considered a manipulation." Tr. 66:15-18. And the defense does not dispute that market manipulation is unlawful. *See* Defendants' Joint Proposed Requests to Charge at Nos. 29, 31, ECF No. 125 (listing elements of market manipulation). Given that it is not a disputed issue, the evidence of an SEC consent judgment, which is inadmissible for its truth under Rule 408, *see* ECF No. 158 at 10-11, and a related administrative order should be excluded under Rule 403. *See United States v. Curley*, 639 F.3d

50, 56-57 (2d Cir. 2011) ("When reviewing evidence admitted pursuant to Rule 404(b), we consider whether . . . the evidence was relevant to *a disputed issue* . . . .") (emphasis added).

### V. Counterparty Testimony Regarding Tiger Asia Is Inadmissible

Finally, the prosecution repeats nearly verbatim an argument from its opposition brief that evidence of the alleged misconduct at Tiger Asia must be admitted because "when making credit assessments, counterparties confronted Archegos representatives about Tiger Asia's misconduct and considered Archegos's explanations and remediation for Tiger Asia's misconduct." Govt Ltr. at 9; *see* ECF No. 173 at 54-55 (making identical argument). As Mr. Hwang explained in his April 9 reply, evidence of these purported misrepresentations about *Archegos's* compliance procedures cannot serve as a backdoor to admit the alleged *Tiger Asia* misconduct. *See* ECF No. 177 at 7-8.

Critically, the prosecution does not allege that Mr. Hwang or others at Archegos lied to counterparties about what occurred at Tiger Asia. In fact, the prosecution asserted the opposite in its opposition brief, stating that "the counterparties *were aware of* Tiger Asia's regulatory history, including its wire fraud conviction, investment advisor bar, and fines." ECF No. 173 at 53 (emphasis added). The alleged misstatements, then, concern not Tiger Asia, but rather the compliance procedures that Archegos adopted *following* Tiger Asia. Of course, the prosecution can fully and effectively explore whether Archegos was honest with counterparties about the nature of its compliance procedures without ever mentioning Tiger Asia.

The prosecution argues, in response, that inserting a full accounting of the alleged Tiger Asia misconduct to this relatively simple question of whether Archegos misrepresented its compliance procedures is essential because it explains "why the banks had specific concerns about doing business with Hwang" and the alleged conspirators' "motiv[e]" to mislead the counterparty banks. Govt Ltr. at 9. These justifications are insufficient. To start, it is illogical to suggest that *Tiger Asia* is what motivated Archegos to purportedly lie to counterparties about *Archegos's own* compliance procedures. The very theory of the indictment is that Archegos made "false and misleading statements to banks and brokerages" to obtain "trading capacity, brokerage relationships, and specific margin rates" *for Archegos*. *See* Superseding Indictment ¶ 74(b); ECF No. 173 at 54. Thus, obtaining trading benefits is the alleged motive to lie, not Tiger Asia.

And even assuming it is true that Tiger Asia's history caused the counterparties to have "specific concerns about doing business with Hwang," *why* they had those concerns is irrelevant, as Archegos is not alleged to have lied about Tiger Asia. Because the prosecution can fully prove the alleged misrepresentations without reference to Tiger Asia, and because introducing Tiger Asia would lead to an extensive trial within a trial that would unfairly prejudice Mr. Hwang, evidence of the alleged Tiger Asia schemes must be excluded under Rule 403. *See McCallum*, 584 F.3d at 477; *United States v. Aboumoussallem*, 726 F.2d 906, 912-13 (2d Cir. 1984) (affirming exclusion of similar act evidence where the "risk of unfair prejudice and jury confusion" and potential "trial within a trial" outweighed evidence that "did not have much probative force"); *Levy*, 2013 WL 655251 at *1 (precluding FTC judgment as direct evidence of defendant's "misrepresentations regarding the FTC judgment to business partners as part of the

fraud charged" or "as background evidence of the charged conspiracy" because of the "substantial[] . . . danger of unfair prejudice, confusing the issues, and misleading the jury").

\* \* \*

For the foregoing reasons, Mr. Hwang respectfully requests that the Court preclude the prosecution from offering evidence or argument relating to Tiger Asia.

Respectfully submitted,

*/s/ Michael Martinez*

Michael Martinez
Barry H. Berke
Dani R. James
Jordan Estes

cc:   Counsel of record