# EXHIBIT B

O5GVHWA1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          22 CR 240(AKH)

SUNG KOOK HWANG and PATRICK
HALLIGAN,
            Defendants.                 Trial
------------------------------x
                                        New York, N.Y.
                                        May 16, 2024
                                        10:05 a.m.
Before:

             HON. ALVIN K. HELLERSTEIN,

                                        District Judge
                                         -and a jury-
                    APPEARANCES

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW D. PODOLSKY
     ANDREW M. THOMAS
     ALEXANDRA ROTHMAN
     SAMUEL ROTHSCHILD
     Assistant United States Attorneys

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
     Attorneys for Defendant Halligan
BY:  MARY MULLIGAN
     TIMOTHY HAGGERTY
     BONNIE BAKER
     ANIL VASSANJI
     RUPITA CHAKRABORTY

KRAMER LEVIN NAFTALIS & FRANKEL LLP
     Attorneys for Defendant Hwang
BY:  BARRY H. BERKE
     DANI R. JAMES
     JORDAN L. ESTES
     MICHAEL MARTINEZ
     MICHELLE BEN-DAVID
     SHAKED SIVAN
     DAYNA CHIKAMOTO
```

1         THE COURT:  You can publish it to the jury.
2         MR. THOMAS:  Thank you, your Honor.
3    Q.  Mr. Jones, do you see on Exhibit 228 the subject reads:
4    "Archegos Employees Mandatory Zoom Meeting"?
5    A.  Yes.
6    Q.  And 10:30 a.m. Eastern Standard Time?
7    A.  Yes.
8    Q.  Did that meeting, in fact, go forward?
9    A.  I believe it did.
10   Q.  Did you participate?
11   A.  Yes.
12   Q.  Could you describe what you recall from the meeting.
13   A.  There was a presentation done by Andy Mills and Diana Pae
14   regarding a number of different factors.  It concerned, you
15   know, the firm's status at that point in time.
16   Q.  Did Mr. Mills comment on deferred compensation during this
17   meeting?
18   A.  I believe so.
19   Q.  What was his message?
20   A.  Just that it did not look very positive that there was
21   going to be any value to the deferred compensation; that we had
22   looked at all different kinds of options over the weekend, and
23   we were painfully and disappointedly to the point of not seeing
24   a path where that was going to have value.
25   Q.  Were employees encouraged or discouraged from resigning?

1  A.  I don't recall the exact words, but there was an
2  encouragement for generally just to -- you know, to stay with
3  the firm and to continue as employees.
4  Q.  Did the subject of loyalty come up?
5  A.  I don't recall if that word was used in that Zoom call.
6  Q.  Did it come up over the weekend?
7  A.  I think generally that there was some discussion around
8  desire for there to be loyalty.
9  Q.  And could you tell the jury in what sense?
10 A.  It was a core value of the firm, was that we would -- you
11 know, that we were loyal to one another and that there was a
12 loyalty element, just as a part of our culture.
13          And so I think in this context it came up under a
14 discussion around, you know, a preference that we would stay
15 together and not have an ending that was, you know, everybody
16 gets fired and gets a pink slip and that's the end of Archegos.
17 I think there was a desire to have something better as we dealt
18 with the aftermath of this tragedy and tried to figure out a
19 path forward.
20 Q.  In those weekend conversations, did Mr. Hwang address the
21 subject of loyalty?
22 A.  I don't recall exactly his words.  I mean, I think we
23 talked about, you know, this concept together as an executive
24 team with Mr. Hwang there, but I don't recall whether or not he
25 exactly used the word "loyalty."