# Kramer Levin



**Barry H. Berke**
Partner
T  212.715.7560
F  212.715.7660
bberke@KRAMERLEVIN.com

1177 Avenue of the Americas
New York, NY 10036
T  212.715.9100
F  212.715.8000

**June 2, 2024**

**BY ECF**

Hon. Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re: *United States v. Sung Kook (Bill) Hwang, et al.*, No. 22 Cr. 240 (AKH)

Dear Judge Hellerstein:

      On behalf of defendant Bill Hwang, we respectfully write to request that the Court issue a limiting instruction with regard to Dr. Carmen Taveras's testimony on the price impact of Archegos's limit orders. The proposed instruction would read as follows:

> You have heard testimony from Dr. Taveras about the potential effect that Archegos's trading had on the price of certain securities. To be clear, the purchase or sale of any security, or securities-based swap, may be engaged in for investment reasons, and the mere fact that a transaction affected market prices does not render it improper.

      At the start of her testimony, Dr. Taveras confirmed that she would not opine on causation.[1] Nonetheless, Dr. Taveras repeatedly testified that Archegos's limit orders caused stock prices to rise:

> **Q. In your work at the SEC, have you studied the effects of having a larger trade volume at 15 percent?**
> MS. ESTES: Objection.
> THE COURT: Overruled.
> **A. Yes, I have.**
> **Q. What have you seen?**
> **A. I find that it often has a price effect.**

---

[1] Trial Tr. at 2025:3-2025:6 (May 30, 2024) ("THE COURT: So you're -- let me – you're not an expert on cause and effect, right? THE WITNESS: I don't intend to opine on cause and effect.").

> Q. Now, for what days did you run the liquidity of the Archegos portfolio?
> THE COURT: Something more definite than "often."
> MS. ROTHMAN: Sure. I can follow up, your Honor, and I'll talk more about it.
> **Q. When you say, "often has a price effect," what are some of the factors that could affect whether 15 percent of trading volume could have a price effect?**
> **A. I think 15 percent of trading volume is very likely to have a price effect.**
> Q. Why is that?
> A. Because it's a huge fraction. I mean, we are -- 15 percent of trading volume is a lot of volume in one stock.
> **A factor that can make it even more pronounced is if you are over 15 percent of trading volume for multiple days. So that is even more likely to cause a price effect.**
> Q. Why is that?
> A. Because you're adding price pressure. So here, it's pressure on price to have 15 percent of the trading volume being added to whatever number of shares was going to trade without that additional trade happening.

Trial Tr. 2045:22-2046:24 (May 30, 2024).

> **Q. And before I show you at least one of the charts you prepared, can you tell us why Archegos' daily volume is interesting to you as you're looking at their portfolio?**
> MS. ESTES: Objection.
> THE COURT: Did you decide to use that graph? Is it your decision?
> THE WITNESS: My decision to what?
> THE COURT: To use that graph.
> THE WITNESS: Yes.
> THE COURT: Tell us why you thought it was important.
> **THE WITNESS: Because it shows the frequency of their trading in the market and what a large portion they are in the market.**
> BY MS. ROTHMAN:
> **Q. Why is that interesting to you?**
> MS. ESTES: Objection.
> THE COURT: Overruled.
> **THE WITNESS: Because it provides the evidence of potential price effect.**

*Id.* at 2070:6-2071:4.

> Q. Can you explain what's reflected in your chart once Archegos raises its limit price?
> A. Yes. So Archegos, at around 3:53 or so p.m., Archegos increased its limit price by $1 from $124 to $125 flat. And we see a lot of the orders that are traded during that time are Archegos orders. That's why we see so much red. We see the price going upwards rapidly from where it was. So within a minute or so, the price went

> up by $1. **Then the price went up to meet the limit price set by Archegos at $125 per share and stayed there from about 3:55 p.m. through 4:00 p.m**.
> MS. ESTES: Your Honor, move to strike the "meet the limit price."
> THE COURT: Overruled.

*Id.* at 2123:21-2124:8

> **Q. Dr. Taveras, you described a pattern of Archegos raising its limit price and the market price meeting that limit price --**
> MS. ESTES: Objection.
> THE COURT: Overruled.
> **Q. Let me ask you, did you see that trend again in other charts that you reviewed?**
> MS. ESTES: Objection.
> THE COURT: Overruled.
> **A. Yes, I saw it multiple times.**

*Id.* at 2125:10-2125:19 (describing GX-9005, p.27).

> Q. We'll go through some of them. **What did you see in those charts, Dr. Taveras?**
> **A. I saw that the market price generally increased during the day and rose to meet the limit price that Archegos set.**

*Id.* at 2126:17-20.

> **Q. What happened to the market price after Archegos raised its limit price?**
> **A. The market price rose to meet the limit price set by Archegos.**

*Id.* at 2130:12-2130:15 (describing GX 9005, p. 29).

> **Q. What does Archegos do here and what happens to the market price?**
> **A. It increases the limit price of the order that had the lowest limit price.**
> **Q. And what happened to the market price thereafter?**
> **A. It increases slightly.**

*Id.* at 2133:6-11 (describing GX 9005, p. 30).

> **Q. Does Archegos raise its limit price again on March 22nd in Farfetch?**
> **A. Yes.**
> Q. At what time?
> A. Close to 4:00 p.m. at 3:59:37.
> **Q. Once Archegos does that, what happens to the prices for Farfetch?**
> MS. ESTES: Objection.
> THE COURT: Overruled.
> **A. The price for Farfetch increased.**

*Id.* at 2134:12-2134:21 (describing GX 9005, p. 30). Dr. Taveras provided similar testimony in other instances as well.[2]

While price effect or impact may be a relevant factor in this case, the law is clear that price impact, alone, is not enough to establish market manipulation. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) ("[I]t is generally true that short selling or other hedging activity is not, by itself, manipulative—even when it occurs in high volumes and even when it impacts the market price for a security."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("[S]hort selling—even in high volumes—is not, by itself, manipulative. . . . To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security."); *United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (observing that significant trading over short time "alone . . . does not make the investor a manipulator"). In fact, price impact is the "natural consequence[]" of larger-scale, legally sanctioned trading. *GLF Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 209 (3d Cir. 2001) ("[S]hort selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation. That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are natural consequences of a lawful and carefully regulated trading practice.").

Dr. Taveras's repeated testimony that Archegos's limit orders impacted or affected stock prices, in addition to being speculative, creates a danger that the jury will mistake price impact, which alone is not improper, with market manipulation, which requires intent. This risk is particularly acute here because Dr. Taveras testified about Archegos's profits while providing her price impact opinions, misleadingly suggesting that Archegos's intent was to drive up prices.[3] *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 (S.D.N.Y. 2008) ("[E]ntering into a legitimate transaction knowing that it will distort the market is not manipulation—only intent, not knowledge, can transform a legitimate transaction into manipulation."). Such testimony invites the jury to draw the unfair conclusion, contrary to Federal Rule of Evidence 403, that Mr. Hwang intended to manipulate the market because stock prices, at times, rose after Archegos entered limit orders. *Cf. Colson v. Cupp,* 449 F.2d 730, 731 (9th Cir. 1971) ("When the lawfulness of an act depends upon the guilty intent with which the act was done, it is patently wrong to tell a jury that it can infer the requisite intent simply from proof that a defendant did the act."); *United States v. Silver,* 864 F.3d 102, 118 (2d Cir. 2017)

---

[2] *See, e.g.*, *id.* at 2114:23-25 (Q. As [Archegos's trades] rise, is that an increase in the price at which the share is purchased? A. Yes."); 2122:3-7 ("[W]hen Archegos is willing to pay higher than the market price, then their orders get filled . . . and we see that the price is increasing in that time up until the limit price set by Archegos.").

[3] *See, e.g.*, Trial Tr. at 2131:15-16 (May 30, 2024) ("that increase of about 70 cents in the market price generated a profit of $17 million for Archegos"); 2135:24-213642 ("A. We see the limit price increasing from $61.50 and increasing to $62. And so 90 million shares they held the day before and the price increased by 50 cents, so that's about $45million of additional profit from this increase in price. Q. And how long of a trading period? A. Less than a minute.")

- 5 -

(vacating conviction where jury received overbroad instruction that improperly "captured lawful conduct" and thus "could not have received a correct interpretation of the law").

Given the significant danger that the jury will conflate price impact with market manipulation due to Dr. Taveras's repeated testimony about stock prices increasing to meet Archegos's limit prices, the defense requests a limiting instruction explaining that price impact, alone, is not improper.

\* \* \*

For the foregoing reasons, Mr. Hwang respectfully requests that the Court issue the requested limiting instruction regarding price impact.

Respectfully submitted,

*/s/ Barry H. Berke*

Barry H. Berke
Dani R. James
Jordan Estes
Michael Martinez

cc:     Counsel of record