O5MsHWA1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,
 3
                 v.                        22 CR 240(AKH)
 4

 5   SUNG KOOK HWANG and PATRICK HALLIGAN,

 6               Defendants.
     ------------------------------x
 7                                         New York, N.Y.
                                           May 22, 2024
 8                                         10:15 a.m.
     Before:
 9
                     HON. ALVIN K. HELLERSTEIN,
10
                                           District Judge
11                                         -and a jury-

12                           APPEARANCES

13   DAMIAN WILLIAMS,
          United States Attorney for the
14        Southern District of New York
     BY:  MATTHEW D. PODOLSKY
15        ANDREW M. THOMAS
          ALEXANDRA ROTHMAN
16        SAMUEL ROTHSCHILD
          Assistant United States Attorneys
17
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
18        Attorneys for Defendant Halligan
     BY:  MARY MULLIGAN
19        TIMOTHY HAGGERTY
          BONNIE BAKER
20        ANIL VASSANJI
          RUPITA CHAKRABORTY
21
     KRAMER LEVIN NAFTALIS & FRANKEL LLP
22        Attorneys for Defendant Hwang
     BY:  BARRY H. BERKE
23        DANI R. JAMES
          JORDAN L. ESTES
24        MICHAEL MARTINEZ
          MICHELLE BEN-DAVID
25        SHAKED SIVAN
          DAYNA CHIKAMOTO
```

O5MsHWA1

1                                 APPEARANCES (Continued)

2

3    ALSO PRESENT:
     Anna Gamboa, USAO Paralegal
     Arjun Ahuja, USAO Paralegal
4    Madeline Sonderby, USAO Paralegal
     Raymond McLeod, Defense Trial Consultant
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5MsHWA1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  Good morning.
 3              On the government's application, the motion is denied.
 4    If the document becomes relevant in the course of redirect, it
 5    can be reoffered at that time, but it's not necessarily now.
 6    The evidence will be redundant.
 7              If there is anything new that is to be shown, I can
 8    reconsider.  We are dealing with information that is readily
 9    attainable from the witness's memory.
10              MS. ROTHMAN:  Your Honor, if I may, not --
11              THE COURT:  You all can sit.
12              MS. ROTHMAN:  Should I go to the podium?
13              THE COURT:  Go ahead.  I can hear you.
14              MS. ROTHMAN:  Putting aside yesterday, there is one
15    Bloomberg chat which is mentioned in this letter 3783 that I
16    would ask the court to reconsider its ruling on.  Your Honor
17    has it.  It's the one which I can pass up a copy, but it's
18    attached to our letter.  It's from the 25th of March.
19              It's on the screen, your Honor.
20              THE COURT:  Highlight what you want me to look at.
21              MS. ROTHMAN:  If you can turn to the second page.
22    Beginning at 1129 where Mr. Halligan writes, just deflect as
23    best you can and then --
24              Thank you, Ms. Sonderby.
25              THE COURT:  Wait.
```

O5MsHWA1

1          How is this going to enlighten the case?

2          MS. ROTHMAN:  This is the defendant, Mr. Halligan,

3  providing false information for Mr. Becker to give on the

4  Credit call with -- Credit Suisse call.  He said he couldn't

5  join because I couldn't claim ignorance as the CFO.  These

6  messages are in quotations --

7          THE COURT:  I'm persuaded.  You can offer the

8  document.

9          MS. ROTHMAN:  Thank you, your Honor.

10          THE COURT:  You can draw the jury's attention to that

11  part.

12          MS. ROTHMAN:  Thank you, your Honor.

13          MS. MULLIGAN:  Your Honor, may I be heard?

14          THE COURT:  Sure.

15          MS. MULLIGAN:  Your Honor, it's the witness's

16  testimony --

17          THE COURT:  Could you.  I can't hear your voice as

18  well.

19          MS. MULLIGAN:  Your Honor, it's the witness's

20  testimony.

21          THE COURT:  You have a softer voice.  I'll ask you to

22  take the podium.

23          MS. MULLIGAN:  May the record reflect, your Honor.

24          The testimony comes from the witness and it is the

25  witness' remarks.  There is nothing in this document that

O5MsHWA1

1    indicates it's false.  And prosecutors questioning yesterday,

2    which included falsity in the questions, was directing

3    Mr. Becker.

4           So I would ask that the prosecutor elicit his memory

5    of what was said and his understanding of it, not suggesting in

6    her question that it was a lie or that it was false.

7           THE COURT:  It's offered as an admission of

8    Mr. Halligan.

9           MS. MULLIGAN:  Your Honor, I think we heard a phone

10   call from Andy Mills --

11          THE COURT:  Sorry, Ms. Mulligan.  It's a conversation

12   in words that are typed.  It's not an oral conveyance.

13          So the words that Mr. Halligan typed are the words

14   that the government offers as an admission against

15   Mr. Halligan.

16          MS. MULLIGAN:  Your Honor, those quotes are from phone

17   call where Mr. Mills said many of those statements, so that's

18   Mr. Mills' statements who is not charged in this case, your

19   Honor.

20          THE COURT:  Put it up again, please.

21          MS. MULLIGAN:  Yes, your Honor.

22          I believe that tape, those conversations were played

23   extensively by the government.  Mr. Mills -- it's quite a long

24   phone call, and they were played extensively to all -- to Brian

25   Fairbanks who testified --

O5MsHWA1

1          THE COURT:  What is this document, Ms. Rothman?

2          MS. ROTHMAN:  I'm sorry, your Honor?

3          THE COURT:  What is the document?

4          MS. ROTHMAN:  What is the document?

5          THE COURT:  Yes.

6          Is it a text?

7          MS. ROTHMAN:  This is a text message via Bloomberg

8    that Mr. Halligan sends to Mr. Becker on the morning of

9    March 25.

10          THE COURT:  So it's not oral conversation.

11          MS. ROTHMAN:  No.

12          THE COURT:  It's textual conversation.

13          MS. ROTHMAN:  It's like chatting on your phone, your

14   Honor.

15          THE COURT:  I rule it's admissible.

16          MS. ROTHMAN:  Thank you, your Honor.

17          THE COURT:  Let's get the jury.

18          Good morning, Mr. Becker.

19          Do you nod when someone says good morning?

20          THE WITNESS:  Good morning.

21          (Continued on next page)

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, members of the jury.

3          THE JURY:  Good morning.

4          THE COURT:  Let's all be seated.

5          Mr. Becker remains on the stand.  I remind you you're

6   under oath.

7    SCOTT BECKER, resumed.

8          Ms. Rothman will continue with direct examination.

9          MS. ROTHMAN:  Thank you, your Honor.

10  DIRECT EXAMINATION

11  BY MS. ROTHMAN:

12  Q.  Mr. Becker, before we broke yesterday, you were talking

13  about messages you had sent to Mr. Halligan and Mr. Tomita with

14  information about Archegos' portfolio.

15          Do you remember that?

16  A.  Yes, I do.

17  Q.  And it was in advance of the call with UBS on Wednesday

18  night, right?

19  A.  Yes.

20  Q.  Focusing on that call, who from Archegos spoke to UBS?

21  A.  On that call, Mr. Mills had spoken substantially the same

22  statements that were made in the prior calls with brokers, and

23  there was some back and forth between UBS and primarily

24  Mr. Mills and Mr. Tomita.

25  Q.  After the call with UBS, did you speak with Mr. Halligan?

1  A.  Yes, I did.

2  Q.  Was that by phone?

3  A.  Yes, it was by phone.

4  Q.  While you were on the phone with Mr. Halligan, what

5  happened?

6  A.  While I was on the phone with him, I had an incoming call

7  coming into my phone.  I didn't recognize the number, but I

8  thought it could be Mr. Tomita.  So I hung up with Mr. Halligan

9  and picked up the incoming call.

10  Q.  Who was the call from?

11  A.  It was from Scott Alpaugh, the relationship manager at UBS.

12  He was just on the call that we had.

13  Q.  What did Mr. Alpaugh ask you?

14  A.  He had asked me for some additional caller of what was

15  going on at Archegos.

16  Q.  What did you tell Mr. Alpaugh?

17  A.  I told him that I couldn't comment further than what was

18  already discussed.

19  Q.  While you were on phone with Mr. Alpaugh, were you in

20  communication with Mr. Halligan?

21  A.  Yes, I was, via Bloomberg chat.

22  Q.  What did you tell Mr. Halligan?

23  A.  I told him that Mr. Alpaugh had called.

24  Q.  Did you say anything else?

25          THE COURT:  One minute.

O58sHWA5                           Becker - Direct

1              (Pause)

2              You were asked to recount the conversation on

3    BlackBerry with Mr. Halligan

4              MS. ROTHMAN:  Thank you, your Honor.

5    A.   So the Bloomberg chat between Mr. Halligan and I, I had

6    stated that I was deflecting.  And Mr. Halligan had said if

7    he's giving you a problem on calling back the excess cash, just

8    tell him that's what we do every day.

9    Q.   Can you remind us what Mr. Halligan was referring to when

10   he said calling back the excess cash?

11   A.   Yes.

12             So earlier in the day, in order for Archegos to meet

13   its margin calls, we had to call back the excess cash from

14   other counterparties that was out there, that substantially all

15   of that excess cash that was available in order to meet the

16   large calls that Archegos had to pay that day.

17   Q.   Was it accurate that Archegos' calling back the cash that

18   day was how it had typically interacted with its brokers?

19   A.   Not in the manner that with it was done that day.

20   Typically Archegos would -- the operations team would go

21   through a process where we would see the excess cash balances

22   that were out of brokers, depending on trade activity and

23   market movement on that particular day.  It would be more no

24   leave excess cash at those brokers, but it would not be normal

25   to call back substantially all of that excess cash, which is

O58sHWA5                          Becker - Direct

1   what Archegos did that day.

2   Q.  I want to turn to Thursday morning, Mr. Becker.

3           Did you join a call with Macquarie on Thursday

4   morning?

5           THE COURT:  Thursday, March 25, members of the jury.

6           MS. ROTHMAN:  Thank you, your Honor.

7   A.  Yes, I did.

8   Q.  Around what time was the call?

9   A.  7:30 a.m.

10  Q.  Who from Archegos joined?

11  A.  On that call from Archegos, it was the same individuals

12  that were on the prior calls.  So it was Mr. Mills,

13  Mr. Halligan, Mr. Tomita, myself, and I believe David, Mr. Eun,

14  was also on the call.

15  Q.  Did you take notes of who said what?

16  A.  Yes, I did.

17  Q.  Were you in touch with Mr. Halligan that morning as well?

18  A.  Yes, I was, via Bloomberg chat.

19  Q.  Do you recall Mr. Halligan sent you messages during the

20  Macquarie call?

21  A.  Yes, he did.

22          MS. ROTHMAN:  If we can pull up what is in evidence as

23  Government Exhibit 2521-T just for a moment.  We already heard

24  this transcript, so we actually have not heard it.

25          So, your Honor, at this time, I'm going to offer 2521.

1    I'm not going to play it though.  I'm going to ask Mr. Becker a

2    few questions about it.

3            THE COURT:  If you're not offering it, keep it for

4    identification if you need it.

5            MS. ROTHMAN:  Well, then I'll offer it, your Honor,

6    and play a portion of it.

7            MS. MULLIGAN:  No objection.

8            MR. BERKE:  No objection, your Honor.

9            THE COURT:  Received.

10           (Government's Exhibit 2521 received in evidence)

11           MS. ROTHMAN:  Thank you.

12           If we can publish 2521-T, which is the transcript of

13   it.

14   Q.  Just focusing on the top, Mr. Becker, was this around the

15   time that you spoke to Macquarie on Thursday morning?

16   A.  Yes, it was.

17           MS. ROTHMAN:  If we can also pull up side by side

18   what's been marked for identification as 3783.  This is just

19   for the witness so we can take it down, the transcript.

20   Q.  Do you recognize this, Mr. Becker?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is a Bloomberg chat excerpt between myself and

24   Mr. Halligan on March 25.

25           MS. ROTHMAN:  Your Honor, the government offers 3783

O58sHWA5                          Becker - Direct

1   into evidence.

2              MS. MULLIGAN:  No objection.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Is this the document we talked about

5   before the jury came in?

6              MS. ROTHMAN:  Yes, your Honor.

7              THE COURT:  Received.

8              (Government's Exhibits 3783 received in evidence)

9              MS. ROTHMAN:  If we can publish that to the jury,

10  please.

11             THE COURT:  You may publish.

12             MS. ROTHMAN:  Thank you.

13             If we can go to the second page, please.  I want to

14  focus on the two lines at the top from Mr. Halligan.

15             Thank you.

16  BY MS. ROTHMAN:

17  Q.  At 705 and 712, Mr. Halligan writes to you --

18             THE COURT:  It's now in evidence.  You can show it to

19  the jury.

20             Draw their attention to it.  Read it.

21             MS. ROTHMAN:  Thank you.

22             THE COURT:  You don't need a witness.

23             MS. ROTHMAN:  Thank you.

24  Q.  Mr. Becker, looking at this message from Mr. Halligan at

25  705 a.m., which appears to be 11:05 UTC, Mr. Halligan writes

O58sHWA5                         Becker - Direct

1   oof.

2          Do you recall what was said during the Macquarie call

3   to which he responded oof?

4   A.  I believe that was in response to Macquarie telling

5   Archegos what its margin call would be that day.

6   Q.  Do you recall approximately the size of Macquarie's margin

7   call?

8   A.  Approximately $300 million.

9   Q.  The next message from Mr. Halligan is at 7:12 a.m.  Here it

10  appears at 11:12 UTC.  And Mr. Halligan writes, O dollars.

11         Do you recall what that response from Mr. Halligan was

12  in response to on the Macquarie call?

13         MS. MULLIGAN:  Objection.

14         THE COURT:  It's in evidence, the document itself.

15         MS. ROTHMAN:  Yes, your Honor.

16         THE COURT:  What do you need a witness for?

17         Put the document in evidence.  Read the document to

18  the jury.

19         MS. ROTHMAN:  I have.

20         My question to Mr. Becker is if he recalls what

21  Mr. Halligan was responding to when he wrote to him O dollars.

22         THE COURT:  Isn't the previous call, the previous

23  communication?

24         MS. ROTHMAN:  No, your Honor.  There is two messages

25  from Mr. Halligan.  One is oof and one is zero dollars, and

1    they are different questions.

2                THE COURT:  But the inquiry that led to that response

3    is also in the document, no.

4                MS. ROTHMAN:  No, it is not, your Honor.  It's in the

5    recording.

6                I can pull the transcript up if the court would like.

7                MS. MULLIGAN:  Your Honor, I object with respect to

8    what Mr. Halligan meant.  This witness can testify what he may

9    have understood.  What Mr. Halligan had going on his head he

10   shouldn't testify.

11               THE COURT:  I would like you to read.  Go through the

12   form.

13               MS. ROTHMAN:  The transcript?

14               THE COURT:  Go through the transcript and let's hear

15   it.

16               MS. ROTHMAN:  No problem.

17               If we can pull up 2521.

18               THE COURT:  I don't think you've given me that, have

19   you?

20               MS. ROTHMAN:  No.

21               I'm happy to play it, your Honor.

22               THE COURT:  Go ahead.  This is admitted into evidence.

23               MS. ROTHMAN:  If we can begin around two minutes.

24               THE COURT:  Let's see who is on this call.  The jury

25   will see who is there from Archegos.

1           MS. ROTHMAN:  Ms. Sonderby, can you highlight the

2    names of the Archegos participants.

3           THE COURT:  And who from Macquarie?

4           Go ahead.

5           MS. ROTHMAN:  Can we proceed, your Honor?

6           THE COURT:  Yes.

7           MS. ROTHMAN:  Let's begin about two minutes in the

8    transcript -- two minutes in the recording.

9           (Audio played)

10          Page two.  We can go to the three-minute mark.

11          THE COURT:  Please announce the page and line number

12   each time.

13          MS. ROTHMAN:  Yes, your Honor.

14          (Audio played)

15          THE COURT:  Page.

16          Folks, folks, folks.

17          MS. ROTHMAN:  Page 3, line 18.

18          THE COURT:  We can't do things simultaneously.

19          MS. ROTHMAN:  Understood.

20          THE COURT:  What page did you read before?

21          MS. ROTHMAN:  We can start at page 3, line 18.

22          THE COURT:  OK.

23          MS. ROTHMAN:  Which we have on the screen, and the

24   recording is teed up.

25          MS. MULLIGAN:  Your Honor, for completeness I would

1   like them to start at line 14.

2            THE COURT:  Please start line 15.

3            (Audio played)

4            MS. ROTHMAN:  If we can pause right there,

5   Ms. Sonderby.

6            Thank you.

7   Q.  Mr. Becker, when Mr. Sofoluwe from Macquarie announces what

8   the margin call is, do you recall Mr. Halligan sending you a

9   message via Bloomberg?

10  A.  Yes, I do.

11  Q.  What do you recall that message being?

12  A.  I recall that message being oof.

13           MS. ROTHMAN:  We can keep playing a bit longer on the

14  call.  I don't intend to play all of it, but we will play a bit

15  longer.

16           (Audio played)

17           Pause right there for a moment.

18           Thank you, Ms. Sonderby.

19           THE COURT:  You stopped reading what page.

20           MS. ROTHMAN:  We stopped at the bottom of page seven,

21  bottom of page six, where we just got to Mr. Mills is about to

22  say, I would say a couple of things.

23           Before I do that --

24           THE COURT:  Line number.

25           MS. ROTHMAN:  Line 21.

O58sHWA5                          Becker - Direct

1   BY THE COURT:

2   Q.  Mr. Becker, as Mr. Mills is speaking during this call, what

3   are you doing?

4   A.  I was taking notes of the conversation.

5   Q.  Why is that?

6          MR. BERKE:  Objection, your Honor.

7          THE COURT:  Did anybody instruct you to take notes?

8          THE WITNESS:  That evening, Mr. Halligan instructed me

9   to pay attention to what was being said.  That is why I took

10  notes.

11         THE COURT:  That is why you took notes.

12  Q.  Did you have an understanding of what your role would be

13  the next day?

14  A.  Yes.  My understanding was that the next day was followup

15  conversations.  I would be the one having those discussions

16  with the companies.

17  Q.  Did you have conversations with banks after this seven a.m.

18  call on Thursday that you understood would happen?

19  A.  Yes, I did have those calls.

20         MS. ROTHMAN:  Let's keep playing a bit longer on this

21  transcript.  We can start at the top of page 7, line 1, when

22  Mr. Mills picks up.

23         (Audio played)

24         You can pause it right here at line 20.

25  Q.  Mr. Becker, did you consider Tencent Music and Baidu

O58sHWA5                          Becker - Direct

```
 1    household names?
 2              MR. BERKE:  Objection, your Honor.
 3              THE COURT:  Sustained.
 4              MS. ROTHMAN:  We can keep playing.
 5              Line 21, page 7.
 6              (Audio played)
 7              We can pause at line five.
 8    BY MS. ROTHMAN:
 9    Q.  Now, Mr. Becker, when Mr. Mills says that the portfolio has
10    FAANG like names, let me ask you.
11              What portion of the portfolio contained FAANG like
12    names?
13              THE COURT:  We have gone over this a million times.
14              MS. ROTHMAN:  My last question on this topic, your
15    Honor.
16              THE COURT:  Haven't we gone over this a million times?
17              MS. ROTHMAN:  I can keep going.  We can keep playing.
18              (Audio played)
19              You can pause it right there.
20    Q.  Now, Mr. Becker, did there come a time when you dropped off
21    of the Macquarie call to join another call?
22    A.  Yes, there did.
23    Q.  What call did you join?
24              MS. ROTHMAN:  We can take down the transcript.
25    A.  I joined a call with Credit Suisse.
```

1    Q.  Who else from Archegos joined that call?

2    A.  No one.  It was just myself.

3    Q.  And did you communicate with Mr. Halligan in advance of the

4    Credit call?

5    A.  Yes, I did.

6    Q.  Did he provide you with directions for the call?

7    A.  Yes, he did.

8    Q.  What did he tell you?

9    A.  In a telephone conversation, he had told me to say that I

10   didn't have access to data, that I actually had that data

11   being -- he told me to say I didn't have access to Archegos'

12   portfolio, I didn't have access to the trade blotter which

13   shows the trades that the trade was executing on the market,

14   and that I didn't have access to the total amount of margin

15   calls that were coming in from brokers that morning.

16            I had access to all three of those.  Also, via

17   Bloomberg chat, he had mentioned I believe in the Bloomberg

18   chat they are actually in quotes of things to say.  They were

19   similar talking points to what Mr. Mills had just said to the

20   effect of there is a plan in the works, we meaning Archegos

21   started selling overnight in Asia, and I think a few other

22   things to that.

23            MS. ROTHMAN:  Let's just pull up one short excerpt

24   from that Bloomberg chat, which is 3783, page 2 at the 11:28

25   timestamp, which is 7:28 in the morning.

1           Focusing on Mr. Halligan's line that reads right in

2    the middle.  Thank you.  11:29.

3           Perfect.  Thanks.

4           We can highlight, Just deflect as best you can.

5    Nothing is getting solved with your call.  It's what the

6    traders do.

7           We can take that down.

8    Q.  Now, after the credit call with Credit Suisse, did you

9    speak to other banks on Thursday?

10   A.  Yes, I did.

11   Q.  Did you take notes in your notebook before doing so?

12   A.  Yes, I did.

13   Q.  Who directed you to have these calls that day?

14   A.  Mr. Halligan.

15          MS. ROTHMAN:  We can pull up what's been marked for

16   identification as Government Exhibit 2522.  The transcript as

17   well, which is 2522-T.

18   Q.  Did you speak with Macquarie around nine o'clock that

19   morning?

20   A.  Yes, I did.

21          MS. ROTHMAN:  Your Honor, the government offers into

22   evidence 2522.

23          MS. MULLIGAN:  No objection.

24          MR. BERKE:  No objection, your Honor.

25          THE COURT:  Received and may be published.

1      (Government's Exhibit 2522 received in evidence)

2   Q.  Now, to keep things moving, I'm going to ask you a few

3   questions about the call, Mr. Becker.

4        OK.  What do you remember Macquarie asking you on the

5   call?

6   A.  They were asking for a further update on what Archegos'

7   plan was, what Archegos thought it may be able to pay of the

8   margin call.  And I believe on this call -- if not it was in

9   later calls I had with Macquarie -- they had mentioned the

10  possibility of Macquarie liquidating some of the positions in

11  Archegos' portfolio with Macquarie.

12  Q.  What information did you provide to Macquarie on the nine

13  a.m. call?

14  A.  I had stuck to the same talking points that were already

15  communicated on the call that we had just gone over earlier

16  that morning at seven a.m.  I -- I don't remember if I said

17  anything else of substance to Macquarie.

18  Q.  OK.  If we can turn to page three of the transcript.

19       I want to focus on the line at the top, line four

20  where you say, I do feel good about it.

21       And then at the bottom on line 19 where you say, I do

22  feel confident.  I think we'll get there.

23       Was that accurate?

24  A.  No, that's not accurate.

25  Q.  Let's turn to the last page, page five of the transcript.

1    Focusing on line four where you say -- lines three and four --

2    I think an important communication that I've tried to give

3    everyone I've spoken to today is, if you're not able to get

4    ahold of Will or anyone else, come to me.  I'll make sure the

5    message is delivered.  We don't want to leave anyone in the

6    dark.

7              Did anyone direct you to say that?

8    A.  Yes.  Mr. Halligan did.

9    Q.  OK.

10             THE COURT:  When?

11             MS. ROTHMAN:  We can take that down.

12             THE COURT:  When?

13             MS. MULLIGAN:  Objection, your Honor.  There are

14   several statements in that paragraph.

15             THE COURT:  I'm asking when.

16             MS. MULLIGAN:  Sure.

17             THE WITNESS:  It was the evening before in the calls

18   with the brokers.  Several of the brokers had mentioned that it

19   was important to have an open line of communication.

20             Mr. Halligan instructed me to be that open line of

21   communication if a broker couldn't get ahold of anyone else at

22   Archegos.

23             MS. ROTHMAN:  OK.

24             MS. MULLIGAN:  Thank you, your Honor, for your

25   inquiry.

1          MS. ROTHMAN:  We can take that down.

2    BY MS. ROTHMAN:

3    Q.  Now, on the morning of Thursday, did Archegos tally the

4    margin calls it was receiving from the banks?

5    A.  Yes, we did, as they came in.

6    Q.  Do you recall the approximate size of those margin calls?

7    A.  I believe they were 12 or $13 billion.

8    Q.  If we can pull up what's been marked for identification as

9    Government Exhibit 216.

10          Before I ask you about this, let me ask you this,

11   Mr. Becker, had you provided directions to the operations team

12   with respect to whether or not they should get back to banks

13   that morning?

14   A.  Yes, I did.  I mentioned to the members of the operations

15   team, who normally process margin calls, if any of the banks

16   reached out to them, to just not respond or don't pick up the

17   phone if they call your phone.

18   Q.  What was the reason for that?

19   A.  That was the -- that was the default practice at Archegos.

20   Obviously this situation was a bit extreme, but there were past

21   situations where Archegos, there was a timing issue or,

22   perhaps, wires from margin calls wouldn't be sent out

23   immediately.  The default was to not pick up the phone until

24   we -- we had a plan of when those calls would be paid.

25   Q.  OK.  Looking at Government Exhibit 216, do you recognize

O58sHWA5                    Becker - Direct

1   this document?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  This is an e-mail from Mr. Halligan updating Mr. Mills and

5   Mr. Tomita on the current margin calls that had come in as of

6   that morning.

7           MS. ROTHMAN:  Your Honor, the government offers into

8   evidence Government Exhibit 216.

9           MS. MULLIGAN:  No objection, your Honor.

10          MR. BERKE:  No objection, your Honor.

11          THE COURT:  Received, and you may publish.

12          (Government's Exhibit 216 received in evidence)

13          MS. ROTHMAN:  If we can just highlight for the jury

14  the total at the bottom, which is about $10 billion, and the

15  time of this e-mail, which is about 8:48 in the morning.

16          The bottom e-mail.  Thank you.

17  Q.  Mr. Becker, did you have the authority to direct which

18  margin calls would be paid?

19  A.  No, I did not.

20  Q.  Who had that authority at Archegos?

21  A.  Mr. Halligan would have to approve all wires as authorized

22  inventory.

23  Q.  Did Archegos have enough money to pay its margin calls that

24  morning?

25  A.  No, it did not.

O58sHWA5                        Becker - Direct

1    Q.   Did Archegos pay any margin calls on Thursday?

2    A.   Yes.  It paid two margin calls.

3    Q.   Which ones?

4    A.   The margin calls for Jeffreys and BMO, Bank of Montreal.

5    Q.   Do you know why those margin calls were paid?

6    A.   Yes.  Because those were smaller margin calls, and

7    Mr. Halligan was interested to pay those margin calls so those

8    two brokers would leave us alone.

9    Q.   We can take this down.

10           Did you also speak with UBS on the morning of

11   Thursday, March 25?

12   A.   Yes, I did.

13   Q.   Do you recall who you spoke with?

14   A.   Yes.  On a call from UBS, it was Brian Fairbanks, his --

15   his manager, I don't recall his name, and I believe

16   Mr. Fairbanks' two members of his team as well.

17   Q.   Now we've already heard this call.  I'm not going to play

18   it again.

19           Let me ask you, Mr. Becker, what information did you

20   provide to UBS on that call?

21           THE COURT:  What did you say would be a better

22   question.

23   Q.   What did you say?

24   A.   I reiterated the information that was communicated to them

25   the prior night in a call that Mr. Mills had led.

O58sHWA5                        Becker - Direct

1  Q.  We can go to the transcript, which is 2543-T.  We can turn

2  to page 8, please, line 16.

3          Focusing on lines 10 through 17, when Mr. Nikolov

4  asked you the outstanding margin calls as of this morning.

5          We can highlight that.  Just highlight.  That's great.

6          And you say, I don't have a clear picture.  I couldn't

7  share that anyway to be honest.

8          Did you know the margin calls that morning?

9  A.  Yes, I did.

10  Q.  Why didn't you tell UBS what the actual margin calls were?

11  A.  Because I was instructed by Mr. Halligan to say that I

12  didn't have access to that data.

13  Q.  We can take that down.

14          Did you and Mr. Halligan stay in contact throughout

15  Thursday?

16  A.  Yes, we did.

17  Q.  Did you participate in the call with Macquarie in the

18  afternoon of Thursday, March 25?

19  A.  Yes, I did.

20          MS. ROTHMAN:  OK.  We can pull up for the witness what

21  has been marked as 2526, and the relevant transcript 2526.

22          The government offers into evidence Government Exhibit

23  2526.

24          MS. MULLIGAN:  No objection.

25          MR. BERKE:  No objection, your Honor.

O58sHWA5                         Becker - Direct

1              THE COURT:  Received.  You may publish.

2              (Government's Exhibit 2526 received in evidence)

3              MS. ROTHMAN:  Thank you, your Honor.

4              This is a short call, so we can play it starting at

5    the beginning, which is page 1, line 10.  Thank you.

6              (Audio played)

7              We can pause it right there, Ms. Sonderby.  Thank you.

8    BY MS. ROTHMAN:

9    Q.  Mr. Becker, when you told Macquarie you couldn't see the

10   portfolio in realtime, who directed you to say that?

11   A.  Mr. Halligan.

12             MS. ROTHMAN:  We can take that down.

13             THE COURT:  Was that the same time he told you to take

14   notes?

15             THE WITNESS:  No.

16             He had mentioned taking notes the evening before, and

17   this --

18             THE COURT:  This was a separate instruction?

19             THE WITNESS:  This was a separate instruction the next

20   morning.

21             THE COURT:  Had you mentioned this before your

22   particular testimony, this particular instruction?

23             THE WITNESS:  To say that I didn't have access to

24   counterparties?

25             THE COURT:  Yes.

O58sHWA5                        Becker - Direct

1          THE WITNESS:  Yes.  I believe that was discussed a

2    short while ago.

3          THE COURT:  Are we repeating?

4          MS. ROTHMAN:  No.  We're moving on, your Honor.

5          THE COURT:  Have we been repeating?

6          MS. ROTHMAN:  No, your Honor.

7          We're about to move to -- we're about to wrap up.

8    BY MS. ROTHMAN:

9    Q.  After the calls you had that afternoon, what did you do?

10          THE COURT:  Promise.

11          MS. ROTHMAN:  I do.  You can start a timer, if you

12   want.  I have about six minutes left.

13   Q.  After the calls, what did you do?

14   A.  After the calls that I had that day, Mr. Halligan had asked

15   me to, um, write down a list of the questions that I was asked

16   throughout the day and how I was going to answer it.

17          So I -- I did that and e-mailed it to him.

18          MS. ROTHMAN:  Let's pull up what's been marked as

19   government 186 and 186A, please.

20   Q.  Do you recognize this, Mr. Becker?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is an e-mail from myself to Mr. Halligan on March 25,

24   summarizing the questions and answers of discussions I had with

25   brokers that day.

O58sHWA5                        Becker - Direct

1              MS. ROTHMAN:  The government offers 186 and 186A.

2              MS. MULLIGAN:  No objection.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Received.  You may publish.

5              (Government's Exhibits 186 and 186A received in

6    evidence)

7              MS. ROTHMAN:  Thank you.

8    Q.  We can just focus on first your e-mail to Mr. Halligan at

9    5:40 p.m. with the attachments conversations with brokers,

10   3.25.21.

11             Then focusing on the messages that -- the notes that

12   you send to Mr. Halligan -- I won't ask you about all of

13   them -- but is the information in here true or false?

14   A.  False.

15             MS. MULLIGAN:  Objection, your Honor.

16             MS. ROTHMAN:  OK.

17   Q.  Where did you get this information from?

18             THE COURT:  Just a minute.

19             MS. MULLIGAN:  Objection, your Honor.

20             THE COURT:  I know.  I heard it.

21             Sustained.

22             MS. ROTHMAN:  OK.  I can go through a few examples and

23   then move on, your Honor.

24   Q.  If you look at number two -- zoom in on number two -- where

25   you write, I don't have access to the trade blotter.

1          Did you have access to the trade blotter?

2     A.  Yes, I did.

3     Q.  OK.  If we can go to number four where you write, I don't

4     have access to the total range calls.

5          Did you know the total range calls?

6     A.  Yes, I did.

7     Q.  Let's go to page two of your notes.  Actually, I'm sorry,

8     page 117A.  You can zoom in where you say, the internal reports

9     that I typically have access to were not published last night.

10         Did Archegos publish its portfolio reports on

11    Wednesday night?

12    A.  Yes, they were published.

13    Q.  Now, if we can go to page two of your notes to Mr. Halligan

14    focusing on 9A.  I want to focus on what you put in parentheses

15    at the end where you say, I did not go into much detail here

16    and simply reiterated the summary that Andy and Will have

17    already provided to each broker.

18         Why did you tell Mr. Halligan that?

19    A.  Because that is what I did on -- when this question came

20    up from counterparties.  These were -- these were the

21    conversations, the conversations that Mr. Mills and Mr. Tomita

22    had led the prior night and that next morning.

23         MS. ROTHMAN:  We can zoom out.

24    Q.  Did Mr. Halligan respond to your e-mail?

25    A.  No, I don't believe he did.

1        MS. ROTHMAN:  We can take this down.

2   Q.  Now, after you sent these notes to Mr. Halligan, did you

3   learn that Archegos had a call with several banks on Thursday

4   night?

5   A.  Yes, I did learn that.

6   Q.  Did you join that call?

7   A.  No, I did not.

8   Q.  After the call, did you receive an e-mail from someone at

9   Deutsche Bank?

10  A.  Yes, I did.

11  Q.  What did Deutsche Bank ask you?

12  A.  Deutsche Bank had said that they were just on a call with

13  people from Archegos, and on that call they had given data

14  points that were inconsistent with what I had communicated with

15  them earlier in the day.

16  Q.  When you got that e-mail, what did you do with it?

17  A.  I forwarded it to Mr. Halligan.

18       MS. ROTHMAN:  Please pull up for the witness what's

19  been marked as 1394.

20  Q.  Do you recognize this document?

21  A.  Yes, I do.

22  Q.  What is it?

23  A.  This is the e-mail that I forwarded to Mr. Halligan from

24  Deutsche Bank asking about that, those data points.

25       MS. ROTHMAN:  The government offers 1394 into

O58sHWA5                          Becker - Direct

1    evidence.

2              MS. MULLIGAN:  No objection, your Honor.

3              MR. BERKE:  No objection, your Honor.

4              THE COURT:  Received.  You may publish.

5              (Government's Exhibit 1394 received in evidence)

6    BY MS. ROTHMAN:

7    Q.  I just want to focus on the top e-mail from you to

8    Mr. Halligan.

9              Why did you forward Deutsche Bank's e-mail to

10   Mr. Halligan?

11   A.  Because I didn't know how to respond, if at all, to

12   Deutsche Bank.

13   Q.  Did Mr. Halligan respond to your e-mail?

14   A.  I don't believe so.

15             MS. ROTHMAN:  We can take this down.

16   Q.  On Friday, did Archegos receive default notice from its

17   banks?

18   A.  Yes, it did.

19   Q.  Who were they sent to?

20   A.  They were sent to -- it was several methods.

21             Some of them were sent via e-mail, others were sent

22   via courier to Archegos' offices, some were sent to -- it was a

23   combination of Mr. Halligan, myself, Mr. Hwang, Mr. Mills,

24   Mr. Tomita.  And I believe even Mr. Hwang was cc'd on some of

25   those e-mails.

1  Q.  When you got them, what did you do with them?

2  A.  I compiled them and forwarded that to legal counsel.

3  Q.  When did you learn that Archegos had collapsed?

4  A.  That morning as the default notices came in from the

5  brokers.

6  Q.  Mr. Becker, I want to wrap up by talking about how you got

7  here.

8         After the collapse, when did you first have contact

9  with law enforcement?

10  A.  In late July of 2021.

11  Q.  What happened that day?

12  A.  That morning, several FBI agents knocked on my front door

13  to execute a search warrant.

14  Q.  Did you know why they were there?

15  A.  Yes, I did.

16         When they knocked on the door, I had answered, um, via

17  video doorbell.  When they said they were from the FBI, I knew

18  that it was related to Archegos.

19  Q.  What did they take from your house that day?

20  A.  They took my cell phone, my tablet, um, my computer, as

21  well as hard copy files.

22  Q.  Did the agents say anything to you that morning?

23  A.  Yes, they did.

24         Um, at the beginning of their -- um, at the beginning

25  of their search, they -- my wife and son were also home.  And,

1    um, one of the agents noticed my son.  He asked how old he was.

2    He was one at the time.  And he said that it was OK if my wife

3    and my son go into one of the bedrooms upstairs with the door

4    closed while agents conducted their search.

5            They were there, um, I believe for over an hour or so.

6    Q.  What else did they say?

7    A.  When they were done with their search and they were

8    leaving, I thanked them for, um, for -- for allowing my wife

9    and son to, um, not witness what was going on.  And, um, one of

10   the agents, he said, you're welcome, um, we -- we hope to work

11   with you on this.  Um, two of the agents gave me their cards

12   and had requested that my legal counsel contact them for next

13   steps.

14   Q.  How soon after the search did you first meet with the

15   government?

16   A.  I believe it was the next day.

17   Q.  In that first meeting, who did most of the talking?

18   A.  The -- the government.  The, um, AUSA.

19   Q.  Did they play any recordings for you?

20   A.  Yes, they did.

21           THE COURT:  Did you have counsel at that meeting?

22           THE WITNESS:  Yes, I did.

23   Q.  What did they ask you to consider?

24   A.  They asked me to consider cooperating with them.

25   Q.  After that first meeting, what did you decide to do?

O58sHWA5                        Becker - Direct

1    A.  I decided to move forward and cooperate.

2    Q.  Why did you make that decision?

3    A.  Because I was -- I was guilty, um, and I -- I just wanted

4    to move forward with my life.

5    Q.  When you first sat down with the government, did you have a

6    cooperation agreement?

7    A.  No, I did not.

8    Q.  When you first met with the government, what type of

9    information did you provide?

10   A.  Um, I provided, um, information about the crimes that I had

11   committed, um, general information about Archegos, and the

12   crimes that others at Archegos had committed.

13   Q.  Why did you provide this information?

14   A.  Because that -- that was, um, that was my understanding of

15   how I could cooperate.

16   Q.  Did you later plead guilty to federal crimes?

17   A.  Yes, I did.

18   Q.  How many crimes have you pled guilty to?

19   A.  Three.

20   Q.  What crimes did you plead guilty to?

21   A.  Racketeering conspiracy, securities fraud, and wire fraud.

22   Q.  Before pleading guilty, did you enter into a cooperation

23   agreement with the government?

24   A.  Yes, I did.

25            MS. ROTHMAN:  Can you please pull up for the witness

O58sHWA5                    Becker - Direct

1   what's been marked as Government Exhibit 4501.

2   Q.  Do you recognize this document?

3   A.  Yes, I do.

4   Q.  What is it?

5   A.  This is my cooperation agreement.

6           MS. ROTHMAN:  Your Honor, the government offers into

7   evidence 4501.

8           MS. MULLIGAN:  No objection.

9           MR. BERKE:  No objection, your Honor.

10          THE COURT:  Received.  You may publish.

11          (Government's Exhibit 4501 received in evidence)

12  BY MS. ROTHMAN:

13  Q.  Mr. Becker, what is your understanding of your obligations

14  under this agreement?

15  A.  To tell the truth, not commit crimes, and to be available

16  to cooperate as the government requests.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MS. ROTHMAN:

2   Q.  If you live up to your obligations, what is your

3   understanding of what the government will do for you?

4   A.  That they will provide a 5K1 letter to the sentencing

5   judge.

6   Q.  What is your understanding of what information will be

7   included in that letter?

8   A.  The letter will include details of my crimes, as well as --

9   as well as details of my assistance in their investigation.

10  Q.  What are you hoping will happen as a result of the

11  government writing this letter?

12  A.  I hope that the judge takes that into consideration and

13  to -- for me to avoid prison.

14  Q.  Will the government recommend a specific sentence to the

15  judge?

16  A.  No, they will not.

17  Q.  What is the maximum punishment you face?

18  A.  60 years in prison.

19  Q.  Does that maximum punishment apply even if the government

20  writes the letter?

21  A.  Yes, it does.

22  Q.  What is your understanding of who decides your sentence?

23  A.  The judge.

24  Q.  Is the judge required to give you a lower sentence if the

25  government writes this letter?

O5M6HWA2                      Becker - Direct

1   A.  No, he's not.

2   Q.  If you violate the terms of your cooperation agreement, do

3   you believe the government will still write a letter for you?

4   A.  No, they won't.

5   Q.  Have any promises been made to you about what sentence you

6   will receive?

7   A.  No, none at all.

8   Q.  Sitting here today, do you know what sentence you will

9   receive?

10  A.  I do not.

11  Q.  What sentence do you want?

12  A.  I don't want to go to prison.

13  Q.  Does the outcome of this trial have any effect on whether

14  or not the government writes this letter?

15  A.  No, it does not.

16  Q.  If you lie today, do you still get a letter from the

17  government?

18  A.  I will not.

19  Q.  What is your understanding of the only thing that matters

20  with respect to your testimony here today?

21          MR. BERKE:  Objection, your Honor.

22          MS. MULLIGAN:  Objection.

23          THE COURT:  Sustained.

24  BY MS. ROTHMAN:

25  Q.  What happens if you're not truthful here today, Mr. Becker?

1            MR. BERKE:  Objection.

2            MS. MULLIGAN:  Objection.

3            THE COURT:  Sustained.

4            MS. ROTHMAN:  We can take this down.

5    BY MS. ROTHMAN:

6    Q.  Mr. Becker, after the collapse, were you offered a job at

7    Grace & Mercy?

8    A.  Yes, I was.

9    Q.  Is that Mr. Hwang's family foundation?

10   A.  Yes, it is.

11   Q.  Who offered you the job?

12   A.  Diana Pae.

13   Q.  What was the title?

14   A.  The title was director of operations/risk management.

15   Q.  What was the salary?

16   A.  The salary was the same as my Archegos salary, $250,000 per

17   year.

18   Q.  Were you offered a bonus?

19   A.  She said the bonus would range between 30 and 100 percent

20   of my base salary.

21   Q.  Did you speak with Mr. Halligan about the job offer?

22   A.  Yes, I did.

23   Q.  What did he say to you?

24   A.  After I spoke to Ms. Pae, I spoke to Mr. Halligan.  The

25   biggest question that I had for Mr. Halligan, based on my

1   understanding of the position -- that a lot of that position,

2   those responsibilities, would surround Grace & Mercy's

3   investment portfolio.  Grace & Mercy had an investment

4   portfolio, the counterparties of which were two of Archegos'

5   counterparties.

6           So I had asked Mr. Halligan when he expected

7   Grace & Mercy to be able to start trading that portfolio, given

8   they were the same counterparties.  He, at the time, said he

9   had anticipated that to unfreeze in about six months.

10  Q.  Did Mr. Halligan say anything else about the offer?

11  A.  Yes.  And it may have been a subsequent conversation.  I

12  don't recall if it was the initial conversation.  He had stated

13  that if I -- if I am considering not accepting the position at

14  Grace & Mercy, to not do so for the sake of any of my

15  colleagues in the operations department because this job offer

16  was only for me.

17  Q.  Did you accept the offer?

18  A.  I did not.

19  Q.  Why not?

20          MR. BERKE:  Objection, your Honor.

21          MS. MULLIGAN:  Objection, your Honor.

22          MR. BERKE:  Your Honor, if I may, I object to the last

23  question.

24          THE COURT:  I understand.

25          MR. BERKE:  Thank you, Judge.

O5M6HWA2                          Becker - Direct

1            THE COURT:  That's why I'm thinking.

2            MR. BERKE:  Thank you, Judge.

3            I better discuss this with the lawyers.  It's time for

4    our break anyhow.  Why don't we break now.  Close your books.

5    Leave them on your chair.  Don't discuss the case.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5M6HWA2                           Becker - Direct

1                  (Jury not present)

2                  THE COURT:  Be seated.

3                  What was the purpose, Ms. Rothman, of eliciting

4       information that Mr. Becker was offered a job at Mr. Hwang's

5       family foundation?

6                  MS. ROTHMAN:  So I think two points, your Honor:  The

7       intention by that job offer is to keep his loyalty, and what he

8       will say is -- and that's particularly important by the fact

9       that this job is just for him, as Mr. Halligan said, and no one

10      else in the operations team.  They know they have in Mr. Becker

11      someone who will do what he is told to do.  And that's what his

12      testimony has been, maybe for too long, but that's what his

13      testimony has been.  And this job offer is one more point in

14      that direction.

15                 What he will say is he didn't accept it because he

16      knew he had been committing crimes with these people for over a

17      year.  It goes to his credibility, it goes to his motivation.

18      He is going to be attacked extensively on cross-examination.

19      The jury should hear what he was offered and why he chose not

20      to take it.

21                 THE COURT:  The jury has heard what he was offered.

22                 MS. ROTHMAN:  And they heard he hasn't taken it.

23                 THE COURT:  That's the point I'm talking about right

24      now.  It seems to me that all he needs to say -- and you have

25      already established he didn't take it, the offer, at this

1    point.

2              I don't see the relevant value of the information of

3    why he didn't want to take it and his propounding on the point

4    that crimes committed by others adds to the relevant

5    information in a way that doesn't completely become

6    overbalanced by the prejudicial effect of the information.

7              MS. ROTHMAN:  Your Honor, respectfully, I'm not sure I

8    appreciate the undue prejudice from a cooperating witness who

9    has pled guilty to federal crimes, who will be cross-examined

10    on his motivations for doing so, by telling the jury that when

11    offered to work at this company where he committed crimes, he

12    said no because he knew what he was doing was wrong and he

13    didn't want to work with them anymore.

14              THE COURT:  Have you ever heard of redirect?

15              MS. ROTHMAN:  Thank you, your Honor.  Then I'm done,

16    that's it.

17              THE COURT:  Okay.  Let's take a break.  Objection

18    sustained.

19              (Recess)

20              MR. ROTHSCHILD:  May we bring the witness back?

21              THE COURT:  Yes, you may.

22              MS. ROTHMAN:  Your Honor, should I just say no further

23    questions for the record?

24              THE COURT:  Yes.

25              MS. ROTHMAN:  Okay.  No problem.

O5M6HWA2                         Becker - Direct

1          THE COURT:  Or I'll say it.

2          Who is cross-examining?

3          MR. BERKE:  Your Honor, I'm the opening act.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (Jury present)

 2                  THE COURT:  I sustained the objection.  Ms. Rothman

 3     doesn't have any further questions, so we'll begin

 4     cross-examination with Mr. Berke.

 5                  MR. BERKE:  Thank you, your Honor.

 6                  Your Honor, if I may.

 7                  THE COURT:  You may.

 8     CROSS-EXAMINATION

 9     BY MR. BERKE:

10     Q.  Mr. Becker, you testified at length on direct about lies

11     you told counterparty banks over an extended period of time,

12     correct?

13     A.  Yes, that's correct.

14     Q.  Sir, my question is, how many times prior to telling those

15     lies did Mr. Hwang direct you to tell lies?

16     A.  I don't recall an instance where he explicitly told me to

17     lie.

18     Q.  So the answer is none, no times did Mr. Hwang tell you

19     that, correct, sir?

20     A.  Yes, that's correct.

21     Q.  Sir, how many times after --

22                  THE COURT:  Just a minute.

23                  (Pause)

24                  THE COURT:  Can you move your mic away, Mr. Berke.

25                  MR. BERKE:  I'm sorry, Judge.  Yep.

1          THE COURT:  Put it down, take it down -- no, no.  The
2     head of it.
3          MR. BERKE:  Thank you, Judge.  Is that better?
4          THE COURT:  No, it's going to take -- it's the head
5     that reinforces it.  Not the base.
6          MR. BERKE:  I see.  Judge, is this okay for you?
7          THE COURT:  Yes.
8          MR. BERKE:  Thank you, Judge.
9     BY MR. BERKE:
10    Q.  Mr. Becker, how many times after you told lies to the banks
11    did you tell Mr. Hwang that you had lied to the banks?
12    A.  Zero times outside of the internal Zoom call that was held
13    prior to the discussions with the banks that Mr. Mills and
14    Mr. Tomita led.
15    Q.  Hold on.  You just mentioned a March 24 call.  I asked you,
16    sir -- we'll get to the final week.
17          The question is, was your answer none, you reported
18    your lies to Mr. Hwang no times?
19    A.  That's correct.
20    Q.  And, sir, on that March 24th call you did not tell
21    Mr. Hwang that you had been lying to the banks, did you, sir?
22    A.  No, I did not.
23    Q.  And, sir, when you met with these banks, and you told your
24    lies, at how many of those meetings was Mr. Hwang present?
25    A.  They were primarily phone calls.  He was not present for, I

O5M6HWA2                          Becker - Cross

1    believe, any of them.

2    Q.  Mr. Becker, I believe you said on your first day of direct,

3    no fewer than three times it was your job to lie; is that

4    correct?

5    A.  Yes, that's correct.

6    Q.  Mr. Becker, before testifying you met with the prosecutors

7    in this case and the agents, like more than 30 times; isn't

8    that correct?

9    A.  It may have been about that, yes, that many times.

10   Q.  This goes back to 2021, you met with them many times,

11   correct?

12   A.  Yes.  That's correct.

13   Q.  2022 you met with them, correct?

14   A.  Yes.  During 2022 as well.

15   Q.  2023 you met with them, correct?

16   A.  I'm not sure if I met with them in 2023.

17   Q.  Sir, let me show you an example, if I may, let me show you

18   what is marked as 3501-38 just for the witness.

19           Sir, I ask you to read to yourself the top line, and

20   my question to you, sir, does that refresh your memory that you

21   met with the prosecutors in 2023 as well?

22   A.  Yes, it does.

23   Q.  And you also met with them many times in 2024, correct?

24   A.  Yes, that's correct.

25   Q.  So my question for you, Mr. Becker, is when did you first

O5M6HWA2                        Becker - Cross

1   come up with this line that you used, that it was your job to

2   lie?

3            MS. ROTHMAN:  Objection.

4            THE COURT:  Sustained.

5   BY MR. BERKE:

6   Q.  When did you first make the statement, sir, that it was

7   your job to lie?

8   A.  I'm not sure.

9   Q.  Was it just recently in preparation for your testimony?

10           MS. ROTHMAN:  Objection.

11           THE COURT:  Overruled.

12  A.  I don't recall when I made that statement to them.

13  BY MR. BERKE:

14  Q.  Sir, isn't it a fact that you did not tell the prosecutors

15  that it was your job to lie in 2021?

16  A.  I don't know when I said that to them.

17  Q.  You have no memory of saying that in 2021, do you?

18           MS. ROTHMAN:  Objection.

19           THE COURT:  Overruled.

20  A.  I don't know specifically in which meeting I said that for

21  the first time.

22  BY MR. BERKE:

23  Q.  You have no memory of saying that in 2022, do you, sir?

24  A.  I don't recall when I said that.

25  Q.  Did you say it in 2023, sir?

1   A.  I don't know.

2   Q.  Is the first time you said it, sir, as you were just

3   getting ready and rehearsing for your testimony here in court?

4   A.  I don't know when I said it for the first time.  The

5   preparation sessions, I would not refer to those as rehearsals

6   for this at all.  I refer to them as preparation for this.

7   Q.  Did it come up, sir, for the first time in your preparation

8   sessions?

9   A.  I don't know when it came up for the first time.

10  Q.  Whose -- who came up with that wording it was your job to

11  lie, did you come up with it or did someone on the prosecution

12  team come up with it, who came up with that?

13  A.  I came up with that, that's the truth.

14  Q.  Were you asked, sir, was it your job to lie by someone on

15  the prosecution team?

16  A.  I don't know what prompted me to say that.  That's the

17  truth, though.

18  Q.  Mr. Hwang never told you it was your job to lie, did he,

19  sir?

20  A.  No, he didn't explicitly say that.

21  Q.  He didn't implicitly say that either, did he, sir?

22  A.  On a Zoom call on March 24th, the discussion from all the

23  participants on that call were lies and misrepresentations to

24  give the banks in follow-up calls.

25  Q.  Whoa, whoa, whoa.

O5M6HWA2                      Becker - Cross

1            THE COURT:  Let him finish.

2   BY MR. BERKE:

3   Q.  Are you finished, sir?

4            THE COURT:  He's not finished.

5   BY MR. BERKE:

6   Q.  Okay, please finish.

7            THE COURT:  Do you know where you picked up?

8   A.  It was during that Zoom call before the conversations that

9   Mr. Mills and Mr. Tomita led with the banks, the talking points

10  discussed on that call were lies, Mr. Hwang was on that call as

11  was I.

12  BY MR. BERKE:

13  Q.  Sir, all right, let me understand this.  You said you were

14  telling lies to banks for years prior to the final week,

15  correct?

16  A.  I don't know when I first started telling lies to banks.

17  It may have been in 2018 or '19.  But I know it was absolutely

18  in 2020.

19  Q.  Okay.  And, sir, let's put aside right now the final week.

20  Tell me, prior to the -- prior to your claims about the final

21  week, when did Mr. Hwang tell you to lie?

22  A.  He didn't.

23  Q.  And, sir, let's talk about the final week.  Sir, do you

24  recall that prior to April 13, 2022, you met with the

25  prosecution seven times?

1   A.  I met with them several times.  I don't know exactly how

2   many times, but I did meet with them prior to April 15.

3   Q.  Do you have any basis to disagree with seven?

4              MS. ROTHMAN:  Objection.

5              THE COURT:  Sustained.

6   BY MR. BERKE:

7   Q.  Let me show you -- you said you met with them several

8   times, correct?

9   A.  Yes, several times.

10  Q.  First, do you recall you met with them on August 3, 2021,

11  correct?

12             If we could quickly pull up 35011?

13             MS. ROTHMAN:  Objection.

14  BY MR. BERKE:

15  Q.  Do you recall, sir, if you met with them on that day,

16  August 3rd?

17  A.  That date sounds correct.

18  Q.  Do you recall you met with them on August 9, 2021?

19  A.  That date sounds about correct.

20  Q.  Do you recall you met with them on August 10, 2021?

21  A.  That day sounds correct, yes.

22  Q.  Do you recall you met with them on August 13, 2021?

23  A.  That date sounds correct, yes.

24  Q.  Do you recall you met with them on September 8, 2021?

25  A.  That date sounds correct.

O5M6HWA2                        Becker - Cross

1    Q.  Do you recall you met with them on September 20, 2021?

2    A.  That date sounds correct.

3    Q.  You recall you met with them on December 12, 2021?

4    A.  That date sounds correct.

5    Q.  And isn't it true, sir, that at each one of those meetings,

6    completely, you told the prosecution team that you couldn't

7    remember any specific instances or direct interaction with

8    Mr. Hwang about the misrepresentations that you, sir, made to

9    the counterparty banks?

10   A.  Yes, I believe that's correct.

11   Q.  So let me ask you about a direction Mr. Hwang did give you.

12            Mr. Hwang directed you and everyone at the firm to

13   protect the confidentiality of the investment strategies at the

14   firm, correct?

15            MS. ROTHMAN:  Objection.

16            THE COURT:  Overruled.

17   A.  Those were general instructions from Mr. Hwang, yes.

18   BY MR. BERKE:

19   Q.  And you knew it was even in the compliance manual, the

20   importance of protecting the investment strategy of the firm so

21   people couldn't steal it or undermine the investment strategy,

22   correct?

23   A.  Yes, I believe the compliance manual did mention that.

24   Q.  Was it your job, sir, to keep things confidential?

25   A.  Yes, it was part of my job.

O5M6HWA2                          Becker - Cross

1  Q.  And, sir, you know the difference between keeping things

2  confidential and telling lies, don't you?

3  A.  Yes, I do.

4          MR. BERKE:  Your Honor, may I put on the screen what's

5  in evidence as Government Exhibit 2140?

6          THE COURT:  You may.

7          MR. BERKE:  Thank you, Judge.

8  BY MR. BERKE:

9  Q.  Sir, do you recognize this as the e-mail that we talked

10 about between you and Mr. Salcedo in March of 2021?

11 A.  Yes, I do.

12 Q.  And do you recall, sir, that on this -- let me show you

13 some paragraphs, if I may.  If you go to Page 2, top e-mail.

14         And, sir, you see, in this line, you say, "Hi Chris,

15 it was nice chatting with you as well.  Unfortunately I can't

16 comment about position sizes away from UBS or individual

17 names."

18         Do you see that, sir?

19 A.  Yes, I do.

20 Q.  And you were being direct with Mr. Salcedo, telling him

21 directly so he could understand that you couldn't comment about

22 that, correct?

23 A.  Yes, that's correct.

24 Q.  You're telling him that information is confidential and you

25 can't tell him, correct?

1    A.  Yes, that's correct.

2    Q.  Let me show you again -- excuse me -- let me show you

3    another entry as well.  And if we could go to Page 1, bottom

4    e-mail.

5            And you see he asks for more details about top names

6    and the gross market value and average daily volume, do you see

7    that, sir?

8    A.  Yes, I do.

9            MR. BERKE:  Can we go to the two answers?

10   BY MR. BERKE:

11   Q.  And you say, I can't provide the color either.  I spoke to

12   Will Tomita on it and he said that if there are liquidity

13   profile concerns, you can reflect that in the margin rates.

14           You would agree with me, sir, again, that's an example

15   of you saying something is confidential and being direct about

16   it to a banker and you can't disclose it, correct?

17           MS. ROTHMAN:  Objection to form.

18           THE COURT:  Overruled.

19   A.  Yes.  That's correct.

20   BY MR. BERKE:

21   Q.  And you're also saying, if we're not telling you enough,

22   just charge us more margin, take more cash in doing the

23   transaction, you're repeating what Mr. Tomita told you to say,

24   correct?

25   A.  I was repeating what Mr. Tomita said -- yes, that is

1    correct.

2    Q.  Okay.  And, sir, you were aware that that was something

3    Mr. Tomita would say to banks, that if you're not comfortable

4    with our confidentiality and what we are disclosing, you can

5    charge us more margins, correct?  Or require a greater margin,

6    correct?

7    A.  Correct.

8    Q.  And Mr. Tomita might also say, if you're not comfortable

9    with the information we're disclosing, you don't have to -- you

10   don't have to give us more capacity and do banking with us,

11   correct?

12           MS. ROTHMAN:  Objection.

13           THE COURT:  Overruled.  It might also say "fix that

14   up."

15           MR. BERKE:  Thank you, Judge.  You're right, of

16   course, you're right.  You're always right, but you're

17   absolutely right on this one.

18           THE COURT:  Just a moment.  I want to write that down.

19   BY MR. BERKE:

20   Q.  Mr. Tomita did tell the banks at times that if they weren't

21   comfortable with the confidentiality or the disclosures, they

22   could not give greater capacity, correct?

23   A.  I don't know if he said that.

24   Q.  Well, he said they didn't have to do business with you,

25   correct?

O5M6HWA2                          Becker - Cross

1    A.  I don't know if he said that.

2    Q.  Well, do you recall him saying that we can do business --

3    we can seek to do business with other banks?

4               MS. ROTHMAN:  Objection.

5               THE COURT:  Overruled.

6    A.  Can you repeat the question.

7    BY MR. BERKE:

8    Q.  Do you recall Mr. Tomita, when talking to banks about

9    getting additional capacity, said if you're not comfortable

10   giving us capacity, we can seek it from other banks?  Do you

11   recall him saying that?

12   A.  No, I don't recall him saying that.

13   Q.  Sir, do you recall telling the prosecution team on

14   August 9, 2021, that Mr. Tomita would say he could move

15   Archegos' business to other firms if they weren't comfortable

16   giving capacity?

17   A.  I don't recall the specific statement, but it would be

18   normal practice for Mr. Tomita to say that Archegos could move

19   positions from one broker to another, if sometimes that was

20   requested.

21   Q.  And Mr. Tomita would also say, would he not, that if the

22   banks would give you greater capacity, Archegos could do more

23   business with those banks?

24               MS. ROTHMAN:  Objection.

25               THE COURT:  Mr. Becker can take care of this himself.

1              MS. ROTHMAN:  Understood, Judge.

2              THE COURT:  Objection overruled.

3   A.  Can you repeat that question again?

4   BY MR. BERKE:

5   Q.  Yes.

6              Am I right, sir, that Mr. Tomita would also tell the

7   banks that if they did give capacity, Archegos could

8   potentially do more business with them?

9   A.  Yes, that's accurate.

10  Q.  And you've already said, he would say -- regularly say, and

11  if you aren't comfortable with our disclosures you can also

12  require greater margin, correct?

13  A.  Yes, that's correct.  The example we just saw.

14  Q.  And am I right, sir, that you were amazed that after

15  Mr. Tomita would have those conversations, you would have a

16  very short call with the credit department of the banks, and

17  the banks would give Archegos billion-dollar increases in

18  trading capacity?

19             THE COURT:  That's a much too complicated sentence.

20             MR. BERKE:  Judge, I'll rephrase, I'll break it down.

21  Thank you.

22  BY MR. BERKE:

23  Q.  Sir, do you recall saying that you were amazed, after

24  Mr. Tomita's conversations with the banks, that they would give

25  billions of dollars of capacity after your short call?

1   A.  Yes, after my credit conversations with the banks were --

2   yes.

3   Q.  And didn't you also believe, sir, that the reason the banks

4   were doing that because Mr. Tomita told them could do more

5   business with Archegos if they gave capacity, they could charge

6   higher margin if they wanted to, and Archegos could also go to

7   other banks if there wasn't capacity available?

8              MS. ROTHMAN:  Objection, compound.

9              THE COURT:  Overruled.  Did you say all those three

10  things?

11  A.  Could you repeat that, please?

12  BY MR. BERKE:

13  Q.  Yes.  And, sir, didn't you say that you believed the banks

14  were prepared to give the billions of dollars of capacity

15  because of Mr. Tomita on a call before you, saying the banks

16  could do more business --

17             THE COURT:  Mr. Berke, our minds don't function --

18             MR. BERKE:  I'll break it down.

19             THE COURT:  -- in so many clauses.

20             MR. BERKE:  Let me break it in three, you're right.

21  Thank you, Judge.

22             THE COURT:  One clause is enough.

23  BY MR. BERKE:

24  Q.  Do you recall saying -- when you said you were amazed, do

25  you recall saying you were amazed that they would give billions

O5M6HWA2                         Becker - Cross

1   of dollars after your call, it was because of Mr. Tomita's call

2   beforehand?

3           THE COURT:  Let's stop.  Did you say you were amazed

4   at something or other?

5           THE WITNESS:  I may have said that I was amazed of how

6   quickly a bank could provide Archegos with capacity.

7   BY MR. BERKE:

8   Q.  And you recall, you were amazed that they would give

9   billions of dollars of capacity quickly?

10  A.  Yes, that sounds correct.

11  Q.  And do you recall, sir, you attributed it to Mr. Tomita's

12  call prior to your call?

13  A.  I don't recall if I said that.

14  Q.  Well, do you recall telling the prosecutors that you were

15  amazed and saying you believed it was a result of Mr. Tomita's

16  calls beforehand?

17  A.  I don't recall that statement.

18  Q.  Well, did you tell the prosecutors that on August 9, 2021?

19  A.  I don't know.

20          MR. BERKE:  Your Honor, if I may show the witness

21  what's been marked for identification as 35015.

22          THE COURT:  Now, when you have been shown something

23  for identification and asked if it sparks your recollection,

24  just because it's a piece of paper doesn't mean that

25  necessarily is something that happened or something you should

1    say that happened.  It's your recollection that counts.  So if
2    seeing something sparks your recollection, you say it.  If it
3    doesn't, you say it doesn't refresh my recollection.
4                THE WITNESS:  Thank you, your Honor.
5                MR. BERKE:  I would ask that we put before the
6    witness, Page 4 of 6, second full paragraph.
7                Thank you, Judge.
8    BY MR. BERKE:
9    Q.  I'm directing your attention to the highlighted portion,
10   but read as much of the paragraph as you'd like, to yourself,
11   sir.
12   A.  I'm not sure what this document is.  But after reading it,
13   it doesn't bring up --
14   Q.  Let me show you --
15               THE COURT:  Let him finish.
16               THE WITNESS:  I finished, your Honor.
17   BY MR. BERKE:
18   Q.  Let me show you the first page, first paragraph, so you
19   will know what it is.  Do you see what the document is, sir?
20   A.  Yes, I do.
21   Q.  Now, let me go back to Page 4 of 6, second full paragraph.
22               And my question, sir, is does that refresh your
23   recollection that you told the prosecutors that you believed
24   that you were able to get billions of dollars of capacity after
25   a short call because of Mr. Tomita's call prior to yours?

O5M6HWA2                           Becker - Cross

1    A.  I don't recall saying the statement.

2              THE COURT:  All right.  Let's go on.

3    BY MR. BERKE:

4    Q.  But Mr. Tomita would generally speak to the --

5              THE COURT:  Let's go on to another subject.  You've

6    exhausted that.

7              MR. BERKE:  Can I ask three more questions?

8              THE COURT:  You can ask a lot more questions, but

9    you've exhausted this subject.

10             MR. BERKE:  Three more, Judge.

11             THE COURT:  He said he was amazed because the bank

12   would give so much money on the basis of a simple call.  Go on.

13   BY MR. BERKE:

14   Q.  And you would agree with me, sir, telling counterparty

15   banks that you would not disclose confidential information is

16   not lying, isn't that correct, sir?

17   A.  That is correct, yes.

18   Q.  Telling banks that you would do more business with them if

19   they gave you capacity, that's not lying, is it, sir?

20   A.  No, it's not.

21   Q.  Telling --

22             THE COURT:  I think we've exhausted this subject.

23   Move on.

24             MR. BERKE:  Thank you, Judge.  Moving on.

25

O5M6HWA2                    Becker - Cross

1   BY MR. BERKE:

2   Q.  Sir, let's talk about your actual job at Archegos.

3            Am I correct, sir, that after Archegos collapsed, you

4   put together a resume to try to obtain new employment?

5   A.  Yes, that's correct.

6   Q.  And am I correct, sir, that in your resume, you described

7   your work at Archegos?

8   A.  Yes, that's correct.

9   Q.  I'd like to show you what's been marked for identification

10  as Defense Exhibit 6798.  And, sir, I want to show you the

11  first page of the document.  And now I'll show you the second.

12           Now if we could go to the first again.

13           Sir, do you recognize this as an e-mail from you on

14  April 26, 2021, providing a copy of your resume?

15  A.  Yes, I do.

16           MR. BERKE:  Your Honor, I would offer Defense

17  Exhibit 6798.

18           MS. ROTHMAN:  Objection.

19           MS. MULLIGAN:  No objection.

20           MS. ROTHMAN:  Objection.

21           THE COURT:  Objection?

22           MR. BERKE:  If we can go to the second page.

23  Your Honor, I'll show you the resume.

24           THE COURT:  Sustained.  You can use it to refresh his

25  recollection.

O5M6HWA2                         Becker - Cross

1           MR. BERKE:  Okay.

2   BY MR. BERKE:

3   Q.  Sir, were you truthful in the resume that you prepared?

4   A.  Yes, I was.

5   Q.  Did you say, sir, that your job at Archegos was to manage

6   operations of a finance team of a single-family office, and

7   that the areas of responsibility included fund accounting,

8   compliance, regulatory matters, and enterprise risk management.

9   A.  Yes, that's correct.

10  Q.  Did you say, sir, and we -- why don't we do it from the

11  bottom up.  Thank you.

12          And did you say, sir, for enterprise risk management

13  that you created and maintained a risk matrix that assessed

14  areas of risk firm wide, including the principal's private

15  family foundation and highlighted areas of concern suggesting

16  ways to better mitigate risk to senior management.

17          Did you say that in your resume, sir?

18  A.  Yes, I did.

19  Q.  Was that part of your job at Archegos, sir?

20  A.  Yes, that was.

21  Q.  And did you say you contributed to the development of best

22  practices and processes and procedures and the contributions

23  included the study and presentation of best practices around a

24  portfolio of a private family foundation, exploring a

25  possibility of separately managed sub portfolios, seating

O5M6HWA2                        Becker - Cross

1   arrangements, managing foreign affiliate relationships --

2           THE COURT:  Excuse me.  We can assume he said what's

3   written.

4           MR. BERKE:  Okay.

5           THE COURT:  What's your question?

6   BY MR. BERKE:

7   Q.  Was that true, that that was part of your job at Archegos?

8   A.  Yes, that was true.

9   Q.  Is it true, also, sir, that you said part of your job at

10  Archegos was that you incorporated dynamic margin methodologies

11  of multiple brokers to allow for ongoing leverage optimization?

12  A.  Yes, that's correct.

13  Q.  And was it also part of your job, sir, that you were fully

14  involved throughout the process, including the margin term

15  negotiation, the creation of Excel models to recreate each

16  broker's customized methodology and communication of the most

17  efficient trade allocation and capacity information to the

18  trading desk throughout the day?

19  A.  Yes, that's correct.

20  Q.  That was part of your job at Archegos, correct?

21  A.  That was part of my job.

22  Q.  Now, sir, let me ask you about regulatory matters.

23           Is it also true, sir, that it was a part of your job

24  and you put this on your resume that while you were at Archegos

25  you reviewed and actively monitored shareholder disclosure

O5M6HWA2                        Becker - Cross

1    requirements globally and performed weekly tests of the funds

2    portfolio to ensure any required filings were made?

3    A.  That's correct.

4    Q.  Was it also true, sir, that you worked closely with outside

5    legal counsel whenever situations presented themselves that

6    required a more bespoke analysis, examples of this includes

7    understanding the timing of and impact of company IPOs, stock

8    purchases, secondary offerings and Share Class conversions?

9            MS. ROTHMAN:  Objection.

10           THE COURT:  Overruled.

11   A.  Yes, that's correct.

12   BY MR. BERKE:

13   Q.  And was it also part of your job --

14           THE COURT:  Are we going to go down every bit of that

15   resume and ask if it was true.  Assume it was true unless you

16   have something to say it's not true.

17           MR. BERKE:  Your Honor, I'm just putting it in

18   evidence but the document itself is not --

19           THE COURT:  I told you can't put it in evidence.

20           MR. BERKE:  That's why I'm establishing --

21           THE COURT:  Don't put it in this way.

22           MR. BERKE:  I understand, your Honor.

23           THE COURT:  If you have a cross of something, bring it

24   out, but don't put in the whole document.

25           MR. BERKE:  I understand, your Honor.

O5M6HWA2                        Becker - Cross

1             THE COURT:  It's not relevant.

2    BY MR. BERKE:

3    Q.  Sir, on your direct you testified about what your job was,

4    correct?

5    A.  Correct.

6    Q.  Didn't your job, sir, also include at Archegos that you

7    monitored upcoming legal and regulatory developments, studying

8    any impact on the firm, and presenting this information clearly

9    to senior management?

10            MS. ROTHMAN:  Objection.

11            THE COURT:  Only this one.  Overruled.  Go ahead.

12   A.  You're asking if that was part of my job.

13   BY MR. BERKE:

14   Q.  Yes.

15   A.  Yes, it was.

16            MR. BERKE:  Your Honor, could I do one more area?

17            THE COURT:  No, no more.  Finished.

18            MR. BERKE:  One more question?

19            THE COURT:  No, you are just abusing being given the

20   privilege now.  You can't get the document in, you can use it

21   to refresh his recollection, but this is not relevant stuff.

22   Go on to another subject.

23            MR. BERKE:  Your Honor, can I make one statement?  I

24   don't want to --

25            THE COURT:  No.  Take it up with me at a recess.

```
1            MR. BERKE:  Okay.  Can I just complete this because I
2    have one question to complete this area?
3            THE COURT:  You completed it.  Go on to the next
4    issue.
5            MR. BERKE:  I will, your Honor.
6    BY MR. BERKE:
7    Q.  Sir, that, you would agree, sir, was your job at Archegos,
8    correct?
9            MS. ROTHMAN:  Objection.
10           THE COURT:  Sustained.
11   BY MR. BERKE:
12   Q.  Sir, am I correct that prior to March 2020, you had limited
13   contact with Mr. Hwang?
14   A.  I communicated with him -- I sent some e-mails almost every
15   day for my time at the firm.  In terms of limited, I guess can
16   you define --
17   Q.  Let me ask you differently.  Would you agree that prior to
18   March 2020, you had limited direct contact with Mr. Hwang?
19           THE COURT:  An e-mail could be said to be direct
20   contact.
21           MR. BERKE:  Fair enough, your Honor.
22   BY MR. BERKE:
23   Q.  You had limited in-person -- well, withdrawn.
24           Let's -- excluding e-mails --
25           THE COURT:  How frequently did you meet with Mr. Hwang
```

O5M6HWA2                         Becker - Cross

1    directly?

2              MR. BERKE:  Even better, Judge.  Thank you.

3              THE WITNESS:  Not frequently.

4    BY MR. BERKE:

5    Q.  Would you say you had limited direct contact with him?

6              THE COURT:  I think you got the point.  Now next

7    question.

8    BY MR. BERKE:

9    Q.  Sir, am I right that after COVID, everybody was working

10   remotely for the most part, correct?

11   A.  For the most part, yes.

12   Q.  You, sir, were in Goshen, New York, correct?

13   A.  Yes.

14   Q.  You did not interact with Mr. Hwang in person, correct?

15             THE COURT:  You've already established --

16             MR. BERKE:  This is after -- the question before was

17   prior to March '20.  I just want to be clear that now we're

18   talking about after March 2020.

19             THE COURT:  After March '20, how frequently did you

20   meet with Mr. Hwang?

21             THE WITNESS:  Very, very infrequently.

22             THE COURT:  Next question.

23   BY MR. BERKE:

24   Q.  You said there were regular Zooms between Mr. Hwang and the

25   trading team, correct?

1   A.  Yes, that was my understanding.

2   Q.  You were not on those Zooms, correct?

3   A.  I was not on those Zooms.

4           THE COURT:  Let's go off the record.

5           (Discussion off the record)

6           THE COURT:  Go ahead.

7   BY MR. BERKE:

8   Q.  Sir, I am correct, sir, that you continued during COVID to

9   carry out your responsibilities, correct?

10   A.  Yes, that's correct.

11   Q.  You built models that duplicated margin roles -- excuse

12   me -- that duplicated margin rules that you had with the

13   brokers, correct?

14   A.  Yes, that's correct.

15   Q.  And the -- these are models that you yourself built, sir,

16   right, that allows you to see updated margin terms on a

17   realtime basis, correct?

18   A.  Yes, that's correct.

19   Q.  And you can see, you, sir, could see it on this model as it

20   changed during the day, correct?

21   A.  Yes, that's correct.

22   Q.  And you spent considerable time maintaining and updating

23   these margins during the period we're talking about, correct?

24   A.  Yes, I did.

25   Q.  And, sir, the result of that, you would put in these

1   capacity notes that you talked about that you would do on a

2   daily basis, correct?

3   A.  Yes, that was one of the results, yes.

4   Q.  And you, sir, considered yourself to be the specialist on

5   this to the extent that you referred to yourself at times as

6   the margin man, correct?

7   A.  I believe the term was margin bot, but yes.

8   Q.  Well, you said that too, and a bot is an automated software

9   program, correct?

10  A.  Yes.

11  Q.  And you said you were a margin bot, but you were acting

12  like an automated software program to generate these very

13  complicated numbers through the margin model that you had

14  built, correct?

15  A.  Yes, that's correct.

16  Q.  And am I right, sir, that this was particularly challenging

17  because different brokers had different types of margin,

18  including something called dynamic margin, correct?

19  A.  Yes.  That's correct.

20  Q.  So different brokers would have different methodologies

21  that they would use, and you would have to put them into the

22  program that you built to determine how that would impact cash

23  or capital at the firm, correct?

24  A.  Yes, that would impact cash.  It wouldn't have an impact on

25  capital.

1    Q.  It was, sir, I believe you alluded to this, but let's be

2    clear, it was your responsibility to communicate with the

3    credit teams at banks with regard to capacity and margin and

4    related issues, correct?

5    A.  Yes, that was part of my responsibility.

6    Q.  And aren't I right, sir, that you believed that Mr. Hwang

7    did not fully understand all that you did as part of your

8    process in dealing with the credit teams at the counterparty

9    banks?

10             MS. ROTHMAN:  Objection.

11             THE COURT:  Did you believe that Mr. Hwang fully

12   understood what was going on with the credit teams at the

13   counterparty banks?

14             THE WITNESS:  I did not know.

15   BY MR. BERKE:

16   Q.  Well, sir, do you remember you testified yesterday about

17   your attempts to onboard CICC?

18   A.  Yes.

19   Q.  And do you recall, sir, that when that process was going

20   on, they sent you, like, 15 forms that you had to fill out and

21   provide information on?

22   A.  Yes, I remember filling out forms, I don't know how many,

23   yes.

24   Q.  Do you recall, sir, that in connection with that process

25   you expressed to the operations team that Bill is under the

O5M6HWA2                    Becker - Cross

 1   impression we will be up and trading swaps with them in a
 2   few days?
 3              MS. ROTHMAN:  Objection.
 4              THE COURT:  Overruled.
 5   A.  I may have said that.
 6   BY MR. BERKE:
 7   Q.  And do you recall, sir, saying, following that statement,
 8   that "nobody has any F'ing idea what goes on -- what goes into
 9   anything we do"?
10              MS. ROTHMAN:  Objection.
11   Q.  Let me rephrase that.
12              Do you recall saying in response to that, sir, "Nobody
13   has any F'ing idea what goes into anything we do"?
14              MS. ROTHMAN:  Objection.
15              THE COURT:  Overruled.  Do you remember saying that?
16              THE WITNESS:  I remember being frustrated.  I may have
17   said that.
18   BY MR. BERKE:
19   Q.  Sir, let me show you what has been marked for
20   identification, this is just for the witness and the Court, as
21   Defense Exhibit 8269, and I'm going to direct you to
22   February 19, 2021, at 16:26:31 UTC.  And we can also look at
23   the top line, sir, at 16:20:31.
24              THE COURT:  He just said he said it, you don't need to
25   say anymore.

O5M6HWA2                        Becker - Cross

1          MR. BERKE:  I think he --

2          THE COURT:  He said he said it.  Now go on to the next

3    question.

4          MR. BERKE:  We will, Judge.

5    BY MR. BERKE:

6    Q.  Sir, isn't it also true that you believed Will Tomita lied

7    to Mr. Hwang and took credit for the work that you were doing?

8          MS. ROTHMAN:  Objection.

9          THE COURT:  Overruled.

10   A.  I think I may have said that at one point, yes.

11   BY MR. BERKE:

12   Q.  And you believe, sir, that what he was doing is you would

13   do this complicated work that you described, he would rebrand

14   it as his work, and claim to Mr. Tomita -- excuse me, and claim

15   to Mr. Hwang, that he and Mr. Tomita did it?

16   A.  Who is the "he" in the --

17   Q.  Let me rephrase.

18         THE COURT:  Tomita is he.

19         MR. BERKE:  I'm going to rephrase it.

20   BY MR. BERKE:

21   Q.  And you, sir --

22         THE COURT:  I think he's got it.  Do you believe that

23   Tomita was taking credit for your work?

24         THE WITNESS:  There were times where I felt that, yes.

25

1  BY MR. BERKE:

2  Q.  You believe, sir, that he was doing it so that he could

3  then claim credit for it at the end of the year and get a

4  bigger bonus by saying your work -- by telling Mr. Hwang that

5  he did your work, correct?

6             THE COURT:  Why is your question so complicated?

7             Do you think --

8             MR. BERKE:  It is.  I'll rephrase it.

9             (Simultaneous cross-talk)

10             THE COURT:  -- do you think Mr. Tomita said it to get

11  a better bonus?

12             THE WITNESS:  I may have vented that to my peers.

13             THE COURT:  You think that might have reflected a

14  lower bonus for you?

15             THE WITNESS:  I didn't know what impact it had on

16  mine.

17             THE COURT:  Now can we go to another subject?

18  BY MR. BERKE:

19  Q.  And, sir, you became very angry, that you believed

20  Mr. Tomita was lying to Mr. Hwang in this way?

21  A.  I don't recall being very angry.  I -- I may have vented to

22  my peers.

23             THE COURT:  So you were angry but not very angry?

24             THE WITNESS:  If there's a definition of angry.

25             THE COURT:  Why don't we go on to another subject?

1           MR. BERKE:  Can I ask one other question?

2    BY MR. BERKE:

3    Q.  Well, sir, you were so angry, did you wish upon Mr. Tomita

4    some nasty and unspeakable act which I won't say in court?

5           MS. ROTHMAN:  Objection.

6           THE COURT:  Sustained.

7    BY MR. BERKE:

8    Q.  Sir, do you recall giving testimony in your direct about

9    the Chinese ADR stocks that traded on the U.S. exchanges?

10   A.  Yes, I do.

11   Q.  And do you recall, sir, saying that Archegos traded them

12   prior to 2020, but they were much smaller prior to 2020?

13   A.  Yes, I do.

14          MR. BERKE:  I would like to show the witness a

15   document that's marked for identification as DX53, Defense

16   Exhibit 53.

17   BY MR. BERKE:

18   Q.  Sir, do you recognize this as an e-mail from you to

19   Deutsche Bank on May 20, 2020, regarding the 2018 Archegos

20   issued audit?

21   A.  Yes.  I sent them the December 31, 2018, and gave an update

22   on the timing of the December 31, 2019.

23   Q.  Do you see, sir, the actual 2018 audit is attached to the

24   e-mail?

25   A.  Yes, I do.

O5M6HWA2                          Becker - Cross

1              MR. BERKE:  Your Honor, I would offer Defense

2      Exhibit 53.

3              MS. ROTHMAN:  No objection.

4              MS. MULLIGAN:  No objection.

5              THE COURT:  Received.  You may show.

6              MR. BERKE:  Thank you, Judge.

7              (Defendant's Exhibit 53 received in evidence)

8      BY MR. BERKE:

9      Q.  Okay.  And Jake Geloff, you talked about, was someone at

10     Deutsche Bank, correct?

11     A.  Yes.

12     Q.  And you're sending him -- why are you sending him the

13     audited financials for 2018 and 2020?

14     A.  That's -- he had requested that -- he was requesting the

15     2019 financials.  I sent him the most recent completed

16     financials.

17     Q.  And you recall, sir, you had sent them also the prior year

18     when they were ready?

19     A.  If he had requested them, I would have, yes.

20     Q.  Can we look to the first page of the attachment?  Just the

21     very first page.

22             And you see this is the audited financials for the

23     year ending December 2018, correct?

24     A.  Yes.

25     Q.  And these are audited by outside accountants who vouched

1  for it, correct?

2  A.  Yes, it is.

3          MR. BERKE:  And now if we could go to 53-7?

4          THE COURT:  They don't really vouch for it.  They

5  issue an opinion that it is fair.

6          MR. BERKE:  Thank you, Judge.

7  BY MR. BERKE:

8  Q.  Sir, do you see that for the year ending 2018, there's a

9  list of the U.S. stocks.

10          If we could go under Internet Media Telecom and blow

11  it up?

12          You see, sir, that it shows for 2018, these stocks

13  like Amazon was 62 percent of net capital and Netflix

14  39 percent, correct?

15          Do you want to see the top?

16  A.  If I could see the whole page, please.

17  Q.  Yeah.  Zoom out.

18  A.  So, yes, you are correct in that.

19  Q.  And, sir, you would agree this is greater than 35 percent,

20  correct?

21  A.  Yes, I would.

22  Q.  And these are stocks that I think you said you had a

23  discussion that they were stupidly liquid because they traded

24  so much, correct?

25  A.  Mr. Fairbanks of UBS had described them with that, yes.

O5M6HWA2                          Becker - Cross

1              MR. BERKE:  Now if we could go to the second -- the

2    next page, 538 and Defense Exhibit 53.  If we could blow up the

3    China stocks?

4    BY MR. BERKE:

5    Q.  Now, sir, remember, again, you said the Chinese ADRs, the

6    trading in them prior to 2020 was much smaller, correct?

7    A.  In comparison to where they ended up in 2020, '20 and '21,

8    yes.

9    Q.  Well, sir, you recognize Bidu as a Chinese ADR traded in

10   2020, correct?

11   A.  Yes, that's correct.

12   Q.  And, sir, that was traded in 2018 at 42 percent --

13   42.4 percent of net capital, correct?

14   A.  Yes, that's correct.

15   Q.  And in 2018, iQ was 10.3 percent of net capital, correct?

16   A.  Correct.

17   Q.  And we have VIPs, which was also traded in 2020, correct?

18   A.  Yes.

19   Q.  And Alibaba was 17 percent, correct?

20   A.  Yes, that's correct.

21            MR. BERKE:  And, Mr. McLeod, if I could trouble you to

22   put the two pages next to each other so the U.S. and Chinese

23   can be compared for 2018?  If we could blow up both.  Thank

24   you, Mr. McLeod.

25

O5M6HWA2                          Becker - Cross

1   BY MR. BERKE:

2   Q.  So, sir, am I correct, if you see, if you look at the

3   numbers, am I correct, sir, that in 2018, Bidu, the Chinese ADR

4   was the second largest position held by Archegos, correct,

5   after Amazon?

6   A.  Based on these schedules, I can't tell if these are cash

7   holdings and not equity swaps.

8            THE COURT:  It's cash holdings and not equity swaps.

9   Q.  Well, sir, if you look at the total --

10           THE COURT:  I think we need to slow down our answers.

11  Mr. Berke, slow down your questions.

12           And, Mr. Becker, be louder in your answers.

13           THE WITNESS:  Thank you.  Yes, your Honor.

14  BY MR. BERKE:

15  Q.  If we could go out -- well, let me -- let's -- let me show

16  you what's in evidence as Government Exhibit 448.  And if we

17  could go -- do you recognize this, sir, as the combo sheet you

18  were testifying about?

19  A.  Yes, I do.

20  Q.  And if we could first go to Column K, Row 43?

21           And you see the number there for Amazon, 1.238?

22  A.  Yes, I do.

23  Q.  If we could now go to line -- I'm sorry, Row 55 for Bidu?

24           You see for Bidu, sir, it's 841,264 and change --

25  A.  Yes, I see that.

O5M6HWA2                      Becker - Cross

1   Q.  -- and 4 million?

2   A.  Yes, I see that.

3   Q.  And then if we could go to Netflix, which is in Column 101.

4           And now, sir, do you see for 2018, does that show you,

5   sir, that the holdings at year end have --

6           MR. BERKE:  Go up a little higher, Mr. McLeod.

7   BY MR. BERKE:

8   Q.  You have Amazon number one, Bidu number two.

9           Scroll down a little bit, Mr. McLeod, thank you.

10          And Netflix number three.

11  A.  Yes, that looks correct.

12  Q.  So, in other words, Bidu in 2018 was the second largest

13  position held by Archegos, correct?

14  A.  Yes, it was.

15  Q.  And the counterparties knew it because it was sent in the

16  2018 audited financials that were sent in 2019, correct?

17          MS. ROTHMAN:  Objection.

18          THE COURT:  Sustained.

19  BY MR. BERKE:

20  Q.  Do you recall, sir, whether or not these audited financials

21  were sent to Deutsche Bank in June of 2019?

22          THE COURT:  We established that already, didn't we?

23          MR. BERKE:  There was some uncertainty, Judge.

24          THE COURT:  No, it wasn't, it was attached.

25          MR. BERKE:  That was in 2020, Judge.  That was at a

O5M6HWA2                      Becker - Cross

1   later period.

2   BY MR. BERKE:

3   Q.  Do you recall whether the same document had been sent to

4   Deutsche Bank in June of 2019?

5   A.  I don't know.  If they had requested it, I would have sent

6   it.

7   Q.  Let me show you what's been marked as Defense Exhibit 7012

8   for identification.

9            Look at that yourself, sir.  I ask, does that refresh

10  your memory that you sent the 2018 audited financials to

11  Deutsche Bank on June 19, 2019?

12  A.  Yes, I did.

13  Q.  So they would have seen the Chinese ADR Bidu was the second

14  largest position in two that you --

15            MS. ROTHMAN:  Objection.

16            THE COURT:  Sustained.

17  BY MR. BERKE:

18  Q.  Do you agree with me that the positions of Amazon and Bidu

19  were all greater than 35 percent, correct?

20  A.  Yes, I would agree.

21  Q.  Sir, you testified during direct about Mr. Hwang's trading

22  during the pandemic increasing, do you recall that, sir?

23  A.  Yes, I do.

24  Q.  Okay.  Sir, you're familiar with Dr. Philip Fisher, are you

25  not?

1    A.  Yes, from conversations at Archegos, I am.

2    Q.  Well, sir, also, do you recall that at a retreat in 2015,

3    for example, everybody was given a book by Dr. Philip Fisher

4    and were required to bring it to the meetings?

5              MS. ROTHMAN:  Objection.

6              THE COURT:  If you want to object, stand up and

7    object.

8              MS. ROTHMAN:  Objection.

9              THE COURT:  Overruled.

10   BY MR. BERKE:

11   Q.  You may answer, sir.

12   A.  Yes, I do recall that.  That is the book in your hand.

13   Q.  And, sir, you recognize this is the book?

14   A.  Yes, I do.

15   Q.  That is the book, correct?

16   A.  That is the book.

17              (Continued on next page)

18

19

20

21

22

23

24

25

 1              MR. BERKE:  Your Honor, I would offer the book?

 2              THE COURT:  Would you recommend it?

 3              MR. BERKE:  Your Honor, I believe I would have to ask

 4     my client, but I would offer defense exhibit -- with some

 5     help --

 6              THE COURT:  We're not.

 7              MS. ROTHMAN:  Objection.

 8              THE COURT:  The book is not coming into evidence.

 9              MR. BERKE:  OK.  Your Honor, could I offer at least

10     the cover so we can talk about it?

11              MS. ROTHMAN:  Objection.

12              THE COURT:  No.

13     BY MR. BERKE:

14     Q.  All right.  Sir, am I right, sir, when your home was raided

15     by the FBI, that book was on your book shelf at home?

16     A.  It most likely was, yes.

17     Q.  Let me show you what the government chose to introduce as

18     GX 235.  It's in evidence.

19              Sir, you recognize this -- do you recognize this as

20     the e-mail that Mr. Hwang sent in April 23, right after COVID

21     began, subject lessons relearned from common stocks and

22     uncommon profits?

23     A.  Yes, I do.

24     Q.  You recall, sir, that right after COVID hit, the markets

25     crashed considerably, correct?

1   A.  Yes, that's correct.

2   Q.  And you recall, sir, that in this exhibit, which we can go

3   to page two -- thank you, Mr. McLeod --

4           That's not it.

5           THE COURT:  Maybe the market crashed because

6   Dr. Fisher's book was being sent to people.

7   Q.  You recall, sir, that Mr. Hwang sent this out to everybody

8   and he said that he learned a lot about how to potentially

9   trade in this pandemic from chapters in Dr. Fisher's book,

10  correct?

11          MS. ROTHMAN:  Objection.

12          THE COURT:  Sustained.

13  Q.  Sir, did you read Mr. Hwang's e-mail?

14  A.  Yes.

15          MS. ROTHMAN:  Objection.

16          THE COURT:  Overruled.

17  A.  Yes, I did.

18  Q.  What was your reaction to it?

19          MS. ROTHMAN:  Objection.

20          THE COURT:  Sustained.

21  Q.  Did you understand what Mr. Hwang was saying?

22          MS. ROTHMAN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Did his strategy --

25          THE COURT:  Get the hint.

1          MR. BERKE:  I couldn't hear you, Judge.

2          THE COURT:  Take the hint.

3          MR. BERKE:  I'm taking the hint, your Honor.  Maybe I

4   got hit a little harder.  I got it.

5   Q.  Sir, do you recall that you yourself --

6          MR. BERKE:  We can take that down.  Thank you,

7   Mr. McLeod.

8   Q.  Do you recall, sir, that you yourself would invoke

9   Dr. Fisher about your own personal investments?

10         MS. ROTHMAN:  Objection.

11         THE COURT:  Sustained.

12  Q.  You knew that Mr. Hwang --

13         THE COURT:  Let's get off Dr. Fisher and this book.

14         MR. BERKE:  Your Honor, can I ask that one question

15  about whether he himself --

16         THE COURT:  If you ask, I'm sure that Ms. Rothman will

17  object, and I'm sure I'll sustain the objection.

18         MR. BERKE:  Your Honor, I'm going to go out on a limb

19  and I'm not going to ask the question.

20         Thank you.  I'll save you both.

21  Q.  Sir, do you remember that you yourself expressed in this

22  time period, April of 2020, that you thought everything was on

23  sale right now because of the pandemic and that it was a good

24  time to put your money in the market?

25         MS. ROTHMAN:  Objection.

1          THE COURT:  Overruled.

2  A.  Yes, I recall saying something to that effect.

3  Q.  OK.  Do you recall a number of months later, the summer

4  after the pandemic had started, so August of 2020, that you

5  discussed with the operations team how Mr. Hwang was

6  methodically buying stocks on the "dips"?

7          MS. ROTHMAN:  Objection.

8          THE COURT:  Overruled.

9  A.  I probably said that, yes.

10  Q.  Do you recall, sir, that you said that after seeing

11  13 years of that, it would make you want to load up on stocks

12  during a pandemic?

13  A.  Yes, I believe I said that.

14  Q.  Sir, you knew that Mr. Hwang was, prior to this time and

15  during this time, a very aggressive trader in stocks he

16  believed in, correct?

17          MS. ROTHMAN:  Objection.

18          THE COURT:  Overruled.

19  A.  Can you repeat the question?

20  Q.  Do you believe, sir, that Mr. --

21          THE COURT:  Do you believe that Mr. Hwang was an

22  aggressive trader of stocks in which he believed?

23          THE WITNESS:  Yes, that would -- that would be one

24  way, yes.

25  Q.  And one of Mr. Hwang's catch phrases for years prior to the

O58sHWA5                          Becker - Cross

1    pandemic was that you should go on -- that Archegos needs to

2    play offense when investing in companies?

3    A.  Yes.  That was a phrase I heard many times over the years.

4    Q.  And he said it in 2020 and 2021 as well, correct?

5    A.  Yes, that's correct.

6    Q.  Sir, do you recall saying that because of COVID -- do you

7    recall when you caught COVID during the time, what you called

8    it to the operations team?

9    A.  What I called it?

10            No, I don't.

11   Q.  Did you call it the China virus?

12            MS. ROTHMAN:  Objection.

13            THE COURT:  Sustained.

14            Come on, Mr. Berke.

15            MR. BERKE:  Your Honor --

16            THE COURT:  All of a sudden we'll have a presidential

17   campaign here.

18            MR. BERKE:  Well, that wasn't my purpose.

19            THE COURT:  Get off it.

20   Q.  Let me ask you, sir.

21            Did you say that you believe that the Chinese names --

22            MR. BERKE:  This is about stocks, your Honor.

23   Q.  Did you believe, sir, that the Chinese names are going to

24   struggle because of COVID and presented a buying opportunity?

25   A.  I may have said that.

1   Q.  And do you recall also saying, sir, that you believed,

2   during this time that the Chinese ADR stocks, certain of them

3   were being artificially depressed because of short sellers

4   putting out false information?

5   A.  I may have said that.  That would be repeating things I

6   heard internally at Archegos.

7   Q.  OK.  Well, sir, do you recall, with regard to GSX, after a

8   short-selling firm Citron put out false information, what you

9   believed to be false information, you said to Mr. Tomita, how

10  is this even legal?

11  A.  Yes.  I was referring to the actions of the short-selling

12  firm.

13  Q.  And you said also, Yeah, but it provides a buying

14  opportunity because the false information was causing the stock

15  to go below its value?

16  A.  Yes, because that's what Archegos was doing.

17  Q.  But you said it, sir, correct?

18  A.  Yes, I believe I did.

19  Q.  And you said it to the operations team, correct?

20  A.  I believe so, yes.

21  Q.  Sir, do you also recall talking about how this reminded --

22  when I say this, the pandemic period -- reminded you of 2018

23  when the market had gone down, Mr. Hwang invested aggressively

24  and made 2019 a very successful year for Archegos?

25          MS. ROTHMAN:  Objection.

O58sHWA5                          Becker - Cross

1              THE COURT:  Overruled.

2    A.  I may have said that, yes.

3    Q.  Do you recall you personally did the same thing in your

4    stock accounts and it also did well as a result?

5    A.  In 2018?

6    Q.  Yes.

7    A.  Um --

8              THE COURT:  2018, 2019.

9    A.  -- I -- I probably did, yes.

10   Q.  And you recall also discussing during this period, the

11   period being mid to late 2020, because interest rates were so

12   low, it made much more sense to put money in the stock market

13   rather than keeping it as cash?

14   A.  You're asking if I said that?

15   Q.  Yes, sir.

16             Did you recall discussing that with the operations

17   team?

18   A.  I remember the topic coming up.  I don't know who said

19   what.

20   Q.  Sir, when you worked at Archegos, including in 2020 and

21   2021, you, sir, believed that Mr. Tomita was a conservative

22   trader, correct?

23   A.  Yes, I probably said that.

24   Q.  And you saw Mr. Tomita talking to compliance about the

25   funds' trading activities, didn't you, sir?

O58sHWA5                          Becker - Cross

1    A.   In the 2020-2021 period?

2    Q.   Yes.

3    A.   Um, I'm not sure.

4    Q.   Well, sir, do you recall telling the prosecutors that you

5    saw Mr. Tomita talking to compliance about the funds' trading

6    activities?

7    A.   In this period of 2020 and 2021?

8    Q.   And prior.

9    A.   Yeah.

10   Q.   I'll limit it to that.

11   A.   So anytime at Archegos?

12   Q.   Yes.

13   A.   Yes, I've seen Will talking to compliance.

14   Q.   And you saw it in 2020, sir, too?

15   A.   I'm not sure.  We were all working remote.

16   Q.   Well, sir, you knew that --

17            Fair point.  Let me say it differently.

18            You communicated with Mr. Tomita about checking on

19   questions that came up with compliance about trading, didn't

20   you, sir?

21   A.   Yes, I did.

22   Q.   And, sir, didn't you also believe in prior periods and in

23   2020 and 2021, that Mr. Tomita understood where the line was

24   between appropriate trading and market manipulation?

25            MS. ROTHMAN:  Objection.

1           THE COURT:  Can you fix up the question to ask if he

2   said rather than he believed it.

3           MS. ROTHMAN:  Your Honor, I believe this may open the

4   door to 2008.

5           THE COURT:  Save your question.  We'll discuss it.

6           MR. BERKE:  Yes.

7   BY MR. BERKE:

8   Q.  Sir, do you recall you were asked questions on direct about

9   the five percent rule, correct?

10  A.  Yes, I recall.

11  Q.  That was your responsibility, to make sure that Archegos

12  complied with the SEC regulations regarding disclosures if the

13  funds' stock or cash holding rose above to five percent of the

14  outstanding shares of a company, correct?

15  A.  Correct.  It was my responsibility to make sure Archegos

16  was below that five threshold, yes.

17  Q.  Because if it's over, there was a filing that was required,

18  correct?

19  A.  Yes, that's correct.

20  Q.  And you had discussions at Archegos that if the filing was

21  required, you would do it, correct?

22  A.  Yes, I believe so.

23  Q.  And aren't I correct, sir, that lawyers for Archegos would

24  do presentations where they talked about the five percent rule

25  to the firm as a whole as part of the training they did

O58sHWA5                         Becker - Cross

1    annually?

2                MS. ROTHMAN:  Objection.

3                THE COURT:  Same point.

4                MS. ROTHMAN:  Pretrial ruling.

5                THE COURT:  Pardon?

6                MS. ROTHMAN:  Pretrial ruling.

7                MR. BERKE:  Your Honor.

8                THE COURT:  I don't remember the ruling.

9                Save that one, too.

10               MR. BERKE:  OK.  We can do that, too.

11   BY MR. BERKE:

12   Q.  But you recall, sir, that you would track --

13               Let me just -- we talked about it very clearly.  Cash,

14   securities, that applies to the five percent rule, correct?

15   A.  Correct.

16   Q.  Swaps does not involve Archegos actually owning shares,

17   correct?

18   A.  That's correct.

19   Q.  As a result Archegos does not get any votes when they

20   invest through swap contracts, correct?

21   A.  That's correct.

22   Q.  So the SEC said, because there are no votes, you don't have

23   to disclose whatever your holdings are, correct?

24               THE COURT:  Sustained.

25               MS. ROTHMAN:  Thank you.

O58sHWA5                        Becker - Cross

1    Q.  There is no requirement to include swaps when you count to

2    the five percent, correct?

3    A.  Yes, as long as you're a passive investor, that's my.

4    Understanding.

5    Q.  When you say passive investor, drawing a distinction

6    between a passive investor and an activist investor, is that

7    correct?

8    A.  Yes.  That's correct.

9              THE COURT:  What's the difference?

10             THE WITNESS:  An activist investor is actively

11   involved in very regular conversations with company management.

12   Whereas a passive investor just invested in a security and is

13   not trying to influence management in any way.

14   Q.  Sir, you were the one who not only tracked it, you also

15   prepared the reports related to that number, correct?

16   A.  The ownership tasks, yes.

17   Q.  That got circulated, correct?

18   A.  Correct.

19   Q.  And, sir, there were other instances when the regulations

20   required certain filings to be made on behalf of Archegos,

21   correct?

22   A.  Where actual filings were required by Archegos?

23   Q.  In fact, you recall there is a rule that required fuelings

24   for a large trader, if you were above a certain size you had to

25   make filings with the SEC?

O58sHWA5                         Becker - Cross

1    A.  Yes.  Yes, I recall that.

2    Q.  Sir, you worked with -- if I may, you worked with lawyers

3    to do -- well, withdrawn.

4            You were in charge of making sure that that rule was

5    complied with and those filings were made, correct?

6    A.  I worked with outside counsel on the filings that were made

7    under the management of Mr. Halligan.

8    Q.  OK.  Do you recall, sir, that at times compliance,

9    Mr. Satine and Ms. Fernanda, would track the trading and if

10   they had questions about whether you might be going over the

11   five percent, they would raise them with you?

12           MS. ROTHMAN:  Objection.  Objection.

13           THE COURT:  Sustained as to form.

14   BY MR. BERKE:

15   Q.  And you recall, sir, that at times compliance would come to

16   you with questions about the five percent requirement with

17   regard to certain stocks?

18   A.  I'm not sure how closely I looked at it.  They were a

19   recipient of the ownership testing that I sent.

20   Q.  Do you recall, sir, that there were times that they would

21   ask you questions about whether certain trading had gone over

22   the five percent?

23           MS. ROTHMAN:  Objection.

24   Q.  I'll rephrase.

25           Do you recall they had raised questions about whether

O58sHWA5                          Becker - Cross

1    a certain trading was getting close to the five person?

2           THE COURT:  Sustained.

3    Q.  Do you recall, sir, compliance raising questions with

4    regard to a stock called the lending club in 2020?

5           THE COURT:  The objection as to this line for the

6    reasons that I gave at pretrial and the objection is sustained.

7           MR. BERKE:  Judge, to be clear, this is only

8    compliance, not lawyers.

9           THE COURT:  I know what you're saying.  The objection

10   is being sustained.

11          MR. BERKE:  I understand, Judge.

12   BY MR. BERKE:

13   Q.  And, Mr. Becker, long before 2020, Archegos, they always

14   traded with swaps, correct?

15   A.  Archegos had -- yes, it had traded on swaps.

16   Q.  The way that -- the manner which -- well, withdrawn.

17          The composition of cash, securities, and swaps, in

18   other words, cash securities up to five percent and then swaps,

19   that is how they traded long before 2020, correct?

20   A.  Yes, that's correct.

21   Q.  And, sir, isn't it true also that Archegos, prior to 2020,

22   also regularly worked with multiple counterparty banks as part

23   of those swap relationships?

24   A.  Yes, that's correct.

25   Q.  Isn't it also true, sir, that they would trade with

1    leverage or margin regularly when trading the swaps so that

2    they would have margin require some cash down, but would

3    require a percentage of cash down, correct?

4    A.  Yes, that's correct.

5    Q.  Sir, am I also right that prior to the 2020-21 period,

6    Archegos would trade a highly concentrated portfolio, meaning

7    their top positions would be a large portion of the portfolio?

8    A.  Yes, similar to the example that we saw on the December 31

9    2018 financials.  Not to the degree it got to late 2020, early

10   2021.

11   Q.  Sir, I'm asking you about concentration.

12          So, do you recall prior to 2020 it would often be the

13   case that the top three holdings of Archegos could be a large

14   portion of the portfolio?

15   A.  Yes, I would agree.

16   Q.  Do you recall, sir, prior to 2020 it could be the top five

17   holdings would be an even larger percentage of the portfolio?

18   A.  Yes.

19   Q.  You would agree with me, sir, prior to 2020 the top ten

20   could be almost the entire portfolio?

21   A.  Yes.  There were probably times that were the case.

22          THE COURT:  If it's top ten, you couldn't be entire

23   because it's only ten.

24          MR. BERKE:  That's why it was only nearly entirely,

25   Judge.

O58sHWA5                         Becker - Cross

1    Q.   Sir, you gave testimony about what 100 percent margin

2    means, correct?

3    A.   Yes, I did.

4    Q.   And, just to be clear, that simply means Archegos would buy

5    the stocks in cash, correct, without leverage?

6    A.   Correct.

7    Q.   Aren't I right that Mr. Hwang did that regularly when

8    buying swaps for Grace & Mercy, he would only use 100 percent

9    margin?

10             MS. ROTHMAN:  Objection.

11             MR. BERKE:  Your Honor, the government put in Grace &

12   Mercy's trading into the case.

13             MS. ROTHMAN:  It's misleading.

14             THE COURT:  Overruled.

15             I'm sorry.  Objection is sustained.

16   BY MR. BERKE:

17   Q.   Let me ask you this.  Grace & Mercy, because it was a

18   family foundation, could not trade with leverage, correct?

19             THE COURT:  I think we kept that out.

20             MR. BERKE:  I don't think that's the basis for the

21   objection, Judge.

22             THE COURT:  Well, I sustained the objection.

23             MR. BERKE:  OK.

24   Q.   You're familiar, prior to 2020-21, Mr. Hwang was involved

25   in trading 100 percent margin, correct?

O58sHWA5                         Becker - Cross

1    A.   Through --

2             MS. ROTHMAN:  Objection.

3    BY MR. BERKE:

4    Q.   All right.  Let me ask a different question, sir.

5             Do you recall, sir, discussing with Mr. Tomita how the

6    banks viewed 100 percent margin?

7             THE COURT:  What's 100 percent margin?

8             THE WITNESS:  If you purchase a security without using

9    leverage, you're paying 100 percent of the cost.

10             THE COURT:  You're paying full cash price?

11             THE WITNESS:  Yes.  That's correct.

12             THE COURT:  Put a different question, please.

13             MR. BERKE:  Thank you, Judge.

14    Q.   Do you recall, though, that, for example, do you recall

15    communications in early March 2021 or mid March 2021 where

16    Morgan Stanley said that because of the organic growth of the

17    portfolio, they would require 100 percent margin for additional

18    capacity?

19    A.   Yes, I recall something to that effect.

20             THE COURT:  Meaning it won't lend you any more money.

21             THE WITNESS:  For specific securities, yes.

22    Q.   Sir, what does organic growth of a portfolio mean?

23    A.   Organic growth is growth from the price appreciation of the

24    security.  You're not adding to it by buying more.  The

25    position is getting larger by price appreciation.

O58sHWA5                          Becker - Cross

1   Q.  To be clear, if the bank has given, let's say, 100,000 of

2   capacity and Archegos owns 50,000 SFP, 50,000 for the stock,

3   but it goes up in value, that counts towards the capacity

4   limit, correct?

5   A.  With some brokers, yes.

6   Q.  So, do you recall with Morgan Stanley it did, so when the

7   portfolio had organic growth, they were using up the existing

8   capacity at lower margin rates?

9   A.  Yes.  A part of the margin model captured that dynamic that

10  you described.

11  Q.  Do you recall, sir, that Mr. Tomita --

12          THE COURT:  Excuse me.

13          It's a function of the amount of a particular stock to

14  the whole, isn't it?

15          THE WITNESS:  Correct.

16          The particular, um, broker that he's discussing,

17  Morgan Stanley, one of the -- part of their margin methodology

18  was if a security reached a certain concentration of that

19  portfolio at that broker, anything past that appreciate

20  threshold would be 100 percent margin.

21          THE COURT:  To get that concentration, doesn't make a

22  difference whether you buy it or it grows organically?

23          THE WITNESS:  Correct, yes.

24          THE COURT:  Once it passes the threshold, no more

25  credit to that stock?

O58sHWA5                    Becker - Cross

1           THE WITNESS:  Correct, yes.  Yes.

2    Q.  And do you recall, sir --

3           THE COURT:  We'll break for lunch at this point.

4           MR. BERKE:  Thank you, Judge.

5           THE COURT:  2:15.

6           We'll go to 4:00 o'clock today.

7           MS. ROTHMAN:  Thank you, Judge.

8           THE COURT:  Close up your books and give them to

9    Ms. Jones on the way out.  Don't discuss the case.  Keep an

10   open mind.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O58sHWA5                          Becker - Cross

 1                (Jury not present

 2                THE COURT:  You're excused.

 3                (Witness temporarily excused)

 4                Please sit.

 5                MS. ROTHMAN:  I can speak to the lawyer issue, your

 6     Honor.

 7                My concern is the court --

 8                THE COURT:  I remember now we discussed -- I didn't

 9     appreciate what was coming up, but we discussed that without a

10     defense of advice on lawyers, testimony that lawyers were all

11     around the place and answering different questions might be

12     misleading.

13                I sustained that objection.

14                MS. ROTHMAN:  Thank you, your Honor.

15                MR. BERKE:  Your Honor, if I.  May, when we raise the

16     issue, we said we are not seeking it for that purpose.  We said

17     that if we are going to raise lawyers in the direct, we would

18     alert the government so they can raise an objection.

19                We did alert the government that we would be raising

20     the lawyers in three areas, although we said two areas we

21     didn't expect to get to before lunch.  One area with boxing

22     involves training compliance, which I understand the government

23     wants to put into evidence.  And I understood from Ms. Rothman,

24     she said they were not objecting to that.  That's why we didn't

25     raise it to the judge.

O58sHWA5                    Becker - Cross

 1          THE COURT:  Boxing?

 2          MR. BERKE:  I'm sorry.  Not boxing.

 3          I mean the five percent.  Boxing is a different issue

 4   that we withdrew from boxing.  I misspoke.

 5          THE COURT:  We have had enough testimony on the five

 6   percent.

 7          MR. BERKE:  OK.  Judge, the other part --

 8          THE COURT:  The points about the activities of

 9   compliance and lawyers with compliance is just a point that I

10   held was misleading, and I sustained the objection to further

11   questioning in that area.

12          MR. BERKE:  If I may, your Honor.  Drawing a

13   distinction between the compliance department at Archegos and

14   the lawyers, the government did not raise the same objection

15   for the compliance department they did with the lawyers.

16          In fact, on direct the government brought out

17   testimony that they believed the compliance letter given to

18   banks about the role of compliance was untrue.  So the role of

19   compliance is in this case.  It was put in by the government.

20          It is fair -- with respect, Judge, it's a fair topic,

21   unrelated to the lawyers.  Compliance did go to the lawyers a

22   lot.  That is not what we were getting to.  We were getting at

23   the compliance.  The internal compliance folks themselves would

24   raise issues about five percent, and we have documents to show

25   that.

1          That was not part of the ruling.  And, Judge, I don't

2     believe --

3          THE COURT:  What's the relevance?

4          MR. BERKE:  Judge, the government has claimed in the

5     direct of Mr. Becker that the compliance letter was false in

6     describing the role of the compliance department at Archegos.

7     So the role --

8          THE COURT:  Which compliance letter?

9          MR. BERKE:  The internal compliance department.

10         So they said their role in monitoring trading, what

11    was said in the compliance letter that was put into evidence by

12    the government that are given to banks, the government has

13    brought out from Mr. Becker a claim that the letter was false

14    in a number of respects, including that the role of compliance.

15         THE COURT:  Could I see that letter?

16         MS. ROTHMAN:  It's 1002A.

17         MR. BERKE:  We can put it up.  It may already be up.

18         Are you guys putting it up, or do you want me to?

19         Thanks.  That's the second page.

20         MS. ROTHMAN:  Third.

21         MR. BERKE:  Third page.

22         We will be getting into Mr. Becker's testimony about

23    this compliance letter after lunch, your Honor, with your

24    permission.

25         THE COURT:  Ms. Rothman.

O58sHWA5                          Becker - Cross

1          MS. ROTHMAN:  If I may.  So I disagree.  Mr. Berke's

2     referred repeatedly to lawyers.  That's why we objected, and

3     the court correctly sustained that objection for the reasons

4     cited in the pretrial ruling, which I believe your clerk

5     provided to you.

6          As to this point, this has nothing to do with whether

7     or not the five percent requirement was followed and whether

8     compliance asked questions.  This statement which Mr. Becker

9     said was false is that all trades are reviewed daily.  And if

10    Mr. Berke wants to ask questions about that, that is fine.  But

11    to suggest that things are otherwise approved, I think is

12    improper.

13         MR. BERKE:  Your Honor, the example I had to build up

14    to this was compliance.  And I can do it in connection with the

15    letter, if that is the preference of your Honor.  But it is an

16    instance of compliance reviewing the trading, raising a

17    concern, based on the trading, they were going to go over the

18    five percent and Mr. Becker dealing with it.

19         I can do an example with regard to the letter, and

20    that would be fine, Judge.

21         THE COURT:  I'll have to see where the questioning

22    goes --

23         MS. ROTHMAN:  That's fine, your Honor.

24         THE COURT:  -- and make a ruling.

25         MR. BERKE:  Your Honor, can we submit during the lunch

1    the testimony on the direct we're referring to.

2              THE COURT:  You can tell me about it now.

3              MR. BERKE:  Well, I'll give you the actual testimony.

4    The testimony was that Mr. Becker, at various points, said

5    certain aspects of the letter were false, including this

6    paragraph.

7              THE COURT:  I understand that.  I remember.

8              MR. BERKE:  Yes.

9              THE COURT:  I remember.

10             MR. BERKE:  OK.  That's what we would want to respond

11   to, Judge.

12             THE COURT:  I just said we'll see how the questioning

13   goes and I'll make my rulings.

14             MR. BERKE:  Fine.  Thank you, Judge.

15             Can I say one last thing, Judge?

16             THE COURT:  Yes.

17             MR. BERKE:  Mazel tov.  I thought that was the best

18   part of the morning.

19             MS. ROTHMAN:  I'm offended, Mr. Berke.  I thought you

20   liked the wrapping up of my direct.

21             THE COURT:  Have a good lunch.  See you at 2:15.

22             (Luncheon recess)

23

24

25

O58sHWA5                          Becker - Cross

 1                         AFTERNOON SESSION

 2                             2:20 p.m.

 3            (Jury not present)

 4            MS. ROTHMAN:  Should we get the witness, your Honor?

 5            THE COURT:  Yes, please.

 6            (Witness resumed)

 7            Good afternoon, Mr. Becker.

 8            THE WITNESS:  Good afternoon.

 9            We might as well sit down until the jury comes in.

10            (Jury present)

11            THE COURT:  Mr. Becker, you remain under oath.

12   Mr. Berke will continue his cross-examination.

13            MR. BERKE:  Thank you, Judge.

14   BY MR. BERKE:

15   Q.  Mr. Becker, do you recall when we broke we were talking

16   about conversations you were having with Mr. Tomita regarding

17   Morgan Stanley and 100 percent margin?

18   A.  Yes, I do.

19   Q.  And, sir, do you recall that Mr. Tomita said, we will come

20   out looking like good partners to MS as we're doing them a

21   favor by adjusting to their needs?

22   A.  Yes, I do recall that.

23   Q.  And MS is Morgan Stanley, correct?

24   A.  Yes, that's correct.

25   Q.  Sir, you were asked some questions about hedging on direct.

1    I have a couple of questions for you, sir.

2            So, just to be clear, a swap contract, we already had

3    a lot of testimony, is between the bank and Archegos, correct?

4    A.  Yes, that's correct.

5    Q.  And the contract means Archegos is not owning or

6    controlling the shares or the security, correct?

7    A.  Yes, that's correct.

8    Q.  And under the ISDA contract, which we've talked about,

9    Archegos has no ability to force the bank to buy the shares of

10   stock, correct?

11   A.  That's correct.

12   Q.  The bank can, on its own, decide to hedge their position on

13   the swap contract, correct?

14   A.  That's my understanding.

15   Q.  I'm going to ask you about a swap contract as an example

16   that's long.

17           For example, Archegos is taking a long position of the

18   security in the swap.  Does that make sense to you?

19   A.  Yes, it does.

20   Q.  So it's a bet, to use the judge's language, it's a bet that

21   the stock will go up, correct?

22   A.  Yes.

23   Q.  The bank, if they choose, they could purchase the stock and

24   then hold on to the stock as the hedge, correct?

25   A.  Correct.

1   Q.  They could also, though, they could also sell that stock

2   back in the market and hedge it by having a swap that goes the

3   other way, or a short position, so they equal each other out,

4   correct?

5              MS. ROTHMAN:  Objection.

6              THE COURT:  You better explain that.  I don't think he

7   can answer it the way it's been asked.  But explain the area,

8   shorts and longs as hedges.

9              THE WITNESS:  My general understanding of how a broker

10  would hedge a swap contract could be any combination of the

11  broker buying the underlying shares in the market.  For the

12  first example, they may have another client taking the opposite

13  side of the short side of the transaction.  Where Archegos in

14  this example is long, another client of that broker could be

15  short.

16             So the broker is acting as the intermediary between

17  the two.  They are collecting interest.  That's their interest

18  in that transaction.

19             THE COURT:  So there one investor's purchase and the

20  other investor's sale balances each other out?

21             THE WITNESS:  Yes, in that scenario.

22             THE COURT:  In swaps.

23  BY MR. BERKE:

24  Q.  Am I correct, sir, that after the initial contract, if the

25  bank hedges initially the swap contract, you, at Archegos, you

1    don't know whether or not they are keeping those shares or

2    whether they are hedging it a different way, correct?

3              MS. ROTHMAN:  Objection.

4              THE COURT:  Overruled.

5    A.  That's my understanding, yes.

6    Q.  And, sir, are you also familiar --

7              THE COURT:  A hedge, this thing is not focused

8    necessarily on, would you say, the transaction, on a single

9    transaction, but rather on an overall position in the bank?

10             THE WITNESS:  Yes.  Generally, a bank may hedge the

11   entire, their entire exposure, yes.

12             THE COURT:  So the bank is doing swaps with a number

13   of different investors.  In order to hedge it, it needs to look

14   at the total position, not a partial position.

15             THE WITNESS:  Yes, that's my understanding.

16             THE COURT:  So it's not necessarily what we call a

17   one-to-one relationship.  One party's transaction will not

18   automatically trigger a hedge.  One has to look to the whole

19   picture.

20             THE WITNESS:  Yes.  That's my understanding, your

21   Honor.

22             MR. BERKE:  Thank you, Judge.

23   Q.  Sir --

24             THE COURT:  I think that's your point, isn't it?

25             MR. BERKE:  It is, Judge.

 1              I'll move on to another point.  Thank you.
 2    Q.  It's also true, sir, that a bank, if they do have shares,
 3    they could lend them out for the use of short sellers, those
 4    shares.
 5              Are you familiar with that, sir?
 6              MS. ROTHMAN:  Objection.  Witness's knowledge.
 7              MR. BERKE:  If he knows.
 8              THE COURT:  First of all, we're not giving
 9    explanations, right.
10              MS. ROTHMAN:  I'm sorry, your Honor?
11              THE COURT:  Objection's overruled.
12    Q.  You may answer, sir.
13    A.  Can you repeat the question, please?
14    Q.  Yes.
15              Are you familiar, sir, that if the bank does have the
16    shares as a hedge, that at times the banks will lend out the
17    shares to short sellers who are interested in having those
18    shares?
19              THE COURT:  We are talking about repose now.
20    A.  I have a very basic understanding of that, of what the
21    broker does on their end.  My general understanding is that
22    that may occur.
23    Q.  Sir, do you recall on your direct testimony you were asked
24    questions about a compliance letter?
25    A.  Yes.

1            MR. BERKE:  Your Honor, I would like to put up on the

2    stand what has been entered into evidence as Government Exhibit

3    1002A.

4            Thank you, Mr. McLeod.

5    Q.  Sir, this is the compliance letter, correct?

6    A.  Yes, it is.

7            MR. BERKE:  OK.  Could we go to the last page.

8    Q.  The letter is signed by Andy Mills, the executive chairman

9    and co-chief executive, correct?

10           I'm sorry, co-chief executive officer, correct?

11   A.  Yes, that's correct.

12   Q.  Can we now go to the beginning of it, please.

13           Sir, do you recall you were asked questions about

14   paragraph one Andy Mills?

15   A.  Yes, I was.

16   Q.  And, sir, do you see where it says Andy's responsible for

17   all day-to-day and strategic non-portfolio decisions, correct?

18   A.  Yes, I see it says that.

19   Q.  What does non-portfolio decisions mean?

20   A.  Non-trading decisions.

21   Q.  And who was -- so Mr. Mills, he was not responsible for the

22   portfolio or trading decisions, correct?

23   A.  That is correct.

24   Q.  That's because Mr. Hwang, the co-CEO, he was singularly

25   responsible for the trading and portfolio decisions, correct?

1    A.  Mr. Hwang was responsible for all trading decisions, yes.

2    Q.  Right.

3          So you don't have any -- the rest of this paragraph

4    describes Mr. Mills' background of 40 years.  You don't have

5    any issues or claims that any of that is false, do you?

6          MS. ROTHMAN:  Objection.

7          THE COURT:  Sustained.

8    Q.  Sir, you remember you were asked about your description --

9          If we may go to paragraph two, number six.

10          Sir, you were the director of risk management,

11    correct?

12    A.  Yes.

13    Q.  And, remember, we went over your role for enterprise risk

14    management.  And your role, you did have a role with risk,

15    correct?

16    A.  I had a role related to enterprise risk, yes.

17    Q.  Enterprise risk, yes.

18          And you recall --

19          THE COURT:  What is enterprise risk?

20          THE WITNESS:  Enterprise risk is a term that captures

21    the general business risk of a company.  It's not specific to

22    an investment company.  Types of -- they were the types of

23    risks that I looked at, such as cybersecurity risk and physical

24    security risk of the office.

25    Q.  And you recall --

1          MR. BERKE:  I'm sorry, Judge.  Are you done?

2          THE COURT:  Yes.

3          MR. BERKE:  OK.  Thanks.

4   Q.  And, sir, you recall testifying on direct that you did not

5   have a role spent on portfolio risk?

6   A.  That is correct.  I was not responsible.

7   Q.  Again, that is trading risk, correct?

8   A.  Yes.

9   Q.  And, more broadly, that is the trading portfolio risk?

10  A.  The fund's portfolio risk, yes.

11  Q.  And, sir, isn't it a fact that Mr. Satine, the chief of

12  compliance, would clarify with brokers that you, Mr. Becker,

13  did not review portfolio risk, that Bill was responsible for

14  the portfolio?

15          MS. ROTHMAN:  Objection.

16          THE COURT:  Break up your question, please.

17          MR. BERKE:  You want me to repeat it?

18          THE COURT:  I want you to break it up.

19          MR. BERKE:  OK.

20  Q.  Sir, isn't it true that, first, Michael Satine is chief of

21  compliance, correct?

22  A.  Yes, he was.

23  Q.  And Michael Satine would have calls with the brokers, the

24  banks, correct?

25  A.  Yes.  I was on a few calls with him, yes.

1    Q.  And isn't it true, sir, that Mr. Satine, chief of

2    compliance, would clarify with the brokers that you, Scott

3    Becker, did not review portfolio risk?

4    A.  I recall two phone calls with Michael where compliance was

5    discussed with brokers where he did make that distinction, yes.

6    Q.  And what he said was, it wasn't you, but Bill Hwang who was

7    responsible for the portfolio, correct?

8    A.  Yes, that's correct.

9    Q.  And so the letter does not say that you're responsible for

10   portfolio risk, does it?

11             THE COURT:  The letter is what it says.

12             MR. BERKE:  OK.  Thank you, Judge.

13   Q.  And you're familiar as well, sir, that there were calls

14   with the brokers in the onboarding process that they were led

15   by Andy Mills and Michael Satine?

16             MS. ROTHMAN:  Objection.

17             MR. BERKE:  Let me rephrase it, Judge.

18   Q.  You recall, sir, that there were calls that discussed some

19   of the changes in compliance that happened at Archegos, is that

20   correct, sir?

21   A.  That's my general understanding, yes.

22   Q.  And you recall that those calls were led by Andy Mills and

23   Michael Satine?

24             THE COURT:  What do you mean by led?

25             Fix that up.

O58sHWA5                              Becker - Cross

1    Q.  That they would be the one speaking on those calls?

2    A.  There may have been phone calls that I was not on in terms

3    of when compliance was discussed with brokers on calls that I

4    was on.  I recall two calls where myself and Michael Satine

5    were on those calls talking about compliance.

6    Q.  OK.  Well, sir, you were aware that it was Andy Mills --

7    withdrawn.

8           You were aware, sir, that Andy Mills maintained the

9    relationships with the senior executives at the bank and prime

10   broker firms that Archegos did business with, correct?

11          MS. ROTHMAN:  Objection.

12          THE COURT:  Overruled.

13   A.  My understanding is that he maintained many of those

14   relationships, yes.

15   Q.  Sir, you recall you were also asking about the role of

16   compliance involving trading on direct?

17   A.  Yes.

18   Q.  And, sir, wasn't it your understanding at Archegos that

19   compliance could see all of Archegos' trades?

20   A.  They -- my understanding is that, yes, they had access to

21   the trade buyer.

22   Q.  Isn't it also the case that at times the internal

23   compliance personnel would bring to your attention questions

24   they have based on the tradings they were looking at?

25          MS. ROTHMAN:  Objection.

O58sHWA5                    Becker - Cross

1         THE COURT:  Overruled.

2    A.  I recall one instance where compliance had a question

3    specifically related to Archegos' portfolio trading, yes.

4    Q.  Do you recall, sir, that compliance was also very focused

5    on trading as it related to MNPI or material nonpublic

6    information?

7    A.  Yes.

8    Q.  Just to be clear, that is to make sure that there was -- no

9    one had gotten possession of information that could be material

10   nonpublic information for which you're not allowed to trade on,

11   is that correct?

12   A.  Yes, that's correct.

13   Q.  Sir, you recall you were asked on direct about change in

14   access to trading portfolio information in January of 2021?

15   A.  Yes.

16   Q.  And do you recall, sir, that in January of 2021, there was

17   something known as the meme stock frenzy going on?

18   A.  Yes, I recall that.

19   Q.  What was the mean stock frenzy in January, February 2021,

20   sir?

21   A.  There was -- there was an elevated level of trading, um, by

22   a group referred to as meme stock traders.  Typically

23   individual traders, I think a lot of these trades were

24   coordinated online through websites, such as Reddit, and I

25   believe those trades were focused on the holdings of an

O58sHWA5                           Becker - Cross

1    investment fund called Melvin Capital.

2              THE COURT:  What do you mean by meme, m-e-m-e?

3    Q.  That's for you, sir.

4              THE WITNESS:  The term meme --

5              THE COURT:  Why is it called meme, to your

6    understanding?

7              THE WITNESS:  Many of the securities that, um, this

8    group of investors had invested in were securities who

9    typically, generally in the -- by professional investors

10   weren't looked upon fondly, such as GameStop.  They sold video

11   games at physical malls.

12             THE COURT:  But you don't know why they were called

13   meme, m-e-m-e?

14             THE WITNESS:  There is a, um, there is a popular

15   culture reference to the actual term meme.  I don't know the

16   definition of the word.

17             THE COURT:  OK.

18   BY MR. BERKE:

19   Q.  Sir, do you recall you discussed among the operations team

20   that these Reddit traders had learned the positions of an

21   investor called Melvin Capital and traded against those

22   positions?

23   A.  That was my understanding based on media reports, yes.

24   Q.  And you recall, sir, you talked among --

25             And you recall, sir, that this happened on or around

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

O58sHWA5                              Becker - Cross

1    January 27, 2021?

2    A.  It was around that time, yes.

3    Q.  And you recall, sir, that you discussed among the

4    operations team the fact that these Reddit traders were likely

5    to target other big investors and you wondered who would they,

6    quote, hammer next?

7                MS. ROTHMAN:  Objection.

8                THE COURT:  Overruled.

9    A.  I may have said that to the operations team.

10   Q.  And can you explain what that means, how would the Reddit

11   traders hurt other investors if they learned their positions?

12   A.  In the case -- in the cases that were public, I believe

13   they related to short positions that Melvin Capital had,

14   whereas these group of meme stock investors coordinated their

15   purchasing of these securities to create a short squeeze, a

16   short squeeze meaning that the stock price of the securities

17   that were being purchased in concert between this group of

18   investors caused the market price of those securities to

19   increase and the investor investment fund had a short position

20   in those names.

21        The securities had appreciated in price, stock prices

22   went up so quickly that it created the term short squeeze,

23   meaning a short position that appreciated significantly in a

24   short amount of time leading to losses for the investment fund.

25   Q.  Thank you, sir.

1          And, sir, during this time, Mr. Halligan and Archegos

2     had some very large short positions in companies like FUTU,

3     correct?

4     A.   There were two large short positions in Archegos' portfolio

5     individual --

6     Q.   FUTU and Rocket Mortgage, correct?

7     A.   Yes, those are correct.

8     Q.   Sir, do you recall that the GameStop stock, for example,

9     went through the roof, went very high, correct?

10    A.   Yes, it did.

11    Q.   And you recall another stock that was targeted by these

12    Reddit traders was GSX, which Archegos was trading, correct?

13    A.   I don't know if GSX was one of the meme stocks.

14          MR. BERKE:  Sir, let me show you what I ask to be

15    marked -- what is marked for identification as DX 8271.

16          Mr. McLeod, if we can begin January 27 at 14:29:10.

17          Sir, I'm going to show you a couple entries and ask

18    you just to read them yourself.

19          Now, I would ask to go down to the same day, 14:43:41.

20    It's on a different page.

21          You can take this down, Mr. McLeod.  Thank you.

22    Q.   Do you see that, sir?

23    A.   Yes, I do.

24    Q.   My question is, sir, does that refresh your memory that one

25    of the stocks that Melvin Capital was shorting was GSX, so on

O58sHWA5                            Becker - Cross

1  the January 27th, it also shot up high?

2  A.   Is it the blown-up section specifically?

3          Looking at this, I don't have a recollection of GSX

4  being one of the Reddit-related stocks.

5          MR. BERKE:  Let me show you one other on this same

6  exchange.

7          Can we go to January 27, at 14:33:58.  Then underneath

8  it at 34:56, and if you can get them both, that would be great.

9          This is the same exchange of what I showed you

10  earlier, sir, regarding GameStop.  It's just a very long one.

11          THE COURT:  Anything in particular you want him to

12  see?

13          MR. BERKE:  OK.  We're going to 14:33:58, Mr. McLeod.

14  Thank you.

15          Down a little further to 34:56.  Earlier was the

16  reference to GameStop in the same exchange.

17  Q.   Sir, my question is, does that refresh your recollection

18  that --

19          THE COURT:  Is GSX GameStop?

20          MR. BERKE:  No, a different one.  GSX is one of the

21  stocks in Archegos' portfolio, Judge, for which there is a lot

22  of testimony.

23  A.   Can you repeat your question, please?

24  Q.   Yes.

25          Does that refresh your memory that GSX was one of the

1   stocks that Melvin Capital was shorting, and that on the same

2   day GameStop went up so high, it went up so high because the

3   Reddit traders were trading it to hurt Melvin Capital?

4              MS. ROTHMAN:  Objection.

5              THE COURT:  That's a very difficult and compound

6   question.

7              MR. BERKE:  I'm sorry, Judge.  I'll do better.

8   Q.  Does this refresh your memory that in addition to GameStop,

9   the Reddit traders were also buying GSX stock on January 27?

10             THE COURT:  Did you know what the Reddit traders were

11  buying?

12             THE WITNESS:  I knew memes that were reported in the

13  media, GameStop being the most popular example.

14             THE COURT:  Do you know if Reddit people were buying

15  GSX?

16             THE WITNESS:  No, I don't know.  I mean, reading this

17  transcript here, I could see on this particular day the GSX

18  price, I would assume, moved significantly.

19             THE COURT:  The question is --

20             THE WITNESS:  I don't know the driver.

21             THE COURT:  The question is, do you know that the

22  Reddit people were buying GSX stock?

23             THE WITNESS:  No, I don't.

24             MR. BERKE:  Thank you, Judge.

25  BY MR. BERKE:

1    Q.  Let me ask you a different question.

2              Do you recall that on January 27, 2021, GSX went up

3    35 percent on that single day?

4    A.  From this exchange, I would --

5              THE COURT:  No.

6              MR. BERKE:  Let me show you something else.

7              THE COURT:  The question is to your recollection.

8    You're testifying as to your recollection.  You're sworn to

9    give your recollection, as best you can, to tell the truth, the

10   whole truth, and nothing but the truth.  But you're not

11   required to read pieces of paper and say that must have been

12   the case.

13             THE WITNESS:  Thank you for the clarification.

14             THE COURT:  So...

15             MR. BERKE:  Your Honor, if I may show the witness

16   another document to see if it refreshes his recollection on the

17   last question?

18             THE COURT:  What is the recollection that you want

19   refreshed?

20             MR. BERKE:  That on January 27 -- excuse me -- on the

21   27th, GSX also went up and it went up 25 percent.

22             THE COURT:  Do you remember that?

23             THE WITNESS:  I don't remember that particular day.

24   GSX had many days of volatility.  I don't know what drove the

25   price movement.

1           MR. BERKE:  Your Honor, can I show this witness a

2    document to see if it refreshes his memory about the stock

3    moving on that day?

4           THE COURT:  You're showing him, aren't you?

5           MR. BERKE:  I'm sorry, Judge.  I couldn't hear you.

6           THE COURT:  You're showing him.

7           MR. BERKE:  I'm going to show a different document

8    about the actual stock price.

9           THE COURT:  He says it went up a number of days.  He

10   didn't know what drove it.

11   BY MR. BERKE:

12   Q.  Let me ask this.

13          Sir, do you recall that another stock that was also

14   the subject of the Reddit traders attempts to hurt Melvin

15   Capital was Viacom?

16   A.  No, I wasn't aware of that.

17   Q.  OK.  Just to be clear, Archegos was long both GSX and

18   Viacom in January of 2021, correct?

19   A.  Yes, that's correct.

20   Q.  You recall, sir, that for Melvin Capital, the positions

21   that got, quote, hammered were those the ones that became

22   public?

23   A.  Yes.  That's my general understanding.

24   Q.  And do you recall, sir, for that reason, that was what

25   caused Archegos to decide to have heightened security so they

1  weren't the next large investors to get hammered by so-called

2  Reddit traders?

3           MS. ROTHMAN:  Objection.

4           THE COURT:  Overruled.

5           It's a question of your recollection, sir.  Is that

6  the reason that Archegos decided to have heightened security?

7           THE WITNESS:  That was the reason given from Mr. Mills

8  when Archegos had increased its security around portfolios.

9  Not Viacom or GSX specifically, but the overall theme of Melvin

10 Capital.

11 Q.  The GameStop meme frenzy, correct?

12 A.  Yes, the GameStop meme frenzy.

13 Q.  Sir, let me show you what is in evidence as defense Exhibit

14 6842.

15          Sir, this is the communication from Andy Mills

16 regarding the access to portfolio information within Archegos?

17 A.  Yes, it is.

18 Q.  And you see, sir, that the date is January 22, two days

19 after the start of the meme stock frenzy we've been talking

20 about?

21          THE COURT:  Don't tie up your questions like an

22 argument.

23          MR. BERKE:  OK.

24          MS. MULLIGAN:  Excuse me.

25          THE COURT:  Short questions.  Single point.

 1              MR. BERKE:  Yes.

 2   Q.  Sir, what was the date of the memo?

 3   A.  This is January 29.

 4   Q.  OK.  You see, sir, where it says with the current state of

 5   affairs -- second paragraph -- current state of affairs in the

 6   market, we made the decision to pull back our information

 7   distribution somewhat at this time so that we can continue to

 8   invest confidentially and successfully?

 9   A.  Yes, I see it.

10   Q.  What did you understand the current state of affairs in the

11   market referred to?

12   A.  The GameStop-Reddit mania.

13              MR. BERKE:  Thank you, sir.  You can that that down,

14   thank you, Mr. McLeod.

15   Q.  And you recall, sir, that confidentiality of investment

16   information also, at times, were issues with the banks you were

17   dealing with?

18              MS. ROTHMAN:  Objection to form.

19              MR. BERKE:  Well, I can rephrase, Judge.

20              THE COURT:  Haven't you made your point?

21              MR. BERKE:  Let me ask one thing specific.

22   Q.  Sir, do you recall that in late 2020, one of your banks,

23   UBS, had a week where Archegos investments in certain Japanese

24   swap positions were leaked to another hedge fund?

25   A.  Yes, I do recall that incident.

1    Q.  You recall that was an issue of grave concern for both UBS

2    and Archegos?

3    A.  Yes, I do.

4    Q.  And do you recall that UBS wrote apologetically to Archegos

5    and they listed all the new security measures that they were

6    going to put in place so they would not again breach Archegos'

7    confidentiality and investment decisions, correct?

8    A.  Yes, correct.

9    Q.  And you recall that one of the things that UBS was doing

10   after they had this heightened concern was they actually

11   breached Archegos' information, they were going to limit access

12   to Archegos' investment information that they possessed?

13            THE COURT:  Mr. Berke, simple questions.

14   Q.  OK.  Do you recall, sir, that one of the things they said

15   to you is they were limiting who had access to their clients'

16   investment information?

17            THE COURT:  Who is they now?

18            MR. BERKE:  They being UBS.

19            Thank you, Judge.

20   A.  I recall they -- they had several remediations they were

21   working on.  I don't remember exactly what they were.

22   Q.  And, sir, do you recall that you yourself gave some

23   directions about how your team should be more protective using

24   passwords and the like for the information you had?

25            Do you recall that, sir?

1    A.  Yes.  That would be normal practice for our team.

2    Q.  Do you recall that you increased it after the meme stock

3    frenzy in late January 2021?

4    A.  Yes, as was directed by Mr. Mills, we did.

5    Q.  And you recall, sir, that UBS, when they had that breach in

6    late 2020, they were saying they were doing the same thing for

7    their personnel, to better protect Archegos' information that

8    they had?

9              MS. ROTHMAN:  Objection.

10             THE COURT:  Overruled.

11   A.  They had proposed steps of remediation to prevent future

12   data leaks.  I don't remember what those steps were.

13             THE COURT:  Can you move to another point?

14             MR. BERKE:  We are, Judge.  Thank you.  I agree.

15   Q.  Sir, do you recall you were asked some questions on direct

16   about the ISDA agreement?

17   A.  Yes.

18   Q.  And do you recall that you had a renegotiation for the ISDA

19   agreement with Credit Suisse in 2020?

20   A.  Yes, I do.

21   Q.  Am I correct, sir, that you coordinated the ISDA

22   negotiation for Credit Suisse in 2020?

23   A.  I coordinated the negotiation between outside counsel and

24   Credit Suisse.

25   Q.  Am I right, sir, that while you were at Archegos, you were

 1    not aware of any of the terms of that agreement being violated?

 2              MS. ROTHMAN:  Objection.

 3              THE COURT:  Sustained.

 4              MR. BERKE:  Your Honor, this is an issue which your

 5    Honor would not know why it's important to us, but it is.  And

 6    I would be happy to tell your Honor briefly.  And it's very

 7    important for this one, I have one question, and this is it.  I

 8    can tell your Honor, but it is an important issue for us.  I

 9    know the answer to this question.

10              THE COURT:  Put it up.  Let me see it.

11              MR. BERKE:  I'm going to put up 3501-55, your Honor,

12    if I may.

13              THE COURT:  Is it in evidence?

14              MR. BERKE:  No.  I'm just putting it up for you, your

15    Honor.

16              This is 3500 material regarding what I'm asking about.

17    It's page two, line two, so your Honor will understand it.

18    There is also more background to this issue, Judge, I would be

19    happy to tell you.  I think your Honor would want to hear about

20    it before ruling on any issue.

21              THE WITNESS:  Excuse me.

22              Should I be seeing this?  I'm not looking.  it's on my

23    screen, though.

24              MR. BERKE:  OK.  Why don't we do it just for the

25    judge, if we can.

1                Thank you, Mr. McLeod.

2                Your Honor, are you able to see that?

3                THE COURT:  I am.

4                MR. BERKE:  It's the highlighted part I'm asking

5      about, Judge.  That's my only remaining question on this.

6                THE COURT:  Sidebar.

7                MR. BERKE:  Yes, Judge.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  What's the point?

3            MR. BERKE:  Judge, one of the allegations in this case

4    is that there was a Credit Suisse 2020 agreement, that there is

5    a line in there that is not accurate.

6            He asked the government, when they did not elicit

7    anything from Mr. Becker about the agreement, whether they are

8    still alleging there was a knowing misstatement.

9            THE COURT:  Well, why don't you just focus on the

10   statement.

11           MR. BERKE:  Well, no.  Because, Judge, if I may, our

12   position is Mr. Hwang never saw this.  The document he signed

13   was a one-page signature page that didn't have it.

14           The only thing this witness didn't focus on either,

15   that's why he didn't think it was violated, was a mistake made

16   in this agreement by the lawyers.  We can prove it.

17           But to have this witness, who coordinated it, leading

18   it, for the government to ask him a single question --

19           THE COURT:  Show him the particular point that you

20   think he said to your client and then you can confront him with

21   this.

22           MR. BERKE:  The only question, your Honor, is he said

23   that he -- he said we -- he told the government he was not

24   aware while he was there about the terms violated.  That's it.

25           THE COURT:  That's not going to be good.

O58sHWA5                          Becker - Cross

1              Go with a particular to the general.

2              MR. BERKE:  Judge, here is the problem.

3              THE COURT:  You can elicit what he said that you want

4    to cross.  You can't bring this out.

5              MR. BERKE:  Can I explain, Judge.  I would say the

6    government can't later argue there is something false in there,

7    when the person that coordinated it didn't believe there was

8    any misrepresentation.

9              THE COURT:  You can't.

10             MR. BERKE:  Sorry, Judge.  Did you --

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O58sHWA5                                    Becker - Cross

 1                    (In open court)

 2                    THE COURT:  The objection is sustained.

 3   BY MR. BERKE:

 4   Q.  Sir, am I correct that Mr. Hwang never directed you to make

 5   any misrepresentations in any ISDA agreements, correct?

 6   A.  That is correct.

 7   Q.  Sir, you recall that you were asked some questions on

 8   direct about what was described as boxing, correct?

 9   A.  Yes.

10   Q.  Just to orient the jury, boxing, again, is when you have

11   both purchases and sales, correct?

12   A.  Yes.

13   Q.  OK.  Of the same security, correct?

14   A.  Of the same security, yes.

15   Q.  OK.  And you understood, sir, that boxing was a way to

16   reduce the firm's position in the stock when the price was

17   high, for example?

18   A.  Yes, that could be one reason why.

19   Q.  OK.

20                    THE COURT:  How does that work?

21                    THE WITNESS:  If you have -- in the example of a long

22   position, if you have -- you hold shares long, you could

23   short-sell the same security.  If you have, for example, ten

24   shares long, you could short ten shares.  That would be a box

25   position of ten shares.  Your economic exposure of those ten

O58sHWA5                        Becker - Cross

1    shares would be fully hedged.

2              THE COURT:  Why would you want to do that, if you were

3    an investor?

4              THE WITNESS:  You could do it for tax purposes.  You

5    could do it for hedging purposes.

6              THE COURT:  If you had built up a long position, why

7    would you want to box, just sell whatever portion you felt was

8    too much?

9              THE WITNESS:  The initial transaction where, again, in

10   a case of a long security is held, where you short-sell, that

11   would have the same impact as selling the shares that you had

12   long.

13             MR. BERKE:  Judge, are you done?

14             THE COURT:  I'm done questioning.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   BY MR. BERKE:
 2   Q.  And, sir, am I correct that the advantage of boxing over
 3   just selling is there are certain tax advantages that attach to
 4   reducing your position through boxing as opposed to an outright
 5   sale?
 6   A.  There is a tax strategy, yes.
 7           THE COURT:  You can't buy the same stock for some
 8   period of time.  Right?
 9           THE WITNESS:  I'm not intimately familiar with the
10   rule, but generally once you enter into the box position, for
11   the tax strategy to work appropriately, you need to hold the
12   short position for -- I don't know if it's 30 or 60 days.
13   BY MR. BERKE:
14   Q.  And you recall, sir, that the accountants of Archegos were
15   involved in reviewing the boxing strategy from a tax
16   perspective?
17   A.  The outside tax accountants.
18   Q.  Yes.  And they signed off on how it was being done at
19   Archegos, the accountants --
20           MS. ROTHMAN:  Objection.
21           THE COURT:  Sustained.
22   BY MR. BERKE:
23   Q.  Sir, do you recall that you told Andy Mills that boxing was
24   a legitimate tax strategy?
25   A.  Yes.  Based on -- yes.
```

O5M6HWA4                        Becker - Cross

1   Q.  Okay.  And, sir, let me ask you this -- and, sir, am I

2   right that you discussed the applicable tax rules with your

3   outside accountants?

4            MS. ROTHMAN:  Objection.

5            THE COURT:  Sustained.

6   BY MR. BERKE:

7   Q.  And am I right, sir, that the counterparty banks were very

8   familiar with the concept of boxing?

9            MS. ROTHMAN:  Objection.

10            THE COURT:  Sustained.

11   Q.  Sir, do you recall that you spoke to -- you e-mailed with

12   UBS to discuss what the margins would be for boxing exchanges?

13   A.  Yes.  That sounds right.

14            MR. BERKE:  Let me show you -- if I may show you

15   what's been marked for identification as Defense Exhibit 7131,

16   just for the witness and the courtroom parties, please.

17            Thank you, Mr. McLeod.

18   Q.  And, sir, is this an e-mail exchange, if you look down,

19   involving you, folks from UBS, and others from Archegos, on

20   January 22, 2021?

21   A.  Yes, it is.

22            MR. BERKE:  Your Honor, I would offer defense

23   Exhibit 7131.

24            MS. MULLIGAN:  No objection.

25            MS. ROTHMAN:  No objection.

O5M6HWA4                          Becker - Cross

 1              THE COURT:  Received.

 2              (Defendant's Exhibit 7131 received in evidence)

 3              MR. BERKE:  Thank you, Judge.

 4              THE COURT:  You may show.

 5              MR. BERKE:  Okay.  Thank you.

 6         Mr. McLeod, if we may publish, thank you?

 7              THE COURT:  Do you want the jury to take note of

 8    anything?

 9              MR. BERKE:  I'm going to highlight some things.

10    BY MR. BERKE:

11    Q.  So if I may begin by going to the -- excuse me, the line

12    that begins with Mr. Tomita, 8:21 a.m., it's at the bottom of

13    554.

14              And, sir, Yifei Chuang, you testified earlier, he's at

15    UBS, right, along with Bryan Fairbanks?

16    A.  That's correct.

17    Q.  You see where it says, we think ahead about potentially

18    trimming our position if it keeps rallying.  Can you please

19    explain what that means?

20              MS. ROTHMAN:  Objection.

21              THE COURT:  Are you on this memo?  Yes.

22              MR. BERKE:  Well, let me ask it differently.

23              THE COURT:  You can ask what his understanding was

24    when he received this.

25              MR. BERKE:  Yes.

1    Q.  Sir, what was your understanding when he received it?

2            THE COURT:  About what?

3            MR. BERKE:  About the phrase, as we -- let me ask it

4    differently.

5    BY MR. BERKE:

6    Q.  Sir, you see the first sentence says, as we think about

7    potentially trimming our position if it keeps rallying, instead

8    of long selling, we are considering to short sell and box the

9    position, long swap/short cash.  Do you see that, sir?

10   A.  Yes.

11   Q.  What did you understand that to mean?

12   A.  That this -- I believe this is in regards to GSX, which was

13   a long position for Archegos.  So he's saying we're thinking

14   about potentially trimming our positions, so potentially

15   reducing our economic exposure to GSX.  If it keeps rallying,

16   meaning if the price keeps going up instead of long selling, so

17   you have the option of just selling the shares that you own.

18   We were considering to short sell to box the position.  That's

19   the -- that's the issue we're discussing now.  You're creating

20   a box.

21   Q.  And you see where it says, if you were to do that on

22   1 million shares, would you be able to apply 0 percent 1A to

23   the box long/short position?  What did you understand that to

24   mean?

25   A.  He's asking if -- in this example if Archegos were to box a

1   million shares of GSX, would that have the same margin impact

2   of Archegos selling 1 million shares.

3            MR. BERKE:  Okay.  Can we then go to Mr. Cheng's

4   response at 2:38?  That's at 552.

5   Q.  And do you see where Mr. Cheng responds in this case to

6   you -- says, agreed with you on below scenarios.  Also great to

7   see GSX above 90.  In addition, we are okay with 0 percent

8   margin on boxed long/short position in below scenarios.  And

9   0 percent margin means you don't need to put money up?

10  A.  Correct.

11  Q.  That's because the positions will cancel themselves out as

12  a way to trim your position in a tax efficient manner, correct?

13  A.  Trimming the position.  Tax efficient depends on how long a

14  short was held.  But, yes, in concept, you are correct.

15  Q.  Okay.  Am I also correct, sir, that another reason you

16  might box is if you want to save certain capacity that you have

17  to buy stocks for another time in case the price becomes a good

18  price?

19           MS. ROTHMAN:  Objection.

20           THE COURT:  Overruled.

21  Q.  You may answer, sir.

22           THE COURT:  If you know the answer, you can give it.

23  A.  Can you repeat the question?

24  Q.  Let me do it this way.  This may be easier.

25           MR. BERKE:  If I can show the witness what's been

O5M6HWA4                        Becker - Cross

 1    marked --

 2              THE COURT:  Why do people box?  How about that

 3    question?  Do you like that question?

 4              MR. BERKE:  That's good too.  I have a document that

 5    may be helpful to the witness.  He's on it.

 6              THE COURT:  Why do people box?

 7              THE WITNESS:  Generally, you would box to -- as we are

 8    discussing, you would reduce your economic exposure to a

 9    security.

10              THE COURT:  By boxing?

11              THE WITNESS:  Yes.  That's one method.

12              THE COURT:  Are there other reasons to box?

13              THE WITNESS:  Yes.  There could be other reasons to

14    box.  You -- if -- using the same example of a long security,

15    you could short shares to box a position, and then later on in

16    the same day, for example, you could purchase those shares

17    again.  So your economic impact from the beginning of the day

18    to the end of the day didn't change, but you could purchase

19    securities at a specific time if you boxed.

20              THE COURT:  What's the benefit of that?  You're ending

21    up with the same position you had the day before?

22              THE WITNESS:  You could -- I'm not sure if this

23    actually occurred, but you could be impacting the market price

24    of a security that you box when you buy the shares later in the

25    day.

O5M6HWA4                         Becker - Cross

1          THE COURT:  How so?

2          THE WITNESS:  Market prices are a -- they are as a

3     result of supply and demand in the market.  So the more

4     purchasing that's going on, generally the price goes up; the

5     more selling, generally the price goes down.

6          THE COURT:  So you could sell in the morning, because

7     you think that's a good idea, and buy in the afternoon, because

8     you think that's a good idea.  Is that what you're talking

9     about?

10          THE WITNESS:  You could be doing that, or you could be

11     selling into the morning and buying shares back in the

12     afternoon.  If the price was down, you might be trying to

13     support the price.

14          MR. BERKE:  Your Honor, may I show a document that I

15     think will help on this?  If I could show the witness what's

16     been marked in identification as Defense Exhibit 7132?

17     BY MR. BERKE:

18     Q.  Sir, do you see this is an e-mail exchange — again, also

19     with Mr. Cheng at UBS and others — involving you and Mr. Tomita

20     on March 5, 2021?

21     A.  Yes, I see that.

22          MR. BERKE:  Your Honor, I would offer into evidence

23     Defense Exhibit 7132.

24          MS. MULLIGAN:  No objection, your Honor.

25          MS. ROTHMAN:  Your Honor, could I just have one

O5M6HWA4                        Becker - Cross

1   moment?  I don't think I have a copy of it.

2              MR. BERKE:  Do you want us to go down?

3              MS. ROTHMAN:  You can just zoom out.

4              No objection.  Thank you.

5              THE COURT:  Received.

6              (Defendant's Exhibit 7132 received in evidence)

7              THE COURT:  Show it to the jury.

8              MR. BERKE:  Thank you.

9              Mr. McLeod, can we show the full document?  Thanks.

10   And can we blow up the top part?  It says -- sorry.  I guess we

11   have to do the bottom part first.  Thank you, Mr. McLeod.

12   BY MR. BERKE:

13   Q.  You see Mr. Cheng says, confirmed with Yifei, we can charge

14   zero margin for box positions.  Let me know if you need

15   anything else.

16              MR. BERKE:  Can we go to the top?

17   Q.  And, Mr. Becker, you see where it says:  We are thinking of

18   potentially strategically boxing GSX in order to save the long

19   capacity in case the stock comes back in again.  Not sure if we

20   will do anything, but it's good to know.

21              And, sir, do you understand that to mean that they are

22   thinking of potentially strategically boxing GSX in order to

23   sell it while the price is high with the idea that if the price

24   were to get low again, they'd have capacity with UBS to buy it

25   again if they thought it was a good price to buy the stocks?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. ROTHMAN:  Objection.

2          THE COURT:  Overruled.

3    A.  Reading this e-mail, that explanation that you said makes

4    sense.  Yes.

5    Q.  Thank you, sir.

6          MR. BERKE:  We can take that down.

7    BY MR. BERKE:

8    Q.  Sir, do you recall that you were asked questions about a

9    meeting on March 21?

10   A.  Which meeting?

11   Q.  2021.

12   A.  Which meeting?

13   Q.  This was a meeting in which Mr. Hwang and Mr. Tomita were

14   together meeting in the city at Archegos' corporate apartment.

15   You, sir, were on Zoom in Goshen, New York, on the weekend, and

16   Mr. Halligan was also on Zoom?

17   A.  Yes, I recall that.

18   Q.  And you recall, sir -- and this was the weekend before the

19   fateful week of March, 22nd, 2021, correct?

20   A.  Yes, that's correct.

21   Q.  And you recall, sir, that the purpose of this meeting and

22   Zoom call was for the group to discuss how Archegos could more

23   efficiently allocate its investments among its prime brokers to

24   reduce margin and generate additional cash?

25   A.  Yes.  That's correct.

1    Q.  And do you recall during the call, sir, it was discussed,

2    the potential about the onboarding of other prime brokers who

3    you were having discussions with at the time?

4    A.  Yes.

5    Q.  Do you recall, sir, in particular, two of them who you were

6    in advanced discussions with were Citibank and Bank of America?

7    A.  Yes, that's correct.

8    Q.  And you also recall, sir, you were in more preliminary

9    discussions with Societe Generale and a bank colloquially known

10   as HSBC?

11   A.  At that point, I am not aware of any conversations Archegos

12   had with Societe Generale and HSBC.  Those were proposed as the

13   next batch of counterparties.

14   Q.  You were at a preliminary stage where you were talking

15   about seeing if you were going to onboard them as prime brokers

16   for Archegos.  It was preliminary, not advanced like Citibank

17   and Bank of America; is that accurate?

18   A.  That call was the first time I heard those brokers

19   mentioned as prospective counterparties for Archegos.

20   Q.  But they were discussed at that meeting?

21   A.  They were discussed, yes.

22   Q.  Okay.  And this discussion that you were having, this was

23   your first discussion directly with Mr. Hwang himself there

24   along with Mr. Halligan and Mr. Tomita, correct?

25   A.  This -- can you rephrase the question?

1   Q.  Yes.  This was the first direct meeting and discussion you

2   had with Mr. Hwang about onboarding prime brokers, and it was

3   with Mr. Halligan and Mr. Tomita as well, correct?

4          THE COURT:  I think you have too many points in the

5   question.

6          Is this the first time you're meeting with Hwang about

7   the proposition about getting more brokers?

8          THE WITNESS:  In this time frame, yes.

9   BY MR. BERKE:

10  Q.  When you say this time frame, you're talking about

11  2020/2021, correct?

12  A.  Yes, that's correct.

13  Q.  And I'm right as well that Mr. Tomita was there and

14  Mr. Halligan, correct?

15  A.  That's correct.

16  Q.  Okay.  So tell me every lie you discussed with Mr. Hwang

17  that would be told to these prospective counterparties so you

18  could get capacity for them.

19  A.  I didn't say any of that on the call, any lies.

20  Q.  You didn't say that you were going to have to lie to them

21  to get capacity; did you?

22  A.  No, I did not.

23  Q.  Mr. Hwang didn't tell you that he was going to have to

24  lie -- have you lie to them to get capacity; did he?

25  A.  No, he did not.

Q.  Mr. Tomita didn't say, gee, if I've been talking to

Mr. Becker about it, everyone knows we're going to lie to

counterparties; did he?

A.  No, he did not.

Q.  And Mr. Halligan didn't say anything, oh, we're going to

have to lie to these counterparties at the meeting; did he?

A.  No, he did not either.

Q.  Now, sir, you said -- you remember you said on direct that

you couldn't say no to Bill, Bill Hwang?

A.  Yes.

Q.  Well, sir, isn't it the case that your boss -- withdrawn.

        Isn't it the case, sir, that the head of the firm —

Bill Hwang — said he wanted to meet on the weekend, and you

said no way, I'm not going into the city?

A.  I said that to Mr. Tomita, and I'm not sure how he

delivered that to Will.  He verbed it as he would cover for me.

I'm not sure what was told to Mr. Hwang.

Q.  Sir, there's no mistaking it, you understood the request

for you, sir, the margin bot, to come and meet that weekend was

for Mr. Hwang, correct?

        MS. ROTHMAN:  Objection.

        THE COURT:  Objection sustained.

BY MR. BERKE:

Q.  You understood that the request for you to meet in person

that weekend was from Mr. Hwang, correct?

1  A.  Yes, I understood that.

2  Q.  And you understood the meeting was about, among other

3  things, margin and capacity, correct?

4  A.  Yes, that's correct.

5  Q.  But you described yourself as the margin bot because you

6  were the margin expert, correct?

7  A.  I described myself as the margin bot because I spent the

8  bulk of my day going over margin schedules, correct.

9  Q.  And you told Mr. Tomita that he should convey to Mr. Hwang

10  that no way are you coming to the city?

11          THE COURT:  I think you repeated that line several

12  times.

13          MR. BERKE:  Yes, we did.

14  BY MR. BERKE:

15  Q.  You never changed your position.  Right?  You said you

16  weren't going?

17          MS. ROTHMAN:  Objection.

18          MR. BERKE:  Just to close it up, Judge?

19          THE COURT:  Did you decide later to go?

20          THE WITNESS:  I did not go into the city that weekend,

21  no.

22          THE COURT:  Okay.

23  BY MR. BERKE:

24  Q.  And you didn't suffer any consequences for not acceding to

25  Mr. Hwang's request that you meet in person in the city?

O5M6HWA4                         Becker - Cross

1          MS. ROTHMAN:  Objection.

2          THE COURT:  Sustained.

3    BY MR. BERKE:

4    Q.  I want to ask you now, sir, about the last week, just to

5    orient our timing.

6          Monday was March 22, correct?

7    A.  Yes, that's correct.

8    Q.  Okay.  Do you recall, sir, you testified, that it was at

9    the close of the trading day that Viacom announced this

10   $2 billion secondary offering, correct?

11   A.  Yes.  I believe it was shortly after the market closed at

12   4:00.

13   Q.  And, again, this may be obvious, but just to be clear, it's

14   not uncommon for companies to make announcements after the

15   market closed so that investors will know about it for the

16   following day, but not in the middle of the trading day,

17   correct?

18   A.  Yes, that's common.

19   Q.  And, sir, do you recall that Mr. Hwang had a request of you

20   and Mr. Tomita to see whether Archegos could participate in the

21   secondary offering and buy Viacom shares through the secondary

22   offering?

23   A.  Yes.

24   Q.  Okay.  And, again, just to be clear, you can buy shares of

25   a company on the open market, the stock exchange, correct?

1   A.  Yes, you could buy shares on the open market.

2   Q.  And we've all talked ad nauseam, you can also bet on a

3   company in the same way through swaps, correct?

4   A.  Correct.

5   Q.  And if a company is having a secondary offering, you can

6   participate in that secondary offering to seek to purchase the

7   shares, the new shares that are being offered by that company,

8   correct?

9   A.  Yes, that's correct.

10  Q.  And oftentimes how the market may react to an offering

11  depends on how enthusiastic the participation is in that

12  secondary offering, correct?

13          MS. ROTHMAN:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  That's my general understanding, yes.

16  BY MR. BERKE:

17  Q.  And Mr. Hwang, you knew, was very interested in

18  ViacomCBS -- withdrawn.

19          You knew that Mr. Hwang had expressed during this

20  period that he was very interested in the success of the

21  ViacomCBS company, correct?

22  A.  I -- through his trade activity, I knew he was positive on

23  Viacom stock, yes.

24  Q.  And, sir -- well, you also talked among the operations team

25  how Mr. Hwang talked about how much he liked the content at

O5M6HWA4                        Becker - Cross

1   ViacomCBS as well as Discovery, correct?

2           MS. ROTHMAN:  Objection.

3           THE COURT:  Too many things in this question.  Fix it

4   up.

5           MR. BERKE:  Understood.

6   BY MR. BERKE:

7   Q.  You discussed with the operations team some of the

8   statements Mr. Hwang had made about ViacomCBS, correct?

9   A.  Probably, yeah, yes.

10  Q.  And you understood that he was enthusiastic about the

11  streaming potential and the content of the company, correct?

12          MS. ROTHMAN:  Objection.

13          THE COURT:  What do you understand Mr. Hwang's

14  interest in Viacom at around the time of March 2021,

15  specifically March 22, 2021?

16          THE WITNESS:  So you're asking what was my

17  understanding as of that date?

18          THE COURT:  Yes.

19          THE WITNESS:  In previous firm-wide meetings preceding

20  March 22, Bill had spoken positively about some of the

21  programming on various Viacom entities and Discovery entities.

22  BY MR. BERKE:

23  Q.  Okay.  So you understood that he was asking whether there

24  were any regulatory rules that would prevent Archegos from

25  participating in the secondary offering, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.  That was one of his questions, yes.

2   Q.  Okay.  And do you recall, sir, that you -- you, sir, said

3   that you would check?

4   A.  Yes.

5   Q.  And you checked to determine whether there would be any

6   regulations that could limit Archegos' ability to participate

7   in Viacom's secondary offering, correct?

8   A.  That's correct.

9   Q.  And you determined that because for a period of time near

10  this time Archegos had taken a very small short position in

11  Viacom, that there was a regulation that said they couldn't

12  participate in the offering, correct?

13  A.  Yes.

14  Q.  Okay.  And you conveyed that to Mr. Hwang, correct?

15  A.  I'm not sure if I did directly, but I was working on that

16  project with Mr. Halligan, and it may have been conveyed to

17  Mr. Tomita.  But my understanding is that made its way to

18  Mr. Hwang if it wasn't directly communicated to him.

19  Q.  And this regulation, without getting into details, is

20  Reg M, M like Mary?

21  A.  Yes, that's correct.

22  Q.  When you say it's a regulation, Archegos could have gone

23  ahead and participated in the offering, but they would have

24  been in violation of Reg M.  Right?

25          MS. ROTHMAN:  Objection.

O5M6HWA4                        Becker - Cross

1          THE COURT:  Sustained.

2   Q.  Reg M wouldn't have prevented the firm from actually

3   participating in the offering when it became available --

4          MS. ROTHMAN:  Objection.

5   Q.  -- if they could physically do it?

6          THE COURT:  He said because it was a short position

7   that they couldn't.  Do you want to explore that?

8          MR. BERKE:  Yes.

9   BY MR. BERKE:

10  Q.  So what that meant is that if Archegos would have gone

11  ahead and participated in the secondary offering, at a later

12  point, it could be claimed that they had violated this

13  regulatory provision because they had been short a small amount

14  of stock at a period of time --

15         THE COURT:  Put the question differently:  According

16  to your understanding at the time, if Archegos was short in

17  some shares of Viacom, would it have been permissible for it to

18  buy shares on the offering?

19         THE WITNESS:  My understanding was because of a short

20  trade in Viacom I believe the preceding Friday, that Archegos

21  wasn't eligible to participate in the secondary offerings due

22  to Reg M.

23  BY MR. BERKE:

24  Q.  Was it your understanding, sir, that they could

25  participate, but they could face a claim that they had violated

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5M6HWA4                          Becker - Cross

1   Reg M; in other words, that there was no physical -- nothing

2   that prevented them, it would just be a violation of --

3              (Simultaneous cross-talk)

4              MS. ROTHMAN:  Objection.

5              THE COURT:  -- there is nothing to prevent anyone from

6   breaking the law until the policeman comes around.

7   Q.  Let me ask you this, sir.  When you told Mr. Hwang that it

8   would violate Reg M --

9              THE COURT:  Let's stop for a minute.

10             Ready, set, go.

11  BY MR. BERKE:

12  Q.  Sir, after Mr. Hwang learned about the Reg M requirements,

13  Archegos did not participate in the Viacom secondary offering,

14  correct?

15             MS. ROTHMAN:  Objection.

16             THE COURT:  Objection sustained as to form.

17             MR. BERKE:  Okay.

18             THE COURT:  Did Viacom participate, to your knowledge,

19  in this offering?

20             MR. BERKE:  Archegos, you mean?

21             THE COURT:  Did Archegos participate in the offering?

22             THE WITNESS:  No, it did not, to my knowledge.

23             MR. BERKE:  Thank you, Judge.

24             THE COURT:  Next subject.

25             MR. BERKE:  Okay.

O5M6HWA4                        Becker - Cross

1   BY MR. BERKE:

2   Q.  Now, sir, let me show you what's been marked for

3   identification as Defense Exhibit 7100, just for the witness,

4   the Court, and the parties.

5           Sir, do you recognize this as an e-mail with the

6   excess cash report being sent out on March -- the morning of

7   March 23rd, 2021?

8   A.  Yes, I do.

9           MR. BERKE:  Your Honor, I'd offer into evidence

10  Defense Exhibit 7100.

11          MS. MULLIGAN:  No objection.

12          MS. ROTHMAN:  No objection.

13          THE COURT:  Received.

14          (Defendant's Exhibit 7100 received in evidence)

15          THE COURT:  Show it.

16          MR. BERKE:  Thank you, Judge.

17  BY MR. BERKE:

18  Q.  And so this is sent out from Jesse Martz, who worked in

19  your group, correct?

20  A.  Correct.

21  Q.  And it gets sent to Bill Hwang, everyone in operations, and

22  Pat Halligan, correct?

23  A.  Yes.  That's correct.

24  Q.  And if we can go to the attached, a little past

25  10:00 o'clock, Eastern Time, correct?

O5M6HWA4                          Becker - Cross

1   A.  That is correct.

2   Q.  Okay.  If we could look -- so on the morning of Tuesday,

3   the 23rd, your excess cash is north of $6 billion, correct?

4   A.  Yes.  That's the beginning of the day balance, 6 billion.

5   Q.  10:00 a.m.

6           You're saying there's a lag time between when you

7   calculate and when it gets sent out?

8   A.  This report reflects the data from the broker margin

9   reports that morning.  So this would be the beginning of the

10  day cash balances, so after all margin calls were received.

11  Q.  Give me a time -- as of what time?

12  A.  The start of business on March 20 -- this is the 23rd,

13  whatever day this was.

14  Q.  To be clear, it was sent out to Mr. Hwang and others just

15  past 10:00 a.m. with that number?

16  A.  That's correct.

17  Q.  Okay.  Now, I believe you said, sir, that there came a

18  point in time that you recall that Mr. Tomita said that he had

19  spoken to Bill Hwang, correct?

20  A.  Yes.  On that day, yes.

21  Q.  Okay.  And do you recall, sir, that that was around

22  12:46 p.m. on the 23rd?

23  A.  That sounds right, yes.

24  Q.  Okay.  And I believe you testified that he said what he had

25  talked to Mr. Hwang about was there was a question of whether

1    approximately a billion dollars of cash at Wells Fargo could be

2    used for trading that day or week, correct?

3    A.   That was the night that Mr. Tomita and I discussed, yes.

4    Q.   And it wasn't that -- at Wells Fargo, but it could not be

5    used for trading, correct?

6    A.   Correct.  That was -- that was stuck, for lack of a better

7    term, at Wells Fargo.

8    Q.   The only other thing -- you understood that Mr. Hwang was

9    in the middle of orders that day from the morning.  Right?  He

10   was buying and selling, correct?

11   A.   He was trading that day, yes.

12   Q.   Okay.  And he had asked that question about Wells Fargo,

13   then he said he'd like to continue to trade to Mr. Tomita, who

14   was the trader doing the trades, correct?

15   A.   I'm not sure what communication they had, but Mr. Tomita

16   had relayed to me that Mr. Hwang would like to continue

17   trading.

18   Q.   Okay.  Sir, let me show you what's admitted into evidence

19   as Defendant's Exhibit 7096.

20         Do you recognize -- this is another excess cash report

21   on the same day, and it's indicating 1:4: p.m. Eastern Standard

22   Time, correct?

23   A.   Yes, I see that.

24   Q.   Okay.  And, sir, this one is different, though, than the

25   10:00 a.m. one, because it's not sent to Mr. Hwang, is it?

O5M6HWA4                        Becker - Cross

1    It's only sent to the operations team, correct?

2    A.  That's correct.

3    Q.  If we go to Page 2 --

4         MR. BERKE:  Maybe it's the attachment, Mr. McLeod.

5    Thank you.

6    BY MR. BERKE:

7    Q.  So it's in an Excel spreadsheet.  You see the excess cash

8    is a little higher than it was at 10:00.  It indicates it's

9    over $7 billion, correct?

10   A.  Yes, I see that.

11   Q.  Okay.  Sir, I believe you testified that you, sir, spoke to

12   Mr. Hwang sometime after 1:00 p.m. on March 23, correct?

13   A.  Yes.

14   Q.  And you said, sir -- and you recall, sir, that there's a

15   text exchange or something where -- I say text or chat, where

16   you say that Bill Hwang is going to call you, correct?

17   A.  Yes.  I believe that was in the operations Bloomberg Chat.

18   Q.  Okay.  And I believe it was your testimony that you said he

19   was calling about the -- had a couple questions about the

20   Wells Fargo account and that same billion dollars, correct?

21   A.  Yes, that's correct.

22   Q.  And you conveyed to him that -- again, you confirmed that

23   that was just not available for trading that day?

24   A.  Correct.

25   Q.  And, sir, am I right that earlier in August of 2021, you

O5M6HWA4                        Becker - Cross

1   had no independent recollection of the substance of your call

2   with Mr. Hwang?

3   A.  I'm not sure.

4   Q.  Well, let me phrase it differently.

5          Do you recall on August 10, 2021, telling the

6   prosecution team that you had no independent recollection of

7   the call with Mr. Hwang beyond the reference in your

8   Bloomberg Chat entry?

9   A.  I'm not sure.

10  Q.  Okay.  Let me show you what's been marked for

11  identification as 3501-7.

12          MR. BERKE:  Mr. McLeod, if we could first show the

13  first page to the witness?  Now if we could go to Page 4?

14  Okay.

15  Q.  I'd ask that you read prior to the highlighted words as

16  well to yourself, sir.

17          Okay.  My question is, does that refresh your

18  recollection that you had told the prosecutors on August 10,

19  2021, you had no independent recollection of the call beyond --

20  with Mr. Hwang, beyond the reference in your Bloomberg Chat

21  entry?

22  A.  Yes.  That's correct.  It was a brief phone call, yes.

23  Q.  And you recall, sir, that the Bloomberg Chat entry --

24          THE COURT:  That's your recollection now?

25          THE WITNESS:  Yes, yes.

O5M6HWA4                        Becker - Cross

1   BY MR. BERKE:

2   Q.  And you recall, sir, that the Bloomberg Chat entry just

3   said -- was you just saying, Mr. Hwang is going to call you?

4   A.  That is the Bloomberg -- yes.

5   Q.  You recall, sir, having some discussions with the

6   prosecution team where they couldn't find in your phone records

7   any evidence of a call or anything indicating how long it was?

8           MS. ROTHMAN:  Objection.

9           THE COURT:  Sustained.

10          MR. BERKE:  I can rephrase it.

11  BY MR. BERKE:

12  Q.  Sir, did you ever see any phone records indicating how

13  long -- indicating a call with Mr. Hwang or how long it was?

14          MS. ROTHMAN:  Objection.

15          THE COURT:  Sustained.

16  Q.  Sir, was there anything you saw between August 10, 2021,

17  and your testimony yesterday that refreshed your memory about

18  the call you had with Mr. Hwang in the middle of the day on

19  March 23?

20          MS. ROTHMAN:  Objection.

21          MR. BERKE:  Judge.

22          THE COURT:  Sustained.

23          MR. BERKE:  Okay.

24  BY MR. BERKE:

25  Q.  And you testified on direct that the only topic on your

1    direct testimony that you said you talked to Mr. Hwang about

2    was the Wells Fargo money that you referenced earlier, correct?

3    A.  Yes, that's correct.

4    Q.  Sir, am I correct that generally you would send out excess

5    cash reports to Mr. Hwang at various points in the day,

6    correct?

7    A.  Yes.  There was a more realtime report that was sent

8    periodically.

9    Q.  And, sir, that was not sent out on the 23rd to Mr. Hwang,

10   was it?

11   A.  I don't know.

12   Q.  Have you seen any documents indicating that it was?

13           MS. ROTHMAN:  Objection, your Honor.

14           THE COURT:  Sustained.

15   BY MR. BERKE:

16   Q.  You have no reason -- do you have any basis to say that it

17   was sent to him?

18           MS. ROTHMAN:  Objection.

19           THE COURT:  I think we're covering the same point.

20   BY MR. BERKE:

21   Q.  Sir, let me ask you this, you recall at the end of the day

22   you weren't able -- there was a delay in trying to calculate

23   what the excess cash was?

24   A.  At the end of the day, yes, I recall.

25           THE COURT:  On what day?

1          MR. BERKE:  March 23, the Tuesday, Judge.

2     Q.  Sir, what was the delay that you were having in trying to

3     calculate the excess cash?  And when I say the end of the day,

4     this is well after the market closed, correct?

5     A.  Yes, yes.

6     Q.  And what was the delay in calculating the cash, sir?

7     A.  Given the volatility in Archegos' portfolio and the amount

8     of trade volume that day, our Excel-based margin schedules, we

9     had a hard time at the end of the day calculating the correct

10    cash number.

11    Q.  And, sir, I'm going to pause for one second.  Let me go

12    back.  I'll go to one other document that's in evidence.  It's

13    marked --

14          MR. BERKE:  Give me one second, Judge.

15    BY MR. BERKE:

16    Q.  Okay.  Never mind that.  Withdrawn.

17          And do you recall, sir, that at 6:30 p.m. that night,

18    you told Jesse Martz and the rest of the operations team that

19    you're still in a holding pattern with cash reports?

20    A.  Yes, I recall that.

21          THE COURT:  What does that mean, a holding pattern?

22          THE WITNESS:  I was waiting for approval from some

23    combination of Mr. Halligan or Mr. Hwang before reports were

24    distributed via e-mail by the operations team.

25    Q.  I'm sorry --

1          THE COURT:  So before you distributed your report to

2     the other people in the operations department, you wanted

3     approval from Mr. Hwang or Mr. Halligan.  Is that what you are

4     saying?

5          THE WITNESS:  These reports would be normal e-mails

6     that the operations team would send.  Before they were sent, we

7     awaited approval from -- I don't recall if it was Mr. Halligan

8     or Mr. Hwang before they hit send on those e-mails to

9     distribute them out --

10          THE COURT:  Before they were distributed to other

11     people or within your own company?

12          THE WITNESS:  Before they were distributed within

13     Archegos to Mr. Hwang and Mr. Halligan.  There may have been

14     others on the normal distribution.  That, I don't recall.

15          THE COURT:  What time in the evening was it,

16     approximately?

17          THE WITNESS:  Early evening.

18          THE COURT:  Like 6:00, between 6:00 and 7:00?

19          THE WITNESS:  Probably around there.

20     BY MR. BERKE:

21     Q.  So, sir, you said Mr. Hwang.  You don't have any memory of

22     talking on the 23rd to Mr. Hwang about cash reports; do you?

23     A.  No, not directly.

24     Q.  Let me see if I can refresh your memory.  Do you recall

25     around 6:31, you were talking to Jesse Martz, and you were

O5M6HWA4                        Becker - Cross

1   asking him if he had been able to get things in order so that

2   you could issue a cash report?  Do you recall that, sir?

3   A.  Yes.

4   Q.  Do you recall, sir, that you did have some discussions with

5   Mr. Halligan about problems you were having in doing that

6   calculation?  Do you recall that, sir?

7   A.  Yes, I do.

8   Q.  And there were no discussions with Mr. Hwang about holding

9   it; you guys were working through it, as the operations team,

10  the issues of calculating what the excess cash was that day,

11  correct?

12  A.  We were working on getting the correct excess cash numbers.

13             THE COURT:  Did you speak with Mr. Hwang that evening?

14             MR. BERKE:  Your Honor, I could help with that.

15             THE COURT:  Did you speak with Mr. Hwang that evening?

16             THE WITNESS:  I'm just getting my day straight.

17             MR. BERKE:  Your Honor, could I offer something?

18  There was a Zoom that night.

19             THE WITNESS:  I had spoken to Mr. Hwang.  He was part

20  of a group Zoom call that I was a participant on.  I didn't

21  speak with him directly.

22  BY MR. BERKE:

23  Q.  Okay.  So you recall, sir, that the attempt to calculate

24  the excess cash was happening leading up to the 7:00 o'clock

25  Zoom call that you had with a number of people, including --

1    well, that you had with Mr. Halligan, Mr. Tomita, Mr. Hwang,

2    and Mr. Mills?

3    A.  Yes, I believe Mr. Eun might have been on that as well.

4    Q.  And you recall, sir, as you were trying to do this, other

5    members of the operations team like Mr. Hohlman and Mr. Osei

6    were asking could they help with the calculations so you could

7    get it done?

8    A.  Yes, they were.  That's correct.

9    Q.  So it was all hands trying to do these calculations on the

10   23rd so you could get your final report, correct?

11   A.  Yes.  So that the data was correct as of the end of the

12   day, yes.

13   Q.  Okay.  And, sir, am I right that on the 23rd, you never

14   raised any questions with Mr. Tomita about the trading that was

15   being done on the 23rd?

16   A.  I had expressed to him that afternoon in a flurry of trades

17   that we were trying to figure out Archegos' cash balances

18   because, due to the portfolio volatility and all the trade

19   volume, it was difficult to calculate that.  And that was

20   the -- that was the substance of that conversation.

21   Q.  But am I correct, sir, that you didn't push back on

22   Mr. Tomita regarding the trading strategy because you did not

23   feel that was in line with your role at the fund to question

24   the trading strategy?

25   A.  It would -- no, it would not have been my role to do that.

1    Q.  But am I right, sir, that for that reason, you didn't push

2    back with Mr. Tomita regarding the trading that day, the 23rd?

3         MS. ROTHMAN:  Objection, your Honor.

4         THE COURT:  Did you question Mr. Tomita at all during

5    the day about the volatility of trading?

6         THE WITNESS:  No.  When I said that I was trying to

7    work on cash and work on capacity, his statement via

8    Bloomberg Chat was something to the effect of, Bill says to

9    kindly please keep working the orders -- writing his trade

10   orders.

11        THE COURT:  So you were focused on the consequences of

12   trading and not the trading itself?

13        THE WITNESS:  I wasn't executing the trades, but I was

14   encompassed realtime in providing the trading desk with which

15   broker they should trade with, as I was trying to work with the

16   operations team to make sure that our cash estimate model was

17   properly functioning.

18   BY MR. BERKE:

19   Q.  But you didn't push back at all on Mr. Tomita about the

20   trading going on on the 23rd, correct?

21        MS. ROTHMAN:  Objection.

22        THE COURT:  Withdrawn.  Did you complain to Mr. Tomita

23   that day?

24   Q.  About the trading?

25   A.  I did not tell him to -- I had expressed the difficulty

O5M6HWA4                        Becker - Cross

1   that I was having keeping up with the activity.

2            Are you asking if I told him to stop trading?

3   Q.  Yes.

4   A.  No, I didn't.

5   Q.  Now, let me talk about this Zoom meeting that happened at

6   7 o'clock on the 23rd.  And, again, this was you, Mr. Tomita,

7   Mr. Mills, Mr. Hwang, and Mr. Halligan, correct?

8   A.  And I believe Mr. Eun.

9   Q.  I'm sorry.  Who is the other one?

10  A.  Mr. David Eun.

11  Q.  What was Mr. Eun's position at the time?

12  A.  He had just joined the firm.  I think he may have been

13  co-chairman or something to that effect.

14  Q.  Okay.  And am I correct, sir, that what you took out of

15  this meeting for you to do, that you were told as the margin

16  expert, to update the margin schedule for the following day,

17  correct?

18  A.  To update the schedule that I had worked on over the

19  weekend, yes.

20  Q.  And to be clear, we're talking about the margin schedule?

21  A.  The margin schedule that would map out what could be sold

22  to generate excess cash, correct.

23  Q.  Well, the margin schedule did more than that, correct?

24  A.  Which?  I had a lot of margin schedules.  Which one are you

25  referring to?

1    Q.  Am I correct, sir, that the message to you -- and, again,

2    we're talking about the 7 o'clock Zoom meeting on the 23rd, is

3    that you were directed to update your margin schedule?

4    A.  I was directed to update the margin schedule that I created

5    on Saturday for two days -- two days of trade activity and

6    price movements.

7    Q.  And the margin schedule is based on the capacity and

8    margins of all your prime brokers in various securities,

9    correct?

10   A.  Are you referring to my margin models?

11   Q.  I'm asking you -- tell us what -- the margin schedule that

12   you were told to update, which margin schedule are you

13   referencing?

14   A.  This was the schedule that I had created on Saturday.  It

15   had a selection of names in the portfolio.

16   Q.  Can I stop you?

17              Names in the portfolio.  You mean stocks in the

18   portfolio, companies?

19   A.  Yes.  That's correct.

20   Q.  Please continue.

21   A.  For each of those stocks in the portfolio, it listed the

22   lots of those securities that were held at the highest margin

23   rates and --

24              THE COURT:  Is this in evidence?

25              MR. BERKE:  It is not, your Honor.

1          MS. ROTHMAN:  We tried to offer it.  We're happy to

2     offer it now.

3          MR. BERKE:  Well, let me consult.  Let me make sure

4     we're talking about the same document.

5          (Counsel confer)

6          MR. BERKE:  Your Honor, we'll work out whether it's in

7     evidence, to make sure.

8          THE COURT:  I think since both people are asking about

9     it, the jury might as well see the document they're asking

10    about.  They're asking what was in it.  The best way to know is

11    to see the document.  Why don't you both look at it now and see

12    if you can put it on?

13         (Pause)

14         MR. BERKE:  Your Honor, it is -- let me see.  We have

15    confirmation.  Okay.  Good.

16         Your Honor, may I publish what's marked as Government

17    Exhibit 184 and 184A?

18         THE COURT:  Okay.  Let's go through this and we'll

19    break for the day.

20         MR. BERKE:  Okay.

21    BY MR. BERKE:

22    Q.  So this is March 23.  And just so we have the timing right,

23    military time, so we're talking about well into the evening,

24    correct?

25    A.  That's correct.

O5M6HWA4                           Becker - Cross

1  Q.  Okay.  And this is being sent to the participants on the

2  call along with Austin Scholl, who is also a trader, correct?

3  A.  Yes, that's correct.

4  Q.  But he was not on the call, as best you can remember?

5  A.  No, I don't believe so.

6         THE COURT:  This is an update of what you had done in

7  the weekend?

8         THE WITNESS:  Yes, it is.

9  BY MR. BERKE:

10 Q.  When you say the weekend, that was that March 21 meeting we

11 were talking about, the Saturday, correct?

12 A.  This was the project I had spent Saturday working on, yes.

13        MR. BERKE:  Can we go to the second page?  I believe

14 it's a separate exhibit, 184A, in evidence.

15        And this is the chart that you were describing,

16 correct?

17 A.  Yes, that's correct.

18 Q.  And it indicates whether the positions for each stock are

19 held in swap; or when it says cash, that's just a way that you

20 described, that it's a security and not a swap, correct?

21 A.  That's correct.

22 Q.  It has the amount.  Capacity is how much capacity you have

23 left?

24 A.  The capacity status column?

25 Q.  Yes.

O5M6HWA4                          Becker - Cross

A.  So that's whether -- if Archegos closed out that lot of

shares at that particular broker, that was the demarcation of

if that broker would save that capacity for Archegos to use at

a later time.

Q.  Okay.  And then you have the cash impact at closeout.

That's how much the cash would be affected if you closed out a

position, either how much additional cash Archegos would get,

or if it was position-adverse.  I think all these are positive.

I think it's essentially how much cash Archegos would get if

you closed out the position.

A.  Right.  Exactly.  So as each row was closed out, that's how

much cash that would be generated by closing out that

particular row.

Q.  So just to be clear, this reflects that at that meeting on

the 23rd, you were asked to do this calculation so decisions

could be made the following day, correct?

A.  Yes, that's correct.

          MR. BERKE:  Your Honor.  Thank you.  It's a good time

to break.

          THE COURT:  Close up your books.  Give them to

Ms. Jones.

          Just a moment.  10:30 tomorrow morning.  Don't discuss

the case.  Keep an open mind.

O5M6HWA4

1              (Jury not present)

2              THE COURT:  Anything before me?

3              MS. ROTHMAN:  Not from the government.

4              MR. BERKE:  Not from Mr. Hwang.

5              MS. MULLIGAN:  Not Mr. Halligan.

6              THE COURT:  See you tomorrow at 10:30.

7              MR. BERKE:  We're going until 4:00, 5:00?  We'll talk

8    to Brigitte.

9              THE COURT:  We can go to 5:00 tomorrow.

10             MS. ROTHMAN:  Starting at 10:30, not 11:00?  Earlier

11   this week, you had mentioned 11:00 would be tomorrow.

12             THE COURT:  I have a dental appointment at 9:00.  I

13   think I can be here at 10:30.

14             MS. ROTHMAN:  10:30.  Have a good afternoon, your

15   Honor.

16             (Adjourned to May 23, 2024, at 10:30 a.m.)

17                              * * *

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                           Page

 3     SCOTT BECKER

 4    Direct By Ms. Rothman  . . . . . . . . . .1152

 5    Cross By Mr. Berke . . . . . . . . . . . .1190

 6                      GOVERNMENT EXHIBITS

 7    Exhibit No.                             Received

 8     2521   . . . . . . . . . . . . . . . . .1156

 9     3783   . . . . . . . . . . . . . . . . .1157

10     2522   . . . . . . . . . . . . . . . . .1166

11     216   . . . . . . . . . . . . . . . . . .1169

12     2526   . . . . . . . . . . . . . . . . .1172

13     186 and 186A  . . . . . . . . . . . . . .1174

14     1394   . . . . . . . . . . . . . . . . .1177

15     4501   . . . . . . . . . . . . . . . . .1181

16                      DEFENDANT EXHIBITS

17    Exhibit No.                             Received

18     53   . . . . . . . . . . . . . . . . . .1221

19     7131   . . . . . . . . . . . . . . . . .1281

20     7132   . . . . . . . . . . . . . . . . .1286

21     7100   . . . . . . . . . . . . . . . . .1298

22

23

24

25
```