UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                                                                           :

UNITED STATES OF AMERICA
                                                                                                                           :

       - v. -                                                                     No. 22 Cr. 240 (AKH)

                                                                                                                           :

PATRICK HALLIGAN,
                                                                                                                           :

              Defendant.

                                                                                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

 

                                                           DANIELLE R. SASSOON
                                                           United States Attorney
                                                           Southern District of New York
                                                           The Jacob K. Javits Federal Building
                                                           26 Federal Plaza, 37th Floor
                                                           New York, New York 10278

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. PROCEDURAL HISTORY ..................................................................................................... 1

III. STATEMENT OF FACTS ...................................................................................................... 2

    A. Halligan Works for Hwang at Tiger Asia ........................................................... 2

    B. The Early Days of Archegos ................................................................................ 3

    C. Halligan and Hwang Operate the Archegos Enterprise Through Fraud ............. 4

    D. Archegos's Collapse ............................................................................................. 6

    E. After the Collapse ................................................................................................. 8

IV. GUIDELINES CALCULATION ........................................................................................... 9

    A. The Applicable Guidelines .................................................................................. 9

    B. The Evidence Supports the Government's and Probation's Guidelines Calculation . 10

V. THE SENTENCE .................................................................................................................. 12

    A. The Nature and Circumstances of the Offense. ................................................ 12

    B. An Eight Year Sentence Will Promote Respect for the Law and General Deterrence 14

    C. An Eight Year Sentence Satisfies the Remaining Section 3353(a) Factors ................ 16

    D. Forfeiture Order ................................................................................................. 17

    E. Restitution Order ................................................................................................ 17

VI. CONCLUSION .................................................................................................................... 18

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Patrick Halligan. For the reasons set out below, and as agreed to by the defendant, the Court should sentence Halligan to eight years' imprisonment, and order forfeiture and restitution in the amount of $2,085,000, which was Halligan's salary and bonus during his participation in the scheme. Such a sentence would be sufficient but no greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C § 3553(a).

## II. PROCEDURAL HISTORY

On April 25, 2022, a grand jury sitting in this District returned an eleven-count indictment against Halligan and Bill (Sung Kook) Hwang. Halligan was charged in three counts with violations of Title 18, United State Code, Section 1962(d) (Racketeering Conspiracy) (Count One); Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud) (Count Ten); and Title 18, United State Code, Section 1343 (Wire Fraud) (Count Eleven).

Beginning in May 2024, the Court held a jury trial. After hearing two months of evidence, the jury convicted Halligan and Hwang of conspiring to conduct the affairs of Archegos through a pattern of racketeering activity, committing securities fraud and wire fraud.[1]

On January 17, 2025, Halligan filed a sentencing memorandum in which he asks the Court to sentence him principally to eight-years imprisonment. Halligan further consents to the entry of

---

[1] The jury further convicted Hwang of scheming to—and succeeding in—manipulating the prices of Viacom, Discovery, GSX, TME, and VIPS. The jury acquitted Hwang of manipulating the price of IQ.

orders of forfeiture and restitution in the amount of $2,085,000. Finally, Halligan asks the Court to grant him bail pending appeal.[2]

## III.   STATEMENT OF FACTS

### A.   Halligan Works for Hwang at Tiger Asia

Halligan first worked for Hwang at Tiger Asia, which was Hwang's prior hedge fund that became the Archegos Enterprise. (Trial Tr. 806 (Becker)). Halligan served as Tiger Asia's Chief Financial Officer. (*Id.*). In this role, Halligan liaised with Tiger Asia's outside investors, and oversaw the Operations group, which included Scott Becker. (Trial Tr. 811 (Becker)).

In 2008, Hwang committed market manipulation and insider trading at Tiger Asia. Regulators in multiple countries discovered Hwang's misconduct, and in 2012, Tiger Asia pled guilty to wire fraud in a case before the U.S. District Court for the District of New Jersey.[3] The Securities and Exchange Commission also filed a complaint against Hwang alleging, among other things, that he manipulated the market using open-market trades (GX 2708), and Hwang entered into a no-admit, no-deny settlement with the Securities and Exchange Commission on the insider trading and market manipulation conduct and accepted a multi-year bar from managing outside investments. Tiger Asia also entered into a settlement with a Hong Kong regulator in connection with Hwang's conduct. (GX 2706).

In 2013, Hwang returned outside investor money, changed Tiger Asia's name to "Archegos," and committed to operate Archegos as "family office" that managed Hwang's wealth. (Trial Tr. 812 (Becker)). Halligan stayed on as Chief Financial Officer. (Trial Tr. 803 (Becker)).

---

[2] In light of the Court's decision to grant Hwang bail pending appeal, the Government does not object to Halligan remaining on bail pending appeal.

[3] *See United States v. Tiger Management, LLC*, 12 Cr. 808 (SRC) (D.N.J. 2012).

2

### B. The Early Days of Archegos

Once it rebranded, Archegos began to tell its counterparties that it had entered a new era and moved beyond its Tiger Asia issues. (PSR ¶ 116). Archegos hired additional senior executives, such as Andy Mills and Diana Pae, as Co-CEO and Co-President, respectively. (*Id.*). Archegos also hired a compliance executive, Michael Satine, and represented to multiple counterparties that "All trades are reviewed daily" by compliance. (*E.g.*, GX 1002A). To maintain, and later to increase, the number of banking counterparties Archegos worked with, Archegos began sending its brokers a letter summarizing these changes and implying that Hwang, although the final investment authority, operated within the constraints of an ordinary, compliance-minded fund run, in part, by independent executives. (PSR ¶ 116).

But these changes were illusory. Hwang was the sole decision maker on all trading, and Halligan took to repeatedly and deliberately misleading counterparties with respect to important information about Archegos's portfolio and, at times, intentionally withheld information about the portfolio's performance. (PSR ¶ 117). Specifically, in conversations with Archegos's counterparties, Halligan would repeatedly understate the relative size of the firm's largest positions. (PSR ¶ 118). In or about 2017, when Becker took over the role of liaising with the credit teams at the counterparties, Halligan instructed Becker, in substance, to tell the counterparties that Archegos's largest position was 35% of Archegos's capital, even if that was not the truth. (*Id.*). Relatedly, Halligan at times would purposefully withhold information from counterparties regarding Archegos's monthly performance and assets under management. (*Id.*) Halligan explained, in part, that the banks were too ignorant to understand the information anyway.

3

### C.     Halligan and Hwang Operate the Archegos Enterprise Through Fraud

In 2020, Archegos's misleading practices developed into pervasive fraud: the defendants pursued two interrelated criminal schemes, one involving manipulative trading in the marketplace and the other involving false and misleading statements to Archegos's trading counterparties. Halligan and Becker were primarily responsible for the latter scheme.

Archegos's portfolio, which had been worth approximately $2.7 billion at the end of February 2020, fell to less than $1.5 billion by March 12, 2020, as the U.S. markets declined and COVID-19 lockdowns began. In the months that followed, Hwang became obsessed with trading, and specifically with using his trading power to influence the prices of the stocks that underlay his positions. Hwang began deploying strategies aimed to manipulate, control, and artificially affect the market for securities in Archegos's portfolio, including techniques he had used at Tiger Asia. (PSR ¶ 50). These techniques included purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. (PSR ¶ 64).

Based on the margin rules in place at the time, daily price moves would typically result in a change in how much margin Archegos owed the bank or, conversely, the bank owed Archegos. For the stocks where Hwang bet the prices would go up, a daily price increase would mean that variation margin moved in his favor, too, permitting him to access more cash. (PSR ¶ 65). Hwang took that cash and used it to fund additional buying, further driving up the prices of the stocks, and thus freeing up still more cash. (Trial Tr. 3040-41 (Tomita)). As position sizes—and thus margin impact—grew over 2020 and into 2021, the margin framework became both an engine for fraud and a liability: a decrease in prices would trigger a margin call and potentially threaten to unwind the price inflation Hwang had achieved. To avoid this, Hwang began to focus much of Archegos's

4

trading at the end of day, in large sizes and in relatively outsized proportions of the market. (*E.g.*, Trial Tr. 2834-40 (Battalio)).

Hwang's trading schemes were sustained and furthered by lies and misrepresentations made to Archegos's counterparties, largely directed by Halligan. As Hwang's trading led to large position sizes, Archegos encountered risk, capacity, and margin lending limits at its counterparties. To enable Hwang to continue to trade the same names at larger sizes, Halligan, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to Archegos's counterparties. (PSR ¶ 78). Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. These false and misleading statements were designed to fraudulently induce the counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos. (PSR ¶ 78).

Hwang further accomplished his manipulative trading by structuring it to avoid any public reporting requirements that would reveal Archegos's concentration. Most significantly, Hwang used derivatives known as total return swaps that, unlike traditional equity securities, did not have a public reporting requirement. (PSR ¶¶ 33-36). The Archegos conspirators, however, treated their swaps as the functional equivalent of purchasing or selling the equity itself.

In early March 2021, Archegos became increasingly constrained for capacity at its existing trading counterparties. (Trial Tr. 847 (Becker)). At Hwang's direction, Halligan and others worked to initiate swap trading relationships with new counterparties, including Bank of America, JP Morgan Chase, and Citigroup. (Trial Tr. 1048-56 (Becker)). Because Archegos's portfolio was

5

increasingly concentrated and, in turn, risky, Halligan and Becker lied to prospective counterparties to induce them to do business with Archegos. For example, on a March 16, 2021 phone call with representatives from Bank of America, Halligan and Becker falsely represented that Archegos's largest position was 35 percent of Archegos's net asset value, and that its top ten positions were 300 percent of Archegos's net asset value. (Trial Tr. 4337-38 (Lipsky); GX 2351)). By March 2021, however, Archegos's largest position—ViacomCBS—was more than 75% of Archegos's net asset value. (GX 475).

### D. Archegos's Collapse

By late March 2021, Hwang's manipulative trading scheme had profoundly reshaped Archegos's portfolio and risk profile. Though Archegos often had concentrated positions in the past, those positions typically had been in highly liquid stocks, such as Amazon or Netflix. (PSR ¶ 44). Now Archegos had concentrated its investments in a grab bag of stocks with markets that Hwang found he could distort, including ViacomCBS, Discovery, and VIPS. Archegos's internal reporting estimated that it would take months to unwind these positions without crashing the markets. (GX 962A). At the same time, individual counterparty banks began charging higher margin rates because even the slices of the Archegos portfolio they could see appeared to be large and concentrated in a handful of names. Because it was essential to the scheme to continue buying the same stocks, Archegos was forced to do so at margin rates of 30%, 50%, and even 100%. (*E.g.*, Trial Tr. 3462 (Tomita)). The combined effect of these trends was that Archegos's portfolio became highly vulnerable to external events that might deflate the artificial prices Hwang had created and it sapped Archegos of the liquidity or cash to respond to such a development.

In late March 2021, the markets exposed Hwang's price manipulation. On March 22, 2021, ViacomCBS announced a seasoned equity offering. (PSR ¶ 93). Immediately, the conspirators

perceived that the announcement threatened to unwind their work by depressing the prices of Viacom stock. Halligan, for example, remarked, "get ready for a ride" (GX 3745), and the traders prepared for a wild trading day. What followed was a brazen attempt to overpower the markets: On March 23, Hwang directed nearly a billion dollars in additional Viacom purchases, even as Halligan, Becker, and Tomita acknowledged that the firm may not have the cash to cover the trading. (PSR ¶ 95). When the day ended, Halligan and others understood that the following day the firm would face margin calls it could not meet. The problems compounded on March 24, 2021, when the SEC announced new disclosure requirements that would apply to some of the foreign issuers in Archegos's portfolio, which had the effect of further depressing their stock price. On March 24, 2021, using what cash and capacity remained, Hwang made one final attempt to reverse market forces but he failed. (PSR ¶ 96). As he did so, Halligan and Becker strategized about how best to ignore and mislead counterparties that were inquiring about the situation. (PSR ¶ 98). When the markets closed, Archegos faced substantial margin calls that it could not meet.

Archegos's senior executives pleaded with the firm's counterparties for more time to meet the margin calls. In a series of late-night phone calls on March 24, Archegos asserted that it faced a "liquidity" problem, not a "solvency" problem, and that its portfolio comprised "household names" that it knew well. (*E.g.*, GX 2537). The following day, Becker led a series of calls with the banks. At Halligan's direction, Becker lied to the banks while also refusing to provide the banks with specific details about its positions or its plan to unwind positions to cover the margin calls. Becker later emailed Halligan a summary of the lies he told the banks that day. (GXs 186, 186A).

Soon thereafter, the counterparties lost patience and declared a default. In the following days, the counterparties sold the stocks they held in connection with their agreements with Archegos. The prices that had been artificially supported by the trading directed by Hwang, and

7

funded by lies told by Halligan and others to the counterparties, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within a matter of days. (PSR ¶ 99).

Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized a wide swath of market participants, including banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit, ordinary investors who purchased and sold the relevant securities at artificial prices, and securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

### E.   After the Collapse

By Friday, March 26, 2021, Archegos was no longer a viable business. Mills convened an all-hands video conference and announced that Archegos would be winding down. (Trial Tr. 558 (Jones)). For some employees—most of whom had limited access to portfolio performance data—this was the first they had heard that Archegos was in distress. The news that the fund was closing arrived as a shock and carried with it the prospect that they would lose both their jobs and their deferred compensation, which was invested in the fund.

In the months that followed, Hwang took care of those that had been closest to him. As regulatory authorities and the Government began to demand documents about the collapse, Hwang "hired" certain senior Archegos personnel at Grace & Mercy. At the same time, those like Halligan that had previously done part-time work for Grace & Mercy suddenly received massive pay

increases.[4] As a result, Grace & Mercy has spent millions of its purportedly charitable funds on the salaries of the people who witnessed Hwang's crimes at Archegos.

## IV. GUIDELINES CALCULATION

The Government and Probation Office agree that the applicable Guidelines sentence is 720 months' imprisonment, based on an offense level of 43, a Criminal History Category of I, and a maximum statutorily authorized sentence of 60 years' imprisonment. (PSR ¶¶ 140, 144, 202).

### A. The Applicable Guidelines

The Government requests that the Court adopt the following Guidelines computation, which is largely consistent with Probation's calculation, except that it excludes an enhancement for deriving more than $1,000,000 in gross receipts from one or more financial institutions, pursuant to Section 2B1.1(b)(17)(A), which does not apply to Halligan and which the Court rejected in calculating Hwang's Guidelines:

- Base offense level of 7, pursuant to § 2B1.1(a);
- An increase of 30 levels because the offense involved losses in excess of $550 million, pursuant to § 2B1.1(b)(1)(k);
- An increase of 2 levels because the offense involved 10 or more victims, pursuant to § 2B1.1(b)(2);
- An increase of 2 levels because the offense used sophisticated means, pursuant to § 2B1.1(b)(10); and
- An increase of 3 levels because Halligan was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to § 3B1.1(b).

---

[4] In Grace & Mercy's publicly filed Form PF for Tax Year 2019, Halligan was identified as treasurer, was reported to work an average of five hours per week, and received no compensation. In Tax Year 2020, Halligan was identified as treasurer and was reported to have worked five hours per week, and received no compensation. In Tax Year 2021, Halligan was again identified as treasurer, but now purportedly worked 40 hours per week and received base pay of more than $400,000.

9

The adjusted offense level of 44 becomes a total adjusted offense level of 43, the maximum offense level, by operation of Chapter 5, Part A (cmt. 2). Based upon these calculations, Halligan's advisory Guidelines imprisonment range is life. (PSR ¶ 202). However, because the statutorily authorized maximum sentence is 60 years' imprisonment, which is less than life imprisonment, the applicable Guidelines sentence is the statutory maximum: 60 years (720 months) imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

      **B.    The Evidence Supports the Government's and Probation's Guidelines Calculation**

The trial proof, record evidence, and PSR support the Government's and Probation's Guidelines calculation and an offense level of 43. Despite stipulating to an eight-year sentence, Halligan notes that he intends to maintain his objections to the PSR, including his objections to loss amount and other enhancements. (Halligan Mem. 25).[5] As set forth below, and as the Court found in calculating the Guidelines for Hwang, the offense level is properly calculated at 43.

*First*, as the Court heard from multiple witnesses at trial, Halligan's offenses caused losses far in excess of $550 million. These losses are comprised of losses to counterparties as well as to innocent Archegos employees. As to the former, as the Court explained in calculating the Guidelines at Hwang's sentencing:

> The gravity of the offense is the manipulation brought about by falsification of material facts. That led to the large accumulation of shares. And when the inflated and false market collapsed, as it inevitably had to do, the losses that were incurred, were incurred by the counterparties to cover their position, and they had this right as secured creditors. And specifically, under the agreements that each counterparty signed with Archegos. So the loss is measured by the losses incurred by the counterparties in liquidating their positions….The loss here is clearly more than $550 million.

---

[5] Halligan has withdrawn objections to certain paragraphs that appear to have been resolved in his favor at the Hwang sentencing.

10

(Nov. 20, 2024 Sent. Tr. 30-31). At the December 19, 2024 sentencing hearing, the Court further found that the counterparties' losses exceeded $9 billion, as set forth below:

| Name | Total Owed |
|---|---|
| Bank of Montreal | $ 5,040,128.71 |
| Credit Suisse | $ 4,905,668,935.78 |
| Jefferies | $ 31,452,469.69 |
| Macquarie | $ 32,023,527.48 |
| Morgan Stanley | $ 740,436,946.00 |
| MUSE | $ 243,176,791.68 |
| Nomura | $ 2,624,669,995.84 |
| UBS | $ 794,056,227.00 |
| **Counterparty Total** | $ **9,376,525,022.18** |

(*See also* ECF Doc. 373-1). As to the latter, as the Court found at Hwang's sentencing, Halligan's crimes caused losses of millions of dollars to innocent Archegos employees who were required, and often pressured, to contribute to Archegos's deferred compensation plans, and then lost all of these contributions when Archegos collapsed. (Dec. 19, 2024 Sent. Tr. 6-7). Following Hwang's sentencing, the Government received additional claims from former Archegos employees seeking restitution and has provided the Court with a proposed restitution order and schedule of victims. Taking account of all the proven losses, Halligan's Guidelines offense level increases 30 levels. U.S.S.G. § 2B.1(b)(2)(P).

*Second*, as the trial evidence demonstrated, and as the Court found in calculating the Guidelines for Hwang, Halligan's conduct resulted in financial harm to more than ten loss-suffering victims. (Nov. 20, 2024 Sent. Tr. 34-35). Accordingly, Halligan's offense level must be increased by 2 levels. *See* U.S.S.G. § 2B1.1(b)(2).

*Third*, as the trial evidence demonstrated, and as the Court previously found in calculating Hwang's Guidelines, (Nov. 20, 2024 Sent. Tr. 37), these schemes involved a "complex web of

11

fraud" that requires the application of the 2-level sophisticated means enhancement. *See United States v. Ojemen*, 465 F. App'x 69, 72 (2d Cir. 2012).

*Fourth*, Halligan should receive a manager/supervisor enhancement pursuant to U.S.S.G. § 3B1.1(b). The trial evidence amply demonstrated that Halligan supervised Becker, (Trial Tr. 804 (Q: "Who directed you to lie to the banks? A: Mr. Halligan")), and that there were five or more participants in the criminal activity or the activity was otherwise extensive. Thus, a 3-level enhancement under Section 3B1.1(b) applies.

In sum, the PSR correctly computes the offense level to be 43. The offense level adjustments and role adjustments produce an offense level at or above 43, so the total adjusted offense level becomes 43. *See* Notes to Part A, U.S.S.G. Chapter Five. At Criminal History Category I, the Guidelines sentence is life imprisonment. However, as noted above, because the statutorily authorized maximum sentence is 60 years' imprisonment, which is less than life imprisonment, the applicable Guidelines sentence is 60 years' (720 months) imprisonment. U.S.S.G. §§ 5G1.1(a), 5G1.2(d).

## V. THE SENTENCE

The Government respectfully submits that the Court should sentence Halligan to a term of eight years' imprisonment, and order forfeiture and restitution in the amount of $2,085,000. Such a sentence balances Halligan's persistent and professionalized criminal conduct against his personal circumstances and relative culpability compared to Hwang.

### A. The Nature and Circumstances of the Offense.

Halligan played a leadership role in a massive fraud scheme that depended on his sustained deceptive conduct to succeed. Through his lies, and the lies he directed Becker to tell the counterparties, Halligan obtained tens of billions in loans and trading capacity for Hwang, and thus

enabled Hwang to distort the markets. Halligan's willingness to lie created significant and concealed economic risks to market participants, Archegos's counterparties, and Halligan's fellow employees—risks that ultimately materialized as billions of dollars in losses. A substantial sentence is necessary to punish such deliberate and consequential wrongdoing.

Halligan's contribution to Hwang's schemes stand out for their persistence. Halligan lied for years, in varied circumstances, and to multiple victims. The trial featured evidence that Halligan personally lied to Credit Suisse in 2017, for example, by misrepresenting the relative size of the largest positions. (GX 1151). Halligan told a similar lie to Wells Fargo in 2018. (Trial Tr. 4319-20 (Maisel)). More significantly, however, Halligan's commitment to deception extended beyond his own conduct. As the trial showed, Halligan mentored Becker, his closest work colleague, to follow in his footsteps. Halligan showed Becker when and how to lie, perhaps as far back as 2017. (Trial Tr. 893-95 (Becker)). And the two kept at it in the years thereafter. They were still at in 2021, when Becker systematically misrepresented the portfolio's risk to numerous banks. At times, Halligan joined Becker, such as when they tried to deceive Bank of America about Hwang's positions in March 2021. (GX 2351). Nothing about Halligan's crimes can be dismissed as a temporary error or diminished as improvident impulse; they reflect a career of dishonesty.

Halligan conduct is also significant because of its brazen disregard for others. In early 2021, Archegos began to run out of capacity at existing counterparties and Hwang turned to Halligan to help spearhead an effort to find more funds at new counterparties. By searching for new counterparties—and by inducing them to do business through lies—Halligan played a significant role in ensnaring new victims in the fraud and placing the existing victims at increasing risk of substantial losses. Once the prospect of losses appeared imminent, Halligan acted with notable callousness: in Archegos's final days, he and Becker actively tried to withdraw collateral

from some banks, then misled those banks and others about the fund's cash and margin position and its ability to meet its margin calls, and then pretended to be in the dark about Archegos's financial position. (*See* Trial Tr. 1133 (Becker); GX 186A). Archegos's counterparties were financial institutions, but the direct recipients of Halligan's lies were innocent professionals who assumed, wrongly, they could trust Halligan and his team during critical moments in each of their careers.

Finally, it is worth nothing that Halligan's conduct is significant because it was essential to the fraud. Hwang did not involve Halligan in the trading, but Hwang's trading could not have happened without Halligan's help. Halligan's and Becker's effort to establish the free flow of capital from the banks to Archegos provided the critical infrastructure Hwang needed to manipulate the markets.

Halligan's pernicious, consistent, and essential contributions to Hwang's scheme merit the substantial punishment of 8 years' incarceration.

### B. An Eight Year Sentence Will Promote Respect for the Law and General Deterrence

An eight-year sentence will promote respect for the law and general deterrence. As to the former, an eight-year prison sentence will send the message that no one—not even white collar criminals—is above the law, and that all must be held to account for their crimes.

As for general deterrence, the legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases

14

because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

Moreover, the defendants here committed fraud through a private fund, misled banks on subjects that were difficult to verify, and often avoided committing their misstatements to writing. These features of the scheme made it the sort of fraud that is difficult to detect and prosecute and thus one where it is exceptionally important to promote general deterrence. As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*). The Second Circuit has recognized this principle in the context of insider trading, holding that significant sentences in the context of financial crimes are often necessary to ensure others understand that the crime is not "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (Rakoff, J.) ("As the Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").

The publicity that this case has received in the securities industry makes imposing an eight-year term of imprisonment important as a deterrent. Market participants are watching to see what happens, as the widespread reporting on Hwang's sentence has demonstrated.

### C. An Eight Year Sentence Satisfies the Remaining Section 3353(a) Factors

The Government is mindful that an eight-year sentence is significantly shorter than the eighteen-year sentence the Court recently imposed on Hwang. But this disparity in sentences between Hwang and Halligan is consistent with the Section 3553(a) factors, in light of relative culpability of Hwang and Halligan, and Halligan's recent personal family circumstances. *See* 18 U.S.C. §§ 3553(a)(1), 3553(a)(6).

First, while Hwang and Halligan were both convicted of conspiring to conduct the affairs of Archegos through a pattern of racketeering activity, committing securities fraud and wire fraud, the trial evidence amply showed that Hwang was far more culpable than Halligan in this scheme. For one, it was Hwang, and not Halligan, who made all of the trading decisions at Archegos, and specifically directed the manipulative trading that formed the core of the criminal conduct. Second, it was Hwang, and not Halligan, who served to financially profit the most if the scheme had not collapsed in the final days. While Halligan was compensated for his work at Archegos, his combined earnings of $2,085,000—all of which he has agreed to forfeit as a result of his conviction—pale in comparison to the billions of dollars that Hwang stood poised to extract from Archegos if his scheme had succeeded. Thus, while Section 3553(a)(6) directs Courts to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), the trial evidence provides a sound basis on which the Court can distinguish Hwang and Halligan when imposing sentence.

Second, and as recounted in detail in Halligan's sentencing memorandum, since his conviction, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ An eight-year sentence would serve

16

the purposes of sentencing, while also taking into account the collateral consequences that will befall his family during the pendency of his incarceration.

### D. Forfeiture Order

The Indictment contained forfeiture allegations that placed the defendant on notice that various proceeds and facilitating assets would be subject to seizure upon conviction. At sentencing, the Court should order Halligan to forfeit the proceeds he obtained and used during the course of the fraud, which is $2,085,000. A proposed forfeiture order is attached hereto as Exhibit A.

### E. Restitution Order

Under the MVRA, the Court must order restitution to Halligan's victims. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution," and need only make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States* v. *Milstein,* 481 F.3d 132, 137 (2d Cir. 2007). "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. 3664(h).

Based on the trial proof, record evidence, and victim submissions, the Court should order restitution to two classes of victims: (a) Archegos counterparties that suffered losses from their business dealings with Archegos and (b) innocent Archegos employees whose deferred compensation amounts were lost as part of his scheme. The Court should cap Halligan's restitution

17

obligation at $2,085,000, the amount of Halligan's forfeiture, pursuant to 18 U.S.C. § 3664(h), which contemplates an apportionment of liability based on a defendant's "level of contribution" to a victim's loss and "economic circumstances." As set forth above, based on Halligan's relative culpability and his significantly smaller economic resources, an apportioned restitution order is appropriate. The Government previously submitted a proposed restitution order, ECF Doc. 383-2, and it now submits a revised version, Exhibit B, that accepts a minor change proposed by Halligan's counsel.

## VI.    CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence Halligan to a term of eight years' imprisonment, and order forfeiture and restitution in the amount of $2,085,000.

Dated: New York, New York
January 23, 2025

Respectfully submitted,

DANIELLE R. SASSOON
United States Attorney

By: _____
Matthew Podolsky
Alexandra N. Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys