UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

SUNG KOOK (BILL) HWANG and
PATRICK HALLIGAN,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __6/13/25__

22-CR-240 (AKH) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. ALVIN K.
HELLERSTEIN (REDACTED)**

**BARBARA MOSES, United States Magistrate Judge.**

On July 10, 2024, after a nine-week jury trial, defendants Sung Kook (Bill) Hwang, the founder and Chief Executive Officer of Archegos Capital Management (Archegos), and Patrick Halligan, Archegos's Chief Financial Officer, were convicted of three counts of conspiracy, securities fraud, and wire fraud in connection with a scheme to control the price and artificially increase the value of certain securities in Archegos's portfolio. Hwang was additionally found guilty of one count of securities fraud and six counts of market manipulation (as to six different securities). The scheme began in 2020 and ended in late March 2021 with the collapse of the artificially inflated market for those securities, which resulted in more than $100 billion in losses to market participants, counterparty financial institutions, and – as relevant here – Archegos employees, all of whom invested at least 25% of their year-end bonuses in Archegos's portfolio.

On March 12, 2025, the Hon. Alvin K. Hellerstein, United States District Judge, referred two questions to me for report and recommendation pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3664(d)(6). Those questions are: (1) "which former Archegos employees are 'victims' for purposes of restitution under 18 U.S.C. § 3663A(a)(2)," and (2) "how much restitution each is entitled to[.]" Dkt. 401. On December 19, 2024 – prior to the referral – Judge Hellerstein determined that five former Archegos employees (the First Five) qualified as victims entitled to restitution. *See* 12/19/24 Sentencing Tr. (Dkt. 376) at 6-8, 51. The government

now requests restitution on behalf of a total of 39 former Archegos employees (the Proposed Victims), including the First Five. *See* Phase II GX 1 (final proposed Schedule of Victims) (sealed).[1] One additional former employee, Dave Park, was excluded from the government's Schedule of Victims but objects to the exclusion and actively seeks restitution.

After careful review of the evidence and arguments submitted in support of and in response to the government's final restitution request, including testimony and exhibits received at the evidentiary hearings that I held on May 9 and May 21, 2025, I conclude that 38 of the Proposed Victims, plus Park, are entitled to restitution, and that the evidence is sufficient to provide a "reasonable estimate" of the amount of restitution owed to each victim. Consequently, as discussed in more detail below, I respectfully recommend that a total of 39 former Archegos employees receive restitution, in the aggregate amount of $32,996,491.58, divided among them as detailed below and summarized in Appendix 2.

---

[1] Under the MVRA, "[t]he privacy of any records filed, or testimony heard" regarding restitution "shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera." 18 U.S.C. § 3664(d)(4). Much of the evidence discussed in this Report and Recommendation was submitted under seal, including most of the declarations, letters, and other documents submitted by or on behalf of the former Archegos employees seeking restitution, as well as the detailed victim schedules and backup materials submitted by the government. Additionally, the testimony of two former Archegos employees was taken confidentially during the "Phase I" evidentiary hearing held before me on May 9, 2025, and that portion of the Phase I transcript is sealed.

In this Report, "Phase I GX __" refers to government exhibits introduced during the Phase I hearing. "Phase II GX __" refers to government exhibits introduced during the "Phase II" hearing, held before me on May 21, 2025. "Trial Tr. __" refers to the consecutively-paginated trial transcript, which spans numerous docket entries from Dkt. 253 to Dkt. 315. "GX __" refers to government exhibits marked at trial. "1/21/25 Victim Sub." refers to a compilation of numerous individual restitution requests from former Archegos employees, collected by the government and submitted under seal as Exhibit C to the government's letter dated January 21, 2025 (1/21/25 Gov. Ltr.) (Dkt. 383). "Rothman Ex. __" refers to the exhibits to the Declaration of Alexandra Rothman, filed April 18, 2025 (Rothman Decl.) (Dkt. 410), some of which were submitted under seal. "Hwang Ex. __" refers to the exhibits to the Memorandum on Behalf of Bill Hwang Addressing Restitution, filed April 18, 2025 (Hwang Rest. Mem.) (Dkt. 408), some of which were submitted under seal.

I.    **BACKGROUND**

A.    **Relevant Facts**

I assume familiarity with the underlying facts, and recount them here only to the extent they are pertinent to the restitution issues currently before me. Archegos was a "sophisticated investment firm" that functioned like a hedge fund but operated as a "family office" (meaning that it was exempt from regulatory oversight pursuant to the Investment Advisors Act of 1940), because it "only invested the personal wealth of Hwang, his family, and the deferred compensation of [its] employees." Superseding Indictment (SI) (Dkt. 134) ¶¶ 9-10; Hwang Final Presentence Investigation report (Hwang PSI) (Dkt. 332) (sealed) ¶ 28.[2] During the relevant period,[3] Archegos maintained a staff of more than fifty employees and managed more than $160 billion in assets prior to its collapse in March 2021. SI ¶¶ 3, 10; Hwang PSI ¶ 23, 30.

As is common in the financial services industry, Archegos employees received an annual salary plus a discretionary year-end bonus, which could be substantial. Beginning in 2016, under the "mandatory plan," employees were required to defer 25% of their year-end bonus for a four-year period. Trial Tr. at 423-24, 459, 481 (Martz); *id.* at 560, 693-94 (Jones); *see also* Hwang PSI ¶ 99 & n.3; Hwang Rest. Mem. at 3 ("The initial deferral period for the mandatory plan was four years.").[4] During that period, the deferred portion of each employee's bonus was "invested in Archegos's portfolio," Hwang Rest. Mem. at 3, such that its value would rise "based on the fund's

---

[2] The relevant background facts set forth in Halligan's Final Presentence Investigation report (Dkt. 335) (sealed) are identical to those in Hwang's Final Presentence Investigation report.

[3] In this Report and Recommendation, "relevant period" means the time period outlined in each count of the Superseding Indictment: "from at least in or about 2020, up to and including in or about March 2021." SI ¶¶ 1, 68, 76, 78, 80, 82.

[4] The record suggests that in later years, employees were required to defer 25% of their annual bonus for a five-year period. *See* Trial Tr. 459-60 (Martz); Rothman Ex. V (sealed) (copy of 2019 "Award Acceptance" provided by Archegos to one of the Proposed Victims).

performance." Hwang PSI ¶ 99 n.3. At the same time, the plan had a "floor," such that (in theory) the value of the deferred award could not decrease. Trial Tr. at 693-94 (Jones) ("[i]t could rise" but "it could not fall below what it was issued at"); *see also* Hwang PSI ¶ 99 n.3.

Under the mandatory plan, employees awarded bonuses at year-end 2016 were scheduled to receive the deferred portion (plus any market gains) in early 2021. However, in November 2019, they were given the option of re-deferring their 2016 deferred compensation awards for another five years. Hwang Rest. Mem. at 3; *see also* Rothman Ex. GG (sealed) (November 25, 2019 email from Archegos management to Archegos employees explaining that "those of you who received the 2016 year-end deferred bonus" could "(a) Take the accrued money out [in] January 2021 or (b) elect subsequent deferral which will continue to invest alongside the main portfolio"). Insofar as the record reflects, no eligible employee declined that re-deferral option.[5]

Beginning in 2018, Archegos added an "elective plan," under which "knowledgeable" (senior) employees could defer up to an additional 25% of their bonus in 2018 and up to an additional 35% in 2019 and 2020. Trial Tr. at 560 (Jones); *see also* Hwang PSA ¶ 99 & n.3; Hwang Rest. Mem. at 3; Gov. Rest. Mem. (Dkt. 409) at 6-7; Rothman Ex. V (sealed) (2020 Archegos Capital Management Elective Deferred Bonus Plan for Knowledgeable Employees). Most (though not all) employees eligible for the elective plan deferred the maximum percentage permitted. *See* Rothman Ex. R (sealed) (2020 firm-wide data); Gov. Rest. Mem. at 8.

Defendant Hwang "personally made all investment and trading decisions" for Archegos, and directed its research analysts, traders, and other employees. SI ¶ 12(a); *see also* Hwang PSI ¶ 24. "In practice, Hwang made every significant trading and investment decision" for Archegos.

---

[5] *See* Phase II GX 1, Tab 3 (showing that only three Archegos employees – all of whom left the firm prior to the events at issue in this action – received distributions from the deferred compensation program).

SI ¶ 12(a). Defendant Halligan oversaw its accounting, cash management, and operations functions. SI ¶ 12(b); Hwang PSI ¶ 25.

Most of Archegos's trading positions "related to common stocks and American Depositary Receipts, also known as 'ADRs,' traded on United States securities exchanges." SI ¶ 13; Hwang PSI ¶ 32. To facilitate its trading in common stocks and ADRs, Archegos relied heavily on credit extended by counterparty banks. SI ¶ 13; Hwang PSI ¶ 32. As a general practice, Archegos "would initially establish its investments in cash equities, until it approached 5% ownership of all outstanding stock of the security," which could trigger public disclosure requirements. SI ¶ 14; Hwang PSI ¶ 33. When Archegos's ownership in a particular stock neared 5%, Hwang "required that any additional exposure be through a financial agreement known as a total return swap." SI ¶ 14; Hwang PSI ¶ 33. When Archegos took a long position through a total return swap, its counterparty generally purchased the underlying security, as a hedge. SI ¶ 16; Hwang PSI ¶ 35. In practice, therefore, the use of swaps "meant that Archegos could bet on the price of a stock, and dictate trading in the stock, without owning the stock itself." SI ¶ 17; Hwang PSI ¶ 36. Most of Archegos's trading positions were "long," "meaning the value of [its] portfolio would increase if the prices of the stock underlying its swaps increased." SI ¶ 21(a); Hwang PSI ¶ 41.[6]

Beginning in 2020 – when COVID-related restrictions caused Archegos to move to a remote work environment – defendant Hwang "corrupted" its operations and activities by engaging in manipulative trading practices to artificially drive up the prices of the stocks underlying its portfolio and, in turn, increase Archegos's industry standing and capacity to engage in further

---

[6] Archegos's counterparties permitted trading "on margin," that is, on credit. SI ¶ 18; Hwang PSI ¶ 37. When its positions rose in price, some of its margining agreements permitted it to withdraw existing collateral, or "excess margin," thereby obtaining a portion of its gain as cash "without needing to exit its position." SI ¶ 18; Hwang PSI ¶¶ 37-38.

trades. SI ¶¶ 1, 24-40, 70-73. These goals were principally achieved by concentrated trading "in the same stocks in large quantities day after day," SI ¶ 28(a); Hwang PSI ¶ 50, and "in amounts far exceeding volumes known within the securities industry," SI ¶ 28(c); Hwang PSI ¶ 52 (noting that by 2021, defendants sometimes exceeded as much as 35% of the daily trading volume of certain stocks). For example, between October 2020 and March 2021, Archegos "routinely accounted for more than 10% of the entire daily traded volume" of ViacomCBS (VIAC), SI ¶ 28(c)(ii), and exceeded 35% of the trading volume in Tencent Music Group (TME) on eight days. *Id*. ¶ 28(c)(iv). To further prop up the price of Archegos's stock holdings – and avoid margin calls – Hwang also engaged in defensive buying tactics. For instance, he commonly directed traders to "serially" raise limit prices, *i.e*., "the highest price they would pay for the stock," throughout the trading day, or engage in high-volume trading at "strategic times" to affect the opening or closing prices of relevant stocks. SI ¶¶ 28-35; Hwang PSI ¶¶ 50, 56, 62-67.

Hwang's trading "had a stark impact upon market prices." SI ¶ 31; Hwang PSI ¶ 58. For example, in two of Archegos's positions, VIAC and Discovery Communications, Inc. (DISCA), the price of the stock rose more than 250% between October 1, 2020 and March 23, 2021, only to fall "precipitously" following Archegos's own collapse. SI ¶ 31; Hwang PSI ¶ 58. During the same period, Hwang "increasingly ignored internal Archegos analyst research," and instead "frequently spent almost all of his workday with the traders, primarily via all-day, open-line video conferences." SI ¶ 33; Hwang PSI ¶ 60.

By early 2021, as Archegos's concentrated holdings grew rapidly, counterparty banks began imposing escalating costs and restrictions on further trades. SI ¶¶ 34, 42-49; Hwang PSI ¶¶ 61, 72, 75, 77. To sustain the manipulative trading scheme, defendants "provided false and misleading information to Counterparties in an effort to conduct [further] swap transactions and

obtain [additional] margin lending," SI ¶ 41; Hwang PSI ¶ 72, including misrepresentations as to the concentration of Archegos's positions, the liquidity of its holdings, and the composition of its portfolio. SI ¶¶ 41-59; Hwang PSI ¶¶ 78, 80-92. The obvious risk was that "an unexpected decrease in the value of Archegos's positions could quickly cause it to default on its margin loans and swap guarantees to its Counterparties, which would then be forced to sell their hedges at significantly reduced and declining prices, causing substantial losses." SI ¶ 49; Hwang PSI ¶ 79.

In March 2021, this risk materialized, "caus[ing] billions of dollars in losses." SI ¶ 49; Hwang PSI ¶ 79. On March 22, 2021, ViacomCBS announced a secondary stock offering, significantly driving down the price of VIAC (one of the most concentrated positions in the Archegos portfolio) and, accordingly, the value of that portfolio. SI ¶ 60; Hwang PSI ¶ 93. Using "Archegos's free cash" (including employees' deferred compensation), Hwang "attempted to defend the price of VIAC by initiating an extraordinary amount of trading." SI ¶ 60; Hwang PSI ¶ 93. However, by March 23, 2021, Hwang "had critically depleted Archegos's available cash," prompting margin calls from counterparty banks. SI ¶ 62; Hwang PSI ¶ 95. By March 26, 2021, Archegos was unable to meet those outstanding margin calls and was forced to liquidate, "ow[ing] billions of dollars more than it had" available to settle its positions. SI ¶¶ 62-67; Hwang PSI ¶¶ 95-99. In a matter of days, market participants, counterparties, and Archegos employees suffered billions of dollars in losses. SI ¶ 67; Hwang PSI ¶ 99 & n.3.

Two years later, in the course of winding up its business, Archegos offered small settlements to former employees who lost their deferred compensation when the fund collapsed. *See* Rothman Ex. D (sealed); Phase II GX 1, Tabs 2, 3 ("Employee Settlement Payments" column). In order to obtain settlement payments, the former employees were required to release certain civil

claims arising out of their lost deferred compensation or otherwise out of their employment at Archegos. *See* 1/21/25 Victim Sub. (settlement and release agreement signed by ██████).

### B.    Relevant Procedural History

#### 1.    Pretrial and Trial Proceedings

On April 25, 2022, the government filed an eleven-count indictment against Hwang and Halligan. *See* Dkt. 1. On January 18, 2024, it filed the Superseding Indictment, charging defendants with one count of racketeering conspiracy under 18 U.S.C. §§ 1962(c), (d) (Count One); one count of securities fraud as to Archegos's counterparties under 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2 (Count Ten); and one count of wire fraud as to Archegos's counterparties under 18 U.S.C. §§ 1343 and 2 (Count Eleven). In addition, the Superseding Indictment charged Hwang with one count of securities fraud under 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2 (Count Two); and seven counts of market manipulation, under 15 U.S.C. §§ 78i(a)(2) and 78ff and 18 U.S.C. § 2, as to VIAC, Discovery Communications, Inc. (DISCA and DISCK), GSX Techedu Inc. (GSX), iQIYI, Inc. (IQ), TME, and Vipshop Holdings Ltd. (VIPS) (Counts Three through Nine).

Hwang and Halligan maintained their innocence and proceeded to trial, which lasted nine weeks, from May 8, 2024 through July 10, 2024. At trial, several former Archegos employees testified, including about the mandatory and elective plans and the loss of their deferred compensation upon Archegos's collapse. *See, e.g.*, Trial Tr. at 423-24, 458-60 (Martz); *id.* at 560-63, 573-76, 692-98 (Jones). On July 10, 2024, the jury found Hwang guilty on Counts One through Six and Eight through Eleven, but not guilty on Count Seven (charging him with market manipulation as to IQ). Halligan was found guilty on all counts charged against him (Counts One, Ten, and Eleven). *See* Verdict Form (Dkt. 249); Trial Tr. at 5479-96.

### 2.        Restitution Proceedings Before the District Judge

After trial, the government began receiving restitution requests, including – as relevant here – from former Archegos employees who lost their deferred compensation when Archegos collapsed. Hwang PSI ¶ 122. As of November 20, 2024, the government had received submissions from four former Archegos employees seeking restitution. *See* Dkt. 340-2, Sched. A (sealed). A fifth employee then requested restitution, and on December 18, 2024, the government submitted – unsealed – a list of five proposed former employee victims (Christopher Burn, Sarah Gohmert, Cindy Huang, Ryan Kealy, and Brendan Sullivan), for whom it sought restitution of approximately $9.4 million. *See* Dkt. 371-1. That figure included almost $4 million in lost elective deferrals by four of the five (Burn, Huang, Kealy, and Sullivan), and over $350,000 in attorneys' fees and expenses incurred by the same four in connection with this action. *Id.*

In support of their requests, each of the four employees seeking restitution for lost elective deferrals explained that the deferrals were not truly "elective" because they were pressured to defer the maximum amount. For example, ████ argued (through counsel) that "these additional deferrals were very nearly compulsory and implicitly tied to bonus award amounts." 8/21/24 Moore Ltr. at 2 n.2; *see also* 12/3/24 Clayman Ltr. at 4 (asserting that ████ was "induced to make these additional, 'voluntary' contributions through several material misrepresentations," including the promise of a guaranteed payout at the end of the deferral period); 12/5/24 ████ Decl. ¶ 14 ("I felt pressure from senior management to contribute the maximum amount to the 'Elective' Plan or risk being viewed by Defendant and other senior managers as disloyal."); 12/5/24 ████ Ltr. at 1 (arguing that "[i]t would be inaccurate to divide [his] deferred compensation into separate mandatory and elective buckets" because, at Archegos, "maxing out [] deferred compensation . . . was made mandatory."). As an example, ████ described "one occasion" when he elected to defer less than the maximum amount, but was then approached by "Archegos executives,"

9

including co-President Diana Pae, who urged him to change his election to the maximum, lest he be "viewed as disloyal." 12/5/24 ███ Ltr. at 1. Additionally, several employees noted that they were required to make their elections in November, before they knew what their bonus would be that year. *Id*.; 12/5/24 ███ Decl. ¶ 16.[7]

On December 19, 2024, during a sentencing hearing for defendant Hwang, Judge Hellerstein determined that the First Five former employees were entitled to restitution as requested, including for lost mandatory deferrals, lost elective deferrals, and legal expenses. 12/19/24 Sentencing Tr. at 6-8. As to the lost deferrals, the district judge reasoned that "Mr. Hwang used [their] money as part of the capital that Archegos had to carry out its manipulation. So what he got from the employees in their deferred compensation added to the way he deployed his funds to execute what the jury found was manipulation. Accordingly, the proper finding would be that they are victims; that the losses they suffered were the direct and proximate result of the violations of law carried out by Mr. Hwang." *Id*. at 6-7. In making these findings, Judge Hellerstein relied in part on "the testimony about the climate in Archegos," including "the requirement of employees to declare how much they would be putting into deferred compensation before Mr. Hwang told them what bonuses they would get and the distinct feeling they had that if they were not cooperative with Mr. Hwang they would suffer in their employment." *Id*. at 6.[8]

Shortly after the December 19 sentencing hearing, the government received multiple additional submissions from former Archegos employees requesting to be included in the final

---

[7] All of the statements quoted in this paragraph were submitted under seal as part of the 1/21/25 Victim Submission. Some of them were then resubmitted, for example, as Rothman Ex. U (███ *id*. Ex. V (███ *id*. Ex. AA (███ *id*. Ex. FF (███

[8] The district judge further ruled that the employees were entitled to priority with respect to the deferred compensation losses but not with respect to their legal fees and expenses. 12/19/24 Sentencing Tr. at 7.

restitution orders. *See* Dkt. 378. On January 8, 2025, the government proposed a schedule (which the Court so ordered) under which additional employee submissions would be collected by January 17; the government would update its proposed restitution orders by January 21; and any objections would be lodged by January 24. *See* Dkt. 379. Accordingly, on January 21, 2025, the government submitted an updated Schedule of Victims listing 41 former Archegos employees (including the First Five), *see* Dkt. 383 Ex. B (sealed), together with the underlying restitution requests themselves. As to all 41 former employees, the government took the position that they were entitled to restitution for the loss of all of their deferred compensation (including both mandatory and elective deferrals). On January 24, 2025, Hwang objected to the then-current Schedule of Victims, *see* Dkt. 388, and Dave Park – a former Archegos analyst who was *not* included on the government's schedule – objected to his exclusion, pointing out, among other things, that the government did not oppose any other analyst's restitution claim. 1/24/25 Park Obj. (Dkt. 389) at 2.

On January 27, 2025, during defendant Halligan's sentencing hearing, Judge Hellerstein stated that some individualized proof would be needed to show why the former employees who made elective deferrals should be "treated as a victim rather than as a willing participant to what looked to be a very lucrative deferred compensation agreement." 1/27/25 Sentencing Tr. (Dkt. 394) at 55; *see also id.* at 3 (noting that the First Five showed that they "deferred compensation because of undue pressure by Mr. Hwang or others," but it was "not proved" for other employees); *id.* at 57 ("if it's a voluntary deal, then they're not entirely victims[.]"). Thereafter, on March 12, 2025, the district judge referred this case to me for report and recommendation as to which former Archegos employees are "victims" and how much restitution each should be awarded.

### 3.    Further Changes to the Schedule of Victims

On March 14, 2025, I requested (among other things) that the government submit its "most recent proposed schedule of former Archegos employee victims," with backup data. 3/14/25 Order (Dkt. 402) ¶ 1. On March 24, 2025, the government submitted another updated Schedule of Victims, this one including a total of 40 former Archegos employees. *See* Dkt. 403 Ex. A (sealed).[9] Finally, as noted above, the government updated its Schedule of Victims once again on May 21, 2025 – on the day of the Phase II hearing – after another former employee withdrew his claim for restitution, bringing the total number of Proposed Victims to 39 (including the First Five but excluding Park). The government seeks restitution on behalf of these Proposed Victims in the aggregate amount of $31,544,430.03. *See* Phase II GX 1, Tab 1. This sum includes lost mandatory deferrals for all Proposed Victims, lost elective deferrals for twelve of them, and reimbursement for legal fees and expenses incurred by five of them, less the amount of any settlement received from Archegos. *See id.*, Tab 2. Separately, Park seeks restitution for $1.65 million in lost mandatory and elective deferred compensation awarded to him in 2018 and 2019. *See* 1/21/25 Victim Sub. (January 17, 2025 letter from attorney Mark A. Berman on behalf of several former employees, including Park).[10]

---

[9] Two former employees (whose names previously appeared on the Schedule of Victims) withdrew their claims, *see* Dkt. 403 Ex. E (sealed), while one former employee, ███████, was added to the Schedule of Victims. The government has never submitted any written restitution request by or on behalf of ███ and did not explain why his name first appeared as a potential victim almost two months after the deadline set by the district judge.

[10] Appendix 1 to this Report lists each former Archegos employee who now seeks restitution and identifies where in the record (if at all) that employee's individualized restitution claim(s) may be found. Ten of the Proposed Victims did not submit any written claim. Appendix 1 also shows which former employees seek restitution for lost elective deferrals and which of them re-deferred their mandatory 2016 deferrals in 2019. Lastly, Appendix 1 shows which former employees expressly (i) deny having any knowledge of defendants' criminal conduct, and/or (ii) assert that they were coerced into making elective deferrals or re-deferrals. Outside of the First Five, only a handful of Proposed Victims have addressed these issues.

## II.    LEGAL STANDARDS

Under the MVRA, restitution is mandatory where, as here, a defendant is being sentenced for "an offense against property" under Title 18, "including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), and where "an identifiable victim or victims has suffered a . . . pecuniary loss." *Id*. § 3663A(c)(1)(B). *See United States v. Avenatti*, 81 F.4th 171, 207 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2598 (2024); *United States v. Battista*, 575 F.3d 226, 230 (2d Cir. 2009). Where the offense results in loss of property for which the "return of the property . . . is impossible," a restitution order must require the defendant to pay the victims "the value of the property." 18 U.S.C. § 3663A(b)(1). In addition, the MVRA requires the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Among the "other expenses" recoverable under the MVRA are the "attorneys' fees incurred by victims while helping the government investigate and prosecute the defendant," *United States v. Afriyie*, 27 F.4th 161, 163 (2d Cir. 2022) (quoting *United States v. Amato*, 540 F.3d 153, 159-60 (2d Cir. 2008)), but only if the fees are incurred in connection with "criminal matters" (as opposed to, for example, related regulatory or civil proceedings). *Id*. at 163-64.

Under the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). "[C]o-conspirators" cannot be victims within the meaning of the MVRA. *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006). Thus, any former Archegos employee who knowingly participated in the defendants' criminal conduct is not a victim under the MVRA and is ineligible for restitution in any amount. But that is not the end of the matter. Determining which "innocent" former Archegos employees qualify as "victims" – and for what losses – requires determining whether

their losses were directly and proximately caused by the criminal conduct for which defendants were convicted. *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021); *United States v. Calderon*, 944 F.3d 72, 95 (2d Cir. 2019). As to proximate cause, the key question is whether "the harm alleged has a sufficiently close connection to the conduct[,]" *Robers v. United States*, 572 U.S. 639, 645 (2014) (citation omitted), "which we evaluate based on whether that harm was 'foreseeable' to a defendant." *Goodrich*, 12 F.4th at 229. Where, as here, the offenses of conviction "involve[] as an element a scheme, conspiracy, or pattern of criminal activity," victims include any identifiable persons "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(2).

Pursuant to MVRA § 3664(e), the government carries "the burden of demonstrating the amount of the loss sustained by a victim as a result of the offense," and "any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). In *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011), the Second Circuit explained that the government must show, by a preponderance of the evidence, "that each alleged 'victim' was actually a victim." *Id.* at 172. It must also show the amount of each victim's loss that was directly and proximately caused by the offenses of conviction. *Goodrich*, 12 F.4th at 228. However, the amount of the loss need not be determined with precision; the court need only "make a reasonable estimate of the loss, given the available information." *United States v. Turk*, 626 F.3d 743, 747-48 (2d Cir. 2010) (quoting *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007)).

"The showing required to satisfy the government's burden [] varies depending on the circumstances[.]" *Archer*, 671 F.3d at 172. In many cases, "a generalized description of the fraudulent scheme" suffices to support an award of restitution across a broad category of victims.

14

*Id.* In other cases, "where it is plausible" that at least some purported victims were in fact knowing participants, "the government must proffer some individualized evidence to meet its burden[.]" *Id.* However, where the government's burden of proof "would require it to prove a negative and the facts at issue are more readily ascertainable by the defendant," the Court may appropriately look to the defendant "to assume a burden of production of evidence that presents at least a triable issue as to the fact at issue, at which point the burden of persuasion must be assumed by the prosecution." *Id.* at 173.

Decisions as to what procedures are needed to resolve restitution disputes "lie within the discretion of the sentencing court . . . so long as the defendant is given an adequate opportunity to present his position." *United States v. Gushlak*, 728 F.3d 184, 193-94 (2d Cir. 2013); *accord United States v. Sabhnani*, 599 F.3d 215, 257-58 (2d Cir. 2010). The court "may require additional documentation or hear testimony," 18 U.S.C. § 3664(d)(4), but is not required to do either. *See Gushlak*, 728 F.3d at 194 (district court was entitled to rely on affidavits and was not required to "expand the evidentiary hearings to include the live testimony and cross-examination of the affiants").

## III.    NEW EVIDENCE SUBMITTED

In my March 14, 2025 order, I asked the parties for their respective proposals for addressing the two questions referred to me. 3/14/25 Order ¶¶ 3-4. The government proposed a minimalist approach. In its view, "[a]ny former employee who contributed to Archegos's deferred compensation program is entitled to restitution in the amount of [all] lost mandatory and elective contributions unless he or she knowingly participated in the criminal conduct that led to the losses." 3/24/25 Joint Ltr. (Dkt. 403) at 1. Further, according to the government, this Court could

"determine the class of eligible victims," as well as the amount of each victim's loss, "by a preponderance of the evidence based on the existing record without a hearing." *Id.* at 3.

Defendant Hwang, on the other hand, proposed a maximalist approach, under which the government would be required to provide live testimony on a wide range of topics, including (for example) testimony from "any former employee seeking restitution who did not submit a request prior to December 19, 2024 concerning the reason(s) for their delay in seeking restitution," and from "any former employee whom the government has, at any point, excluded from the victim list and who still wishes to be included in a final restitution order concerning the government's reason(s) for the exclusion[.]" 3/24/25 Joint Ltr. at 3. Hwang also sought testimony from each employee who made elective deferrals, or who re-deferred their 2016 bonus in 2019, "concerning the reason(s) for their participation in the elective deferred compensation plan and/or decision not to withdraw funds that had vested." *Id.* at 4.

Halligan took "no position on the procedures" the Court should adopt. 3/24/25 Joint Ltr. at 5.

During a conference on April 7, 2025, the parties discussed their respective proposals at length. *See* Dkt. 415. I then issued an order scheduling two evidentiary hearings: a Phase I hearing to determine which employees qualify as victims (and as to which losses), and a Phase II hearing to address calculation issues. *See* Dkt. 405. In the same order, I asked for supplemental briefs in advance of the Phase I hearing, which the parties (and Park) submitted on April 18, 2025.

Consistent with the position it took in the March 24 joint letter, the government declined to produce any witnesses or new documentary evidence for the Phase I hearing, maintaining that "there is ample basis in the record" to find that each of the employees on its Schedule of Victims is entitled to restitution. Gov. Rest. Mem. at 20. In order to assist the Court in that task, the

government submitted a compilation of evidence from the existing record, including excerpts from the trial testimony of Scott Becker, Brian Jones, Jesse Martz, and William Tomita, *see* Rothman Exs. E-O, T; a sampling of previously-submitted victim statements, *see id*. Exs. U-GG (sealed); and detailed data (obtained from Archegos's corporate counsel and presented in the form of Excel spreadsheets) concerning the former Archegos employees' deferred compensation contributions (both mandatory and elective), withdrawals, and settlements. *Id.* Exs. B-D (sealed).[11]

Defendant Hwang's April 18, 2025 memorandum argued that the existing record "does not satisfy the government's burden of proving by a preponderance" that the "newly added employees with deferred compensation that was elective and/or eligible to be withdrawn" are entitled to restitution with respect to those losses. Hwang Rest. Mem. at 18.[12] Hwang acknowledged that Judge Hellerstein relied upon trial evidence and the submissions of the First Five to find that they are entitled to restitution as to all of their deferred compensation losses, *id.*, but argued that that evidence was insufficient "for this Court to make a generalized finding that *all* employees were subject to the same pressure, and that their decisions were a consequence of that pressure." *Id.* at 18-19. Hwang asserted that individualized evidence of coercion would be required as to *each* employee seeking restitution for losses associated with elective deferrals or re-deferrals, and noted that most of the newly-named Proposed Victims did not submit any such evidence. *Id.* at 19-21. Accordingly, in Hwang's view, "[t]he Government cannot meet its burden without putting forth additional evidence establishing that the [newly-named] employees were coerced[.]" *Id.* at 22; *see*

---

[11] There is no dispute as to the accuracy of the compensation data set forth in the Excel spreadsheets submitted by the government.

[12] As noted above, one of the former Archegos employees withdrew his restitution claim on May 21, 2025. By the Court's count, the government's final Schedule of Victims (Phase II GX 1, Tab 1) includes 20 former Archegos employees (comprising all of the First Five plus 15 newly-named Proposed Victims) who re-deferred their 2016 deferred compensation in 2019, participated in the elective plan when it became available, or both. *See* App. 1.

*also id*. at 26 ("It is the government's responsibility to marshal whatever evidence it believes will make that showing.").

Additionally, Hwang argued that the government should be required to "address its decision to include [two former employees, referred to herein as "Executive 1" and "Executive 2"] in its proposed Schedule of Victims after first informing their counsel that it was 'undecided' about whether they were 'innocent victims entitled to restitution' or knowing participants who should be excluded in the restitution order." Hwang Rest. Mem. at 26. In Hwang's view, if and to the extent the government had any basis to believe that these two former employees had knowledge of or involvement in defendants' criminal conduct, it should be required to make that evidence available. *Id*. at 27.

As for Park, he submitted a letter-brief arguing that the government had "failed to establish by a preponderance of the evidence that [he] was a knowing participant in the conspiracy," but that if the government continued to "insist upon its current position," he was prepared to testify at the Phase I hearing. *See* 4/18/25 Park Ltr. (Dkt. 406) at 1.

By order dated May 7, 2025, I advised the parties as to what additional evidence – in my view – would be required at the Phase I hearing. First, I explained, I would have to determine whether any of the former employees knowingly participated in defendants' criminal conduct. 5/7/25 Order (Dkt. 413) at 1. Applying the burden-shifting analysis set forth in *Archer*, 671 F.3d at 172-73, I found it "plausible" that Executive 1 and Executive 2 (about whom the government apparently had some doubts before including them on its final proposed Schedule of Victims) could be knowing participants in the criminal conduct. 5/7/25 Order at 2. Consequently, I concluded, "the Government must present individualized evidence supporting its current view that these two employees are 'innocent' of the offense conduct." *Id*.

As to Park, I rejected his assumption that the government was required to justify its exclusion of him from the Schedule of Victims by a preponderance of the evidence as inconsistent with 18 U.S.C. § 3664(e). 5/7/25 Order at 7 ("It cannot be the case . . . that every self-proclaimed victim must be accepted as such under the MVRA unless the Government *disproves* that claim."). Instead, I explained, because the government was unwilling to request an award on his behalf, he himself would bear the burden of proof, and thus would be required to persuade the Court, by a preponderance, that he was a "victim," as that term is used in the MVRA, entitled to restitution. *Id*.

Turning to the coercion issue, I agreed with the government that former Archegos employees who were otherwise entitled to restitution for their lost deferred compensation should not be required to show that their deferral or re-deferral decisions were coerced. I explained:

> [T]here is no principled distinction to be made between innocent employees who lost their deferred compensation because they were *required* to invest it in the Archegos fund and innocent employees who lost their deferred compensation because they *chose* to do so (or chose not to withdraw a portion of it when they had the opportunity to do so in late 2019), trusting that the fund would be operated in accordance with the law. In both cases, the resulting loss was entirely foreseeable to defendants "in the course of committing the offense[s] of conviction." *Goodrich*, 12 F.4th at 223.

5/7/25 Order at 5. I then advised the parties that, to the extent proof of coercion *was* required, "neither the evidence presented at trial nor the victim statements submitted to date show that all [of the newly-named] employees who made elective deferral or re-deferral decisions did so as a result of coercion or pressure." *Id*. at 5-6. Consequently, I gave the government another opportunity to present testimony or other individualized evidence of coercion, "particularly as to those employees who did not submit victim statements or did not address the coercion issue in their victim statements." *Id*. at 6.

The government declined the invitation. By letter dated May 8, 2025 (Dkt. 417), it advised the Court that "it does not intend to present further testimony or evidence at the Phase I hearing."

On May 9, 2025, the Court conducted the Phase I hearing, at which three former Archegos employees testified: Park (in open court) and Executives 1 and 2 (in the presence of all parties but in a non-public setting). All three provided direct testimony under questioning from their own counsel, after which the government and the defendants were given the opportunity to cross-examine them. *See* Phase I Tr. (Dkt. 424) at 24-79 (Park); *id*. at 80-87 (Executive 1); *id*. at 88-105 (Executive 2). All three witnesses testified that they were not knowing participants in defendants' conspiracy. Park readily conceded that his elective deferral decisions (made in 2018 and 2019) were voluntary. *Id*. at 67. Executive 1 and Executive 2 were not asked – and did not volunteer any testimony – about their elective deferrals and re-deferrals.

By order dated May 9, 2025, issued after the Phase I hearing concluded, I gave the former Archegos employees seeking restitution one more opportunity to submit written evidence with respect to the coercion issue. *See* Dkt. 418. Their deadline was May 15, 2025. On that day, the Court received one supplemental declaration – from ████████, one of the First Five, who had already submitted evidence regarding coercion, and whose restitution claim had already been approved by Judge Hellerstein. ██████ stated (again) that he was "pressured by the Defendant and his co-conspirators to contribute an additional 35% of [his] bonus . . . through misrepresentations and coercion." 5/15/25 Supp. ██████ Decl. (sealed) ¶ 8. ██████ also requested "an additional $5,000 in legal fees to cover the costs of preparing and submitting this declaration." *Id*. ¶ 2 n.1.

Finally, on May 21, 2025, the Court conducted the Phase II evidentiary hearing, regarding the amount of restitution to be awarded to each former employee victim. The government offered the testimony of the FBI forensic accountant responsible for performing the financial calculations underlying its restitution request, *see* Phase II Tr. (Dkt. 426) at 4-7, and defendants cross-examined the witness. *Id*. at 16-20.

## IV.    PROPOSED FINDINGS OF FACT AND RECOMMENDATIONS AS TO DISPOSITION

### A.    Lack of Knowing Participation

#### 1.    Executive 1 and Executive 2

As noted above, any former Archegos employee who knowingly participated in defendants' criminal conduct is not a "victim" under the MVRA and consequently is not eligible to receive restitution. *Reifler,* 446 F.3d at 127 (disallowing restitution for those individuals whose stock lost value but who bought it knowing the defendant intended to inflate the price artificially); *Archer*, 671 F.3d at 172 ("[C]o-conspirators, who, by definition, know of the scheme, are not victims and may not receive restitution[.]"). Moreover, it is generally the government's burden to show "that each alleged 'victim' was actually a victim." *Archer*, 671 F.3d at 172; *see also* 18 U.S.C. § 3664(e).

This does not mean, however, that the government was required to furnish individualized evidence establishing that each Proposed Victim – from senior executives to receptionists – did *not* knowingly participate in the criminal conduct of Hwang and Halligan. As the Second Circuit explained in *Archer*, "[t]he showing required to satisfy the government's burden on this point, varies depending on the circumstances of the fraud." *Archer*, 671 F.3d at 172. Where, as here, "the prosecution's burden of proof would require it to prove a negative and the facts at issue are more readily ascertainable by the defendant," the Court may appropriately look to the defendant "to assume a burden of production of evidence that presents at least a triable issue as to the fact at issue[.]" *Id.* at 173. Only then must the burden of persuasion be "assumed by the prosecution." *Id.*

In this case, defendants did not "present a triable issue of fact" as to any of the Proposed Victims except two research analysts, Executive 1 and Executive 2.[13] Consequently, there was no need for additional "evidence of innocence" as to any other Proposed Victim.

Both Executive 1 and Executive 2 testified (under questioning from their own counsel) that they were senior research analysts at Archegos. *See* Phase I. Tr. at 82 (Executive 1); *id*. at 89-90 (Executive 2). Both testified that they never falsified any information in their research reports, *see id*. at 83 (Executive 1); *id*. at 91 (Executive 2), and played no role in daily trading, trading strategy, or communicating with brokers or other third parties. *See id*. at 83 (Executive 1); *id*. at 91-92 (Executive 2). Both stated unequivocally that they had no knowledge of defendants' criminal conduct. *See id.* at 84-85 (Executive 1); *id*. at 96 (Executive 2).

Executive 1 worked remotely during the COVID pandemic and rarely saw defendant Hwang. *See* Phase I Tr. at 85-86. Executive 2 worked remotely for approximately the first six months of the pandemic, and then began working in what the Archegos employees referred to as the "corporate apartment," in Manhattan, where Hwang and Park also worked in late 2020 and early 2021. *See id.* at 93-94. However, according to Executive 2, all three of them wore masks and "spread out as best we could." *Id*. at 95. Executive 2 did not listen to Hwang's phone calls, did not

---

[13] Even as to these two, defendants did not present any admissible evidence suggesting that they knowingly participated in defendants' crimes. Rather, defendant Hwang argued that the government should be "required to address its decision to include [Executive 1 and Executive 2] in its proposed schedule of victims after first informing their counsel that it was 'undecided' about whether they were 'innocent victims entitled to restitution' or knowing participants who should be excluded in the restitution order." Hwang Rest. Mem. at 26; *see also* Hwang Ex. W at 2 (sealed) (January 7, 2025 letter from former employees' counsel, stating counsel's "understanding" that the government "is undecided about [Executive 1 and Executive 2]"). It was therefore, in my view, a close question whether Hwang had raised a "triable issue of fact," *Archer*, 671 F.3d at 173, as to either Executive 1 or Executive 2. Ultimately, as I explained during the Phase I hearing, I concluded that the "prudent thing to do," under the circumstances, was to "require that either the government, or, in the government's absence, the two executives themselves provide some evidence that they did not knowingly participate in Defendants' crimes." Phase I Tr. at 20.

"participate in Mr. Hwang's meetings with the traders," and did not hear or see anything in the apartment "that suggested that there was a criminal securities fraud being committed[.]" *Id.* at 95.

I found the testimony of Executive 1 and Executive 2 to be credible. Moreover, no contrary evidence was adduced. I am therefore satisfied that neither of them knowingly participated in defendants' criminal scheme. Even if the government was at one point uncertain as to whether to include Executive 1 and Executive 2 in the Schedule of Victims, there is no reason to exclude them now. *See, e.g.*, *U.S. v. Paul*, 634 F.3d 668, 676, 678 (2d Cir. 2011) (upholding award of restitution to a victim that was initially excluded after the Probation Department "'concluded that it erred' and changed its position"). I recommend that both be included in the Court's final restitution orders.

### 2.    Park

The government's decision to omit Dave Park from the Schedule of Victims was motivated by two principal considerations. First, although Park (like Executive 1 and Executive 2) was an analyst, not a trader, he "worked daily with Hwang out of the Archegos corporate apartment," and therefore, in the prosecutors' view, "had a front-row seat to Hwang's manipulative trading strategy during the period of the offense conduct." 1/21/25 Gov. Ltr. at 5-6. As support for this point, the government relied on a photograph (GX 22) showing Park sitting at the kitchen table in the apartment, not far from the laptop on which Hwang and the Archegos traders were "on one of their all-day Zoom calls[.]" *Id.* at 5. Second, the government pointed to a March 15, 2021 email from Park to a more junior Archegos analyst, in which Park asked his colleague to help Hwang "justify" his price targets for VIAC and DISCK (GX 178), as evidence that Park "understood that Hwang's price targets for the securities he was manipulating . . . were disingenuous." *Id.* at 6.

In response, Park argued that his "mere presence" at the corporate apartment did not mean he had knowledge of the criminal conspiracy, and pointed out that Executive 2 – for whom the government sought restitution – also worked out of the corporate apartment. 1/24/25 Park Obj.

at 3-4. Park insisted that he – like Executive 2 – "was not involved in setting trading strategy, [] did not conduct trades, and . . . was [not] a knowing participant in the criminal conspiracy alleged by the government." *Id*. at 4. With respect to the March 15, 2021 email, Park explained that he "simply was telling [the junior analyst] . . . that he should investigate the assumptions that would be needed to support Hwang's price target so that the assumptions driving the price difference could be provided to Mr. Hwang to consider[.]" *Id*. Park reiterated these points in his April 18, 2025 letter-brief, *see* Ltr. at 2-6, and in his Phase I testimony, which was taken in open court.

Like Executive 1 and Executive 2, Park testified that he never falsified any information in his research reports, *see* Phase I Tr. at 27; that he played no role in daily trading, trading strategy, or communicating with brokers or other third parties, *see id*. at 27-28; and that he had no knowledge of defendants' criminal conduct. *See id*. at 32-34, 37-38. Park began working out of the corporate apartment early in the pandemic, with Hwang, because he "lived close by." *Id*. at 29. Sometimes he acted as "a glorified assistant" for Hwang, performing administrative and logistical tasks. *See id*. at 30, 32. Like Executive 2, however, he testified that he did not participate in or listen to Hwang's (video) meetings with the traders, did not witness anything that appeared to be "illicit," and did not know that Hwang was manipulating securities prices. *Id*. at 31-33.

On cross-examination, the government emphasized that Park was in the corporate apartment almost every day, sometimes printing materials out for Hwang, and thus was in a position to know that Hwang was monitoring the P&L of the Archegos portfolio while on Zoom calls with traders, was "buying and selling throughout the day," and was increasing the frequency of his trading. *See* Phase I Tr. at 39-42. The government also established that, until late January 2021, Park received a daily email listing Archegos's portfolio holdings, from which he could see that the portfolio was growing significantly and becoming increasingly concentrated in a handful

of stocks. *See id.* at 42-45. Insofar as the record reflects, however, Executive 2 – for whom the government seeks restitution – worked under the same conditions, in the same proximity to Hwang, with the same access to information. *See id.* at 96-98. In his testimony, moreover, Park repeatedly disclaimed knowledge of Hwang's "trading strategy" (as opposed to his "investment strategy," which Park described as "long term"). *See id.* at 41-43.

Next, the government questioned Park about a text-message thread from August 20, 2020 (GX 2966), in which Hwang and various Archegos traders were discussing that day's trading in, and price movements of, GSX and VIAC. Both securities rose in price that day. At the end of the thread, a trader noted that GSX was driving the Archegos P&L up 11.5%, to which Park responded with "celebration" emojis. Park agreed that he was "celebrating the increase in the price of GSX," Phase I Tr. at 52, but denied that he could see, from the text-message thread, "how the prices moved with Mr. Hwang's trading." *Id.* at 49 ("I don't know if it's because of his trading. I know the stocks were going up and down, but not necessarily because of his trading."). I found Park credible on this point and am reluctant to interpret his use of a celebratory emoji in response to a profitable day as evidence that he was a knowing participant in a market manipulation scheme.

Park was then asked about the March 15, 2021 email regarding Hwang's price target for VIAC and DISCK. Notwithstanding his use of the word "justify" in that email, Park testified that his task was "to help [Hwang] analyze" the companies and to "to help him figure out if he thinks this is a good price target." Phase I Tr. at 54-55. More broadly, although the government suggested that Park was willing to tailor his analysis to Hwang's preconceived notion of what the price target should be for the securities in Archegos's portfolio, it failed to explain how – if at all – this contributed to (or showed Park's knowledge of) the market manipulation scheme of which Hwang was found guilty.

Hwang was also found guilty of defrauding Archegos's prime brokers and counterparty banks, including by lying to them about the volume of Archegos's trading in certain securities. In an effort to demonstrate that Park knew about those lies, the government showed that he was present for (and in fact took notes during) a series of calls with banks on March 25, 2021, days before Archegos collapsed. Phase I Tr. at 57-60; Phase I GX D. During one such call, Hwang stated (according to Park's notes) that the fund's "top positions trade $2-5bn," when in fact, according to Archegos's internal "portfolio reports," the average daily trading volume for the firm's "top names" was only $2 billion to $2.8 billion. Phase I Tr. at 61-63; Phase I GX A. I note, however, that by March 2021, Park was no longer receiving the daily portfolio reports. *See* Phase I. Tr. at 45 (Park received them until "the end of January 2021"). The March 25, 2021 reports passed through his hands only because Hwang asked him to print them out for him. *Id*. at 61; Phase I GX A. I cannot conclude that Park had the requisite guilty knowledge simply because, in his role as Hwang's "glorified assistant," Phase I Tr. at 30, he printed out documents from which the discrepancy could have been discovered.[14]

Finally, the government sought to draw an inference of complicity from the fact that Park received a "spot bonus" at the end of 2020. Phase I Tr. at 63-65. As Park explained, both he and Executive 2 received a spot bonus that year. *Id*. at 63. When asked why, Park stated that he did not know but he could guess that it was because during the pandemic, when everyone else was working

---

[14] I note as well that the government's theory as to the nature of Hwang's March 25, 2021 misrepresentation appears to have changed. According to the presentence investigation report, Hwang "misleadingly informed the Counterparties" on that date "that Archegos's top two-to-three securities positions had average daily trading ('ADT') of $2 to $3 billion," when in fact the ADT was higher. Hwang PSI ¶ 89. When cross-examining Park, however, government counsel pressed him to acknowledge that Hwang informed the counterparties that the firm's "top positions" had average daily trading of $2 to $5 billion, when in fact the ADT did not reach $5 billion. Phase I Tr. at 60-63.

remotely, he was in the corporate apartment "every day, like, long, long days." *Id.* at 65; *see also id*. at 103 (Executive 2, testifying that the spot bonus had "something to do with, you know, like a bit of hardship, like, it was Covid and, you know, I was willing to travel and be in the corporate apartment.").

Taken as a whole, I found Park's testimony both credible and consistent with the testimony of Executive 2. By contrast, the government's efforts to distinguish the two analysts – painting Park as complicit while seeking restitution for Executive 2 – rest largely on inference, speculation, and a handful of ambiguous documents. I note as well that Park chose to testify, to "clear [his] name" (and, of course, in hopes of obtaining a substantial restitution award), Phase I Tr. at 25, notwithstanding the government's warning that "were he to get on the witness stand and say things similar to what he said at the time of [his] interviews, we do think there could be consequences that follow from that testimony." *Id.* at 22; *see also id*. at 23 (warning Park directly). Accordingly, I recommend that Park also be included in the Court's final restitution orders.

### B.    Coercion

I next turn to the coercion question; that is, whether the former Archegos employees who participated in the elective plan, or who re-deferred their 2016 bonus, must show that defendants coerced them into making those decisions in order to establish that the resulting losses were "directly and proximately" caused by defendants' criminal conduct. 18 U.S.C. § 3663A(a)(2). This issue does not affect the rights of the First Five, because they have already established, to the satisfaction of the district judge, that they were coerced. *See* 12/19/24 Sentencing Tr. at 6-7; 1/27/25 Sentencing Tr. at 3. Nor does it affect the rights of the 19 additional Proposed Victims who only participated in the mandatory plan (and had no 2016 bonus to re-defer in 2019). *See* App. 1. As to 15 of the newly-identified Proposed Victims, however, it does matter, because, in addition

to participating in the mandatory plan, they participated in the elective plan when it became available, re-deferred their 2016 bonus in 2019, or both. *See* App. 1; App. 2.[15] It also matters to Dave Park, if he is otherwise found eligible for restitution, because he participated in both the mandatory and the elective plan. *See* App. 1; App. 2.

### 1.    Whether Coercion is Required for Proximate Causation

Defendant Hwang contends that individualized proof of coercion should be required before restitution can be awarded for elective or re-deferred contributions, because (i) "it is the law of the case," Hwang Rest. Mem. at 16, and (ii) "a finding that Mr. Hwang played no role in employees' decisions to defer compensation would take these losses outside the chain of causation." *Id*. at 17. The government disagrees, arguing that the law of the case doctrine cannot apply where, as here, the district judge has "probed the circumstances of the employee losses" but has not "ruled" that only involuntary compensation deferrals by Archegos employees are compensable under the MVRA. Gov. Rest. Mem. at 18. Further, in the government's view, any rule that would exclude an otherwise-eligible Archegos employee from restitution – because that employee made a voluntary deferral in hopes of profit – would run contrary to the MVRA, which requires only that the victim was directly and proximately harmed as a result of the defendants' criminal conduct. *Id*. at 18-20.

The Court agrees with the government on both points. The law of the case doctrine applies once a court has "ruled on an issue." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri,* 306 F.3d 1217, 1225 (2d Cir. 2002)). In this case, Judge Hellerstein did not rule on either of the questions that he referred to me for recommendation pursuant to 18 U.S.C. § 3664(d)(6). And I cannot make a recommendation as to "how much restitution" each former

---

[15] Appendix 1 identifies which former Archegos employees participated in which plans. Appendix 2 gives the dollar amount of each employee's mandatory deferrals, elective deferrals, and re-deferrals.

Archegos employee is entitled to without considering whether – and under what circumstances – they are entitled to restitution for the loss of compensation that was deferred voluntarily as well as involuntarily. I therefore conclude that the coercion question is within the scope of my reference – subject, as always, to "a de novo determination of the issue" by the district judge. *Id.*

I further conclude, as I did in my 5/7/25 Order, that the MVRA does not require victims to show that they parted with their money involuntarily in order to recover restitution. The phrase "directly and proximately harmed," as used in 18 U.S.C. § 3663A(a)(2), has been interpreted in our Circuit "to impose cause-in-fact and proximate cause requirements, respectively." *Goodrich*, 12 F.4th at 229. "Cause-in-fact," that is, but-for cause, is not seriously disputed in his case. But for defendants' offense conduct, the Archegos portfolio would not have imploded in late March 2021, destroying the value of *all* of the employees' deferred compensation accounts, both mandatory and elective.

Proximate cause, in contrast, "is a flexible concept that defies easy summary." *Calderon*, 944 F.3d at 95 (2d Cir. 2019) (quotations and citation omitted); *see also United States v. Marino*, 654 F.3d 310, 319 (2d Cir. 2011) ("caution[ing] against a rigid 'direct' causation standard that would foreclose restitution where even the slightest intervening event severs factually or temporally the link between defendant's crime and victim's loss.").[16] In order to determine whether "the harm alleged has a sufficiently close connection to the conduct," *Robers*, 572 U.S. at 645, the courts focus on whether that harm was "foreseeable" to the defendant. *Goodrich*, 12 F.4th at 229 (quoting *Robers*, 572 U.S. at 645).

---

[16] It is well settled in this Circuit that a victim's harm may have multiple proximate causes. *See, e.g.*, *Sosa v. Alvarez-Machin*, 542 U.S. 692, 704 (2004) ("[A] given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm."); *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("[I]t is common for injuries to have multiple proximate causes."); *accord United States v. Barbera*, 2023 WL 6095026, at *2 (S.D.N.Y. Sept. 18, 2023).

Again, this is not a close question, regardless of how the employees' funds came to be deferred. Once invested, both mandatory and elective accounts were effectively frozen for at least four years, enabling defendant Hwang to "use[] this money as part of the capital that Archegos had to carry out its manipulation." 12/19/24 Sentencing Tr. at 8; *see, e.g.*, Rothman Ex. V (sealed). Defendants were well aware of the employee money under their stewardship. They tracked it on a daily basis and utilized it, alongside Hwang's own capital, to fuel their unlawful trading. *See*, *e.g.*, Rothman Ex. P (Dkt. 410-12) (Archegos "Capital Base Table for March 18, 2021, as emailed to defendant Hwang that day, showing that the firm had $764 million in deferred employee compensation at its disposal). Moreover, as the district judge pointed out, given the size and scope of the market manipulation scheme, it was "inevitabl[e]" that the "inflated and false market" would collapse, *see* 11/20/24 Sentencing Tr. (Dkt. 349) at 30, injuring all of the deferred accounts equally.

The distinction that Hwang seeks to draw – between employees compelled to defer their compensation by him and those who deferred willingly, in hopes of a profit – has no basis in the MVRA or relevant caselaw. First, "[a]s a matter of plain meaning, a victim is a 'person harmed by a crime,'" and may include individuals who "willingly participated in it in the hope of obtaining a benefit" and "[e]ven if [the victims] engaged in the scheme voluntarily." *United States v. Rainford*, 110 F.4th 455, 483-84 (2d Cir. 2024); *see also Gushlak*, 728 F.3d at 187 (victims included voluntary investors in legitimate stocks who, unwittingly, had their investments diverted into illegitimate, manipulated stocks); *United States v. Perez*, No. 22-1547, 2023 WL 8800722, at *1 (2d Cir. Dec. 20, 2023) (summary order) (voluntary nature of investments was irrelevant where defendant *used* the funds to executive unauthorized trades as part of securities fraud scheme).

Second, it is well-settled that restitution under the MVRA may not be denied based on a victim's alleged negligence, contributory fault, failure to mitigate, or related tort concepts. *See,*

*e.g.*, *United States v. Thomas*, 377 F.3d 232, 241-42 (2d Cir. 2004) (collecting cases); *United States v. Holland*, 394 F. App'x 766, 768 (2d Cir. 2010) (summary order); *United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008); *United States v. Agnew*, 171 F. App'x 376, 397 (2d Cir. 2006) (summary order).

Third, even if a market manipulation victim had to prove that she was not in some way at fault for her own injury, there is no fault to be assigned here. As Hwang himself points out, most of the employee compensation that defendants lost through their market manipulation scheme was deferred (either through the mandatory plan or by election) well before the charged scheme was hatched in 2020. *See* Hwang Rest. Mem. at 6-7. Insofar as the record discloses, there was no reason for any Archegos employee to suspect, pre-COVID, that during the pandemic defendants would put their money to work manipulating the prices of VIAC and DISCA. And, thanks to the long vesting schedule under the Archegos deferred compensation plans (which applied to both mandatory and elective contributions), even if an Archegos employee became uneasy and wished to withdraw his money, there was no easy way (short of quitting his job) to do so.

In short, there is no principled distinction to be drawn, under the MVRA, between innocent Archegos employees who deferred 25% of their bonus because they had to, and innocent Archegos employees who deferred 50% or 60% of their bonus because they trusted the firm's promise that the value of their account "could not fall below what it was issued at." Trial Tr. at 693-94 (Jones). In both cases, once the money was locked in, defendants used it "in service of the offense of conviction," *United States v. Seabrook*, 968 F.3d 224, 235 n.6 (2d Cir. 2020), thereby both directly and proximately causing enormous financial harm.

Accordingly, I respectfully recommend that all otherwise eligible former Archegos employees be awarded restitution for the full amount of their lost deferred compensation - both

mandatory and elective - because those losses were directly and proximately caused by defendants' criminal conduct. *See* Appendix 2, "Recommended Restitution" column (recommending a total award of $32,996,491.58 in restitution, calculated by summing each employee's mandatory contributions, elective contributions, and attorneys' fees and expenses, minus any settlement payment); *see also* Part IV(D), *infra*. However, to the extent the district judge finds that evidence of coercion is required, I have also provided the necessary calculations in the "Restitution if Proof of Coercion Required" column in Appendix 2 (recommending a total award of $20,197,981.58 in restitution, calculated in the same manner as the "Recommended Restitution" column *except* that, as to employees who did *not* submit individualized proof of coercion (as discussed below), elective contributions and re-deferred 2016 bonuses are excluded).

### 2.    Whether the Government Has Established Coercion by a Preponderance of the Evidence

As explained above, I do not believe that individualized evidence of coercion is (or should be) required before the otherwise-eligible former Archegos employees can be compensated for their elective compensation deferrals or re-deferrals. However, I agree with defendants that *if* such evidence is required, the government cannot meet its burden as to all of the newly-named Proposed Victims by relying on the trial testimony and the victim statements submitted by the First Five.

No one testified at trial that any employee was coerced into making elective deferrals or re-deferring their 2016 bonus. The victim statements submitted by the First Five do address this issue, but often in terms that are both vague and subjective. For example, ██████ attests that it was "commonly known" that loyalty was prized at Archegos, and that, as a result, she "felt pressure from senior management" to "contribute the maximum amount to the 'Elective' Plan or risk being viewed by Defendant and other senior managers as disloyal." 12/5/24 ██████ Decl. ¶ 14. Other employees describe concrete examples of pressure but do not establish that their colleagues had

similar experiences. For example, ██████ states that on "at least one occasion" he was personally and directly "urged" to "change [his] election to the maximum," 12/5/24 ██████ Ltr. at 1, but offers only speculation that "other Archegos employees faced the same pressure." *Id*.

To be sure, all employees eligible for the elective plan were required to make their deferral decisions in November – before they learned what their bonus amount would be – which, in a corporate culture that prized loyalty, may well have had a coercive effect. *See* 12/5/24 ██████ Decl. ¶ 16 & Ex. B; 12/5/24 ██████ Ltr. at 1. However, company data shows that some employees eligible for the elective plan did in fact elect less than the maximum, *see* Rothman Ex. R (2020 firm-wide data), and Park clearly testified that his elective deferrals were "voluntary." Phase I Tr. at 67. I therefore cannot conclude that the "existing record" adequately establishes that *each* employee who made an elective deferral or re-deferral was coerced into doing so.

As for the newly-named Proposed Victims, only two of them – █████████████ ██████ – make any effort to address coercion, and only ██████ does so persuasively. ██████ victim statement – a letter from his lawyer – states in a single sentence that "senior employees like ██████ 'were pressured and induced to defer an additional 35% of their bonuses.'" 1/8/25 Bunch Ltr. (Rothman Ex. Y) (sealed) at 2. Not only is this statement conclusory and unsupported; it is a direct quotation (properly attributed) from the government's December 10, 2024 sentencing memorandum, which in turn relies on the December 5, 2024 ██████ Declaration, discussed above. *See* Dkt. 361 at 36. In short, rather than come forward with individualized evidence as to his own experience, ██████ has simply recycled "the existing record."

By way of contrast, ██████ has submitted her own letter, in which she details three related episodes of pressure tactics that she personally experienced, and attaches the underlying emails. *See* ██████ Ltr. (Rothman Ex. GG) (sealed). First, on November 25, 2019, ██████ (and others)

received an email from Pae, Archegos's co-President, informing her about the option to re-defer her 2016 bonus. *Id.* Three days later, on November 28, 2019, Pae added, in bold type, "**I think you should unless you need the money soon**." *Id*. The following day, after ███ informed Pae that she intended to withdraw her deferred compensation (████████████████████ ████████████), she received another email from Pae telling her that "everyone else" had chosen to re-defer, which "added significant pressure as [she] knew that given the company culture, non-compliance could result in ostracism." *Id*. Thereafter, during an in-person meeting, ███ was "strongly encouraged," by Pae, to borrow against her 401k instead of withdrawing her deferred bonus. *Id*. Ultimately, ███ yielded and re-deferred her 2016 bonus, which she lost when the firm collapsed in 2021, ████████████████. *Id*.[17] ███ has, in my view, convincingly established that she re-deferred her 2016 bonus as a result of coercion from Archegos's senior management.

### C.    Legal Fees

Five former Archegos employees (Burn, Huang, Kealy, Sullivan, and ███ seek restitution to cover their legal expenses, totaling $383,694.49. As to four of these employees (Burn, Huang, Kealy, and Sullivan), defendants do not object. In fact, they take the position that the amount of attorneys' fees to which these four former employees are entitled is "not currently at issue before this Court," since they were among the First Five, whose awards were approved on

---

[17] ████████████████████████████████████. ███ Ltr. at 2. According to Archegos's records, ███ lost a total of $263,750 in deferred compensation, including the $37,500 that she could have elected, in November 2019, to theoretically be withdrawn in January 2021. *See* App. 2.

December 19, 2024. *See* 5/19/25 Hwang Ltr. (Dkt. 420) at 3. I agree, and see no need to revisit the award of legal expenses for Burn, Huang, Kealy, and Sullivan.[18]

The fifth employee who now seeks reimbursement for his legal fees is ████████

████████████████████████████████████████████████████████████

████████████████████████. ████ now seeks $19,920.00 in attorneys' fees incurred in connection with the assistance he provided to the government in investigating and prosecuting this case. I have reviewed the legal invoices that ████ submitted to support his request, and find them reasonable. ████ should therefore be awarded restitution in the additional amount of $19,920.00 to reimburse him for the expenses. *See* Phase II GX 6-10 (████ invoices).

### D.    Computation of Restitution

As noted above, the government seeks a total of $31,544,430.03 in restitution for the 39 Proposed Victims listed on it final Schedule of Victims. *See* Phase II GX 1, Tab 1. It calculated this figure by summing each employee's total mandatory and elective deferred compensation contributions, plus any fees and expenses incurred by that employee in connection with the investigation and prosecution of this criminal proceeding, minus the amount of any settlement payment received from Archegos following its collapse. *See* Phase II GX 1, Tab 2; Phase II Tr. at 15.

---

[18] As noted above, ████ made a supplemental request for "an additional $5,000 in attorneys' fees," just before the Phase II hearing, in connection with his preparation of a supplemental declaration regarding coercion. *See* 5/15/25 Supp. ████ Decl. ¶ 2 n.1. The government has included the additional $5,000 in its restitution calculation, *see* Phase II GX 1, Tab 2, but I recommend that no award be made to ████ for this purpose. ████ is one of the First Five employees. His restitution claim was approved on December 19, 2024, including ████ in legal fees incurred through that date. *See* Dkt. 371-1. There was no reason for him to submit additional coercion evidence five months later. Moreover, his new declaration is duplicative of his original victim statement. *See* Rothman Ex. FF.

I recommend a net increase to the government's proposed restitution amount of approximately $1.45 million. *See* Appendix 2 ("Recommended Restitution" Column). First, for the reasons explained above, I recommend that Dave Park be *included* in the Court's final restitution orders. Based on the same methodology used by the government, Park's restitution award would be $1,585,230.89. *See* Phase II GX 1, Tab 3.[19]

Second, I recommend that ███████ be *excluded* from the final restitution orders. The government was required to collect any additional restitution requests from former Archegos employees by January 17, 2025, and to update its Schedule of Victims by January 21, 2025. Dkt. 379. However, ███ was first added to the Schedule of Victims on March 24, 2025, *see* Dkt. 403 Ex. A (sealed), without explanation. Moreover, there is no evidence in the record as to when (or indeed whether) ███ himself sought a restitution award.

Third, I recommend that ████ restitution award be *reduced* by the $5,000 that he claims for submitting his duplicative supplemental coercion declaration.

## V.        CONCLUSION

For the foregoing reasons, I respectfully recommend that defendants be ordered to pay $32,996,491.58 in restitution to a total of 39 former Archegos employees – including Park, but excluding ████ – in the amounts specified in the "Recommended Restitution" column of Appendix 2.

Alternatively, if the district judge disagrees with my conclusion that individualized proof of coercion is not properly a part of the proximate causation analysis under the MVRA, I

---

[19] Park asked for $1.65 million in lost mandatory and elective deferred compensation but neglected to deduct the ████ settlement that he received from Archegos.

recommend that the same 39 former employees be awarded a total of $20,197,981.58 in restitution,

divided as shown in the "Restitution if Proof of Coercion is Required" column of Appendix 2.

Dated:  New York, New York
       June 13, 2025

                                 _____
                                 **BARBARA MOSES**
                                 **United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

       The parties have 14 days from this date to file written objections to this Report and Recommendation pursuant to Fed. R. Crim. P. 59(b)(2). Any objections must be filed with the Clerk of the Court, addressed to the Hon. Alvin K. Hellerstein, and delivered to Judge Hellerstein in accordance with his individual practices. Any request for an extension of the deadline to file objections must also be directed to Judge Hellerstein. Failure to object in accordance with Rule 59(b)(2) "waives a party's right to review." Fed. R. Crim P. 59(b)(2); *see also United States v. Male Juv. (95-CR-1074)*, 121 F.3d 34, 38 (2d Cir. 1997) ("[F]ailure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object.").

**APPENDIX 1**

| Name | Individualized Claim/Evidence? | Elective Deferrals? | 2019 Re-Deferral? | Claims No Knowledge? | Claims Coercion? |
|---|---|:---:|:---:|:---:|:---:|
| **The First Five** | | | | | |
| Brendan Sullivan | Rothman Ex. U<br>Hwang Ex. V<br>1/21/25 Victim Sub. | ✓ | ✓ | ✓ | ✓ |
| Chris Burn | Rothman Ex. AA<br>Hwang Ex. T<br>1/21/25 Victim Sub. | ✓ | | ✓ | ✓ |
| Cindy Huang | Rothman Ex. V<br>Hwang Ex. U<br>1/21/25 Victim Sub. | ✓ | ✓ | ✓ | ✓ |
| Ryan Kealy | Rothman Ex. FF<br>1/21/25 Victim Sub.<br>5/15/25 Supp. Kealy Decl. | ✓ | | ✓ | ✓ |
| Sarah Gohmert | Rothman Ex. CC<br>1/21/25 Victim Sub. | | ✓ | ✓ | |
| **The Remaining Proposed Victims** | | | | | |
| ▆▆▆▆▆▆ | | | | | |
| ▆▆▆▆▆▆ | Rothman Ex. X<br>Hwang Ex. Y<br>1/21/25 Victim Sub. | ✓ | | | |
| ▆▆▆▆ | Rothman Exs. I-K, Y<br>Hwang Ex. X<br>1/21/25 Victim Sub. | ✓ | ✓ | ✓ | ✓ |
| ▆▆▆▆ | 1/21/25 Victim Sub. | | | | |
| ▆▆▆▆▆ | Rothman Ex. W<br>1/21/25 Victim Sub. | | ✓ | | |
| ▆▆▆ | | | | | |
| ▆▆▆▆ | 1/21/25 Victim Sub. | | ✓ | | |
| ▆▆▆ | Rothman Ex. X<br>Hwang Ex. Y<br>1/21/25 Victim Sub. | ✓ | ✓ | | |
| ▆▆▆ | 1/21/25 Victim Sub.<br>Phase I Testimony | ✓ | ✓ | ✓ | |
| ▆▆▆▆▆ | Rothman Ex. DD<br>1/21/25 Victim Sub. | | | | |
| ▆▆▆ | 1/21/25 Victim Sub. | | | | |
| ▆▆▆ | Rothman Ex. EE<br>1/21/25 Victim Sub.<br>Phase II GX 6-10 | | | | |
| ▆▆▆ | | | | | |
| ▆▆▆▆ | | | ✓ | | |
| ▆▆▆▆ | 1/21/25 Victim Sub.<br>Phase I Testimony | ✓ | ✓ | ✓ | |
| ▆▆▆ | | | | | |
| ▆▆▆ | Rothman Ex. BB<br>1/21/25 Victim Sub. | | | | |
| ▆▆▆ | 1/21/25 Victim Sub. | | | | |

**APPENDIX 1**

| Name | Individualized Claim/Evidence? | Elective Deferrals? | 2019 Re-Deferral? | Claims No Knowledge? | Claims Coercion? |
|---|---|---|---|---|---|
| ████████ | | | | | |
| | Rothman Ex. DD<br>1/21/25 Victim Sub. | ✓ | ✓ | | |
| ████████ | 1/21/25 Victim Sub. | | | | |
| | Rothman Ex. X<br>Hwang Ex. Y<br>1/21/25 Victim Sub. | ✓ | ✓ | | |
| ████████ | 1/21/25 Victim Sub. | ✓ | | | |
| | Rothman Ex. Z<br>1/21/25 Victim Sub. | | ✓ | | |
| | Rothman Ex. GG<br>Hwang Ex. Z<br>1/21/25 Victim Sub. | | ✓ | ✓ | ✓ |
| ████ | 1/21/25 Victim Sub. | | ✓ | | |
| ████████ | | | | | |
| | Rothman Ex. W<br>1/21/25 Victim Sub. | | | | |
| ████████ | | | | | |
| | Rothman Ex. W<br>1/21/25 Victim Sub. | | | | |
| ████████ | 1/21/25 Victim Sub. | | | | |
| ████████ | | | | | |
| | 1/21/25 Victim Sub. | | | | |
| ████████ | | | ✓ | | |
| **Dave Park** | | | | | |
| Dave Park | 1/21/25 Victim Sub.<br>1/24/25 Park Obj.<br>4/18/25 Park Sub.<br>Phase I Testimony | ✓ | | ✓ | |

---

\* Added to the government's Schedule of Victims on March 14, 2025.

**APPENDIX 2**

| Victim Name | Mandatory Contributions | Elective Contributions | Re-deferred 2016 Bonus | Attys' Fees & Expenses | Settlement Payments | Recommended Restitution[1] | Restitution if Proof of Coercion Required[2] |
|---|---|---|---|---|---|---|---|
| **The First Five** | | | | | | | |
| Brendan Sullivan | $ 2,047,500.00 | $ 1,722,500.00 | $ 247,500.00 | $ 273,774.49 | $0.00 | $ 4,043,774.49 | $ 4,043,774.49 |
| Chris Burn | 443,750.00 | 481,250.00 | 0.00 | 10,000.00 | 0.00 | 935,000.00 | 935,000.00 |
| Cindy Huang | 1,017,500.00 | 860,000.00 | 123,750.00 | 35,000.00 | 0.00 | 1,912,500.00 | 1,912,500.00 |
| Ryan Kealy | 750,000.00 | 875,000.00 | 0.00 | 45,000.00 | 0.00 | 1,670,000.00 | 1,670,000.00 |
| Sarah Gohmert | 22,206.00 | 0.00 | 656.00 | 0.00 | 0.00 | 22,206.00 | 22,206.00 |
| **The Remaining Proposed Victims** | | | | | | | |
| ██████ | $ 4,925.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ ████ | $ 3,925.00 | $ 3,925.00 |
| ██████ | 525,000.00 | 150,000.00 | 0.00 | 0.00 | ████ | 625,539.95 | 475,539.95 |
| ██████ | 3,955,000.00 | 3,410,000.00 | 480,000.00 | 0.00 | ████ | 6,630,160.50 | 2,740,160.50 |
| ██████ | 221,250.00 | 0.00 | 0.00 | 0.00 | ████ | 200,406.12 | 200,406.12 |
| ██████ | 109,125.00 | 0.00 | 7,875.00 | 0.00 | ██ | 109,125.00 | 101,250.00 |
| ██████ | 328,125.00 | 0.00 | 0.00 | 0.00 | ██ | 328,125.00 | 328,125.00 |
| ██████ | 353,765.00 | 0.00 | 41,265.00 | 0.00 | ████ | 274,341.21 | 233,076.21 |
| ██████ | 2,808,750.00 | 2,406,250.00 | 300,000.00 | 0.00 | ████ | 4,700,531.91 | 1,994,281.91 |
| ██████ | 2,327,500.00 | 2,016,000.00 | 247,500.00 | 0.00 | ████ | 3,843,843.03 | 1,580,343.03 |
| ██████ | 212,500.00 | 0.00 | 0.00 | 0.00 | ████ | 192,480.46 | 192,480.46 |
| ██████ | 9,375.00 | 0.00 | 0.00 | 0.00 | ██ | 9,375.00 | 9,375.00 |
| ██████ | 41,312.50 | 0.00 | 0.00 | 19,920.00 | ████ | 57,340.42 | 57,340.42 |
| ██████ | 30,000.00 | 0.00 | 0.00 | 0.00 | ████ | 27,173.71 | 27,173.71 |
| ██████ | 153,500.00 | 0.00 | 9,750.00 | 0.00 | ████ | 124,044.05 | 114,294.05 |
| ██████ | 1,596,250.00 | 1,341,250.00 | 195,000.00 | 0.00 | ████ | 2,579,763.21 | 1,043,513.21 |
| ██████ | 83,125.00 | 0.00 | 0.00 | 0.00 | ████ | 75,293.83 | 75,293.83 |
| ██████ | 93,750.00 | 0.00 | 0.00 | 0.00 | ████ | 84,917.85 | 84,917.85 |
| ██████ | 6,461.02 | 0.00 | 0.00 | 0.00 | ████ | 5,461.02 | 5,461.02 |
| ██████ | 5,037.00 | 0.00 | 0.00 | 0.00 | ████ | 4,037.00 | 4,037.00 |

[1] Calculated by summing the employee's mandatory contributions, elective contributions, and attorneys' fees and expenses, minus any settlement payment.

[2] Calculated in the same manner as the "Recommended Restitution" column *except* that, as to employees who did *not* submit individualized proof of coercion, elective contributions and re-deferred 2016 bonuses are excluded.

| Victim Name | Mandatory Contributions | Elective Contributions | Re-deferred 2016 Bonus | Attys' Fees & Expenses | Settlement Payments | Recommended Restitution[1] | Restitution if Proof of Coercion Required[2] |
|---|---|---|---|---|---|---|---|
| ▮ | $ 605,000.00 | $ 475,000.00 | $ 90,000.00 | $ 0.00 | $ ▮ | $ 933,945.05 | $ 368,945.05 |
| ▮ | 22,900.00 | 0.00 | 0.00 | 0.00 | ▮ | 20,742.60 | 20,742.60 |
| ▮ | 451,250.00 | 329,750.00 | 75,000.00 | 0.00 | ▮ | 665,558.09 | 260,808.09 |
| ▮ | 164,219.00 | 169,750.00 | 0.00 | 0.00 | ▮ | 318,498.02 | 148,748.02 |
| ▮ | 168,245.00 | 0.00 | 10,620.00 | 0.00 | ▮ | 138,113.27 | 127,493.27 |
| ▮ | 263,750.00 | 0.00 | 37,500.00 | 0.00 | ▮ | 263,750.00 | 263,750.00 |
| ▮ | 166,000.00 | 0.00 | 36,000.00 | 0.00 | ▮ | 117,745.55 | 81,745.55 |
| ▮ | 14,250.00 | 0.00 | 0.00 | 0.00 | ▮ | 12,907.51 | 12,907.51 |
| ▮ [3] | 141,500.00 | 0.00 | 0.00 | 0.00 | ▮ | 00.00 | 00.00 |
| ▮ | 157,486.00 | 0.00 | 0.00 | 0.00 | ▮ | 142,649.33 | 142,649.33 |
| ▮ | 66,663.00 | 0.00 | 0.00 | 0.00 | ▮ | 66,663.00 | 66,663.00 |
| ▮ | 3,900.00 | 0.00 | 0.00 | 0.00 | ▮ | 2,900.00 | 2,900.00 |
| ▮ | 11,739.00 | 0.00 | 0.00 | 0.00 | ▮ | 10,633.07 | 10,633.07 |
| ▮ | 310,437.50 | 0.00 | 45,000.00 | 0.00 | ▮ | 237,047.84 | 192,047.84 |
| **Dave Park** | | | | | | | |
| Dave Park | $ 687,500.00 | $ 962,500.00 | $ 0.00 | $ 0.00 | $ ▮ | $ 1,585,230.89 | $ 622,730.89 |
| **Totals** | | | | | | | |
| | $ 20,403,446.02 | $ 15,199,250.00 | $ 1,947,416.00 | $ 383,694.49 | $ ▮ | $ 32,996,491.58 | $ 20,197,981.58 |

[3] Added to the government's Schedule of Victims on March 14, 2025.