

**MARY E. MULLIGAN**
mmulligan@fklaw.com
212.833.1123

December 2, 2025

**VIA ECF**

Hon. Alvin K. Hellerstein
United States District Judge
Daniel Patrick Moynihan
  United States Courthouse
500 Pearl St.
New York, NY 10007-1312

        Re:    <u>*United States v. Hwang, Halligan*, No. 22-cr-240-AKH</u>

Dear Judge Hellerstein:

      On behalf of this firm's client Patrick Halligan, we respectfully move to vacate the restitution order and final judgment of conviction entered against Mr. Halligan (ECF Nos. 435 & 463, the "**Orders**"), so that they may be reconsidered by another District Judge. We make this motion pursuant to Fed. R. Crim. P. 33, 28 U.S.C. § 455, and the interests of justice, because we recently learned that the Court's former law clerk, who assisted the Court during the unusually complicated and protracted restitution proceedings, had accepted an offer of employment and associated substantial compensation – including, we presume, a clerkship bonus – from the law firm that represented an alleged victim with a substantial and direct financial interest in the outcome of those proceedings.

      These circumstances create, at a minimum, a reasonable appearance of bias or impartiality on the part of the law clerk, which the law requires must be imputed to the Court, and which undermines both Mr. Halligan's due process right to an impartial tribunal and the public's confidence in the fair administration of justice. The necessary remedy is vacatur of the Orders and referral to another District Judge to reconsider restitution *de novo*.

      Critically, this remedy is required based on the <u>objective</u> appearance of partiality arising from the law clerk's participation in the restitution proceedings in this case after they had committed to future employment with the law firm that was seeking over $700 million in restitution for its client in this case. This remedy is required regardless of whether any decision by the Court or the Court's former clerk was actually influenced by partiality towards the clerk's future employer, regardless of whether the Court's decisions were legally or factually correct, and even regardless of whether the Court was aware of the clerk's employment connection with one of the participants in the restitution proceedings, because the restitution proceedings fell short of the "guiding consideration" "that the administration

Hon. Alvin K. Hellerstein - 2 - December 2, 2025

of justice should reasonably appear to be disinterested as well as be so in fact." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869-70 (1988) (cleaned up).[1]

## I. Relevant Procedural Background

The jury returned a guilty verdict against Mr. Halligan on July 10, 2024. Sentencing was conducted over a series of proceedings beginning in November 2024, and concluding with entry of the judgment of conviction against Mr. Halligan in August 2025.

The restitution component of the sentencing proceedings was particularly complex. During Mr. Halligan's initial sentencing proceeding, the Court remarked that "[t]his is not the usual restitution situation." (*See* Tr. Jan. 27, 2025 Hrg. at 58:4.) Eight major banks and over 40 former Archegos employees claimed losses of over $9 billion. (*See* ECF No. 373-1.)

As to the banks in particular, the Court explained that "[i]f they want to have a claim for restitution, *they have got to participate and show their claim*." (Tr. Dec. 18, 2025 Hrg. at 87:13-15 (emphasis added).) Morgan Stanley[2] was one of the banks that chose to participate in the restitution proceedings. (*See* ECF No. 365-5.) During those proceedings, Morgan Stanley – through its counsel Davis Polk & Wardwell LLP ("**Davis Polk**") – submitted at least two claimant statements to the government, which the government in turn filed with the Court. (*See* ECF Nos. 351-6 & 365-5, attached hereto as **Exhibits D & E**.) It claimed that its losses arising from its relationship with Archegos were over $860 million. (*See* ECF No. 351-6.)

During the sentencing proceedings, the defense (both Mr. Halligan and Mr. Hwang) raised multiple objections to the banks' restitution claims. They rejected, among other things, the banks' contention that they were "victims" under the Mandatory Victims Restitution Act (18 U.S.C. § 3663A, the "**MVRA**"). A "victim" under the MVRA is a person or entity whose losses were foreseeable to the defendant and directly and proximately caused by the defendant's conduct." *See, e.g.*, *United States v. Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013) (emphasis omitted); 18 U.S.C. § 3663A(a)(2); *United States v. Goodrich*, 12 F.4th 219, 232 (2d Cir. 2021) (vacating restitution order where the record lacked sufficient evidence to establish that the defendant "knew of, or could have reasonably foreseen, that his participation in the public market scheme would result in the harm to private placement purchasers"). Mr. Halligan argued that the banks' losses were not foreseeable to him, nor were they directly and proximately caused by his conduct. (*See* Tr. Jan. 27, 2025 Hrg. at 21-22.)

---

[1] Mr. Halligan will be filing his opening appellate brief in the Second Circuit on December 11, 2025. As discussed further below, the posture of this case is therefore unusual, and we make this application in an abundance of caution and to ensure that the legal issues addressed here are preserved for appeal.

[2] "**Morgan Stanley**" refers collectively to Morgan Stanley & Co. LLC, Morgan Stanley Capital Services LLC, and Morgan Stanley & Co. International plc. (*See* ECF No. 365-5.)

Hon. Alvin K. Hellerstein        - 3 -        December 2, 2025

      The defense also argued that the banks' bare bones submissions were insufficient to support their claimed entitlement to restitution. Morgan Stanley's December 10, 2024 submission exemplifies this deficiency. (*See* ECF No. 365-5.) The letter was submitted by Morgan Stanley's counsel at Davis Polk, includes no sworn statements by any Morgan Stanley employee, and largely recites conclusory amounts (most in the hundreds of millions of dollars, if not billions). (*Id.*)[3]

      Over the defense's objections, the Court found that the banks were entitled to restitution under the MVRA, and that the total amount of their losses was $9,376,525,023.18. (*See* ECF Nos. 373-1 & 445.) The Court determined that Morgan Stanley's losses were $740,436,946.00. (*See* ECF No. 373-1.)

      During Mr. Halligan's sentencing proceedings, counsel for the government and the defendant reached agreement on a joint restitution proposal as to Mr. Halligan. (*See* ECF No. 384-2, attached hereto as **Exhibit F**.) As expressly permitted by the MVRA, that proposal took into account Mr. Halligan's "level of contribution to the victim's loss and economic circumstances." (*Id.*; *see also* 18 U.S.C. § 3664(h) (court "may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant"); 18 U.S.C. § 3664(f)(2) (restitution order and payment schedule must take into account "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the defendant; and any financial obligations of the defendant; including obligations to dependents"). The parties thus jointly proposed that the Court enter a restitution order against Mr. Halligan in the amount of $2,085,000. (*See* Exhibit F hereto; see also Tr. Jan. 27, 2025 Hrg. at 51-58.)

      The Court fully rejected the parties' joint proposal for a restitution order commensurate with Mr. Halligan's resources and relative role, and instead imposed upon Mr. Halligan a restitution obligation of $3,136,507,171.59, or one-third of the total amount of restitution ordered to all of the individuals and entities that the Court determined to be "victims" as defined by the MVRA. (*See* ECF No. 445, at 5-6.)

      On July 29, 2025, the Court entered the order of restitution against Mr. Halligan. (See ECF No. 453.) On August 26, 2025, the Court entered the judgment of conviction against Mr. Halligan, also incorporating the more-than-$3-billion restitution amount. (*See* ECF No. 463 at 6.)

---

[3] Morgan Stanley's November 14, 2024 submission (also made through its counsel at Davis Polk) included a declaration from a bank employee that appended two spreadsheets of "positions liquidated in connection with Morgan Stanley's notice of default for [Archegos]," but did not include various other amounts that Davis Polk recited in its December 10, 2024 submission. (*Compare* ECF No. 351-6 (Nov. 14, 2024 Letter) *with* ECF No. 365-5 (Dec. 10, 2024 Letter).) The amounts provided by Davis Polk in the December 10, 2024 submission were the basis for the final restitution calculation. (*Compare* ECF No. 373-1 *with* ECF No. 365-5.)

Hon. Alvin K. Hellerstein              - 4 -              December 2, 2025

On October 16, 2025, defense counsel received a letter addressed to Your Honor, with copies to all counsel, from Davis Polk's Managing Attorney and Litigation Counsel to Your Honor. A copy of this letter attached hereto as **Exhibit A**. This letter advised that the Court's former law clerk would be joining Davis Polk as an associate on October 20, 2025; that the former law clerk "participated in your chambers' work on the Screened Matter" during their clerkship, which ran from September 2024 through October 2025 (i.e., the full duration of Mr. Halligan's sentencing proceedings); and would be screened from any work in connection with Davis Polk's representation of Morgan Stanley in this matter. (Ex. A.)

We have asked Davis Polk's Managing Attorney for additional information about the timing of the former clerk's offer of employment, acceptance of that offer, compensation, and other matters that could aggravate our concerns that these circumstances have infringed Mr. Halligan's right to an impartial tribunal and also contributed to the appearance of a conflict of interest or an actual conflict. We reserve the right to update this motion with any additional information that we learn through Davis Polk's response to our inquiries.[4]

     II.      **Mr. Halligan's Restitution Proceedings Were Tainted By the Appearance of Conflict**

The guiding principles are straightforward, and they compel the conclusion that Mr. Halligan's restitution proceedings were tainted by the appearance of conflict and the Orders therefore must be vacated.

     **A. Relevant Law**

Mr. Halligan's due process right to an "impartial and disinterested tribunal" is so fundamental it requires little elaboration. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). "The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. At the same time, it preserves both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done." *Id.* (cleaned up).

To protect litigants' due process rights, and at the same time "promote public confidence in the integrity of the judicial process," Congress enacted the judicial disqualification statute, 28 U.S.C. § 455. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). This statute mandates that a judge "***shall*** disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This is an objective standard "based on what a reasonable person knowing all the facts would conclude," and does *not* require a showing of "actual partiality." *Litovich v. Bank of Am. Corp.*, 106 F.4th 218, 224 (2d Cir. 2024) (cleaned up). Indeed, this standard requires judicial recusal even where the judge himself or herself lacked actual knowledge of the facts that

---

[4] A copy of our correspondence with Davis Polk is attached hereto as **Exhibit B**.

Hon. Alvin K. Hellerstein - 5 - December 2, 2025

create the appearance of impropriety, "so long as the public might reasonably believe that he or she knew." *Id.* (same).

Applying these principles, "it is universally accepted that the court must be disqualified where its law clerk continued to participate in a case in which his future employer represented one of the parties." *McCulloch v. Hartford Life & Acc. Ins. Co.*, No. 3:01CV1115(AHN), 2005 WL 3144656, at *5 (D. Conn. Nov. 23, 2005) (citing authorities).[5] As the Eleventh Circuit explained in *Hunt v. American Bank & Trust Company of Baton Rouge, Louisiana.*, "[i]t is true that a reasonable person might wonder about a law clerk's impartiality in cases in which his future employer is serving as counsel. **Clerks should not work on such cases** . . . ." 783 F.2d 1011, 1015 (11th Cir. 1986); *see also Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416–17 (9th Cir. 1995) ("a reasonable person might be concerned whether a law clerk's advice to a judge would be biased in favor of the position taken by a firm, if the law clerk had worked there before his clerkship, was on a leave of absence, and planned to work there after his clerkship"); *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015) ("If a law clerk continues to work on the case in which his or her impartiality might reasonably be questioned, however, the clerk's actual or potential conflict may be imputed to the judge.").

The Committee on Codes of Conduct of the Judicial Conference of the United States has issued a formal advisory opinion addressing "ethical issues that may arise in connection with a law clerk or staff attorney's pursuit of future employment."[6] This opinion concludes that:

> A judge should implement appropriate procedures when it is contemplated that a law clerk may accept employment with a lawyer, law firm or other private employer that is participating in a pending case. The Committee advises that such a circumstance does not in itself mandate disqualification of the judge. **The law clerk, however, should have no involvement whatsoever in pending matters handled by the prospective employer.** The Committee believes that the need to exclude the

---

[5] The court in *McCulloch* cited *Hall v. Small Business Administration*, where the Fifth Circuit held that disqualification was required where a law clerk continued to work on a case in which her future employers were counsel for plaintiffs, 695 F.2d 175 (5th Cir.1983); and *Miller Industries Inc. v. Caterpillar Tractor Co.*, where a district court held that disqualification was required where a law clerk was actively involved in a case for eight months after he accepted employment with the firm that represented one of the parties, 516 F. Supp. 84 (S.D. Ala. 1980).

[6] *Committee on Codes of Conduct Advisory Opinion No. 74: Pursuit of Future Employment by Law Clerks and Staff Attorneys*, available at https://www.uscourts.gov/administration-policies/judiciary-policies/ethics-policies/published-advisory-opinions ("**Conduct Opinion No. 74**").

> law clerk from pending matters handled by the prospective employer arises whenever an offer of employment has been extended to the law clerk and either has been, or may be, accepted by the law clerk; the formalities are not crucial.

(Emphasis added.)

Similarly, the Federal Judicial Center's guidance for federal judicial law clerks explains that:

> a job search may create new conflicts of interest. . . . Once you have accepted an offer, however, the ethics rules take the decision out of your judge's hands. **You may not work on any pending or future cases involving your future employer**.[7]

(Emphasis added.)

Judge Vyskocil's recent application of these principles in *United States v. Hernandez* underscores the U.S. Supreme Court's admonition that 28 U.S.C. § 455(a) must be interpreted to "'promote confidence in the judiciary by avoiding even the *appearance* of impropriety whenever possible.'" No. 1:23-CR-110 (MKV), 2025 WL 2461062 (S.D.N.Y. Aug. 26, 2025) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988). In *Hernandez*, the court discovered – after sentencing had concluded and the defendant had appealed – that her financial advisor had made several trades in the securities of a company that had been awarded restitution against the defendant. *Id.* at *1. The trades were made without the court's knowledge or authorization in the total amount of just over $1,000, and the court instructed her financial advisor to void the trades as soon as she became aware that they had been placed. *Id.* at *2. Nonetheless, and notwithstanding that the Court was "firmly of the view that [its] impartiality cannot be questioned," that it had followed appropriate procedures to divest the securities as soon as it learned of the trades, and that it made no substantive decisions during the nine-day period between the purchase and cancelation, the court recused itself from the matter. *Id.* at *3-4. In reaching this decision, the court observed that it was "concerned that the confidence in the fair administration of justice not be undermined," and that the judicial recusal statute "is not about the reality, but any possible appearance of impartiality." *Id.* at *4.

---

[7] Federal Judicial Center, *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* (Rev. 4th Ed. 2019), at 25-26, *available at* https://www.fjc.gov/sites/default/files/materials/24/Maintaining_the_Public_Trust_Revised_4th_Edition_2019.pdf.

Hon. Alvin K. Hellerstein - 7 - December 2, 2025

**B. The Court's Former Law Clerk Should Have Been Recused From Any Work on Restitution Matters in this Case, and the Failure to Recuse Violated 28 U.S.C. § 455**

This Court's former law clerk's work on restitution proceedings in which their future employer was a participant created, at a minimum, a reasonable impression of partiality on the part of the Court's Chambers. It is, in fact, exactly the situation that courts have found requires a law clerk's recusal and, if recusal is not timely implemented, judicial disqualification. *See, e.g.*, *McCulloch*, 2005 WL 3144656, at *5 ("it is universally accepted that the court must be disqualified where its law clerk continued to participate in a case in which his future employer represented one of the parties").

Any reasonable person could plausibly question the law clerk's impartiality in these circumstances. They assisted the Court with restitution proceedings in which their future employer's client, Morgan Stanley, had a tremendous financial stake in the outcome, as it sought (and received) a restitution award of *over $700 million*. And the law clerk's past and future employer itself had a significant professional stake in the outcome. Morgan Stanley is not merely an important institutional client of Davis Polk,[8] but the relationship between Morgan Stanley and Davis Polk (including their respective predecessor firms) appears to trace back at least *a century*.[9]

The financial component of the clerk's employment connection to Davis Polk gives rise to credible, objective doubts about their ability to remain impartial. Among other things, the law clerk stood to achieve significant compensation through their permanent employment with the firm. Based on Davis Polk's published career resources, this compensation presumably includes a financial bonus for their clerkship with Your Honor.[10]

---

[8] Davis Polk's website touts its successful representation of Morgan Stanley in many significant matters. Defense counsel's search of the Davis Polk website for the term "Morgan Stanley" returned 144 hits, including a 2024 description of the firm's representation of Morgan Stanley in twelve years of litigation arising from the financial crisis. *See* search results at https://www.davispolk.com/search?general_site_search_en[query]=morgan%20stanley and *Victory for Morgan Stanley on the eve of trial in longstanding RMBS case* (August 30, 2024), *available at* https://www.davispolk.com/experience/victory-morgan-stanley-eve-trial-longstanding-rmbs-case.

[9] *See* THE NEW YORK TIMES, *John W. Davis Head Of His Law Firm; Stetson, Jennings & Russell Is Now Davis, Polk, Wardwell, Gardiner & Reed* (Jan. 17, 1925), *available at* https://www.nytimes.com/1925/01/17/archives/john-w-davis-head-of-his-law-firm-stetson-jennings-russell-is-now.html ("The firm has handled legal business for J. P. Morgan & Co. and for many corporations, including numerous railroads, and has figured in celebrated litigations over a long period.").

[10] *See* https://www.davispolk.com/careers/laterals-clerks ("Individuals who join the firm directly after completing a judicial clerkship for a U.S. federal or state court or a Canadian

Hon. Alvin K. Hellerstein — - 8 - — December 2, 2025

In these circumstances, 28 U.S.C. § 455(a) required recusal regardless of the precise nature of the work that the law clerk performed in Chambers, because the appearance of partiality arises from the relationship itself – regardless of whether the law clerk was *actually* partial towards their future employer and future employer's client. As Judge Vyskocil recently explained, the essential demand of this situation is that "confidence in the fair administration of justice not be undermined." *Hernandez*, 2025 WL 2461062, at *3-4.

This said, it is readily apparent that the law clerk did indeed work on restitution matters. The transcript of Mr. Halligan's January 2025 sentencing proceeding reflects that the clerk conferred with the Court regarding the amount of restitution determined in favor of the banks, *see* Tr. Jan. 27, 2025 at 50:24-25, and at one point, the law clerk emailed all counsel to request a copy of certain exhibits to a proposed restitution order.[11] Accordingly, our inquiry to Davis Polk seeks additional information about the nature of the work that the clerk performed, as well as any communications with Davis Polk regarding restitution matters in this case, and the information that we learn could provide additional bases for disqualification under specific grounds set forth in 28 U.S.C. § 455(b), including actual bias, personal knowledge of relevant facts, or an interest that could be affected by the outcome of the restitution proceedings.

While the appearance of conflict might have been addressed with disclosure and screening at the outset of the clerkship, the failure to take these measures created the impermissible situation in which the law clerk had a role in proceedings "matters handled by [their] prospective employer," in violation of Conduct Opinion No. 74. This was plainly improper, and violated Mr. Halligan's right to an impartial tribunal capable of ensuring "both the appearance and reality of fairness" and promoting public trust in the guarantee "that justice has been done." *Marshall*, 446 U.S. at 242.

---

court will be eligible to receive a bonus for a one- or two-year clerkship or two one-year clerkships."). Our follow-up inquiry to Davis Polk seeks additional details and confirmation of the financial arrangements between the clerk and the firm. *See* Ex. B.

[11] *See* **Exhibit C** hereto. To be sure, litigation over restitution issues involved a host of disputed legal and factual issues that, consistent with general customs in the professional field, the Court's law clerk may have helped the Court research or consider. *See* Federal Judicial Center, LAW CLERK HANDBOOK (4th Ed. 2020) at § 1.1 ("In most chambers, law clerks concentrate on legal research and writing. Typically, a law clerk's broad duties include conducting legal research, preparing bench memos, drafting orders and opinions, editing and proofreading the judge's orders and opinions, and verifying citations. Many judges discuss pending cases with their law clerks and confer with them about decisions."), *available at* https://www.cafc.uscourts.gov/wp-content/uploads/HR/Forms/Law_Clerk_Handbook_Fourth_Edition-1.pdf.

Hon. Alvin K. Hellerstein	- 9 -	December 2, 2025

### C. Vacatur of the Orders is Required So That They May Be Reconsidered By Another Tribunal Without the Appearance of Partiality

This is, defense counsel is aware, an unusual situation insofar as the conflict was disclosed to the defense only after judgment was entered and appeals were taken. Nonetheless, FED. R. CRIM. P. 33 provides the remedy, which that the Orders be vacated in the interests of justice and the matter remanded to a different judge for restitution proceedings.[12]

FED. R. CRIM. P. 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A restitution order is a judgment. 18 U.S.C. § 3664(o) ("A sentence that imposes an order of restitution is a final judgment . . ."). This Court therefore may vacate the Orders in the interests of justice on the basis that the restitution proceedings, and thus the Orders, were tainted by the appearance of conflict. *See United States v. Nixon*, 480 F. Supp. 3d 859, 862 (C.D. Ill. 2020) (after conclusion of defendant's direct appeals, granting motion for new trial and vacating defendant's conviction and sentence pursuant to FED. R. CRIM. P. 33 where original trial judge should have been recused under 28 U.S.C. § 455(a)).

While *Liljeberg* was a civil case in which vacatur of a judgment was sought under FED. R. CIV. P. 60(b), it is instructive here. 486 U.S. at 864. There, the U.S. Supreme Court held that the trial court's violation of 28 U.S.C. § 455(a) (i.e., failure to recuse in a situation where an "objective observer would have questioned [the trial judge's] impartiality) could require vacatur in light of "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 863.

Those same concerns compel vacatur of the Orders here. The risk of injustice to Mr. Halligan is extreme: while the government and the defense agreed to a joint restitution proposal that, pursuant to the appropriate statutory considerations, would have imposed in a $2,085,000 restitution obligation on Mr. Halligan, the Court decided to reject that proposal and instead burden Mr. Halligan with a crippling obligation of *over $3 billion*, largely in favor of major banks like Morgan Stanley. Given the crushing economic consequences of the Court's restitution decisions to Mr. Halligan and his family, it would be devastatingly unfair if any improper consideration contributed to this result. The risk of injustice in other cases is also acute. Law clerks play an important role in many, if not most, of the cases adjudicated in the federal system, and enforcing the rules and standards that require them to perform their

---

[12] Because Mr. Halligan has noticed his appeal of the judgment of conviction, this Court may first issue an indicative ruling that it would grant the motion, and Mr. Halligan would then request that the Court of Appeals remand the case for further proceedings in order to facilitate the final entry of the relief sought herein. *See* FED. R. APP. P. 12.1 ("Remand After an Indicative Ruling by the District Court on a Motion for Relief That Is Barred by a Pending Appeal").

work free of conflicts – and free of the appearance of conflicts – is critical to the promoting fairness in all litigation. Finally, declining to enforce those rules would also impair the public's trust in the judicial process. As the Supreme Court has repeatedly reminded, "justice must satisfy the appearance of justice,"[13] and that demand is undermined if the public cannot trust that the judiciary and its staff will decide cases based on their impartial consideration of the facts and the law, not professional allegiances to the litigants or their counsel.

### III. Conclusion

For the foregoing reasons, and the reasons set forth in Mr. Hwang's letter motion based on these same circumstances, we respectfully request that the Court vacate the restitution order and judgment of conviction entered against Mr. Halligan, and request that this matter be reassigned to another District Judge for *de novo* reconsideration of restitution matters.

As discussed above, *see* n.12, we respectfully submit that the appropriate mechanism for this relief at this posture is an indicative ruling from this Court pursuant to FED. R. APP. P. 12.1, which Mr. Halligan will then present to the Court of Appeals along with his request that that the Circuit Court remand to this Court for the entry of a final ruling by this Court and then *de novo* restitution proceedings before another District Judge. *See* FED. R. APP. P. 12.1.

Finally, while we respectfully submit that the present record compels the relief sought herein, we request the opportunity to take discovery and further develop the record as to any issues that the Court determines require factual determinations, including without limitation the nature and extent of the law clerk's work on restitution matters in this case. We also reserve the right to supplement this motion based on any additional information that we learn regarding these matters, including any information that requires disqualification under specific grounds set forth in 28 U.S.C. § 455(b), including actual bias, personal knowledge of relevant facts, or an interest that could be affected by the outcome of the restitution proceedings.

Respectfully submitted,

*Mary Mulligan*

Mary E. Mulligan

cc: All Counsel (by ECF)

Attachments (Exhibits A-F)

---

[13] *Liljeberg*, 486 U.S. at 864 (quoting *In re Murchison,* 349 U.S. 133, 136 (1955)).